**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHARLOTTE CHAPMAN BYRD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | |
| | § | **CIVIL ACTION NO. 3:24-cv-2767-N** |
| **PRIMORIS SERVICES CORPORATION,** | § | |
| **PLH GROUP INC., POWER LINE** | § | **JURY TRIAL DEMANDED** |
| **SERVICES, INC. and FUTURE** | § | |
| **INFRASTRUCTURE, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

# PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Charlotte Chapman Byrd submits this Brief in Response to Defendant's Motion for Summary Judgment (ECF # 39) and Corrected Summary Judgment Brief (#40-1), and respectfully requests that the Court deny Defendant's motion in its entirety.

Respectfully submitted,

**TREMAIN ARTAZA PLLC**

*/s/ Christine A. Hopkins*
Christine A. Hopkins
Texas State Bar No. 24095786
christine@tremainartaza.com
Carmen Artaza
Texas Bar No. 24055114
carmen@tremainartaza.com
6060 North Central Expwy, Ste. 567
Dallas, TX 75206
T (469) 573-0297
F (214) 254-4941

*Attorneys for Plaintiff Charlotte Chapman Byrd*

## TABLE OF CONTENTS

**I. Introduction**……………………………………………………………………………….1

**II. AI Disclosure**…………………………………………………………………………….3

**III. Summary of Argument**…………………………………………………………….…….3

**III. Response to Defendant's Statement of Material Fact**…………………………………….9

A. Primoris Acquires PLH Group & $1.3 Billion in Revenue………………………………….9

B. A Black Recruiting Director Brings Byrd on Board as a PLH HR Manager………..........9

C. Campbell Ignores Byrd's Complaint about a Racist Leader in Florida.………………..….10

D. PLS Undergoes a Normal Merger into PTD……………………………………………11

E. A March 31, 2023 HR Re-Alignment Does Not Cause the Layoff of HR Managers……...12

F. Byrd Takes on Added Responsibility for PDS & Future Gas……………………………...14

G. Retention Decisions Remain in Flux…Until Byrd Engages in Protected Activity……..….14

H. Byrd Opposes Attempts to Cover-Up a White Director's Use of Racial Epithets……..… 16

I. Campbell Terminates Byrd The Day After Byrd Stands Up to Campbell………………… 26

**IV. Argument and Authorities** ……………………………………………………...………27

A. Genuine Disputes of Material Fact Preclude Summary Judgment…………….…………..27

B. Byrd's Circumstantial Evidence is Not Restricted Under McDonnell Douglas…………...28

C. Sufficient Circumstantial Evidence Supports Byrd's Race Discrimination Claims.………29

1. The Same-Actor Inference Does Not Compel Summary Judgment…………………….…29

2. White Employees Were Treated Better Than Byrd……………………………………..…..31

D. Defendant is Not Entitled to Summary Judgment on Byrd's Retaliation Claims…...……..35

1. Byrd Engaged in Protected Activity Under Title VII and Section 1981...………………35

a. *Hagan* Does Not Apply to Title VII & Section 1981 Cases……………...………….…35

b. Even if *Hagan* Does Apply, Byrd Stepped Outside of Her Role……….……………..38

c. Byrd's Protected Activity Was Reasonable and in Good Faith………………………41

2. Byrd's Protected Activity and Termination Are Causally Connected...…………………41

3. Byrd's Evidence of Pretext Defeats Summary Judgment………………………………..42

**E. The Record Evidence Establishes a Timeline Consistent with Retaliation**……………...48

**V. Conclusion** ………………………………………………………………………………. 49

---

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253 (11th Cir. 2010)……………………49

*Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303 (2025)………………………..……………28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………………..………27

*Autry v. Fort Bend Indep. Sch. Dist.,* 704 F.3d 344, 347 (5th Cir. 2013)………………………..32

*Binh Hoa Le v. Exeter Fin. Corp.,* No. 3:15-CV-3839-L,
2019 WL 1436375(N.D. Tex. Mar. 31, 2019) *aff'd,* 990 F.3d 410 (5th Cir. 2021),
and *aff'd*, 990 F.3d 410 (5th Cir. 2021)…………………………………………….....35

*Brown v. E. Mississippi Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)…………………39

*Brown v. Wal-Mart Stores E., L.P.,* 969 F.3d 571, 578 (5th Cir. 2020)……………………....41

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 72-73 (2006)……………………49

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408 (5th Cir. 2007) …………44-45

*Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015)……………..…28, 44, 46

*Caldwell v. KHOU-TV,* 850 F.3d 237 (5th Cir. 2017)……………………………………...42

*Claudio-Gotay v. Becton Dickinson Caribe, Ltd*, 375 F.3d 99 (1st Cir. 2004)…………………37

*Crawford v. Metro. Gov't of Nash. & Davidson Cnty.*, 555 U.S. 271 (2009)……………………40

*DeMasters v. Carilion Clinic,* 796 F.3d 409 (4th Cir. 2015)……………………………35-36, 37

*E.E.O.C. v. HBE Corp.,* 135 F.3d 543, 554 (8th Cir. 1998)……………………………………..37

*E.E.O.C. v. Premier Operator Servs., Inc.,* 75 F. Supp. 2d 550 (N.D. Tex. 1999)……………......41

*Esquivel v. McCarthy,* No. 3:15-CV-1326-L, 2016 WL 6093327 (N.D. Tex. Oct. 18, 2016)…….32

*Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)…………………………...42, 46

*Gibson v. Verizon Servs. Org., Inc.,* 498 F. App'x 391 (5th Cir. 2012)……………………………32

*Golatt v. Perot Museum of Nature & Sci.,* 659 F. Supp. 3d 745 (N.D. Tex. 2023)………………..29

*Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523 (5th Cir. 2022)…………………………...42, 49

*Grelle v. City of Windcrest,* 539 F. Supp. 3d 657 (W.D. Tex. 2021)……………………………29

*Hagan v. Echostar Satellite, LLC*, 529 F.3d 617 (5th Cir. 2008) ………………..……. ..35, 37-40

*Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996)……………………………………29

*Haynes v. Crescent Real Est. Equities, LLC,* No. CIV.A. H-11-2201,
2011 WL 5597351\ (S.D. Tex. Nov. 17, 2011)…………………………………………..…39

*Jackson v. Genesee Cnty. Rd. Comm'n,* 999 F.3d 333 (6th Cir. 2021)………………………36, 38

*Jackson v. Host Int'l, Inc.,* 426 F. App'x 215 (5th Cir. 2011)……………………………………29

*Johnson v. Halstead*, 916 F.3d 410 (5th Cir. 2019)…………………………………………...36

*Johnson v. Univ. of Cincinnati,* 215 F.3d 561 (6th Cir. 2000)……………………………...…38

*Jones v. Mississippi Valley State Univ.,* No. 4:20CV152-M-JMV,
2021 WL 5629227 (N.D. Miss. Nov. 30, 2021)……………………………………...38-39

*Jones v. Robinson Prop. Grp., L.P.,* 427 F.3d 987 (5th Cir. 2005)…………………………...39

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253 (5th Cir. 2009)……………………………………33

*Lindquist v. City of Pasadena Texas*, 669 F.3d 225 (5th Cir. 2012)……………………………..33

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015)……………………………………36

*Long v. Eastfield Coll.,* 88 F.3d 300 (5th Cir. 1996)……………………………………………46

*McClellan v. Ritz-Carlton Hotel Co.,* 961 S.W.2d 463 (Tex. App. 1997)………………………...3

*McInnis v. Alamo Comm. College Dist.*, 207 F.3d 276, 283 (5th Cir. 2000)…...........................44

*McKenzie v. Renberg's Inc.,* 94 F.3d 1478 (10th Cir.1996)…………………………………...37

*Muldrow v. City of St. Louis,* 601 U.S. 346 (2024)………………………………………….…...28

*Noble v. Lear Siegler Servs., Inc.,* 554 F. App'x 275 (5th Cir. 2014)……………………..31-32

*Patrick v. Ridge,* 394 F.3d 311 (5th Cir. 2004)……………………………………………….48

*Patterson v. McLean Credit Union,* 491 U.S. 164 (1989)……………………………………28-29

*Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940 (5th Cir. 2015)….41-42

*Qin v. Vertex, Inc.*, 100 F.4th 458 (3d Cir. 2024)……………………………………………..33

*Rangel v. Omni Hotel Mgmt. Corp.*, No. SA-09-CV-0811,

2010 WL 3927744 (W.D. Tex. Oct. 4, 2010)……………………………………………38

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)…………………………..27, 43

*Rutherford v. Harris Cnty., Tex.,* 197 F.3d 173 (5th Cir. 1999)…………………………………32

*Scott v. U.S. Bank Nat'l Ass'n,* 16 F.4th 1204 (5th Cir. 2021), *as revised* (Nov. 26, 2021)……...36

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)………………………………...43

*Starnes v. Wallace,* 849 F.3d 627, 634 (5th Cir. 2017)……………………………….……40

*Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981)…………………………………….28

*Watkins v. Tregre*, 997 F.3d 275 (5th Cir. 2021)………..………………………………………43

*Young v. United Parcel Serv., Inc.,* 575 U.S. 206 (2015)………………………………………..32

**Other Citations**

EEOC Compliance Manual § 8–IIB2………………………………………………………....38

# I. INTRODUCTION

This is a Title VII and 42 U.S.C. § 1981 race discrimination and retaliation case brought by Charlotte Chapman Byrd, a black HR Manager, against Primoris Services Corporation and affiliated defendants.[1] Defendant terminated Byrd the day after Byrd's supervisor, Alicia Campbell, met with Byrd and a black employee Tony Gill ("Gill") to demand that Gill change a witness statement he had given to Byrd reporting that a white director called him the N-word twice. Byrd refused to force Gill to alter his statement. Campbell fired Byrd the very next morning.

Contrary to Defendant's allegations, Byrd recalled and testified to the critical details regarding her claim – namely that Campbell pressed Byrd and Gill to change Gill's witness statement on February 20th and fired Byrd the next day for her refusal:

Q. All right. So anything else that Alicia did that was discriminatory except for not letting you travel, keeping you out of certain meetings, feeling alienated, and moving you from Fort Worth to Everman?

A. She fired me because I wouldn't -- she wanted me to alter a statement. She wanted me to change a statement, and I wouldn't do it. And that conversation with her that day was so -- it was humiliating, it was demeaning, it was dehumanizing. The way she handled and she talked to me for reporting and not wanting to, basically, do something unethical and dishonest.

(P's Apx. 001, Byrd Dep. 163:1-10)

Q. But you're sure that that meeting with you and Tony where Alicia demands that he change his statement happened on the 20th?

A. It was on the 20th because that was Monday. That Tuesday, I was gone.

(P's Apx. 018, Byrd Dep. 225:8-12)

Gill, a third-party witness, with no stake in this litigation confirmed Byrd's testimony –

[1] By Stipulation (ECF # 32), Plaintiff's claims will proceed at trial solely against Primoris Services Corporation.

that Campbell met with Gill and Byrd and pressured Gill not to report the use of the "n" word:

> Q. All right. From the testimony you just gave, was there a sit-down meeting you had with Alicia in which she presented you two different ways to make your statement, one that did include the N-word and one that didn't include it?
>
> A. Yes.
>
> MS. PLAGENS: Objection, form.
>
> Q. (BY MS. HOPKINS) All right. And she said that if the N-word was left in the statement there would be more serious consequences?
>
> A. Yes.

(P's Apx. 033, Gill Dep. 135:14-24; *See Also* P's Apx. 033, Gill Dep. 136:4-6)

> Q. Are you sitting here now thinking that Alicia Campbell told you if you left the N-word in your statement Alvin Craddock would be banned from the industry?
>
> A. I think -- I think that's -- maybe part of it, but I can't tell you for sure. I know it was really harsh. Maybe along the lines of that will stick with them for as long as they're in this industry. It was something harsh that made me remove it.

(P's Apx. 035, Gill Dep. 141:14-22)

Defendant's Motion asks this Court to do something it cannot do at the summary judgment stage – to credit Campbell's testimony while rejecting the testimony of Byrd and Gill, and to ignore a host of other documents, discovery responses, and testimony that support Byrd's claims.

Critically, there is ample evidence for a reasonable jury to conclude that Campbell did not make a final decision on February 16, 2023 to layoff Byrd and that Campbell only pulled the trigger on Byrd's termination because Byrd refused Campbell's unethical request. Campbell admitted the decision whether to retain or lay off Byrd and her HR team was in constant flux:

> Q (BY MS. HOPKINS) Your decisions about what to do with Alexis Goluguri, Ashley Dickson, and Charlotte Chapman-Byrd were in flux in the early weeks of February 2023, correct?
>
> MS. PLAGENS: Objection; form.
>
> A That's -- yes, as every -- with business it's ever changing, so yes.

(P’s Apx. 071, Campbell Dep. 245:3-245:9)

Jackie Hendrick, Campbell’s boss, similarly admitted the RIF lists were in constant flux. (P’s Apx. 108, Hendrick Dep. 210:20-25). Even more specifically, Campbell admitted that the February 16th RIF list was not a final layoff list. (P’s Apx. 073, Campbell Dep. 254:25-257:5). Most of the employees identified for layoff on the February 16th list actually ended up keeping their jobs. *Id.* (*Also Compare* the 2/16 RIF List at P’s Apx. 122-127 with P’s Apx. 131, Response to Rog 5).

As Justice Murry B. Cohen observed when deny summary judgment to an employer in a Texas state court retaliation case, “Disproving bad motive will often heavily depend, as it does here, on the defendant's credibility; thus, it is a particularly difficult thing to disprove as a matter of law.” *McClellan v. Ritz-Carlton Hotel Co.,* 961 S.W.2d 463, 465 (Tex. App. 1997). In this case, there are genuine disputes of credibility and fact that only a jury can resolve, and, as such, Defendant is not entitled to summary judgment.

## II. AI DISCLOSURE

Counsel use a generative artificial intelligence (AI) tool designed for attorneys to prepare the initial draft of this brief. The AI tool used by Plaintiff’s counsel does not pull information from the internet or public sources but rather from (1) the law firm’s prior attorney-generated briefs; (2) the client’s case file including case-specific discovery and deposition transcripts; and (3) a library of case law, CLE presentations, and other legal materials vetted by the law firm’s attorneys.

All sections of the initial AI-generated draft of the brief were independently researched, reviewed, verified, and edited by Plaintiff’s counsel. Plaintiff’s counsel takes full responsibility for the accuracy and integrity of the arguments and citations contained herein.

## III. SUMMARY OF ARGUMENT

Defendant's motion for summary judgment fails because material disputes of fact and

credibility pervade the record on every central issue in this case, including the question of who made the decision to terminate Byrd, why, and when. The following seven genuine and material factual disputes demonstrate why a jury must decide whether Campbell simply used the ongoing RIF as a pretext and excuse to fire Byrd because of her race and protected activity.

**(1) PLS wasn't shut down, it was merged into PTD, and ample HR work remained.** Defendant's entire justification for Byrd's February 21st layoff rest on the claim that PLS had ceased operations, making Byrd's position obsolete. The evidence refutes this. PLS continued to operate as part of PTD: PLS employees, jobs, and equipment were transferred to PTD in multiple waves over nine months continuing through August 28, 2023—more than six months after Byrd was terminated. (P's Apx. 083-084, 100-101, Hendrick Depo. 27:20--29:3, 30:7-10, 169:14-170:1) (P's Apx. 138 & 142, Rogs 12, 15, &16). Defendant continues to hold Power Line Services out as an active business unit on its website, https://www.prim.com/about/business-units/power-line-services?page, and its 2024 SEC Annual Report on Form 10-K discloses a successful merger and integration of the operations of PLS' parent company, PLH Group, into Primoris with no mention of any closures, wind-down, or RIFS. (P's Apx. 187 & 1940195, 198, SEC 10-K). At the time of Byrd's alleged "layoff," the employe headcount in Campbell's region had actually increased, 317 employees were still working for PLS, and Byrd had gained additional responsibility for 200 Future and PDS Gas employees, companies that continued their operations. (P's Apx. 110 & 065-066, Hendrick Dep. 229:1–4 & Campbell Dep. 215:15-216:2, 216:16-19, 220:5-222:2) (P's Apx. 268-269 & 276, Curtis Dep. 97:21-99:1 & Bagony Dep. 60:7-12). Defendant did not lay off a similarly-situated white HR manager when two business units – PTD and PDS – were removed from her scope of responsibilities and her headcount dropped even lower than Byrd's, to 379 employees. (P's Apx 293-294, Wood Dep. 68:16-19, 69:3-16, 70:4-25).

**(2) The February 16, 2023 RIF list on which Defendant relies was not a final list.** Defendant's entire causation argument rests on the claim that Byrd was definitively selected for RIF the morning of February 16, 2023—hours before Campbell learned of the Gill investigation. Campbell, however, admitted the February 16th list was not a final list. (P's Apx. 073, Campbell Dep. 256:24-257:5). Out of ten employees listed on that list in red as RIFs, four remained active employees as of October 2025, a fifth employee remained employed until November 2024, and three others remained employed until the summer of 2023. (*Compare* the 2/16 RIF List at P's Apx. 115-127 with P's Apx. 131, Response to Rog 5). PLS's two other HR employees – Alexis Goluguri and Ashley Dickson - who were initially slated for layoff due the PLS "closure" also were not laid off on February 21st – one wasn't let go until May 18, 2023, and the other was retained and only later ended up resigning. (P's Apx. 142 & 086 & 061, Rog 13 & Hendrick Dep. 44:19-20 & Campbell Dep. 186:16-18). In fact, another list circulating on February 16, 2023, identified Byrd as an employee who would be transferred, not laid off, in Wave 4 of the employee transfers. (P's Apx 315-319). Indeed, even after Byrd's sudden termination, the integration team continued to list Byrd as an employee to be retained through April 1, 2023. (P's Apx. 321-323 & 325-326 & 105, 2/22/23 Integration Team Emails & Hendrick 192:19-193:23).

**(3) The timing of Byrd's termination is highly suspicious.** Campbell terminated Byrd on February 21, 2023—the morning after Campbell demanded Byrd get Gill to change his witness statement. (P's Apx. 018, Byrd Dep. 225:8-12). Campbell denies making any such demand, but admits to meeting with Byrd and Gill on February 20th around 11am, and admits to e-mailing Gill not just once but twice on February 20th after the meeting asking Gill to confirm whether Byrd's summary of his statement was accurate. (ECF #39-1 PageID, Campbell Dec. ¶ 21; P's Apx 057, Campbel Dep. 166:24-167:10). Campbell then went into the RIF list at 11:44am on February 20th,

immediately after meeting with Byrd and Gill. (P's Apx. 061-062 & 098-099 & 328, Campbell Dep. 189:17-190:13 & Hendrick Dep. 161:19-162:15 & 2/20 Email). Campbell cannot offer any explanation for being in the RIF list at that time. *Id.* There is zero documentation February 21, 2023 had been set as the date for  Byrd's termination prior to her protected activity on February 20, 2023. (P's Apx. 073 & 075, Campbell Dep. 254:14-20, 276:4-277:12).

**(4) Defendant made false statements to the EEOC about Byrd's termination.** Defendant lied when it told the EEOC that Byrd was laid off on February 21, 2023 because the PLS HR Department no longer had any employees to support as of that date. (P's Apx. 331, EEOC Position Statement). There were still 317 PLS employees who had not transferred to PTD yet as of February 21, 2023. (P's Apx. 110 & 065, Hendrick Dep. 229:1-4 & Campbell Dep. 215:15-216:2, 216:16-19). Defendant also told the EEOC that "just before" Byrd "was scheduled to be laid off," Campbell told Hendrick that Gill complained to Wood about Byrd's "inappropriate and unprofessional" handling of the investigation, including that Byrd was the one who had "attempted to insert racial slurs" into his statement. (P's Apx. 331-332). Both Wood and Gill denied under oath that Gill ever made any such complaint. (P's Apx. 309-310 & 036-037, Wood Dep. 173:20-174:9 & Gill Dep. 152:21-153:7). Defendant's presentation of false information to the EEOC undermines Defendant's credibility as to the entirety of Byrd's termination. If Campbell and Hendrick were discussing Byrd's involvement in the Gill investigation right before Byrd was terminated, it is much more likely they were discussing firing Byrd because of her protected activity not discussing a complaint that Gill never even made.

**(5) Campbell told another HR employee Byrd was terminated for cause.** Kristie Madison worked in the HR department under Hendrick and Campbell. (P. Apx 336-337, Madison Dec. ¶¶ 2, 11, 14). Madison states Hendrick did not characterize Byrd's termination as a layoff but instead

told her that “they had to let Charlotte go” and that “Carlotte was not a good person.” (P’s Apx. 337, Madison Dec. ¶ 12). Hendrick admits to going into Madison’s office the morning of Byrd’s termination to discuss Byrd’s separation with Madison, but disputes Madison’s version of events. (P. Apx. 084-085, Hendrick Dep. 33:12-35:1). More importantly, however, Madison attests that Campbell later told Madison that Charlotte had been terminated "over an interaction Byrd and Campbell had in Campbell’s office and that whatever Byrd had said or done in Alicia’s office was the reason for Charlotte’s termination.” (P. Apx 337, Madison Dec. ¶ 14). Campbell had in fact had a heated interaction in her office with Byrd the day prior to Byrd’s termination. (P’s Apx 017-018, Byrd Dep. 220:17-223:1).

**(6) Defendant identified Campbell as the sole decision-maker, but Hendrick was the one making RIF decisions.** In verified interrogatory responses, Defendant consistently identified Campbell, and Campbell alone, as the one who made the decision to terminate Byrd. (P’s Apx. 345 & 353, Rogs 1 and 2). It was Campbell, and Campbell alone, who ordered Byrd to change Gill’s statement, removed Byrd from the Gill investigation, and received notice that Byrd had reported concerns about her removal from the investigation and a cover-up to another HR Director. (P’s Apx. 017-018 & 449 & 452-453). Campbell’s boss, Jackie Hendrick was not identified as a decision-maker despite evidence that Hendrick was making the RIF-related decisions. (P’s Apx. 279, Bagony Dep. 73:11-19). According to Bagony, the HR manager who was handling the RIF lists, Campbell was not involved in the RIF discussions or decisions at that time because Campbell was too busy with a major investigation that lasted several months. (P’s Apx. 279-281, Bagony Dep. 73:11-74:8, 74:25-75:4, 81:14-23). Indeed, it was Hendrick who identified Byrd, Dickson, Goluguri, and a third HR employee as potential RIF candidates in December 2022. (ECF # 39-1 PageID 680-681, Campbell Decl. ¶ 12). After initial denying it, Hendrick also was forced to admit

that Hendrick was the one who told the integration team to put Byrd down as a future RIF for Wave 5 on April 1, 2023. (P’s Apx. 105, Hendrick Dep. 192:19-193:23). In her deposition, Campbell could not recall if she was the one who asked Byrd to be listed as a RIF candidate on the February 16th RIF list and, like Bagony, testified that she, Campbell, “was not handling the RIF list” at the time. (P’s Apx. 064, Campbell Dep. 210:1-12, 18-25). Her memory now different, Campbell attests in her summary judgment Declaration that both she and Hendrick decided to list Byrd in red as a RIF candidate on the February 16th RIF list. (ECF # 39-1 PageID 681-682, Campbell Decl. ¶ 14). If that is true and if that was in fact the final termination decision, Hendrick should have been identified by Defendant as one of the decision-makers who decided to terminate Byrd, but it did not. The available evidence shows that Byrd was not terminated as part of the RIF decisions that Hendrick made alone or along with Campbell, but for another reason that was in Campbell’s mind and Campbell’s mind alone.

**(7) Evidence of race discrimination in Defendant's HR organization supports Byrd's claim.** Multiple black HR professionals working in Campbell's sphere reported race discrimination, resigned under protest, and attributed their departures directly to Campbell's and Wood's conduct. (P’s Apx. 053 & 475-478 & 506-513 & 484-485, Campbell Dep. 134:16-18, 134:23-135:6, 135:10-14 & Sealed Exhibit & Figueroa E-mail). Meanwhile, despite there being ample HR work available, Byrd was terminated while two white HR Managers were retained and absorbed Byrd's headcount (P’s Apx. 066, Campbell Dep. 218:25-219:7). A white HR Generalist was placed in Byrd's spot as managing 300 remaining PLS employees on Campbell's February 24, 2023 headcount chart (P’s Apx. 066, Campbell Dep. 218:1-21). And a white HR generalist with documented performance issues who allegedly had no work left to do at the company was retained for three additional months after Byrd was terminated (P’s Apx. 071 & 487-493 & 401-402 & 142,

Campbell Dep. 244:19-25 & E-mail & Rog 13).

Defendant's motion fails under the blackletter summary judgment standard due to these and other material disputes of fact and credibility.

## IV. RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACT

### A. Primoris Acquires PLH Group & $1.3 Billion in Revenue

Plaintiff does not dispute that Primoris greatly benefitted from its acquisition of PLH and its subsidiary PLS in August 2022. As reported to the SEC, Primoris' revenue increased by $1.3 billion in 2023 primarily due to the 2022 acquisitions of both PLH and B Comm and growth in the Utilities and Energy segments. (P's Apx 194, SEC 10-K). Defendant also accurately describes the HR reporting structure in the Utilities Segment at the time of Byrd's hire.

Plaintiff does, however, dispute the PLH and PLS headcount numbers that Primoris presents in an attempt to bolster its argument that there later became a justification to layoff Byrd. Hendrick testified that her Utilities Segment only gained 1,000 employees from the PLH merger, and Campbell placed the number even lower at 600 to 700 employees total from PLH as a whole. (P's Apx. 089 & 044, Hendrick Dep. 60:3-61:3 & Campbell Dep. 52:5-22). Only 484 of those employees were PLS employees. (P's Apx. 097, Hendrick Dep. 135:20-136:13) Hendrick testified that lower headcount of a mere 484 PLS employee was sufficient to justify hiring Byrd as a fourth HR Manager for the South Region of the Utilities Segment. *Id.*

### B. A Black Recruiting Director Brings Plaintiff on Board as a PLH HR Manager

As stated above, Plaintiff disputes why she was hired – Hendrick testified the 484 PLS headcount justified Byrd's hire. *Id.* Hendrick and Campbell intended Byrd's HR Manager position to be permanent. (P's Apx 045, Campbell Dep. 54:5-10). Plaintiff also disputes that Primoris ever planned for PLS to remain its own entity – its August 2022 Press Release clearly states PLH's

operations "will be incorporated" into Primoris' Utilities, Energy/Renewables, and Pipeline segments. (P's App. 360, Press Release).

Plaintiff does not dispute her offer letter or start dates, starting job title, or job duties, however, Plaintiff does dispute that the opportunity she was offered was solely for PLS or that her hire was attributable to Campbell. A black Recruiting Director Leslea Scott was actually the one who recruited Byrd and signed and extended the offer of employment to Byrd. (P's Apx. 364-368, 9/22 E-mail & Offer Letter). The recruiting e-mails and offer letter also state the opportunity is with PLH Group, PLS' parent company, not just PLS. *Id.* In this role, Plaintiff was also available, able, and actually assigned to support other Primoris subsidiaries. (P's Apx 066, Campbell Dep. 220:5–221:5.).

**C. Campbell Ignores Byrd's Complaints about a Racist Leader in Florida**

Plaintiff agrees that Campbell allowed her to fire low-level hourly employees in Florida who were caught red-handed using racist language over text in November of 2022. (P's Apx. 370-382, 11/15 E-mail & Racist Texts).

Plaintiff disputes, however, that this somehow proves Campbell supported holding company leaders (directors, vice presidents, etc.) responsible for racism. Campbell could not make screenshots of racist texts disappear, but she could bury complaints about leaders verbally using racist language or holding racist beliefs.

Campbell failed to investigate Plaintiff's complaint that the Vice President in charge of that crew in Florida verbally engaged in racism. The white Vice President Brice Burns wanted to fire three black employees without following progressive discipline steps. Byrd reported to Campbell that when Byrd told Burns the company had to follow the progressive discipline steps, Burns became heated and told Byrd "you can't let the prisoners run the prison," and that the black

employees "weren't welcome here." (P's Apx. 005-007, Byrd Dep. 71:13-72:2, 110:3-111:17, 113:3-13, 135:24-136:2). Campbell did nothing in response.

Byrd then received the text thread showing Burns' crew was not only exchanging texts using explicit racist and sexist language, but that one of that crew sent a text saying "Good luck the dog don't like niggers either." (P's Apx. 008-009, Byrd Dep. 152:12-17, 154:2-17). Members of Burns' team confirmed the dog referred to Burns. *Id.* Burns, however, was not on the text thread and thus HR had no texts from Burns using racist language. (P's Apx. 076, Campbell Dep. 269:15-20). Byrd provided Campbell copies of the texts and asked how to handle them. (P's Apx. 009, Byrd Dep. 155:6-7, 156:10-21). Campbell only approved the termination of the low-level crew members who without dispute had used racial or sexual language themselves. (P's Apx. 370 & 077, 11/15 E-mail & Campbell Dep. 270:17-271:5). Despite the seriousness of the matter, Campbell did not allow Byrd to travel to Florida to investigate the matter in person, and could not even recall if she instructed Byrd to provide Burns and his crew antidiscrimination training. (ECF #39-1 at PageID 679, Campbell Decl. ¶ 8) (P's Apx 048, Campbell Dep. 101:16-20).

**D. PLS Undergoes a Normal Merger into PTD**

Plaintiff disputes that PLS shut down or had any alleged financial difficulties or that.

As set forth in Section III (1), *supra*, PLS continues to operate as Primoris business unit, and, in 2024, Primoris represented to the SEC and shareholders that the PLH/PLS merger was a driver of $1.3 billion in increased revenue in 2023. (P's Apx. 194 & 230).

PLS' employees, jobs, and equipment also merged into PTD. (*See, e.g.,* P's Apx 437-446). Burns and his crew, for example, remained employed and simply transferred from PLS to PTD. (P's Apx. 067, Campbell Dep. 222:6-10). Defendant's assertion that administrative positions were targeted for layoff is also incorrect. A January 27, 2023 PLS migration chart shows that all

accounting, HR, and Admin/Management employees were to be retained. (P's Apx. 384-386). Campbell also wrote an e-mail on February 3, 2023 stating that she, Campbell, wanted Byrd to transfer to PDS so Byrd could be retained to provide HR support to PDS:

> **From:** Alicia Campbell <Alicia.Campbell@prim.com>
> **Sent:** Friday, February 3, 2023 11:33 AM
> **To:** Sunita Khorana <skhorana@prim.com>
> **Cc:** Srinivas Goluguri <sgoluguri@prim.com>
> **Subject:** RE: PLS_Auger Employees to PTD 02 27 2023 | Wave 4 | Please respond to item 3 at least
>
> *Hi Sunita,*
>
> *Put them under department 1002 & Kelly Wood as the supervisor.*
>
> *Now with Charlotte, is there a way to move her to company 187 ( PDS). The reason I am asking is she will be supporting that group from an HR stand point.*

(P's Apx. 397 & 071, 2/3/23 E-mail & Campbell Dep. 242:9-243:2). The two other HR employees on Byrd's "PLS" team, Ashley Dickson and Alexis Goluguri, did in fact transfer from PLS to PSC to continue to provide HR support to PTD. (P's Apx. 142 & 071, ROG 14 & Campbell Dep. 241:14-242:3, 243:7-10). Primoris continued to hire additional employees to work on PLH projects, but simply put them under PTD instead of PLH. (P's Apx. 520, SEALED Dep. 35:24-36:10). As a result, the employee headcount for Campbell's South Region, which included the PLS and PTD employees, actually increased from November 2022 to February 2023. (P's Apx, 065 & 404-406, Campbell Dep. 215:15-216:2 & 2/24 Headcount Chart).

**E. A March 31, 2023 HR Re-Alignment Does Not Cause the Layoff of HR Managers**

Plaintiff does not dispute that the HR Department restructured from regions to lines of business. Plaintiff does, however, dispute the effect and effective date of this restructure. Defendant did not identify the re-alignment of the HR Department from regions to lines of business as a reason for terminating Byrd's employment in either its original or supplement interrogatory responses. (P's Apx 346 & 354-355, Rog 3).

The March 31, 2023 e-mail and organization chart attached to Defendant's summary judgment motion shows the actual restructure to lines of business did not occur until after March

31, 2023 ("Sam will be moving…" / "Jessica will move.."). (ECF #39-2 at Page ID 732 &733). Curtis places the actual transition as occurring in April or May of 2023. (P's Apx. 268, Curtis Depo. 95:19-25). As of February 24, 2023, the Utilities Segment headcount chart show HR continued to be organized by region. (P's Apx 404-406). Headcount charts also shows that the realignment of all Power Delivery segments to Campbell was going to result in Cambell gaining three new Power Delivery companies, PEI, TTRS, and Edison (608 employees total) from Berry's team that someone was going to have to manage. (ECF # 39-2 PageID 738-739).

Oddly, Campbell never told her own boss, Hendrick, that Campbell had assigned Byrd to support Gas employees, despite the fact the two of them were supposedly making decisions about what to do with Byrd together. (P's Apx. 111, Hendrick Dep. 230:15-21). After the restructure, Hendrick remained the HR leader over both the Power segment and Gas segment – two segments that Byrd had experience supporting while at Primoris. Hendrick testified at her deposition that if Byrd had still been employed and supporting Gas employees at the time the restructuring occurred, she could have moved Byrd from Campbell's group to Berry's group.[17] (P's Apx. 112, Hendrick Dep. 238:17–24, 239:5-8). If anything, the restructure proves the flexibility Campbell and Hendrick had to adjust HR Manager assignments in order to keep the people they wanted to keep. A white HR Manager under Campbell, was not laid off due to the restructure despite losing an entire business unit, PDS, to Berry's group. (P's Apx. 283, Bagony Dep. 94:24-95:6). In fact, despite numerous shifts in work assignments over time, not one single HR Manager serving under Campbell lost their job due to shifting division assignments. (P's Apx. 294, Wood Dep. 70:12-25). The reorganization did not eliminate the need for Byrd's position—it created a question about where Byrd would be assigned.

**F. Plaintiff Takes on Additional Responsibilities for PDS & Future Gas**

Plaintiff does not dispute that Campbell assigned her to support Colby Sparks' group in December of 2022. Plaintiff does dispute that her assignment was only limited to 68 Future Gas employees, a temporary assignment, or that this assignment or the HR line of business restructure was a reason for her layoff.

Campbell, Curtis, and Bagony all testify that Byrd was assigned to support approximately 200 employees under Sparks, including his PDS and Future Gas employees (P's Apx. 066 & 268-269 & 276, Campbell Dep. 220:5-222:2 & Curtis Dep. 97:21-99:1 & Bagony Dep. 60:7-12). E-mails also confirm that Byrd became the HR Manager for PDS Gas and Future Gas, and was introduced to Sparks' entire group as their new HR manager. (P's Apx. 410-420). This new assignment required Byrd to receive training and access to new systems. *Id.* Curtis, who was the HR Manager in charge of Future and who provided the training to Byrd, was never told Byrd's assignment to Future would be temporary. (P's Apx. 263 & 267 & 418, Curtis Dep. 28:6-22, 78:8-18, 79:23-80:6 & 2/9/23 Training Invite). Moreover, the official transition of Byrd to this new assignment did not occur until February 6, 2023. (P's Apx. 265-266 & 413, Curtis Dep. 73:21-74:5 & 1/23 E-mail). It makes no sense that Campbell would have her team expend significant time and resources putting Byrd into a position to support Sparks for only 15 days. In any event, like the line of business restructure, Defendant did not identify the allegedly "temporary" nature of Byrd's assignment to support PDS & Future Gas as a reason for Byrd's termination. (P's Apx 346 & 354-355, Rog 3).

**G. Retention Decisions Remain in Flux…Until Byrd Engages in Protected Activity**

As set forth in section III (2), supra, Plaintiff disputes that any final decision had been made whether to retain her or lay her off prior to her engaging in protected activity on February 20, 2023.

The majority of the 9 employees listed as RIF candidates on the February 16th "RIF" list were actually retained. ((*Compare* the 2/16 RIF List at P's Apx. 115-127 with P's Apx. 131, Response to Rog 5). Campbell admits the February 16th RIF list wasn't a final RIF list. (P's Apx 073, Campbell Dep. 257:3–5). Another list circulating on February 16, 2023, identified Byrd as an employee who would be transferred, not laid off, in Wave 4 of the employee transfers. (P's Apx 315-319). Campbell and Hendrick admitted that decisions were in constant flux (P's Apx 071 & 108, Campbell Dep. 245:3-245:9 & Hendrick Dep. 210:20-25):

Q. Okay. So these RIF lists that were going back and forth between Paula Bagony and Sunita Khorana, operations, and the business units, they were constantly in flux and changing, weren't they?
MS. PLAGENS: Objection, form.
A. Yes.

What occurred with Alexis Goluguri, an HR Generalist on Byrd's PLS team, demonstrates how up in the air the decisions truly were. (P's Apx. 045, Campbell Dep. 56:22-57:1). On February 3, 2023, Campbell told Hendrick she was going to make February 24, 2023 Goluguri's last day, yet Goluguri wasn't in fact laid off on February 24th. (P's Apx. 401-402, 2/3 Email). As of February 7, 2023, Goluguri was listed on a RIF list with a planned RIF date of March 31, 2023, yet Goluguri, again, wasn't let go on March 31st. (P's Apx. 422-426). Instead, Goluguri was retained until May 18, 2023. (P's Apx. 142, Rog 13).

As for Byrd, e-mails indicate that plans for her were all over the map. Campbell wanted to transfer Byrd to PDS in one of the last waves so that she could be retained to support PDS. (P's Apx. 389-391). Hendrick told the integration team to put Byrd down for an April 1, 2023 layoff, but Hendrick didn't know Campbell had actually already followed through with her plan for Campbell to start working for PDS and Future. (P's Apx 105 & 111, Hendrick 192:19-193:23, 230:15-21). Then, on February 20, 2023, after Byrd opposed Campbell's attempts to shut down

the investigation into Craddock's use of racial epithets, Hendrick and Campbell discussed Byrd's involvement in the Gill investigation:

**Chat: Jackie Hendrick, Charlotte Chapman-Byrd**

C — Charlotte Chapman-Byrd <cchapman-byrd@prim.com> — 2/20/2023, 11:45 AM
There is an incident here that you and Rhonda need to be aware of. I have spoken with

C — Charlotte Chapman-Byrd <cchapman-byrd@prim.com> — 2/20/2023, 11:45 AM
Alicia for three to have a meeting.

J — Jackie Hendrick <jhendrick@prim.com> — 2/20/2023, 5:34 PM
Hi Charlotte. I have been tied up all day. I have been updated from Alicia about this incident. Alicia is leading the investigation and I will take over once I get all the statements from her. Since this does not fall under your remit, I will handle this with Alicia. Thanks for reaching out to let me know...I already know what's going on.

(ECF #39-2, PageID 823, App. 48)

Suddenly, on that same date, February 20, 2023, Hendrick and Campbell also landed on their final plan to terminate Byrd on February 21, 2023:

Q. Okay. So it was February 20th, 2023, that you confirmed with Alicia that you were going to come to the Everman office the next day to have the meeting with Ms. Byrd and Ms. Campbell in which Ms. Byrd was let go?
A. Correct.

(P's Apx 088, Hendrick Dep. 57:6-15).

## H. Byrd Opposes Attempts to Cover-Up a White Director's Use of Racial Epithets

Campbell admits that she did not fire Byrd over anything Byrd did or did not do during the Gill investigation. (P's Apx. 346 & 254-255 & 075, Rog 3 & Campbell Dep. 264:8-13). Despite this, Defendant goes to great lengths in its fact section (and Campbell goes to great lengths in her summary judgment Declaration) to malign Byrd's actions in advocating for Gill. Plaintiff disputes Defendant's allegations that she did anything wrong or in violation of HR Best Practices during the Gill investigation. Instead, the facts show Byrd acted reasonably and in good faith at all times.

### 1. A White Director Calls Gill "Nigger"

A highly disturbing incident occurred on February 15, 2023 when a white Director of

Operations Alvin Craddick, a white Tool Supervisor Kelly Porter, and two white members of Craddock's crew confronted, physically threatened, and used a racial epithet toward a black employee Tony Gill . (P's Apx. 025-029, Gill Dep. 20:7-14, 51:16-52:2, 52:12-55:21, 58:7-59:14, 59:25-62:13, 63:7-23). Gill, upset, scared, and physically shaken by the incident, then left the building and went to the Everman office. (P's Apx. 029 & 336, Gill Dep. 64:15-22 & Madison Decl. ¶¶ 3-7).

Defendant leaves the most disturbing details of the incident: Craddock called Gill the "n" word twice while Porter and two white crew members surrounded Gill after Porter went into his office and returned holding an object behind his back that Gill believed to be a weapon. (P's Apx. 028-029, Gill Dep.  59:25-62:9, 63:7-23). Plaintiff disputes that Gill went to Wood first upon arriving at Everman. Instead, Gill went to Madison, a black HR employee.[2] (P's Apx. 336, Madison Decl. ¶¶ 3-7). Madison recommended that Gill speak to Byrd and also asked Byrd to go speak with Gill. (P's Apx. 336 & 012, Madison Decl. ¶¶ 3-7; Byrd Dep. 193:20-24).

Plaintiff does not dispute that Gill did not want to share the details of what happened with Wood. Gill did not trust Wood to handle the matter due to her connections with Craddock's chain of command, John Pinkerton and Adam Campbell. (ECF # 39-2 PageID 767). Gill understood that Craddock was high up "next to Vice President." (P's Apx. 026, Gill Dep. 52:12-53:4). The Vice President Craddock served under was Adam Campbell, and Adam Campbell was HR Director Alicia Campbell's brother-in-law. (P's Apx. 043 & 054,  Campbell Dep. 33:6-20, 144:5-12, 145:7-8). Wood was in fact quite close with Alicia Campell and Adam Campbell's brother Ben Campbell

[2] Gill, over two and a half years later, could not recall whether he went to Madison for help. (P's Apx 030, Gill Dep. 106:10-15).  This is understandable considering how distraught Gill was following the incident, to the point where he was still physically trembling while in Madison's office. (P's Apx 336 & 013, Madison Decl. ¶¶ 3-7 & Byrd Dep. 194:10-13). The testimony of Madison and Byrd regarding Madison's involvement is credible because they offer the only logical explanation as to how Byrd knew to go speak to Gill that day.

– having connections with them outside of work and having loyally served numerous members of the Campbell family during her time at Primoris. (P's Apx. 299 & 289-290, Wood Dep. 108:14-19, 20:12-25, 25:15-10, 28:12-19, 29:1-5).

**2. Byrd Meets with Gill at Madison's Request**

At a time when retention decisions were still in flux (*see* Sections III(2) and IV(G), *supra*) Byrd spoke to Gill. Byrd first spoke to Gill on the date of the incident – February 15, 2023. (P's Apx. 012-013, Byrd Dep. 193:20-194:13). Byrd did so because Madison, worried about Gill's physical and emotional state, asked Byrd to intervene. *Id.* (P's Apx. 336, Madison Decl. ¶¶ 3-9)

Gill was the one who insisted Byrd "Come to my office ASAP. ASAP" on February 16 when Wood and Campbell called to confront him about the incident. (P's Apx. 428, Gill Text Byrd00043). Campbell had previously told Byrd that having witnesses to HR conversations was important. (ECF #39-2 PageID 778, 1/31/23 Chat at 4:48pm). Byrd did the right thing by honoring a fearful victim's urgent request for a witness in a situation where both Wood and Campbell had conflicts of interest. (P's Apx. 433-434, 2/16 Chat at 5:35pm & 5:38pm) (P's Apx. 026-027 & 043 & 054 & 299 & 289-290, Gill Dep. 52:20-53:4 & Campbell Dep. 33:8-10, 144:5-12, 145:7-8, 176:17-2 & Wood Dep. 108:14-19, 20:12-25, 25:15-10, 28:12-19, 29:1-5). As it turns out, despite HR best practices, neither Campbell nor Wood took any notes to document what was said on that phone call. (P's Apx. 049 & 051-052, Campbell Dep. 107:16-19, 125:22-126:4) (P's Apx 296 & 306, Wood Dep. 80:7-10, 159:18-160:6) (P's Apx. 095, Hendrick Dep. 121:3-7).

Despite HR best practices, Campbell and Wood also did not place Craddock or Porter on leave pending the investigation, providing no interim protection to Gill. (P's Apx. 304 & 296 & 050, Wood Dep. 136:3-16, 74:23-1, 75:16-24, 76:15-77:12 & Campbell Dep. 120:2-18). Byrd, because she actually cared about Gill, checked on his well-being that night and told him: "Trust the Process. Take your time and take care of yourself and your mental and physical health." (P's

Apx. 428).

Byrd did first inform Campbell of the seriousness of Gill's concerns on February 16, 2023. (P's Apx. 433-434). Byrd also informed Campbell that Byrd had already asked Gill to put a statement together, but that Gill was "not wanting to tell out of extreme fear of retaliation" and was "pretty shaken and cried when telling me the story." (P's Apx. 433-434, 2/16 Chat at 5:35pm & 5:38pm). Campbell, in response, did not tell Byrd that she should not have asked the employee to provide a statement, did not tell Byrd to stand down or take no further action, and did not at that point tell Byrd that Campbell was assigning the investigation to Wood. (P's Apx. 433-434 & 055, 2/16 Chat & Campbell Dep. 152:21-153:4). Instead, Campbell sent messages acting as though Byrd should encourage Gill to come forward – "well this individual will not get retaliated against" and "we need to let them know that" and "we have a whistleblower policy." (P's Apx. 433-434, 2/16 Chat at 5:36pm). Byrd did just that on February 17, 2023 when she met with Gill to formally take his statement. (P's Apx. 014, Byrd Dep. 207:15-208:19) (ECF #39-2 PageID 763-767).

**3. HR Best Practices for Workplace Investigation.**

Plaintiff disputes that Byrd "took it upon herself" to investigate Gill's allegations or that the investigation was outside of her purview.

Byrd's Job Description as an HR Manager included overseeing investigations generally, without any specification limiting her duties only to her business units. (ECF # 39-2 PageID 697). Even if Byrd's duties were limited to her business unit, Byrd was PLS HR Manager, Craddock and his crew were a recently transitioned PLS crew, the incident occurred at a PLS office over missing PLS tooling, and Porter, the instigator of the incident and the one who allegedly retrieved a gun from his office, was a PLS employee:

| | | | |
|---|---|---|---|
| 111 | Power Line Services, Inc. | Craddock Sr., Alvin A. | Wave 1 |

(P’s Apx. 387; *Also* P’s Apx. 437-446)

> *Kelly Porter*
> **Tool Supervisor/ Facilities Manager**
> **2100 Great SW Pkwy**
> **Fort Worth TX 76106**
> **Mobile** Redacted
> kporter@prim.com
> PowerLine
> SERVICES
> A PLH GROUP COMPANY

(ECF # 39-2 PageID 794, App. 119)

> On Wednesday 2/15/2023 at 10:20am it was brought to my attention that a crew has not received the tooling for their crew (Crew 534on CoServ AJ Byers and Clayton Caley). Kelly Porter sent me the order that was made for the crew. Then walked the crew into my office to figure out what was missing. I took a screen shot of the highlighted tooling asking Tony Gill and John Pinkerton where the tools were. Kelly left back to building B. The crew and I waited for a response. I did not get a response. Then crew and I agreed to go look in the PLS tooling to see if we could find this missing tooling. We walked into building B, by Kelly and Tonys office (the west side entrance). Kelly Opened the door. (All of the tooling doors self-lock when closed) We started discussing the tooling that PLS had available to fill the tooling needs. Tony walks into the room. The rest of the conversation goes as follows.

(P’s Apx. 480, Craddock Statement)

> At PSC Yard, Cody got a digger truck and went on his way. Then AJ and Chase proceed to go to the PLS office since Tony was moved over there to get tools that were ordered about 1 – 2 months ago.

> tools, etc. Kelly Porter sends and email to Alvin said there is another situation regarding tooling issues but these guys are here at the PLS office. So Kelly Porter take them (AJ and Chase) to Alvins’ office.

(P’s Apx. 465, Newton Statement).

Byrd, in fact, had just completed another fully authorized investigation involving Porter’s bad behavior with vendors and a female employee. (P’s Apx. 012, Byrd 191:24-192:21). Byrd also thought Gill was a PLS employee because Gill worked out of a PLS office. (P’s Apx. 015, Byrd 212:17-213:2).

Additionally, Madison told Byrd that Byrd needed to speak with Gill because Madison, as a black HR employee, felt Gill, a black employee, would be able to trust Byrd, a black HR Manager who had established a reputation for truly caring about all employees regardless of their race. (P’s

Apx. 336, Madison Decl. ¶¶ 8-9). As it turned out, Gill himself did not trust the company generally to address racism in the workplace or his business unit's HR Manager, Wood. (P's Apx. 031, Gill Dep. 109:10-111:1). Gill, however, did trust Byrd. (P's Apx. 030, Gill Dep. 106:18-107:23). It would have been unethical for Byrd to turn Gill away when Gill didn't feel he had anyone else he could trust.

Byrd does not dispute Defendant's general summary of HR best practices for conducting an investigation, but notes that Defendant exaggerates one of these practices as a hard and fast rule to make Byrd look bad. Byrd testified that "normally" an investigation starts by getting a statement from or interviewing the complainant, not that this always had to occur and that witness interview can go in any order. (P's Apx. 003-004, Byrd Dep. 58:25-59:18, 61:24-62:10).

**4. Campbell & Wood Violated HR Best Practices, Not Byrd**

It was Campbell and Wood who violated HR best practices, not Byrd. Plaintiff did speak with Gill first, before any other witnesses, on the date of the incident, February 15, 2023. (P's Apx. 012-013, Byrd Dep. 193:20-194:9). In this case, taking Gill's full statement on February 15, 2023 wasn't possible because he was still "visibly shaken" and in extreme fear of retaliation and not wanting to fully report what happened. (P's Apx. 433-434 & 013, 2/16 Chat & Byrd Dep. 194:10-13). Byrd spoke to Jones and Kohrman next because Gill gave her their names. (P's Apx. 014-015, Byrd 209:23-210:10). It turns out Byrd obtained valuable information by doing so – namely that right after the incident, Gill told Jones that Gill thought Porter might have had a "gat" or gun behind his back during the incident. (P's Apx. 037 & 460, Gill Dep. 155:2-7 & Jones Statement). Possession of a gun on Primoris' property is a violation of Primoris' workplace violence policy, and warranted further investigation. (P's Apx. 298, Wood 102:19-23).

Despite knowing that Porter was not only a direct eye witness to the incentive, but also allegedly retrieved a weapon or gun from his office during the incident, neither Campbell nor

Wood ever interviewed Porter. (P's Apx. 292-293 & 300-301, Wood Dep. 33:22-25, 113:10-15, 116:9-117:15, 137:10-13) (P's Apx. 063, Campbell Dep. 194:14-21). Wood, who took over the investigation from Byrd, never searched Porter's office for any weapon or gun or did anything else to investigate whether Porter had a gun or not. (P's Apx. 301, Wood Dep. 114:19-115:10). Wood blames her failures on the fact Hendrick told Wood that Hendrick would complete the investigation. (P's Apx. 302 & 305, Wood 118:3-8, 139:8-140:9). Hendrick, however, states she simply told Wood that she wanted to review Wood's finds and recommendations once Wood completed the investigation. (P's Apx 091, Hendrick 67:1-21). Despite claiming she takes complaints involving racial epithets "very seriously," Hendrick also did not flag the fact that Porter was never interviewed nor did she instruct Wood to go back and interview Porter (P's Apx 091 & 092, Hendrick Dep. 69:14-17, 76:22-77:5). Wood, Campbell, and Hendrick additional knew that Gill reported having a time-stamped photo of a noose in his office, and not one of them ever asked Gill (or Byrd) about that allegation or for a copy of the photo. (P's Apx. 058-059 & 299 & 307-308 & 092, Campbell Dep. 173:10-174:7, 175:13-20 & Wood Dep. 106:17-22, 165:8-15, 166:1-15 & Hendrick Dep. 77:6-12).

Even if Byrd's decision to talk to Jones and Kohrman before obtaining Gill's full statement on February 17, 2023 could be criticized, pales with the egregious violation of HR best practice Campbell, Wood, and Hendrick committed by allowing the investigation to be closed out without ever interviewing Porter – a direct eye witness who may have violated the workplace violence policy – or asking Gill about the time-stamped photograph of a noose in his office. (P's Apx. 095-096, Hendrick 117:12-15, 127:10-128:5) (P's Apx. 051 & 057, Campbell 123:5-7, 168:4-7) (P's Apx. 292-293 & 300 & 304 & 299 & 307-308, Wood Dep. 33:22-25, 113:10-15, 137:10-13, 106:17-22, 165:8-15, 166:1-15).

### 5. Gill Gets Worried About Going Up Against Craddock and Porter

It is true that Gill sent a text at February 19, 2023 expressing that he wanted to take the "n" word and weapon allegation of his statement, but he also reported that he hadn't been able to sleep going over what happened and that his wife told him it was because he was "feeling guilty about reporting this." (ECF #39-2 PageID 782, App. 107).

A good HR investigator is supposed to identify inconsistencies in an investigation and gather more information  to determine the truth. (P's Apx. 095, Hendrick Dep. 120:20-121:2, 121:8-19) (P's Apx 051, Campbell 123:8-20) (P's Apx 296, Wood 80:2-10, 80:21-25, 81:5-8). Byrd had good reason to want to meet with Gill on February 20, 2023 and investigate the reasoning behind his text. For one, the incident itself was frightening, Gill had been afraid to report the full truth from the beginning, Gill had not been offered any protection from the company pending investigation, and Gill's text indicated that mental and emotional distress were driving his retraction. (P's Apx. 304 & 029 & 032-033, Wood Dep. 136:3-16 & Gill 62:7-13, 132:13-133:20). For another, Gill had also reported to Byrd that a noose had been hung in his office, and provided Byrd a photo of the noose. (P's Apx. 457 & 019, 2/17 Statement & Byrd Dep. 227:2-6, 228:9-15). This indicated that allegations of racial discrimination in Gill's original statement were in fact accurate. Indeed, on February 20, 2023, Gill confirmed to Byrd that the racial epithet was used, but he wanted to remove it to "take the pressure off me" and because "nothing is going to change, he is going to be here. So to make it easier on me…moving forward." (ECF #39-2 Page ID 784).

It was not until after Byrd was removed from the investigation on February 20, 2023 at 1:24pm, that Byrd then, at 3:25pm, shared– not as an investigator but as an employee - her personal belief with Curtis that Craddock had used a racial epithet, and that the company had removed her from the investigation in order to get away with doing nothing about it. (P's Apx. 482-483).

**6. Campbell Speaks with Gill and Plaintiff.**

Gill's February 19, 2023 text was sent to Byrd, not Campbell: Campbell had no idea that Gill sent Byrd the February 19th text or that Gill himself out of stress and guilt might want to change his statement. When Campbell saw Byrd and Gill meeting in the conference room on the morning of February 20, 2023, she admits she did not know why Byrd was speaking Gill. (ECF #39-1 PageID 684, Campbel Decl. ¶ ). Campbell's immediate reaction was to summon Byrd and then Gill to her office. (P's Apx. 017-018, Byrd Dep. 220:23-221:22).

Campbell both could have and did instruct Gill to change his statement during that meeting. *Id.* Byrd printed out a physical copy of her notes of her February 17th interview with Gill, brought them into Campbell's office, and went over the statement Gill had given out loud with Campbell and Gill. *Id.* Campbell was "livid" and "seething" in the meeting and told Byrd it was her responsibility to change his mind." *Id.* Gill confirmed Campbell told him negative consequences would flow from keeping the N-word in his statement. (P's Apx. 033-035, Gill Dep. 135:19–136:6, 141:14-22).

**7. Campbell Asks for an Electronic Copy of Gill's Statement After the Meeting**

Campbell places her February 20, 2023 meeting with Byrd and Gill around 11:19am based on a direct message chat thread that Defendant produced at ECF # 39-2 PageID 812. (ECF # 39-1 PageID 684, Campbel Decl. ¶ 21). When Defendant printed these chat messages from their system, it stamped them one hour ahead of Texas/CST time. (P's Apx. 430, referencing time-stampe difference between P's Apx 433 vs. P's Apx 435). Campbell, therefore, talks about a 10:19am chat message she received from Byrd on February 20, 2023 sharing Gill's concerns about the confidentiality of the investigation (ECF #39-1 PageID 684, Campbel Decl. ¶ 21). On the actual printout of the chat, this message is time-stamped 11:19am, but, as confirmed by Campbell's Declaration, Campbell actually received it at 10:19am. (*Compare* ECF # 39-2 PageID 812 Entry

at 11:19am with ECF #39-1 PageID 684, Campbel Decl. ¶ 21). As all of the chats on that page were sent and received one hour earlier than stamped, the messages stamped at 12:19pm where Campbell tells Byrd "tony is here" and Campbell responds "coming" actually happened at 11:19am. This is important because that also means the 1:44pm message where Campbell asks Byrd "Can you send me the statement. Thanks." was actually sent at 12:44pm.

This proves without a doubt that Campbell already knew about the February 17th statement Byrd had taken from Gill before Campbell received it from Byrd at 12:49pm. Campbell's 12:44pm request for Byrd to send Campbell the statement lines up with Byrd's testimony that Byrd had just gone over that February 17th statement with Campbell in the meeting between Campbell, Byrd, and Gill that had started at 11:19am. This also means that when Byrd e-mailed Campbell the February 17th statement, Byrd was not picking and choosing what to send to Campbell, but in fact sending Campbell the exact statement Campbell had asked Byrd to send. (ECF # 39-2 PageID 812).

After receiving the electronic copy of Gill's statement, Campbell e-mailed Gill twice that same day, first at 1:15pm and again at 4:33pm, with the statement attached asking him whether it was accurate. (P's Apx 057, Campbell Dep. 166:24-167:10). By 1:24pm, Campbell had told Byrd that Wood would take over the investigation. (P's Apx 060, Campbell Dep.182:22-183:4 & Email). Campbell then had a second meeting with Gill on February 20th without anyone else present. (P's Apx. 058, Campbell Dep. 170:25-171:5). Despite HR best practices, Campbell did not create any notes to document what happened at her February 20th meeting with Byrd and Gill or her later February 20th meeting with just Gill. (P's Apx. 051-052, 056 & 058, Campbell Dep. 125:22-126:4, 157:19-22, 170:25-2) (P's Apx. 296 & 095, Wood Dep. 80:7-10 & Hendrick Dep. 121:3-7).

Gill did not submit a new statement on February 21, 2023 because he found the statement

Byrd took from him on February 17th unsatisfactory. Gill testified that Byrd's February 17th notes accurately reflect the truth and exactly what he told Byrd. (P's Apx. 030-031, Gill Dep. 106:18-109:16). Gill changed his statement, not only removing the reference to the "n" word and the weapon but also the reference to the noose and racial discrimination at the company, because of Campbell's coercion and his desire to protect himself from Craddock and Porter. (P's Apx. 033 & 035, Gill Dep. 135:14-24, 141:4-22). Gill's instincts were not wrong. Despite retracting his most serious allegations against Craddock and Porter, he shortly after found bullet casings all around his truck in the Primoris parking lot. (P's Apx. 038-039, Gill Dep. 168:14-169:11, 170:1-25).

### I. Campbell Terminates Byrd The Day After Byrd Stands Up to Campbell

Byrd was never slated for termination for Friday February 24, 2023. Instead, as of her termination date, Byrd was slated for either a transfer or a RIF on April 1, 2023. (P's Apx 323 & 325-326). The RIF decisions were in constant flux, and even though Goluguri had been placed on a RIF list with a specific RIF date set for March 31, 2023, she was not laid off on that date. (P's Apx. 426 & 142). Defendant's claim that Goluguri was retained for her institutional knowledge is contradicted by both Goluguri's ongoing performance issues and Campbell's admission that there would be "nothing" for Goluguri to for PLS once she was transferred on February 24, 2023 and lost PLS access. (P's Apx 487-493 & 401-402).

Byrd's refusal to change Gill's statement and complaint to Curtis about her removal from the Gill investigation were the real reasons Campbell and Hendrick pulled the trigger on Byrd's termination on February 21, 2023. Alleged scheduling conflicts pale in comparison to the weight of what happened between Byrd, Campbell, and Gill on February 20, 2023. Indeed, Defendant's assertion that company policy required Hendrick to be present for Byrd's termination is flatly false. Hendrick testified that there is no such company policy and she was not present for the termination

of any other HR employees, not even HR Manager Patricia Ackerman, in 2023. (P's Apx. 106, Hendrick Depo. 198:6-16).

In any event, in its original interrogatory responses, Hendrick and Campbell never identified Hendrick's alleged scheduling conflicts as a reason for moving Byrd's termination up but instead asserted they moved the termination up to avoid having to issue Byrd two W-2s, one from PLS and another from the company Campbell planned to transfer Byrd to so that Byrd could provide ongoing support for PDS. (P's Apx 346 & 354-355, Rog 3). Hendrick testified issuing two W-2s is a minor task. (P's Apx. 102, Hendrick Dep. 175:24-176:12). And while Hendrick kept Goluguri on despite her belief that there would be the same need to issue Goluguri two W-2s, it turned out both Goluguri and Dickson, the other transferred HR employee, only received one W-2 for 2023. (P's Apx 102 & 503-504, Hendrick 175:5-176:2 & W-2s). Whether minor administrative issues or Byrd's protected activity motivated her termination is a fact and credibility issue for a jury to decide.

## IV. ARGUMENT AND AUTHORITIES

### A. Genuine Disputes of Material Fact Preclude Summary Judgment

The summary judgment standard is well known to the Court. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). At the summary judgment stage, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

Defendant is not entitled to summary judgment because the evidence shows that material disputes of fact and credibility pervade this case – from the dispute over whether Campbell ordered

Byrd to change Gill's statement, to Defendant's false statements to the EEOC, to the dispute over whether Byrd was ever going to be laid off and if so when, to questions over why Campbell is identified as the sole decision-maker despite Campbell's testimony both she and Hendrick put Byrd on the RIF list, and to the fundamental question of Campbell's motive for termination, raised mostly clearly by Campbell's admissions to Madison that Byrd was let go over an interaction between Byrd and Campbell in Campbell's office.

## B. Plaintiff's Circumstantial Evidence is Not Restricted under *McDonnell Douglas*

Defendant sets forth a rigid version of the *McDonnell Douglas* burden-shifting framework, but fails to acknowledge that the overriding focus of the summary judgment analysis should be on any and all circumstantial evidence that creates genuine issues of material fact.

The Fifth Circuit's instruction to its own Courts is "not to substitute our judgment for that of the jury and not to unduly restrict a plaintiff's circumstantial case of discrimination." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 241 (5th Cir. 2015). The U.S. Supreme Court has also recently rejected the application of atextual judge-made doctrines to Title VII, finding that the courts cannot rewrite Title VII to compel workers to make a showing the statutory text does not require. *Muldrow v. City of St. Louis,* 601 U.S. 346, 350 (2024) ("Title VII's text nowhere establishes that high bar."); *Ames v. Ohio Department of Youth Services*, 605 U.S. 303, 305-306 (2025) (finding that court-created 'background circumstances' rule was "not consistent with Title VII's text…").

Even under the court-created *McDonnel Douglas* burden-shifting test, the burden of establishing a prima facie case is not intended to be onerous. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). And the types of pretext evidence that an employee may offer are virtually unlimited and may take a variety of forms. *Patterson v. McLean Credit Union,* 491 U.S.

164, 187 (1989) ("“Although petitioner retains the ultimate burden of persuasion, our cases make clear that she must also have the opportunity to demonstrate that respondent's proffered reasons for its decision were not its true reasons. *Ibid*. In doing so, petitioner is not limited to presenting evidence of a certain type.”).

**C. Sufficient Circumstantial Evidence Supports Plaintiff's Race Discrimination Claims**

**1. The Same-Actor Inference Does Not Compel Summary Judgment.**

Defendant invokes the "same actor inference" because Campbell both hired and terminated Byrd. The Fifth Circuit has recognized the application of this judge-created rule in discrimination cases, but “has cautioned that this presumption is not irrebuttable.” *Grelle v. City of Windcrest,* 539 F. Supp. 3d 657, 667 (W.D. Tex. 2021). “While evidence of such circumstances is relevant in determining whether discrimination occurred, we decline to establish a rule that no inference of discrimination could arise under such circumstances. Instead, we prefer to look at the evidence as a whole, keeping in mind the ultimate issue.” *Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996). For this reason, “it falls within the province of the jury to decide whether the “same actor” inference should apply in this case, as it is a question of fact rather than one of law.” *Golatt v. Perot Museum of Nature & Sci.,* 659 F. Supp. 3d 745, 759 (N.D. Tex. 2023).

Here, a reasonable jury could reject the same actor inference for two reasons.

First, Byrd’s hire was facilitated by a black Recruiting Director Leslea Scott, who was the one who actually extended the offer of employment to Plaintiff. (P’s Apx 364-368). Scott’s involvement detracts from any inference that Campbell, left to make decisions on her own, would have selected a black candidate. *See Jackson v. Host Int'l, Inc.,* 426 F. App'x 215, 220–21 (5th Cir. 2011) (finding that a jury could reject the same actor inference when the offer letter was signed by someone other than the same actor).

Second, there is ample evidence that Campbell did not treat Black HR employees fairly once they were hired, and instead favored the white employees on her team. In the span of just two years (2023 & 2024), four black HR employees who worked under Campbell alleged that Cambell treated them and others differently because of their race. (P's Apx. 337 & 053 & 506-513, Madison Decl. ¶ 15, Campbell Dep. 135:16–18, 134:23–135:14 & Sealed Exhibit at ¶¶ 1, 8, 20-23, 25-28, 30 ,34-41, 73, 92-93) (P's Apx 518, 521-530, Sealed Deposition 11:3-12:2, 49:4-9, 52:4-23, 52:24-54:1, 54:2-5, 54:16-55:11, 55:18-24, 60:5-65:20, 74:2-20, 89:25-90:15, 113:2-9, 142:25-143:24). The same-actor inference carries either no weight or very little weight in the face of this evidence.

The four black employees who claim Campbell treated them poorly include Byrd, who filed this race discrimination and retaliation lawsuit, and three employes – Kristie Madison, Stewart Figueroa, and a director-level employee identified in Plaintiff's Sealed Exhibits – who all left the company due to the race discrimination they experienced. *Id.*

Plaintiff had to file the most compelling of her evidence of race discrimination and retaliation effectuated not just by Campbell but also by her boss Hendrick and her two white HR Managers Wood and Bagony under seal because Defendant threatened to sue the employee who provided the evidence for breach of contract if Plaintiff were to file any of the information publicly. (*See* Plaintiff's Motion to Seal). Plaintiff incorporates herein the following sealed evidence into this brief; P's App 506-513, Sealed Exhibit and P's Apx 518, 521-530, Sealed Deposition at 11:3-12:2, 49:4-9, 52:4-23, 52:24-54:1, 54:2-5, 54:16-55:11, 55:18-24, 60:5-65:20, 74:2-20, 89:25-90:15, 113:2-9, 142:25-143:24).

Byrd herself saw Campbell dismiss and ignore her complaint about Burns, pressure a black employee to rescind his report of racial epithets, and speak negatively about two other black directors on the HR team - Leslea Scott and Shunte Curtis. (P's Apx. 005-007, 009, 018, Byrd

Dep. 71:13-72:2, 110:3-111:17, 113:3-13, 135:24-136:2, 157:4-160:1, 222:3-18).

As for Madison, she resigned on June 22, 203 because she "felt that the environment in the Human Resources department was hostile, toxic, unfair, and discriminatory…I felt that Kelly Woods and Alicia Campbell did not judge me based on the merits of my work. Instead, I felt that because I was not the same race as them, I was last on the totem pole and would never be one of their 'chosen ones.'" (P's Apx. 337, Madison Decl. ¶ 15).

Stewart Figueroa, a Black HR Coordinator who worked under Kelly Wood, resigned on October 30, 2024 and reported race discrimination against both himself and his black HR colleague Corree. (P's Apx. 484-485, Figueroa Email). He stated Wood and Campbell "frequently undermined our abilities…advising team members to avoid working closely with Corre and me." *Id.* He further reported that "while I was denied advancement and learning opportunities, less tenured and experienced white team members were being covertly prepared for promotions." *Id.* He further reported "Disparities in work duties, professional development, and acknowledge of performance were apparent and troubling." *Id.* He stated that his black HR colleague Corree also resigned because of "increased discrimination and retaliation." *Id.*

**2. Evidence of Race Discrimination.**

Defendant does not dispute that Plaintiff meets the first three elements of the prima facie case – Byrd was black, qualified for her position, and subject to the adverse employment action of termination. (P's Apx. 003 & 047 & 090, Byrd Dep. 58:21-24 & Campbell Dep. 72:4-21 & Hendrick Dep. 62:15-24). Defendant disputes that Plaintiff can satisfy the fourth element of showing that a similarly-situated white employee was treated more favorably. In truth, Plaintiff is allowed to prove the fourth element either with evidence of similarly-situated white employees or with evidence that she "was otherwise terminated because of a protected characteristic." *Noble v.*

*Lear Siegler Servs., Inc.,* 554 F. App'x 275, 276 (5th Cir. 2014); *Gibson v. Verizon Servs. Org., Inc.,* 498 F. App'x 391, 395 (5th Cir. 2012) (same); *Esquivel v. McCarthy,* No. 3:15-CV-1326-L, 2016 WL 6093327, at *7 (N.D. Tex. Oct. 18, 2016) (Judge Samuel A. Lindsay) (citing Gibson for the prima facie standard). *See also Autry v. Fort Bend Indep. Sch. Dist.,* 704 F.3d 344, 347 (5th Cir. 2013) (endorsing an alternative "or otherwise failed to promote the plaintiff because of his race" method of establishing the fourth prima facie element in a promotion case); *Rutherford v. Harris Cnty., Tex.,* 197 F.3d 173, 179 (5th Cir. 1999) (same). The prima facie case is "not intended to be an inflexible rule…Rather, an individual plaintiff may establish a prima facie case by 'showing actions taken by the employer, from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion…" *Young v. United Parcel Serv., Inc.,* 575 U.S. 206, 228 (2015) (citations omitted).

In this case, Plaintiff can in fact produce both similarly-situated comparators and other evidence that she was terminated because of her race.

First, as to similarly-situated white employees, Wood, a white HR Manager also supervised by Campbell and Hendrick, was not laid off when two business units – PDS and PTD—were removed from her scope of responsibilities and her headcount (379) dropped down lower than Byrd's headcount (517)[3]. (P's Apx 293-294, Wood Dep. 68:16-19, 69:3-16, 70:4-25). Second, a white HR Manager Paula Bagony also supervised by Campbell and Hendrick, was not laid off when she lost a business unit due to a restructure of the HR department. (P's Apx 283, Bagony Dep. 94:24-95:6).

---

[3] This consists of 317 PLS employees and 200 Future/PDS Gas employees. Despite admitting Byrd was supporting Spark's ~200 employees in her deposition, Campbell's summary judgment declaration states Byrd was only supporting 68 Future employees. (*Compare* ECF # 39-1 PageID 681, Campbell Decl. ¶ 13 with P's Apx 065-067 & 268-269, Campbell Dep. 215:15-216:2, 216:16-19, 220:5-222:2 & Curtis Dep. 97:21-99:1). Even so, 317 plus 68 is 385, and higher than Wood's headcount after she lost PDS and PTD as business units.

Defendant's attempt to distinguish Wood and Bagony on their tenure ignore the fact that the Fifth Circuit does not require comparators to be "identical" and typically "it is sufficient that the ultimate decisionmaker as to the employee's continued employment is the same individual." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260-61 (5th Cir. 2009); *See Also Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 233-34 (5th Cir. 2012) ("The legal requirement that a class-of-one plaintiff's comparators be "similarly situated" is not a requirement susceptible to rigid, mechanical application…"); *See Also Qin v. Vertex, Inc*., 100 F.4th 458, 474 (3d Cir. 2024) (finding an employee's different project assignments and short tenure "immaterial" for the purposes of establishing a prima face case when the similarly-situated employees had the same position, supervisor, and job responsibilities).

Second, Campbell's negative treatment of four black HR employees, resulting in four race discrimination complaints against her in a two year period of time creates at least a prima facie inference that race was a factor in Campbell's decision to terminate Byrd, but not a single one of the white HR employees, during the merger and HR realignment. As this is a case in which Defendant has argued that PLS' closure left "no employees" for the PLS HR department to support (P's Apx 331), Defendant's treatment of the white members of the PLS HR department, Dickson and Goluguri, should matter even if they were employed in lower-level positions than Byrd. Either there are employees to support and work to be performed in a business unit, or there isn't.

Defendant's excuse that Goluguri and Dickson were retained because of their historical knowledge of PLS' operations makes little sense in light of Defendant's argument that PLS ceased operations. Why would Defendant need continued historical knowledge of a business unit that no longer existed? In addition, the e-mails show that once Goluguri and Dickson transferred to Primoris in February 2023, they lost all visibility and access to PLS systems – therefore their

historical knowledge of PLS' systems also became irrelevant. (P's Apx. 071, Campbell Dep. 244:19–25). Even Campbell acknowledged in an e-mail that there would "nothing" for Goluguri to do once she was transferred, and Goluguri had pre-existing performance problems that raise even more questions why Golugri was retained if Campbell wasn't simply giving Goluguri preferential treatment because of her race.[4] (P's Apx 071-072 & 487-493, Campbell Dep. 243:14-244:5, 244:19–25, 246:2–25; 247:21–25 & Goluguri Warnings).

In addition, even though Dickson held a job title one level below Byrd's title, Campbell confirmed at her deposition that after Byrd's termination, a February 24, 2023 headcount report listed Dickson as taking over Byrd's supervisory slot over the 317 PLS employees still pending transfer. (P's Apx. 065-066, Campbell Dep. 218:1–21, 215:15-216:7):

*Before Byrd's Termination:*

Alicia Campbell/Chrlotte Byrd-Chapman

| BU | Type | Locations | Employee HC |
|---|---|---|---|
| PLS | Power Delivery | TX, GA, NM | 404 |
| | | Total | 404 |

(ECF #39-2 PageID 738, App. 62)

*After Byrd's Termination:*

| | | | | |
|---|---|---|---|---|
| 23 | Alicia Campbell/Ashley Dickson | | | |
| 24 | BU | Type | Locations | Employee HC |
| 25 | PLS | Power Delivery | TX, GA, NM | 317 |
| 26 | | | Total | 317 |

(P's Apx 406)

A reasonable jury could conclude that Campbell treated Wood, Bagony, Dickson, and Campbell preferentially in situations that also warranted the elimination of their positions because of these four employees were white.

[4] Hendrick denied that the decision to retain Goluguri had anything to do with the fact Goluguri's father worked for the company in corporate. (P's Apx. 101, Hendrick Dep. 173:12-25).

**D. Primoris Is Not Entitled to Summary Judgment on Plaintiff's Retaliation Claims**

**1. Plaintiff Engaged in Protected Activity Under Title VII and Section 1981.**

Defendant argues that Byrd did not engage in protected activity because she was simply performing her ordinary job duties. Defendant relies on an Fair Labor Standards Act (FLSA) case, *Hagan v. Echostar Satellite, LLC*, 529 F.3d 617 (5th Cir. 2008), to argue that there is a "manager rule" that requires HR employees to "step outside" their role to engage in protected activity under Title VII and Section 1981. This argument is wrong for two independent reasons – one legal and one factual.

**a. *Hagan* Does Not Apply to Title VII or Section 1981, or TCHRA Cases**

As a matter of law, *Hagan's* FLSA manager rule does not apply to Title VII or section 1981 retaliation claims.

Defendant concedes that the 5th Circuit has never applied *Hagan's* FLSA "manager rule" to Title VII claims. *See Binh Hoa Le v. Exeter Fin. Corp.,* No. 3:15-CV-3839-L, 2019 WL 1436375, at *34 (N.D. Tex. Mar. 31, 2019) (Judge Sam A. Lindsay acknowledging "the lack of Fifth Circuit authority directly on point" and deciding the case on other grounds), *aff'd,* 990 F.3d 410 (5th Cir. 2021), and *aff'd*, 990 F.3d 410 (5th Cir. 2021).

Defendant fails to mention that four Circuits that have directly decided the issue have found that the FLSA's "manager rule" does not apply in Title VII cases because the statutory language of Title VII defines protected activity in an entirely different manner than the FLSA. *See Patterson v. Georgia Pac., LLC,* 38 F.4th 1336, 1346–48 (11th Cir. 2022) (holding that Title VII's " statutory text does not indicate that any employee or category of employees, like HR managers, is to be analyzed under a special rule or subjected to a different legal standard than other employees or categories of them); *DeMasters v. Carilion Clinic,* 796 F.3d 409, 422–24 (4th Cir. 2015) (same

holding); *Jackson v. Genesee Cnty. Rd. Comm'n,* 999 F.3d 333, 346 (6th Cir. 2021) (same holding); *Littlejohn v. City of New York*, 795 F.3d 297, 317 n.16 (2d Cir. 2015) (declining to adopt the manager rule in a Title VII case for the same reason).

The 2nd, 4th, 6th, and 11th Circuits have found that statutory "differences counsel against important the 'manager rule' into Title VII" because, unlike the FLSA's narrowly-drawn retaliation provision, Title VII includes a broad opposition clause that makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter…" *See DeMasters, supra,* 796 F.3d at 409. These cases observe that "[i]nstead of referring to job titles or duties, the key word in the opposition clause is 'opposed.' Congress made the verb, not the noun, the key. What matters is not the job duties or title of the employee but the actions or conduct that caused the retaliation against her." *Patterson, supra,* 38 F.4th at 1347 (11th Cir. 2022) (citations to 42 U.S.C. § 2000e-3(a) and *Littlejohn v. City of New York* omitted).

This same logic applies to Section 1981 claims as the definition of protected activity under Section 1981 mirrors Title VII and broadly includes opposition to racially discriminatory practices. *See Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019) ("we have repeatedly explained that '[r]etalation claims under § 1981 and Title VII ... are parallel causes of action," which means they 'require[ ] proof of the same elements in order to establish liability.'") (citations omitted); *See Scott v. U.S. Bank Nat'l Ass'n,* 16 F.4th 1204, 1209–10 (5th Cir. 2021), *as revised* (Nov. 26, 2021) ("An employee engages in a protected activity under Section 1981 when 'he has opposed any practice made unlawful by [Title VII].'")

Defendant's argument that the U.S. Supreme Court's *Crawford* ruling somehow supports imposition of a manager rule in Title VII (and, by extension Section 1981) cases has also been

rejected. "While the Court indicated in *Crawford* that there may be 'eccentric' exceptions to the sweeping protections of the Opposition Clause, such as 'an employee's description of a supervisor's racist joke as hilarious,' neither in *Crawford* nor in subsequent cases has the Court endorsed a categorical exception based on an employee's workplace duties *DeMasters*, *supra*, 796 F.3d at 423. As noted by Defendant, the U.S. Supreme Court decided *Crawford* a year after the 5th Circuit decided *Hagan,* and, the FLSA manager rule had been circulating in other Federal court opinions since 1996. *See McKenzie v. Renberg's Inc.,* 94 F.3d 1478, 1486 (10th Cir.1996) (applying FLSA manager rule to an FLSA relation claim); *E.E.O.C. v. HBE Corp.,* 135 F.3d 543, 554 (8th Cir. 1998) (same)*; Claudio-Gotay v. Becton Dickinson Caribe, Ltd*, 375 F.3d 99, 102 (1st Cir. 2004) (same). The fact the U.S. Supreme Court knew about but did not cite FLSA manager rule or circumstances consistent with it as one of the "exceptions" that may exist to Title VII's opposition clause in *Crawford* is a clear indication that the U.S. Supreme Court did not believe it was appropriate to endorse the use of the HR manager rule in Title VII cases.

Policy-wise, "Supreme Court precedent also militates against restricting the scope of Title VII's anti-retaliation provision, which has been held to 'provide broad protection from retaliation,' and to cover a wide range of conduct through which an employee communicates to an employer the employee's "belief that the employer has engaged in ... a form of employment discrimination.' *Id*. Circuit courts have noted specific public policy reasons that HR Managers should have the same anti-retaliation protections under Title VII as any other employee: "[T]he categories of employees best able to assist employees with discrimination claims—the personnel that make up EAP, HR, and legal departments—would receive no protection from Title VII if they oppose discrimination targeted at the employees they are duty-bound to protect. *DeMasters, supra,* 796 F.3d at 423. "[N]arrowing the scope of Title VII could create perverse incentives for employers

and leave the employees specifically hired to do the often difficult work of combating discrimination with fewer protections than general employees." *Jackson*, *supra,* 999 F.3d at 345.

Citing to this policy reason as well as the lack of 5th Circuit authority, the Western District of Texas held that an employer in a Title VII retaliation case was "not entitled to summary judgment on the retaliation claim on the basis of *Hagan"* and that "no authority extends the *Hagan* rule to Title VII. *Rangel v. Omni Hotel Mgmt. Corp.*, No. SA-09-CV-0811, 2010 WL 3927744, at *4–6 (W.D. Tex. Oct. 4, 2010). This Court should make the same ruling in this case.

**b. Even if *Hagan* Applies, Plaintiff Stepped Outside of Her Role**

As a factual matter, even if *Hagan*'s framework did apply to Byrd's Title VII and Section 1981 claims, Byrd stepped well outside her ordinary job duties with the actions she took on February 20, 2023. Needless to say, it is not in any HR Manager's normal job description to either follow, or refuse to follow, an unethical and immoral directive to get a victim of race discrimination to remove all references to race discrimination from their witness statement. Here, Byrd not only refused a direct order from her supervisor in order to stand up against race discrimination in the workplace, she advocated for a victim of race discrimination both in her meeting with her supervisor and afterward, and reported to another HR Manager that she was being removed from an investigation into the use of a racial epithet to facilitate a cover-up.

The EEOC has long identified "refusing to obey an order because the worker thinks it is unlawful under Title VII" as protected oppositional activity. *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579 (6th Cir. 2000); *See Also* EEOC Compliance Manual § 8–IIB2. In reliance on the EEOC manual and case law, the Northern District of Mississippi held that "refusing to encourage a subordinate employee to drop an EEOC charge may constitute protected activity." *Jones v. Mississippi Valley State Univ.,* No. 4:20CV152-M-JMV, 2021 WL 5629227, at *3 (N.D. Miss.

Nov. 30, 2021). Here, Gill had not filed an EEOC Charge but had reported to internally to HR, through Byrd, that a white Director had called him the "n" word twice. The Fifth Circuit has acknowledged that "the term 'nigger' is a universally recognized opprobrium, stigmatizing African–Americans because of their race" and "that racial epithets undoubtably demonstrate racial animus." *Brown v. E. Mississippi Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993); *Jones v. Robinson Prop. Grp., L.P.,* 427 F.3d 987, 993 (5th Cir. 2005). Byrd had every justification to believe that it would be unlawful under Title VII for Defendant to coerce Gill into retracting the portion of his internal HR complaint in which he reported that a white Director called him "nigger" twice. Byrd's refusal to obey a direct order to engage in such coercion was protected activity in and of itself.

It is only logical that once Byrd's employer gave her a direct order to help white-wash Gill's complaint, her refusal constituted "taking a position adverse to the employer" so as to take her activity outside of *Hagan's* purview. *See Haynes v. Crescent Real Est. Equities, LLC,* No. CIV.A. H-11-2201, 2011 WL 5597351, at *3 (S.D. Tex. Nov. 17, 2011). The Southern District of Texas had no difficulty finding a manager stepped outside of her role in an FLSA case when she persisted in pursuing an overtime issue after being told to "let it go." *Id.* The Court held "once her employer told her to stop and she failed to do so, she was stepping outside her job description as she was pursuing a role her employer had asked her not to pursue." *Id*.

In addition, Alicia Campbell's Declaration shows that, despite testifying to the contrary in her deposition, Campbell viewed Byrd's specific advocacy for Gill's right to report and obtain redress for racial discrimination as Byrd stepping outside of her job duties. Campbell states it was outside of Byrd's purview to initiate her own investigation into Gill's complaint, and attests that she was "confused" as to why Byrd continued to meet with Gill about Gill's complaint. Campbell

received messages from Byrd earlier on showing that Byrd clearly believed Gill's report of the racial epithet being used, and that Byrd felt the offending Director should be terminated. Wood testified it was her job, not Byrd's job, to investigate Gill's complaint because Gill worked in her business unit. Campbell's decision, because of that, was to tell Byrd to stand down so that Wood could complete the investigation. Campbell then received a screenshot from Shunte Curtis showing that Byrd had reported to Curtis her continued belief that a white Director did in fact call Gill a "nigger" and that Campbell had removed Byrd from the investigation so that the company wouldn't have to do anything about it. Curtis was, by that time, no longer Byrd's peer but an HR Director who was higher up than Byrd in the HR reporting structure.

*Crawford v. Metro. Gov't of Nash. & Davidson Cnty.*, 555 U.S. 271, 276–77 (2009) makes clear that even informal complaints—such as Byrd expressing to Curtis that "we had a director call an employee the N-word and I honestly feel they are not going to do anything about it since they removed me from the investigation"—constitutes protected opposition activity. Byrd communicated her belief that Primoris was not properly investigating race discrimination and was moving to suppress the evidence.

Furthermore, as the Fifth Circuit itself recognized in *Hagan*, the "manager rule" was designed to prevent HR employees from claiming protection for doing nothing more than ministerial tasks such as forwarding an employee's legal question about overtime to a higher up, not to bar HR employees from claiming protection for "actively assisting other employees' in asserting FLSA rights." *See Hagan*, 529 F.3d at 628. The Fifth Circuit has since recognized that even in the FLSA content, an HR manager's consistent advocacy for the rights of a single employee's statutory rights takes the matter outside of the manager's normal job duties. *Starnes v. Wallace,* 849 F.3d 627, 634 (5th Cir. 2017). There are certain ample facts for a jury to conclude

that Campbell viewed Byrd as an active advocate for Gill, and fired her because of it.

**c. Byrd's Protected Activity Was Reasonable and in Good Faith**

In a last ditch attempt to obtain summary judgment on Plaintiff's retaliation claim, Defendant attempts to argue under *Whatley* that Plaintiff's oppositional activity was unprotected because it was not reasonable or in good faith. However, Campbell and both of her HR Managers admit that it is wrong to ask or pressure a witness to change their statement in a race discrimination investigation. (P's Apx. 049, Campbell 107:20-108:7) (P's Apx. 274-275, Bagony 45:6-9, 46:2-6) (P's Apx. 297, Wood 86:1-6). On a scale of 1 to 10, with 10 being the most serious violation of HR best practices, Defendant's own HR Manager Wood said it would be a "10" for "a human resources director to put pressure on a human resources manager to alter their investigative findings or witness statements." (P's Apx. 297, Wood Dep. 88:4-11). Wood also admitted that a human resources professional "does the right thing by refusing to ask the employee to change their statement." (P's Apx. 297, Wood Dep. 87:16-23).

In light of this evidence, Byrd's activities were reasonable, did not violate either HR best practices or protocol, and did not interfere with Defendant's "right to run a business." *E.E.O.C. v. Premier Operator Servs., Inc.,* 75 F. Supp. 2d 550, 559 (N.D. Tex. 1999) (finding that it was for a fact-finder to determine whether the employees' refusal to sign an agreement not to speak their native language in violation of an employer's "English-only" policy was so "unpalatable, immoral, or degrading" as to outweigh the employer's right to run its business).

**2. Byrd's Protected Activity and Termination are Causally Connected**

When an employee's protected activity and termination are "very close in time," timing alone establishes causation. *Brown v. Wal-Mart Stores E., L.P.,* 969 F.3d 571, 578 (5th Cir. 2020), *as revised* (Aug. 14, 2020) (citing *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810

F.3d 940, 948 (5th Cir. 2015). The one day gap between Byrd's protected activity and her termination "is shorter than gaps…previously found sufficient to show a causal connection" and therefore establishes Byrd's prima facie case of retaliation on timing alone. *Id.*; *See Also Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (five day lapse sufficient to establish a causal connection).

This is true even in the context of companies undergoing RIFs. *Gosby v. Apache Indus. Servs., Inc.,* 30 F.4th 523, 527 (5th Cir. 2022). In *Gosby*, the 5th Circuit held that a six day gap between an employee's diabetic episode and layoff established a *prima facie case* of disability discrimination where employment continued for many other employees in the employee's department. *Id.* The Fifth Circuit rejected the employer's argument that temporal proximity didn't matter because the employee was newly hired and expected to be laid off soon anyway. *Id.*

Here, in addition to timing, the decision-maker – Campbell – not only had knowledge of Byrd's protected activity, Campbell is the one whose actions Byrd resisted and criticized. (P's Apx 482-483 & 018, 2/20 Chat & Byrd Dep. 222:3–18). The Fifth Circuit has held that the decision-maker's knowledge of the protected activity "might be sufficient to establish the 'causal link' element of a prima facie case of retaliation." *Shannon v. Henderson,* 275 F.3d 42 (5th Cir. 2001); *See also Garcia v. Penske Logistics, LLC*, 165 F. Supp. 3d 542, 559 (S.D. Tex. 2014), *aff'd sub nom. Garcia v. Penske Logistics, L.L.C.,* 631 F. App'x 204 (5th Cir. 2015).

**3. Pretext Defeats Summary Judgment on the Retaliation Claims**

"In the context of a summary judgment proceeding, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." *Caldwell v. KHOU-TV,* 850 F.3d 237, 242 (5th Cir. 2017). "Proof that the defendant's explanation is unworthy of credence…can be quite persuasive…the trier of fact can reasonably infer from the

falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, *supra*, 530 U.S. at 147. "[R]ejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination…" *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

**Timing & a Discredited Termination Reason.** The Fifth Circuit has held there is "no room to doubt" that a plaintiff-employee has carried her summary judgment burden when evidence that discredits the employer's proffered reason for termination is combined with "near-immediate temporal proximity of the discharge to the protected activity." *Watkins v. Tregre*, 997 F.3d 275, 285–86 (5th Cir. 2021). In addition to the near-immediate proximity of Byrd's discharge to her protected activity, Madison's Declaration offers clear evidence that discredits Campbell's reason for Byrd's discharge. Campbell has consistently claimed Byrd was laid off due to the closure of PLS. (P's Apx 346 & 354-355, Rog 3). Campbell has never once identified a performance reason for Byrd's termination, and testified that Byrd was not fired because of anything Byrd did or did not do during the Gill investigation. (P's Apx 346 & 354-355 & 075, Rog 3 & Campbell Dep. 264:8-13). Madison, however, attests that Campbell admitting to terminating Byrd because Byrd did said or did something wrong during an interaction between Campbell and Byrd in Campbell's office. (P. Apx 337, Madison Dec. ¶ 14). This is not hearsay, this is a party admission, and evidence of Campbell's state of mind and motives - and the details match up with Byrd refusing Campbell's directive in the February 20th meeting in Campbell's office. FRE 801(d)(2); FRE 803(3).

Additionally, there is evidence that Campbell was willing to use the excuse of a layoff to terminate employees for performance reasons or retaliatory reasons. Byrd informed Campbell that HR Generalist Alexis Goluguri had serious performance issues, and Byrd drafted and sent a final written warning for Goluguri to Campbell. (P's Apx. 487-493, Goluguri Warning Emails).

Goluguri, as a result, was supposed to be terminated for performance in November 2022. (P's Apx. 020, Byrd 263:23-264:). In response, Campbell told Byrd that, because Goluguri's father worked for the company, instead of terminating Goluguri for cause (including stealing company time), Campbell would "wait until May and just say it was a layoff." *Id.* The Sealed Exhibits also show that Campbell allowed another so-called "layoff" for retaliatory reasons. (P's Apx 524 & 526, Sealed Deposition 60:5-64:12, 74:2-20) (P's Apx. 511-512, Sealed Exhibit ¶¶ 65-75).

**False Representations.** Under Fifth Circuit precedent, evidence of pretext also includes evidence that an employer has made "flatly untrue" statements to the EEOC. See *Burton, supra,* 798 F.3d 222 at 238 (5th Cir. 2015) (Evidence showing that statements made to the EEOC were "flatly untrue" was some evidence of pretext); *McInnis v. Alamo Comm. College Dist.*, 207 F.3d 276, 283 (5th Cir. 2000) (reversing summary judgment in part because the employer's report to the EEOC "contained false statements."). Defendant told made two flatly untrue statements to the EEOC. First, in an attempt to make it appear that Byrd engaged in wrongdoing rather than protected activity, Defendant told the EEOC that Gill had complained to Wood about Byrd's handling of the investigation and complained that she inserted the racial slurs into his statement. (P's Apx. 331-332). Both Wood and Gill confirm that this is simply not true. (P's Apx. 309-310 & 036-037, Wood Dep. 173:20-174:9 & Gill Dep. 152:21-153:7). Second, in an attempt to justify Byrd's February 21, 2023 layoff date, Defendant told the EEOC that there were no longer any PLS employees for Byrd to support as of February 21st. (P's Apx. 331). There were, however, still 317 PLS employees who had not transferred to PTD yet as of February 21, 2023. (P's Apx. 111 & 065, Hendrick Dep. 229:1-4 & Campbell Dep. 215:15-216:2, 216:16-19).

**Shifting Explanations.** The Fifth Circuit has also held that a Defendant's shifting explanations for its actions are evidence of pretext. *Burrell v. Dr. Pepper/Seven Up Bottling Grp.,*

*Inc.*, 482 F.3d 408, 413 (5th Cir. 2007). Defendant has offered shifting and inconsistent explanations for why Byrd was suddenly terminated on February 21, 2024, when Campbell planned to retain Byrd to provide support to PDS and Hendrick, who was unaware of Campbell's plan, had told the integration team to list April 1, 2023 as Byrd's possible layoff date. (P's Apx. ). Bagony and Campbell testified that Campbell wasn't the one making RIF decisions for the HR team. (P's Apx. 279-280 & P's Apx. 064, Bagony Dep. 73:11-74:8 & Campbel Dep. 210:1-12, 18-25). Campbell also testified at her deposition that she couldn't recall if she was the one who put Byrd on the February 16th RIF list. (P's Apx. 064, Campbel Dep. 210:1-12, 18-25). Yet, Campbell and Hendrick claimed in sworn interrogatory responses and their depositions that Campbell was the sole decision-maker for Byrd's termination. (P's Apx. 086 & 109, Hendrick 47:25-48;3, 48:16-49:4, 214:10-215:10, 216:19-3). Now, however, at the summary judgment stage, Campbell attests, without any doubt, that "we" – both she and Hendrick – "marked Ms. Byrd to be included in the RIF" on February 16th. (ECF # 39-1 at PageID 682, Campbell Dec. ¶ 14).

Defendant also originally explained the February 21, 2023 termination date by stating Campbell didn't want the hassle of issuing Byrd two W-2s were she to transfer as part of the merger along with Dickson and Goluguri. (P's Apx. 346). Hendrick then admitted issuing two W-2s to an employee is not a big deal. (P's Apx. 102, Hendrick Dep. 175:24-176:12). Later, Defendant added a brand new reason – that company policy required Hendrick to be present for Byrd's termination and it was in fact Hendrick, not Campbell, who decided to move the termination date up to February 21st to accommodate her scheduling conflicts. (P's Apx. 354-355 & 106, Rog 3 & Hendrick Dep. 196:9-14). Hendrick, however, was never identified as a person who made the decision to terminate Byrd on February 21st, and Hendrick admitted there is no such company policy and that she wasn't present for any other HR terminations in 2023. (P's Apx 345

& 353 & 106-107, Rog 1 & 2 & Hendrick Dep. 197:25-198:16 ).

**Lack of Documentation.** The Fifth Circuit has also held that absence of documentation that should exist also constitutes evidence of pretext. *See Evans, supra,* 246 F.3d at 356 (5th Cir. 2001) (denying summary judgment based on timing and a lack of documentation to support a theory of preexisting disciplinary problems); *Burton*, *supra,* 798 F.3d at 239–40. If Hendrick and Cambell truly had planned to terminate Byrd on February 24th (and only moved up the date to accommodate Hendrick's schedule), a reasonable jury would expect some documentation of that plan to exist . The company was circulating spreadsheets and e-mails listing employee transfer and RIF dates (P Apx. 315-319, 321-323, 325-326, 384-387, 389-402, 422-426). In addition, Campbell claims she had to coordinate Byrd's termination meeting with Hendrick (P Apx. 074, Campbell Dep. 258:9-22). Campbell also had to prepare, and get approval to offer, Byrd a severance that Byrd was not entitled to under the rules the company had set for merger-related layoffs. (P's Apx. 060 & 495-501, Campbell Dep. 185:1-21 & Severance Information).[5] Yet there is not a single RIF list, e-mail, chat message, or document showing any plans to lay off Byrd with a severance on February 24th. (P's Apx. 086-087, Hendrick Dep. 45:19-46:1). Hendrick also admitted there is no documentation of her travel schedule that would explain why the termination had to occur on February 21 rather than February 24 or later in Wave 5 or the Final Wave. (P's Apx 106, Hendrick Dep. 195:14-17).

**Motive.** The Fifth Circuit has looked at the motive of the decision-maker when deciding if adequate evidence of retaliation exists. *Long v. Eastfield Coll.,* 88 F.3d 300, 306 (5th Cir. 1996) (the fact plaintiff complained about the same two individuals who moved to fire her constituted evidence linking the termination to the plaintiff's protected activity). The evidence does show that

[5] The company had decided that employees with less than 6 months of service would not get a severance, however Campbell offered Byrd a severance of 1 week of pay. (P's Apx. 495-501).

Campbell had a motive to terminate Byrd to prevent Byrd from continuing to advocate for Gill following Byrd's removal from the Gill investigation. A finding that Craddock used the "n" word would have resulted in Campbell's brother-in-law Vice President Adam Campbell losing his Director of Operations, Craddock. (P's Apx. 026-027 & 043 & 054, Gill Dep. 52:12-53:4 & Campbell Dep. 33:8-10, 144:5-7, 145:7-8). Campbell pressured Byrd and Gill to remove the "n" word from Gill's statement, knew that Byrd wanted to have a meeting with Hendrick and Hendrick's boss, the Chief Human Resources Officer Rhonda Anderson about the Gill investigation, removed Byrd from the investigation, and then found out Byrd was reaching out to other HR employees objecting to her removal from the investigation and accusing the company of a cover-up. (P's Apx. 018 & 033 & 482-483, Byrd Dep. 222:3–18 & Gill Dep. 135:19–136:6 & 141:14-22 & 2/20 Curtis E-mail & Screenshot) (ECF # 39-2 PageID 812).

Terminating Byrd was the only way to silence Byrd and remove Byrd from a position where Byrd could continue to internally advocate for Gill and for Craddock's termination. The fact that the company did then close out the investigation without trying to figure out whether Gill's original statement or retracted statement was more credible, without interviewing a key eye witness Kelly Porter, without asking Gill for a time-stamped photo of a noose he referenced in his original investigation, and without even following through with their watered down recommendation to provide training to Gill and Craddock, all show the company was more vested in protecting Craddock and the company than doing the right thing. (P's Apx. 472-473, 3/3/23 Wood E-mail) (P's Apx. 300-302 & 058-059 & 063 & 091-092, Wood Dep. 113:10-15, 114:19-115:10, 116:9-117:15, 118:3-8, 181:23-182:13 & Campbell Dep. 173:10-174:7, 175:13-20, 194:14-21 & Hendrick 67:1-21, 69:14-17, 76:22-77:5, 77:6-12).

### E. The Record Evidence Establishes a Timeline Consistent with Retaliation

Defendant's central causation argument is that the February 16 timestamp on the RIF list entry conclusively establishes that Byrd's termination was decided before anyone knew about the Gill investigation. This argument has at least four evidentiary problems.

During her deposition, however, Campbell could not confirm the exact date on which she made a final decision to terminate Byrd, stating there were "a lot of factors" and "too many factors." (P’s Apx 073,Campbell Dep. 257:6-16). A host of other evidence contradicts any assertion that any final RIF decision had been made on February 16th and an alternative plan existed to retain Byrd to provide HR support to PDS. (P’s Apx 073 & 071 & 065 & 066-067 & 069-070, Campbell Dep. 256:24-257:5, 245:3-245:9, 216:16-19, 220:5-222:2, 237:8-238:3, 238:15-23) (P’s Apx 389-391 & 397, 2/3/23 E-mails) (P’s Apx. 105 & 108, Hendrick Dep. 192:19-193:23, 210:20-25) (P’s Apx 410 & 268-269 & 270, Curtis Dep. 97:21-99:1 & Bagony Dep. 60:7-12).

Even if a jury were to believe the February 16th list definitively placed Byrd in some RIF queue, that list does not establish *when* the RIF would have been set to occur. The only evidence of a date set for any layoff of Byrd indicates she was to be retained until April 1, 2023. (P’s Apx 321-323). The ultimate question of why Cambell suddenly terminated Burd on February 21st — right on the heels of Byrd’s February 20th protected activity—remains genuinely disputed. *Patrick v. Ridge,* 394 F.3d 311, 319 (5th Cir. 2004) (the ultimate question is what was going through the decision-maker’s head at “the instant that the decision was made…”).

A jury could reasonably conclude Campbell only terminated Byrd on February 21, 2023 because of Byrd’s refusal to change Gill’s statement and complaint about her removal from the investigation. The acceleration of an employee’s future layoff by six weeks due to an employee’s protected activity costs an employee six weeks of pay and benefits, and constitutes a materially

adverse action that would deter a reasonable employee from engaging in protected activity. *Gosby v. Apache Indus. Servs., Inc.,* 30 F.4th 523, 527 (5th Cir. 2022); *Also See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1268–69 (11th Cir. 2010) (it is a materially adverse action to fire an employee sooner than the company otherwise would have absent the employee's protected activity); *See Also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 72-73 (2006) (a materially adverse action is one that "might have dissuaded a reasonable worker" from engaging in protected activity and includes the loss of 37 days of pay even if the employer later issues back pay for the period of the loss).

## V. CONCLUSION

For the foregoing reasons, Plaintiff Charlotte Chapman Byrd respectfully asks the Court to deny Defendant's Motion for Summary Judgment in its entirety. Genuine disputes of material fact and credibility pervade this case. Plaintiff is entitled to have a jury resolve those fact and credibility disputes.

Date: June 1, 2026

Respectfully submitted,

**TREMAIN ARTAZA PLLC**

/s/ Christine A. Hopkins
Christine A. Hopkins
Texas State Bar No. 24095786
christine@tremainartaza.com
Carmen Artaza
Texas Bar No. 24055114
carmen@tremainartaza.com
6060 North Central Expwy, Ste. 567
Dallas, TX 75206
T (469) 573-0297
F (214) 254-4941

***Attorneys for Plaintiff Charlotte Chapman Byrd***

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2026, a true copy of the foregoing Brief and attached Appendix was electronically served via CM/ECF to all counsel of record.

/s/ Christine A. Hopkins
Christine A. Hopkins