# PLAINTIFF'S EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CHAPMAN BYRD, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| VS. | ) | Civil Action No. |
| | ) | 3:24-CV-2767-N |
| PRIMORIS SERVICES | ) | |
| CORPORATION; PLH GROUP INC; | ) | |
| and FUTURE INFRASTRUCTURE, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants | ) | |

--------------------------------

ORAL DEPOSITION OF

CHARLOTTE CHAPMAN BYRD

November 20, 2025

--------------------------------

ORAL DEPOSITION OF CHARLOTTE CHAPMAN BYRD, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and -numbered cause on the 20th day of November, 2025, from 10:08 a.m. to 6:32 p.m., at the law offices of Jackson Lewis, PC, 500 North Akard Street, Suite 2500, Dallas, Texas, 75201, before Jamie Gonzalez, CSR in and for the State of Texas, reported by oral stenography, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record and attached hereto.

Job No. CS7723955

those types of -- of administrative tasks. Those types of tasks. Do you have experience with all of those administrative tasks that I just listed?
A. I've worked in those yes.
Q. There's also a section of HR that is related to employee relations, correct?
A. Correct.
Q. And what job duties or responsibilities would you consider that you had in HR that were related to employee relations?
A. The investigation process is one of the ones that I dealt with the most when it came to employee relations. Engagement kind of falls into that as well.
Q. What do you mean by "engagement"? I just want to make sure --
A. Well, when you say "employee engagement," you want to do -- for me, employee engagement is getting employees involved, getting their input. You also want to make sure you do the performance management and things of that nature.
Q. Okay. I want to hone in and talk specifically about the investigation process. In your career in HR, how many years would you say experience you have in HR?
A. Eighteen to 20, maybe. In 2024, yeah. Eighteen to 20.
Q. Okay. So in your 18 or 20 years of experience in HR,



can you please walk me through the investigation process?
A. Well, for me, in my process and what I've utilized -- some people may do it differently -- you get a complaint. You want to make sure you action that complaint quickly. Normally, what I do is once it's brought to my attention, I start gathering facts. I get with the individual who is the person lodging the complaint. I get their statement or I get their interview done, and then I gather the facts from the person being accused. And if there are anybody else that can attest to what transpired, my job is to speak with everyone.
And then once I get all the information and facts presented and put together, I give that information to my boss. Also, with most of the investigations that I dealt with, especially with Maximus, I like to engage the legal team. And then once there is -- you know, once I have my determination, I'll put together, you know, what I feel like needs to be recommended. I give my recommendation -- I put together the facts, I give my recommendation -- and then we go from there.
Q. Okay. That was a great summary for me. I'm going to want to break that all down.
A. That's fine.
Q. Okay, so you say that the first thing that happens to initiate an investigation is that you get a complaint, correct?
A. Someone has to have something happen that requires that, or something has to be brought to our attention.



Q. And I want to specifically talk to you about your experience with the investigation process as an HR manager, okay?
A. Okay.
Q. When you receive a complaint, as an HR manager -- well, tell me -- as the HR manager, do you report to anyone else?
A. Yes.
Q. Who do you report to?
A. Either I report -- well, I've reported to the VP of HR before, I've reported to -- at Primoris, I reported to the director. I don't know if she was a senior director or a director at the time, but I reported to the director.
Q. And when you were reporting to the VP of HR, was that Maximus?
A. Yes.
Q. Anywhere else?
A. No. I don't remember.
Q. When you receive a complaint, do you notify your supervisor, or who you report to, that you're starting an investigation? Is that a standard practice?
A. Normally what I do is, when someone comes in, I get the information from them. Contingent on what it is and the severity of it, I let them know, yes.
Q. And what severity would raise to the level --what



kind of action would raise the level of severity that you wanted to notify your supervisor?
A. Racial discrimination is one, violence is another. If it's just a dispute between two coworkers, then I'll talk to them and let them know, but certain ones have to be escalated.
Q. Okay. So you get the complaint. How quickly after receiving a complaint -- if, say, it's dealing with race discrimination -- would you notify or take it up the chain of command?
A. I'd like to get a good understanding of it. I like to come -- I like to have everything together, at least the individual statements, so that I have a clear understanding of what it is. So that I can say, "Hey, we have," -- You know, I may say, "Hey, we've got this situation going on. Once I get some more particulars on it, you know, I'll bring it to you and we can start going at it." It just depends.
Q. Then why do you escalate it?
A. You want to escalate those because the legal implications, you don't want. And you want to make sure it's taken care of in a timely fashion for everybody involved. But for legal implications.
Q. Okay. So you said that you get the complaint. And then the next step, I believe you said if it's a severe issue, you'll let your supervisor know about it. When you're conducting interviews and gathering the facts, first you said

that you talk to the complainant first. Is that correct?
A. That's usually the person that brings it.
Q. And then you said you gather the facts from the accused, correct?
A. Yes. I start interviewing everyone. And it doesn't go in any particular order. It's just dependent on the situation and the circumstances and the timeframe at the time. It's not a particular order on how I talk to them, but normally in any complaint, you talk to -- the person that has the grievance or the issue, you talk to them first.
Q. And then who -- other than the complainant and the accused, who else do you talk to?
A. If there's anyone else that can attest to it. So if there's anybody that was a witness or anyone that has any information, you talk to them. That can provide some insight or a complete story.
Q. And when you're conducting these interviews, what are you doing during the interview?
A. I document. I have -- normally prior to doing something formal, I have my – there's a set of – there's a plan put in place. There's a set of questions that are asked. And what I'll do is I'll ask the question and I'll type in the answer. So I'll do, like, a document. A statement.
Q. Are you doing that contemporaneously while speaking with the individual?



A. I'm doing it as we talk.
Q. Do you prepare the questions beforehand, or are you typing up the questions as well?
A. Well, I'll have a standardized set of questions prior to. And as we are talking and things come to mind, I'll type those questions in. And when I let them know, you know, "I am sitting here with you. If you hear me silent, I'm just, you know," -- I'll jot down my question and then I'll add their answer.
Q. Okay. When you are conducting witness interviews or interview of the – let's start -- I don't want to do a compound question, I'm sorry.
So when you're conducting your first interview of the complainant, are you taking notes at that time?
A. Yes.
Q. Always?
A. I take notes. If I'm talking to you, I'm taking notes.
Q. And you said that you're taking these notes contemporaneously. That you have a standard set of questions that you might start with, but as you ask them you might add to those questions and write down the person's answer?
A. If I need more clarification. If something else that they mention -- I do add additional questions as we go along, if needed. It's just -- like I said, it's contingent on what's



going on.
Q. When something serious happens, how soon would you let your supervisor know about it?
A. It depends.
Q. Depends on what?
A. It just depends on what's going on in timeframe and when I find out and what I find out.
Q. Okay. So we've got that you get a complaint, you conduct investigations, you speak with the complainant first, and then -- in no particular order -- you're going to talk to people that witnessed it, someone who might have information, and the accused. Is that correct?
A. Yeah.
Q. What determines the order of who you interview?
A. It doesn't. It just depends who's available. Because people work, and I have to work around their schedule and things of that nature.
Q. Would you agree that it's a best practice to get the complainant's statement first, before interviewing anyone else?
A. Yes.
Q. Okay. And then once you've gathered, you've conducted your witness interviews, you've taken contemporaneous notes of the interviews, what's the next step in your interview process?
A. It just depends on how it's going. Once I've gotten



all my facts together, I'll make a determination. I'll talk to my boss or higher up, contingent on how severe it is. It just depends on how that's set up. And I'll present that information to them and let them know what's going on, and it depends on how -- from there. Like I said, each one is different. I can't sit here and just say x, y, z happens every time.
Q. Could you give me best practices, step-by-step, of what an investigation should contain?
A. It's going to have a complaint, it's going to have interviews, it's going to have an outcome. Is it substantiated or unsubstantiated? It's going to have a recommendation, it's going to have a -- you know, whatever that outcome is, whether it's termination or something else. And those are the top five.
Q. When you've conducted an investigation and it's a he said, he said -- or, she said -- situation, how do you make a determination as to the outcome or the resolution of the complaint?
A. There's a lot of different factors that go into that. Interviews with the individuals. Again, you take into account witnesses. You have to take all those things into account. And you kind of put together -- you can take the pieces of it, and you put it together. You can tell by the -- sometimes, by the -- individual that's making the complaint. You can tell by

A. There was one.
Q. And what is your definition of a complaint of race discrimination?
A. Racial slurs, mistreatment on the job. I've made a complaint, myself. I've received other complaints that I forwarded, but there was only one that I investigated. There was another one that we -- involving three gentlemen in Florida.
Q. Okay, let's break that down. So for you, the definition of race discrimination would include racial slurs, mistreatment on the job. Anything else?
A. It's really contingent on what that individual wants to -- anything that has to do with their race, right? And anything that's offensive to that person, whether it be, you know -- it's just a number of things that fit under that.
Q. Okay. And as we sit here today, you remember conducting one investigation at Primoris into a race discrimination complaint, correct?
A. There was another incident involving some gentlemen in Florida.
Q. So there were two complaints of race discrimination that you investigated while working at Primoris?
A. I'm trying to see how that one actually panned out as far as -- that one was really complicated. Because there were -- there were text messages. It was just a lot. So I -- it



was -- I don't want to misstate on it, but it was -- there was something there.
Q. There was an element of race discrimination there?
A. There was -- there was -- yes.
Q. And the other one that you say that you did conduct. Is that the Tony Gill investigation?
A. That was Tony's.
Q. Okay, and we'll -- I want to get into those later. We're going to get into details of that, but I'm just trying to get a general background of the types of investigations you've conducted.
A. Mm-hmm.
Q. You said you received other complaints and forwarded them. What other complaints did you receive at Primoris that you forwarded?
A. I made a complaint.
Q. Okay, so I -- that's going to be a separate question. Let's talk about -- what complaint did you make?
A. I made a complaint about Bryce Burns.
Q. To who?
A. Alicia.
Q. And what was the complaint?
A. He made a comment regarding minority employees.
Q. When did you do that?
A. That was -- it had to be sometime in October. End of



October, maybe. I don't know. I know it was around that time.
Q. Okay.
A. Maybe the end of November, sometime around there. I don't know the specific date.
Q. Any complaints of retaliation that you investigated -- well, sorry. Any other complaints of discrimination or race discrimination that you either forwarded or made at Primoris?
A. I made complaints to Leslea Scott about some of the things that I was experiencing.
Q. Okay, I got a little ahead of myself. Would it be fair to say that conducting investigations for Primoris was a part of your job responsibilities as an HR manager?
A. Yes.
Q. And you already -- I think you already answered this, but making -- complaining about race -- if you saw race discrimination, that's part of an HR manager's job to complain about it, correct?
MS. ARTAZA: Objection, form.
THE WITNESS: Say that again?
Q. (BY MS. PLAGENS) As an HR manager, if you see something -- have you heard the phrase --
A. If you see something, say something? Yes.
Q. Okay? And so we could agree that reporting -- if you see race discrimination, reporting is part of the job as an HR manager, right?



MS. ARTAZA: Objection, form.
THE WITNESS: Yeah.
Q. (BY MS. PLAGENS) When you conduct interviews, who's present?
A. Me and -- it just depends if there's someone available. I've done them with someone in the room, and I've done them without someone in the room. It's normally me and that individual. It just depends.
Q. And why would there be another person there?
A. If the manager wants to be there or if there needs to be, like, a third person verifier. But a lot of the ones I've done, I've done.
Q. What circumstances would require another person to be present in the room?
A. It just depends. If, for example, you want to make sure that if the person -- you want to make sure that person is comfortable. If you want to make sure that -- there's any number of reasons to have another person involved. Like I said, I've had it both ways. I've had a manager in there because the person being interviewed had the potential to be violent. So there's a number of reasons.
Q. But if you're interviewing someone and you're talking to someone, you're taking notes, correct?
A. I am taking notes. I have my computer there.
Q. Can we agree that it's an HR best practice to

A. There may be others I can't think of at this time. At this particular moment.
Q. Okay. How did Bryce Burns violate the anti-discrimination policy?
A. When he made the comment to me -- he made a comment to me, stating that you can't let the prisoners run the prison, when referring to -- during a very heated discussion he was having with me regarding three minority employees in Florida.
Q. How do you know that prisoners -- I mean, what about prisoners who run the prison has a racial connotation?
A. It's a stereotype. He knew what he was saying.
Q. Are you implying some sort of --
A. Because --
Q. That it refers to people of color?
A. No, because I told him -- it did.
Q. And how do you know that?
A. Because it's been said before.
Q. By who?
A. It's a negative connotation in association with a particular group when it comes to prison and jail and things of that nature.
Q. But nothing in the comment of "prisoners run the prison" says people of color that are prisoners, that run the prison. Or -- who's making this assumption that there's a negative connotation --



A. It's not an assumption. It's not an assumption.
Q. What is that based on?
A. It's based on what he said and how he talked to me and how he was handling me during that conversation as well.
Q. Explain to me how that had a racial connotation.
A. When you get on the phone -- this is -- and I'll just go through it in this context. He was wanting to fire these gentlemen, which is fine. I told him we had to follow the progressive steps, okay? He was very belittling, he was very demeaning, he was very dehumanizing to me. And then he says, "I don't want them here. We don't want them here. You can't let the prisoners run the prison."
And my direct response to him was correction. I said, "You cannot say that. And you cannot say that to me."
His response was that he could say whatever he wanted. And that he -- they were not welcome here. He did not want them.
Q. What was the reason why he wanted them terminated?
A. I cannot remember the particulars of what was going on. I know that, eventually, those individuals were fired, which I knew they would be. That's why I said we needed to follow the progressive steps.
Q. Do you know why? Do you remember what it was that they were being terminated for?
A. They were initially -- Luke Naron came to me --



because that was the person that was working out there -- came to me and they were having attendance issues, initially. That was the initial issue with Luke. Them not coming to work. And I believe that it started to get progressively worse. I can't remember anything after that.
I do know that there was an instance later involving e-mails -- not e-mails, text messages -- within the group and then they just kind of -- I know it got really bad at one point, to when they were all gone. We terminated one of the two, Luke and I. And then I think the other two just got -- it just went -- it just went bad.
Q. So how did Bryce Burns become involved?
A. Bryce is the director over that group. Luke reports to -- he's one of the higher-ups to Luke. I don't know if there's a person between them, but I know that Luke reports to Bryce.
Q. Was this a telephone conversation, in person? When did this alleged conversation occur between you and Bryce Burns in which he said, "You can't let the prisoners run the prison"?
A. It was a phone conversation.
Q. How long was the call?
A. Oh, I don't know.
Q. Ten minutes?
A. I don't know how long that call was.
Q. Less than 30 minutes?



A. Again, I don't know. I don't know how long that call was. I just remember having that call.
Q. And then, how does the comment "you can't let the prisoners run the prison" relate to you?
A. I'm a Black woman.
Q. Did you report this to someone?
A. I told Alicia about it.
Q. When?
A. I want to say I talked to her the day after because -- either it was the day after we talked, it happened. Or it may have been the day after that because after it transpired, she came and worked at our -- she came down to the Fort Worth office and she met with Bryce.
Q. Anything else that you -- that you're claiming by Mr. Burns that was discriminatory?
A. He was referenced in a text message as "the big dog," and I knew that was him because in a conversation prior to those text messages, there was a couple other employees that referred to him as that.
Q. Who?
A. Patrick Conrad. I remember asking him who that was, and he said that's what -- they would call Bryce that.
Q. Who is Patrick Conrad?
A. Patrick Conrad is -- he works with the guys in Florida. He's under Luke. I believe he was under Luke. He

Page 134

Q. And if you turn to page Primoris 741, do you see that same e-mail from Bryce Burns, October 28th? "Please write up the safety violations for William Norman and attach to this e-mail for termination due to major safety violations today"?
A. I see that on there.
Q. Okay. And then if you turn the page, there are some attachments to this one. There is a proposed employee warning notice, correct?
A. Yes, I see this.
Q. And this was created by -- is it Patrick Conrad? Correct?
A. Patrick.
Q. So, Patrick is the one who recommended termination, correct? Because if you look under -- "type of warning, other, recommended termination."
A. I would've had a conversation with him about this. I really can't speak to it because I wouldn't -- it's different.
Q. Why can't you speak to it?
A. Because I didn't fill this out. Patrick did.
Q. Okay. So someone else other than Bryce Burns also wanted him terminated. Recommendation for major safety violations, correct?
A. If there was a safety violation, then I would've conceded to that.
Q. Okay. So if you look on the handwritten notes on

Page 135

Primoris 743, top says, "Terrence was coached for working without gloves. He had gloves on his side."
Have you ever seen these written notes before?
A. I don't remember seeing them. I'm not going to say I didn't get -- I just don't remember it. That was some time ago.
Q. Then we've got an entry for Will on 10/28. "Will was coached on basic lineman knowledge."
10/27, he "sagged top phase and pressed it before sagging other conductors."
Do you know what that means?
A. No, I don't.
Q. The next entry says, on 10/28/22, "Will asked if could Mac jumper to a turn buckle, which is in no way okay. These turn buckle are between the insulator and the pole. It's obvious Will lacks basic electrical knowledge."
Did I read that correctly?
A. Where are you at on that?
Q. Primoris 743. The third handwritten entry.
A. I see that.
Q. "It's obvious Will lacks basic electrical knowledge."
Did I read that correctly?
A. You did read that correctly.
Q. You understand that Mr. Burns was the vice president of distribution, correct, for Primoris transmission and

Page 136

distribution?
A. Yes.
Q. That's part of Primoris's power delivery sector, correct?
A. I'm assuming so.
Q. Are you aware that there are major safety concerns related to power delivery and electrical knowledge?
A. Now, I do know that this statement on 10/28 -- in Will's capacity, I would've had to confirm that with Luke. Because Luke did a lot of work, and they did an eval on this individual. So -- I don't know about that.
Q. On the first page of Exhibit 18, Primoris 739 -- would it be fair to say that someone working in the field is more familiar with safety concerns than you as an HR manager?
A. They're on -- they're boots on the ground. I can concede to that.
Q. So on October 31, '22, you say, "Good morning, Alicia. See attached documentation from Luke regarding Will Norman's termination request."
Did I read that correctly?
A. Yes.
Q. "I met with Luke and another employee from this group over the weekend, Terrence Norman."
Did I read that correctly?
A. Yes.

Page 137

Q. Do you remember that meeting?
A. I think I gave a -- I actually remember that it was on a weekend. I can't recall exactly what it was about, if I delivered any type of warning or something. But I do remember having -- Luke sent me an invite to meet with him over the weekend.
Q. You can concede that, since 2020, a lot of meetings are taking place over Zoom or remotely, correct?
A. Yeah.
Q. Did this safety meeting -- and I'll hand you Exhibit 19. Exhibit 19 is an e-mail chain between you and Luke Noran titled "Terrence Norman Meeting Recap Saturday."
(Whereupon Defendant's Exhibit 19 was marked for identification.)
A. Yeah.
Q. Is this talking about the meeting that you're talking about?
A. It was on a Saturday so yeah, it would be talking about it.
Q. So you were allowed to meet with at least some of the team that was reporting to Luke, correct?
A. Yeah, but he didn't want me -- he didn't want me down there. He didn't want to do a Zoom meeting. He wanted me in person. So there's a difference there. I wouldn't -- those aren't the same.

Page 150

A. And it was the one where you questioned where I said I was on the fence. And one of the reasons -- if you look at the employee warning notice for that termination, and you look down where it says "description of infraction" and things of that nature. If you look at that one and you look at 21, it's a lot more -- I can stand behind this a lot more than I can stand behind someone just writing some stuff down in a notebook. And for me --
Q. Who typed up -- sorry. Who typed up Primoris 685?
A. I believe that I assisted Luke with this.
Q. So explain to me why it is that Mr. Conrad's attachment of three pages outlining bullet pointed safety concerns is not enough supporting documentation, but a typed-up incident report about no show, no calls, misconduct, insubordination -- why -- I mean, I don't -- I'm not following as to why Exhibit 18's three pages of safety violations are not enough supporting documentation for a termination when we're talking about safety violations.
A. And I concede to that. When I look at this -- and -- I can go -- no, no. It's fine. It's different.
Q. Are there any documents related to the third employee that you're alleging?
A. I don't -- I don't recall. I don't know. Like I said, if that was then, I can't speak on what we had or what they did have back then. If I was back at that time, I could.

Page 151

I'm pretty sure there are. I just don't remember them or what they were.
Q. On Exhibit 22, Alicia writes back -- after you said, "I recommend termination," she says, "Hi, Charlotte. Let's see if we can obtain one more statement."
Did you obtain another statement?
A. I may have. Is this regards to the safety issue?
Q. This is recommending Isaiah Edwards for termination. Exhibit 22.
That one that's in your right hand --
A. Yeah, I'm looking. Hold on. I'm looking at his and -- so, yes. I probably did do another one. Another statement. If she recommended that.
Q. Was Isaiah ultimately terminated?
A. He was.
Q. And are you claiming that termination was discriminatory?
A. No, I never said his termination was discriminatory.
Q. Was there another incident down with Luke regarding his team that required you to perform some sort of investigation?
A. It had to have been the text messages. I think that was the third and final situation with that group.
Q. And as we sit here today, you cannot remember the third employee that Bryce wanted to terminate?

Page 152

A. It was three of them. They were all related. I cannot remember his name.
Q. I'm handing you exhibit 23.
A. I'm pretty sure something on it has its name on it.
Q. Are these the text messages that you're talking about, that were regarding this group?
(Whereupon Defendant's Exhibit 23 was marked for identification.)
A. This looked like it could be the text messages, yes.
Q. Who is Josh Bridges?
A. I don't know.
Q. Primoris 183. If you'll look at page 183? Or, 184, sorry. I don't know why I can't speak. One eighty-four. There's a text at the bottom that says," Josh Bridges" in gray. "Good luck. The dog don't like N-word either."
Is that the text you're talking about?
A. Yes.
Q. And how do you know that this is talking about Bryce Burns?
A. In my conversations -- prior to receiving these -- with Luke and Conrad, they had made reference to that term. And when I asked about that term, it was Bryce. So --
Q. Is -- oh, sorry.
A. So, in my conversation with Luke and in my conversation with Patrick Conrad, that term came up. And I

Page 153

asked who that was, and that's when they kind of said that -- they mentioned Bryce.
Q. Did you ever talk to Josh Bridges to ask him who he meant by "the dog"?
A. I don't remember.
Q. That's one of the text messages that got him terminated, right?
A. Yeah. If he was one of the two. I know there was two individuals terminated. I can't remember who was who.
Q. But you don't remember asking him about who he was talking about?
A. In this situation.
Q. Why would field employees have had interactions with a VP of Operations or a Director of Operations for distribution?
A. He went down there.
Q. When?
A. He traveled down there when I was supposed to go down there. And that's when Luke came and said that he came down there and made it worse.
Q. What did he do to make it worse?
A. He never got into the particulars of that. He just said that Bryce came down and made it worse. And he was upset about it.
Q. Looking at Exhibit 23, which is Primrose 177 to 187.

A. Mm-hmm.
Q. You agree with me that this is the text chain that you were investigating that came to your attention about the Clear River, Florida worksite, correct?
A. This is the text messages that I received. I believe so.
Q. Do you recall Bryce Byrne's name being said? Or "Bryce" being explicitly said in any of these text messages?
A. No, he was only referred to as "the dog "or "big dog," which is what was here.
Q. And you don't remember if you asked the person who texted that exact phrase who he was talking about?
A. I'm almost for certain -- I don't want to say I didn't. I'm almost for certain I did. Because again, like I said, I heard that term before, prior to this. And again, with Patrick and with Luke. And both of them said, you know, that's what they call -- Bryce's name.
Q. Do you have any notes or documentation of that? You said that when you talked to people, you take notes.
A. When I talked to Josh, if this was his individual, that was during his termination. When I talked to Luke about it, or when we were just talking in general conversation, that was not an investigation. When I talked to Luke. It came up in conversation. I asked who it was, and he kind of explained to me who that person was. And that was the term that they



used to identify Bryce. So it wasn't -- I didn't have to document that conversation with Luke.
Q. Did you submit your notes of the conversation you had with Josh Bridges?
A. I don't remember.
Q. Did you know -- dd you escalate this situation to anyone?
A. These messages, again, were sent over to Alicia.
Q. When did you do that?
A. I do not remember when I sent them over.
Q. Do you remember how long after receiving the messages it took you to forward them to Alicia?
A. No.
Q. If you look at Exhibit 20, Primoris 231, the bottom right-hand corner. There's a screenshot of a text message that looks like -- from Charlotte, November 11, 2022 at 1039 a.m.
A. Okay.
Q. And if you look very closely, can you see that? It says, "Good luck. The dog don't like"? There are two different screenshots of it that you were sending.
A. I can't read this so little, and I don't have glasses on. So I don't want to say I can see it and I cannot.
Q. Okay. If the document is a screenshot that says what I believe it says --
A. Mm-hmm.



Q. And I understand you can't. Do you have anything to dispute that this was a text message that you sent to Alicia?
A. I do remember sending them to her.
Q. Do you remember how much time passed between receiving them and sending them to Alicia?
A. No, I do not.
Q. Okay. Did you report to Alicia that Bryce Burns doesn't like N-words?
A. I believe I told that to Leslea.
Q. So if, in your complaint or your charge of discrimination, it says that you provided Ms. Campbell with a text message from another employee, Mr. Richard Conrad, stating that Mr. Burns does not like N-word either, is that the text message that you're talking about? Or is there another one?
A. Patrick and Richard, I believe, are the same person. I think I was getting their names mixed up.
Q. Okay.
A. So, I believe that person is the same person.
Q. Okay, but that's the text message that you're referring to?
A. Yes, that is the text message.
Q. So we've talked about the conversation with Bryce Burns in which the prisoners don't run the prison, and we've talked about him wanting to terminate employees without going through the proper -- according to you, without going through



the proper procedures.
Any other discriminatory acts by Bryce Burns?
A. No. Nothing I can think of off the top of my head.
Q. All right. How about Alicia Campbell? List for me every discriminatory act that you believe Alicia Campbell took or engaged in.
A. Her and -- there were times where they didn't want to take -- it was like they didn't want to take initiative or direction from us. Or input. And there was an incident where Kelly and I -- I was getting ready to do a training, and I wanted to incorporate, not only my two reports, but the other reports as well. And Kelly came back in the e-mail chain. She sent a very nasty e-mail. And I responded to that e-mail. I can't remember the particulars of it. And instead of coming in and saying, okay, as a unit -- instead of bringing the group together, it was more divisive.
And I felt like she -- she -- instead of saying, "Okay, Kelly, you off base on this" or whatever, it was like I was wrong. And I found myself in positions where I had to kind of dummy myself down in the room. There were times where I would listen to her and --
Q. When you're saying "her," are you talking about Alicia?
A. I am. I am referring to Ms. Campbell. I would be in a room with her and Jackie, and I would listen to them talk so

badly about Leslea Scott. Or I would be in there and listen to Alicia and Kelly say negative things about Shunte. And that's disheartening.

And I remember being in Alicia's office and her saying -- her and Kelly telling me that people with degrees don't do well in this business. Like, they can't make it. Like, they don't ever do well. And I was like, what? And they were like, "Yeah, they just don't do good."

And I always found myself trying to let them know, like -- you know, it's like I was always trying to prove myself. I'm a part of the team. I'm here, I'm part of the team. That's all I want to do, is be a part of the team. I didn't come here to deal with this kind of stuff. Or take anybody's place, if that's what you think. I'm not here for that.

Q. How does talking about someone having or not having a degree have a racial connotation?

A. It's -- you -- and I'm trying to figure out a way to put this into perspective in words. If -- for example, right, even with the Bryce situation. I remember after he -- being in her office and me messaging her. And I -- he saw me, she saw me. Because the windows are clear. I said, "Hey, I see you over there. You're over there. You're talking to Bryce. Would you like for me to come over?" Clearly, you could tell he's pissed off.



And I messaged her and asked her if she wants me to come over so that we could talk about it and get through. She never responds. I later go in there, and she makes a comment about racism. And I remember thinking, okay, why did she say that? It rang in my head.

And it's like being in a relationship and you walk in a room and someone says, "I'm not cheating."

"Well, I didn't ask you if you were cheating."

It's the same thing as me coming in a room and you make a comment about racism. I didn't come in here and say that, but your saying that lets me know that there's something going on. There's something there.

Q. What was the comment?

A. She said something along the lines of understanding it. I can't remember. All I heard was "racism," and she said something about understanding it or something else. And I think once she said the racism part of it, I kind of -- it just took me off guard. I just kind of, like -- after the conversation with him and feeling like I felt, and then for me to walk in there -- it's just a series of events to me. It came to that.

Q. But you don't remember what the comment was?

A. Not in its entirety. I remember her saying something about racism, and either she didn't understand it or she -- it was something around racism and understanding. That's all I



remember. And that's what it was. That was the comment.

Q. Any other comments or instances that you claim that Alicia violated the anti-discrimination policy?

A. For me, it was just how business was conducted after that. Not letting me travel, not -- you know, keeping me out of certain meetings. And it was like after that, I became very, you know, alienated. I was eventually moved from the location, and sent to a different location.

Q. You understand that PLS, Power Line Services, was being dissolved into Primoris T&D, correct?

A. The employees were being transferred over to PSC.

Q. They were being transferred to PSC?

A. From my understanding, the employees were just being transferred to PSC.

Q. Where does that understanding come from?

A. That was the conversations and stuff that we had, to my knowledge. That all they were doing was transferring those employees underneath that umbrella. That way, everybody was under the same system. Because there were two different systems and you couldn't -- if you were a PSC HR, you couldn't see PLH. If you were PLH, you couldn't see PSC.

So, from my understanding, we were just transferring everybody over to be under that. I don't remember them ever saying it was being dissolved or that they were closing the business, because they still had the same



contracts. Everything was the same. The only thing that actually changed was the name for which those people were under. And that's it. They kept the same contracts, they did the same business, all of that. Nothing changed.

Q. You understand that entities can move assets around, correct?

A. Yeah.

Q. And contracts for building infrastructure are an asset, correct?

A. They can move.

Q. Human capital. Do you understand what the term "human capital" means?

A. Yeah.

Q. That can be an asset that moves to another company, correct?

A. Yes.

Q. So, they were trying to find you -- they're going through a reduction in force.

You understand that, correct?

A. It was never presented to me as a reduction in force when it came to me. The only thing that I was told is that I was going to be transferred to work with Colby's group, and that's where I was going to be. It was never told to me that it was temporary. It never was told to me that I was passing through. It was none of those things. I was going to be

supporting Colby's group, and that's where I was going to be.
Q. And as we sit here today, you're now claiming that you being transferred to support Colby's group is discrimination?
A. No, that's not what I said.
Q. Okay. I asked you about what it was that she had done that was discriminatory, and you said, "Not letting me travel, keeping me out of certain meetings, felt alienated and moving from one location and then sent to a different location."
A. My office location was moved from Fort Worth to Everman.
Q. Is that where Colby was?
A. No.
Q. When were you moved to Everman?
A. I can't remember. It was after the -- it was after everything had transpired.
Q. Where was the rest of your HR group located?
A. They were still in -- when I left Everman -- I mean, when I left Fort Worth, my two reports were still there.
Q. Your two reports were who?
A. Ashley and Alexis. They stayed in Fort Worth.
Q. When was that?
A. I don't remember how long they stayed, but I was transferred to Everman.



Q. All right. So anything else that Alicia did that was discriminatory except for not letting you travel, keeping you out of certain meetings, feeling alienated, and moving you from Fort Worth to Everman?
A. She fired me because I wouldn't -- she wanted me to alter a statement. She wanted me to change a statement, and I wouldn't do it. And that conversation with her that day was so -- it was humiliating, it was demeaning, it was dehumanizing. The way she handled and she talked to me for reporting and not wanting to, basically, do something unethical and dishonest.
Q. Before we get into the details of that, you also mentioned that it was something that was discriminatory about the way that she and Jackie would talk about Leslea Scott.
How does someone talking about another employee directly affect you?
A. Because if they talk about that employee, they would talk about me, too.
Q. Do you know that for certain?
A. I've seen them do it with two other people. You are what you do, most of the time.
Q. But we can agree you're still making an assumption? You have no evidence that they had any comments about you?
A. No. But again, I watched how they talked about Leslea. I watched how her and Kelly talked about Shunte. What would make me any different?



Q. How is that -- how is them talking about other employees discrimination against you?
A. Alicia hated Leslea. She couldn't stand her. And I don't even -- and -- and -- why, I don't know. But it was the -- it was painful to listen to. It was hard to watch. It was malicious. It was like, wow.
Q. How is that discrimination against you?
A. That conversation, her talking about them, that's not discrimination. But it all plays -- it all comes into play.
Q. Okay. So we can agree that even if they said negative things about Shunte, that, again, is not discrimination against you?
A. When you have discrimination against a particular group, how does it not include me?
Q. You understand that you are a single Plaintiff, correct? You don't have any other Co-Plaintiffs, so you're not a class action or a collective action, correct?
A. I -- I am aware that it's just me.
Q. And you understand that you do not have a hostile work environment claim, correct?
MS. ARTAZA: Objection, form.
THE WITNESS: I know what my attorneys tell me I have. I don't know what I have.
Q. (BY MS. PLAGENS) So on the face of your complaint it says discrimination under Title VII in Section 1981 -- sorry.



I said the three. Under 1981.
The complaint stands for itself when it says discrimination under Title VII in 1981, correct?
A. I guess so.
Q. Same thing if it says retaliation under Title VII in Section 1981, correct?
A. I guess so.
Q. Okay. All right, so not letting you travel, keeping you out of certain meetings, alienating you from locations, then this conversation about changing a statement. We're going to talk about -- is that relating to the Tony Gill incident?
A. It is.
Q. Okay. I want to talk about that when we talk about that investigation.
So anything else that you can think of that you claim is discriminatory on the part of Alicia Campbell?
A. No.
Q. Okay. You mentioned that there was an issue with you and Kelly Wood about some sort of training, and that Kelly's response was -- I don't want to put words in your mouth. What was -- something that was offensive or something --
A. I don't know how to describe it. I just know that there was stuff behind it, and there was meetings afterwards.
Q. I'm going to hand you what is marked as Exhibit 24. Take a glance through Exhibit 24, which is Primoris 222 to 229.

Future Gas, correct?
A. That's not the conversations I had with him.
Q. How many employees did he have?
A. I don't remember off the top of the head how many he had.
Q. You heard him testify that he had about 100?
A. He had. That's what he stated.
Q. And you were here for Ms. Bagony's deposition as well, right?
A. I was.
Q. You heard her testify that she supports between 800 and 1,000 employees, correct?
A. She also has other reports that assist with that, so she doesn't do that single-handedly.
Q. We looked earlier at the head count. We don't need to look back at it, but Kelly Woods was roughly 1,500, correct?
A. And she has people under her that also help and assist that. She doesn't handle that single-handedly.
Q. You had two reports under you, correct?
A. I did.
Q. And Tessa Turner was supposed to move with you?
A. Ashley was mine, and she was transferred to PSC under Kelly Wood. Tessa was transferred to me, so I don't know what was going to transpire with Tessa. I didn't know -- I know that they were wanting to term her, but I didn't know what was



going to happen with her.
Q. But my question was that you had individuals working under you also, correct?
A. I only ended up with one report. Because again, Ashley was moved over to PSC, and -- well, I still had Alexis. So I had two, yes. And Alexis helped with whatever was going on with PLS, and Tessa was helping. She was still doing some stuff for PSC because she was transitioning files over. And she was going to help with -- I guess if there was some minor stuff that needed to be helped with Colby's group, she would assist with that.
Q. When you were allegedly moved to Future, were you going to support any other line of business or business unit?
A. I'm not sure.
Q. So as we sit here today, if you're not sure if you were going to support anyone else? You know that Future Gas only had about 100 employees, and you were moved to support them?
A. I know what he testified to. I don't know what the true facts were. From my understanding, that was going to be who I supported. And during that time, I supported him, and I still did things for PLH, and anything that was needed with PSC.
Q. What did you do for PLH?
A. One of the things was the Kelly Porter investigation.



I did that. And --
Q. The Kelly Porter -- sorry. The Kelly Porter investigation. Is that the Tony Gill complaint?
A. No.
Q. What is the Kelly Porter investigation?
A. Kelly Porter was reported for engaging in misconduct. I can't remember. If I had his corrective action in front of me, I would be able to speak to what he did more. But I do remember at the end of the investigation, he was put on a final warning.
Q. Did the investigation have to do with discrimination or retaliation?
A. You could say it was kind of like sex discrimination, because it involved another young lady that he had been kind of being distasteful to. And he was disrespectful and engaged in -- he violated policy when dealing with vendors.
Q. Are you claiming that you were terminated for some -- your role in this investigation into Kelly Porter?
A. No. I said that I also did some work for PLH. I continued to do some things for them, including that. One of the things that I did was that investigation.
Q. You claim that your position in the PLS division was subsequently filled with two Caucasian female employees. Who allegedly filled your position?
A. Paula and Kelly.



Q. So it's your testimony today that they were moved to replace your position supporting PLS?
A. They supported the group that I supported. However, they did that on paper, I don't know.
Q. You understand that Kelly and Paula already supported Primoris T&D, correct? We looked at that work chart earlier today?
A. Yeah.
Q. And you understand that it's the company's position that the PLS employees were moved under Primoris T&D, correct?
A. They were still under PLS when they started having meetings with Danny and all of them.
Q. What do you mean? Who started having meetings with Danny and all of them?
A. Paula and Kelly and the executives that was left over in that group.
Q. Okay. I want to talk to you now about the Tony Gill investigation.
A. Okay.
Q. How did you learn about the Craddock altercation?
A. Another employee came and told me that Tony needed to talk to me.
Q. Who?
A. Kristie Madison.
Q. When?

A. I believe I talked to him briefly the day it happened, so it had to be that day.

Q. Did you do any – did Kristie Madison just come to you out of nowhere with this information, that you needed to talk to Tony?

A. I think he had -- I don't know if he went to her or whatever. And she told him that he needed to talk to me. And I saw her in passing and she was like, "Tony needs to talk to you."

Q. And tell me about the first conversation you had with Tony. The day that it happened.

A. He was pretty upset. You could tell he was visibly shaken. He was hurt. It was tough to watch.

Q. How long was that conversation?

A. I don't know exactly how long that conversation was, but I do remember, in the conversation, he said that he wanted to wait because -- I can't remember his name. Pinkerton. His last name is Pinkerton. John. Said that they had some kind of -- because he had talked to John Pinkerton about it. And he -- John had asked him to kind of hold off and give him a chance. It's some kind of arrangement him and John made, but he did tell me about it.

Q. How long was the conversation?

A. I don't recall.

Q. Do you have any notes from that conversation with Mr.



John?

A. I did not take notes because that was informal.

Q. What happened to your testimony that if you're talking to someone, you're going to take notes?

A. That was an initial conversation. That was something off the fly. It was never official. If it's an official investigation, of course I'm going to take notes. But if he's just -- me going to him because someone tells me, "I want to have a conversation with you," I'm not going in there knowing that – I'm not knowing what's going to be told. He could've been telling me, "ey, you want to buy my car?" I don't know.

So I didn't go in there in preparation to do that.

Q. When did it become an official investigation?

A. It's dated on the notes that I took.

Q. So if your notes say that your notes start on February 17th, your investigation did not start until February 17th?

A. That's when we sat down and we officially talked about it. Because we also talked about it on the 16th as well.

Q. Do you have any notes from the 16th?

A. No.

Q. Why not?

A. Because he, again, was wanting to -- whatever him and Pinkerton had going on, he was trying to honor that. And what



I told him was, you know, "This is a serious allegation. We are going to have to do a report." And then I asked him again what transpired.

Q. Do you know when he decided to make it official that you --

A. When we did it. When we talked, the date of the -- whatever date is on that, which I believe it was, like you said, the 17th. We did it.

Q. I'm handing you what I've marked as Exhibit 28. This is -- I'll represent to you this is -- you produced this as a text message that you have with Tony.

(Whereupon Defendant's Exhibit 28 was marked for identification.)

A. Yes.

Q. The top of the message says, "Thursday, February 16th at 4:39. Come to my office ASAP."

A. Yes.

Q. "ASAP:

A. Yes.

Q. Why did he need to talk to you or have you come to his office ASAP?

A. Because Alicia and Kelly had called him on a three-way call.

Q. Do you know why Alicia and Kelly called him on a three-way call?



A. They were talking to him about the situation. They were trying to talk him out of reporting it.

Q. They were trying to talk him out of reporting it?

A. Yes.

Q. How do you know that?

A. Because he had him on speaker.

Q. And you were there?

A. I was there. That's why he told me to come to his office. I was in the office.

Q. Did they know that you were present?

A. No.

Q. Okay. I'm handing you what I've marked as Exhibit 29. Do you know how Alicia found out to call him?

(Whereupon Defendant's Exhibit 29 was marked for identification.)

A. That -- I don't know how she knew to call him.

Q. Okay. I'm handing you Exhibit 29.

A. Probably Kelly.

Q. It's a team message between you and Alicia Campbell?

A. It is.

Q. Okay. So at 5:29 on February 16th -- so an hour after Tony says, "Come to my office ASAP," you say, "Hello, Alicia. There was some information reported to me that day that was pretty alarming."

Did I read that correctly?

Tony Gill and Alvin Craddock?
A. I believe I was trying to find out which ones were in that room.
Q. Did you ever interview any of these three individuals?
A. Like I said, I believe I interviewed some. I just don't remember which ones I did.
Q. Do you have notes from your interviews of those individuals?
A. I wouldn't have them. They would be somewhere either in my office or on that computer.
Q. Did you submit those notes to anyone at Primoris?
A. I never had an opportunity to do so.
Q. You submitted other notes to HR, correct? You submitted Tony Gill's statement?
A. Yeah, and it went bad from there. We never got any further than that. Than Tony.
Q. Do you know when you interviewed Tony?
A. Our -- my notes say that I interviewed him officially on the day -- I guess, what is that? The 17th.
Q. I'm handing you Exhibit 33. Do you recognize Exhibit 33 to be a meeting invite from you to Lonnie Gill?
(Whereupon Defendant's Exhibit 33 was marked for identification.)
A. Yes.



Q. Is Lonnie Gill, Tony Gill?
A. Yes, I believe that's his first name.
Q. And that's set for 3 p.m., correct?
A. Yes, it is.
Q. And it's called a follow-up meeting?
A. I don't know why it would be a follow-up meeting.
Q. Because at that point, you had not taken an official statement? Until this first meeting?
A. I don't want to pin myself to that. I don't know. I don't know why it would be called a follow-up meeting. It could be just follow-up because we had had a non-official conversation. And maybe that's why it's called a follow-up, but I don't want to speak. But I know that's when we did it officially. During that time, during that meeting.
Q. I'm Handing you Exhibit 34 to your deposition. It's an e-mail where you submit a employee statement, 2/17/23, and the attachment is entitled "Tony Gill's Investigation, Tony Gill, 2/17/23." Did I read that correctly?
(Whereupon Defendant's Exhibit 34 was marked for identification.)
A. Mm-hmm.
Q. And looking at Primoris 297 through 301, do you recognize this to be the notes from your meeting on the February 17th with Tony Gill?
A. It looks like them.



Q. And you mentioned earlier when we were talking about your investigation that you will have a set of typed up questions, and then you'll fill in the answers.
Is that what you did with Mr. Gill in Exhibit 34?
A. I had some of these questions, like, "What is your position? How long," -- those type questions were there. And as we talked, you know, we would fill things out. If things came up, I would ask more and I would add them, and I would have him answer them on the spot.
Q. Okay. And this says that this time stamp was 3:07 p.m., correct?
A. Correct.
Q. On February 17th?
A. Yes.
Q. And we can agree that Mr. Gill is the complainant, right?
A. He is the person who was involved, who reported it, yeah.
Q. And 3:07 coincides with that follow-up meeting time stamp of 3 p.m. that was in Exhibit 33, right?
A. Mm-hmm. But this wasn't a follow-up meeting. This was his first official -- yeah. So that could very well just be -- I don't -- it wasn't a follow-up. This was his first official.



Q. I'm going to hand you two exhibits, 35 and 36. Thirty-five is Primoris 262, and 36 is Primoris 263. Exhibit 35 looks like it says, "Tony Gill's investigation, Amy Khorman, February 17th, 2023, PLH Office 119, time 9:34 a.m." Did I read that correctly?
(Whereupon Defendant's Exhibits 35, 36 were marked for identification.)
A. Mm-hmm.
Q. Do you recognize Exhibit 36 to be notes that you took?
A. These are notes that I took, but I would have to question those times.
Q. Why?
A. Because I would not have been able to talk to Amy or Brayden until after talking to Tony.
Q. Right. Because you testified earlier that it was best practices to interview the complainant first?
A. So I don't know what it is with these times. Those can't be correct, because I would have talked to Tony first.
Q. So are you claiming that someone has altered these?
A. I'm not claiming anything. I'm just saying I know that I would not have talked to them first.
Q. Why did you speak with Amy Khorman and Brayden Jones before you spoke to the aggressor, Alvin Craddock, or Kelly Porter?

A. They -- I had access to them. Tony had said that -- he had mentioned those two in my conversation with him. He was supposed to go to lunch with them, and I kind of wanted to get a feel of -- you know, I wanted to see what they had to offer on the investigation.
Q. They were not witnesses to the alleged event, correct?
A. No, but he was supposed to go have lunch with them. And you know, she had some valuable information to add, and so did Brayden.
Q. What was the valuable information that Amy added?
A. Amy said that - she confirmed that he was supposed to go to lunch. She answered some questions about Tony -- I mean, Kelly Porter. She also said that her and Tony were supposed to go to lunch, he left abruptly. He left out the back. And he called her once he left there.
Q. Conducting an investigation into Tony Gill's complaint. That was part of your job as an HR manager, correct?
A. It is.
Q. And what important information did Brayden give you?
A. He said that Tony had told him about it, and he just gave me his account of it. And what Tony had told him, and what Tony did not tell him.
Q. I'm handing you Exhibit 37. And what did -- and what



did -- Brayden said that Tony did not mention Alvin using the N-word, correct?
A. He said that Tony wouldn't tell him that because Tony knew how he would react, and Tony wouldn't want him to do anything to get himself in trouble. Because he said that Tony would -- Tony knew that he would fight Alvin or do something to Alvin for being disrespectful to Tony.
Q. Okay. But we can agree that Tony did not tell Brayden, and Brayden did not claim that he knew Alvin Craddock allegedly used the N-word?
A. He said that Tony wouldn't tell him that.
Q. Okay. We've got an e-mail -- Exhibit 37 -- I've handed to you, which looks like Alicia's response to Exhibit 34. Is that a fair assessment? February 20th -- your e-mail is 20th, '23 at 12:49, and that's the same time stamp in Exhibit 34, correct?
(Whereupon Defendant's Exhibit 37 was marked for identification.)
A. The 1:21 p.m.?
Q. 12:49 PM, the 2nd. It's Exhibit 34.
A. Okay.
Q. We can agree that Exhibit 37 contains the e-mail that's Exhibit 34, right?
A. You can say that, yeah.
Q. And the statement that you attached on February 20th



at 12:49 PM is the statement that you took from Tony Gill on February 17th, 2023, starting at 3:07 p.m., correct?
A. It is the same, yeah.
Q. Had you spoken with Tony a second time, as of February 20th, 12:49 p.m.?
A. We had a second conversation. I can't remember when it was.
Q. Alicia asks, "Can you please confirm who informed you of the complaint?"
Did you ever respond to that question?
A. No. I don't remember.
Q. And then she says, "Kelly will," --
A. I'm sorry, I didn't mean to cut you off. I don't remember responding to this e-mail about it.
Q. She tells you, "Kelly will finish out the investigation, as this is her group."
Tony Gill was not one of your business units, correct? He was not with PLS, correct?
A. He was.
Q. He was with PLS?
A. He -- from my understanding, that was where he sat, over in that office. And so from my understanding, he was.
Q. So when you were investigating his claim, you were of the position that he was one of your employees that you were responsible for?



A. I was under the impression that he fell under that group, yes.
Q. I'm handing you Exhibit 38 and 39.
A. And he implicated Kelly in his statement, so why would Kelly investigate him if she's been implicated? That he didn't trust her.
Q. I'm handing you Exhibits 38 and 39. Thirty-eight is another follow-up meeting too, sent from you to Lonnie Gill. Do you dispute that you did not send this Teams meeting for a follow-up meeting at 9 a.m. on 2/20?
(Whereupon Defendant's Exhibits 38, 39 were marked for identification.)
A. I did have this meeting with Tony.
Q. And then we've got -- Exhibit 39 looks to be witness interview notes from that follow-up meeting. Is that correct?
A. It looks that way. I would have to look at mine, but yes, they look like them.
Q. I see that there has -- do you think this has been altered or changed at all?
A. I wouldn't know.
Q. It looks like there's, "To be honest, I was warned about this -- them. Both Kelly and Alvin both. Who warned Donny Sadwick [sic], a truck driver, ahead of fleet. Even John said he did not care for"?
Do you see where I'm looking?

A. I see that.
Q. Then there's a gap or a space. "He felt the information was already out there and out of his control because he can tell by the e-mails they are handling him differently and not mentioning Alvin or his crews."
Do you know if something was removed before that? Or any explanation for why that spacing is there or after it?
A. Again, this is not a document that I brought to the table. I can't say what has happened to it or not.
Q. We can agree that you did not attach it to the statement that you submitted at 12:49 p.m. on February 20th to Alicia Campbell, correct?
A. I don't believe that I got an opportunity to. Her and I -- like I said, I don't know the course of events where all this transpired. She asked for that statement. I sent her that initial statement. Again, I had lost some trust in her because she was dishonest with me. I sent her what I had, and I was going to give everything that I had to either Alicia or -- I was leaning more towards Rhonda.
Q. You say you didn't trust her? Were you -- I mean, in that text message exchange, you said you were testing to see if she'd be honest with you.
A. And she was not.
Q. You were setting a little trap for her?



A. I wasn't setting a trap. I just wanted to see if she was going to be honest with me.
Q. And we can agree that you did not attach the Exhibit 39 statement, that meeting ending at 9:38 a.m., to Alicia Campbell. Correct?
A. She asked for the statement, and I gave her the original statement. Again, I was still working on getting the other statements put together, and I was going to put all that stuff together and give it to either -- leaning more towards giving it to Rhonda.
Q. In your complaint, you claim that you had a meeting with Alicia and Tony Gill in which she demanded that he change his statement on February 20th, correct?
A. Yes, ma'am. I cannot remember what time that conversation was.
Q. Was the e-mail that you sent -- the statement on February 20th -- the first time that you had submitted a statement to Alicia that she would've seen from Tony Gill?
A. I don't remember, and I don't want to sit here and say I know exactly how that went down. I don't recall, but I do know that we had a meeting in her office. And I can't say if we had that meeting before or -- if I sent that before or after that meeting, I don't remember.
Q. Well, I mean, logically speaking, if she has not seen something, she can't tell someone to change it yet, right?



A. This is true, so I must have sent it in.
Q. Okay. But the first e-mail that we have you sending it in is February 20th at 12:49 p.m., correct? In exhibit --
A. Where I sent her the e-mail?
Q. Yes. Exhibit 34?
A. Okay, yeah. That's the time that's on there. Like I said, I don't know about the times and how they transpired, but that's the time that's on there.
Q. Look at Exhibit 30. It is the Tony Gill text messages that we pulled back some, or that were in dispute. Page 628 was agreed that we can talk about.
Turn the page to Primoris 628?
A. Okay.
Q. February 19th, 2023 at 5:43 a.m. There's a message that says, "Hey, Charlotte. Can't sleep. Going over the scenario in my head. My wife says I'm feeling guilty about reporting this, but two things I think you should take out. Because now I can't recall him saying the N-word. And second, keep in mind I didn't see anything in Kelly's hand. Everything else I'm 100 percent about."
Did I read that correctly?
A. You did.
Q. And those are Tony Gill's words to you, correct?
A. Correct.
Q. Why was Tony Gill sending you his personal e-mail on



February 17th at 5:05 p.m.?
A. I don't know. I don't know why he sent me that.
Q. Okay. But looking back at the February 19th, 5:43 a.m., we can agree that Tony is asking to change his statement prior to you sending it to Alicia on February 20th at 12:49 p.m., correct?
A. Which is why I would've met with him that morning. I had a conversation with him that morning.
Q. I don't have any notes from a conversation on February 19th.
A. He -- February 19th, he sent this text message. That may have been -- I don't know what day that was, but that's a Sunday. Him and I met a second time that Monday morning because one of the comments -- what I said to him in that meeting is, "I have a responsibility to report the truth and only the truth."
And that's when, if you look at the notes -- what I can remember without reading what you said, is that he was afraid of them. He was worried about what was going to happen to him. For one, he went against what Tony Pinkerton had wanted him to do, which-- whatever their agreement was. And he was legit afraid of them, and what could happen to him. Which I don't know. You would have to talk to him. He kind of attests to what he thought that would be.
Q. And we can agree, though, that roughly two years --

two and a half years -- after February 19th, 2023, as we sit here -- November 20th, 2025 -- to the best of your knowledge, Tony Gill is still employed by a Primoris entity, correct?
A. He is.
Q. Okay. So he was not terminated for reporting?
A. They can't terminate him because it would be retaliation, and it would be not a good decision to make.
Q. And you do not recall ever submitting Exhibit 39 to Alicia or anyone at Primoris?
A. See, if you look at this document, it doesn't say -- okay, "your meeting ended at 9:38 p.m.
Q. That seems to line up with Exhibit 38 saying that the meeting was at 9 a.m.
A. Mm-hmm. Mm-hmm. Because he says in here, "I don't have any enemies in this industry. I may have people who do not like me. I normally de-escalate everything. That is just how I am."
And it says, "So your retraction was for what reason? Nothing is going to change. We both are going to be here, and nothing is going to change. He is going to be here. So to make it easier on my," -- I guess he wanted to say myself -- "So I know how to deal with them moving forward. To be honest, I was warned about them -- both Kelly and Alvin both."
I think my question was, "Who warned?"
And he said, "Donnie," -- whoever this person is



-- "a truck driver, Dole, the head of fleet. Even John said he did not care for. He felt the information was already out there and out of his control because he can tell by the e-mail that they were handling him differently and not mentioning Alvin or his crews.
Charlotte, I have no reason to lie or to escalate or to make something worse than what it is. If anyone knows me, knows my history, my family background, none of this type of stuff falls in my family tree. So when you call me that," -- meaning the N-word. These are his words. "That is not a way to approach me. It's just stupid and doesn't make sense and not something that I would do, and it does not make any sense."
So he confirmed that he said it. He retracted it because he's scared and he knows that they're both going to be there, and he doesn't want to face the repercussions of them coming at him.
Q. I'm handing you Exhibit 40. It's an e-mail from Lonnie Gill, February 21st, to you, at 7:15 a.m. Tony Gill, February, and Primoris 307. It looks like a written statement. This is from Lonnie Gill, who is Tony Gill, to you at 7:15 a.m. on February 21st. Do you understand that this is a statement that he wrote and submitted to you?
(Whereupon Defendant's Exhibit 40 was marked for identification.)



A. I never saw this e-mail, So I can't speak on his e-mail at all.
Q. Okay. So you never saw his rewritten statement?
A. I never saw this e-mail. So I can't speak on it at all.
Q. Okay.
A. So I would question it because I never saw this e-mail at all.
Q. I guess same question then for Exhibit 41. Do you ever recall seeing Exhibit 41? It looks like Tony sent it at 7/29 to Alicia, and copied you as well.
(Whereupon Defendant's Exhibit 41 was marked for identification.)
A. Again, I never saw this e-mail. And I would really like to remember when me and her met and had the conversation for him to change that the statement that he made.
Q. And you can't, as we sit here -- so the statement in your complaint that it happened on the 20th. You don't know if that's correct or not?
A. That me and Alicia -- yeah, I know what happened on the 20th because when I showed up the next morning, they fired me.
Q. Okay. So you know you had the conversation on the 20th, and you're -- okay. You're saying that you just don't know what time it happened.



A. I don't know what time it happened on the 20th. We had the conversation on the 20th.
Q. And it's your testimony that Tony was in that meeting --
A. He was in that room with us. Because she initially -- I can't remember if she Teams'ed me to come down there or how I got down there. She called me to her office. I was in her office. She asked about the statement. She was trying to implicate that I did something wrong with the statement. And she was like, "Well, will Tony come down here and say that?" And she called Tony down to the office.
I remember standing in her office. I remember her kicking me out of her office, and telling me I could wait outside. While waiting, I went to my office and printed out the statement. And once I printed out the statement, I walked down and I got Tony. And we both walked into Alicia's office.
Once in Alicia's office, I said, "Tony, this is a statement that we had from me and from us." I said, "I'm going to read my questions, I'm going to read your answers. Tell me 'yes' or 'no' if these are your words."
I read off the questions that I had on my statement. He said, "Yes, those are my words."
Q. And it's your testimony that this happened in front of Alicia? You read his statement off and asked him, line by line, if those were his words?

A. Yes.
Q. And Alicia was there for that?
A. She was there, and she was livid.
Q. Did Tony Gill at all testify in his deposition that Alicia was livid?
A. I don't know if they asked him. She was all right. She was very upset. She was seething. Because she told me that she said that she didn't like -- she said to the both of us, she didn't like it. She wanted him to write another statement.
She said that -- one of the things that she said to me is that it was my responsibility to change his mind. And I told her, "No, it's not my responsibility to change his mind. It's my responsibility to gather the facts and report them forward."
And she told him that he had to write another one. He said he didn't want to write another one. And she was like, "You have to, because I don't like what it says."
And then Tony said, "Well," -- I can't remember how it went, but he said something about rewriting. And he said, "Well, I'll just rewrite what she has down right there. I want to stick with that statement." And it was a statement that I printed in my office.
Q. From the 20th or the 17th?
A. The 17th, because I had read those questions off, and he said that they were his.



Q. Well, we can agree that the next morning, Tony did submit a different statement, correct?
A. I can't agree to anything because I didn't get the e-mail.
Q. Okay. You were here during Tony's deposition where he testified that he changed his statement because it was explained to him that there were two options that might happen, one with the word in it ad one without. And he decided to go without.
Do you remember him testifying to that?
A. I remember him saying that Alicia wanted him to change his statement. And she gave him two scenarios to change in his statement, and that they would get the same desired outcome. And one would kind of cause some type of repercussion. I can't remember what it was. But I do remember him saying that Alicia wanted him -- and coached him -- on changing his statement.
Q. And you remember that from his deposition?
A. I remember that from his deposition.
Q. We can agree that his transcript is going to speak for itself, correct?
A. Yes, it will.
Q. How long did you meet with him on the 15th, when he first told you about it?



A. I don't remember how long that conversation was.
Q. Are you also saying that you met with him on the 16th? You said that you went to his office, correct?
A. I was in and out of his office checking on him, yes.
Q. Did you take any notes from that conversation?
A. It wasn't official.
Q. How many times did you speak with Mr. Gill about the Craddock incident?
A. When he came in, he was upset and talked about it. I gave him time. I revisited and checked on him. And then, because of our schedules, he didn't have time to meet with me on the 16th. So we put something on the 17th, when he was available to talk about it. So it was based on his availability.
Q. So it's your testimony, though, that the timing of the two witnesses that you interviewed -- that those times must be wrong because you wouldn't have interviewed them before getting a statement from Tony?
A. There has to be something wrong with that time because -- and that could've just been me putting the time on there wrong, and not thinking at the time. Because I would have talked to -- I had to have talked to Tony first to even know to go talk to them. I wouldn't be able to talk to them and not -- Tony would have to have told me to talk to them. I wouldn't just know to go talk to them. I wouldn't know to do that.



Q. Other than Amy, Brayden, and Mr. Gill, did you speak with anyone else regarding Mr. Gill's complaint?
A. I sent an -- I did send an e-mail to Shunte.
Q. And what did you tell Shunte?
A. I just said -- I gave a brief description of what transpired. I didn't give anybody's name.
Q. Did you interview anyone else?
A. I can't remember if I interviewed anybody else. I didn't get an opportunity to. That happened on the 17th, met with Alicia on the 20th, she fired me the next day. Her and Jackie.
Q. But you're sure that that meeting with you and Tony where Alicia demands that he change his statement happened on the 20th?
A. It was on the 20th because that was Monday. That Tuesday, I was gone.
Q. Okay. So why did Tony ask, on the 19th at 5:43 a.m., to change his statement if you're saying that he only changed his statement because Alicia told him to on February 20th?
A. I don't know why he sent that. Like I said, when I read him his statement, he said that he was fearful. He said that he was scared of what they were going to do with him. He said that he-- if you look at the notes that I gave on February 20th, 2023, when I met with him the second time after his

e-mail on the 19th, which is a Sunday. I went to talk to him about that because here's the thing. If it wasn't the truth, then I don't ever want to report something that's not true and accurate.
Q. What were Ms. Campbell's words, exactly, to Tony?
A. She didn't like his statement and she wanted him to change it. She didn't like what it said.
Q. Did she say what she didn't like about it?
A. She said a lot of things. I don't think she said what she didn't like. She wanted him to write a new one. She did not like it. She told me -- again, she told me it was my responsibility to change his mind. She said she wanted him to do a new one. She didn't like what it said about Kelly. She said she just did not like -- she was upset.
Q. Explain to me how an incident between Tony Gill and Alvin Craddock and Kelly Porter is discrimination against you.
A. Again, there's the N-word. And being subjected to everything else that had transpired prior to that.
Q. But it wasn't used -- no one directed the N-word to -- at you?
A. It wasn't at me, but it does -- it still impacts me.
Q. Okay. And we understand that you don't have a hostile work environment claim, correct?
A. Just because I don't have a claim don't mean that that wasn't transpiring. It just means that we didn't do a



claim.
Q. There was testimony during Mr. Gill's deposition about a picture of a noose that he claims was in his office as of December 8th, 2020.
Do you remember that?
A. I do.
Q. When did you get that photo?
MS. ARTAZA: That's going to be work product.
MS. PLAGENS: Well, Christine opened the door to that when she asked Mr. Gill about it during his deposition.
MR. ARTAZA: About -- that it had happened?
MS. PLAGENS: That he provided it to her.
MS. ARTAZA: Okay, that's fine.
Q. (BY MS. PLAGENS) When you got the -- I'm handing you Exhibit 42. Is this the picture that you received from Tony Gill?
(Whereupon Defendant's Exhibit 42 was marked for identification.)
A. This is one of them.
Q. And is this a picture of a phone?
A. Yes, it is.
Q. Do you know -- when you were at the Everman office, was there anything -- was there security that prevented people from just walking in and out of the building?
A. There was a badge in, badge out.



Q. If Mr. Gill's testimony or if Mr. Gill's statement is that you came over to Everman and took a picture of this, do you remember going to Everman after your termination to get a picture of this?
A. I didn't go to Everman.
Q. Did you go to Fort -- any --
A. I did go to Fort Worth, yes.
Q. Okay. After your termination?
A. Yes. The original picture, he sent while I was still employed.
Q. When did he tell you about the noose?
A. He told me about the noose when I talked to him about -- in his investigation, he mentioned it.
Q. Okay, so he --
A. He actually sent me a picture of it to my work phone.
Q. Okay. So he sent you a picture. That would not be work product. You hadn't engaged with an attorney as of February --
A. Right. So he sent me a picture of it on the work phone.
Q. Okay. When you went to the Fort Worth premise, do you have permission to be on the facility's premise?
A. I didn't have permission not to be there. But no one told me --
Q. You didn't have permission not to be there?



A. Yeah.
Q. Do you usually have to have permission to not be somewhere?
A. No. I mean, you asked if I have permission. No one said I couldn't go there.
Q. Okay. So as long as someone hasn't told you, you can't do something, you feel like you can do it?
A. There's no reason why I can't visit that office.
Q. Did you report the noose picture to Alicia?
A. She already knew about that.
Q. How did she know.
A. Because that was one of the things that -- Leslea had mentioned that. And I think that was something that she already knew.
Q. Are you speculating, or do you know she knew?
A. She told Leslea about it.
Q. And then Leslea told you, allegedly?
A. Leslea mentioned, like I said, about the gentleman in the poker. And I knew. But I didn't know it had anything to do with Tony. Or if it was a different noose, I don't know. It could have been another occasion. But again, I didn't get a chance to say anything to Alicia because again, we met on the 20th and I was gone on the 21st. We didn't get to dive into this at all.
Q. Tell me about who -- how did you find out you were

e-mails that you did the application.
Q. Are you continuing to look for jobs?
A. Of course.
Q. What's the last job you applied for?
A. There was a job that I applied for with the City of Dallas. I think it was the City of Dallas.
Q. How many jobs a week are you applying for?
A. I apply to whatever I see that comes available. Since my accident, I haven't really been doing too much because I've been resting.
Q. Understood. And when was your accident?
A. It was October 24th.
Q. I'm handing you Exhibit 62. It looks to me to be LinkedIn jobs. It's titled "LinkedIn Jobs Searches 2024." Did you put that on the top of there?
(Whereupon Defendant's Exhibit 62 was marked for identification.)
A. I may have put that on there, if it's a screenshot, because I put them all together. Yeah, because they're screenshots. So -- and then if you look up here, it says "LinkedIn" as well, on the screenshot. But when I went to e-mail them, I kind of put that up top.
Q. On Byrd 108, the first date -- the last entry is dated 2/22/24.
A. Okay.



Q. That's a year after your employment ended with Power Line Services, correct?
A. A little, yeah.
Q. And that's the first date that you produced to us in this -- and I know I'm -- this is the first date that I have for a LinkedIn entry for your applications. Were you applying on LinkedIn prior to a year after termination?
A. I may have been doing different sites. I bounced back and forth in between a lot of them. Some of the applications that I may have done may have been directly with the job sites themselves. I don't know. I don't want to speak on it.
Q. And then on page 94, the very first page of Exhibit 62. The last entry is 1/1/25. Have you applied for jobs on LinkedIn after January 1st, '25?
A. Yes.
Q. Do you have proof of that?
A. Not with me.
MS. PLAGENS: Could I have, like, two minutes off the record?
THE COURT REPORTER: Off the record at 6:25.
Back on the record at 6:27.
Q. I'm handing you what's been marked as Exhibit 63. This, to me, looks like -- it says, "From charbyrd@yahoo.com to Charlotte Chapman Byrd. Subject: Final written warning.



Attachments: Employee warning notice." And it looks like to me it's some write-ups relating to Alexis Goluguri?
(Whereupon Defendant's Exhibit 63 was marked for identification.)
A. Yes.
Q. Why did you have employee warnings and corrective actions about an employee in your personal Yahoo e-mail address?
A. There was -- this is the employee that we were supposed to term in November. And she was not terminated in November because they said that her father worked for the company and that they were going to wait. Something about it made me uneasy. They said that they were going to wait until May, and just say it was a layoff.
Q. Who is "they"?
A. Alicia.
Q. Where was this conversation?
A. On the phone. I had talked to her a couple of times about Alexis. Smart girl. Just, she -- she -- I'm going to stop right there.
Q. Okay. I'm handing you Exhibit 64. What is Exhibit 64?
(Whereupon Defendant's Exhibit 64 was marked for identification.)
A. This is something Tony sent me.



Q. And it's dated 3/11/23 for one of the entries. Here you go. Have you engaged with an attorney on 3/11/23?
A. I don't think so.
Q. Did you ask for Tony to send you this Primoris Shades of Community, or did he do it on his own?
A. I believe he may have -- is this a text message? He texted it to me. I can't remember exactly how it came about, him sending me this. I know that I would get stuff from him periodically. This was just one of the things. I can't remember off the top of my head right now.
Q. Do you know why he sent it to you?
A. I really don't remember. I just don't know at this time why he did it. It's kind of blurry, too, but it looks like it was some type of e-mail or something.
Q. Okay. I believe -- one moment. Okay.
Ms. Byrd, have I been courteous and polite with you today?
A. You have.
MS. PLAGENS: I'll pass the witness.
MS. ARTAZA: We have the right to read and sign, and then we'll reserve our questions until the time of trial.
THE COURT REPORTER: Do you need a copy of the transcript?
MS. ARTAZA: No, just for her to

Page 266

review.

THE COURT REPORTER: Okay, so the read and sign will go to you?

MS. ARTAZA: Yes, please.

THE COURT REPORTER: Anything else for record before we go off? No? All right, we're off the record at 6.32 p.m.

(The deposition concluded at 6:32 p.m.)

Page 267

CHANGES AND SIGNATURE

WITNESS NAME: CHARLOTTE CHAPMAN BYRD DATE OF DEPOSITION: NOVEMBER 20, 2025

PAGE LINE CHANGE REASON

____________________________________________________

Job No. CS7723955

Page 268

I, CHARLOTTE CHAPMAN BYRD, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

__________________________________

CHARLOTTE CHAPMAN BYRD

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared CHARLOTTE CHAPMAN BYRD, known to me (or proved to me under oath) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

NOTARY PUBLIC IN AND FOR
THE STATE OF ______________________

Job No. CS7723955

Page 269

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLOTTE CHAPMAN BYRD, )
)
Plaintiff )
)
VS. ) Civil Action No.
) 3:24-CV-2767-N
PRIMORIS SERVICES )
CORPORATION; PLH GROUP INC; )
and FUTURE INFRASTRUCTURE, )
LLC, )
)
Defendants )

REPORTER'S CERTIFICATION
DEPOSITION OF CHARLOTTE CHAPMAN BYRD
November 20, 2025

I, Jamie Gonzalez, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, CHARLOTTE CHAPMAN BYRD, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ________ to the witness or to the attorney for the witness for examination, signature and return to me by _________;

That the amount of time used by each party at the deposition is as follows:

Ms. Carmen Artaza .....00 HOURS:00 MINUTES
Ms. Nichole M. Plagens .....06 HOURS:26 MINUTES

That pursuant to information given to the deposition officer at the time said testimony was taken, the following

includes counsel for all parties of record:
Ms. Carmen Artaza, Attorney for Plaintiff;
Ms. Nichole M. Plagens, Attorney for Defendants.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 8th day of December, 2025.

JAMIE GONZALEZ
Texas CSR No. 12349
Expiration Date: 07/31/26
VERITEXT LEGAL SOLUTIONS
FIRM REGISTRATION NO. 571
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
Cs-tx@veritext.com



Carmen Artaza, Esq.
Carmen@tremainartaza.com
December 8, 2025
RE: Chapman Byrd v. Primoris Services Corporation Et Al.
11/20/2025, Charlotte Chapman-Byrd (#7723955)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

# PLAINTIFF'S
# EXHIBIT 2

Page 1

CAUSE NO. 3:24-cv-2767

| | | |
|---|---|---|
| CHARLOTTE CHAPMAN BYRD, | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | DALLAS COUNTY, TEXAS |
| | ) | |
| PRIMORIS SERVICES CORPORATION, PLH GROUP INC., POWER LINE SERVICES, INC., and FUTURE INFRASTRUCTURE, LLC | ) | |
| | ) | |
| Defendants. | ) | 134th JUDICIAL DISTRICT |

----------------------------------

ORAL DEPOSITION OF

TONY GILL

OCTOBER 9, 2025

----------------------------------

ORAL DEPOSITION OF TONY GILL, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on October 9, 2025, from 10:01 a.m. to 3:43 p.m., before Jennifer Strange, CSR, RPR, in and for the State of Texas, reported by machine shorthand, at the law offices of JACKSON LEWIS, 500 North Akard Street, Suite 2500, Dallas, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions, if any, stated on the record or attached hereto.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:

Ms. Christine A. Hopkins
Ms. Carmen Artaza
TREMAIN ARTAZA, PLLC
6060 North Central Expressway
Suite 567
Dallas, Texas 75206
Phone: 469-573-0229
christine@tremainartaza.com
carmen@tremainartaza.com

FOR THE DEFENDANTS:

Ms. Nicholé M. Plagens
JACKSON LEWIS
500 North Akard Street
Suite 2500
Dallas, Texas 75201
Phone: 972-728-3250
nichole.plagens@jacksonlewis.com

ALSO PRESENT:

Ms. Charlotte Chapman Byrd
Mr. Mitchell Bernhard, (via Zoom)
General Counsel at Primoris

Page 3

INDEX


| | PAGE |
|---|---|
| Appearances........................................ | 2 |
| TONY GILL | |
| EXAMINATION BY MS. HOPKINS...................... | 5 |
| Signature and Changes.............................. | 175 |
| Reporter's Certificate............................. | 177 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Email communication;Subject: To whom it may concern.docx with attachment (Primoris 277-279)............................ | 78 |
| 2 | Phone Conversation Between Chase Newton and Kelly Wood, 2-20-2023 (Primoris 320-321)....... | 81 |
| 3 | Utilities Segment - South HR Team (Primoris 3).................................. | 75 |
| 4 | Email communication;Subject: Employee Statement - 2.17.23 (Primoris 304-305)......... | 86 |
| 5 | Email communication;Subject: FW: Crew 534 Tooling (Primoris 259-260)..................... | 98 |
| 6 | Crew 534 Roster (Primoris 261)................. | 118 |
| 7 | Email communication;Subject: Crew 534 Tooling (Primoris 265-266)............................ | 119 |
| 8 | Calendar Invite for a Microsoft Teams Meeting, 2-17-2023 ;Subject: Follow Up Meeting (Primoris 267)......................... | 93 |
| 9 | Tony Gillis (sic) Investigation, 2-17-2023 (Primoris 190-194)............................ | 104 |


Page 4

INDEX (Cont.)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 10 | Photograph (Byrd 294)......................... | 35 |
| 11 | Email communication;Subject: Fwd: PRIMORIS 15010537_NESCO_600951 COSERV T&E 2022 (C#534) with attachments (Primoris 268-274)........... | 123 |
| 12 | Text messages (Primoris 627-638).............. | 124 |
| 13 | Email communication;Subject: Tony Gill Investigation (Primoris 314-315).............. | 147 |
| 14 | Calendar Invite for a Microsoft Teams Meeting, 2-20-2023;Subject: Follow Up Meeting 2 (Primoris 276)............................... | 94 |
| 15 | Tony Gillis (sic) Investigation (Primoris 197)............................... | 139 |
| 16 | Email communication;Subject: Employee Statement - 2.17.23 (Primoris 302-303)......... | 151 |
| 17 | Email communication;Subject: Lonnie Gill shared "Tony Gill - Statement" with you (Primoris 306-308)............................ | 152 |

Page 17

years to get my first raise.
Q. Okay. So if I'm right about that, would it have been in 2024?
A. Yes.
Q. August -- what is it, August 2024, on your anniversary date?
A. I didn't actually get it on my anniversary date, but it was around that time frame when I actually got it.
Q. Okay.
A. But originally I was told that my position didn't warrant a raise, which I had no idea, but come to find out I guess that's wrong, so that was their attempt to fix it.
Q. Okay. Who was your -- who gave you the raise, if you know? Who approved it?
A. It would have had to go all the way up the food chain in order to get it approved. So I would say it would have to come from Ben (sic) Campbell to give it a stamp, or I think maybe at that time it may have been Blake Brumley, which he no longer works for the company. But it would have to have been one of those to give it a stamp of approval.
Q. Did you say Dean Campbell or Adam Campbell?
A. Adam Campbell, yes.

Page 18

Q. Oh, okay. I think there was something else you said, and I don't want to misquote you, but I thought I heard you say that, fortunate or unfortunately the people are the same, they're just at different ages or different stages; is that more or less what you said?
A. Yes.
Q. What do you mean by fortunately that the people are the same? And then I'll ask you after what you meant by the unfortunately part.
A. That I -- I don't have to figure anybody out, it's consistent. So the needs and the expectations are the same coming in and out. You have the older version -- older version and the older ways of doing things, and the kids that are coming in has new ways of doing things, but what they're asking for and what they need are the same, if that makes sense.
Q. That makes sense. And then what's the unfortunately part about the people being the same?
(Voice in the background.)
THE REPORTER: I didn't understand that.
MS. PLAGENS: Sorry, I think that was mistake. He just accidently unmuted for a second.
MS. HOPKINS: Okay.
A. I guess the mindset. The view, it's always something you have to break through in order to get good

Page 19

communication. That would be the unfortunate part.
Q. (BY MS. HOPKINS) And what do you mean by the mindset or the view?
A. The position -- the person that holds the position of getting tools or knowing what's needed in the industry, to get that from someone like me, it's a little different. They expect that energy and that knowledge to come from somebody different, so it's just an ice that you have to break through.
Q. What do you mean someone like you?
A. Just the color, yeah.
Q. Okay.
A. Because we're not -- we're not -- in this industry it's -- it's a lot of safety and a lot of important things that go along with a life, right? So to know that that -- that what they need in order to work for is coming from somebody like me in order for them to do their job correctly and live. It's hard to -- them to envision that what I'm giving them is correct, until they understand who I am and how I feel about the industry and their life. So it just takes a little bit of time to get them to figure that out.
Q. Okay. When you refer to your color, like how do you self-identify in terms of your race or ethnicity?
A. I really don't. I see me as me. I think the

Page 20

issue is with others, but I don't really see color, if that makes sense. Because my family is a ray of different colors, so it's kind of like we're all as one. But I think it's the energy on the inside and what you see in your brain, that's what makes you who you are, so I don't really gravitate that way.
Q. If you have to fill out something like a census or an EEO sheet where you're marking, you know, whether your white, Caucasian, Pacific Islander, black, you know, Hispanic, Latino, like what box do you check?
A. Well, I have to do black because that's what I am.
Q. Okay. Do you identify as African-American?
A. Yes.
Q. Okay. Have you -- from what you were describing about it being difficult for people to sort of trust in you and trust in your work and trust in the correctness of it, do you feel like that has come from white people in the industry?
A. I think it's people in general. I've gotten an energy from a few black people as well because of the position, but this industry is really based on mostly Hispanic and white, not a lot of black people in this industry.
Q. Okay. Your entire time at T&D Services, have

area look like at Everman?
A. Conex boxes.
Q. For those of us who aren't in the industry, what does that look like?
A. Shipping container.
Q. Had you been using those Conex box shipping containers as your shipping and receiving area at Everman ever since you first started in August 2020?
A. Yes.
Q. And what was the reason that you were moving out of the Everman office and the shipping containers over at Everman?
A. Well, Everman was up for sale as well, and we were moving out of that facility because the building that we were in had been bought.
Q. Okay. So everyone was moving out of the facility?
A. Everyone was moving out of the facility.
Q. How much work did that entail for you, personally?
A. It took months to move.
Q. Were you personally responsible for moving your office and shipping and receiving area?
A. Yes.
Q. Did you have help?



A. At the end of it, yes.
Q. At the beginning of it were you doing it by yourself?
A. Yes.
Q. For approximately how long? How many weeks or months were you doing it by yourself?
A. I think a couple months by myself.
Q. And then at the end how much help did you get?
A. Two people.
Q. And how long did those folks help you?
A. About a week.
Q. Okay. So did you have to set up a new shipping and receiving area at Great Southwest after the Everman -- when you were moving from Everman, or were you, like, consolidating it all where you already had stuff?
A. Consolidating, because Kelly Porter had already had the facility at Great Southwest put together.
Q. Who is Kelly Porter?
A. He was the gentleman that held the tool managers position for Power Line Services.
Q. Did he end up getting laid off or was he terminated or do you not know?
A. He was terminated.
Q. Do you know why he was terminated?



A. I was told by -- the reason was for him cursing out a vendor, and it was recorded.
Q. Okay. Who shared that with you?
A. My boss, Travis Lutter.
Q. Okay. Did you already have a shipping and receiving area yourself at Great Southwest before you moved from Everman?
A. No, I did not.
Q. And when you moved to Great Southwest from Everman, did you have to use the same shipping and receiving area as Kelly Porter up until he was let go?
A. Yes.
Q. Okay. All right. So we had an incident occur at the Great Southwest office, right?
A. (Moving head up and down.)
Q. Who was involved in the incident between you and Mr. Craddock, other than you and Mr. Craddock?
A. Kelly Porter and two new hires. I can't remember their names.
Q. What was your understanding of Alvin Craddock's job title at that time?
A. It was director.
Q. A director of what, if you know?
A. Distribution.
Q. Was he director of distribution for T&D



Services or a different company?
A. Originally he worked for Power Line Services.
Q. Is he still employed by the company now?
A. No, he's not.
Q. Do you know when he left?
A. No, I don't.
Q. Do you know if he was laid off or terminated?
A. He quit.
Q. Oh, okay. Do you remember how long ago that was?
A. Approximately a year, year and a half ago.
Q. Okay. So at the time that the incident occurred, Alvin Craddock was the director of distribution for Power Line Services?
A. Yes.
Q. Does that mean he was at a higher level in the company than you?
A. Yes.
Q. How much higher?
A. Everything I do and everything I purchase is approved by a director. And a director of distribution have superintendents under him, general foremens under him, and then all of the workers. So he is next to the vice president of the company, so I would say he's pretty high on the...

Q. Would you have considered him to be an executive level?
A. Yes, because no purchasing is done without his approval.
Q. Is he someone who could have gotten you fired if he had made a complaint about you?
A. Yes, I would think so.
Q. And I think I missed it -- no, I didn't miss it, so Kelly Porter was a tool manager for PLS, right?
A. Yes.
Q. Was Alvin Craddock Kelly Porter's boss?
A. I don't think Kelly had a direct boss. I can't tell you how the dynamic was with PLS. I just know for me, without Travis, the directors would determine what I do and how I do it. And what I do -- what I would do is provide them with the correct information, the correct materials to do what he's asking, like a pyramid kind of thing.
Q. Okay. The other two gentlemen who you referred to as new hires and whose names you don't know, did they work for either Mr. Craddock or Mr. Porter at that time?
A. Mr. Craddock.
Q. Were they crew members?
A. Yes.
Q. Did you know whether they were foremen or just



regular workers?
A. I had no idea.
Q. Okay. So I -- make sure I have the race of everyone involved. What was Alvin's -- what is or is Alvin Craddock's race?
A. White.
Q. And what is Kelly Porter's race?
A. White.
Q. And what were the race of the two new hires?
A. White.
Q. Okay. Now, I know this was over two and a half years ago. To the best your recollection, if you were to give me just like the thumbnail quick summary of what happened during that incident, to the best of your recollection sitting here today, what happened that day with you, Mr. Craddock, Mr. Porter, and these two other gentlemen?
A. Whoo-wee. I'll just start with me walking in the door going to my office to get my bag, getting ready to leave the Great Southwest Parkway building going to the Everman building. As I proceeded to come into the building to grab my bag, I grabbed my bag and got ready to walk out of my office, I was approached by Kelly Porter, Alvin Craddock, and these two gentlemen.
Let me back up. They were actually already



in the room and I actually walked past them to get to my office to get my backpack to walk out. I was stopped and asked about tooling for a specific crew. It started out really civil and then for some reason it took a turn and got really loud, and a matter of fact, and pretty demanding.
Q. Pretty what?
A. Demanding.
Q. Demanding.
A. Of what he was looking for and what he needed.
My communication was really short because I didn't really get a chance to get in as much as I wanted to as far as communicating, because I felt like what they were doing was already set up and they had already knew the answer to everything that they were going to ask me. So I interjected as much as I could to give them what they needed. (Pausing).
It was pretty -- I guess "disrespectful" would be a good word to put it -- to put on it. I assume you want specific details, or do you want an overall assumption of what happened?
Q. I just --
MS. PLAGENS: So let her ask questions.
Q. (BY MS. HOPKINS) No, this is perfect. I'm happy to clarify for you, Mr. Gill. Like that was a



good overall summary. We're going to get into details because there are some documents here with different statements that different people wrote and I want to give you a chance to get into more specifics through the documents, if that's okay?
A. Okay. But if you want a summation, everything that he asked for and was looking for, he got it within an hour --
Q. Okay.
A. -- because it was there, but just at a different location. So it took -- my overall -- my overall view of it, if I would have been let to do what I needed to do and got to Everman, everything that he asked for, he would have got that answer without any conflict.
Q. Okay.
A. Because everything that he was looking for was just at a different location that I was headed to go -- that I was headed that way anyway, so...
Q. Sure. Let me just talk about a couple of phrases or words that you used when you were doing the overall summary. When you say, it got loud, who got loud?
A. Alvin did.
Q. And when you say, it got demanding, who was

being demanding?
A. Alvin was.
Q. And towards whom?
A. Towards me.
Q. And when you say, it got pretty disrespectful, who was being pretty disrespectful?
A. He was towards me.
Q. Okay. And when you -- I think you said something like you felt like they -- they sort of knew what the situation was and it was some kind of setup? I don't want to misquote your words, because I didn't write them all down. I'm sorry, she does a -- the court reporter does a much better job of writing things down than me. Did you use the phrase "setup"?
A. Yes, I believe that all of the answers that they was looking for, that they had them already and they were just walking through the process with me.
Q. Okay. So what about it made you feel like it was a setup?
A. Well, I felt like Kelly had already called the vendor and all the information that they were looking for, that he had it, because their communication was different from what they were getting from me, and it just felt like everything was there. So there was no right answer to give them, if it wasn't the answer that



they had already came up to on their own. So my best -- my best thing was to go find what he was looking for. And by this happening and it forcing me to leave the way that I did, he got what he needed the same day.
Q. Okay.
A. But...
Q. Did you feel like Mr. Craddock, Mr. Porter, and the other two gentlemen had some sort of goal in mind in terms of having this interaction with you?
A. Yes, I felt like they were there to get me fired.
Q. Why did you feel that way?
A. I felt that way because in my mind I didn't think that he thought that I was capable of doing the job that he was looking for in the way that he wanted it done. Just keep in mind, between them there was a system already put in place that was working for them, right? So I'm the one on the outside stepping in to disrupt what they already have in place. So hence, that's where the confusion may have came up, and them not wanting me in that spot at that time.
And also keep in mind, the system that Kelly Porter and Alvin is working -- work with, as far as getting tools and materials, is stuff that I had already put in place. So I may have felt like, in my



mind, that Kelly may have felt some type of way with me coming in having the -- kind of the same title that he had, even though he didn't know what my title actually was, thinking his job might be in jeopardy, and the quickest way to get me out is to discredit me, and that would have been a way to do that by me not performing in the way that they actually want me to.
Q. Did you feel like they were trying to get you to react in a certain kind of way?
A. Yes.
Q. What do you think they wanted you to do?
A. Well, just through the -- just through the communication I felt like they wanted me to -- provoke me to fight or to do something out of character.
Q. Okay. Before we talked about this feeling that you had sometimes that when people didn't think you were capable, it was sometimes because of your color. Did you feel that way during this incident with Mr. Craddock, Mr. Porter, and the two gentlemen?
A. The only person that I knew out of the bunch is Kelly, Kelly Porter. I have never met Alvin before. So whatever information that Alvin was given, I'm sure that's what he took, but -- if that answers your question, though.
Q. It doesn't exactly answer my question. I guess



what I'm getting at is, did you feel like there was a racial component to this incident?
A. If you pull that N-word out of there, no. I feel like this was -- this was driven to get me fired so somebody can save their job. But if you're focusing on that word, then yes. But that word wasn't my main focus in what happened. What happened was the scenario of them trying to get me fired.
I have never had anybody, you know, be -- I had never been pitted like that -- people against me in that way. It was quite confusing. Like I said, I've been in this industry long enough to have a -- a pretty good name, a pretty good reputation. And to be pushed and be put in a corner like that, that was kind of demeaning to me.
Q. Okay. So you've brought up the N-word. Did the N-word get used during that interaction?
A. Yes, it did.
Q. And who used the N-word?
A. Alvin did.
Q. And did he use it towards you?
A. Yes, he did.
Q. And did he use it in a way that he felt was demeaning?
A. Yes, he did.

Page 61

Q. Did he use it in a way that you felt was racially derogatory?
A. Explain derogatory.
Q. Or we can use the word "demeaning" or "disrespectful." I'm just wondering if -- earlier we talked about how in life sometimes people use the N-word and it's just part of culture, maybe music, or people don't really mean it in a bad way. So let me just start here. The way that Alvin was using the word, did you feel it was being used in a negative way?
A. Yes. Yes.
Q. All right. And did you feel like -- did you feel like it was racially disrespectful?
A. It was, but my focus wasn't that word. My focus was the situation.
Q. Right.
A. So just like -- just like I explained to you how I was raised, that word was given but it didn't stick with me. What stuck with me is the position that I was put in at that moment in time. To have someone sit -- stand in front of me with their fist clutched and the cursing brought towards me and then someone standing behind the door with his hand behind him and me not knowing what he had in his hand, and these two kids standing on the side of me with their eyes bucked and

Page 62

like they're afraid, that was my visual. And that was more hurtful to me than that word because I was raised to dismiss that part. Even though it was said and I heard it, but it wasn't something that I dwelt on. What was more important to me was everything else that was going on. That has never happened to me before.
Q. At that time in that moment did you feel physically threatened?
A. Yes.
Q. Did you feel like if you didn't do something to deescalate the situation it could have led to physical violence?
A. Almost definitely.
Q. Did you feel like you did anything to deescalate the situation?
A. Yes. I tried to get out of there as quick as possible.
Q. Okay. I want to go back to a couple things you just mentioned. You mentioned someone had their fist clutched, who was that?
A. That was Alvin.
Q. And were both of his fists clenched or --
A. Just his right fist, that's the only thing that I noticed.
Q. How close was he to you with his fist clenched

Page 63

or clutched?
A. I would say there was a table between us, so maybe 6 -- 10 feet maybe.
Q. Did he get closer to you than that in the course of the incident?
A. No, he did not step towards me.
Q. Okay. And you said there was someone standing behind a door with -- can you tell me who that was and --
A. It was Kelly Porter.
Q. Okay.
A. He was standing in front of his doorway with his -- something behind his back and his hand. I could not see his hand. He went into his office and came back and stood by the door with one of his hands not exposed, so...
Q. Okay. You did not -- you, yourself, couldn't see whether he had anything in his hand or not?
A. No, I did not.
Q. At that time, without knowing whether he had anything in his hand, did you have a fear that it might be a weapon?
A. Yes.
Q. Okay. What was your -- what was your fear at the time just in the moment of what he might have in his

Page 64

hand?
A. It wasn't fear of what he might had in his hand because I knew I was going to deescalate the situation and get out. But I think if it would have escalated to where we'd got into blows, whatever he had in his hand, whatever it was, I felt like it was going to come out.
Q. Okay.
A. So with the situation being deescalated, I wasn't really focused on what he actually had because I knew it wasn't going to happen.
Q. Did you have a gut instinct of, like, what you thought he might have just in the time, in the moment?
A. I can say that it couldn't have been anything big, so it had to have been something small.
Q. Okay. Okay. So the way we sort of started this conversation we were asking you how Ms. Chapman -- you came to speak with Ms. Chapman Byrd about it. After the incident was over, did you leave the Great Southwest office area?
A. Yes, ma'am.
Q. Okay. And where did you go to?
A. The Everman facility.
Q. And you said it was a 30-minute drive to get from Great Southwest to Everman?
A. Yes, ma'am.

Page 105

Q. What's making more sense to you now?
A. Of when the accident actually happened, which was the 15th, so -- but the investigation was done on the 17th is when we actually did the -- in my mind, I'm kind of confused because I thought there was an investigation and a report made on the same day.
Q. Sure. And I know this happened two and a half -- more than two and a half years ago, so -- and I said I would give you a chance to review some documents today and see if it refreshed your recollection.
If you just take a moment to look at the bold and the questions that are asked here -- you don't even have to read the answers, just if you can take a moment to flip through this and look at the questions in bold.
A. (Witness reviewing document.)
Q. Okay. Having had a chance to look at the questions in bold, who was the person who was asking you these questions?
A. Charlotte. Ms. Byrd.
Q. Is -- the questions that you just read over, does this match up with your recollection of the questions Charlotte Chapman Byrd was asking to you when she was taking your statement about the incident?
A. So far -- what I'm reading so far, yes.

Page 106

Q. Okay. Are there any of the questions in bold here that you for sure are thinking, wait, no, Charlotte Chapman never asked me that particular question?
A. (Witness reviewing document.) I don't see anything out of place.
Q. Okay. Looking over these -- this document, did Charlotte Chapman ever ask you to sign off on it, like, put a signature on it?
A. I don't remember.
Q. Okay. Had you spoken to Kristie Madison before February 17th, 2023 about the incident?
A. I don't remember.
Q. Okay. Did Kristie Madison suggest to you that you should talk to Ms. Chapman Byrd about the incident?
A. I don't remember.
Q. Okay. Since we're on Exhibit 9, let's stay there, I will skip ahead.
Looking at Exhibit 9 and recollecting these questions that Charlotte Chapman Byrd was asking you, did you feel comfortable with the questions that she was asking you at the time?
A. Yes.
Q. Did you feel comfortable answering her questions?
A. Yes.

Page 107

Q. Did you feel like she was putting any pressure on you to answer any particular way?
A. No.
Q. Did you feel like she treated you respectfully during the interview?
A. Yes.
Q. Did you have any complaints at all about any way that Ms. Chapman Byrd handled the interview with you?
A. No.
Q. When you were providing information to Charlotte Chapman Byrd that day, did you feel like she was taking everything you were saying seriously?
A. Yes.
Q. Did you feel like she believed what you were reporting to her?
A. Yes.
Q. Did you feel like you could trust her?
A. Yes.
Q. Okay. And did you feel like you could freely answer her questions with completely truthful and honest answers?
A. Yes.
Q. Okay. Let me see. I'm trying think of a way that's easy to break this up without making it too

Page 108

difficult for you. If I go page by page and have you read over the information that's not in bold, so just the information that's after the questions, do you think that's a fair way for me to ask you whether there's anything here that's typed up, in regular font, that you did not actually say?
A. Yes.
Q. All right. So if you just review the first page here, is anything that was typed up, in regular font, as the answers to the question, is anything here incorrect?
A. (Witness reviewing document.)
Those are my words.
Q. Okay. And I'll ask you to review the second page, which is Primoris 191 at the bottom. Can you review everything that's typed on the second page in regular font and confirm for me whether these are -- this accurately captures information that you gave to Ms. Byrd?
A. (Witness reviewing document.)
Those are my words.
Q. Okay. And if we move to the third page, which is stamped Primoris 192 at the bottom, are the answers that are typed to the questions in regular font there on this page, are those your words?

A. (Witness reviewing document.)
Those are my words.
Q. Okay. And if we move to the fourth page, which is marked Primoris 193 at the bottom, could you review the answers typed in regular font after the questions and let me know if that accurately reflects what you told Ms. Byrd?
A. (Witness reviewing document.)
Those are my words.
Q. Okay. And then on the very last -- fifth page, which is pretty short, Primoris 194, what's typed there in regular font after the question, Did he do anything, and then the next paragraph, are those also your words that you shared with Charlotte Chapman Byrd?
A. (Witness reviewing document.)
Those are my words.
Q. Okay. Where it says here, I do not trust Kelly because of her connection to John and Adam.
Are you referring to Kelly Wood?
A. Yes.
Q. And when you say because of her connection to John and Adam, are you referring to John Pinkerton and Adam Campbell?
A. Yes.
Q. At that time, what kind of connection did you



feel that there was between Kelly Wood and John Pinkerton and Adam Campbell?
A. It's just a close-knit, tight group that do things a certain way.
Q. Okay. And how had you gotten that impression?
A. Just by what I see.
Q. Okay. I want to ask you about something that was on the fourth page where it says, Racial jokes about black people in a group setting and we were expected to laugh about it. I do not know how you clean that up. It is too deep rooted in this company and industry.
What did you mean by that?
A. This industry have tooling and material that's depicted in a racial way, and it goes back really far. So you can actually buy this book, so -- it's called the -- this industry's pocketbook, pocket handbook for tooling. And that book you can purchase from several vendors, so from -- and it will tell you the slang version of the tool and the correct version of the tool. That has not changed in this industry.
You can -- there are people in this industry that still call those tools those words. So when I say, deep rooted, it's just something that's just -- if it's not fixed in the culture of the company that you work for, when you -- outside of this company,



it's used. Hopefully that answers your question.
Q. Sure. And I'm not actually familiar with that at all, so I'm hoping you can educate me. What do you mean by slang terms for the tools? Can you give me some examples just so I understand?
A. I'll give you -- there's a tool that they use to lift a reel with.
(Reporter clarification.)
A. You hook it on a piece of equipment, you drop it down in the hole, and at the bottom of it it opens up so you can lift it, right? The correct term for that is called a reel thing or a pickle. "Pickle" is one of the derogatory names that you would call it, but also the name of it we'd -- you would call it a monkey fist. So -- and there's another word that they call for it as well, which is derogatory to us.
. So you hear that version of that tool throughout the industry, depends on how long that person's been in the industry and what they've read or what they've been taught the name of that tool is, so -- and there's several other tools that's like that in the industry as well.
Q. Okay. What is the other derogatory term for it that --
A. It starts with the N-word.



Q. Okay. If you feel comfortable saying it, what is it?
A. It's the N-fist.
Q. Okay.
A. Like...
Q. Okay. And so when you said it's too deep rooted in this company and the industry, were you only referring to these slang words for the tools or were your referring to anything else?
A. That and just the communications on how they -- everybody communicate and what they think is funny and what's not.
Q. Okay. And what do you mean by that?
A. That any joke is a joke, depending on -- and it's not depending on who it hurts or who it offends.
Q. Have you heard racial jokes at the company that have offended you?
A. It should have, but once again, my upbringing, I dismissed certain things. But in this one incident there was a group of people around me and it offended them moreso than it did me, and that's how it went to the president of the company. It wasn't something that I complained about, it was what everybody else that was standing around me. And remind you, none of those people were African-American, all of those were white

live for, is the job something that you live for?
A. I enjoy my job. I enjoy keeping people safe and giving them the things that they need in order to do a job and go home every day, so yeah.
Q. I don't know if it's changed since 2023, but as of 2023, how important was the job to you financially?
A. It's important. You know, everybody needs income in order to survive for the most part, yeah.
Q. I think Charlotte asked you, Explain, question mark?
Is that right? She's asked you to explain your comment?
A. Yes.
Q. And you say, To know something's coming. And that I didn't follow through with their initial plan.
What did you mean by, that I didn't follow through with their initial plan?
A. I think their initial plan was for me to quit because of the process and the acquisition. At first they were saying that they really liked the processes and procedures that Kelly had put in place, not understanding that those were my procedures. Until they made the acquisition and understanding that everything they had in place was actually mine. So I think I might have been -- in my mind, may have been thinking about



pushing me out until everything started. And when they got to know who is what, I think things changed, in my opinion.
Q. Okay. When you refer to their initial plan, who is they?
A. I would say John, Scott, Russell, to just make a decision to cut.
Q. Did you think that John, Scott, and Russell were hoping you would quit because of the transition?
A. Yes.
Q. And I don't know if we have Scott and Russell's last name on the record.
A. You do, Scott Baker and Russell Baker.
Q. Oh, okay. Thank you for reminding me about that.
Okay. Next page. It says, You talking about John? Don't do that to yourself. Let's just take it one day at a time and see what transpires.
And you liked that message. When you liked it, why did you like it?
A. Just thinking about what he said when I talked to him, about, you know, not addressing what I'm -- what had happened to me, just addressing to what Alvin and his situation was, and saying he was going to take care of it. That was something that kind of weighed on me a



little bit.
Q. Okay. It looks like you texted Charlotte Byrd your personal email address on February 17th; is that right?
A. Yes.
Q. Why did you text her your personal email address?
A. She asked for it. I can't remember why or what for. She did ask for it.
Q. Did you and she ever communicate on your personal email address about the Alvin Craddock incident?
A. I can't remember or recall sending anything that way. I may have, but I can't remember.
Q. Okay. This next text I have a few questions about the one that's sent on February 19th, 2023 at 5:43 a.m.
First of all, are you someone who is usually up at 5:43 a.m.?
A. Yes.
Q. How early did you get to work?
A. I'm usually at work at 5:00 in the morning.
Q. Wow. And how late would you usually work?
A. 5:00 in the afternoon or later.
Q. Okay. Are you someone who gets overtime?



A. Yes.
Q. Okay. Thank goodness.
All right. This message says, Hey, Charlotte, can't sleep. Going over the scenario in my head. My wife says I'm feeling guilty about reporting this, but two things I think you should take out because now I can't recall him saying the N-word, and second, keep in mind, I didn't see anything in Kelly's hand. Everything else I'm 100 percent about.
I have some questions about different parts of this text.
A. Okay.
Q. When you told Charlotte, can't sleep, going over the scenario in my head. Was the scenario you were going over in your head the incident with Alvin Craddock, Kelly Porter, and the two other guys?
A. Yes.
Q. What about going over that scenario was making it so you couldn't sleep?
A. Just being put in that position to have to fight. And just re -- re-going over the processes and the communications, and just understand that I've been in this industry this long and never had anything like this happen to me before. As a matter of fact, I've been alive this long and never had anything like that

Page 133

happen to me before or even be viewed in a way to have to defend yourself in that way.

Most of the time when I'm confronted with anything or anyone, it's a communication, but not in that way. So it threw me for a loop. On top of the other issues that was going on with me with my body and all this other stuff, so...

Q. Okay. And it says, My wife says I'm feeling guilty about reporting this.

Were you feeling guilty about reporting it?

A. Well, I had never reported anything before. I always went to the head of everything to get it taken care of. But sitting in front of HR for the first time it was something different. It was something I had never done before, so -- and I didn't know if I should pursue it or not or let it go or not, but I know it was out there. But I didn't get the understanding that I had -- still had a choice whether to put it out there or not. So I'm just weighing on that, whether I should have done it.

Q. Right. At the time you sent this text, you knew you had already told Charlotte about the N-word, the racial jokes, the noose with the time stamp, right?

A. Yes.

Q. Were you feeling worried about having reported

Page 134

those things in particular to her?

MS. PLAGENS: Objection, form.

A. Give that to me again.

Q. (BY MS. HOPKINS) Sure. I'll break it down. Were you feeling guilty about telling Charlotte Byrd that Alvin Craddock had called you the N-word?

A. No, not guilty about something that had happened, no. Maybe the ramifications behind it.

Q. Sure. What do you mean by that, the ramifications behind it?

A. So when we had that meeting with Alicia, she sat down with me and Charlotte both and gave me -- gave me two different ways to present that report. And saying that both ways would get something taken care of. One would be more harsher than the other, but the result will still get it done. So me taking the N-word out would still get them reprimanded, but leaving it in will cause other issues.

And if I -- I can't remember exactly what those things were, but I know they were pretty bad. So those were the things that was weighing on me, whether I should take it out or leave it in there. I just can't remember the ramifications by leaving it in or not.

Q. Okay. So by the time you had sent this text message, hey, Charlotte, can't sleep, had you already

Page 135

had a meeting with Alicia Campbell?

A. Yes, we had. We had sat down and talked.

Q. So you had a sit-down with Alicia Campbell and with Charlotte Byrd in a meeting?

A. I want to think that's -- I can't remember the exact date.

Q. That's okay.

A. But I do remember us sitting down together and going over that.

Q. Okay. By the time you decided to tell Charlotte that you couldn't recall him saying the N-word, had you already sat down and talked to Alicia?

A. I can't remember.

Q. All right. From the testimony you just gave, was there a sit-down meeting you had with Alicia in which she presented you two different ways to make your statement, one that did include the N-word and one that didn't include it?

A. Yes.

MS. PLAGENS: Objection, form.

Q. (BY MS. HOPKINS) All right. And she said that if the N-word was left in the statement there would be more serious consequences?

A. Yes.

Q. And you can't remember if she shared what those

Page 136

more serious consequences were?

A. I know she did, but I just can't remember what they were.

Q. Okay. Any other witnesses to that meeting you had with Alicia?

A. No, just myself and Ms. Byrd.

Q. Did she actually have two, like, physical printed-out statements like there in that meeting that she was showing you?

A. No, this was verbal.

Q. Okay. Verbal. Gotcha.

All right. When you sent this text to Charlotte that said you can't recall him saying the N-word, why did you -- why did you decide to tell her that?

A. That was just what I was feeling at the moment. And like I said before, that wasn't something that I was focused on during the time that that was happening to it. I can remember hearing it, but I can't recall him saying it. And I know he said it twice, but I can't -- I couldn't hear it. But the action behind everything at that moment, that was the most important thing that was going on with me, not that word. I don't know if that makes sense to you. Because I was never focused on that word. I was focused on what he wanted, what Kelly might

Page 137

have had in his hand, and these two kids over here that looked like they didn't belong in the building.
Q. All right. Okay. So -- and then you have a second part of this that says, Second, keep in mind I didn't see anything in Kelly's hand. And that's consistent with the statement we saw previously, right, where Charlotte typed out your answer and you weren't sure whether Kelly -- Kelly Porter had anything in his hand or not, right?
A. Yes.
Q. Okay. Ultimately did you decide to turn in a statement that did not have the N-word in it?
A. Yes.
Q. And who wrote up that statement?
A. I did.
Q. Did you also take out the part about the racial jokes when you turned in that statement?
A. Yes, two different incidents.
Q. What do you mean two different incidents?
A. The racial jokes was done in McKinney, that wasn't part of that incident in Great Southwest. Two different incidents.
Q. Okay. We had seen that the racial jokes were referenced in the information you gave Charlotte Chapman Byrd in Exhibit 9, right?

Page 138

A. Yes, but that was an array of different things that have happened to me since I've been here at Primoris, that was just another example.
Q. Right.
A. But it wasn't part of the situation with Alvin and Kelly Porter.
Q. Yeah, I'm on the same page with you. I completely understand that. When you turned in the statement that did not include the N-word, you also chose not to include any of the background information on the racial jokes that had happened in the past, right?
A. Yes.
Q. And you decided also not to include any of the background information on the noose that had been in your office, right?
A. Yes.
Q. Okay.
A. Only because they were separate incidents, but, yes, you're right.
Q. Did Alicia Campbell in her meeting with you ask you what it meant in Charlotte's notes where it referred to a time-stamp noose?
A. No.
Q. Did she ask --

Page 139

A. I don't recall.
Q. Did she ask you if you had a photograph of a time-stamped noose?
A. From Alicia?
Q. Did Alicia Campbell ask you?
A. No, huh-uh.
Q. Okay. At any point in time when Kelly Wood was talking to you about the incident, either on the phone or in person, did Kelly Wood ever ask you what it meant that it referred to a time-stamp noose in Charlotte Chapman Byrd's notes?
A. I don't remember, no.
Q. Okay. All right. I would like to go to the February 20th, 2023 at 4:17 p.m. you texted, Well, I guess you're not okay to Charlotte, right?
A. Yes.
Q. Why did you text that to her?
A. I cannot remember what that meant.
Q. Okay. If we take -- I'm going -- I want you to just keep in your mind that on February 20th, 2023 at 4:17 p.m. you sent Charlotte this text, well, I guess you're not okay. I would like you to keep that in your mind and flip to Exhibit 15.
On February 20th, 2023, was there a meeting you had with Ms. Chapman Byrd where she was asking you

Page 140

about the text you sent where you said you wanted to remove the N-word from your statement and that you didn't see anything in Kelly's hand?
A. (Witness reviewing document.) Yes.
Q. Okay. When you met with Charlotte Chapman Byrd, did you try to explain to her why you had sent the text saying you wanted to remove the N-word from your statement and to keep in mind that you didn't see anything in Kelly's hand?
A. Where do you see that at? That's just a question you're asking me, or were you reading that?
Q. I haven't read anything from the statement yet, but it might be easier for us to do it that way.
So you see that there's a first paragraph that describes the text message that you sent to Charlotte Chapman Byrd, right?
A. Yes.
Q. And then it says, Monday morning February 20th, 2023, I met with Tony to re-interview and revisit his statement. Do you see that?
A. Yes.
Q. Do you recall that happening?
A. Yes.
Q. Did you tell Charlotte what it says in the next highlighted part: What you received from me is me

Page 141

trying to release, slash, remove it so that it could take the pressure off me?
A. Yes.
Q. What pressure did you want taken off of yourself at that point in time?
A. The ramifications of something happening really bad with leaving that word in there, and if -- if I'm not mistaken -- no, that would be speculating. I don't know what I meant by -- I do know what I meant by taking pressure off of me, but the N-word taking it -- leaving it in there, if I'm not mistaken, it would maybe ban them from the industry. I can't remember. That's kind of close to that, maybe.
Q. Are you sitting here now thinking that Alicia Campbell told you if you left the N-word in your statement Alvin Craddock would be banned from the industry?
A. I think -- I think that's -- maybe part of it, but I can't tell you for sure. I know it was really harsh. Maybe along the lines of that will stick with them for as long as they're in this industry. It was something harsh that made me remove it.
Q. Okay.
MS. PLAGENS: And I don't want to interrupt your flow, but we've been going for almost an hour and a

Page 142

half, so whenever you get to a stopping point.
MS. HOPKINS: Oh, absolutely. I don't want to deprive anyone of any breaks that you need. We can either take a break now or we can just finish this one document and take a break. I'll leave it completely up to Mr. Gill.
THE WITNESS: We can finish.
Q. (BY MS. HOPKINS) Finish this one document, okay. Did Charlotte tell you, Mr. Gill, we want to report the truth and only the truth?
A. Yes.
Q. And did she then ask you again if the N-word was used, yes or no?
A. I said yes.
Q. And you said yes. Okay. And you said, What happened to me that day is what happens to me on a daily basis all the time, I just never say anything. I just leave it alone, and it is handled on the back end.
Is that something that you truly and accurately told Charlotte Chapman Byrd?
A. Yes.
Q. Okay. When you -- and she asked you: When you say on the back end, what does that mean? Did you respond: When it happens they will tell whoever is involved, anytime you have to deal with Tony, come to me

Page 143

and I will go to him?
A. Yes.
Q. Okay. So in other words, would someone just like act as a buffer between you and the person who had a problem with you?
A. Yes.
Q. Okay. Did you tell Charlotte that you did not have any enemies in this industry, just maybe people who did not like you?
A. Yes.
Q. And did you tell her you normally deescalate everything, that's just how I am?
A. Yes.
Q. Did she ask you: So your retraction was for what reason?
Did she ask you that?
A. Yes, she did.
Q. And did you tell her, Nothing is going to change, we are both going to be here and nothing is going to change. He is going to be here. So to make it easier on me so I know how to deal with them moving forward?
A. Yes.
Q. Did you tell her, To be honest, I was warned about this, them, both Kelly and Alvin both?

Page 144

A. Yes.
Q. Had someone warned you about Kelly Porter?
A. Yes.
Q. And had someone warned you about Alvin Craddock?
A. Yes.
Q. Was it this Donny Sadowsky who'd warned you?
A. Yes.
Q. And he worked for Dole?
A. Yes, truck driver.
Q. Is that a different company that's outside of the Primoris?
A. No, they're an entity inside of Primoris.
Q. Oh, okay. What did Donny Sadowsky say to you about Kelly Porter and Alvin Craddock?
A. That they were loud, mean, and they had a bad way of communicating.
Q. Is Donnie Sadowsky white, black, Hispanic?
A. He is white.
Q. Okay. Did he tell you anything about whether he thought Kelly Porter had any racial biases?
A. No.
Q. Did he tell you anything about whether he thought Alvin Craddock had any racial biases?
A. No.

A. Yes.
Q. Okay. And -- all right. I want to ask you a little bit about her section way down the bottom of the email that says Recommendation. Did anyone ever report back to you about what the findings were of any investigation into the Alvin Craddock incident?
A. No.
Q. Did they ever tell you whether any action would be taken in response?
A. No.
Q. It says here, I recommend that John Pinkerton address with Tony and Alvin conflict resolution and how to handle in a professional manner in the workplace conflicts that might arise and learn to respect others.
Did John Pinkerton ever do that?
A. No.
Q. Did he ever address conflict resolution with you, personally?
A. No.
Q. Did John Pinkerton ever sit down with you and Alvin Craddock together to address conflict resolution?
A. No.
Q. It also says, Take classes in PSC Learn or find a class that would assist PSC leadership and employees to understand DE&I.



Did anyone from HR come back to you and tell you that they recommended you take a class in PSC Learn about DE&I?
A. They don't recommend anything, they just put it out there in the email and tell you you have this to do, and you just go through the processes until it's completed. So no recommendation, they just put it out there for all of Primoris to go into PSC Learn to actually go through anything that they have out there to -- that they want you to, I guess, to learn about.
Q. Are you asking -- sorry, are you referring to some sort of general communication that goes out to all employees?
A. Yes.
Q. Okay. And this general communication that goes out to all employees just says, you can go into PSC Learn and take classes?
A. Yes.
Q. Did Kelly Wood, Alicia Campbell, Jaritza Hernandez, anyone from HR, come and tell you that as a result of the Alvin Craddock incident they wanted you to specifically take a class in DE&I?
A. No.
Q. Do you know if anyone ever told Alvin Craddock that he needed to take a class on DE&I?



A. No.
Q. If we go to Exhibit 16. All right. There's an email up top here from Alicia Campbell to Charlotte Chapman Byrd on Monday, February 20th, 2023 at 1:24 p.m. Have you ever seen the top half of that page, that's just the email from Alicia to Charlotte?
A. No.
Q. Alicia's Campbell -- sorry, Alicia's email to Charlotte says, Thanks again for the statement, Charlotte. Kelly will finish out the investigation as this is her group. Can you please confirm who informed you of the complaint?
My question for you, Mr. Gill, is back then, were you told at a certain point by Alicia Campbell that Charlotte Chapman Byrd was being removed from the investigation?
A. No.
Q. Were you told by Alicia Campbell at any point that Kelly Wood was going to be assigned to finish out the investigation into the Alvin Craddock incident?
A. No.
Q. Did Charlotte Byrd herself tell you that she had been removed from the investigation?
A. No.
Q. Okay. All right. And if we flip to



Exhibit 17, please. This is -- is this a true and correct copy of an email you sent on February 21st, 2023 at 7:15 a.m. to Charlotte Chapman Byrd?
A. Yes.
Q. The statement that is attached here, is this the revised statement that you typed yourself?
A. Yes.
Q. Okay. And is this also a statement that you submitted to Alicia Campbell as well?
A. Yes.
Q. So if we go back to Exhibit 16, on the bottom half of the page there is an email -- oh, sorry, never mind, I thought that was a different email. Never mind, I was looking to see if there was an email where you actually sent that to Alicia, so I'll back up.
Going back to the statement that you wrote in Exhibit 17, do you remember if you emailed that directly to Alicia Campbell or whether you got it to her some other way?
A. I can't remember.
Q. Okay. Did you ever complain to Kelly Wood that Charlotte Chapman had gotten involved in the investigation?
A. No.
Q. Did you ever complain to Kelly Wood that

Charlotte Chapman had approached you unexpectedly and attempted to insert racial slurs into a statement she had written for you?
A. No.
Q. All right. Did you have any complaints about Charlotte that you expressed to Kelly Wood at any time?
A. No.
Q. Who is Braydon, Braydon Jones?
A. He's somebody that works for me, just a -- I won't call him a kid, but definitely much younger. But he actually was working out of McKinney, so if I needed anything or he was slow, I would have him come to me in the Everman facility or the Great Southwest facility and he would just hang out with me and work.
Q. Did you give Braydon Jones's name to Charlotte Chapman Byrd as someone who should be interviewed in connection with the Alvin Craddock incident?
A. No, because he wasn't part of the incident. He was a part of a -- afterwards, things happened to him afterwards, but he wasn't part of the actual incident.
Q. What happened to him afterwards?
A. He got treated in a way to where everything that I asked him to do, as far as things that was associated with me, any tooling or material that was associated with me, to lock it up in my office. And



they just gave him a hard time about it. And when he came back the next day he said he had knew that he had locked everything in my office, when he got there, the door was open. And that was his -- his dealings with Kelly and the incident. And his grandfather, which is Wayland Chappell, removed him out the -- that group and just put him in McKinney and told him never to go back, so...
Q. Wayland the last name you said is?
A. Chappell, C-H-A-P-P-E-L-L.
Q. And I'm sorry, who is that?
A. He is the VP of substations.
Q. Okay.
A. And that is Braydon's grandfather.
Q. Oh, okay.
A. Yes.
Q. Is Braydon Jones white, black, Hispanic, or a different race?
A. He is white.
Q. And did you confide in Braydon Jones some information about what happened between you and Alvin Craddock and Kelly Porter?
A. Yes.
Q. Did you tell Braydon Jones that you got ganged up on by four dudes?



A. That may have been my terminology, yes.
Q. Okay. Did you tell Braydon Jones that Kelly Porter went to his office and came back out and you were not sure if he had a gat with him?
A. That is true.
Q. What is a gat?
A. A gun.
Q. All right. Are you someone who instructed Braydon Jones to lock tools and equipment in your office after the incident occurred?
A. He worked for me, yes.
Q. Okay. So you wanted him to lock everything up in your office for what reason?
A. Kelly didn't want anything associated with me anywhere else other than in my office. He wanted Braydon to get rid of it.
Q. Okay.
A. So his way to getting rid of it was to lock it up in my office and be done with it.
Q. And then Braydon Jones reported back to you that after he locked everything up in your office he came back one morning and found the door open?
A. Yes, the next day he found the door open.
Q. Did you tell Braydon Jones about Alvin Craddock using the N-word?



A. No.
Q. Why not?
A. Just wasn't something for me to say.
Q. Okay. Who's Amy Corman?
A. She was an admin that worked for me.
Q. Okay. Did you give her name to Charlotte Chapman Byrd as someone who you thought should be interviewed about the Alvin Craddock incident?
A. I can't remember.
Q. Okay. Is Amy Corman someone who had her office at the Great Southwest --
A. Yes.
Q. -- Parkway location?
A. Uh-huh.
Q. Is it true that after the Alvin Craddock incident you left that location without telling Amy Corman that you were leaving?
A. Yes.
Q. Would it have been your normal practice to tell her when you were leaving?
A. Yes.
Q. Okay. And then did you call her afterwards to tell her that you had left?
A. Yes.
Q. Did you tell her you were going to Everman?

next screenshot is for -- excuse me -- I'm so sorry.
A. Bless you.
Q. Excuse me. We'll power through it. Tuesday, November 5th, do you know what screenshot you were sending Ms. Byrd and -- we can't see it, obviously, I'm just asking from your memory, if you remember?
A. I remember the gist of it, but I couldn't read it, and as a matter of fact, I don't think I read it myself, because it happened so fast, and it was taken down so fast.
Q. Okay. Was it an email from Kristie Madison?
A. No, this was an email from Stewart -- I can't remember Stewart's last name. But he had an incident that happened to him and he sent this to everybody in Primoris.
Q. Okay.
A. And it was quickly taken down. Things that he -- that happened to him as far as discrimination is concerned. And most of it had something to do with him applying for jobs and in line for jobs that was given to other people that was less qualified.
Q. Okay. If we flip to the next page, why did you send Charlotte Chapman texts about Leslie Scott and this Post-it note specifically that's here?
A. There was two people in my office asking me did



I know of her, and I had not. And I -- at the time I was talking to Charlotte and I asked her, did she know who she was. She said, yes, she hired her. And those people that was on a previous page was contacting this lawyer to do a discriminating lawsuit against the company as well.
Q. Okay. So you were just sharing the lawyer's name and contact information with Ms. Byrd?
A. Yes.
Q. All right. I just want to go back something you said way earlier in the deposition about having had a discussion with Kristie Madison about Ms. Byrd. I think her name is Kristie, or did I get that wrong?
Yeah, Kristie Madison. Was there a point in time where you had a conversation with Kristie Madison about Ms. Byrd's termination?
A. We may have spoken, but I cannot remember. Because after Ms. Byrd left, Kristie left not too much longer behind her.
Q. Okay. Do you have any recollection of calling or reaching out to Ms. Madison to talk about Ms. Byrd's termination?
A. If I did, I cannot remember.
Q. Do you remember if Ms. Madison shared any information with you that Kristie had about Ms. Byrd's



termination?
A. Huh-uh, I cannot remember.
Q. So you don't know if -- you don't recall Ms. Madison, like, giving you an inside scope kind of thing about what happened with Ms. Byrd?
A. No, huh-uh.
Q. Okay. All right. I am almost finished with my questions, but I do want to ask you, are there questions I have not asked you about what happened between you and Alvin Craddock -- sorry, I'll strike that and start again.
Is there -- I'm trying to make sure I have all the information that you want to give me about the Alvin Craddock incident. I'll ask it this way. Is there information that you think is important about what happened between you, Alvin Craddock, and Kelly Porter that you haven't shared with me that you want to share with me?
MS. PLAGENS: Objection, form.
A. I think you have it all.
Q. (BY MS. HOPKINS) Okay. Is there any information you have about Ms. Byrd's termination that you haven't shared with me?
MS. PLAGENS: Objection, form.
A. I think you have it all.



Q. (BY MS. HOPKINS) Okay. As of that February 21st, 23rd, 2023 time frame, to your knowledge, was anyone laid off at that time, other than potentially Ms. Byrd?
A. Whoo-wee, I can't tell you if they were laid off or they quit or they got fired, but the demographics have changed quite a bit, so...
Q. After that February 20, 2023 time frame, were you aware of people who were with PLS and who then got transferred to T&D?
A. No, because that information is really above me.
Q. Okay. Have you -- oh, I remember there was a question I needed to ask you. Did something -- did you have any further incidents in February of 2023 after what happened with Alvin Craddock that you were concerned about at work?
A. I can't recall anything right offhand.
Q. Did something happen with your car?
A. Oh, yes. Oh, bullets. Shell casings, yes, that did happen.
Q. Okay. Where was your -- where was your car when you saw bullets or shell casings?
A. In the parking lot of Great Southwest Parkway.
Q. Was -- so it was parked at the Primoris

facility there?
A. Yes.
Q. Did you find them after work, or when in the day did you find them?
A. After work.
Q. Did you report it to anyone?
A. Yes.
Q. To who?
A. To John Pinkerton.
Q. And did anything happen as a result?
A. He paid for a new tire for me.
Q. Do you know if that parking lot had any kind of security cameras?
A. Sure.
Q. Do you know if anyone pulled security footage to see who might have done that?
A. No, it wasn't a big enough incident to do that, I'm sure.
Q. Okay. Did you ever come to find out by any means who left the bullet casings in your -- by your car?
A. No, but they were more of them scattered around the parking lot, though, and a few in a couple of beds of pickups, but I can't tell you who the pickups belonged to.



Q. And I'm sorry, did you say one of your tires had actually been shot?
A. Actually been punctured.
Q. Punctured by a bullet?
A. Yeah.
Q. Okay.
A. So the bullet was placed in a position to where you couldn't see it. When you rolled over it, it inserted itself in it. And I drove from Great Southwest Parkway to McKinney with that being in that tire. When I got there it just deflated. And when they took the tire apart it was a full -- full bullet, and somehow it just lodged itself inside of it.
Q. Okay. From what you observed in the parking lot, did you feel like your vehicle had been targeted?
A. Yes.
Q. And did you share that with Mr. Pinkerton?
A. Yes.
Q. Do you know if anyone investigated it?
A. No.
Q. Did you report to it HR?
A. No.
Q. Why not?
A. Again, we take care of stuff on our own without including HR.



Q. After what happened with the Alvin Craddock incident, did you feel like you couldn't go back to HR about anything?
MS. PLAGENS: Objection, form.
Q. (BY MS. HOPKINS) Or I'll put it a different way. Did you feel like it was best not to include HR?
MS. PLAGENS: Objection, form.
A. Again, I always go to my superiors if I ever have a problem, for the most part.
Q. (BY MS. HOPKINS) At the end of the day, how did you feel about the whole HR handling of the Alvin Craddock incident in terms of how that -- how having HR involved affected it -- that was really bad question.
MS. PLAGENS: Objection, form. Sorry, I'm trying to follow along.
MS. HOPKINS: I almost objected to my own question. I'm tired. I bet you're tired too.
THE WITNESS: A little bit.
Q. (BY MS. HOPKINS) Let me see if I can do better than that.
A. Okay.
Q. After the involvement of Kelly Wood and Alicia Campbell in the Alvin Craddock situation, how did you feel about HR getting involved in your matter?
A. We're right here today, so I'm still -- I'm



kind of still on the fence. I will still go to my superior before I go to HR for anything.
Q. Okay. Have you ever again reported any incidents of race discrimination to anyone at the company?
MS. PLAGENS: Objection, form.
A. No.
Q. (BY MS. HOPKINS) Okay. After your discussions with Charlotte Chapman Byrd, have you ever experienced any other incidents of racial discrimination at the company?
A. I guess it depends on how you look at it. I don't know if that would be called discrimination or what -- well, I don't know if the title is considered discrimination, or them hiring somebody in front of me that doesn't -- doesn't know anything about this industry, so I'll say no.
Q. Okay. And what you were referring to is what you already told me about Travis Lutter getting hired?
A. Yes.
Q. Okay. Just last question. Have you ever worked under Bryce Burns?
A. No.
Q. Have you ever worked with any of the crews that worked under Bryce Burns?

CAUSE NO. 3:24-cv-2767

| | | |
|---|---|---|
| CHARLOTTE CHAPMAN BYRD, | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | DALLAS COUNTY, TEXAS |
| | ) | |
| PRIMORIS SERVICES CORPORATION, PLH GROUP INC., POWER LINE SERVICES, INC., and FUTURE INFRASTRUCTURE, LLC | ) | |
| | ) | |
| Defendants. | ) | 134th JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION
DEPOSITION OF TONY GILL
OCTOBER 9, 2025

I, Jennifer Strange, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, TONY GILL, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on __November 3, 2025__ to the witness or to the attorney for the witness for examination, signature and return to me by __December 3, 2025__;

That the amount of time used by each party at the deposition is as follows:



Ms. Christine A. Hopkins - 04 HOURS:09 MINUTE(S)
Ms. Nicholé M. Plagens - 00 HOURS:00 MINUTE(S)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:
Ms. Christine A. Hopkins
Ms. Carmen Artaza
TREMAIN ARTAZA, PLLC
6060 North Central Expressway
Suite 567
Dallas, Texas 75206
Phone: 469-573-0229
christine@tremainartaza.com
carmen@tremainartaza.com

FOR THE DEFENDANTS:
Ms. Nicholé M. Plagens
JACKSON LEWIS
500 North Akard Street
Suite 2500
Dallas, Texas 75201
Phone: 972-728-3250
nichole.plagens@jacksonlewis.com

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.



Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 30th day of October, 2025.



Jennifer Strange, Texas CSR 7...
Expiration Date: 1/31/2027
Osteen & Associates Reporting Services
Firm Registration No. 392
313 Northglen Drive
Hurst, Texas 76054-3024
(817) 498-9990
osteenreporting@gmail.com



FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _________________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Ms. Christine A. Hopkins, Custodial Attorney;

That $__________ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this __________ day of ____________________, 2025.

____________________________________
Osteen & Associates Reporting Services
Firm Registration No. 392
313 Northglen Drive
Hurst, Texas 76054-3024
(817) 498-9990
osteenreporting@gmail.com

# PLAINTIFF'S EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLOTTE CHAPMAN BYRD,
Plaintiff, CIVIL ACTION NO.
V. 3:24-cv-2767
PRIMORIS SERVICES
CORPORATION, PLH GROUP INC.,
POWER LINE SERVICES, INC.,
and FUTURE INFRASTRUCTURE,
LLC,
Defendants.

******************************************************

ORAL AND VIDEOCONFERENCED DEPOSITION OF
ALICIA CAMPBELL
DECEMBER 8, 2025
(Reported remotely.)

******************************************************

ORAL AND VIDEOCONFERENCED DEPOSITION OF ALICIA CAMPBELL, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 8th day of December, 2025, from 10:01 a.m. to 5:59 p.m., before Kelly Hassell, RPR, CLR, CSR, in and for the State of Texas, reported by machine shorthand, located in Aledo, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.

Job No. CS7781923

out of?
A Her main office was out of our Dallas corporate office, which is downtown Dallas. However, she did have what she would call a traveling office. And that was the office in between myself and Ms. Byrd, the empty one that I speak of, so...
Q If we -- if you can think back to this November 2022 to February 2023 time frame, how often would Ms. Hendrick come to Fort Worth and use the traveling office between your office and Ms. Byrd's office?
A Not very often.
Q If you are able to give me some sort of estimate. Is "not very often" once a month? Is it less frequently or more frequently than that?
A I would say at most twice a month.
Q Did -- and I may pronounce her name incorrectly. Was Leslea Scott officed out of the Fort Worth office with you-all?
A No, ma'am.
Q Okay. How did you and Jackie Hendrick typically communicate about work-related matters in the November 2022 to February 2023 time frame?
A Mostly I would say by phone call or Teams call.
Q Did you also use Team -- Microsoft Teams chat?
A Yes.


Q Did you use a work-issued cell phone for work matters?
A I used my personal as well as I had a work as well. They just recently turned it off, as I was not using it, because it was too much to carry two phones.
Q Okay. Back in the November 2022 to February 2023 time frame, were you using your work-issued phone to communicate with Jackie Hendrick?
A I don't believe so very often, no.
Q Were you using your personal cell phone to communicate with her?
A Yeah. Yes, by phone call mostly.
Q What per- -- what was the cell phone number that you were using back then?
A For my work phone or my --
Q Your personal phone that you were using frequently for work.
A (214) 241-9433.
Q And what was the carrier for your phone back then?
A It was AT&T.
Q And did you also use that phone to communicate with Charlotte Chapman-Byrd?
A Yes.
Q Did you keep a work calendar at that time in


the February -- sorry, November 2022 to February 2023 time frame?
A I guess what do you consider -- sorry -- a work calendar? Like just more detail on that.
Q Sure.
Did you maintain a calendar where you kept track of what meetings you had at work?
A Yes.
Q And what was the format of that calendar?
A That's attached to Outlook, so it's our Outlook calendar that's attached to our email.
Q Okay. Are you related to anyone who works at the company?
A Yes, ma'am.
Q And who are you related to?
A My husband is Benjamin Campbell. And sorry, let me -- you mean currently at -- right now, correct?
Q I'll ask you both questions. Let's start --
A Oh, okay.
Q -- currently right now.
A Okay. Sorry.
Q Sure.
Does Benjamin Campbell, your husband, work for the company?
A Yes, ma'am.


Q And how long has he worked for the company?
A He came back in September 2023.
Q Okay. And what is his job title?
A His title is senior vice president of operations.
Q Okay. Before September of 2023, did you have any relatives who worked for Primoris?
A Yes. Adam Campbell.
Q And who is Adam Campbell?
A My brother-in-law.
Q And what was his job title back in the November 2022 to February 2023 time frame?
A I believe it was senior vice president of operations as well.
Q For what business unit?
A I believe, from what I recall, it was just Primoris T&D.
Q Back in 2022 and 2023, were you the HR director for the business unit that Adam Campbell worked for?
A Yes.
Q And currently are you the HR director for the business unit that Ben Campbell works for?
A Yes.
Q What's his bus- -- what's Ben's business unit?
A Primoris T&D.

director that Primoris had acquired PLH Group, correct?
A Correct.
Q And did you become aware at that time of how many employees would be joining Primoris from PLH Group and Power Line Services?
A Yes.
Q And how many employees did you understand would be joining Primoris from PLH Group and PLS?
A Oh, PLH Group and PLS? Sorry. Can you explain?
Q Let me back up -- let me back up and make sure the question makes sense, first of all. Since you -- okay.
I believe you mentioned it was your understanding that PLH is a parent company for Power Line Services.
Is that -- was that your understanding?
A Correct.
Q Okay. So was it your understanding that when Primoris acquired PLH Group it also acquired Power Line Services at that time as part of the acquisition?
A Yes.
Q Okay. So before this acquisition, you never had to do any HR support for any Power Line Services employees?



A No.
Q Any Power Line Services employees who you provided HR support to, you never provided HR support to them until after the PLH Group acquisition, right?
A Correct.
Q Okay. So when you became aware that this acquisition had happened, were you informed about how many employees were going to be coming on board as a result of the acquisition generally?
A I had a general idea of all PLH entities and what that number was, not just PLS.
Q Sure.
And what was that number for all PLH entities?
A From what I recall, I think it was around 2,500.
Q This article in the second paragraph says, "As a result of the acquisition, the majority of PLH operations will be incorporated into Primoris's Utilities segment with the remaining operations going into the Energy Renewables and Pipeline segments."
My first question is, you were only providing -- you were an HR director only in the Utilities segment; is that correct?
A For part of the Utilities segment, yes.



Q For part of the Utilities segment, right.
And you were not HR director for Energy Renewables and Pipeline segments?
A No, ma'am.
Q Okay. So when you're getting the information that is trickling down to your level about this acquisition, are you told how many employees approximately of those 2,500 employees are going to be coming into your Utilities segment?
A Yes.
Q And about how many employees was that?
A From what I recall, it was probably around 6-, 700.
Q Okay. And from the very beginning, was it always the plan to incorporate those 600 or 700 employees that were coming over from PLH Group into the Utilities segment divisions that Primoris already had?
A No.
Q Okay. Did those 6- or 700 employees that you anticipated coming into the Utilities segment from PLH Group include Power Line Services employees?
A Yes.
Q And did you at that time have any breakdown of how many of the employees -- of that 6- or 700 were Power Line Services employees?



A From what I recall -- because again, we didn't get the head count until about a month in. From what I recall, it was about 500, 600, between there, roughly.
Q Were you in meetings where presentations or PowerPoints were put up giving you information about how many employees were coming over from PLH and PLS?
A Not that I recall.
Q Okay. By email were you getting any memos, reports, PowerPoints, or Excel sheets, or anything like that back in that August to September 2022 time frame that was giving you your anticipated numbers of employees?
A Yeah, from what I recall, I just remember, like, employee head count, I believe it was called, report.
Q Okay. And who did that come from?
A I believe it was Angela Schaeffer who provided it.
Q And who is she?
A She is on our HRIS team, which is the human resources. They handle our HRIS system, so UKG.
Q Okay. When you originally opened up this HR manager position --
A Uh-huh.
Q -- for PLH or PLS in September of 2022 --

A Uh-huh.
Q -- was it your plan and Jackie's plan from the get-go that that position would only last a few months?
A No.
Q At that time in September of 2022 when Ms. Scott was recruiting for the HR manager position that Ms. Byrd ultimately filled, was it your intention and Ms. Hendrick's intention that that would be an ongoing permanent position?
A At that point, yes.
Q Okay. Did you participate in any executive meetings with Mr. Osborn during that time frame --
A No, ma'am.
Q -- of the acquisition?
Has -- have you ever had the responsibility of attending any meetings with Mr. Osborn?
A No, ma'am.
Q How about with Mr. Smith? Was it ever one of your responsibilities to attend any regular meetings with Mr. Smith?
MS. PLAGENS: Objection; form.
Q (BY MS. HOPKINS) And I'm referring to Russell Smith if I didn't say that.
A We would have meetings, yes.
Q Were there any regularly scheduled meetings



that you participated in with Russell Smith?
A I don't recall regularly scheduled.
Q Okay. What kind of meetings did you attend with Russell Smith?
A It would just be anything that I needed to catch up on -- catch him up on from an HR standpoint. So if anything was going on during the week within the groups or, yeah, anything new we would be implementing or just -- maybe just have a weekly, like, follow-up just of what's going on.
Q Okay. When is the first time that you heard that the PLH or PLS employees were going to be put into PTD?
A I believe it was December -- the end of December 2022. I believe that's when the conversation started.
Q Going back to the original acquisition and that October to September 2022 time frame when you were just getting your information about it. Was it your understanding that any human resources employees were going to come over from PLH or PLS to Primoris?
MS. PLAGENS: Objection; form.
A I guess explain, because it's broad, right? Do you mean Primoris as a whole or -- sorry. I just need more context to that.



Q (BY MS. HOPKINS) Sure.
When you're learning about the acquisition, did you know whether PLH Group and PLS had already had their own human resources staff at the time of the acquisition?
A Yes, I was aware they had staff.
Q And then did you become aware of what was going to happen to that staff?
A Not at the time of the acquisition, no.
Q Later on did you become aware of what was going to happen with PLH's own HR staff?
A Aware with some, but not all.
Q Okay. What were you aware of?
A That they were obviously looking at any potential redundancies, you know, if anything was -- was needed, and basically to align the HR with our business as well.
Q Okay. Ultimately as an HR director did you become the supervisor for any employees who were acquired from PLH or PLS?
A Only for companies that fell within my remit.
Q Okay. And who did -- who did you acquire on your team from PLS?
A In the beginning it would have been Lenka Ackerman, and she was RB Hinkle. Ashley Dickson, Lexi



Goluguri. And that was -- that is it.
Q Okay. From the get-go in September of 2022, was there always a plan that Ms. Dickson and Mr. Goluguri were eventually going to be laid off as redundant?
THE COURT REPORTER: I'm sorry. Part of that -- part of that broke up, the Internet. I didn't get part of the question.
MS. HOPKINS: I'll -- I can repeat it. Am I coming through now?
THE COURT REPORTER: Yes.
Q (BY MS. HOPKINS) Okay. Ms. Campbell, my question was, from the -- the get-go in August of -- and September of 2022, was there always the understanding that Ashley Dickson and Lexi Goluguri will eventually be laid off as redundant?
A Not in September, no.
Q Okay. Did you make the decision to -- oh, well, first of all, once the acquisition happened, was there a specific company code that was going to be used for PLH employees?
A I'm not aware for P- -- yeah, I'm not aware for PLH employees. Like the company PLH?
Q Right.
A I'm not aware of what company PLH was going to be.

There's a paragraph here that talks about the acquisition of PLH, and I just want to draw your attention to this highlighted yellow sentence and see if it matches up with your knowledge of what actually ended up happening with the PLH emp- -- and PLS employees.

It says, "We incorporated the majority of the PLH operations into our Utilities segment with the remaining operations going to our Energy segment."

Does that match up with your understanding of what happened with the acquisition as far as the PLH and PLS employees back in 2022?

A Yes.

Q I'm going to scroll down. All right.

As HR director did you get information about how the company was doing overall in terms of whether it was doing well or doing poorly?

MS. PLAGENS: Objection; form.

A Again, at what time would -- like at acquisition time was I aware of how they were doing?

Q (BY MS. HOPKINS) Let's start with that question, sure.

At acquisition time were you aware of how the company was doing?

A I -- I didn't have the exact numbers, no.

Q Did you become aware of how much the



acquisition benefited Primoris financially?

A Not exact numbers, no.

Q Okay. This says that "Revenue for the year ending December 31st, 2023, increased by 1.3 billion compared to 2022 and that the increase was primarily due to growth in both our Energy and Utilities segments -- segments and the acquisition of PLH and B Comm in 2022."

Did you know that revenue had increased by 1.3 billion in 2023?

A No, not that I'm aware of.

Q Did you know generally that the acquisition of PLH and B Comm was a good thing for the company financially?

A I guess at what point? Are we speaking to the acquisition time? I guess that's --

Q Let me speak -- I'll -- I'll ask you, in 2022 after the acquisition happened --

A Uh-huh.

Q -- at the end of 2022 --

A Okay.

Q -- or like December 2022 time frame, were you aware around that time that the acquisition had brought in a lot of revenue?

A I was not aware it brought in a lot of revenue. Again, I was not familiar with the number.



Q Okay. Were you aware generally in December of 2022 that the acquisition of PLH was a good thing for Primoris financially?

MS. PLAGENS: Objection; form.

A I was not aware.

Q (BY MS. HOPKINS) What about in 2023? Did you become aware?

MS. PLAGENS: Objection; form.

A Not directly aware, no.

Q (BY MS. HOPKINS) Was anyone from operations or an executive level telling you in 2022 that there were negative, like, financial repercussions to the acquisition, that there was a -- like a loss of money?

A I was made aware there was a loss at the op inc. level. But necessarily who told me, I think it may actually have came from Jackie with her discussions with Jaeson.

Q Okay. And I think I missed what you said. You said a loss at what level?

A At the op inc., so at the op inc. level.

Q And I might just not be --

A EBITDA. EBITDA.

Q Okay. Okay. And was it your understanding there was a loss at the op inc. level for PLH as a whole?

A I -- I was not aware of PLH as a whole, no.



Q Were you aware --

A (Inaudible).

THE REPORTER: I'm sorry. You talked over her. I didn't hear what the -- the last of your answer was.

THE WITNESS: I said I was not aware.

Q (BY MS. HOPKINS) So what -- the information that you got from Jackie Hendrick, tell me specifically what you remember learning about there being this op inc. issue.

A I don't remember too much in specifics. Just again, they weren't doing good at the op inc. level.

Q And who was "they"?

A Oh, sorry. This would have been everything under -- she would have just spoke to my (inaudible) PLS.

THE COURT REPORTER: She would have spoke to who?

THE WITNESS: My -- I'm sorry. My group, so what was under my remit.

Q (BY MS. HOPKINS) And you said PLS, correct?

A PLS, yes.

Q Is the $95,000 that you spent on Charlotte Byrd's salary the only increase in operational expenses that you had at the human resources level for your -- the companies in your remit as a result of the PLH

acquisition?
A Yes. I believe so, yes.
Q What about Ms. Dickson and Ms. Goluguri? Were they additional expenses?
A They were existing employees.
Q Okay. So you had already been paying their salaries and benefits before the acquisition?
A Oh, sorry. Yes, they would have been in addition that was included in the acquisition.
Q Okay. And -- and how much did it cost you to employ Ms. Dickson and Ms. Goluguri?
A Oh, I wouldn't know that number off the top of my head.
Q Were you ever given enough financial information to make decisions about whether there was enough financial justification to maintain the positions of Ms. Dickson, Ms. Goluguri, and Ms. Byrd?
A Sorry. Can you give more context to that?
Q Sure.
In -- at any time in 20- -- in 2022 or 2023, were you given specific financial information that would have allowed you to form your own opinion about whether there was enough financial justification to retain Ms. Dickson, Ms. Goluguri, and Ms. Byrd based on what was going on with PLH and PLS?



A No, I would not have been given enough financial information for that.
MS. HOPKINS: Okay. Let's take a break. I did promise a break, and we're at 11:30. How long would you -- I'll pause the recording.
THE COURT REPORTER: Off record at 11:30 a.m.
(Break taken from 11:30 a.m. to 11:42 a.m.)
THE COURT REPORTER: Back on the record at 11:42 a.m.
MS. HOPKINS: Okay. I am going to mark as Exhibit 11 Mr. Bernhard's offer letter.
(Exhibit 11 marked.)
Q (BY MS. HOPKINS) Okay. If we scroll down this offer letter to the second page, we'll see that it's actually signed by Ms. Scott and not by yourself.
My first question for you is, did you approve the issuance of this offer letter to Ms. Byrd?
A I -- I don't recall if I did.
Q Did you approve the hiring of Ms. Byrd?
A Yes.
Q Whose decision was it to hire Ms. Byrd?
A It is my decision, and then obviously approval on top of that from Ms. Hendrick.



Q And did Ms. Hendrick approve of hiring Ms. Byrd?
A Yes.
Q And tell me why you decided to give this HR manager opportunity to Ms. Byrd in particular.
A Based on, you know, the candidates presented. Leslea presented me with two candidates, and she had the more HR experience. And --
Q Did you --
A -- she's currently an HR manager.
Q Okay. Did you interview Ms. Byrd before deciding to hire her?
A Yes, ma'am.
Q And how did she do in her interview?
A She did good.
Q What were your impressions of her as an HR professional from the interview?
A That her current employer, you know, obviously being the government, very structured. She obviously had good experience in her background on her résumé. Yeah, she knew and she had knowledge of HR.
Q Okay. In the offer letter, I want to go over a few details in it.
The offer letter was issued on September 29th, 2022, but the start date was set as October 17th,



2022.
Did anything change between September 29th and October 17th where you felt like you might no longer need an HR manager for PLS?
A No, not that I recall.
Q Okay. And is it accurate that when Ms. Byrd came on board she started reporting to you?
A Yes.
Q And did she report to you the entirety of her employment?
A Yes.
Q And was her salary $95,000?
A Yes, ma'am.
Q Did her salary get allocated only to Power Line Services; do you know?
A Yes, I believe it was only allocated to Power Line Services.
Q Do you know who made the decision not to put Ms. Byrd in Company 100, Primoris Services Corporation, when she was hired?
A I believe this was from finance, discussing with Jackie. Again, I can't recall. It was not my decision, though.
Q Okay. What is your recollection of the salary that Alexis Goluguri started at when she joined?

your region, you never had race discrimination complaints come forward to your attention ever?

A Not -- no, never to my attention. No.

Q Do you blame Ms. Byrd in some way for the fact that the first race discrimination complaints your human resources department ever had to deal with were once she joined the company?

MS. PLAGENS: Objection; form.

A No. I mean, with acquisitions you gain obviously different cultures and have to get them aligned. As a company under my remit having over 50 percent minorities, we're a very diverse group. And, you know, even- -- sometimes with acquisitions you just don't know what the culture is with these other companies you acquire, so...

Q (BY MS. HOPKINS) Okay. Who did the investigation into the July 2025 race discrimination incident?

A Sam Alleman.

Q And is that a human resources employee under your supervision?

A Yes. She's an HR manager.

Q Okay. And what was the complaint that she had to investigate?

A A supervisor had came forward in regards to



hearing another employee say the N word in a joke. They originally went to Ms. Wood. However, Ms. Wood engaged Sam immediately, and then Sam went ahead and obviously obtained that statement from the individual putting in the complaint as well as the individual that was -- the other two individuals involved.

Q Was this a situation where it was Mr. Gill's manager who reported hearing the N word used in July of 2025?

A Yes, ma'am.

Q What was the result of that investigation?

A After speaking with Tony, as well as speaking with the individuals, we were unable to substantiate it as the supervisor was the only one that had heard the word.

Q Did anyone get any training as a result of that July 2025 investigation into the use of the N word?

A Yes. We provided training on the operations call. We provided that on the operations call right after the incident happened, as well as we rolled out antiharassment, antidiscrimination training to the entire group that was under me.

Q Which entire group?

A Oh, sorry. Everything under Power Delivery. So PTD, RB Hinkle, now PDS again, they've just moved



back. So everybody under my remit received the training.

Q Did that also include Future, Renewables --

A Yes.

Q -- and B Comm?

A Yes. Sorry.

Q Everyone?

A Or, so -- no, no. B Comm's not under me now. So not Future. Sorry. Sorry.

Just under me now is just PTD, Primoris Power Delivery, Primoris Power Solutions, PTD, RB Hinkle, PDS.

Q Okay. When you say there were training on the operations call, I think you said immediately after the report --

A Incident.

Q -- came in, who was on that call? Was it the accuser and the accused or --

A It was to all -- I mean, he was on the call. But it was to all operations that were -- all operations under our area. So yes, it was a group that he was part of.

But again, there was multiple individuals on that within that group. So it was just a refresher on top of we rolled out the training to my group.

Q What is the name of the employee who was



accused by the supervisor of saying the N word?

A Kenneth Pratt.

Q Now, back in 2023 after the Tony Gill investigation, is it accurate that you did not do any antiharassment and antidiscrimination training for all companies under your remit at that time?

A I can't recall if there was any done after that.

Q With the text message situation that Ms. Byrd was involved in investigating, was there any antidiscrimination or antiharassment training that was rolled out after those text messages came to your attention?

A I can't recall if she had rolled up anything after that or was recommended.

Q Did you instruct Ms. Byrd to have antiharassment and antidiscrimination training for everyone under Mr. Burns's supervision after you saw those text messages?

A I don't recall. Yeah, I don't recall.

Q You didn't think that after you reading through those text messages it was necessary to provide an antidiscrimination and antiharassment training to all of those employees?

MS. PLAGENS: Objection; form.

Page 106

substantiate --
MS. PLAGENS: Objection; form.
Q -- the fact that a racial slur was used?
A With the Tony Gill situation I -- I was not involved in the end of that, and that was the -- the first one. However, based on -- Kelly and Jackie will be able to speak to that.
But based on the last one, we were unable to substantiate based on the witness statements that were in writing.
Q (BY MS. HOPKINS) Okay. I -- was the fact that the N word was used substantiated in the Tony Gill investigation in February of 2023?
A From the follow-up from Jackie Hendrick, it was not substantiated.
Q Okay. And in January of 2025 was the use of the N word substantiated or unsubstantiated by your department?
MS. PLAGENS: Objection; form.
A Based on the written statements, it was unsubstantiated as two employees did not hear it being said, one employee did.
Q (BY MS. HOPKINS) Okay. So it is true that the two times there has been a report that a racial slur has been used verbally and not in writing, your department

Page 107

has concluded that it was unsubstantiated?
A Yes, based on the fact it was unsubstantiated.
Q Do you agree with me that companies must seek the truth when investigating complaints of race discrimination?
A Yes.
Q Do you agree that companies must conduct unbiased investigations into complaints of race discrimination?
A Yes.
Q Do you agree that human resources employees must be honest and accurate when gathering information and writing reports during race discrimination investigations?
A Yes.
Q Is it a human resources best practice to create written notes of all meetings that HR has with witnesses during a race discrimination investigation?
A Yes.
Q Do you agree that an employee who has reported race discrimination must not be asked or pressured to change their witness statement?
A Correct. Yes, they should not.
Q Do you agree that a human resources employee who is investigating a report of race discrimination must

Page 108

not ask an employee to change their witness statement?
A Correct, they should not ask them to change it.
Q Do you agree with me that a human resources employee who is investigating race discrimination must not put pressure on an employee to change their statement?
A Correct.
Q Do you agree that companies must not retaliate against human resources employees who refuse to ask witnesses to alter their statements?
A Yes, I agree they should not.
Q Do you agree that companies must not retaliate against human resources employees for conducting honest and accurate investigations into race discrimination?
A Yes, they should not.
Q Do you agree that companies must not fire a human resources employee to prevent that human resources employee from contesting the results of a race discrimination investigation?
A Yes, they shouldn't.
Q Do you agree that companies must be honest when giving reasons for an employee's termination?
A Yes.
Q As a human resources professional, do you have to be familiar with the different reasons that can be

Page 109

logged or coded for an employee's separation from the company?
A Yes.
Q All right. I want to talk specifically about Primoris Services Corporation, its divisions, departments, and subsidiaries as a whole. If there are differences between them, you'll have to let me know.
Are there recognized reasons for a separation from a company across the entire board that's the same for everyone?
MS. PLAGENS: Objection; form.
A I can't speak as Primoris as a whole. I can only speak to my group.
Q (BY MS. HOPKINS) Okay. Sure. Let's focus only on your group.
What are the reasons for termination or sep- -- or separa- -- sorry. I'll strike that. I meant separation including resignations as well, so let me strike that and start again.
For your group are there certain recognized reasons for separation that can be entered into the personnel file or personnel software for an employee?
A Yes.
Q And what are the recognized reasons for

because we've not always used obviously everything they provide on there. So yeah, I can't say which ones I've seen. I just have never seen this one, because the picture doesn't look familiar.
Q Okay. As an HR director for the companies that are under your purview, do you maintain any written rules or guides about how to conduct a workplace investigation?
A I am trying to think. Right now we do have something, and I don't believe that was in place when Ms. Byrd was there, which just is templates that we use. However, no, at that time I don't believe we had anything in writing.
Q Okay. When Ms. Byrd came on board, did you ever sit down with her and give her instructions for how you wanted her to handle a complaint of discrimination if an employee came to her with a complaint of discrimination?
A I don't believe I had it narrowed down to discrimination. It would have been broad, as in investigation.
Q Okay. Did you sit down with Ms. Byrd and go over your expectations as to what she would do if an employee came to her with a complaint?
A We had had weekly calls, like HR manager calls I called them, where we would discuss, you know,



expectations there, brainstorm, things like that. So that would have been where it would have taken place.
Q Okay. Sitting here today, do you recall any specific instructions you gave to Ms. Byrd about what she should do if an employee came to her personally with an complaint of discrimination?
A Sitting here now, no, I cannot off the top of my head.
Q Okay. Focusing on this guide of how to conduct a workplace investigation, I want to go over certain parts of it to see if you agree or disagree.
As part of a workplace investigation, SHRM has a section on discussing confidentiality with the complaining parties and individuals involved in the investigation.
A Uh-huh.
Q Do you agree that an HR professional conducting an investigation should discuss the topic of confidentiality with witnesses and the complaining party?
A Yeah, and let me know that obviously it's on a need-to-know basis.
Q Okay. At Primoris do you have an expectation that witnesses and the complaining party will be advised that the investigation will be kept confidential to the extent possible?



A Yes.
Q The second step of this article talks about providing interim protection. It states, "When an employee makes a complaint, one of the first considerations may be whether to take immediate measures for the protection of the accuser and the alleged victim. Separating the complainant from the accused may be necessary to guard against continued harassment or retaliation."
Do you agree with that?
A Yes.
Q At Primoris as a step in your investigations do you try to decide whether or not the complaining employee should be separated from the person that they are accused during the investigation?
A Yeah. Depending on what the investigation is, we make a determination on how to proper -- properly protect that individual.
Q Step 3 of this article talks about creating an investigation plan and going through a planning process that includes having a basic outline of your investigatory process and an initial list of witnesses and an initial review of documents and videos on the front end.
Do you agree that that's a best practice?



A Yeah, that's one of the best practices. I mean, there's many out there. But yes, this is a best practice as well.
Q At Primoris in your region, do you go through a planning process for an investigation before an investigation starts?
A Yeah. And again, that's a pretty quick process in the sense of defining the scope as well as defining who will investigate it and who's involved.
Q Do you agree that a company should identify the investigator for any investigation?
A Yeah. It should be based on obviously -- all my managers, for example, have access in the system to certain companies. So obviously more than likely, unless obviously there's a conflict, we will identify the manager who is responsible for that group.
Q Do you go through a decision-making process about whether the investigation should remain internal and conducted by one of your own employees or outsourced to a third-party investigator?
A No.
Q I'm going to scroll to Section 4, Conduct Thorough Interviews and Gather Evidence.
Do you agree that it is a best practice to tell employees that they are required by company policy

Page 122

to cooperate with the investigation?
A So sorry, say that again.
Q Do you agree that it's a best practice for HR to remind witnesses that they are required by the company policy to cooperate with the investigation?
A Yes.
Q Do you -- you agree that an investigator should focus on being impartial to gather and consider relevant facts and should not push the investigation in any particular direction?
A Yes. Correct.
Q Do you agree that the investigator should never offer any opinion or say anything to interviewees that could discredit their impartiality?
A Yes. Correct.
Q Okay. For -- for documentation do you agree that investigators should maintain notes throughout the interviews?
A Yes.
Q And do you agree that, whenever possible, during an interview there should be a third person present to serve as a witness and take notes?
A I can't always say that's possible. We try to. However, majority of the time we usually request the employee to provide us a document of the situation that

Page 123

occurred.
Q Okay.
A So again, we try to get it directly from -- from the employee.
Q Do you think it is important to interview everyone who witnessed a particular incident?
A Yes.
Q Do you think it's true that interviews like -- are likely to provide -- sorry, that interviews are likely to provide differing and potentially conflicting version of events?
A Yes.
Q Okay. And do you think a good investigator needs to consider the credibility of the individuals being questioned, including their demeanor, their motive, their past behavior, and past accusations?
A Yeah, I think obviously that demeanor is going to be subjective to whoever is doing it. And they're -- you know, however, obviously based on past situations, absolutely you take that into consideration.
Q All right. For Step 5 do you agree that an investigator must be careful not to jump to any conclusions before all the facts are available?
A Yes.
Q Okay. Do you agree that an investigation

Page 124

should include a written report of investigation at the end of the investigation?
A Yes, there should be provided a summary of findings.
Q Okay. Do you think it is an HR best practice for the report to include all of these bullet points that are listed here: the incident or issues being investigated, including dates, the parties involved, key factual and credibility findings, employer policies or guidelines and their applicability to the investigation, specific conclusions, the party responsible for making the final determination, issues that could not be resolved and reasons for the lack of resolution, and the employer actions recommended?
A Yeah, I think most of those should be in -- within the investigation itself, yes.
Q Okay. Back in February of 2023, did you have an investigative report template that required filling in all of those sections?
A No.
Q Do you agree that once a decision is made, the employer should notify -- I'm so sorry.
Do you agree that once a decision is made, the employer should notify both the complaining employee and the accused of the outcome?

Page 125

A Yes.
Q For closing the investigation and implementing any corrective actions or disciplinary measures, do you agree that employers must take corrective action that's appropriate to the situation?
A Yeah. I think we give the recommendation to operations, and they're expected to take our recommendation and make sure that whatever we recommended has been implemented.
Q Okay. Does your department have a policy of checking in to make sure that your recommendations have been implemented after an investigation?
A No.
Q I'm sorry. SHRM -- the SHRM article has a Section 7 for finalizing the investigation report and following up with affected parties.
Do you agree that an investigator should create a clear record of everything done and any findings, as well as other steps taken during -- during the inquiry?
A Yes.
Q Do you agree employers should document interviews with the accused, the accuser, and witnesses ensuring notes are as factual as possible, containing as much relevant information as possible, are dated, and

indicate the duration and time of interviews?
A Yes. Now, I can't always say we always include the whole duration of the interview. But again, usually the date it took place.
Q This article recommends that an investigator should set a time frame to follow up with the person who made the complaint to ensure there are no other issues and that they're settling back into the work environment.
Is that something that your human resources division tries to do?
A We try to. However, it's -- we usually guide operations to follow up with their employee if there's any additional issues and how things are going.
Q With Charlotte Chapman-Byrd did you ever conduct a performance review for her?
A No.
Q Do you typically conduct annual reviews for your direct reports at the end of the year?
A We conduct them -- we're doing them right now. I -- I don't believe at that time we did them.
Q Okay. Did you do a performance review for Ms. Wood at the end of 2022?
A I don't recall. There could have been a performance review. I don't recall when they implemented it, what year.



Q Was there sometime in recent memory where the company started consistently doing annual performance reviews for all employees?
A Yes. It would have been as recent. And again, it will be based on the tenure. If the employee hasn't been there very long before the end of the year, it's really hard to -- to gauge on that, right, on their performance, because you really haven't been given an allotment of time to really give an accurate evaluation.
Q Did you ever issue Ms. Byrd any disciplinary action during her employment at Primoris?
A No, ma'am.
Q Did you ever feel like you had reason to issue Ms. Byrd discipline?
A No, ma'am.
Q Does -- do you think that there are any documents that exist that would show Ms. Byrd was less than a satisfactory employee?
A Not that I'm aware of.
Q I want to show you a set of emails from December 2022. Let me find them. All right.
MS. HOPKINS: This is being marked as Exhibit 27.
(Exhibit 27 marked.)
Q (BY MS. HOPKINS) And it starts at the end of



the e-mail chain, so this is a multipage document.
And what I'm thinking, Ms. Campbell, might make the most sense is for me to start -- start with the email that's last and scroll up so you can see how the email chain developed.
So -- okay. Sorry. My mouse is being a little bit sensitive. I'm sorry about that.
A That's okay.
Q All right. There's an email chain that begins from Ms. Charlotte Chapman-Byrd on Friday, December 2nd, 2022, to some folks on the human resources team. It says, "Good morning teammates --"
A Oh, I was not in that email, right? No.
Q Correct. Yeah.
So it starts off with an email about setting up a reasonable suspicion training.
A Uh-huh.
Q Do you know what that is?
A Yes, ma'am, I do.
Q What is it? Because I'm not familiar. I've never seen that.
A So it's basically -- when you're reasonable suspicion training, we require people to do that when they're having to do recommendations on reasonable suspicion. Meaning, if a supervisor calls us and asks



us, you know, to reasonable suspic- -- like drug test an employee due to characteristics that they are presenting, it is signed off by the HR manager, as well as we also have safety and operations involved. So we provide them training so that they know what is required to help assist make those decisions and sign off.
Q Okay. Thank you. I learned something new today.
And if we scroll up, there was a response from Ashley Dickson about the training asking a question if it's DOT certification or just a general training.
A Yeah.
Q And if we keep going up, an email from Jaritza Hernandez where she says she would be interested and has added Kelly as well.
A Kelly is her boss.
Q Kelly Wood is Jaritza Hernandez's boss, right?
A Yes.
Q All right. And then email from Kristie Madison that says, "Count me in." And then an email from Kelly Wood, it says, "Hi, Charlotte. At this time reasonable suspicion is handled by the management team. Thanks, Kelly Wood."
A Uh-huh.
Q And then there was an email from Charlotte back

Q Did she make a complaint of race discrimination against the company?
A I don't recall what her claim was completely. I didn't see it.
Q Okay. To your knowledge, did any part of Ms. Scott's complaint in- -- include accusing you personally of engaging in any discriminatory or retaliatory behavior?
A Again, I didn't see her whole claim. There was just things that I had to provide. So again, I -- I didn't see her whole claim, from what I recall.
MS. PLAGENS: I would interject, Alicia, that to the extent you're about to talk about anything that you were directed to gather by counsel, that is -- please do not disclose that.
Q (BY MS. HOPKINS) Is Kristie Madison a person who was an HR professional in your division?
A Yes. She reported to Kelly Wood.
Q Did she make it known to you that she felt that she was discriminated against because of her race?
A No. The only time it was ever made aware was at her termination.
Q Was she fired, or did she resign?
A She resigned. She just left the office.
Q Did she submit a resignation letter to you?



A To me, as well as there was some others on it too as well. I can't -- I can't recall everybody.
Q In the resignation letter did she -- do you feel like she informed you that she felt she had been discriminated against based on her race?
A In that, yes.
Q Okay. Are there any other HR professionals who have made it known to you that they felt discriminated against because of their race?
A We just had one other one, Stewart Figueroa. But again, yes, he reported to Sam Alleman. So as I was speaking before when you asked, we were talking about direct reports. So I just want to make sure that's clarified. They were not my direct reports.
Q Have you done any type of assessment or review of your own to see what you could be doing better as an HR director to prevent your -- so many employees from coming back with complaints about how they were treated in the HR department?
MS. PLAGENS: Objection; form.
A I guess explain. More context.
Q (BY MS. HOPKINS) Okay. Sure.
So far we've talked about Kristie Madison, Charlotte Byrd, and Stewart Figueroa who have all made it known that they felt like they experienced discrimination



in the HR department.
Have you done any sort of self-reflection or assessment to determine what you could be doing better to prevent employees from feeling that way?
MS. PLAGENS: Objection; form.
A I mean, we've taken -- yeah, I've taken extreme ownership training. Again, more open communication with the team. Speaking to others. So yeah, definitely obviously reflect to see, you know, why people feel that way, absolutely.
Q (BY MS. HOPKINS) What is extreme ownership training?
A It's Jocko Willink training, so it's like a 12-week. It's actually -- I recommend it. It's really good.
Q So I missed what kind of training you said it was.
A It's leadership training.
Q Did you use a particular name of a company or a --
A It's called Echelon Front.
Q Oh, okay.
THE COURT REPORTER: I'm sorry. Can you please speak up? I'm having a hard time.
THE WITNESS: Oh, sorry. Maybe I'll move



closer. Sorry about that. Is this better?
THE COURT REPORTER: Yes.
MS. PLAGENS: Yes.
THE WITNESS: Sorry.
Q (BY MS. HOPKINS) When did you take the 12-week extreme ownership training?
A I would say it was roughly about a -- maybe a year, year and a half ago.
Q Okay. Have you read Tony Gill's deposition testimony?
A Yes.
Q Before reading his testimony, did you know that in February of 2023, after the investigation concluded and cleared Alvin Craddock of any wrongdoing, that Tony Gill walked out into the parking lot to find bullet casings in his truck and in his truck bed?
MS. PLAGENS: Objection; form.
A I was not aware of that, no.
Q (BY MS. HOPKINS) Did John Pinkerton ever report to human resources, to your knowledge, that Tony Gill had a flat tire because of a bullet hole in his tire?
A He -- he never reported to HR, that I'm aware of.
Q (BY MS. HOPKINS) So John Pinkerton, to your

Page 142

transcript it would not have appeared that way.
So you're not aware of employees in the industry describing any tools with -- by using any racial terms?
A I have never heard any racial term -- terms for tools.
Q Okay. Do you know how often the N word is used amongst employees who are out in the field working on Primoris jobs?
MS. PLAGENS: Objection; form.
A I would only have direct knowledge if they brought it to me. So no, I'm not aware.
Q (BY MS. HOPKINS) Is Shack Mack an employee who ever reported discrimination to the company?
A No, ma'am.
Q Has Tandra Betters ever reported discrimination to the company?
A No, ma'am.
Q Does Tandra Better -- Betters work for your brother-in-law?
A No. She works for Jeremy Kirk. My brother-in-law was who has promoted her.
Q Okay. Has an employee named Kevin or Kenneth Shelton reported discrimination to the company?
A I'm not aware who that is. Sorry.

Page 143

Q Okay. Did Ashley Dickerson ever make any complaints against the company?
A Not that I'm aware of, no.
Q Did Josh Bridges make any complaints of discrimination against the company?
A I just think he was the individual involved in those text messages, but I don't -- I'm not aware of any complaints.
Q Okay. Is Amanda Deleon an employee who has made any complaints of discrimination against the company?
A She was not happy at termination, but I don't believe that she -- again, I can't recall her -- her letter of why she was leaving, but...
Q Was she a human resources employee?
A Yes.
Q What was her job title?
A HR coordinator.
Q What were -- was her dates of employment?
A Oh, I can't recall those off the top of my head.
Q Was she --
A It would have been after Charlotte, though.
Q And was she on your team?
A Yes.

Page 144

Q And what race was she?
A White.
Q Okay. I want to focus our attention on February 22, 2023, and the Tony Gill investigation.
As of February 2023, who was Alvin Craddock's supervisor?
A John Pinkerton.
Q And what company did Alvin Craddock work for as of February 2023?
A Primoris T&D Services.
Q What was Mr. Craddock's job title?
A Director of oper- -- director of operations.
Q How important was he to the operations of Primoris T&D?
MS. PLAGENS: Objection; form.
A I can't say that from an HR standpoint. Again, he was a field oper- -- a field management employee. I can't say his importance.
Q (BY MS. HOPKINS) Was Mr. Craddock involved in facilitating the transition of PLS employees and jobs and equipment to PTD in that time frame?
A Sorry. Facilitating? Can you start -- rephrase that or re-- sorry, not rephrase, put more context to that?
Q Sure.

Page 145

Was Mr. Craddock involved in helping with the transition of PLS jobs, employees, and equipment to PTD in that time frame?
A I can't recall if he had any involvement. Again, it would be just assisting, letting them know what tool needed to be moved, equipment. I can't recall.
Q Did John Pinkerton report up to Adam Campbell?
A Yes.
Q Was Alvin Craddock a family friend?
A No.
Q Did you socialize with Mr. Craddock outside of work?
A No.
Q In February of 2023 who was Kelly Porter's supervisor?
A It was either John Pink- -- or actually, it could have been Alvin Craddock. I don't recall who was his direct report at that time. Sorry.
Q Do you recall what company Kelly Porter worked for as of February 2023?
A I don't recall if it was PLS or PTD.
Q Do you recall what Kelly Porter's job title was of as February 2023?
A From what I recall, it was warehouseman.
Q Okay. Did Tony Gill have the job title of yard

Page 150

MS. PLAGENS: -- do --

THE WITNESS: Yeah.

Q (BY MS. HOPKINS) Okay. So you were working, but you were working off-site on February 15th --

A Yes.

Q -- and February 16th; is that right?

A Yes, ma'am.

Q So your testimony is that the first time that you became aware that there had been any racial incident between on employee, Alvin Craddock, and Kelly Porter was when Charlotte Chapman-Byrd direct messaged you on February 16th, 2023?

A Yes, ma'am.

Q You had not heard about it from Alvin Craddock before that?

A No, ma'am.

Q You had not heard about it from Kelly Porter before then?

A No, ma'am. I actually had never even met Kelly Porter.

Q Okay. At any point in time, did you and John Pinkerton ever have a conversation about the incident that occurred between Tony Gill, Alvin Craddock, and Kelly Porter, and the other employees?

A Sorry. Can you say that again? Before this

Page 151

message? Sorry.

Q No. So at any point in time.

A Oh, okay.

Q At any point back in 2023, did you ever have a conversation with John Pinkerton about the incident that involved Alvin Craddock, Kelly Porter, Tony Gill, and other employees?

A I don't believe I was the one that had a conversation with him, no.

Q Did you ever back in 2023 at any point in time have a conversation with Adam Campbell about the incident that occurred between Mr. Gill, Mr. Craddock, Mr. Porter, and the other employees?

A Not that I recall, no.

Q Is there -- did you ever find out that Mr. Gill on February 15th, 2023, went to Kristie Madison to talk about the incident that had occurred with Mr. Craddock and Mr. Porter?

A I had never heard that he went to her.

Q When Charlotte Chapman-Byrd sent you this direct message, "They are not wanting to tell out of extreme fear of retaliation," did you respond to her with any instructions or advice about what she should do?

A Yeah. I believe I told her that they will not be retaliated against.

Page 152

Q Did you give her any --

A I don't recall. Again, this was through Teams, which my preferred method would be through email. So again, I -- I don't recall.

Q Did you give Ms. Charlotte Chapman-Byrd any instructions about whether she should meet with the employee to try to get them to make the complaint?

A I don't recall because I don't know who the employee was at this point. She -- she left Mr. Gill's name out.

Q Right.

From the direct messages that Ms. Byrd sent you on February 16th, and I only have one of them, but I'm asking from --

A Uh-huh.

Q -- the two or however many direct messages she sent you, did you come to the understanding that there was an employee who was afraid to come forward and report an incident that they felt was racial in nature?

A Yes, I was aware of that. Yes.

Q Okay. And did you give Ms. Byrd any instructions about how she should proceed?

A I don't recall.

Q Did you give her any instructions about things she should not do?

Page 153

A I don't recall.

Q Did you prohibit Ms. Byrd from setting up a meeting with the employee to talk to the employee?

A I don't recall what our conversation was.

Q Okay. When did you first find out that the employee who didn't -- who had this extreme fear of retaliation was Tony Gill?

A After Ms. Byrd sent me the message and seeing that Kelly Porter and Alvin were involved, it brought me to think, well, maybe this was within PTD. And I was on the phone with Ms. Wood at the time and just asked her, like, Hey, did anything happen, you know, with Alvin, Mr. Porter that you heard of?

And then she brought up the fact that -- the only -- only thing she was aware of that happened was Tony had came in a couple -- a day or so prior and was upset over an exchange with Mr. Cra- -- Craddock and that, you know, they both handled themselves unprofessionally. But she was not aware of any racial slurs being used.

MS. HOPKINS: Could we take a brief 5-minute break?

MS. PLAGENS: Sure. We've been going about an hour anyway, so can we just take a full 10-minute break so that I can use the ladies' room.

Page 154

MS. HOPKINS: Yes. We'll take a 10-minute break and plan to be back at 2:20. Thank you.

THE COURT REPORTER: Off the record at 2:11 p.m.

(Break taken from 2:11 p.m. to 2:22 p.m.)

THE COURT REPORTER: We are back on the record at 2:22 p.m.

Q (BY MS. HOPKINS) Okay. Ms. Campbell, I am going to mark another exhibit.

MS. HOPKINS: This is going to be Exhibit 17.

(Exhibit 17 marked.)

Q (BY MS. HOPKINS) And these are two emails that you sent on February 20th, 2023. The first one was a follow-up on the prior email, so I'm going to start with the prior email.

A Okay.

Q All right. The email that you see on the screen, is this a true and correct copy of an email you sent to Ms. Byrd and Mr. Gill on Monday, February 20th, 2023, at 1:15 p.m.?

A Yes, ma'am.

Q At this time had you just received a copy from Ms. Byrd of an inter- -- notes of an interview she had conducted with Mr. Gill?

Page 155

A Yes, ma'am.

Q And in your email you wrote, "Thank you, Charlotte. Tony, please confirm the attached statement is correct, or if there is any adjustments that need to be made. As per our conversation, Charlotte had advised me of the situation on Thursday at 12:16" -- sorry -- "Thursday at 12/16 at 4:29 p.m. She did not provide me your name but did let me know that it involved Alvin and Kelly Porter."

The exhibit we had just seen before this was a direct message time stamped 4:35.

A Uh-huh.

Q Do you have a direct message from Charlotte that's time stamped at 4:29 p.m. about that incident?

A I don't have it in my -- with me, no.

Q Do you know if you still have it in your Microsoft Teams chat?

A It would not be in my Microsoft Teams chat, no.

Q Do you know if you still have it in your email?

A No. There was the -- I had no copy of it in my email.

Q Okay. And when Charlotte advised you of the situation, it was over the direct Teams messages, correct?

A Yes. Correct.

Page 156

Q All right. And you say, "I was on the phone with Kelly Wood at the time, and because Alvin falls under her group, I asked her if she knew anything that happened. And being her supervisor she disclosed to me that you came to her upset but didn't know the full story. Attached is where I show her calling you at 4:38 p.m. on Thursday, February 16th with myself as she was driving and I was going to take notes. Again, Kelly did not think much of the situation as you said you did not want to make it official and did not provide much details to her."

Was there a reason you were explaining to Mr. Gill the background of how you came to know about the incident that involved him and Mr. Craddock?

A Yes, because prior to this email, Ms. Byrd and Tony -- well, sorry. Let me back up.

The morning of the 20th I walked in the office and noticed that Tony and Charlotte are in the conference room right by my office. And then after that -- and I don't know if it was Teams, I just recall Charlotte reaching out to me saying, "He doesn't trust Kelly."

I request Charlotte and Tony to come in my office to get -- well, first Charlotte, to get more context on that. After speaking to Charlotte and Tony,

Page 157

Tony was under the impression that Kelly was going around disclosing the incident even though he did not want to make it official. So I wanted to make sure to clear it up with him, also to ease his mind with Kelly doing the investigation that, again, she was not the one going around disclosing to others.

So I just wanted to make sure that was clear with him on how I was made aware.

Q Okay. This -- it looks like Ms. Byrd emailed you Mr. Gill's employee statement on -- on February 20th, 2023 at 12:49 p.m.

Had you already had a meeting with Ms. Byrd and Mr. Gill in your office by that time that day?

A Yes.

Q Did you have a second meeting with Ms. Byrd and Mr. Gill in your office after receiving this email?

A No.

Q Did you take notes during the meeting that you had with Mr. Gill and Ms. Byrd in your office on the morning of February 20th, 2023?

A I did not.

Q Why didn't you take notes of that meeting with Mr. Gill and Ms. Byrd?

A It was really -- that meeting was just

Page 166

remember is it went from side to the other.
So at that point we just requested a statement, because from what Charlotte provided, I wanted to make sure that, you know, we had everything.
Q Did Mr. Gill disclose to you whether profanity was used on the February 16th phone call?
A He said they both used -- you know, he didn't say what it was, but I do remember him saying they used, I guess, swearing, both of them. Both had used, you know, yeah, swears, both of them. And it was from both sides.
Q Okay. When there was the shift in the conversation, did Mr. Gill say that the N word had been used?
A No.
Q Did he say that racial slurs had been used?
A He said they might have been.
Q So when he said they might have been, he was referring to racial slurs and not the N word in particular?
A Correct. I didn't -- I was not aware of the N word until I saw Charlotte's email on -- on the 20th of February when I had requested it after a meeting.
Q Okay. So as we're seeing in this email that's up on the screen --

Page 167

A Uh-huh.
Q -- at 1:15 p.m. on February 20th, 2023, you were asking Mr. Gill to confirm if the attached statement is correct or if any adjustments need to be made, correct?
A Correct.
Q And if we scroll up, by 4:33 p.m. on Monday, February 20, 2023, you were sending Tony another email to follow up --
A Yes.
Q -- to -- okay.
What was so urgent that you were following up with Mr. Gill for a response about whether his statement was correct or whether adjustments need to be made within 3 hours and 15 minutes of emailing him the first time?
MS. PLAGENS: Objection; form.
A Kelly had asked the week prior, so he was the last statement we were waiting on. So we wanted to make sure -- again, we were collecting everything before -- you know, so she could close it out.
Q (BY MS. HOPKINS) Did you have a statement from Kelly Porter?
A I don't recall.
Q Do you know whether or not Ms. Wood ever got a

Page 168

statement from Kelly Porter?
A I don't recall her findings. Again, those were with Kelly and Jackie, so...
Q Do you agree that if Mr. Gill said Mr. Porter was present, that Mr. Porter should have been interviewed?
A Yes.
Q Okay. Between 1:15 p.m. and 3:34 p.m. that day, did you have any phone calls with Mr. Gill?
A No. He came into my office just after this email to tell me that he was being called a thief and wanted to know where that was coming from and if I heard anything.
Q And when he came into your office to report that he was being called a thief, was Ms. Byrd present at all during any part of that conversation?
A No. But Kelly has provided that context in her investigation, because we looked into that as well.
Q How long did the meeting between you, Mr. Gill, and Ms. Byrd last the morning of February 20 of '23 when you first walked in and saw them in the conference room and decided to have a meeting with them?
A It also lasted about 30 minutes.
Q During that first meeting with Mr. Gill, did you tell him that he had the option of making a statement

Page 169

in which racial slurs were used or making a statement in which no racial slurs were used?
A No, because I had not seen his statement at that point.
Q When you met with Mr. Gill and Ms. Byrd that morning, did you ask Ms. Byrd to help Mr. Gill write a statement in which there would be no race discrimination reported?
A I had not seen his statement at that point, so I would have had no knowledge of exactly what was said. So no.
Q Okay. Did you have a meeting with Ms. Byrd at a certain point where you asked her to convince Mr. Gill to change his statement?
A No, because that was the only meeting we had was prior to me getting the -- her summary. So that was the only time we had a meeting.
Q Do you have any documents that would prove that that meeting on February 20 of '23 between you, Ms. Byrd, and Mr. Gill happened before you received his statement from Ms. Byrd?
A Like I said, I recall her making a comment to me in a Teams message if there is something in reference to him not trusting Kelly. And again, at that point I called her in my office.

Q Do you have a copy of a direct Teams message from Ms. Byrd from February 20th, 2023 with a time stamp on it?
A I just recall that message, so I don't know if that message is available.
Q Did you tell Mr. Gill at any point that there would be serious consequences if he submitted a statement stating that Mr. Craddock used the N word or racial slurs?
A No. No.
Q Did you tell Mr. Gill at any point that Mr. Craddock could get banned from the industry if it was reported that he used racial slurs or the N word?
A No.
Q Did you talk to Mr. Gill at any point about there potentially being a -- an industry ban or ban from the industry that could result from an investigation into this incident?
A No. I would have no control of banning anybody from the industry.
Q Can a company lose contracts for having a record of using racial slurs?
A I'm not familiar with our contracts and how they're worded. So again, I can't speak to that.
Q Okay. Do you have any notes from the meeting



with Mr. Gill when he came into your office the second time on February 20th of '23?
A I do not, because, again, I did not antic- -- anticipate him coming right in, so I do not have any from that date.
Q Okay. So the statement you were asking Mr. Gill to either confirm is correct or make adjustments to -- I want to show you Exhibit 18.
(Exhibit 18 marked.)
Q (BY MS. HOPKINS) This -- is it this statement that Ms. Byrd sent to you on February 20th, 2023 at 12:29 p.m.?
A Yes.
Q Okay. When you received this email from Ms. Byrd on February 20th, 2023 at 12:49 p.m., did you take the time to read the attachment?
A Yes.
Q Okay. If we go down -- okay. This -- this attachment is -- 1, 2, 3, 4 -- 4 page -- 5 pages.
Did you read all 5 pages?
A Yes.
Q Okay. When you read the statement, did you see that it said "He said, 'Nigger, you cannot tell me what to do'"?
A Yes.



Q And it said, "I replied, 'man, I'll beat your ass.'"
Did you see that the statement said that next?
A Yes.
Q And that -- the statement then said, "Then he said, 'Nigger, come on, do it. I want you to do it.'"
Did you see that it said that?
A Yes.
Q And is it your testimony that you never had a conversation with Mr. Gill, you yourself, whether someone else was in the room or not, about whether the N word was or was not used?
A I never had a conversation if it was or wasn't used.
Q When you got this statement, did you see that part of Mr. Gill's statement was a comment about his title at the company and that he was reporting that he is a tool manager, "but in UKG they have me as yard help"?
A Yes, I saw that.
Q Did you check at that time to see if he was listed as yard help or yardman?
A Yes.
Q And was he?
A It was -- I believe at the time it was called



warehouse man, so -- so that's what he -- but there -- we had no yard help as a title. It was exactly what was on his offer letter.
Q Okay. Did you make a determination about whether his title in the system should have been tool manager instead of yardman or warehouse man?
A Yeah, I made a determination based -- based on the job he applied for as well his offer letter that he was titled correctly in the system.
Q Okay. When you received this statement from Ms. Byrd, did you see that Mr. Gill told her, "You have the time stamp for the noose in my office, so that has been my dealings with this company since I got here"?
A Yes.
Q Did you ever ask Mr. Gill for the time stamp for the noose in his office or what that meant?
A No. I presented this to Ms. Wood after she conducted the investigation.
Q Did you tell Ms. Wood to find out what Tony meant by stating that he had a time stamp for a noose in his office?
A I just provided her the statement to look into.
Q Seeing that this referred to a time stamp for a noose in Mr. Gill's office, do you think it's pretty serious if a black employee had a noose hanging in their

office at the company?
A Yes.
Q As HR director wouldn't you want to find out what the employee meant by having a time stamp for a noose in his office?
MS. PLAGENS: Objection; form.
A Yes.
Q (BY MS. HOPKINS) And -- but you didn't do anything to find out what that meant, did you?
A I provided it to Kelly Wood to look into the statement.
Q And when Ms. Wood came back to you with the results of her investigation, did you review her results?
A Jackie Hendrick did, as I was removed out at that point of the investigation.
Q Why were you removed out?
A Because upon layoff of Ms. Byrd with me and Jackie Hendrick present, she was -- you know, brought up the same concerns that she thought nothing would be done with the investigation, so Jackie did give her peace of mind. And after discussion it was decided that, you know what, we'll have her step in. And she agreed that she would look over it.
Q Okay. So you're saying you did not receive an email from Kelly Wood with her results of the



investigation?
A She provided it to me. However, all the findings were presented to Jackie and discussed with Jackie.
Q Okay. When you saw what Kelly Wood had emailed you as far as the results of investigation, did you notice that she never mentioned anything about following up on what Tony Gill meant by having a time stamp for a noose in his office?
A I don't recall, because, again, I wasn't in with Jackie and Kelly when they discussed it. So I don't recall.
Q Did -- when you saw this in the statement that Ms. Byrd sent you, did you ask Ms. Byrd, "What does Tony Gill by mean by having a time stamp for a noose in his office"?
A No, I never asked her.
Q Did you ask if she had a photograph that Mr. Gill had shared with her of a noose in his office?
A No, I did not ask.
Q Okay. And did you see that in the statement Ms. Byrd sent you Mr. Gill had referred to racial jokes about black people being made in group settings and that we're expected to laugh about it?
A Yes, I had seen that.



Q And you saw where he said, "It is too deep-rooted in this company and industry"?
A That is what he said.
Q Okay. And you saw the part of the statement that said, "I do not trust Kelly because of her connections to John and Adam." "Adam who?" "Adam Campbell"?
A Yes, I saw that. And again, it was -- it looks like there was no question. It was just a statement provided at the bottom.
Q What connection does Kelly Wood have to Adam Campbell?
A There's no connection. She's his -- she was his business partner at the time from an HR standpoint. That was it. We'd just worked together a long time, all of us. We've all been here 10 years.
Q Are you and Kelly Wood friends outside of work?
A Yes.
Q Do you and Kelly Wood socialize together?
A Yes.
Q Have you and Kelly Wood been out to lunch together?
A Yes.
Q Have you and Kelly Wood been out to dinner together?



A I'm sure we have. We've worked together 13 years.
Q Have you been out together with your spouses?
A I don't recall if we've ever been out with our spouses.
Q Okay. Have you ever invited Kelly Wood to any events where your brother-in-law and husband were present?
A My husband would have been present, but I don't think my brother-in-law has ever been present.
Q Okay. All right. And you saw that Mr. Gill felt like the things that he told Kelly Wood in confidence would not be in confidence?
A Yes. And he felt that way because he thought Kelly went and told me as well as went and told John. However, after speaking with him, that was cleared up on how he found out with my detailed email.
Q After seeing this statement, you continued on a course of action of removing Ms. Byrd from the investigation and allowing Kelly Wood to finish it, correct?
A Kelly had already began the investigation after we spoke with Tony, so I -- I was not aware that Ms. Byrd was getting a statement.
Q When did you become aware that Ms. Byrd had

Page 182

A Again, I've never worked with him long enough or been around him to say if it's credible or not.
Q Did you find it credible that Tony Gill was the aggressor in this entire situation?
A Again, I don't know. I was not present. It would be specifically assumption if I did that.
Q When you read Alvin Craddock's statement, was your takeaway that Alvin was portraying Tony Gill as the aggressor in this situation?
A Again, I don't recall what I thought at that point in time, so that would be speculation.
Q All right. Here is what I am marking as Exhibit 21.
(Exhibit 21 marked.)
Q (BY MS. HOPKINS) Ms. Campbell, did you send this email to Ms. Byrd on February 20th, 2023 at 1:24 p.m. telling --
A Yes, I did.
Q -- her that?
A I'm sorry.
Q That's okay.
When you sent this email to Ms. Byrd on February 20th, 2023, 1:24 p.m., did you inform Ms. Byrd that Kelly would be finishing out the investigation?
A Yes.

Page 183

Q And at that point did you expect Ms. Byrd to stand down and take no further action?
A I just expected her to provide Kelly with everything and she would close it out.
Q Did you state in this email to Ms. Byrd that Ms. Byrd should provide to Kelly Wood everything that Ms. Byrd had gathered?
A No.
Q You asked Ms. Byrd in this email, "Can you please confirm who informed you of the complaint?"
Do you see that?
A Yes, I do.
Q Why did you want to know that?
A Because Tony was not aware of how she found out about it either. So again, wanted to know, because, again, that may be beneficial to get a statement from that individual if they would have had maybe firsthand knowledge. Because to this day we don't know how Charlotte was made aware. And even as per Tony's deposition, he's not aware either.
So again, if it was somebody that was maybe present, maybe we could get a statement from them.
Q Did Ms. Byrd get a chance to answer this question for you?
A No, ma'am, she did not answer it.

Page 184

Q When -- is it correct that you and Ms. Hendrick terminated Ms. Byrd the next day on Tuesday, February 21st, 2023?
A Yes. We laid her off the next day.
Q Did you and Ms. Hendrick meet with Ms. Byrd in person to tell Ms. Byrd that she was going to be let go from the company?
A Yes, ma'am, we did.
Q When you met Ms. Byrd in person to tell her that she was going to be let go, did you ask her again if she could let you know who informed her of the Tony Gill complaint?
A I don't recall asking her that.
Q Did you ask her if she had forwarded everything that she had gathered about the Tony Gill and Alvin Craddock incident to Ms. Wood during that meeting where you let her go?
A I don't recall.
Q What -- who -- who handled the speaking at the meeting in which you terminated Ms. Byrd?
A I initiated it, and I was sitting at my desk. And then Ms. Hendrick was sitting beside her. So I started it, and then Ms. Hendrick reassured her that after that she would make sure to oversee the investigation and that it would be handled.

Page 185

Q How did you start off the meeting with Ms. Byrd when you and Ms. Hendrick met with her on February 21st, 2023?
A Just from what I recall, obviously based on business needs and PLS moving into PTD, and obviously structural changes that, unfortunately, the position was being eliminated.
Q Did you say anything else to her during that meeting?
A I don't recall. I think Jackie finished it up, so...
Q Did you tell her you would be offering her a severance at that meeting?
A Yes. We were providing her a package with the release and for her to -- to look it over. And again, she didn't need to sign it there. She could go ahead, bring home, read it, and send it in to us.
Q During the meeting did you hand Ms. Byrd any other paperwork besides the severance package documentation?
A Only the severance package.
Q Did you write a letter stating that the reasons that Ms. Byrd was being let go?
A No.
Q Did you give her a letter stating the reasons

she was being let go?
A No.
Q Why not?
A Again, this was something at the time that was not a practice of ours. However, since then we've started to incorporate it in.
Q With the -- any other employees who you let go in 2023 from the human resources Utilities segment South Region, did you provide them letters stating the reason why they were being let go?
A I can't speak to that, because, again, I was not -- this was the only one I was in.
Q Were you present -- was Alexis Goluguri eventually let go in 2023?
A Yes, and I was not present.
Q Was Ashley Dickson let go in 2023?
A Ashley -- she resigned, and I can't recall exactly what date.
Q Okay. Do you recall the date that Ms. Goluguri was let go?
A I don't recall sitting here now, unfortunately.
Q I know I've seen it somewhere, but I don't remember where.
So if I found it, I'll -- I'll verify it with you.



A Thank you.
MS. HOPKINS: Okay. I want to mark the next exhibit, which is Exhibit 24.
(Exhibit 24 marked.)
A Okay.
Q (BY MS. HOPKINS) All right. Did Shan- -- Shunte Curtis forward you a conversation that she had had with Ms. Byrd on February 20th, 2023 at 3:43 in the afternoon?
A Yes.
Q Okay. Is this the conversation that Ms. Curtis forwarded to you on the afternoon of February 20th, 2023?
A Yes.
Q Did you read the conversation between Ms. Byrd and Ms. Curtis when you received it from Ms. Curtis?
A Again, that was the end the day. I can't confirm exactly when I read that email.
Q Okay. Before you let Ms. Byrd go, had you read the part where Ms. Byrd says, "Shunte, I do not know what direction we are going here. We had a director call an employee the N word, and I honestly feel like they are not going to do anything about it since they removed me from the investigation"?
A I can't confirm or deny if I read that before we let Ms. Byrd go.



Q Thinking back, before you had the meeting with Ms. Byrd to let her go, did you already know that she had concerns about being removed from the Tony Gill investigation?
A Again, I can't recall.
Q What did Ms. Byrd specifically say in the termination meeting to you and Ms. Hendrick about the Tony Gill investigation?
A Just that she wanted to make sure the investigation was handled proper -- properly, and Ms. Hendrick made her aware that she would be overseeing it.
Q Bear with me. I am trying to find an exhibit.
All right. We saw that February 20, 2023, was the date that you sent Mr. Gill the two emails --
A Yes.
Q -- asking him about -- to either confirm that his witness statement was correct or to adjust it, right?
A Yes. Correct.
Q And we saw that February 20th, 2023 was the date that you received the forwarded message from Ms. Curtis about Ms. Byrd where Ms. Byrd said, "Hey, I'm concerned they're not going to do anything about the director using the N word because they removed me from the investigation."



A I don't know when I saw that. But yes, I had seen that. But again, I can't recall if that was after or before Ms. Byrd was let go.
Q And February 20, 2023, was the day you had the meeting in your office with Ms. Byrd and Mr. Gill, correct?
A Yes.
And February 20th, 2023 was also a day where you had a second meeting with Mr. Gill in your office, correct?
A Yes. He came to my office after speaking with Kelly, and Kelly advised him to come speak with me, which he denied to take the recommendation and do.
Q I am sharing with you what's been marked as Exhibit 49.
(Exhibit 49 marked.)
Q (BY MS. HOPKINS) Is this a direct Teams message from Jackie Hendrick to you on February 20th, 2023 at 11:44 a.m.?
A It seems to be.
Q And Jackie says, "I tried checking the RIF list, and you are in it."
A I don't know if she meant I'm in it, like I am holding it down so she can't get in. I -- I don't know what -- again, I can't recall what she's meaning by that.

Page 190

Q Okay. Was there a RIF list that was on a shared drive or cloud that both you and Ms. Hendrick could access?

A Yes. It was a list that consisted of individuals that we were keeping, RIFing, or still deciding on on PL- -- well, PLH employees, so every subsidiary under PLH.

Q So on February 20th, 2023, around 11:44 in the morning, were you in the RIF list?

A I don't recall.

Q Why were you in the RIF list on February 20th, 2023?

A I don't recall why I would be in it.

Q Okay. Did Mr. Gill eventually email you a statement in which he removed all the references to the noose, racial slurs, and race discrimination?

A Yes. He emailed that to me the next day. And he also originally sent it just to me, and then the second one he sent just to me and just Charlotte.

Q So I must have the copy of a second one. I've marked it as Exhibit 2022 -- sorry, Exhibit 22.

(Exhibit 22 marked.)

Q (BY MS. HOPKINS) Is this the second email Mr. Gill sent you that morning, February 21st, 2023, with the -- his changed statement?

Page 191

A Yes, that is the second one he sent me. The first one was just to me.

Q Okay. And in both the first statement he sent to you and the second statement he sent to you on February 21st, 2023, is it accurate that he removed all the references to the N word?

A Yes.

Q And is it accurate that he removed all references to a noose having been in his office?

A Yes.

Q And is it correct in the statements he sent on February 21st, 2023, he removed all references to racial jokes being made at the company?

A Yes.

Q And is it also correct he removed any reference to being a -- marked as yardman or yard help in the system instead of a tool manager?

A Yes.

Q How did you know that Mr. Gill was not sending you these new statements out of fear of what Alvin Craddock and Kelly Porter might do if he persisted in reporting them for race discrimination?

A Again, at that point I was in the investigation as this was the morning. So right after that, you know, Ms. Byrd had came in, we laid her off, and then

Page 192

Ms. Hendrick took over.

So again, I know from what Kelly's statements were, her and Jaritza Hernandez spoke to Tony -- or, sorry, Lonnie Gill to, you know, obviously reiterate that she had noticed it had been removed.

Q This statement that's attached here, did you help Mr. Gill draft it when he was in your office the day before, February 20th, 2023?

A No, I did not.

Q Okay. And then here I'm marking as Exhibit 23 an email that you sent to -- it looks like to Ms. Wood on February 21st, 2023, at 8:56 a.m.

(Exhibit 23 marked.)

Q (BY MS. HOPKINS) Is it your testimony you had been removed from the investigation at this point?

A That is -- yes. That is why I forwarded it to Kelly, so -- because he had not forwarded it to Kelly. So I wanted to make sure it got to her.

Q This email looks truncated. It says, "Hey, Kelly, I want."

My question for you is, what did you want?

A I don't recall actually putting that. So that looks -- yeah, I don't recall putting that. So again, I don't know.

Is there a way to make sure that's

Page 193

actually -- because again, that seems very strange for me to put. So I don't recall.

Q Okay. Can you tell from the header whether this is an email or a direct message?

A It's an email.

Q Okay. Did you have the phone call with Kelly Wood on February 21st, 2023, after receiving Mr. Gill's revised statements?

A No. She sat right next to me, so there would have been no need to have a phone conversation.

Q So did you have a conversation with Ms. Wood in her office on February 21st, 2023, after you received Mr. Gill -- Gill's revised statements?

A I don't recall ever having one, as I -- I had been removed from it. So again, this was just forwarding to her because she was not in it from Tony.

Q All right. And if we go -- I'm going to go to an Exhibit 25 that I'm marking, which is a March 3rd, 2023, email to you and Jackie Hendrick from Kelly Wood.

(Exhibit 25 marked.)

Q (BY MS. HOPKINS) Did you receive this email?

A Yes.

Q Okay. And did you review it when you received it?

A Yes, I would have reviewed it when I received

it. Yes.
Q Okay. Have you ever seen any notes written by Kelly Wood about an interview she and Jaritza Hernandez conducted with Tony Gill?
A I've never seen them in person. But again, I can't speak to if she provided them to Jackie.
Q Okay. You mean you've never seen them personally?
A I've never seen them -- no, I've never seen them in -- in person.
Q Do you know if any notes exist?
A Kelly is pretty big on taking notes, so I would think that she -- yes, that she did, or Jaritza did.
Q Okay. When you saw a list here of the employees involved, Tony Gill, Alvin Craddock, Andrew Byers, Chase Newtown, you knew that Kelly Porter had also been involved, didn't you?
A Yes.
Q And you knew that Kelly Porter wasn't listed here as someone who Kelly would have spoke to, right?
A Yes, I can see he's not listed here.
Q And did you do anything about that?
A Again, Jackie was overseeing this. And I don't know if Kelly sent a separate message to her. Again, I was removing myself out, you know, and Jackie was leading



this investigation.
Q So did you do anything when you saw that Kelly Porter was not on the list of people Ms. Wood had spoken to?
A Again, I was removed out of it. Jackie was giving directions. So again, I don't know what they spoke about at that point.
Q Did you yourself do anything about it when you saw that Kelly Porter was not on the list of witnesses that Kelly Wood spoke to?
A I did not do anything, as I was removed from the investigation. So Jackie as my VP of HR I would expect would give her obviously feedback on that and ask Kelly on where Kelly is.
Again, I could potentially have not been in all emails. I don't know.
Q All right. The recommendation here, do you know if that -- those recommendations were ever implemented?
A I do not know.
Q Is it your position that, because you were removed from the investigation, you had no obligation to take any steps to make sure the recommendations were implemented?
A HR provides a recommendation which we're



required -- we do. Obviously, Kelly did that here. However, we don't have oversight -- daily operational oversight over these leaders.
So it is expected when HR gives a recommendation that operations follows through with that.
Q Do you know whether this recommendation was ever communicated to John Pinkerton?
A I can -- again, I was not in the investigation. I can't recall if direct -- Kelly -- I was not there, if Kelly had direct conversation. She told me she did. However, I was never in the conversation, as I was removed from the investigation.
Q Do you know if Tony Gill was ever informed of the results of the investigation?
A I do not know, as I was removed from the investigation.
Q Do you know if Alvin Craddock was ever informed of the results of the investigation?
A I do not know, as I was removed from the investigation.
Q Did you tell Kelly Wood to limit the scope of her investigation just to the incident that happened on February 15th, 2023?
A No.
Q Did you ever tell Kelly Wood not to investigate



what Mr. Gill said about his having a time stamp of a noose in his office?
A No. HR was not even aware of that, you know, situation. So she'd have no reason to want to collect that information.
Q Did you -- did you ever become aware that Mr. Gill thought that Kelly Porter was holding something behind his back during the incident?
A Again, I had read that. But I'm -- again, I don't know.
Q Would it be a violation of company policy if Mr. Porter had a gun in the office on February 15th, 2023?
A Yes, just like it was a violation for Mark Tarango when Tony Gill brought that forward and we terminated him. So absolutely.
Q Back in February of 2023, were you aware as whether -- as to whether there was a security camera that would have captured any footage of the location where this incident took place between Tony Gill, Kelly Porter, and Alvin Craddock?
A I don't know where this location necessarily was, as I was not made aware of it.
MS. HOPKINS: I'm going to Mark Exhibit 26.

Q Okay. The second interrogatory asked, "Who made the decision to list Charlotte Chapman-Byrd as -- in red as a RIF on a particular RIF list." That was Primoris -- it was Bates-labeled in this litigation as Primoris 245 to 257. And the response was that you, Alicia Campbell, made the decision to list Ms. Byrd in red as a RIF on that RIF list.
Is that accurate, or do you need to see the RIF list to confirm?
A I -- I can't confirm if I specifically said put her in red. I was not handling the RIF list at that time.
Q Okay.
A However, I mean, the directive was to list RIFs in red just to make it stand out. So again, from the beginning the directive was to list them in red to make them stand out for the integration team.
Q Was there a point in time when you gave a specific instruction to Paula Bagony to list Ms. Byrd as a RIF on a RIF list?
A I don't recall.
Q Do you recall if you are the one who went into a RIF list and put down Ms. Byrd as a RIF?
A I don't think I was. However, I don't recall. I can't confirm or deny that.



Q Was there a situation where you got a RIF list where Ms. Byrd had been listed as a RIF before you had made any decisions to RIF her?
MS. PLAGENS: Objection; form.
A Sorry. You're going to have to -- again, I had never seen her in a RIF list before and made a decision to terminate her or to lay her off.
Q (BY MS. HOPKINS) Okay. All right. I'm going to switch gears a little bit and talk about the head count for the --
A Uh-huh.
Q -- South Region at various points in time.
Is it correct that on a periodic basis Jackie Hendrick would email you and Teresa Berry and some of the other -- it might have been Monica Cruz, to get accurate head counts from you for your divisions, for your regions?
A Yes.
(Exhibit 29 marked.)
Q (BY MS. HOPKINS) Okay. So if we see this email from Teresa Berry to Jackie Hendrick on January 10th, 2023, was Teresa Berry generally the one to compile all of those head counts and then email the final document to Jackie?
A She would assist. So if she was, again,



already pulling her, she'd be wonderful to me and pull it for me too as well, so it was at least just one person sending in a file.
Q Okay. All right. So there's an email from Jackie Hendrick on January 10th to some folks, including you, that says, "Yes, I will get you the most current HC data from Teresa and Alicia once I get the HC reports back from them."
And that's all referring, HC, to head count, correct?
A Yes, ma'am.
Q Okay. Is it accurate that your head count for the South Region as of January 5th, 2023, was 3,616?
A I can't confirm the exact amount, but I have no reason to believe that Teresa would have pulled incorrect information. So, if anything, it would be pretty close.
Q Okay. And if you -- if you had emailed out the information, then you would trust its accuracy?
A Yes.
Q Okay. Does it comport with your recollection that under Ms. Byrd for PLH/PLS there was an employee head count of 426 as of January 25th, 2023?
A Yes, I think that should be pretty accurate.
Q Okay. And in total, the head count for your South Region of 3,616 was pretty much the same as it was



in November of 2022 right after Ms. Byrd was hired, right?
A Yes, I believe that was pretty close.
Q So if we go back to our November head count chart, Exhibit 12, as of November 28th, 2022, you had two more total employees, 3,618, right?
A Yes.
Q All right. And then if we look at your head count for January of 20- -- January 25th, 2023, this is an email from Jackie to Dan Patterson with a head count report 2023 January '25 attached.
Do you see that?
A Yes.
Q Okay.
A And this is where we broke it down to line of business, because this is the direction we were going.
Q Yes, I see that.
A Which my head count would be the 3,360.
Q Okay. So is this 3,360 for the South Region your -- your area of remit, or is this different now because it's a line of business and it's not exactly matching up with your region?
A Yes, this is the line of business. So this is -- this is why we broke it down was to show the line of business and basically that breakdown. So that was --

Page 214

we were doing the transition there for moving the line of business.

Q Okay. So then if I -- I'm going to pull up your numbers from January 2025. I guess this sheet maybe doesn't have a date on it. It's 1321 -- bear with me while I go back to the prior exhibit and see if that was the native file for it. I thought I had it pulled up.

(Exhibit 31 marked.)

Q (BY MS. HOPKINS) Okay. This is Bates-stamped 1319, and that's Bates-stamped 1320. Okay.

So the attachment here of 1321 to the email from January 25th, 2023, it says the South Region HR support is at 3,617.

Is that accurate?

A Yes.

Q And here for Ms. Byrd it's listed as 404 total employees for PLS with Texas, Georgia, New Mexico as the locations?

A Yes.

Q Is that correct?

A Yes.

Q Okay. And again, this is very, very close to what your head count was on November 28th, 2022, correct? Your total head count.

A Yes. Correct.

Page 215

(Exhibit 32 marked.)

Q All right. And then if we look at February 24th, 2023, there's another head count report from February.

A Uh-huh.

Q One of them is one that Teresa Berry emails out after she gets an email from you saying, "Sorry this took me a bit."

A Yeah.

Q It has a head count report attached.

So that's one of the documents that was produced in a native file at 158- -- sorry. That was at 1580. And then this is -- oh, I guess -- did I do the same one? 1580 and 15- -- oh, 1582. All right.

Well, in any event, as of February 4th, 2023, if we go ahead and we look at the Excel file that was attached to Ms. Berry's email --

A Uh-huh.

Q -- we see that your South Region total head count is 3,650 as of February 20th, 2023 when you sent her in those numbers.

Is that accurate?

A Yes, that's accurate.

Q And so you actually had more of a total head count in -- as of February 20th, 2023 than you did in

Page 216

November -- on November 28th, 2022, correct?

A Yes. For the South Region, yes.

Q Now, I want to ask you about this here. It lists Ashley Dickson over PLS Power Delivery with 317 employees.

Do you see that?

A Yes.

Q And so did you prepare this report after Ms. Byrd was let go?

A I don't know if I prepared this or this was -- again, I don't know. I would assume this was prepared after. But again, I don't know if I prepared it, Jackie put those names on there. I don't recall who prepared this. I know that I added the numbers in. But again, I can't speak to -- to that.

Q At the time you let Ms. Byrd go on February 21st, 2023, is it accurate that there were still 317 PLS employees who had not been transferred to PTD?

A Yes.

Q And is it accurate that you put Ashley Dickson over those 317 PLS employees after Ms. Byrd was let go?

A She was not over them as leader, a manager, or anything like that. She was just the highest level that would have been a contact there.

And again, I -- I didn't put those names

Page 217

in there. Again, it would just be assumptions. But I don't recall putting those names in there like that.

Q So you don't believe that you are the one who listed Ashley Dickson and Charlotte Chapman-Byrd's place on your head count report?

A I don't believe so, but I can't recall.

MS. PLAGENS: Objection; form.

THE COURT REPORTER: I think I got all that, but it was really faint.

Q (BY MS. HOPKINS) Sure. Ms. Campbell, you might have to move closer to the laptop again.

A Oh, sorry.

Q Yes.

A Right here.

Q Thank you so much.

A No problem.

Q When was the last of these 117 employees who are listed here for PLS transferred to PTD?

A I mean, we were doing waves it felt like every four weeks, so I would say -- again, I -- I can't recall the exact date. It was in 2023, but I would say right before the summer.

Q Okay.

A We were consistently moving them over. It was really just based on the integration team being able to

Page 218

move them over, so...

Q With -- okay. Charlotte Chapman-Byrd was an HR manager, correct?

A Correct.

Q Is her race -- she is black, correct?

A Correct.

Q And Ashley Dickson was an HR generalist, right?

A Correct.

Q And an HR generalist is a level below an HR manager at Primoris, correct?

A Correct.

Q Ashley Dickson had never been an HR manager ever at Primoris, correct?

A Correct.

Q Ashley Dickson is white?

A Correct.

Q And on this head count report after Ms. Byrd's termination, Ashley Dickson is listed in the place where Charlotte Chapman-Byrd used to be listed for the PLS head count, correct?

A Correct.

Q And who was managing those 317 employees as they moved over to PTD in the months following Ms. Byrd's termination?

A It would have been Paula Bagony and Kelly Wood,

Page 219

as they were transferring into their respective groups.

Again, she was just the contact. And she was, you know, the highest level there that was supporting them, because she was helping them with the transfers with her historical knowledge.

Again, this was no replacement for an HR manager. This was just she was the contact.

Q Okay. I want to talk to you about Ms. Byrd's scope of responsibilities and how they changed over time.

A Yeah.

Q This is an email you were not copied on. It's from January 18th, 2023. It's from Shunte Curtis to Kelly Arnold with Ms. Byrd copied. And it says, "Can you please add Charlotte Chapman-Byrd to the email thread for Future's payroll? She is the HR manager for PBS, and we have about 68 Future Gas employees that she'll be managing."

Do you see that?

A Yes.

Q Did you make the decision to have Ms. Byrd start supporting Future employees along with Shunte Curtis in early 2023?

A Future employees, yes.

Q Okay. And were Future employees being transferred from Future to PDS in that time frame?

Page 220

A No. They eventually moved them down the road after this scope moved to my counterpart, Teresa Berry. And again, that's based on the integration team having time to do that, so.

Q Did you assign Ms. Byrd to specifically support Colby Sparks?

A At that time, yes.

Q Okay. And what division or department was Colby Sparks over?

A He was over the North Texas part of PDS, so that's about -- we have three leaders in that group, Colby, Matthew Pridemoore, and Mike Pence. Colby was one -- one-third of that group, as well as the 68 Future employees.

Q How many employees did Colby Sparks have under him in terms of a head count at that time?

A Roughly around that time I would say just under 200 with Future.

Q And I'm sorry, what was Colby Sparks's job title at that time?

A Vice president of operations.

Q Okay. And was it the intent that Ms. Byrd would provide all types of HR support for Colby Sparks's employees?

A During that time frame, yes.

Page 221

Q So it was the intent that she would provide support with discipline, terminations, investigations, and everything that was in the normal scope of an HR manager's responsibility?

A Yes.

Q This is -- I'm showing you an email from Ms. Byrd to Mr. Sparks on December 29th, 2022. It says, "Thank you, Colby. I look forward to meeting you and everyone." And she's responding to an email from Colby Sparks from December 29th, 2022, where he says, "Good afternoon, everyone. I thought I set a meeting up for January -- Thursday, January 5th, saying that we will have a meet and greet with Charlotte that is on the email as well as go over our expectations and HR expectations. Charlotte will be our new contact starting next week."

Does this email help you recollect when you made the decision to have Charlotte Chapman-Byrd start supporting Colby Sparks and his approximately 200 employees?

A It would have been around that date where we were evaluating the need, as there were a lot of discussion with PLS, as well as moving to line of business and also removing onboarding off of our scope.

So again, in normal business you do -- you evaluate, right? So yes, this was around the evaluation

period of what was the right direction to go to meet the business needs.

Q Okay. Does that mean the decision was made close in time to December 29th, 2022?

A Again, this was an evaluation period.

Q Okay. Had Ms. Byrd just been removed from supporting Mr. Burns's crew at this time?

A I don't recall exactly. Mr. Burns had moved over to PTD, because I believe he was in that part of the wave.

Again, I can't recall. There was so many waves.

MS. HOPKINS: Okay. All right. I think I have not been keeping up with stating what we're marking exhibit numbers as, so let me clean the record up on that.

I had shown the witness Exhibit 33, which is was the December 29th, 2022, emails between Mr. Sparks, Ms. Byrd, and some other folks.

(Exhibit 33 marked.)

MS. HOPKINS: And then before that I had shown the witness Exhibit 34, which was the January 18th, 2023, email from Shunte Curtis to Ms. Arnold with Ms. Byrd copied.

(Exhibit 34 marked.)



MS. HOPKINS: And then I'm going to go to Exhibit 35 next.

(Exhibit 35 marked.)

Q (BY MS. HOPKINS) This is a February 3rd, 2023, it looks like a calendar invite acceptance from Ms. Byrd to Ms. Curtis. It says the subject, "Accepted onboarding training and transition discussion." Location is Future Infrastructure in Mesquite, Texas --

A Uh-huh.

Q -- start date February 9th at 9:00 a.m. End date, February 9th at 2:00 p.m.

Had you asked Ms. Curtis to go ahead and train Ms. Byrd on taking over HR management support duties for Colby Sparks's group?

A Again, I can't recall if I requested this, however. I also needed Tessa to be trained as well. So again, I don't know why she's not on this as well, because they're speaking to onboarding, and onboarding would fall under a coordinator.

So again, I can't recall this meeting.

Q Sure.

Who is Tessa who you also wanted to be trained to take over Future support?

A Tessa Tanner was an onboarding coordinator that ended up reporting to Shunte.



Q Okay. Was the Future infrastructure headquarters in -- at this address in Mesquite, Texas?

A Yes.

Q Is that where Colby Sparks worked out of?

A No.

Q Where did he work out of?

A At that time he was up in almost Oklahoma. I'm trying to think of the name. Sang- -- no, it's just north of Sanger. I can't recall. Very north, way north of Denton, so almost in Oklahoma.

Q Okay. And I'm going to go to Exhibit 36.

(Exhibit 36 marked.)

Q (BY MS. HOPKINS) All right. This is an email that you are copied on from --

A Yeah.

Q -- Shunte Curtis to Colby Sparks on January 23rd, 2023. It says, "Future employees are set up differently (different codes, PR departments, et cetera) in the system than they are for PDS and both Charlotte and Tessa will need to be trained and given the appropriate tools/resources in order for them to take over successfully."

Is that accurate?

A Yes.

Q Okay. And is it accurate that it was



determined that both Charlotte Chapman-Byrd and Tessa Tanner would take over supporting Colby Sparks's group as of February 6th, 2023?

A It was determined to start a transition.

Q So it was determined to start a transition immediately and have it completed by February 2- -- February 6th?

A Yes, from -- and again, I can't recall that meeting, but that's what it says there.

Q Okay. And the email to Colby from Naomi Gonzalez on January 23rd, 2023, that says, "Hi Colby, you are correct, we are currently in the process of transitioning everything to Charlotte and Tessa to take over," is that referring to all of the HR support for Colby Sparks's team was going to be transitioned to Charlotte and Tessa?

A That is, yes, what Naomi is saying there.

MS. HOPKINS: Okay. And then Exhibit 37.

(Exhibit 37 marked.)

Q (BY MS. HOPKINS) I want to ask you about this email Ms. Curtis sent to you on February 13th, 2023.

If we go down, it looks like -- did you send an email to Ms. Curtis asking if Charlotte should have access to Future?

A Yeah.

called "Wave Final"?
A I can't recall. Again, this was really led by the integration team. Again, they gave us a direction we were moving folks over. So again, I can't recall exactly how many.
Q Okay. All right. I'm looking at Line 389 of this third tab on the Excel sheet called "Sunita's PLS Auger." And this was a spreadsheet attached to that January 27th, 2023, email.
A Uh-huh.
Q Is it correct that Charlotte Chapman, meaning Ms. Byrd, was assigned to be transferred in Wave 5 as of January 27th, 2023?
A I can't confirm that because that was not my decision. I've never even seen this. Again, I've -- I wasn't even in these emails. I don't even know where this came from or the purpose, to be honest. So I can't speak to this spreadsheet.
Q Okay. Are you saying that you never got any spreadsheets in which Ms. Chapman was assigned to a wave?
A I don't recall. Again, I can't speak to this one I wasn't in the email with.
Q Okay.
A It's a lot of spreadsheets.
Q Yes.



And -- all right. So were -- this is an email from Sunita Khorana to Garrett Young on January 30th, 2023. It says, "Just met with Danny, and we discussed adding Wave 5 as part of Wave 4."
Were you involved in the discussions about combining Wave 4D and Wave 5?
A No, I was not.
Q And --
A I don't recall, yeah.
Q All right. For the attachment to this, which is 2291, if we go to the Excel sheet and we zoom in. I'm going to do a control find for --
A Oh, I think -- did you just go back to the old spreadsheet?
Q No. This is a -- this is a similar one that was attached --
A Okay.
Q -- to the January 30th email instead of the January 27th email, but they're only a few days apart.
A Okay.
Q I ask you here, so did Dan or Garrett or Sunita ever, like, contact you to ask you, Hey, what wave should Ashley Dickson be in, for example?
A I don't recall them ever reaching out to me. I remember them just usually sending us spreadsheets and



then having to identify, you know, the status of that employee at that point.
Q Okay. Do you agree that Ashley Dickson should have been placed in Wave 5 as of January 20, '23?
A I mean, I can't recall if that would have been the right wave or not. Again, a lot of this was run by our integration team.
THE COURT REPORTER: I'm sorry. Was this going to be an exhibit?
MS. HOPKINS: It's part of Exhibit 40.
THE COURT REPORTER: You just never said.
MS. HOPKINS: Yes. Okay. So what we're going over is the Excel spreadsheet attached to Exhibit 40.
(Exhibit 40 marked.)
Q (BY MS. HOPKINS) Do you see here on Line 182 that Alexis Goluguri is assigned Wave 5?
A Yes.
Q And do you -- did you agree at the time that she should be part of Wave 5?
A I didn't agree to any waves or what part anybody should be part of.
Q Okay. And here on this Line 389 Charlotte Byrd is listed as Wave Final.
Were you part of any discussions where it



was agreed that Charlotte Chapman-Byrd would be part of the Wave Final?
A No, not that I recall. Because again, these conversations were had between Danny Lee, who was finance, and Sunita.
Q Isn't it true that at a certain point you were looped into emails about when your HR employees should be transferred?
A Yes.
Q Okay. Let's mark one of those now so you can speak to if you have personal knowledge about. I'm marking this as Exhibit 41.
(Exhibit 41 marked.)
Q (BY MS. HOPKINS) And this is the last email in a chain of emails that goes up from here.
A Uh-huh.
Q All right. On February 3rd, 2023, did you, Alicia, receive an email from Sunita Khorana, the integrations team, telling you that Ashley Dickson and Alexis Goluguri, your HR generalist and HR coordinator, were slated to transfer from PLS to PTD as part of Wave 4?
A Yes.
Q Okay. And did you respond to Sunita's email on February 3rd, 2023, telling Sunita that Ashley Dickson

and Alexis Goluguri will report to Kelly Wood?
A Yes.
Q And that Kelly is not in PTD, she's in Company 100?
A Correct.
Q Who had made the decision that Alexis Goluguri and Ashley Dickson were going to report to Kelly Wood in Company 100?
A It would have been me based on the individuals that were moving into Kelly Wood's scope was the largest, so at that time it made sense to move them under Kelly.
Q Okay. By that do you mean that the greatest number of PLS employees who were transferring from PLS to PTD were moving under Kelly Wood?
A Yeah. I mean --
MS. PLAGENS: Objection; form.
A Yeah. I guess I would have to see the head count. Also, Kelly was local there too as well, so it was an automatic to put them under her.
Q (BY MS. HOPKINS) When you say "local," what do you mean by "local"?
A Oh, local in the same office as them. Their HR coordinator -- Paula is in Florida.
Q By them -- okay. Are you saying that Kelly Wood was in the same office as Alexis Goluguri and Ashley



Dickson?
A Yes.
Q Okay. And Charlotte Chapman-Byrd was also in the same office as Alexis Goluguri and Ashley Dickson, right?
A Yes.
Q All right. If we scroll up, Sunita asks you a question about what their home department and location is. She needs to know for the laptop migration.
And we keep scrolling up, and on February 3rd, 2023, you ask Sunita, "When are we anticipating Wave 4, just roughly," right?
A Yeah.
Q And then Sunita responds February 27th, 2023, "Start date," correct?
A Correct.
Q And then on February 3rd, 2023, as part of that discussion, you tell Sunita Khorana, "I noticed Charlotte was not on that list and she is my HR manager," right?
A Yes. That was an administrative check and a retention check, meaning I obviously see here what's happening with the other. I wanted to make sure that she was not going to get transferred. Because, again, the reasoning behind the layoff for it to be at that time was not to have W-2s move all our equipment over.



So again, that was strictly an administrative check, not a retention check.
Q You hadn't made the decision as to February 3rd, 2023, whether you were going to retain Charlotte or let her go, had you?
A I mean, that was the direction we were going. After all these evaluations, finding out we're moving to line of business, removing onboarding our first scope, that was the direction we were going.
THE COURT REPORTER: It's very faint.
THE WITNESS: Oh, sorry.
Q (BY MS. HOPKINS) All right. You agree that Sunita Khorana responded to your pointing out that Charlotte was not included but saying, "Hey, Alicia, I can certainly add if you would like. She would not have any PLS visibility, so CCing Danny. And can you provide her last name and can you answer Number 3, the closest office locations?"
A Yep.
Q And you respond to Sunita, "Oh, okay. I would need her to have PLS visibility still. So would you recommend her moving in the last wave?"
Do you see that?
A Yes.
Q Doesn't that mean that as of February 3rd,



2023, you were up anticipating Charlotte Byrd moving from PLS to PTD in the last wave?
MS. PLAGENS: Objection; form.
A Again, I can't confirm the exact dates. There's a lot of moving parts at that point. So again, I'm not sure if it was at that point we had the conversation. I can't recall.
Q (BY MS. HOPKINS) When you asked Sunita, "Would you recommend her moving in the last wave," you were referring to would you recommend Charlotte Chapman-Byrd moving in the last wave, right?
A I would anticipate that with that answer, yes.
Q And Sunita responded, "Yes, she does --" she answered your question, "Yes."
A Uh-huh.
Q Correct?
A Correct.
Q And Daniel Leigh responds, "Hey, Alicia. The intent was that Charlotte and I would be one of the last to move since we have the greatest access on the PLH side just in case we need something. Thanks, Danny."
A Yes.
Q Did you receive that email from Danny Leigh? Leigh? How do you pronounce his name?
A It's Leigh.

Q Okay. And going up, you said, "Sounds good. I agree with that. Thanks, Alicia Campbell."
A Yes.
Q So as of February 3rd, 2023, you agreed that Charlotte Chapman-Byrd should be moved to PTD in one of the last waves so that she could maintain PLS visibility.
MS. PLAGENS: Objection; form.
A Again, I intend to move, I did not -- from what I can see there, I didn't say what company. And again, like I said, there was a lot of moving parts going on at that point, so...
Q (BY MS. HOPKINS) Sure. And I want to get this right.
A Yeah.
Q As of February 3rd, 2023, from what we've seen in these emails, you are agreeing that Charlotte Chapman-Byrd should be one of the last employees to move so that she could continue to have access on the PLH side in case you-all needed something.
MS. PLAGENS: Objection; form.
A Again, at that point in this email, it looks like that is the intent. However, like I said, there was a lot of moving parts to this, so...
Q (BY MS. HOPKINS) All right. We have now looked through all of the emails in this email chain.



At no point in this email chain did you say Charlotte Chapman-Byrd actually doesn't need -- you don't need to worry about transferring her. She's going to be RIF'd.
A Well, RIFs are very confidential. So there would be no need to disclose it, especially for a time frame around the 21st of February, until it's operationally necessary. And that is usually right before the wave goes through.
Again, none of these folks on this email are in HR.
Q All right. So you're saying that, despite what this email says, that as of February 3rd, 2023, you had made a final decision to lay off Charlotte Chapman-Byrd?
MS. PLAGENS: Objection; form.
A I can't confirm the exact date. Again, there was a lot of moving parts. This -- PDS was moving over to my counterpart. We also had onboarding, which is I would say about 40 percent of our scope being removed off of us, and also to PLS was being moved into whatever was remaining within Paula and Kelly.
Q (BY MS. HOPKINS) How much sense does it make to have Charlotte Chapman-Byrd trained in the procedures and processes for the brand-new company, Future, everything she needs to know to support Colby Sparks's



team if you had already made the decision that she wasn't going to be around in two weeks?
A Again, we're needing support there at that time, and Shunte was not aware of it. And a lot of those emails I was not even involved in.
Q Okay. So sitting before a jury in this case, you are going to ask them to believe that you approved Charlotte Chapman-Byrd and Tessa Tanner getting fully trained to support a brand-new division, Future, at a time when you already knew that you were going to let Charlotte Chapman-Byrd go in two weeks?
MS. PLAGENS: Objection; form.
A Tessa Tanner was staying with us at that time, and she was being trained up. I needed her to be trained up.
Q (BY MS. HOPKINS) Okay. And you needed Charlotte Chapman-Byrd to be trained up too, right?
A I never disclosed to Shunte our plans, because, again, they were counterparts.
Q Is it good for HR relations with a business unit like Colby Sparks's business unit to tell Colby Sparks that he's going to have a brand-new HR business partner in Charlotte Chapman-Byrd one week and then tell him, oops, sorry, never mind, she's being laid off the next week?



MS. PLAGENS: Objection; form.
A Unfortunately, we had changes like that constantly since I've been here. Like I've just received PDS back. And when we received PDS back, Teresa Berry laid off an HR manager there, similar to the situation when we moved PDS over to Teresa.
I probably had Colby Sparks back and forth probably about four times now, so...
Q (BY MS. HOPKINS) All right. I'm going to show you another email. We are going to mark it as Exhibit 42, and it starts the same way that a -- the prior email started, but has a different chain above it.
(Exhibit 42 marked.)
Q (BY MS. HOPKINS) So we are going to start here, again, with Sunita's February 3rd, 2023, email to you asking about Ashley Dickson and Alexis Goluguri coming over to PTD as part of Wave 4.
Do you see that that's the same email we looked at before from Sunita to you? Sorry.
A (Nods head.)
Q We need a verbal response for the court reporter.
A Oh, yes. Yes.
Q All right. And now if we look above it, you have a response -- the same response you had before,

Page 242

"They will report to Kelly Wood, and Kelly is not in PTD. She's in Company 100," right?
A Uh-huh.
Q And Sunita asks you the same question about their home department and location.
And if we go up, in your response to Sunita here --
A Yeah.
Q -- on February 3rd, 2023, you email Sunita, "Put them under Department 1002 and Kelly Wood as the supervisor. Now, with Charlotte, is there a way to move her to Company 187PDS? The reason I am asking is she will be supporting that group from an HR standpoint."
Is that what you wrote?
A Yes. However, she was only supporting for that short period of time part of it. So technically, that would not make sense to have her cost hit the whole group.
MS. HOPKINS: Move to strike everything after "Yes."
Q (BY MS. HOPKINS) Did you write to Sunita on February 3rd, 2023, saying, "Now, with Charlotte, is there a way to move her to Company 187PDS? The reason I am asking is she will be supporting that group from an HR standpoint"?

Page 243

Did you write that?
A Yes.
Q All right. And then we scroll up to some other emails about the company number and code situation. All right. I'm sorry, I don't think I have any other questions for you about that email.
Is it correct that Ashley Dickson and Alexis Goluguri were eventually transferred into Company Code 100?
A Yes.
Q All right.
MS. HOPKINS: I'm marking as Exhibit 43.
(Exhibit 43 marked.)
Q (BY MS. HOPKINS) I'm going to start with the email on the bottom of this chain. Again, this is Sunita's February 3rd email about Alexis Goluguri and Ashley Dickson coming over in Wave 4.
If we scroll up, you sent an email to Jackie Hendrick on February 3rd that said, "Just as an FYI - they are wanting to move HR from PLS to PTD on February 27th. That being said, once Alexis moves on that date, Sunita said she will lose visibility to PLS. At that point she will have absolutely nothing to do. Are you good if I adjust her last date to February 24? Also don't want to move someone over to term them,"

Page 244

correct?
A Yes.
Q So did you and Jackie Hendrick follow through and let Alexis Goluguri go on February 24th?
A No.
Q Did you find something for Alexis Goluguri to do after February 24th?
A Yes. We needed her historical knowledge for a lot of these transfers, just because she'd been with the company for a while, so at least a couple years.
Q I thought Alexis Goluguri moved over from PLH Group to -- to Primoris to -- with PLH Group.
A No. She was at PLS.
Q Okay. So was Alexis Goluguri ever an employee of any Primoris division, department, or company before the PLH-PLS acquisition?
A Okay. When we acquired -- she came from PLH, and she's part of PLS. And then when we acquired them, that is when she moved over after -- obviously during that wave.
Q Okay. And you had Ashley Dickson to provide you historical knowledge about PLS and PLH, correct?
A Yes, but not onboarding.
Q Okay. So these decisions were in flux on -- throughout the month of February, right?

Page 245

MS. PLAGENS: Objection; form.
A Sorry. Please?
Q (BY MS. HOPKINS) Your decisions about what to do with Alexis Goluguri, Ashley Dickson, and Charlotte Chapman-Byrd were in flux in the early weeks of February 2023, correct?
MS. PLAGENS: Objection; form.
A That's -- yes, as every -- with business it's ever changing, so yes.
Q (BY MS. HOPKINS) So, for example, on February 3rd you're saying, hey, let's just get rid of Alexis Goluguri on February 24th, and then you moved down the line a little bit, and you decide, no, wait, we'll keep her. We'll keep her on board longer, right?
A Well, with all the integrations and moving things over, yeah, it was needed.
Q Alexis Goluguri had a relative who worked at the company, correct?
A Yes.
Q And who was her relative who worked at the company?
A Sri Goluguri.
Q What was that person's job title and department?
A He -- I can't recall. He was not under my

group.

Q Were there performance reasons for you to let Alexis Goluguri go?

A There was no final incident that justified a termination.

Q Did Charlotte Chapman-Byrd draft discipline to give to Alexis Goluguri?

A Yes.

Q If -- I share Exhibit 44 and mark it.

(Exhibit 44 marked.)

Q (BY MS. HOPKINS) Is it correct that on December 7th, 2022, Charlotte Chapman-Byrd sent you a draft final written warning notice for Alexis Goluguri?

A Yes.

Q Okay. And then scrolling down, on December 7th, 2022, did Ms. Byrd then email you updated corrective action for Alexis that included her leaving early that day without notification?

A Yes.

Q Okay. Did you approve this getting issued to Alexis Goluguri on December 8th, 2022?

A Again, I saw the email. I don't know if I replied an approval. I can't recall.

Q Okay. There's another email from Charlotte Chapman-Byrd to you on December 16th, 2022, where there's



attached a written warning notice and a final written notice, both for unacceptable conduct. And Charlotte says, "Once approved, I will deliver these to her today."

Does that help you remember whether you had approved any discipline to issue to Alexis Goluguri before December 16th, 2022?

A Again, I can't recall without -- again, if I sent it. I just remember seeing them. I don't necessarily know if I approved them.

Q Okay. This final set, which included a final written warning and a -- a final -- sorry. I'm sorry. A final written warning with a date of December 8th, 2022, and then a second final written warning for December 16th, 2022, were both of those ultimately approved and issued to Alexis Goluguri?

A I don't -- I don't recall if they were ever approved.

Q Did you have any reason not to approve them?

A Again, I can't speak at the time. But again, I can't speak to that.

Q Did you trust that Charlotte Chapman-Byrd had provided correct information about Alexis Goluguri's unacceptable conduct in these written warnings?

A I have no reason to not believe Ms. Byrd.

Q And is there any reason that you would have



denied Ms. Byrd approval to issue these written warnings to Alexis Goluguri?

A Again, I --- I can't speak that, as that's been a long time ago. I can't.

Q Okay. Do you know if there are copies of either of these written warnings in Ms. Goluguri's personnel file?

A Off the top of my head, again, I can't recall.

Q Did Ms. Goluguri continue to have performance problems in 2023?

A When she was under Kelly Wood?

Q Or when she was still under Ms. Byrd.

A Again, I can't -- not that I'm aware of. But again, I don't recall because -- yeah, I don't recall.

Q Did Kelly Wood bring to your attention performance problems that Ms. Goluguri was having after Ms. Goluguri transferred into Ms. Wood's group?

A I don't recall any issues she was having.

Q Did you get any complaints from Ms. Wood about Ms. Goluguri leaving early without telling Ms. Wood that she was leaving early?

A Again, sitting here, I do not recall.

Q When you finally let Ms. Goluguri go, did you let her go for performance reasons?

A She was -- I didn't let her go. But Ms. Wood



did, and it was as a layoff.

Q And was it really for performance reasons?

A No.

Q How do you know that?

A Because obviously it was determined, and I had a final conversation with Kelly at termination, that we were laying her off.

MS. HOPKINS: Okay. I'm marking Exhibit 45.

(Exhibit 45 and Exhibit 46 marked.)

Q (BY MS. HOPKINS) An email from Jackie Hendrick to a number of HR folks, including yourself, Alicia Campbell, on February 23rd. I'm sorry, February 7th, 2023.

This says, "Team: Be sure to work with the functions that fall under your remit," and "Also, keep up with the RIFs for your regions and updating workbooks in a timely manner."

Did you get this email from Jackie Hendrick?

A Yes.

Q Okay. And it had an attachment called, "PLH PIP Tracking," February 7th, 2023," correct?

A Correct.

Q All right. So if we look at the document that

Page 254

A Yes.
Q Okay. All right. And if we look at this email, it's labeled at the bottom Primoris 1486, it continues to 1487 and 1488, and then it has a native file Primoris 1489. I'm going to open 1489 for you. View. Zoom. Okay. All right.
So looking at this Excel Sheet 1489, which is the attachment to the February -- well, first of all, do you know if this was the attachment to Paula Bagony's February 16th email rather than to some other email in the email chain?
A Yes. From what I recall seeing all the exhibits, yes, this is the one that was attached.
Q Okay. So based on your testimony that this is the RIF list that was attached to Paula Bagony's February 16th, 2023, email is there any planned termination date listed for Charlotte Chapman-Byrd on this Excel spreadsheet?
A It doesn't look like there's any term date for anybody there on the RIF.
Q Okay. And if we look on here, there are some other employees besides Ms. Byrd in red, including Franchesska Bell, right?
A Yes.
Q And including Aaron Cooper, right?

Page 255

A Yes.
Q Arnold Gillis is included in red as a RIF, right?
A Yes.
Q Janelle Hasen is included in red as a RIF, right?
A Yes.
Q And Linda Hendrick -- sorry. Linda Henricks is included in red as a RIF on this list, right?
A Correct.
Q And a John Ranstadler is included in red as a RIF on this list, right?
A Yes.
Q And Adrianna Smithee, Alessandra Spencer, and Pamela Whiteson are also included in red on this RIF list, right?
A Yes.
Q And not all of these employees were actually RIF'd, right?
MS. PLAGENS: Objection; form.
A I can't confirm everybody that was RIF'd because that fell under the leadership's responsibility, so I can't speak to the employees.
Q (BY MS. HOPKINS) Okay. This was not a final RIF list, right?

Page 256

A I can't confirm what is the final RIF list.
Q Okay. Just keep in mind that some of the names that I have cited here I'm going to go to an interrogatory response we received from Primoris --
A Yes.
Q -- and these were verified by Jackie Henrick -- Hendrick. And we asked for the full name and effective date of termination for every employee listed in red as a RIF --
A Uh-huh.
Q -- on Primoris 254 to 257, and we have some names here of folks that were -- that we just saw on the RIF list that are still active employees, correct?
A Correct.
Q So Lisa Henricks was never RIF'd. She's a senior accountant, and she's still working for the company, right?
A Correct.
MS. PLAGENS: Objection; form.
(Exhibit 28 marked.)
Q (BY MS. HOPKINS) As far as the February 16th, 2023, Paula Bagony sent with a RIF list, if these verified interrogatories answers are correct, there are at least three employees -- Linda Henricks, Adrianna Smithee, and Alessandra Spencer -- who are still working

Page 257

for the company today and were never RIF'd, right?
A Right. Yes.
Q Okay. So doesn't that tell you that that was not a final RIF list?
A Yes.
Q Were you at a certain point planning on letting Charlotte Chapman-Byrd work until the final wave when all of the PLS employees had transferred over to PTD?
A I can't explain necessarily -- again, the date of her layoff was -- there's a lot of factors. That's when Jackie was able to be available to be present, as we had meetings coming up. We were moving to line of business. So there was a lot of factors.
So to say that was my final decision, I can't confirm that. There's way too many factors involved in this.
Q Isn't it correct that you did not make the final decision to actually terminate Ms. Byrd's employment on February 21st, 2023, until the Tony Gill investigation began?
MS. PLAGENS: Objection; form.
A That is incorrect.
Q (BY MS. HOPKINS) Okay. So one of the factors of you choosing to terminate Charlotte Chapman-Byrd's term- -- employment specifically on February 21st, 2023,

Page 258

was not, based on your testimony, related to the fact that the day before you had asked Tony Gill to review his statement and had a meeting with Charlotte Chapman-Byrd and Tony Gill in his office about the investigation?
MS. PLAGENS: Objection; form.
THE COURT REPORTER: I'm sorry. What was the answer?
THE WITNESS: No, that was not the reason.
Q (BY MS. HOPKINS) Are there any emails, direct messages, calendar invites, anything between you and Jackie Hendrick that would show that Jackie Hendrick was specifically planning to be at the office on February 21st to help you with Charlotte Chapman-Byrd's termination meeting?
A Again, sitting here, I can't confirm that, what we have to show that.
Q What's your testimony of how far in advance that termination meeting was planned?
A Again, I don't recall. There was many moving parts. We had travel. We had meetings to attend. Again, in business things are ever changing, so we're having to continue to keep up.
MS. PLAGENS: I see we've been going about an hour and 20 minutes. Would it be time for another break, or --

Page 259

MS. HOPKINS: Yeah. I only have probably six exhibits left, but I agree we should take a brief break so that we don't all exhaust ourselves. And I will hopefully be done by around 5:30, 5:40. I know we're getting late into the evening, but it shouldn't be too much longer.
MS. PLAGENS: Sure.
THE COURT REPORTER: Off the record.
MS. HOPKINS: I'm going to go off the record at 5:04 p.m.
(Break taken from 5:04 p.m. to 5:15 p.m.)
THE COURT REPORTER: Back on the record at 5:15 p.m.
Q (BY MS. HOPKINS) Okay. Ms. Campbell, earlier in your deposition we had seen this exhibit from February 20th, 2023 where Jackie Hendrick said she tried checking the RIF list and that you were in it.
My question is, what was the RIF list that you were in?
A I don't recall if she's talking about the PLH list, which, again, had "keep" and "RIF" in it. So again, I don't know necessarily at this time what she was talking about.
Q Okay. I'm going to show you two Excel sheets and ask if they were the RIF list that you were in.

Page 260

Were you in a RIF list that looked like this with no planned termination dates on it?
A Again, I -- sitting here now, I can't confirm what I was in.
Q Okay. So you don't know if you were, instead, in a RIF list like this that had a Determination column and a Planned Term Date column?
A No. Because again, both of them are not called RIF lists, so I don't necessarily know what she's speaking about.
Q What is your understanding of what people were referring to when they were referring to RIF list?
A Again, I don't know what Jackie was speaking about at that time.
Q Okay. All right. If we go to Exhibit 47, which I don't think I've marked yet.
(Exhibit 47 marked.)
Q (BY MS. HOPKINS) This is a February 2022 email. The Subject line is, "PLS to PTD Wave 5 Effective April 1, 2023."
Is it correct that on February 22nd, 2023, Sunita sent you an email which listed Charlotte Chapman-Byrd as an employee that would be included in Wave 5 with an effective date of April 1st, 2023?
A Yes.

Page 261

Q So as of February 22nd, 2023, you had not communicated to Sunita Khorana on the integrations team that there was any RIF that had occurred for Charlotte Chapman-Byrd?
A No, as I was out of those waves and Paula Bagony was handling it.
Q Is it correct that Wave 5 employees, the employees who transferred from PLS to PTD in Wave 5, transferred on April 1st, 2023?
A I don't recall.
Q If we look at Exhibit 48.
(Exhibit 48 and Exhibit 54 marked.)
Q (BY MS. HOPKINS) We had sent a set of interrogatories to the company that were verified by you. You signed a declaration.
And in this interrogatory we had asked, "Identify the date that PLS employees included in Wave 5 of the PLS-Auger transfers became employees of PTD." And the answer that was included here was March 20th, 2023.
Do you see that?
A Yes.
Q Do you know if that date is correct or the April 1st, 2023, date in Exhibit 47 is correct?
A I would have confirmed that date, so it would have been the 20th.

Q How would you have confirmed that date before verifying the interrogatory response?
A This would have been confirmed with Angela Schaeffer, who was in charge of those waves.
Q Okay. Have you confirmed with Angela Schaeffer what the date was for the Wave Final transfers from PLS to PTD?
A Again, I may have confirmed that with her, but I -- sitting here, I don't recall sitting here today.
Q Is Angela Schaeffer the best person at the company to ask when the PLS-Auger employees in Wave Final ultimately transferred from PLS to PTD?
A Yes, because she would be in charge of transferring them over. That was part of our HRIS team.
Q During her employment did Charlotte Chapman-Byrd come to you with concerns about Brice Burns referring to black employees as prisoners running the prison?
A She never once came to me about that.
Q Did Charlotte Chapman-Byrd come to you with concerns that Mr. Burns wanted to terminate black employees without providing them the same progressive discipline opportunities that had been provided to non-black employees?
A No, she never brought that to me.



Q Was Kelly Porter let go in 2023?
A I don't recall the -- again, I don't recall the exact date or roughly. He could have been. Again, I can't recall sitting here.
Q Why was Kelly Porter let go?
A It was due to a policy violation.
Q Was it a policy violation involving having a gun at work?
A Yes.
Q Did Ms. Wood -- oh, sorry. Strike that.
Were you Ms. Wood's supervisor in 2023?
A Yes.
Q Have you ever been involved in any other investigation, other than the Tony Gill investigation, where the person making the complaints submitted two different witness statements?
A Again, sitting here, I cannot recall.
Q From an HR standpoint, does it raise a red flag for you that you received two different witness statements from Tony Gill, one of which had references to race discrimination and one of which did not?
MS. PLAGENS: Objection; form.
A Again, it depends on the circumstances. I mean, some people change their statement for many different reasons. However, that's why Kelly Wood met



with him after to go over the fact his statement was changed.
Q And Charlotte Chapman-Byrd met with Tony Gill as well to ask him why he changed his statement, right?
A Oh, I'm not aware of that.
Q Okay.
A Yeah.
Q Did Charlotte Chapman-Byrd do anything wrong by obtaining the witness statements from Tony Gill?
A No.
Q Did you let Charlotte go because of anything she did or did not do during the Tony Gill investigation?
A No.
Q Is Charlotte Chapman-Byrd an HR professional who you would hire again for open positions at Primoris Services Corporation?
A Again, she is eligible for rehire, so she has option to apply. I don't have decision-making on any positions that are across all Primoris. Only within my group.
Q Okay. If Ms. Chap- -- Charlotte Chapman-Byrd applied for an open HR position within your remit and your scope of supervision, is she someone that you would hire again?
A I can't say if I would depending on who the



candidates were, and I would make a decision based on all the candidates for the role.
Q Is she someone you would -- truthfully, is she someone that you would still consider for a position in your group?
A Well, based on false allegations that she has made -- well, not false, but obviously recollections of things that are completely different, again, I can't confirm or deny if we would hire her again.
Q Okay. What false allegations do you believe Charlotte Chapman-Byrd has made?
A Stating that I did not allow her to travel based on discriminatory reasons. Also --
Q Did you --
A Well -- oh. As well, she made a comment that she was testing me. As an HR professional the most important thing you should do is address the claim, not test our manager on what they're going to do. She has also admitted to coming on property after her employment ended.
So I -- I put those into consideration, also as well within -- you know, so that all goes into consideration if that is somebody that I would want in an HR role.
Q All right. Are there any other false

allegations that she has made about you?
A I mean, all of her claims about racial discrimination that I kept her out of meetings, those are completely inaccurate. She was never kept out of meetings.
Also stating that I made Tony change his statement. That is absolutely false. And our discussion was solely around Kelly Wood and him not trusting and clearing that up. So yeah.
Q Did you ever approve Charlotte Chapman-Byrd to travel to Florida?
A Again, there was no need at that point. We were looking at shutting that group down, as there was a lot of things behind the scenes with the PLS acquisition she was not aware of. So there was not a business need at that time. All travel is based on business needs.
Q Back in 2023 did you have any discussions with Rhonda Anderson about Plaintiff Charlotte Chapman-Byrd's termination from the company?
A Not that I'm aware of.
Q Did you have any discussions with Rhonda Anderson about Tony Gill's complaint or the investigation that was conducted by either Ms. Byrd or Ms. Wood?
A Not that I recall.
Q Did Teresa Berry eventually take over providing



HR support for Future?
A Shunte Curtis did. So Shunte Curtis moved to director of HR.
Q Okay.
A And now she's my equal. And then Teresa took over responsibility for PDS --
THE COURT REPORTER: I'm sorry --
A -- after. Now in return I just received it back as of June 1st.
THE COURT REPORTER: I'm sorry. Can you please speak up? I'm sorry.
THE WITNESS: Oh, yeah. It's okay. Sorry. I just received it back as of June 1st, PDS.
Q (BY MS. HOPKINS) Back in 2022 or 2023, were you aware of any conflicts that existed between Shunte Curtis and Colby Sparks?
A No.
Q Okay. As far as a complete list of employees that you claim were laid off in the human resources department as part of this PLS to PTD transfer, are Alexis Goluguri and Charlotte Chapman-Byrd the only two human resources employees who you are stating the reason for their termination was that layoff in particular?
A As well as Patricia Ackerman, who worked for RB Hinkle, which was under me.



Q What was her job titles?
A She was HR generalist.
Q Was she under Paula Bagony?
A Yes.
Q Was she someone who came over from P- -- PLH with RB Hinkle?
A Yes, she was part of the PLH acquisition.
Q And what date was she laid off?
A I don't recall. It was in 2020 -- from what I recall, it was in 2023 sometime.
Q How many months after Alexis Goluguri was let go?
A It was roughly close to the same time or maybe a little bit after, as she was the only HR person with any knowledge of RB Hinkle.
Q Did you ever discuss Charlotte Chapman-Byrd's termination with Jaeson Osborn?
A No.
Q Did you ever discuss the Tony Gill investigation with Jaeson Osborn?
A No.
Q Okay. Let me see. Did Brice Burns disagree with the determination that Joshua Bridges and Timothy Smith should be terminated for the text messages that they sent?



A No. He actually agree to it. He had been on vacation.
THE COURT REPORTER: He had been on vacation?
THE WITNESS: He was on vacation, yes, and he agreed to terminate.
Q (BY MS. HOPKINS) Okay. I am going to share Exhibit 58 with you.
(Exhibit 58 marked.)
Q (BY MS. HOPKINS) Is this the text message chain that ended up with Joshua Bridges and Timothy Smith getting terminated from the company for policy violations?
A Yes.
Q Okay. When you and Ms. Byrd were reviewing this matter, did you determine whether Brice Burns was on this text message thread of the 13 people exchanging these texts?
A I believe Ms. Byrd looked into that. And from what I recall, he was never claimed to be on that text.
Q Ms. Byrd also recommended that Mr. Bridges and Mr. Smith be terminated, right?
A Yes. She took my recommendation to terminate based on anybody that was involved in any racial slurs.
Q And she wanted to terminate them as well,

right?
A She originally wanted to write them up. And we actually discussed this on one of our HR calls with Shunte Curtis, Paula Bagony, and Kelly Wood present, as we'd bring certain circumstances, not give out names. And we had discussed it on our call prior to the termination, as Charlotte had called me right before the term saying she thought about it, but she just wanted to, you know, write them up at that time, where I said, absolutely not, we're going to terminate.
Q Do you have any notes from that HR meeting or anything that would show that Charlotte Chapman-Byrd originally wanted to only discipline these employees rather than terminate them?
A It would just be Shunte, Paula, and Kelly as witnesses.
Q Okay. All right. So Charlotte Chapman-Byrd sent you an email on November 15th, 2022, identifying the list of employees identified in the text messages. She says, "Patrick Conrad was mentioned in the messages but there were not any messages that he engaged in present in the images submitted. How are you wishing to proceed? Brice is aware of the initial two but not Dalton. Would you like me to set a meeting with Conrad to get these officially taken care of today?"



And then you responded that you were okay with not terminating whoever did not engage in the conversation, but that you wanted to terminate anyone who used racial, sexual, or violent terminology, right?
A Yes.
Q There isn't a time stamp on your email here. Do you know when it was sent?
A No, not off the top of my head.
Q Okay.
THE COURT REPORTER: Is that an exhibit?
MS. HOPKINS: Yes. That was Exhibit 57.
(Exhibit 57 marked.)
Q (BY MS. HOPKINS) Is it correct that Brice Burns sent you and Ms. Byrd this email on November 15th, 2022, saying that, "As far as terminations, nothing is approved until there's an email from me"?
A I -- he's more speaking to the hiring, because we were not supposed to be hiring more into that. So yeah.
Q Okay. So your recollection is Mr. Burns didn't send this email because of the situation with the text messages or wanting to approve those terminations via email?
A No.
Q Okay. I just have a question about a different



set of emails between Brice Burns and Charlotte Chapman-Byrd in October about the terminations of some employees with the last name Norman.
A Uh-huh.
Q Did you become aware of any disagreements between Mr. Burns and Charlotte Chapman-Byrd about how either discipline or termination of employees with the last name of Norman should be handled?
A Yes, I recall.
Q All right. What was the disagreement between Mr. Burns and Ms. Chapman-Byrd?
A What I recall, I think Ms. Byrd wanted to do progressive discipline. However, based on the severity and our industry being life or death, based on the circumstances of not grounding, which in turn if you don't ground it equals to electrocution, so based on the severity and keeping an employee safe, Brice wanted to terminate.
Q Were those two employees, Isaiah and Will Norman, black employees?
A I could not tell you.
Q If we scroll down, or scroll up maybe, there's also an employee listed named Terrance Norman.
Were there three Normans, Terrance, Will, and Isaiah?



A I can't confirm it or deny sitting here by -- I only see the first name. So, well, there's a Terrance Norman that is the subject, so I would assume that's the same Terrance they're speaking about.
Q Okay. And if we scroll down this email that Ms. Byrd sent with you copied --
A Uh-huh.
Q -- it talks about this meeting she had with Luke Naron, Terrance Norman, and safety this morning. There's a Bullet Point 4 which says, "Mr. Norman mentioned he felt he was being discriminated against. He expressed his concerns. Terrance was advised by HR that safety rules, job expectations, duties, and work-related behavior, conduct, and expectations for all employees, regardless of position level, race, religion, et cetera, across the board, zero tolerance, zero exceptions."
When you were reviewing Charlotte's summary of that meeting, was it your opinion that she handled that response to Mr. Norman's mention of discrimination in a way that was effective and positive?
A Yes, advising him that we have a zero tolerance for that.
MS. PLAGENS: Alicia, can you speak up a bit?
A Oh, sorry. Yes, that we have a zero tolerance

for that. Sorry.
THE COURT REPORTER: I'm sorry. Did you mark that last email?
MS. HOPKINS: Exhibit 55. If I didn't, I apologize. But it is now marked as Exhibit 55.
(Exhibit 55 and Exhibit 56 marked.)
Q (BY MS. HOPKINS) Was Charlotte Chapman-Byrd removed from supporting Brice Burns's group because of conflict that existed between Mr. Burns and Ms. Byrd?
A No. That group -- well, we also had a mass departure of a group, so that literally went and moved within the PTD groups.
Q (BY MS. HOPKINS) Okay. Have you now developed the opinion that Ms. Byrd put Tony Gill up to reporting race discrimination that never occurred?
A I cannot speak to anybody's motives.
MS. HOPKINS: Okay. All right. I would like a 5-minute break just to chat to see if I have any last questions for you, and then we should be very close to done.
THE WITNESS: Okay.
MS. HOPKINS: I will be back on in 5 minutes, and we'll go off the record at 5:38 p.m.
(Break taken from 5:38 p.m. to 5:47 p.m.)
THE COURT REPORTER: On the record at



5:47 p.m.
Q (BY MS. HOPKINS) I just have a few last questions for you.
First, is it correct that you attended and listened to the deposition testimony of Paula Bagony?
A Yes.
Q And did you attend and listen to the deposition testimony of Charlotte Chapman-Byrd?
A Yes.
Q Did you attend and listen to the deposition testimony of Colby Sparks?
A Yes.
Q Was Colby sparks inaccurate when he said that all of his employees transferred to Teresa Berry in 2023?
A No. They transferred to her HR remit.
Q Okay. And when did that happen?
A We started that transfer in the middle of March.
Q Okay. Sitting here today, can you pinpoint an exact date when you decided that Charlotte Chapman-Byrd's last day at the company would be February 21st, 2023?
A I can't recall an exact date, no.
Q When you are sitting before the jury in the trial of this case, what are you going to say about the timeline in terms of when you decided, if not an exact



date?
A That it was decided before the 16th when Paula sent out that email.
Q Okay. And what evidence will you be able to present to show that February 21st was chosen as the termination date for Ms. Chapman Byrd either on February 16th or before that date?
A That -- Paula's email.
Q Paula's email that doesn't have a planned termination date for Ms. Byrd on it is the only thing that you can provide?
A And again, obviously if there are emails with Jackie letting her know that she was coming in, and obviously Jackie was aware of the situation too as well. But --
Q Earlier --
A Go ahead.
Q Go ahead.
A No. Just we only presented that information based on the next wave that was coming up, so...
Q I want to pull that exhibit up one more time.
This right here, this exhibit that we're talking about --
A Yes.
Q -- right here, these red highlights for



Charlotte Chapman that lists her as a RIF, did you make those highlights in that document?
A I can -- I cannot confirm or deny if that was me or not, again.
Q Did you instruct Paula Bagony to make that highlight?
A I do not recall if it came from me or Jackie, just because Paula got put in to having to complete that.
Q Okay. And is there any paper trail of when that instruction was given to Paula Bagony?
A Again, I -- sitting here, I cannot tell you and pinpoint exact documentation to show when that was given.
Q All right. Early on in the deposition, I had asked you what the consequences would be if an em- -- company failed to enforce its retaliation policy. And I believe you said there could be legal ramifications for the company.
A Yes.
Q Can there also be ramifications for an employee if an anti-retaliation policy is not enforced?
A Yes.
Q And what are the potential consequences for an employee if retaliation is allowed to occur?
A Termination.
Q What is the consequence for an employee of

A Yes.

MR. HOPKINS: All right. I have no further questions for Ms. Campbell. I'll pass the witness.

MS. PLAGENS: Reserve our questioning for time of trial.

May we get 30 days to read and sign the transcript?

THE COURT REPORTER: Yes, noted.

And really quick. To both counsel, did you want to order a copy of the transcript?

MS. PLAGENS: My paralegal will commun- -- we don't want a hard copy. We just want digital.

MS. HOPKINS: And for the Plaintiff's side, we will hold -- we will hold off on ordering at this time, and we'll let you know if we need a copy.

Before we conclude, Ms. Mabry does have to go back on the record and read the sign-off.

If -- do you have anything else, Ms. Hassell?

THE COURT REPORTER: Not for today. Thank you.

MS. HOPKINS: Okay. Oh, we can't hear you, Ms. Mabry.

THE DEPOSITION OFFICER: It would help if



I unmute. Can you hear me now?

MS. HOPKINS: Yes, ma'am.

THE DEPOSITION OFFICER: Okay. Thank you.

Thank you, everyone. This does conclude our remote video deposition proceeding for today. The current time is 5:59 p.m.

(End of proceedings at 5:59 p.m.)



CHANGES AND SIGNATURE

PAGE/LINE CORRECTION REASON FOR CHANGE

________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________
________________________________________________

I, ____________________, have read the foregoing deposition and hereby affix my signature that same is true and correct except as noted herein.

________________________
ALICIA CAMPBELL
CA# 3:24-cv-2767

STATE OF ______________ )

Subscribed and sworn to before me by the said witness, ALICIA CAMPBELL, on this the _____ day of ______________, 2025.

______________________
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

My Commission Expires:



STATE OF TEXAS )

I, Kelly Hassell, RPR, CLR, CSR, in and for the State of Texas, do hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 8th day of December, A.D., 2025, at 10:01 a.m., located in the City of Aledo, State of Texas, the following named person, to wit: ALICIA CAMPBELL, who was by me duly cautioned and sworn to testify the truth, the whole truth and nothing but the truth, of her knowledge touching and concerning the matters in controversy in this cause; and that she was thereupon carefully examined upon her oath, and her examination was reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, same to be sworn to and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties; and that the amount of time used by each party at the deposition is as follows:

Ms. Hopkins - 6 hours, 39 minutes;

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

Page 286

I further certify that, before completion of the deposition, the Deponent and/or the Plaintiff/Defendant did request to review the transcript.

In witness whereof, I have hereunto set my hand and affixed my seal this 20th day of December, A.D., 2025.

Kelly Hassell
KELLY HASSELL, CSR No. 5729
Cert. Expires 10/31/26
Veritext Legal Solutions
Veritext Registration No. 571
300 Throckmorton Street
Suite 1600
Fort Worth, Texas 76102
(817) 336-3042
Job No. 7781923

Page 287

COUNTY OF ____________________ )
THE STATE OF __________________ )

I hereby certify that the witness was notified on ___________________________ that the witness has 30 days or (____________ days per agreement of counsel) after being notified by the officer that the transcript is available for review by the witness and if there are changes in the form or substance to be made, then the witness shall sign a statement reciting such changes and the reasons given by the witness for making them:

That the witness's signature was/was not returned as of __________________________________.

Subscribed and sworn to on this, the 20th day of December, 2025.

Kelly Hassell
KELLY HASSELL, CSR No. 5729
Cert. Expires 10/31/26
Veritext Legal Solutions
Veritext Registration No. 571
300 Throckmorton Street
Suite 1600
Fort Worth, Texas 76102
(817) 336-3042
Job No. 7781923

Page 288

Christine A Hopkins, Esq.
christine@tremainartaza.com

December 24, 2025

RE: Chapman Byrd, Charlotte v. Primoris Services Corporation Et
12/8/2025, Alicia Campbell (#7781923)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (Erratas-CS@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

# PLAINTIFF'S
# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CHAPMAN BYRD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | |
| | ) | CIVIL ACTION |
| PRIMORIS SERVICES | ) | NO. 3:24-cv-2767-N |
| CORPORATION, PLH GROUP | ) | |
| INC., POWER LINE SERVICES, | ) | JURY TRIAL DEMANDED |
| INC., and FUTURE | ) | |
| INFRASTRUCTURE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

------------------------------------

ORAL DEPOSITION OF
JACKIE HENDRICK
JANUARY 7, 2026
(REPORTED REMOTELY)

------------------------------------

ORAL DEPOSITION OF JACKIE HENDRICK, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on January 7, 2026, from 9:32 a.m. to 4:55 p.m., via Zoom, before Amber Garcia, Notary Public in and for the State of Texas, reported by machine shorthand, pursuant to the Federal Rules of Civil Procedure.

Job No. CS7797576

Page 26

be paid by Primoris Services Corporation?
MS. PLAGENS: Objection, form.
A. Okay. I don't know.
Q. (BY MS. HOPKINS) Okay.
MS. PLAGENS: And, Jackie, the only time you don't answer when I say, "Objection, form," is if I instruct you not to answer. Okay?
THE WITNESS: Oh, okay. Sorry. I forgot. Sorry.
Q. (BY MS. HOPKINS) That's okay. This is a unique experience. We'll get through. But I do want you to tell me if you don't understand the question.
A. Okay.
Q. All right. Did anyone from the chief financial officer's office ever tell you that you could not pay an HR manager who was reporting Teresa Berry under the Company Code 100 for Primoris Service Corporation?
A. No.
Q. Was the entire recruiting team paid by Primoris Services Corporation?
A. Yes.
Q. Okay. So regardless of which subsidiary a recruiter was recruiting for, they were all paid by Primoris Service Corporation?
A. Correction. I need to correct myself. Leslea

Page 27

Scott was in 100, and I believe the recruiters may have been into the -- whatever business they were supporting, they were hired into their businesses. So I -- I don't remember that group. I don't remember. I don't want to mis- -- misstate.
Q. Okay. Was Mike Wade, who was a senior recruiting business partner for PLH Group, laid off in 2023?
A. No.
Q. Was Karina Alvara, who had responsibilities for recruiting for PLH as well as other entities, laid off in 2023?
A. What date is this -- this org -- org chart, so I can see?
Q. Yes. The date on this one, if we go to the first page, is November 2022. And it says as of November 28th, 2022.
A. I just needed the point in time.
Can you re-ask the question?
Q. Certainly. Is it correct that this chart reflects that Karina Alvara had responsibilities for recruiting for PLH, as well as other entities as of November 28th, 2022?
A. Yes.
Q. Okay. Was she laid off in 2023?

Page 28

A. No.
Q. Were any of the recruiting -- was any of the recruiting staff laid off as the result of PLS -- the PLS employees being transferred to PTD in 2023?
A. No.
Q. All right. At any time in 2023, did anyone from operations sit down with you to go over the human resources organizational chart with an eye towards deciding who would be retained versus let go?
A. One more time with the question, so I understand.
Q. Yeah. In 2023, at any point in time, did anyone from operations go over your organizational chart with you to discuss who should be retained and who should be let go?
A. No.
Q. In 2023, is it correct that PLS was merged into PTD?
A. Repeat the question. I didn't hear.
Q. In 2023, was PLS merged into PTD?
A. Yes.
Q. And did jobs that PLS was completing transfer to PTD?
A. I don't know.
Q. Was part of the merger of PLS into PTD, did it

Page 29

include a transfer of some jobs, some equipment, and some employees?
A. Yes.
MS. PLAGENS: Objection, form.
Q. (BY MS. HOPKINS) Overall with the merger of PLS into PTD, is it true that the vast majority of PLS employees were retained during that -- that merger process?
MS. PLAGENS: Objection, form.
A. Repeat the question.
Q. (BY MS. HOPKINS) Sure. Let me back up.
Before PLS was merged into PTD, approximately, how many employees worked for PLS?
A. I don't know.
Q. Do you know how many employees lost their jobs as a result of any layoffs or reductions in force connected with the merger of PLS into PTD?
A. I don't know the exact number.
Q. What document would you look at to determine how many PLS employees remained employed by the company after the merger?
A. That wasn't handled at my segment level. Those were handled in the regions with the presidents under HR. These were handling -- reviewing their -- their charge, their populations, so I wouldn't have those -- I

Page 30

wouldn't have that information at my level. It would roll up to us. They would make decisions, and they would roll up, and they would go through what -- what -- who was keeping, who was transferred, so that would be determined at the -- the business level in operations with their HR leaders.

Q. Okay. In 2023, were you generally aware that there were going to be multiple waves of employees who were transferred from PLS to PTD?

A. Yes.

Q. And how many waves were there going to be of transfers of PLS employees to PTD?

A. I don't remember. We've done a lot of integration. I can't remember all the waves.

Q. Okay. Is it accurate that there was no reduction in force of Future Infrastructure employees in 2023?

A. I don't know. I can't answer that.

Q. Was there any reduction in force of PDS Southwest gas employees in 2023?

A. Wait. Repeat the question. What -- what -- what business unit?

Q. Was there any reduction in force in PDS Southwest gas employees in 2023?

A. I don't remember.

Page 31

Q. Do you plan on continuing to work for Primoris Service Corporation for the foreseeable future?

A. Yes.

Q. Is there any medical or family reason why you would not be able to attend a trial in Dallas in this case in April of 2026?

A. No.

Q. Back in November of 2022, where did you work from?

A. The Dallas office. And I was a hybrid, so I had the Dallas office, there was a hotel office in the Everman office, or with traveling or home.

Q. When you mention a "hotel office" and an "Everman office," are those two different places or the same place?

A. It's the same. Same place.

Q. Okay. And so there's a Dallas office, and then the Everman office?

A. Yes.

Q. And then also you would work from home; is that correct?

A. Yes.

Q. What city was your home located in at that time?

A. Mansfield.

Page 32

Q. Is -- in 2022, was the Dallas office where Alicia Campbell officed from?

A. Can you repeat the question?

Q. Sure. In 2022, did Alicia Campbell office out of the Dallas office?

A. Oh, no. I wanted to make sure I heard the right location. No.

Q. Did she work out of the Everman office?

A. Yes.

Q. Okay. From -- I want to focus on the time period of Ms. Charlotte Chapman Byrd's employment, which was October 2022 to February of 2023 approximately. In that time frame from November 2022 to February 2023, how frequently did you office out of the Everman office?

A. Not frequently.

Q. Did you have any schedule where you made sure to go to the Everman office every week?

A. No.

Q. Did you have any type of schedule where you made sure to visit the Everman office every month?

A. Yes.

Q. Okay. If you had to give your best estimate of how many times a month you visited the Everman office in the November 2022 to February 2023 time frame, what would be your best estimate?

Page 33

A. I would say two.

Q. Did Kristie Madison also office out of the Everman office during the November 2022 to February 2023 time frame?

A. Yes.

Q. Had you ever had a one-on-one meeting with Kristie Madison?

A. Yes.

Q. When did you have a one-on-one meeting with Kristie Madison?

A. I don't remember the month.

Q. Did you have a one-on-one meeting with Kristie Madison the day that Charlotte Chapman Byrd was terminated?

A. It wasn't -- yes. It wasn't a preplanned meeting, but yes.

Q. Did you have a one-on-one meeting with Kristie Madison right after you terminated Charlotte Chapman Byrd?

A. When Charlotte was laid off, I think -- yes, it was the same day. I was leaving the office walking out.

Q. Okay. In terms of the -- the sequence of events that day, were you in the termination meeting with Charlotte Chapman Byrd first, and then subsequently in the meeting with Kristie Madison?

A. Yes.
Q. Why did you have a one-on-one meeting with Kristie Madison that day?
A. I was leaving the office after Charlotte was laid off, and I know -- I know the two were friends, so I went by her office. I was walking out to leave for -- to go to the Dallas office, and her door was open, so I, you know, went in, said "Hello." I shut the door and I just said, "Hey" -- because I knew those two were friends. And I just let her know, "Hey," you know, I checked on her, see how she's doing, you know, small talk.
And, you know, after we said our pleasantries, I just said, "Hey, I just want to let you know that Charlotte's no longer with the company." And it, you know, did take her by surprise. And I just said, "I wanted to let you know that she's no longer with us, and I know you two are friends."
And I said, "So I just, you know, ask you" -- and I don't tell people who to be friends with outside of work, but when she's no longer here, please don't discuss work activities because HR -- all of our items are still confidential. And, you know, I would just appreciate that she would keep, you know, her friendship and her work relationship separate with



Charlotte. And that was it, and I left.
Q. Okay. I am going to -- have you read Kristie Madison's witness statement that she wrote in this case?
A. Yes.
Q. I am going to mark that as Exhibit 4.
(Exhibit Number 4 was marked.)
Q. (BY MS. HOPKINS) Okay. For Ms. Madison's statement, I want to first ask, is it correct that Ms. Madison worked for Primoris Service Corporation from October 3rd, 2022, to June 22nd, 2023?
A. That seems right.
Q. Okay. And did she work in onboarding?
A. Yes.
Q. Okay. I'm going to scroll to the second page of the statement. Ms. Madison says that she was in her office and that you barged into the office and shut the door, and that it was highly unusual, because while you did on occasion visit our building, she had never had a one-on-one meeting with you. Had you ever had a one-on-one meeting with Kristie Madison prior to the day Charlotte Chapman Byrd was let go?
A. I don't remember.
Q. Okay. Ms. Madison says that you proceeded to stand in her -- in -- stand there in silence in her office with the door shut behind you; is that accurate?



A. No.
Q. Did Ms. Madison ask you if everything was okay?
A. No.
Q. Is it accurate that you told Ms. Madison that you had let Charlotte go?
A. No.
Q. Okay.
A. That's not the phrase I used.
Q. What is the phrase that you recall using?
A. Charlotte was no longer with the company.
Q. Okay. Did you tell Ms. Madison that Charlotte was not a good person?
A. No.
Q. Did you tell Ms. Madison that she should not contact Charlotte?
A. No.
Q. Did you tell Ms. Madison that it was in her best interest not to reach out to Charlotte?
A. No.
Q. Did you tell Ms. Madison why Charlotte was no longer with the company?
A. No.
Q. Did you tell Ms. Madison that Charlotte Chapman Byrd had been laid off?
A. No.



Q. Did you tell Ms. Madison that Charlotte Chapman Byrd had been let go as a reduction in force?
A. No.
Q. Why -- why did you not do that?
A. Because it wo- -- because that would have been a colleague of hers, and I just said she's no longer with the company. That's standard language. You know, she was just a -- so she was not -- she was a colleague of Charlotte's -- or sorry. She would have actually been an -- a subordinate of Charlotte. She didn't report to Charlotte.
But I would not go and disclose the reasoning. I just knew that they were friends, and I wanted to make sure that we kept the professional and personal relationship separate. And I did not disclose the reason.
Q. Did -- do you feel that you said anything to Ms. Madison that would have led her to believe that Charlotte Chapman Byrd was terminated for cause rather than as part of a layoff or reduction in force?
A. No.
Q. Ms. Madison says she's not certain of the timing, but on a later occasion, you also reached out to her to have a call with her. Do you recall having another call with Kristie Madison sometime after you

about Charlotte Chapman Byrd's termination before Charlotte Chapman Byrd was terminated?
A. Yes.
Q. How many phone calls did you have with Alicia about Ms. Byrd's termination?
A. I can't count them. We started our conversations about her layoff and some other layoffs in December -- I want to say Dec- -- let me get the dates right. December 2022, because -- yes, because I got -- it was -- all this was happening the same year. I was brand new with the company, so I'm trying to keep the dates straight.
So in December 2022, our first initial conversation about the layoffs with -- with Alicia to do with the various people on her team, and we had a conversation specifically about Charlotte, and, maybe, a couple other members, you know, on -- on -- on Charlotte's team. And I didn't want to talk about layoffs at Christmas. I just -- and that's why I remember, because I didn't want to lay people off at Christmas.
And I just instructed Alicia, I said, "Hey, work with your ops team. I know they're being staged out in phases." We were doing -- doing layoffs in phases or waves. So, you know, we could talk about it



into the following year, but let's just table any layoff conversations for -- during the holiday.
Q. Okay. After the holiday, what is the next time you recall speaking with Ms. Campbell about Ms. Byrd?
A. I'm thinking. Sorry for the pause. I'm trying to think of the dates, what was going -- there was a lot going on in that time, so Christmas...
I want to say in January, because we were still talking about -- at that time, we couldn't -- Alicia was still trying to figure out how she was staging her team layoffs. We had a lot of -- you know, we weren't the only function. There were lot of functions that were having to time out their layoffs, and, you know, how can we, you know, reduce the work, what are we going to do with the work and such, so I know we talked about in January, probably would be the second time after the holidays, of 2023.
Q. Okay. In January of 2023 after the holidays, was the discussion centering around Charlotte Chapman Byrd, Alexis Goluguri, and Ashley Dickson?
A. And there's somebody else missing off that list, but yes.
Q. Okay.
A. She was the R.B. Hinkle HR manager, I believe, or she might have been the generalist. Sorry. I can't



remember which -- what her title was. But those were the four people, yes.
Q. Was it Patricia Ackleman?
A. Yes. Thank you.
Q. Okay. As of the first conversation you had with Alicia Campbell after the holidays, was it decided that Alexis Goluguri would be laid off, but Ashley Dickson and Ms. Byrd would be retained?
A. No.
Q. What was the conversation at that point in time?
A. From my knowledge, and it was -- they were always scheduled to be laid off. And I'll -- again, I wasn't that into those layers. That was being handled by Alicia. But to my recollection, they were all staged to be laid off. I don't know exact waves they were going to be in, but they were working on that in -- under Alicia's level.
Q. Ashley Dickson was never laid off, correct?
A. Ashley... Correct. I think she resigned.
Q. Was Alexis Goluguri ever laid off?
A. Yes.
Q. Do you know her last date of employment?
A. I don't.
Q. Do you know who would have that information?



A. Yes. Alicia. This was her team, so she would have had the dates.
Q. To the best of your recollection, did Alexis Goluguri remain employed with the company after Charlotte Chapman Byrd was left -- let go?
A. Yes.
Q. To the best of your recollection, did Alexis Goluguri remain one of your HR employees through May of 2023?
A. I don't remember the date, so I don't remember the date.
Q. Was Patricia Ackleman ever laid off?
A. Yes.
Q. When was she laid off?
A. I don't remember the date.
Q. Did Patricia Ackleman remain employed by the company after Charlotte Chapman Byrd was let go?
A. I don't remember the date. I'm sorry.
Q. Have you searched to see if there is anything in writing between you and Ms. Campbell, whether a Teams message or a text, that would confirm when you first started discussing the possibility of laying off Charlotte Chapman Byrd?
A. Yes.
Q. Okay. What exists?

A. Nothing. We weren't writing.
Q. O- -
A. That might have been a short conversation. We weren't writing in -- in that holiday time frame.
Q. Did you ever get to the point where you and Ms. Campbell put anything in writing about when you made the de- -- I'm sorry. I'll start again.
A. Okay. Yeah. Somebody said something right over you. Sorry.
Q. Was there every a point before Charlotte Chapman Byrd was let go where you created any documentation in which you were approving Ms. Charlotte Chapman Byrd's separation from the company?
A. I'm sorry? Repeat one more time. I'm not sure if I'm understanding your question.
Q. Sure. Let me -- let me -- let me back up and ask something else first.
A. Okay.
Q. It might help.
A. Okay.
Q. Was there a point in time where Ms. Campbell had to come to you to get approval to let Charlotte Chapman Byrd go?
A. Not necessarily approval, because the HR directors, they -- they -- they drive their teams and



their staffing, and -- and -- but I do -- anybody who's going to be terminated off the HR team, I want to -- I want to know about it. Just, you know, understand what's going on, why were they chosen, you know, or somebody -- if it's performance, if it's a reduction, I definitely will have that discussion with my leaders, but they determine their staffing, you know, and the timing of that staffing, so there -- that's -- that's the way we work. So I don't necessarily need to approve them, but I definitely wanted to have those discussions.
Q. Okay. Is there anything in writing from you approving Charlotte Chapman Byrd's termination or layoff from the company?
A. No.
Q. Did Ms. Campbell ask for your approval to let Charlotte Chapman Byrd go?
A. No, that's not -- it was more of a discussion. I -- she -- I supported her decision, so that -- but that wasn't meaning she was asking for my approval. But I supported the decisions and what reductions she was making on her team.
Q. Okay. Ms. -- were you in a termination meeting where Ms. Campbell let Charlotte Chapman Byrd go?
A. Yes.
Q. Was it your understanding at the time that



Alicia Campbell was the one who made the decision to let Charlotte Chapman Byrd go?
A. Yes.
Q. Has that understanding ever changed?
MS. PLAGENS: Objection, form.
A. Clarify. Yeah, I didn't understand -- can you clarify the question?
Q. (BY MS. HOPKINS) Sure. At any subsequent point in time, did you obtain information in which your understanding changed about who had been the one to make the decision to terminate Charlotte Chapman Byrd?
A. I'm not sure if I'm understanding your question. I'm sorry.
Q. Sure. Sure.
A. Okay.
Q. As of the date you were in the meeting with Ms. Byrd and she was being let go --
A. Right. Yeah.
Q. -- it was your understanding that Alicia Campbell had made the decision to let Charlotte go, correct?
A. Correct.
Q. Do you -- do you still have that same understanding sitting here today?
A. Yes.



Q. Okay. Has anyone ever told you that someone else made the decision to let Charlotte Chapman Byrd go other than Ms. Campbell?
A. No.
Q. How -- from the best of your recollection, how far in advance did Alicia Campbell invite you to attend the meeting where Charlotte Chapman Byrd was going to be let go?
A. It would have been the beginning of February when we were planning, because we were trying to coordinate schedules. So it was -- it was the month that we laid her off, because she was laid off in Feb- -- yeah, February. So at the beginning of that month, trying to coordinate the schedules, and when I would come out to -- to witness the layoff.
Q. What is your testimony as to the first date that you were told by Ms. Campbell that Charlotte Chapman Byrd was definitely going to be let go?
A. I can't give you an exact date. The -- the -- the original conversation -- they all originated that -- the time before Christmas is when we were having those initial discussions. So the decision was made then to my understanding. I just didn't want to let people go during the holidays. I- --
Q. So --

Q. At the time that Alicia Campbell spoke to you about that investigation, did she share with you that it was an investigation into race discrimination allegations?
A. I don't remember. It was the day before -- it wasn't -- again, it was just a case she was working on. I don't think specifics were discussed. I don't even know exactly what -- when -- I didn't get full knowledge of that investigation until later, so I don't know. But during that conversation that -- when we were planning her reduction, "her reduction," meaning, we were not talking specifics about that case at that time.
Q. Okay. So just to confirm, as of February 20th, 2023, which was the day before Charlotte Chapman Byrd's termination, you did not know what the Tony Gill complaint or investigation was about at all?
A. No.
Q. Did Alicia Campbell tell you about any meeting she had had in her office with Tony Gill and Charlotte Chapman Byrd on February 20th, 2023, prior to letting Charlotte go?
A. No.
Q. Did she tell you later after Charlotte was let go about any meeting she had with Tony Gill and Charlotte Chapman Byrd on February 20th, 2023?



A. I don't remember. I don't remember the sequence of events. I just -- I remember the case afterwards. I can't tell you that.
Q. Okay. Do you have -- back in 2023, were you using a work calendar?
A. I was.
Q. What work calendar were you using?
A. Outlook.
Q. Did you have the February 21st, 2023, meeting with Charlotte Chapman Byrd and Alicia on your work calendar?
A. I don't remember.
Q. Had you put down on your work calendar that you were going to be at the Everman office on February 21st, 2023?
A. I don't remember.
Q. Is there any --
A. I don't know -- I don't know if I would put that on my calendar. That's the thing, I don't remember. And, I mean, I can always go lo- -- back and look. I didn't -- I didn't know that was something I needed to know. I would have looked, but I don't remember if I would put that on my calendar or not.
Q. Okay. Have you been -- have you looked for any documentation such as meeting invitations that were sent



to you that would show when you first planned to be at the Everman office on February 21st, 2023?
A. So -- okay. Can I ask you to -- can you say it one more time to make sure I'm answering it right?
Q. Sure. Let me back up. Okay. For other meetings that other HR employees have scheduled in this case, I have seen things like a -- a meeting invitation that's gone out. So, for example, you know, in January, a meeting invitation goes out from Shunte Curtis to Charlotte Byrd saying, "We're going to meet in the Mesquite office on this date," and it's a meeting invitation, and it shows the date that the meeting invitation was sent.
A. Okay.
Q. Do you know if a meeting invitation exists where Alicia Campbell invited you to a meeting at the Everman office on February 21st, 2023?
A. No.
Q. Just so I can clarify what you meant by "no," "no," it doesn't exist, or "no," you don't know whether or not it exists?
A. No, I don't know whether or not it exists.
Q. Okay.
A. I can't remember that far back. On -- on what meeting -- I know we had a discussion, and I -- in the



day before, and I just re- -- I -- from my recollection, we discussed a time -- I don't even remember the time. I just remember the day before, "Okay. This is what we're going to do. I'll be there at this time, and then we'll, you know, meet with Charlotte for her reduction."
Q. Okay. Is it accurate that you were not confirmed to come to the Everman office to meet with Alicia Campbell and Charlotte Chapman Byrd until the day before, February 20th, 2023?
A. Yes.
Q. Okay. So it was February 20th, 2023, that you confirmed with Alicia that you were going to come to the Everman office the next day to have the meeting with Ms. Byrd and Ms. Campbell in which Ms. Byrd was let go?
A. Correct.
Q. And that had not been decided at any prior point in time?
A. Well, it was decided -- yes, it was decided prior to that in the beginning of February. In fact, we had a different date. Again, these dates, going back into my recollection, in the beginning of February, we had a different date. She was going to go in one of the waves.
But because of my schedule, I -- I'm the one who moved the date up, because I think we were going

to meet her o- -- with her on a Friday, and I said, "Hey, I've got" -- you know, I said, "A couple of things popped up on my calendar where I couldn't be there," and I was going out of town -- the corporate office asked me to go visit one of our HR direct- -- or, I mean -- sorry -- one of our operations vice presidents in his location. So I said, "Alicia, I can't be there Friday, but can we move up her meeting?"

So we were having discussions, because I said, "Can we move that meeting that we had discussed earlier in February from that Friday to that" -- I believe it was a Wednesday -- no. Maybe it was a Tuesday or a Wednesday. It was -- so it was earlier in the week.

That's why when I talked to her on the 20th, I said, "Okay. Let's -- let's coordinate this, and I'll be there on the next day." But we were supposed to meet, I think, later in that week. Again, I might be messing up the time frame a little bit. We were going to do it on a Friday, but I moved it up to a Tuesday or it may have even been a Monday. I'm sorry. I can't remember the dates. I don't have the calendar in front of me.

Q. Is it true that at some point, the plan was to have Charlotte Chapman Byrd continue to work for the



company through at least through May of 2023?

MS. PLAGENS: Objection, form.

A. No.

Q. (BY MS. HOPKINS) Was it the plan at some point in time for Ms. Charlotte Chapman Byrd to work for the company at least through April of 2023?

MS. PLAGENS: Objection, form.

A. No. Sorry.

Q. (BY MS. HOPKINS) Was it the plan at a certain point in for Charlotte Chapman Byrd to continue to work for the company through the end of March 2023?

MS. PLAGENS: Objection, form.

A. No. I don't know of any other plan, just the one in February.

Q. (BY MS. HOPKINS) Okay.

MS. PLAGENS: Christine, we've been going over an hour. Would there be a good time for a break soon? I don't want to interrupt your train of thought.

MS. HOPKINS: Yes, let's take a break. How long would you like for a break?

MS. PLAGENS: 10 minutes.

MS. HOPKINS: That sounds great. I'll pause the recording.

THE REPORTER: All right. Going off the record at 10:45 a.m.



(Recess taken from 10:45 a.m. to 10:58 a.m.)

MS. HOPKINS: We are back on the record at 10:58 a.m.

Q. (BY MS. HOPKINS) Ms. Hendrick, is there any documentation to show what -- go ahead.

A. Yeah. Before -- before we get started, I wanted to make a correction for the record. Earlier, when you asked me, I want to update my testimony, that -- you asked me when we obtained or purchased PLH, how many employees approximately in that head count, I said 15 to 2,000 employees -- 1,500 to 2,000 employees, but I do need to make a clarification. Only a thousand of those employees from PLH were put under utilities. The other -- the other population was spread out to the other segments, so only -- we absorbed 1,000 into our utilities segment.

Q. Okay.

A. Not the -- not the full 1,500 to 2,000.

Q. Thank you for clarifying that for me. Just one other point of clarification on that. When you absorbed the 1,000 PLH employees, did that include the PLS employees?

A. Yes.

Q. Okay. So any employees that you gained as part



of the PLH or PLS acquisition are encompassed in that 1,000 head count number?

A. Yes. Yes.

Q. Okay.

A. And additionally, there's one more thing that I wanted to clarify as well. When you asked me earlier does the HR leaders have to get my approvals for all their terms, they definitely have to come to me. Every -- I review all of their -- anything in our function, and reductions or performance if they're let go, they -- they all have to be ran by me. So I wanted to make clear that in order to get my support, you know, we talk through that case, but I wanted to make -- go on the record and say all -- anything in HR, my team does run by me.

Q. Okay. That's fair. Let me ask you a follow-up question. Is it your expectation that when one of your directors or managers come to you to run a termination or layoff by you, that they share accurate information about why they want to proceed?

A. The HR managers would not review terms with me. It would be -- it would roll up to the directors, and then they would review anything on their team with me.

Q. Okay. Then let me --

A. So --

Q. -- rephrase the question. Was it your expectation that when your HR directors ran a termination or a layoff by you, that they shared with you accurate reasons for the termination or layoff?
A. Yes.
Q. Okay. Is there any documentation to show what other date you were considering for Charlotte Chapman Byrd's termination other than the February 21st of 2023 date?
A. I don't know.
Q. Did Alicia Campbell run Charlotte Chapman Byrd's termination by you before you actually terminated her?
A. Yes.
Q. When Ms. Campbell ran this by you, did Ms. Campbell share any performance-related reasons for wanting to let Charlotte Chapman Byrd go from the company?
A. No.
Q. Did Alicia Campbell inform you of any misconduct or policy violations that resulted in her deciding to let Ms. Charlotte Chapman Byrd go from the company?
A. No.
Q. In terms of reasons that Ms. Campbell shared



with you for letting Charlotte Chapman Byrd go, sitting here today, what do you remember was shared with you as far as the reasons for letting Charlotte Chapman Byrd go?
A. It was a reduction of force was the reason. PLS was being shuttered. The group that Charlotte supported, and along with some other team members.
Q. Okay. At the time, you understood that just because PLS as an entity was no longer going to exist, that you and your utility segment were still going to have to support all of the PLS employees who were transferring from PLS to PTD, correct?
A. Yes.
Q. Okay. So was there a discussion with Ms. Campbell about why Ms. Byrd would not continue to support all of her PLS employees as they transitioned and transferred into PTD?
A. No.
Q. Okay. Did Ms. Campbell share any rationales with you for letting Ms. Byrd go instead of having Ms. Byrd continue to support the PLS employees that transferred to PTD?
A. Can you rephrase that question? Want to make sure I understood that right.
Q. Sure. And I'm just trying to drill down,



specifically, on what Alicia Campbell told you when she was running the termination by you. And I want to know if it was just generally, "This is going to be a reduction in force," or if there were more specifics and specific rationales?
A. It was general.
Q. Okay. So Ms. Campbell didn't have any specific conversation with you about whether it would be better to have Ms. Byrd or Ms. Wood or Ms. Bagony support the PLS employees who were transitioning into PTD?
A. No.
Q. Okay. And did Ms. Campbell have any discussion with you about why -- why the decision would be to let Ms. Byrd go rather than have Ms. Byrd continue to support Colby Sparks's group?
A. No.
Q. Okay. Were you aware at the time that Ms. Byrd was let go that she had been providing HR support for Colby Sparks's group?
A. No.
Q. Okay. Now, I want to move forward to the actual day that Ms. Byrd was let go. Did you sit in on an in-person meeting between Ms. Byrd and Ms. Campbell?
A. Yes.
Q. Who led the meeting?



A. Alicia.
Q. And how did Ms. Campbell start off the meeting?
A. I don't remember verbatim.
Q. What did Ms. Campbell -- did Ms. Campbell tell Ms. Byrd that she was being terminated?
A. No. She told her she -- we were -- we were doing a reduction of force, and that -- and I'm speaking in general, so this is not verbatim. But just she was being laid off, she was selected for the reduction of force, and then she went ov- -- she had a package prepared for Ms. Byrd, and delivered that package. It wasn't a very long conversation.
Q. Okay. When you refer to a "package," do you mean a severance package?
A. Yes.
Q. Okay. Had you approved the offering of that severance package to Ms. Byrd?
A. I didn't see it, but I approved that Alicia could prepare one.
Q. Okay. Did Ms. Byrd say anything during that meeting?
A. I don't remember. I don't know. It wasn't a very long conversation.
Q. During the meeting, did Ms. Byrd express concern to you about how the Tony Gill investigation was

going to be handled in light of her being let go from the company?
A. Yes. She brought up the To- -- she said -- we asked, you know, if there's any work to offload. She brought up the Tony Gill investigation, and she asked me if I was aware of it. I do remember that. And I said, "I had heard something from Alicia about it, and it was my understanding that Kelly wa- -- was leading that investigation," so, you know, we assured her the investigation would continue, and that would not be dropped.
Q. Did Ms. Byrd express concerns about how the investigation was being handled at that point in time?
A. No.
Q. Did Ms. Byrd ask you if you would provide oversight over the Tony Gill investigation?
A. No.
Q. Did Ms. Byrd tell you that she -- that -- that she was concerned that the investigation was going to be closed without a finding?
A. No.
Q. Did Ms. Byrd express concerns about Alicia Campbell continuing to provide oversight over the Tony Gill investigation?
A. No.



Q. Was it decided at some point that you would provide oversight over the Tony Gill investigation?
A. Yes.
Q. When was that decided?
A. I don't remember the date. It was after her release. It was after her release. I can't give you a date.
Q. Who made that decision?
A. I did.
Q. Why did you make that decision?
A. Just based on discussions with Alicia, we had -- there was -- we had another investigation going on, and based on the content of that investigation and -- and some things that materialized after Ms. Chapman's release, that I wanted to just make sure it was thorough. There were some things that I didn't know about going into that investigation. It surfaced later, so I just wanted to -- I asked Kelly to let me review her investigation and her findings and her recommendations once she had the investigation completed.
Q. What did you learn or find out about the Tony Gill investigation that made you decide that you wanted to look over what Kelly Wood was doing?
A. I think it was the statements that were found



on Charlotte's laptop that -- it was some confusion about who -- you know, who -- what -- who -- what was the -- who was -- what was the correct statement Tony was submitting. I think there was some confusion about what was accurate. So when I heard about the confusion and the nature of the complaint, I said, "I would just" -- that's when I intervened and said, "I wouldn't mind, you know, overseeing and looking at this once Kelly made her conclusion on the investigation."
Q. Okay. Who first told you what the nature of Tony Gill's complaint was?
A. Alicia.
Q. And what did Alicia tell you about the nature of Tony Gill's complaint?
A. That there was an alter- -- there was a verbal altercation between him and a supervisor, and that he was, you know, nervous about, you know, what that altercation -- I think he came forward about it was just a verbal altercation he got into, and something about tools. It was -- I'm -- I vaguely remember the exact details, but it was something about tools, and then he reported a verbal altercation between his boss.
Q. When did Ms. Campbell first share that conversation with you?
A. I don't remember the date.



Q. Okay. When did you first learn that there was a -- there was one document showing that Mr. Gill had reported the use of the word "nigger" during the course of making his complaint?
A. Repeat the question just so I make sure I understand it accurately.
Q. Sure. When did you first learn that the complaint involved an allegation of the use of the word "nigger"?
A. I don't remember.
Q. Did you become aware of that at a certain point in time?
A. Yes.
Q. How seriously do you take complaints where a Black employee alleges that a White employee called them a nigger?
A. Very seriously.
Q. All right. I am going to mark as an exhibit Exhibit 5, which is an e-mail from Ms. Wood to you.
(Exhibit Number 5 was marked.)
Q. (BY MS. HOPKINS) Okay. I've marked as Exhibit 5 an e-mail from Kelly Wood to Jackie Hendrick on March 2nd, 2023, at 3:04 p.m. Did you receive this e-mail from Ms. Wood in which Ms. Wood said, "Jackie, I've attached all the documentation that I have on the

through this more slowly for you if you need me to. Did you ever meet with -- yourself with any of the witnesses to the Tony Gill incident?
A. No.
Q. Did you have a -- a discussion with Kelly Wood about the documentation that she sent to you?
A. I don't remember if it was a discussion or an e-mail.
Q. Did you have a discussion with Alicia Campbell about the documentation Kelly Wood sent to you?
A. Yes.
Q. Is March 2nd, 2023, the first time that you started doing your work to provide oversight for the Tony Gill investigation?
A. Yes.
Q. What oversight did you provide?
A. Basically, Kelly Wood was running investigation, and I just wanted to review the -- the summaries, the findings, and her recommendations. So that's the -- I was just providing general oversight to see if the -- you know, what was found, what was discovered, what was substantiated, and what the recommendations were.
Q. Okay. When you reviewed the documentation, did you see entries such as the one highlighted on this



screen that said the incident involved Kelly Porter, Alvin Craddock, and two younger gentleman that worked for Crew 534?
A. Yes.
Q. Okay. In the documentation, did you see that there were references to Alvin Craddock having called Tony Gill "nigger"?
A. Yes.
Q. When you reviewed the documentation, did you see that there were references to Kelly Porter walking into his office, grabbing something, and walking back out with his hand behind his back?
A. Yes.
Q. Did you see that there was reference in the documentation to there being a time stamp -- a time stamp for a noose in Tony Gill's office?
A. Yes.
Q. Okay. Did you see the part of the summary of the interview with Braydon Jones that is highlighted here on the screen and says that Tony Gill told Braydon Jones he "got gained up on by four dudes, and that Kelly went in his office and came back out not sure if he had a gat with him"?
A. Yes.
Q. Did you know what a gat was?



A. No.
Q. Did you do anything to find out what a gat was?
A. No.
Q. Did you see when you were reviewing the documentation that there were three different documents that -- three different documents reporting what Tony Gill -- Tony Gill's position was about what happened that day on February 15th, 2023?
A. What's the -- rephrase the question.
Q. Sure. Did you see that there were three different documents in which Tony Gill was reporting information to the company about what happened on February 15th, 2023, with Alvin Craddock and Kelly Porter?
A. Yes.
Q. And did you see that in one of those documents, Mr. Gill had removed or not included any references to the word nigger, any references to Kelly Porter having anything behind his back, any references to a noose, and any references to race discrimination?
A. Yes.
Q. Did you do anything to investigate what -- which -- whether you thought it was more credible -- sorry. Let me strike that and start again.
Did you do anything to investigate whether



Tony Gill's initial report about the N word being used, a noose being hung in his office, and there being racial discrimination at the company was more credible than his later statement?
A. No.
Q. Did you ever ask Tony Gill for what he was referring to by a "time stamp of a noose in his office"?
A. No.
Q. Did you ask Kelly Wood to find out from Tony Gill whether he had a photo or something else with a time stamp of a noose in his office?
A. No.
Q. Stop my screen share for a moment. I'm going to mark as Exhibit 6 another e-mail to you.
(Exhibit Number 6 was marked.)
Q. (BY MS. HOPKINS) This e-mail was produced to us without a -- a date on it. This is Exhibit 6, it's Pri- -- begins Primoris 4292, and ends Primoris 4311, for the record. Ms. -- Ms. Hendrick, the contents of Kelly Wood's e-mail here are -- are different than the last e-mail we just saw, correct?
A. I don't know. I don't know. I can't see what the differences are.
Q. Okay. So did you also receive this e-mail from Ms. Wood that said Jackie, comma, attached Kelly Wood,

HR Manager?
A. Yes.
Q. And did it contain the attachments, which were documentation from the Tony Gill investigation?
A. Yes.
Q. And if we look back at Exhibit 5, I'll scroll up to Ms. Wood's e-mail, this e-mail that -- that does have a date on it, March 2nd, 2023, Ms. Wood -- the contents of Ms. Wood's e-mail says, "Jackie, I've attached all the documentation that I have on the investigation between Tony Gill and Alvin Craddock," right?
A. Yes.
Q. But if we look at Exhibit 6, what Kelly Wood wrote to you is different, correct?
A. Yes.
Q. She just says, "Jackie, Attached" in this undated e-mail, right?
A. Yes.
Q. So do you know if you got this undated e-mail from her before the e-mail we saw in Exhibit 5 or after?
A. I don't know.
Q. Do you think you received them right around the same time?
A. I don't know.



Q. Do you think you received them on the same day, March 2nd, 2023?
A. I don't know.
Q. Okay. I'm going to share another exhibit with you that I'm going to mark as Exhibit 7.
(Exhibit Number 7 was marked.)
Q. (BY MS. HOPKINS) Okay. Ms. Hendrick, did you receive this March 3rd, 2023, e-mail from Kelly Wood that has the subject "Tony Gill Investigation"?
A. Yes.
Q. And was this Ms. Wood sending you a summary of her -- her -- the steps she took in the investigation, and her findings and recommendations?
A. Repeat the question.
Q. Certainly. I'll repeat the question first, and then you can let me know if you need me to scroll through the exhibits so you can answer it.
A. Okay.
Q. Is this March 3rd, 2023, e-mail the e-mail in which Ms. Wood shared with you the summary of her investigation, including the steps she took, and the findings she made?
A. Yes. Can you scroll? Yes, I'd like to see.
Is that the end of the e-mail?
Q. That's the end of the body of her e-mail, and



then there are a number of attachments. And this is the last attachment, I believe. Okay. When you received this e-mail from Kelly Wood, did you receive both the e-mail and the attachments?
A. Yes.
Q. Did you -- had you already approved Kelly Woods's finding and recommendations before she sent you this e-mail?
A. I don't know.
Q. After she sent this e-mail, did you do anything to review her findings and recommendations with her?
A. I believe this -- I don't think I did this right away. Depending -- I'm looking at the date. I believe I was in an annual meeting during the time all this hit my desk, so I believe it was later. I can't give you the time when this was reviewed. It was after -- it wasn't on the same day I received these.
Q. Okay. When you got to the point where you were able to sit down and review this e-mail from Kelly Wood with her recap and recommendation, at that point in time, did you accept her findings and her recommendation?
A. Yes.
Q. Did you ask her to do anything else to continue the investigation or to verify her findings?



A. No.
Q. When you received this e-mail from Ms. Wood, did you see that Kelly Porter was not listed as a witness that had been interviewed?
A. I don't know.
Q. All right. We can agree that when Kelly Wood wrote you this e-mail, she said that the employees involved were Tony Gill, Alvin Craddock, Andrew Byers, and Chase Newton, right?
A. Yes.
Q. And we can agree that Kelly Porter's name does not appear anywhere in Ms. Wood's e-mail to you, correct?
A. Yes.
Q. But in the documentation you received from Ms. Wood, you did see reference to Kelly Porter being involved in the Tony Gill incident, correct?
A. Yes.
Q. Did you tell Ms. Wood to go back and interview Kelly Porter?
A. I did not.
Q. Did you determine that it was an oversight for Ms. Wood not to have interviewed Kelly Porter?
MS. PLAGENS: Objection, form.
A. (No audible answer.)

Page 114

this PSC Learn course?
A. I don't know.
Q. Has the company ever required all of its employees to take a discrimination and harassment course every year as a condition of employment?
A. Depending what year. When I got -- I arrived in 2022. I don't know what they did previous to that, but starting in 2023 and forward when we were buying a lot of companies, everybody had their own handbooks and trainings and stuff like that, so we were consolidating and making sure -- we're trying to go to -- to, like, a one -- one handbook, one system, all of that.
So I know at some point in time we -- that became a requirement. It's in their -- in their onboarding training, so -- harassment and discrimination, and then we do it annually for current employees as well. So it would be for new hires and current employees. I can't remember the exact date we -- we -- we rolled that out, but it's something that we had to do in time. So I don't -- I can't speak to what was previous to and prior to 2022.
Q. The annual training that you're talking about, is it a PCS [sic] Learn training?
A. Yes.
Q. Okay. I am going to share Exhibit 16, which is

Page 115

your PSC Learn record, Ms. Hendrick. And this is a five-page document.
(Exhibit Number 16 was marked.)
Q. (BY MS. HOPKINS) Does this record accurately reflect the PSC Learn courses that you have taken during your employment with Primoris?
A. Yes.
Q. Is it true that the first time you took a PSC learning class on Workplace Harassment and Complaint Handling was December 31st, 2024?
A. Yes.
Q. At the time you provided oversight for the Tony Gill investigation, you had not yet taken the Workplace Harassment and Complaint Handling course, correct?
A. Not in PSC Learn, no.
Q. At the time you provided oversight to the Tony Gill investigation, had you received any other training from the company directly about how to handle employee complaint or investigation into an employee complaint?
A. Yes, we had legal -- outside legal had some trainings with us.
Q. When did you get trained by outside legal?
A. I don't remember the dates.
Q. Which -- which employment firm provided that training to you?

Page 116

A. I don't remember the exact name of their firm, I just remember the attorney's name.
MS. PLAGENS: Can I -- may I interject? Jackie, was this training performed related to any sort of ongoing litigation?
THE WITNESS: No.
MS. PLAGENS: Okay. Go ahead.
Q. (BY MS. HOPKINS) What -- what was the name of the attorney who provided you the training?
A. I know her first name. Her first name is Beth. I -- I just remember she did some training with us.
Q. Okay. Do you remember if she was with Jackson Lewis?
A. No, she wasn't. She was with a different firm.
Q. I'm going to throw some names of law firms out there at you and see if that rings any bells?
A. Okay. Okay.
Q. Littler Mendelson, does that ring a bell?
A. It does ring a bell. I can't say if it was them.
Q. Okay. Ogletree Deakins?
A. No.
Q. Not them? Okay. Was it a one-day training?
A. Yes.
Q. Is there a record of who attended that

Page 117

training?
A. I believe so. May- -- we would have to ask them. I wasn't keeping the record, but I'm sure there's a record.
Q. Okay. The -- does the training specifically cover best practices for conducting an investigation?
A. Yes.
Q. Was one of those best practices to take notes during interviews with employees during an investigation?
A. I don't recall them covering notes.
Q. Did they train you that it is a best practice to make sure you interview all of the witnesses to an incident of workplace bullying or harassment?
A. Yes.
Q. Okay. And do you still have your materials from that training?
A. I do. And there was an in-house training as well with one of our legal reps, and our in-house did some training on this -- on the investigation handling as well.
Q. Did Alicia Campbell participate in the training by the outside counsel?
A. Yes.
Q. Did Alicia Campbell participate in the training

with the in-house legal rep?
A. Yes.
Q. Did Kelly Wood participate in the training by the outside counsel?
A. I don't remember who was on the list from the -- the HR team. There was a lot -- there were a lot of HR people on it. I can't remember if the -- who on the team was on it. I know Alicia and my directs were on it.
Q. Okay. So would you know whether Kelly Wood attended the training by the in-house legal representative?
A. I don't know offhand.
Q. I am going to mark as Exhibit 17 -- well, first, before I mark the exhibit, let me go back. Do you agree that SHRM is a respected resource for human resources professionals?
A. I've had some issues with SHRM with some recent events that went on in their group, so I can't -- I mean, they've had some past things that -- that were wild, that's why I didn't renew my membership. So I wouldn't say they're not credible, but, I guess, I'm unbenevolent between them.
Q. Sure. When you're talking about some recent things that went on, are you talking about certain



employees who have allegations of discrimination against SHRM?
A. Yeah, they're just -- yeah. And it just -- they're -- they're okay.
Q. Okay. In the past, have you used SHRM as a resource for HR best practices?
A. When I was a member I did, yes.
Q. Okay. In the past, did you use SHRM as a resource for HR best practices in conducting investigations?
A. I don't recall using SHRM for that, no.
Q. Okay. I'm going to share with you what I've marked as Exhibit 17.
(Exhibit Number 17 was marked.)
Q. (BY MS. HOPKINS) It's a how-to guide, How to Conduct a Workplace Investigation dated October 21st, 2024, by Lacy Lusk. This is published on SHRM.org under Topics: Tools -- Tools, How-To Guides, How to Conduct Investigation. I'll scroll through it for you. My question is, have you -- are you familiar with this article? Have you read it before?
A. No.
Q. I want to draw your attention to some of the things it talks about in the -- this how-to guide to see if you agree or disagree. This articles talks about



providing interim protection. It says, "When an employee makes a complaint, one of the first considerations may be whether to take immediate measures for the protection of the accuser or the alleged victim, separating the complainant from the accused may be necessary to guard against continued harassment or retaliation." Do you agree or disagree with that -- those statements?
A. Agree.
Q. On this topic of creating an investigation plan, do you agree that it is a best practice to create an outline of your investigatory process, an initial list of witnesses, and initial review of documents and videos?
A. Yes.
Q. Okay. Do you agree that the development of a witness list is an important aspect of any investigation into an employee complaint of discrimination?
A. Yes.
Q. All right. If we scroll through, there's a section on Conducting Thorough Interviews and Gathering Evidence. There is a statement here about identifying inconsistencies, that an HR investigator should look for inconsistencies and seek opportunities to gather more evidence and the names of other potential witnesses. Do



you agree with that?
A. I'm just reading it. Yes. Yes.
Q. There's a section on Documentation. Do you agree that an HR investigator should maintain notes throughout the interviews, because they are a key part of the documentation of the investigation?
A. Yes.
Q. In terms of considering credibility, there's a section here that says, "Interviews will likely provide differing, potentially conflicting versions of events, because workplace conflicts are very personal. Individual perceptions of what happened may be clouded by personal interest. If employees' jobs are on the line, they may even lie."
Do you agree that investigators must consider the credibility of the individuals being questioned during an investigation, and use various techniques to assess their credibility?
A. Yes.
Q. For someone accused in the workplace of using a racial epithet like the word "nigger," would you expect the person to admit to using the racial epithet when questioned?
MS. PLAGENS: Objection, form.
A. Re- -- re- -- re- -- re-ask the question,

Wood, for her business unit, have a form that she was using for witness interviews during investigations?
A. I don't know.
Q. To your knowledge, back in 2023, did Kelly Wood have a template to use for creating a report of investigation for investigations within her business unit?
A. I don't know.
Q. Another section of this SHRM article at the very end talks about finalizing the investigation report, and following up with the affected parties. One of the items it covers is it says, "Finally, the investigator should set a time frame to follow up with the complainant to ensure that there are no other issues, and that they are settling back into the work environment." Do you agree that that is a best practice?
A. I agree.
Q. Do you know if Kelly Wood ever followed up with Tony Gill to see how he was doing, and whether there were any other issues that he was facing?
A. I don't know.
Q. Okay. Stop sharing that. Do you know an HR professional named Mark Clark?
A. No.



Q. Okay. We, as the plaintiffs, have hired him as an expert witness in the case, so I just wanted to know if you knew anything about his professional background or had ever worked with him at any prior companies where you worked?
A. No.
Q. Okay. I'm going to mark as Exhibit 18 our expert witness's report.
(Exhibit Number 18 was marked.)
Q. (BY MS. HOPKINS) I'm going to skip ahead to one particular page of the report, and this is all I want to ask you about. It's on Page 11. And I want to ask you something that our human resources expert concluded about the Tony Gill investigation, and see if you agree or disagree.
He states, "Ms. Campbell noted that she observes best practices investigative techniques, yet when asked whether a witness statement was made for Kelly Porter, she remarked, 'I don't recall.' As Mr. Porter was present during the conversation in -- in which Mr. Gill states Alvin Craddock called him the N word, his witness testimony is of paramount importance. Yet, Ms. Campbell is unable to produce a witness statement by Ms. Porter, a gross deviation from best practices investigation -- investigative technique s."



Do you agree that it is a deviation from HR best practices in the Tony Gill investigation that no witness statement was ever obtained by Kelly -- from Kelly Porter?
A. Just finished reading. Yes.
Q. All right. He also states, "In addition, Ms. Campbell met with Mr. Gill twice on February 20th, 2023, the day before he changed his statement. Ms. Campbell did not take notes. Her additional failure to produce notes for these two critical meetings with the witness who ultimately changed his statement the next day is another crucial departure from accepted best practices for conducting investigations and a telling oversight." Do you agree that it was a deviation from HR best practices for Ms. Campbell to fail to take notes during the two meetings she had with Mr. Gill on February 20th, 2023?
A. That's a tough one because of the context of those meetings. You don't -- sometimes in conversation, you're not going to have every -- depending what was being discussed in those conversations, if it was, you know, just simply following up on getting a statement, I don't understand why we would need notes. But if there was additional things to his statement that were discussed, yes, there should be notes.



I can't answer that one either way. Just what was the context of those -- those conversations, and why would the notes be needed, and what was missed or not missed? So I don't -- I can't answer that either way without knowing the context of those conversations.
Q. Okay. Do you understand that during this litigation, there has developed a dispute about what Alicia Campbell did or did not say during her meeting with Tony Gill and Charlotte Byrd on February 20th, 2023?
A. No.
Q. Okay. Are you aware that Charlotte Byrd is alleging that Alicia Campbell asked Tony Gill to change his statement during the meeting?
A. No.
Q. Are you aware that Charlotte Byrd is alleging that Ms. Campbell wanted Charlotte to be the one to convince Tony Gill to change his statement?
A. No.
Q. Are you aware that Charlotte Byrd is alleging that she went over Tony Gill's statement with Alicia Campbell in that meeting, and that Ms. Campbell was -- was very upset about what the contents of the statement were?
A. Okay. I've got to ask for clarification. What

Page 134

This is from September 22nd, 2022.
(Exhibit Number 19 was marked.)
Q. (BY MS. HOPKINS) Did you approve the hiring of Charlotte Chapman Byrd as an HR manager for PLH?
A. Yes.
Q. Who made the decision to recruit an HR manager for PLH?
A. Who made the decision? It would be Alic- -- or it was Alicia's team. That would be Alicia.
Q. Okay. Did anyone have to authorize the creation of a new position for Charlotte Chapman Byrd?
A. Yes.
Q. Who -- who had to give that authorization?
A. That would be me and her operations partner.
Q. And who was the operations partner that would have had to give authorization for creating the HR manager opportunity for PLH?
A. That would be, at that time, the president of that group.
Q. Okay. With --
A. Just a minute. Sorry.
Q. With the hiring of Charlotte Chapman Byrd, Ms. Campbell went from having three HR managers to four HR managers, correct?
A. I thought she had three at that -- this would

Page 135

have been the third. Oh, excuse me. I forgot about Shunte. Yes, so that would have been four. Correct.
Q. Okay. Why did you authorize the creation of the fourth HR manager position that Charlotte Chapman Byrd was then hired for?
A. It was part of the acquisition. They were ha- -- there -- there -- I think we lost some resources during that acquisition. It was -- I'm trying to think about 2022. We purchased PLH in August of 2022, so adding in a brand -- there were multiple business units, this being one of them. So there was a need at that time because we just bought -- we had just had a major purchase, as I stated earlier on the record, of about 1,000 employees that got poured into our group, so created another need for support in PLH.
And forgive me if I -- I might -- I might be -- never mind. I'm not going to guess. I don't remember. I don't know if it -- my -- I don't know if it was replacement or an addition. I don't remember.
Q. Okay. Just to verify, when you were talking about Primoris acquiring PLH Group in August of 2022, this is the press release that is discussing that acquisition, correct?
A. Yes, it looks right.
Q. Okay. And if we go back to the HR

Page 136

organizational chart from November, go back to Exhibit 3. When Charlotte Chapman Byrd onboarded to become the fourth HR manager under Alicia Campbell, is it accurate that she was assigned to support approximately 484 Power Line Services employees?
A. I'm looking at the date. Yes.
Q. Okay. And from your perspective as senior HR director, wa- -- sorry. Let me stri- -- let me try to rephrase the question. Strike that.
From your perspective as senior HR director, did it warrant hiring a fourth HR manager to support those 484 employees?
A. Yes.
Q. All right. And I'm going to go to Ms. Byrd's offer letter, Exhibit 21.
(Exhibit Number 21 was marked.)
Q. (BY MS. HOPKINS) All right. This is an offer letter dated September 29th, 2022. Did you interview Ms. Charlotte Chapman Byrd before this offer was made to her?
A. Yes.
Q. And how did your interview with her go?
A. It went well.
Q. What were your impressions of her?
A. It's been a while ago. Let me think. I

Page 137

like -- she had a good demeanor, she had history -- if I remember correctly, she talked about how she was a -- a business partner, you know, had good customer service skills. It's been a while. I just -- that, kind of, is what stood out in the interview. She did a -- it was a good interview.
Q. Okay. And you approved hiring her at a $95,000 base salary?
A. Yes.
Q. It says here her employer is Power Line Services, Inc., a Primoris Services Company. What was the relationship between Power Line Services and PLH, if you know?
A. PLH was their parent company before -- prior to the -- prior to the acquisition, so that would be their parent company.
Q. Okay. When the acquisition happened, were you informed of any requirements that were in the merger agreement as far as the pay or benefits of PLH and Power Line Services employees?
A. No, I was not privy to that information.
Q. Okay. I'm going to mark as Exhibit 22 the agreement and plan of merger dated June 24th, 2022.
(Exhibit Number 22 was marked.)
Q. (BY MS. HOPKINS) Have you ever seen this

repurpose them.
Q. Okay. You and Alicia Campbell repurposed Ashley Dickson, didn't you?
MS. PLAGENS: Objection, form.
A. I don't remember.
Q. (BY MS. HOPKINS) Okay. Ashley Dickson was working for Power Line Services as an HR generalist, correct?
A. Yes.
Q. And the company's position is Power Line Services was shut down, right?
A. Yes.
Q. So was Ashley Dickson repurposed to a different role within the company?
A. I've got to remember. I don't remember Ashley very well. I think she -- yes, I think she went to -- I don't remember. I don't want to speculate. I don't remember what -- what team she went to, and I don't know how long she stayed with us afterwards.
Q. Okay. I'm going to mark Exhibit 51, which talks about the workbooks you may have been -- I want to ask if these are the workbooks you were referencing.
(Exhibit Number 51 was marked.)
Q. (BY MS. HOPKINS) Okay. Exhibit 51 is Bates labeled Primoris 335 to 336. It starts with an e-mail



from you on Monday, January 16th, 2023, sent to a number of people, including Alicia Campbell, and the subject is "PLH Workbooks."
A. Uh-huh.
Q. What was a PLH workbook?
A. Like I stated earlier, David Naro and Jake were -- they -- they put together these workbooks, and they -- they were -- there were multiple workbooks for each of the groups. So each region had their own book, and they were going in -- well, this with the P- -- sorry, the PLH. Sorry. I was thinking about the regional.
The PLH had their workbooks of all of the acquisition people, and I think they were tabbed out. I'd have to see the workbook to make sure I'm -- I'm -- because there was another set of workbooks too, but if I understand it -- if I remember correctly, there was a PLH workbook with all that workforce, and they were deciding who was transferred, who was being RIF'd, and it's all pertaining to this PLH workbook. They had their own set of workbooks.
Q. Okay. Were the names of the human resources employees in those PLH workbooks?
A. Yes, I believe so.
Q. All right. So is there a PLH workbook that has



Charlotte Chapman Byrd's name in it?
A. I don't remember.
Q. Were -- was the PLH workbook a living document, meaning, there was an electronic link to a document that could be edited by anyone who went into it?
A. Yes, those who had access.
Q. Okay.
A. They had to be granted access from Jake.
Q. Is the PLH workbook somewhere where you were marking whether or not you were going to lay people off?
A. I wasn't in the workbooks, but the team was, so they were -- there were a lot -- there were a lot of movement in those books.
Q. Was the PLH workbook the same as the RIF list?
A. I -- this is where it gets murky, because the books get tricky. I mean, can I -- give me a moment to think. Did the PLH...
Yes. Okay. Now, I'm thinking back when -- in the beginning stages. It was sometime during this period -- you have this in January. This is why we're ha- -- these workbooks get tricky, because another seg- -- another group came in from corporate, and they had their books. They were helping with the integrations, and there was a corporate team assigned to it, and they had a set of books.



So I think the original intent was we were going to wor- -- do the books here. And then the corporate group came in, because they were -- they were doing all -- they were doing all the movement and making sure we were staging the integrations where the -- if we were moving craft and equipment to a certain group, they had that book. And then who was being RIF'd, they were -- they were -- they -- they called their stuff "waves."
So this was the original intent of these books, and then we moved to a different -- a different process, because the corporate team came in and had their own -- their own -- their own commission from corporate to drive it from there. So at some point this fell off it, and we -- we switched to that group.
Q. Okay. I'm going to stop sharing for a moment. I'm going to find an e-mail. Hold on. Exhibit 30.
(Exhibit Number 30 was marked.)
Q. (BY MS. HOPKINS) Okay. I've just marked as Exhibit 30, I guess, this is a message between you and Alicia Campbell. It's Bates labeled Primoris 3118. The date is February 20th, 2023. Did you send this message to Alicia Campbell saying, "I tried checking the RIF list, and you are in it"?
A. Yes.

Page 162

Q. Okay. Why were you checking the RIF list on February 20th, 2023?
A. I don't remember. We're in that -- we're in that book quite frequently. I couldn't remember.
Q. Okay. Were you adding Charlotte Chapman Byrd to the RIF list on February 20th, 2023?
A. I didn't add her to the RIF list, but that would have been the date we were having that discussion, because I was going in there the next day to do the reduction, but I can't tell you what this e-mail's referencing because we ha- -- we were doing a lot with those books.
Q. Okay. Did you ever find out why Alicia Campbell was in the RIF list on February 20th, 2023?
A. No.
Q. Is the RIF list you're referring to the PLH workbook?
A. I don't know, because there were two books. I don't know.
Q. Okay. So you don't --
A. And sometimes, if -- and sometimes, if somebody had -- was in a workbook, you couldn't get in. Right? It just says, "Hey, this is assigned to," so you couldn't get in and look at things, so I don't know.
Q. At this time in February of 2023, was there

Page 163

both a PLH workbook and a corporate RIF list?
A. Not probably at this time. I think we moved to that -- fully to the corporate list at that point.
Q. Okay.
A. So that would have probably been the list, like, the wave list.
Q. All right. We are going to go through some of that in detail. Let's start with... Okay. Let's start with Exhibit 31.
(Exhibit Number 31 was marked.)
Q. (BY MS. HOPKINS) All right. Ms. Hendrick, you're not copied on this e-mail, but it gives context to the exhibit I want to share with you. So this is an e-mail from Garrett Young on January 27th, 2023, to Sunita Khorana and some others. The subject is "PLS Migration Planning," and it says it has an attachment called the "PLH Full Employee List."
And Su- -- Garrett says, "Hi, Sunita. Danny and I have gone through every employee and assigned all except nine to a wave. We tried to align the waves with the geographical regions to help alleviate some of the IT constraints." There's a note about the support wave, and then it says, "In the final wave, this wave consists of Danny, Adri, and the accounting team. They need to move last to maintain

Page 164

visibility to the PLS side of the business until the end."
And then they have this attachment of the PLH full employee list, which is a document in native format, Primoris 2238. And if I open that up, this is what it looks like. There's a worksheet called "Pivot," a worksheet called "PLS list," and a worksheet called "Sunita's PLS Auger." Do you know if this was a PLH workbook?
A. It looks like it.
Q. Okay. As of January 27th, 2023, this --
A. And let me -- I'm sorry. You said if it's a PLH, but I'm looking at the tabs below. It looks like it's specifically PLS -- PLS and some Auger on the second tab, so it didn't encompass all PLH. Just PLS and Auger. So PLH had its own -- it was, like, its corporate entity, so it wa- -- it wa- -- it's really a PLS and Auger book.
Q. Okay. But this is, sort of, what you guys were referring to --
A. Yes.
Q. -- as "workbooks"?
A. Yes.
Q. And you had PLS Auger workbooks?
A. Yeah.

Page 165

Q. Okay.
A. Yes.
Q. As of January 27th, 2023, the date of the e-mail this was attached to, it looks like there were three human resources employees assigned to Wave 5. Is that what this shows?
A. Yes.
Q. Okay. And there is a column here for "Term," and "term" means termination, correct?
A. Yes.
Q. And there are zero -- there are no HR -- human resources employees listed for termination as of this January 27th, 2023, date on this workbook, correct?
A. Yes.
Q. And if we go to the PLS report on the next page and we look at Charlotte -- the entry for Charlotte Chapman, she is listed as Wave 5 on this workbook, right?
A. Yes.
Q. So the entry on this workbook reflects that as of January 27th, 2023, Charlotte Chapman was scheduled to be transferred from PLS to PTD in Wave 5, right?
A. Well, it's in the workbook, but that wasn't the plan.
Q. Why would the workbook not reflect your plan?

A. I don't know. I don't know who put that in there.

Q. Okay. I'm going to zoom in on this third tab, the PLS -- Sunita's PLS/Auger. Zoom in a little bit here. Then we're going to do a control find for Chapman. Okay. Is Sunita someone you were in touch with from the operations side about the waves of transfers and layoffs?

A. Yes.

Q. All right. And so Sunita's PLS/Auger sheet here as of January 27th, 2023, again, has Charlotte listed as being transferred, not terminated, in Wave 5, right?

A. No. I don't see "transfer." I just -- I just show where she's not assigned.

Q. Okay. I'm sorry. So I was looking at this Column G --

A. Oh, okay.

Q. -- over here --

(Speaking simultaneously.)

A. I'm sorry. Okay.

Q. (BY MS. HOPKINS) And I know there's a Column B as well, so I'll ask you -- sorry. We'll try not to -- try not to talk over each other. There -- there's two different columns here, right? There's a Column B, in



which she's listed as not assigned, and there's a Column G in which she's listed as Wave 5. What does that mean?

A. I don't know. I mean, she -- she wasn't set to be transferred, so I don't know why they put that in there. Could have not -- may not have been updated yet either. Charlotte was in -- Charlotte was in those transfer meetings, and it could have been just, you know, leave it alone till we -- we're ready for her reduction, because she was getting these workbooks and she was copied in in e-mails, so I don't know who put that in there as a wave.

Q. Okay. Was Alexis Goluguri getting these workbooks?

A. No. It was managers and higher, so managers and directors. Some managers had access to go in there and make up dates, along with the directors.

Q. So as of January 27th, 2023, Alexis Goluguri is also listed as Wave 5, and she is not highlighted in red as a termination, correct?

A. Yeah.

Q. And then if we find Ms. Dickson --

A. But that wasn't the plan for Alexis either. We weren't -- it may -- I don't know. I'll have -- it was Alicia's team, maybe -- was it, maybe, that'd be in a



different thing, because Alexis was also on the RIF list.

Q. All right. How -- how did you and Sunita communicate about the wave and RIF lists?

A. She was -- she was the coordinator of them working with the -- the various operation leaders and with the various HR groups. You know, Alicia was in there with her team, Teresa with her team, and -- and -- who am I missing? At that time, there was only two HR directors, so it would have been that group before we broke out to a different model.

So managers -- the HR managers and directors could go in there, but operation leaders were in there as well. And fina- -- and the financial guys were in there as well, making updates. We were just going back and forth, making updates, having conversations. And -- and it could be that we were not highlighting HR folks because -- on -- on the riffs, because the HR folks had access to it.

Q. All right. Alexis Goluguri, is she someone who had access to Sunita's list?

A. Was she on the list?

Q. Did she have access to Sunita's list?

A. I don't know. I don't know. I don't know.

Q. All right. I am going to mark as Exhibit 32 a



January 30th, 2023, e-mail from Sunita to Garrett Young and Daniel Lee.

(Exhibit Number 32 was marked.)

Q. (BY MS. HOPKINS) It says, "Hey, Garrett. Just met with Danny and we discussed adding Wave 5 as part of Wave 4D. Can you please add a column, and for Wave 5 only, add what current job they are on?" And then the attachment to this is a document produced in native format, Primoris 2291. So if I open up 2291, we, again, see that the three H- -- human resources employees are still listed under Wave 5, correct?

A. I just see the Number 3. The -- yes, I see the Number 3.

Q. Okay. And the three human resources employees are listed on Wave 5 in this workbook from Sunita from January 30th, 2023, correct?

A. Yes.

Q. And if we look at Sunita's PLS Auger tab, Ashley Dickson is listed for Wave 5, right?

A. Yes.

Q. And Charlotte Chapman is now listed for Wave Final. Do you see that?

A. Yes.

Q. And the Wave Final was going to occur after Wave 5, right?

A. Yes.
Q. And was Wave Final also going to occur after Wave 6?
A. Say it again. I don't understand the question.
Q. Sure. I'm looking at Column G --
A. Uh-huh.
Q. -- and there are lots of different waves listed, including Wave 6 --
A. Okay.
Q. -- Wave Final, and Wave Support. So my question is, was Wave Final going to occur after Wave 6?
A. I don't know. I didn't make the workbook. I don't know who was coding those, and I don't know.
Q. Okay. And on this workbook, again, Alexis Goluguri is listed as Wave 5, right?
A. Yes.
Q. On February -- I'm marking as Exhibit 33 an e-mail chain from February 3rd, 2023.
(Exhibit Number 33 was marked.)
Q. (BY MS. HOPKINS) There's an e-mail here between Sunita Khorana, Alicia Campbell, and Daniel Lee. It says, "Hey, Alicia. The intent was that Charlotte and I would be one of the last to move since we have the greatest access on the PLH side just in case we need something. Thanks, Danny." Did you and Alicia Campbell



have discussions about keeping Charlotte on board and waiting to move her in one of the last waves so that she could maintain her access on the PLH side in case something was needed?
A. I know we had discussion. I'm looking at the date. This was around the beginning of February. Maybe it was the first week. It was the beginning where -- we didn't know what stage she was going to be in the layoffs, and I thought it was going to be at the end of February because we were close to winding down. I don't know the exact date of what wave that was going to be when we were going to start doing that reduction, but it was -- it was going to be at the end of February. Because we were talking about it in the beginning of February, so around this time.
Q. Alexis Goluguri wasn't laid off at the end of February, was she?
A. No. She was support, so she wasn't a management level. She was a support group and had industry history. So -- and she was in a -- I think she -- I don't -- I don't want to guess her title, but she was more of a lower-level support that we were going to need as we're continuing to ramp off, and she was still helping with some of the data processing and things, so it was a different -- a different need for



that level. She wasn't a manager.
Q. Okay. I understand that she wasn't a manager. But in terms of these waves of layoffs and riffs, certainly, there were still waves and layoffs happening into March, April, and May of 2023, weren't there?
A. Yes.
Q. Okay. So this wasn't all wrapped up by the end of February, was it?
A. It was close.
Q. "Close," as in you still had more to do in March, April, and May of 2023?
A. Yes, but those were transfers. It wasn't, like, day-to-day on-site management was needed, because the -- the population was -- was -- at this -- at this stage, it was -- the on-site population had been reduced significantly. So it was more of that -- that support data, support that they needed in the lower levels in terms of, you know, processing the data, helping with the transfers, but it wasn't any on-site management was needed, because the population was dwindled down.
Q. Was Franchesska Bell someone who was let go in one of the waves of this same layoff that we're talking about that encompassed Charlotte Chapman Byrd?
A. I don't know that name.
Q. An accounts payable specialist named



Franchesska Bell?
A. I don't know.
Q. How about Arnold Gillis, an operations director, do you know him?
A. I wasn't -- I wasn't involved with that -- at that level. Those were handled by Alicia and the team down, so I -- I don't know.
Q. If we go to Exhibit -- we're going to mark Ex- -- Exhibit 34, which is more of the February 3rd, 2023, e-mail.
(Exhibit Number 34 was marked.)
Q. (BY MS. HOPKINS) Okay. This starts with an e-mail from Sunita to Alicia and Sri. Who is Sri?
A. Sri is one of our corporate resources. At the time, he was the head of compensation and benefits.
Q. And what was his last name?
A. Goluguri.
Q. What was his relationship to Alexis Goluguri?
A. That's his fa- -- he was her father -- is her father.
Q. And did you decide to keep Alexis Goluguri on longer than she was needed because Sri Goluguri was her father?
MS. PLAGENS: Objection, form.
A. No.

Page 174

Q. (BY MS. HOPKINS) All right. So this starts with an e-mail identifying, "These are the HR folks slated to come over to PTD as part of Wave 4," and Sunita's asking for information about them. They're listed as Ashley Dickson and Alexis Goluguri. Now, Alexis Goluguri did actually change companies from PLS to PTD in 2023, right?
A. I don't know what group she was transferred to.
Q. Was Alexis Goluguri, in fact, transferred from PLS to another entity in 2023?
A. Yes. Yes.
Q. Was Ashley Dickson tran- (audio distortion) -- transfers happened at the time where it was going to require the company to issue them two W-2s, one from PLS and one from their new entity, correct?
A. Thinking of the timing. Can I see the timing? In February, that sounds right.
THE REPORTER: Ms. Hopkins, my --
A. That actually does -- that actually does sound right. They would have two.
THE REPORTER: My audio cut out in the last question and answer before, "Was Ashley Dickson transferred -- transfer happened at a time where it was going to require the company to issue them two W-2s." The question before that, I didn't get it. I'm sorry.

Page 175

MS. HOPKINS: Okay. There's definitely going to be a Zoom recording of everything that you can listen to later. I'll try to recapture it, but I don't know if we're going to recapture it exactly.
Q. (BY MS. HOPKINS) I had asked if Ashley Dickson did, in fact, transfer from PLS to another entity in 2023, and Ms. Hendrick, you said, yes, she did, right?
A. Yes.
Q. And then I had asked if Alexis Goluguri did, in fact, transfer from PLS to another entity in 2023, and that answer, Ms. Hendrick, was also "yes," correct?
A. Yes.
Q. And then I asked you if they transferred at a point in time where they needed to be issued both a W-2 from PLS, and a W-2 from their new entity in 2023, and I think that's where we left off where you were trying to clarify it for me. So go ahead, Ms. -- Ms. Hendrick.
A. Oh, me? I thought you were -- okay. Do you want to -- want to re-ask the question?
Q. Yeah. So did the company have to issue two W-2s to Ms. Goluguri in 2023; one from PLS, and one from the new entity?
A. Yes.
Q. Okay. And did the company have to issue two W-2s to Ashley Dickson in 2023; one from PLS, and one

Page 176

from the new entity?
A. Yes.
Q. Okay. And that's not that big of a deal, is it, administratively?
MS. PLAGENS: Objection, form.
A. You're asking me if it's not a big deal? I really don't know. No.
Q. (BY MS. HOPKINS) Does it create that much more work to have to issue two W-2s to an employee rather than just one?
MS. PLAGENS: Objection, form.
A. No.
Q. (BY MS. HOPKINS) All right. I'm going to share my screen again, and go back to Exhibit 34 that we were looking at. So we saw that we were talking about Alexis Goluguri and Ashley Dickson being HR folks slated to come over to PTD as part of Wave 4. Alicia Campbell responds, "Hi, Sunita. They will report to Kelly Wood, and Kelly is not in PTD. She is in Company 100."
And if we go up, there's a further conversation. And then Alicia Campbell says, "Hi, Sunita. Put them under Department 1002, and Kelly Wood is the supervisor. Now, with Charlotte, is there a way to move her to Company 187 PDS? The reason I am asking is she will be supporting that group from an HR

Page 177

standpoint." Did Alicia Campbell inform you of a plan to have Charlotte Byrd support PDS from an HR standpoint?
A. No.
Q. Did you and Alicia talk about moving Charlotte from PLS to Company 187?
A. No.
Q. All right. I have no other questions about that exhibit for you, Ms. Hendrick. I'm going to share Exhibit 35.
(Exhibit Number 35 was marked.)
THE WITNESS: Can you give me one moment? My hearing aid is ringing a little bit. Give me one moment, please. Sorry.
MS. PLAGENS: We've been going almost an hour. Should we just take a quick break?
THE WITNESS: Yeah, if you don't -- I've got to go see why it's ringing.
MS. HOPKINS: Yes, let's take a 10-minute break.
THE WITNESS: Okay. Thank you.
MS. HOPKINS: We're off the record at 2:50 p.m.
(Recess taken from 2:50 p.m. to 3:02 p.m.)
MS. HOPKINS: We are back on the record at

Page 178

3:02 p.m.
Q. (BY MS. HOPKINS) And I was in the process of sharing Exhibit 35 with you. Ms. Hendrick, did you receive this e-mail from Alicia Campbell on February 3rd, 2023?
A. Yes.
Q. And Alicia says, "Just as an FYI, they are wanting to move HR from PLS to PTD on February 27th. That being said, once Alexis moves on that date, Sunita said she will lose visibility to PLS. At that point, she will have absolutely nothing to do. Are you good if I adjust her last date to February 24th? Also, don't want to move someone over to term them. Thanks." Alexis Goluguri did not end up getting terminated on February 24th, 2023, correct?
A. Correct.
Q. And why did you and Alicia Campbell change course on that?
A. It was on a need basis. We were -- when we were staging these out, you know, the fluctuation of the workforce and everything, and things being moved into another part of the workforce, Alicia was assessing, you know, her -- her -- her team needs, and she still had -- with Alexis being in onboarding, we were onboarding folks. We had some other groups that were -- especially

Page 179

in our craft, so she was just reassigning her. The -- the -- she was still projected to be a layoff. We were just adjusting the dates, because we di- -- we ended up laying her off later. But it was really on a needs basis. There was still a need for her to help process onboarding and -- and intake and intel and data.
Q. Did Ms. Goluguri lose PLS visibility on February 27th, 2023?
A. I don't know.
Q. Did the date for the transition of HR from PLS to PTD get pushed out past February 27th, 2020- -- sorry -- February 27th, 2023?
A. We were doing them in stages, yes, because we -- I think we had some that we pushed into March, because we were still -- there was still a -- until we can dwindle it down.
Q. Okay. So despite Ms. Campbell telling you that Alexis wasn't going to have anything to do after February 27th, you and Ms. Campbell found a way to find more work for Alexis Goluguri, right?
A. No. No. I didn't find work for her. Alicia had a need, and asked me if it was okay to extend her reduction to another date, and I was fine with that.
Q. When did Ms. Campbell change her mind about extending Alexis Goluguri's date?

Page 180

A. I couldn't tell you. I don't remember.
Q. Was it on February 20th, 2023, when y'all decided to proceed with Ms. Byrd's termination instead?
MS. PLAGENS: Objection, form.
A. I need to hear the question again.
Q. (BY MS. HOPKINS) Did Ms. Campbell decide to extend Alexis Goluguri's employment on February 20th, 2023, right as you all were getting ready to terminate Ms. Byrd?
MS. PLAGENS: Objection, form.
A. No.
Q. (BY MS. HOPKINS) So the plans with Ms. Goluguri did not change because plans with Ms. Byrd changed?
A. Not to my knowledge.
MS. PLAGENS: Object- -- sorry. Objection, form, but I was late.
Q. (BY MS. HOPKINS) Were you aware that Ms. Goluguri had been having performance issues?
A. No.
Q. I'm marking as Exhibit 36 Ms. -- an e-mail from Ms. Byrd to Ms. Campbell on December 7th, 2022, with a final written warning -- a final written warning attached for Ms. Goluguri.
(Exhibit Number 36 was marked.)

Page 181

Q. (BY MS. HOPKINS) Did Ms. Campbell share this with you?
A. No. Can I see -- can I see the document, please? Because I haven't seen it.
Q. Yep.
A. There was a document underneath it. Okay. Okay.
Q. Okay. Did you become aware that Alexis Goluguri had shared incorrect information with Chris from safety about whether or not new hire groups were going to be compensated?
A. No.
Q. Did you learn that Ms. Goluguri left work early without notifying Ms. Byrd on December 6th, 2022?
A. No.
Q. There's another e-mail from Ms. Byrd to Ms. Campbell on December 7th, 2022. Did Ms. Campbell share this e-mail with you?
A. No.
Q. And did Ms. Campbell share this write-up that Charlotte Chapman Byrd had drafted for Alexis Goluguri with you?
A. No.
Q. Were you aware that two days in a row, Ms. Byrd went to speak with Alexis Goluguri regarding work tasks,


Veritext Legal Solutions
800-567-8658 973-410-4098

A. Yes.
Q. And if we look for Alexis, let's see if I can find her. As of this date, if we look at Line 220, Alexis Goluguri, as an HR coordinator, she is listed as the determination is to RIF her as of March 31st, 2023. Do you see that?
A. Yes.
Q. And was that the actual plan for Alexis Goluguri at the time of the e-mail that you sent? I think we need to go back to my PDF.
A. To the e-mails?
Q. Yeah. Go back to the PDF. As of February 7th, 2023?
A. So what was the question?
Q. Sure. We're looking at this PLH PIP tracking Excel sheet that was attached to your February 7th, 2023, e-mail. Was the determination at that time that Alexis Goluguri would be RIF'd as of March 31st, 2023?
A. Yes.
Q. Okay. So in this case, the document accurately reflects what the decision was between you and Ms. Campbell at that time, right?
A. Yes. And -- yes.
Q. And Ms. Chapman is not on this list at all, right? If we look --



A. Yeah, she's not. I don't see her.
Q. Was there a reason that Ms. Chapman wasn't on this list?
A. I don't know. I didn't put together the list. I don't know. Might have been an ov- -- I don't know.
Q. Okay. But nonetheless, this list was sent to Alicia Campbell with an instruction that she should keep the riffs for her region up- -- and the workbooks updated in a timely manner, right?
A. Yes.
Q. Okay. I am going to mark as Exhibit 3 [sic] an e-mail from Sunita to Sean Gordon on February 9th, 2023.
(Exhibit Number 38 was marked.)
Q. (BY MS. HOPKINS) This has an attachment "PLS Auger employees remaining after Wave 4 to transfer." "Here is the list of remaining employees after Wave 4 to transfer from PLS and Auger to PTD. Before we get the process started, can we identify who was on the PSC no-hire list?" Charlotte Chapman Byrd was not on the PSC no-hire list, right?
A. I'm reading this. On the no-hire list, no, she not -- she would not have been.
Q. Okay. So she would have been eligible to be hired by PSC if there had been a position opened for her with PSC?



A. Yes.
Q. All right. And if we look at the native document, the Excel sheet attached, which is Primoris 3440. I'm going to open that up for us. We will zoom in. We will find Ms. Chapman on Line 35. And she is on this list as an employee that is still remaining to be transferred after Wave 4, right?
MS. PLAGENS: Objection, form.
A. And I can't see the -- all of -- all of the other side of it. There you go.
Q. (BY MS. HOPKINS) I guess, this list does not include any determinations on it of --
A. Yeah. I don't see any determinations. And also, this is -- during this period, it gets another layer of complexity. At this point, we pulled in Paula Bagony. She's trying to help us keep up with these lists. There was a lot of lists to keep up with.
Alicia got pulled into an investigation, so I don't -- this is where the lists get confusing, because there were, again, two different groups running these lists. And we pulled -- we had Paula come in to help us. And Alicia and I were careful about when we were going to tell, you know, who to update who from the HR side of things, because HR people were still getting in that list. So it gets a little bit -- this is the



complexity of it where Paula Bagony starts helping update the list for us. So she may not have known until we told her it was time.
Q. I am going to mark as Exhibit 39 Primoris 3025 to 3026. This is a February 22nd, 2023, e-mail chain.
(Exhibit Number 39 was marked.)
Q. (BY MS. HOPKINS) And on February 22nd, 2023, Sunita e-mails Sri and Alicia, and says that Charlotte Chapman Byrd or Charlotte Chapman, here is an employee below that will be included in Wave 5 with an effective date of April 1st, 2023. Do you see that that's what Sunita writes in her e-mail?
A. Yeah, but Sunita would have not known -- this was after -- I mean, if you look at the date, it's the day after we had a reduction of force with -- with -- with Charlotte. So she probably wasn't updated until after the fact, because Sunita would not have known or made that decision.
Q. Right. Sunita had not been informed that Charlotte's termination had been accelerated to February 21st, 2023?
A. Correct.
MS. PLAGENS: Objection, form.
Q. (BY MS. HOPKINS) Someone, either you or Ms. Campbell, had to have told Sunita at some point that

your intention was to include Charlotte Chapman in Wave 5 with an effective date of April 1st, 2023, right?
MS. PLAGENS: Objection, form.
A. It wasn't me.
Q. (BY MS. HOPKINS) Okay. And to your --
A. I don't know -- I don't know who told -- it wasn't me.
Q. Do you have any reason to believe that Sunita Khorana, on her own, would have decided to put Charlotte Chapman in Wave 5 with an effective date of April 1st, 2023?
MS. PLAGENS: Objection, form.
A. I wouldn't know that.
Q. (BY MS. HOPKINS) To your knowledge, was Sunita Khorana the one making the decisions about whether employees were going to be transferred or RIF'd?
A. No.
Q. To your knowledge, was Sunita Khorana the one deciding which waves employees would be transferred in?
A. No.
Q. Was it Alicia Campbell's responsibility to decide which wave Charlotte Chapman Byrd would be transferred in or whether she would be RIF'd instead?
A. Yes.
Q. So Alicia -- is there anyone else besides



Alicia Campbell who would have had the authority to tell Sunita Khorana that Charlotte Chapman Byrd was to be included in Wave 5 with an effective date of April 1st, 2023?
MS. PLAGENS: Objection, form.
A. Yes.
Q. (BY MS. HOPKINS) Who else would have had that authority?
A. I would have the authority.
Q. Okay. And your testimony is that you did not give Sunita that instruction, correct?
A. Correct.
Q. Do you have any reason to doubt that Alicia Campbell gave Sunita that instruction at some point in time?
MS. PLAGENS: Objection, form.
A. I have no reason to -- excuse me.
Can you repeat the question?
Q. (BY MS. HOPKINS) Do you have any reason to doubt that Alicia Campbell gave Sunita Khorana the information that Charlotte Chapman Byrd was to be included in Wave 5 with an effective date of April 1st, 2023?
MS. PLAGENS: Objection, form.
A. Yes.



Q. (BY MS. HOPKINS) What is your reason to doubt that?
A. Because Sunita was putting -- the -- the corporate team were deciding the dates of waves. We weren't deciding those -- those -- we were not making the decision on dates. Like, waves that people were going. So Sunita had the authority to make that decision on the -- on -- on what wave, and what the date was going to be.
Q. Okay. I'm very confused. I asked you if Sunita Khorana was the one who was making decisions about which wave employees would be transitioned in, and I thought you said "no"?
A. She would decide on the employees, but they were de- -- the corporate team was determining the dates of what waves -- what dates. So people may be remaining, but I can't answer this question, because I don't know who gave her this direction.
Q. All right. I am going to skip ahead -- or actually, do I need to skip backwards? Let me find the e-mail. Oh, here it is. All right. I'm going to mark as Exhibit 29 an e-mail from Sunita Khorana on February 22nd, 2023, to Nicholas Hebert.
(Exhibit Number 29 was marked.)
Q. (BY MS. HOPKINS) It has a Master PLS,



underscore, Auger, underscore, Employees to be Transferred Excel sheet attached to discuss for our meeting. There's a document produced in native format. That is 1539. And if I open up Document 1539, Charlotte Chapman Byrd is listed here on Line 81. Can you read what's written next to Charlotte Chapman's name and the Wave Hire Transfer Term section?
A. Yes. "RIF per Jackie after Wave 4 list."
Q. And --
A. She was selected for a RIF.
Q. But it says, "RIF per Jackie," that is referring to you, Jackie Hendrick, correct?
A. Yes.
Q. All right. So this would indicate that you told Sunita at some point that Charlotte Chapman Byrd was to be RIF'd after the Wave 4 list, right?
A. Must be. Yep.
Q. And Wave 5 would be after Wave 4, right?
A. Yes.
Q. Okay. So when Sunita sent the e-mail saying, "Here's an employee, Charlotte Chapman Byrd, to be transferred in Wave 5 with an effective date of April 1st, 2023," that did come from you, didn't it?
MS. PLAGENS: Objection, form.
A. I don't know.

Q. (BY MS. HOPKINS) Isn't it true that up until Ms. Campbell decided to fire Ms. Byrd on February 20th, 2023, your plan had been to keep Charlotte employed until either Wave 5 or Wave Final of the RIF?
MS. PLAGENS: Objection, form.
A. No.
Q. (BY MS. HOPKINS) Okay. When did you plan to RIF Charlotte Chapman Byrd after Wave 4? When was that decision made?
A. Again, we -- I had that discussion with Alicia in the beginning of February of that year. I moved up the date. I was not going to be available for any additional waves starting at the end of February through the beginning of March, I was going to be on the road. We had company events planned. So my schedule was not going to allot for me to be in and witness this reduction of force.
So I'm the one who moved the date to the 20th. I called Alicia, I said, "Hey, I" -- we had it scheduled for that Friday. I said, "I need to move it up to this Tuesday," I believe it was, "and I can come in to the Everman office on this day," because my schedule following that, I was not going to be available.
I know that Sunita had her scheduled dates



of reductions, but I'm the one who had to push up the date based on my schedule. I was on the road from the be- -- from the -- at the end of March through the beginning of -- I mean, sorry -- the end of February through the beginning of March, all the way up until we get the -- every single week, I was scheduled to be somewhere, so I was out of town. I'm the one that said, "Hey, let's do it now while I'm still in town," and we executed the reduction on the 21st.
Q. Is there any documentation to prove that, any of that that you just said?
A. Well, yes, we -- because we executed it on the 21st.
Q. Is there any documentation to prove that you were planning on firing Charlotte on a Friday, but moved it up to a Tuesday because of your schedule?
A. No.
Q. Okay.
A. But there's documentation right there that she was still selected to be on the RIF list. We could determine the timing as we saw fit.
Q. Right. And you had determined the timing to be after Wave 4 -- after the Wave 4 list was transferred?
A. That's before things got on my schedule. Again, I wanted to be there in person so I could be the



witness with Alicia, so we moved it up.
Q. Okay. And it's just absolutely entirely a coincidence that Ms. Byrd was terminated on February 21st, 2023, the day immediately after she had a meeting with Alicia Campbell and Tony Gill about his race discrimination complaint?
MS. PLAGENS: Objection, form.
A. Yes.
Q. (BY MS. HOPKINS) And it's your testimony that moving her -- Ms. Byrd's termination date up to February 21st, 2023, was not Ms. Campbell's decision?
A. Correct.
Q. It was your decision?
A. Yes.
Q. What documentation do you have about what your travel schedule was like in February of 2023 and March of 2023?
A. I couldn't tell you at this time.
Q. Did you spend some days working at home during that time frame from Mansfield, Texas?
A. No, not during -- not the end. I was traveling. We had annual events coming up, we had the summit, and I had to go on the road to Louisiana. I had the annual summit that PCS had I had to go to, and then we had a new boss coming in, so I had to go to that



summit as well. So I was -- I would have flight records to show, like, my traveling time.
Q. Is it your testimony that between February 20th, 2023, and March 31st, 2023, there was no day when you were in the DFW area physically?
MS. PLAGENS: Objection, form.
A. I -- I would have to check. I can't -- I can't answer that.
Q. (BY MS. HOPKINS) Okay. Do you -- do you recall having a time period where you were gone from your home in Mansfield, Texas for over a month straight for work in 2023 without returning home?
A. No, I was home. I was back and forth. I was traveling, attending meetings, attending events. So I would -- I would come back, travel, come home for the weekend, pack up, travel again. So I was home on the weekends, maybe coming home on a Friday.
Q. Okay. And it certainly would've been possible for you to coordinate a flight to come in to the Dallas or Everman office on a Friday afternoon or stay until a Monday morning, right?
MS. PLAGENS: Objection, form.
A. I wouldn't -- I don't -- I wouldn't know that without looking at my schedule for that time frame.
Q. (BY MS. HOPKINS) Were you physically present

Page 198

in the meeting in which Alexis Goluguri was let go from the company?

A. No.

Q. Was someone else besides Alicia Campbell?

A. I don't know.

Q. Is it your company policy that there needs to be two HR employees in any termination meeting with any other HR employees?

A. No, not a policy.

Q. Okay. Were you physically present for the termination meetings of any other HR employees in 2023 other than Charlotte Chapman Byrd's termination meeting?

A. No.

Q. Were you physically present in any meeting in which Patricia Ackerman was let go from the company?

A. No.

Q. Was the reason that you were physically present for Charlotte Chapman Byrd's meeting because Alicia Campbell anticipated that Charlotte Chapman Byrd would object to the termination?

MS. PLAGENS: Objection, form.

A. No.

Q. (BY MS. HOPKINS) Did Alicia Campbell tell you on February 20th, 2023, that she felt the termination meeting with Charlotte Chapman Byrd would not go well?

Page 199

A. No.

Q. Okay. Just need a moment to figure out where I'm at in the exhibits. And we're going through a lot, and thank you so much for your patience as I keep pulling up different exhibits.

A. No problem.

Q. I am going to mark as an exhibit Exhibit 40.

(Exhibit Number 40 was marked.)

Q. (BY MS. HOPKINS) We, over the course of the lawsuit, have served written questions or interrogatories to the company that require a verified response. And some of these were verified by Alicia Campbell and not by you, and this is one of them. But I want to ask you a question here about the date that PLS employees included in Wave 5 of the PLS Auger transfers became employees of PTD. This states the date is March 20th, 2023. Do you see that?

A. Yes.

Q. And we had seen the e-mail from Sunita earlier -- oops. I think I lost it. Give me a moment. We had seen this e-mail earlier from Sunita that said, "The Wave 5 would have an effective date of April 1st, 2023." Do you see that?

A. Yes.

Q. Do you know which of those dates is accurate,

Page 200

April 1st, 2023, or March 20th, 2023?

A. I don't.

Q. Who would know definitively for certain what the date was that the PLS employees became PT- -- PTD employees in Wave 5?

A. Alicia would make a report on that.

Q. Do you know a someone named Angela Schaffer?

A. Yes.

Q. What is her role in the company?

A. She is the HRIS database manager. I don't know if she's manager level. I can't -- I don't know her title, but she's on the HRIS team.

Q. Okay. Would she be able to look up in HRIS the date that Wave 5 employees became PTD employees?

A. Yes.

Q. And how would she do that? Do you know if she'd have to know the name of an employee who was transferred in Wave 5 in order to do that?

A. Or you can look -- you could pull up the date. I think, maybe, the easier day would be pull up a date of all the people that were, like, hired in the hire date, and you can sort them by that date. And then you'd have to crosscheck it with the -- the transfer list, because some of those might be new hires, some of those may have been transfers.

Page 201

Q. Okay.

A. However, now, that I say that, I -- the PLH HRIS database is -- I mean, I don't even know if it's active anymore because we transferred everybody into one database. I'm not sure if that's an active database anymore.

Q. The employees who were transferred from PLS to PTD, what database were they put into when they transferred over to PTD?

A. They would have been on the -- from PLH database into the PSC HRIS -- HR- -- HRIS database.

Q. Okay. Is the PSC HRIS database still in use today?

A. Yes. So, yeah -- well, you know what, I'm getting confused, because I'm thinking -- thinking of PLH going to PLH. Yeah. So if they were coming into our -- onto the PSC side, that would be the point of record where we could pull back hire dates, sort out, and crosscheck with the transfers.

Q. Are there any employees that stand out to you as you knowing for certain that they transferred in Wave 5?

A. No.

Q. I am going to share Exhibit 41 with you.

(Exhibit Number 41 was marked.)

were all over the map. And the managers and -- and functions were going through their needs, you know, Hey, I -- I -- I -- I want to RIF them on, let's say, the January RIF. Or you know what, things came up in our business. You know what, I can use them probably until the next wave or later on, but they're all over the map.

And leadership and -- and functions and managers were determining, okay, I -- the actives, maybe the needs of the business changed, maybe we had some projects that came in, could need a project controls and -- and accountants, we were looking for those. So the -- things changed throughout our time of our business. So -- but the others, the dates were all over the map. It doesn't even look like they may not have been in different waves. Could have been just based on business needs.

Q. (BY MS. HOPKINS) Is it correct that Janelle Haz- -- Hazen resigned rather than being terminated?

A. I -- I don't know.

Q. Okay. So these RIF lists that were going back and forth between Paula Bagony and Sunita Khorana, operations, and the business units, they were constantly in flux and changing, weren't they?

MS. PLAGENS: Objection, form.

A. Yes.



Q. (BY MS. HOPKINS) Okay. And just because Charlotte Chapman Byrd was listed in red on that RIF list on February 16th, 2023, does not mean that a final decision had been made as to whether she would actually be RIF'd or when she would -- she -- she would be RIF'd?

MS. PLAGENS: Objection, form.

A. Rephra- -- repeat the question.

Q. (BY MS. HOPKINS) Just because Charlotte Chapman Byrd was highlighted in red on Paula Bagony's Excel spreadsheet on February 16th, 2023, that does not mean that Charlotte Chapman Byrd was going to be -- was definitively going to be RIF'd, does it?

MS. PLAGENS: Objection, form.

A. I don't think I -- now, this is where I'm -- I'm getting confused, because you're using a double negative. Can you -- on the questions. So are you ask- -- can you re- -- can you re- -- can you rephrase it a different way so I'm understanding it better?

Q. (BY MS. HOPKINS) I -- I think that's okay. I think the -- the facts that we have speak for themselves. But I do want to go through something that can confirm how Janelle Hazen came to leave the company. So if we can just note that she's listed under Interrogatory Number 5 as -- with a termination date of February 24th, 2023, I want just to keep that in mind



for a moment. And we're going to go back to Exhibit 29. And we're going to find Ms. Hazen on this list. Here she is on Line 185. The notes say, "Resigned per Robert S, comma, when." Do you see that?

A. Yes.

Q. How can we verify whether Ms. Hazen resigned?

A. We can look at the -- at the records.

Q. Okay.

A. She might have resigned. I don't know the date of her term, so she might have been on the list, but then resigned before the RIF.

Q. Okay. To your knowledge, did Franchesska Bell refuse to alter a witness's statement and erase discrimination investigation?

A. I don't know.

Q. To your knowledge, did Aaron Cooper refuse to alter a witness's statement in a race discrimination investigation?

A. I don't know.

Q. To your knowledge, did Arnold Gillis refuse to alter a witness statement in a race discrimination investigation?

A. Not to my knowledge.

Q. To your knowledge, did Linda Henricks refuse to alter a witness statement in a race discrimination



investigation?

A. Not to my knowledge.

Q. To your knowledge, did John Ranstadler refuse to alter a witness statement in a race discrimination investigation?

A. Not to my knowledge.

Q. To your knowledge, did Adrianna Smithee refuse to alter a witness statement in a race discrimination investigation?

A. Not to my knowledge.

Q. To your knowledge, did Alessandra Spencer refuse to alter a witness statement in a race discrimination investigation?

A. Not to my knowledge.

Q. To your knowledge, did Pamela Whitson refuse to alter a witness statement in a race discrimination investigation?

A. Not to my knowledge.

MS. HOPKINS: Could we take a 5- to 10-minute break, so I can see which exhibits I've gone through, and which I haven't, please?

MS. PLAGENS: Yes.

MS. HOPKINS: Thank you. We're going off the record at 3:58 p.m.

(Recess taken from 3:58 p.m. to 4:13 p.m.)

MS. HOPKINS: We are back on the record at 4:13 p.m.

Q. (BY MS. HOPKINS) For the record, I am going to be skipping three exhibits. Exhibit Numbers 42, 43, and 44 will not be marked or used, so we will just skip those numbers entirely. I am going to go back to some exhibits I did not cover. And Ms. Hendrick, I want to show you Exhibit 24.

(Exhibit Number 24 was marked.)

Q. (BY MS. HOPKINS) This is another set of interrogatory responses. And if we look here, it says it is Defendant Primoris Service Corporation's Objections and Answers to Plaintiff Charlotte Chapman Byrd's Limited First Set of Interrogatories. And scrolling down, these were verified by you on June 24th, 2025. Did you review these interrogatory responses at the time and verify that the answers were true and correct to the best of your knowledge?

A. Yes.

Q. On Interrogatory Number 1, we asked who made the decision to terminate Ms. Byrd on February 21st, 2023, and the answer was that Alicia Campbell made that decision, correct?

A. Yes.

Q. The second interrogatory was to state the name



of the person who made the decision to list Charlotte Chapman Byrd in red as a RIF on Primoris 254 to 257, and the answer was that Alicia Campbell made that decision, right?

A. Yes.

Q. As of the time you verified these interrogatories, had you confirmed with Ms. Campbell that she made the decision to list Ms. Byrd in red as a RIF on that document?

A. Yes.

Q. We asked for every reason Defendant decided -- decided to involuntarily terminate the employment of Charlotte Chapman Byrd on February 21st, 2023. And the answer begins with an explanation of the scheduled layoff and her position becoming obsolete. It ends with a paragraph specifically explaining the timing of Ms. Byrd's termination.

This paragraph here, Ms. Hendrick says, "The timing of Ms. Byrd's termination on February 21st, 2023, took place for three reasons," right? There are three reasons listed?

A. Yes.

Q. And none of those reasons were your travel schedule or unavailability for a later termination meeting, right?



A. I'm reading it. Yeah, it's not listed on there.

Q. Okay. And you certainly had the knowledge about your own travel schedule -- what your own travel schedule was in February of 2023 and March of 2023 as of the date you verified these interrogatories on June 24th, 2025, right?

A. Yes.

Q. Okay. Last night, we received amended interrogatory responses from the company. I'm going to mark those as Exhibit 24.1.

(Exhibit Number 24.1 was marked.)

Q. (BY MS. HOPKINS) These interrogatory responses are verified by Alicia Campbell. And if we look at the second answer, it has changed. So I'm going to put them side by side if we can get my PDF maker to cooperate with me, so give me one moment.

A. Okay.

Q. What we're doing is we have Exhibit 24.1, the first amended interrogatory responses on the left. And on the right, we have the original interrogatory responses that were verified by you, Ms. Hendrick. Interrogatory Number 2, the amended response says, "Change the answer to state that Alicia Campbell made the decision to list Ms. Byrd as a RIF, and that the



instruction to list employees who were to be included in the RIF in red came from operations." Do you see that?

A. Yes.

Q. Operations did not make the decision, however, to list Charlotte Chapman Byrd in red as a RIF on any document, did they?

A. I don't know.

Q. Were you aware of any instruction coming down from operations that your team should list employees who were to be included in the RIF in red?

A. No.

Q. Did you and Ms. Campbell discuss, outside the presence of any attorneys for the company, between you two changing the response to this Interrogatory Number 2 to include the information about operations?

A. No.

Q. All right. And if we look at the Interrogatory Number 3 that has explanations for Ms. Byrd's termination, in the amended interrogatory responses, there is now a fourth reason listed for the timing of Ms. Byrd's termination on February 21st, 2023. Do you see that?

A. Yes.

Q. The original answer had three reasons listed, the new answer has four reasons listed, right?

MS. PLAGENS: If you can -- if you can explain where we got the information from, you can tell her where you got the information from. Just nothing about any instructions or direction that you received from anyone in legal. Okay?
THE WITNESS: Okay.
A. I don't know the answer.
MS. HOPKINS: Well, I think -- Nichole, you would agree with me that I'm entitled to know that the numbers were pulled from two different databases; is that right?
MS. PLAGENS: I think that goes into work product. I mean, I'll let her give a little leeway of explaining why there could be inconsistencies. She can explain where the information came from.
Q. (BY MS. HOPKINS) Okay. So Ms. Hendrick, we have to do this in a little bit of an awkward fashion just to avoid you revealing any attorney-client privileged communications you had with Ms. Plagens or her office or your in- -- inside counsel.
Stepping back, from the head count report we got, the 5,848 number, do you know if that is a more accurate number than the 5,552 number reflected in the interrogatory responses?
A. I don't know.



Q. If you were to try to determine yourself why there was a discrepancy between the head count number and the interrogatory response number as you noted of about 300 employees give or take, what would you check to see what might explain that discrepancy?
A. The HRIS report and what business units they pulled at -- in that point of time.
Q. Okay. For the business units under your scope of responsibility, is all of that data in one database?
A. No.
Q. So for head count information that we're trying to get from 2023 -- well, 20- -- from these dates that are listed here, would you have to go into two different databases, and then add them up?
A. Yes.
Q. And what are those two different databases?
A. PLH had their own HRIS database, and PSC had their own HRIS database. They were two separate databases.
Q. Okay. And I think earlier in the deposition, did you say the PLH database is no longer in use?
A. Yes.
Q. Can it -- can reports still be run from it?
A. I don't know.
Q. Is it possible that these numbers are excluding



the employees who are still under PLS as of January 1st, 2023, and February 21st, 2023?
A. I don't know without seeing the detailed report.
Q. Okay. Were there about 300 employees as of Jan- -- the January/February 2023 time frame who still needed to transfer over from PLS to PTD?
A. No -- I don't know.
Q. Okay. I want to go back to Exhibit 28 for a moment, the attachment to Exhibit 28. So these are head count reports from after the date -- that were e-mailed on February 24th, 2023, which was after the date of Ms. Byrd's termination, correct?
A. I thought her terminate was on the 21st.
Q. Right. So Alicia Campbell sent her head count report in about three days after Ms. Byrd was let go, right?
A. Yes.
Q. Okay. And if we go back to the Excel sheet and we look at Alicia Campbell's South region, we have business units under Kelly Wood, business units under Paula Bagony, business units under Shunte Curtis, and then we have a PLS unit that's listed under Ashley Dickson with 317 employees. Do you see that?
A. Yes.



Q. Does that indicate that there were still 317 employees from PLS who had not yet been transferred to PTD as of February 24th, 2023?
A. Yes.
Q. And after Ms. Byrd's termination, was Ashley Dickson put in charge of those 317 PLS employees?
A. I don't know. She was a generalist. I don't know.
Q. Do you agree that there was still work for Ms. Byrd to do as long as those 317 employees remained with PLS, and had not yet transferred?
MS. PLAGENS: Objection, form.
A. I don't know. I wasn't in that level, running the day-to-day.
Q. (BY MS. HOPKINS) The last few exhibits, I think, we're going to be able to go through relatively quickly. They're going to start with Exhibit 46.
(Exhibit Number 46 was marked.)
Q. (BY MS. HOPKINS) You are not copied on any of the exhibits I'm -- the e-mails I'm about to show you, Ms. Hendrick, and my question is going to be if you were aware or made aware by anyone of -- of some of the things that were going on as reflected in these e-mails.
This first e-mail is an e-mail from Charlotte Chapman Byrd sent on December 12th, 2022, to

Colby Sparks. Ms. Byrd says, "Hello, Colby. It was a pleasure meeting you, and I cannot wait to meet you, your team, and to learn this business from the ground up."

"Just to tell you little bit about me, I love to get to know people I serve, the business, and their work. I'm a very personable person." Gives her contact information, and says, "You and your team -- our team call me -- can call me any time. Thanks again, and I look forward to working with you." Were you aware that Ms. Byrd had met with Colby Sparks in December of 2022, so that she could start providing HR support to his team?

A. No.

Q. Did Alicia Campbell inform you that she had decided to assign Alicia -- sorry -- did Alicia Campbell tell you that she had decided to assign Charlotte Chapman Byrd to provide HR support for Colby Sparks's team at any time between December of 2022 and February of 2023?

A. No.

Q. How many employees did Colby Sparks have underneath him?

A. I don't know.

Q. If we wanted to get a number of employees Colby



Sparks had underneath him in 2020- -- early 2023, like, the first quarter of 2023, what would you look at to determine that?

A. We can run a report out of the system and see what group reports up under his business unit.

Q. Okay. All right. Exhibit 47, which I am marking, is -- the part that I want to focus on is an e-mail from Colby Sparks that was sent to Charlotte Chapman Byrd and other individuals on December 30th, 2022.

(Exhibit Number 47 was marked.)

Q. (BY MS. HOPKINS) Did you know that Colby Sparks had set up a meeting for Thursday, January 12th, with Charlotte Chapman Byrd?

A. No.

Q. Do you know that Colby Sparks had been told that Charlotte Chapman Byrd would be his new HR rep for 2023?

A. No.

Q. What business unit did Colby Sparks work for?

A. Oh, you'd have to ask him that. He's in the -- he's in the gas group. I want to say -- I don't want to guess. He's in -- I know he's in -- he's in the gas part of our business. I want to say PDS.

Q. Does PDS include both gas and non-gas



employees?

A. No.

Q. All right. So PDS is entirely a gas segment of the business?

A. It is now, yes.

Q. Okay. All right. I'm marking as Exhibit 48 a January 18th, 2023, e-mail from Shunte Curtis to Kelbi Arnold with Charlotte Chapman Byrd copied.

(Exhibit Number 48 was marked.)

Q. (BY MS. HOPKINS) It says, "Can you please add Charlotte Chapman Byrd to the e-mail thread for Future's payroll? She is the HR manager for PDS and we have about 68 Future Gas employees that she'll be managing." Were the 68 Future Gas employees gas -- in addition to a group of gas employees that were under PDS?

A. No. It looks like 68 Future Gas. It looks like there are two -- there's two separate component -- or different units.

Q. Did you know how many PDS gas employees were under Colby Sparks as of January 2023?

A. No.

Q. Were you aware that Charlotte Chapman Byrd had been added to the e-mail thread for Future's payroll as of January 18th, 2023?

A. No.



MS. PLAGENS: Objection, form.

Q. (BY MS. HOPKINS) Are you on the e-mail thread for Future's payroll?

A. No.

Q. Did you and -- did you have weekly human resources meetings in 2023 with Alicia Campbell and her HR managers?

A. No.

Q. Okay. So if Alicia had regularly scheduled meetings with Ms. Byrd, Ms. Bagony, Ms. Wood, and Ms. Curtis, you did not participate in those?

A. No.

Q. Would you expect Alicia Campbell to keep you informed of the assignments that she is giving to HR -- her HR managers?

A. No.

Q. Could -- did Alicia Campbell have the authority to decide to transfer Charlotte Chapman Byrd as an HR manager into Company Code 187?

A. Yes.

Q. If we look at Exhibit 49, this is an e-mail from Shunte Curtis to Colby Sparks dated January 23rd, 2023.

(Exhibit Number 49 was marked.)

Q. (BY MS. HOPKINS) She says, "Good evening,

Q. I'm getting --
A. It is a lot. Well, I'm drawing off my memory. Go ahead.
Q. It's okay. I'm getting tired too, and we're almost done.
A. All right.
Q. So my understanding is that some gas employees came out from underneath Ms. Campbell and went over to Ms. Berry at that time. Were there also electric employees under Ms. Berry that came out from under Ms. Berry, and then went to Ms. Campbell?
A. Yes.
Q. Okay. Do you know if it was a fairly even trade in terms of the number of employees they switched at that time?
A. I don't recall the numbers. Not that far back.
Q. If Charlotte Chapman Byrd had still been employed and supporting the Future gas and PDS Southwest Gas employees at that time, is there any reason she could not have switched from Alicia Campbell's group to Teresa Berry's group?
MS. PLAGENS: Objection, form.
A. I don't know.
Q. (BY MS. HOPKINS) Is there -- have you switched HR managers from underneath one director to another



director in the past?
A. No.
Q. Is there any rule against you doing that?
A. No.
Q. If business needs dictated, would you have the authority to change one of your HR managers from one region to another or one line of business to another?
A. Yes.
MS. HOPKINS: Okay. Okay. I will pass the witness. And thank you, Ms. Hendrick, for your time today and your patience.
THE WITNESS: No problem.
MS. PLAGENS: We reserve questioning for time of trial. 30 days to read and sign, please.
MS. HOPKINS: And Ms. Mabry just needs to read us off the deposition before I stop the recording.
MS. MABRY: Yes. Thank you, everyone. This does conclude the remote video deposition proceeding for today. The current time is 4:55 p.m.
(End of proceedings at 4:55 p.m.)



CHANGES AND SIGNATURE

WITNESS NAME: JACKIE HENDRICK DATE: JANUARY 7, 2026

PAGE LINE CHANGE REASON

Job No. CS7797576



I, JACKIE HENDRICK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

JACKIE HENDRICK

Job No. CS7797576

Page 242

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLOTTE CHAPMAN BYRD, )
)
Plaintiff, )
)
v. )
) CIVIL ACTION
PRIMORIS SERVICES ) NO. 3:24-cv-2767-N
CORPORATION, PLH GROUP )
INC., POWER LINE SERVICES, ) JURY TRIAL DEMANDED
INC., and FUTURE )
INFRASTRUCTURE, LLC, )
)
Defendant. )

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
JACKIE HENDRICK
JANUARY 7, 2026
(REPORTED REMOTELY)

I, Amber Garcia, Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, JACKIE HENDRICK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30 (e) (1) that the signature of the deponent:

____x_____ was requested by the deponent or a party

Page 243

before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

_________ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this the 26th day of January, 2026.

Amber Garcia
______________________________
Amber Garcia, Notary ID No. 13426953-9
My commission expires: 3-24-2027
VERITEXT LEGAL SOLUTIONS
Firm Registration No. 571
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
(817) 336-3042
(800) 336-4000

Page 244

Christine@tremainartaza.com

January 26, 2026

RE: Chapman Byrd, Charlotte v. Primoris Services Corporation Et
DEPOSITION OF: Jackie Hendrick 7797576

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

# PLAINTIFF'S EXHIBIT 5

REDACTED VERSION OF THE 2/16/23 "RIF" LIST

At Bates Numbers Primoris 000254-000257
As Referenced in Plaintiff's Interragotatory No. 5

**Attachments:** PLS_Auger Employees Remaining after Wave 4 to Transfer_PB.xlsx

---

**From:** Paula Bagony
**Sent:** Friday, February 17, 2023 3:30 PM
**To:** Alicia Campbell <Alicia.Campbell@prim.com>
**Subject:** FW: PLS_Auger Employees Remaining after Wave 4 to Transfer.xlsx


Paula Bagony
*HR Manager*

**Primoris Utilities & Distribution Group**
Direct: 352.458.4455
Cell: [redacted]
Fax: 813.996.2919
www.prim.com


*"No business objective is so important that it will be pursued at the sacrifice of safety."*

---

**From:** Paula Bagony
**Sent:** Thursday, February 16, 2023 9:07 AM
**To:** Sunita Khorana <skhorana@prim.com>; Jackie Hendrick <jhendrick@prim.com>
**Cc:** Sean Gordon <SGordon@prim.com>
**Subject:** RE: PLS_Auger Employees Remaining after Wave 4 to Transfer.xlsx

Sunita,
There is only one employee, [redacted] that is not eligible for rehire -he is in red
The others in red are on the RIF list
The one's in blue will be rehires that are eligible for rehire. I added their Primoris EE number to the spreadsheet
The ones in orange have already been transferred from PLS to PTD
[redacted] last day is tomorrow so he will not need transferred.

The RIF information is extremely confidential. I do not know what [redacted]'s involvement has been or what information he may or may not have regarding the RIF's.

Please let me know if you have any questions.

Regards,

Paula Bagony
*HR Manager*

**Primoris Utilities & Distribution Group**
Direct: 352.458.4455
Cell: [redacted]
Fax: 813.996.2919
www.prim.com

*"No business objective is so important that it will be pursued at the sacrifice of safety."*

---

**From:** Sunita Khorana <skhorana@prim.com>
**Sent:** Thursday, February 16, 2023 7:28 AM
**To:** Jackie Hendrick <jhendrick@prim.com>; Paula Bagony <PBagony@prim.com>
**Cc:** Sean Gordon <SGordon@prim.com>
**Subject:** RE: PLS_Auger Employees Remaining after Wave 4 to Transfer.xlsx

Hello ladies,

Any update on this list? I just need to know if any of these folks are a PSC DO NOT HIRE. I have my meeting this morning with [redacted] to review.

Sunita | [redacted]

---

**From:** Sunita Khorana
**Sent:** Tuesday, February 14, 2023 2:54 PM
**To:** Jackie Hendrick <jhendrick@prim.com>; Paula Bagony <PBagony@prim.com>
**Cc:** Sean Gordon <SGordon@prim.com>
**Subject:** FW: PLS_Auger Employees Remaining after Wave 4 to Transfer.xlsx
**Importance:** High

Jackie, Paula,

Please let me know if anyone on this list is a DO NOT HIRE. I would appreciate getting this back by COB tomorrow as I have a meeting with [redacted] on Thursday morning.

Regards,

Sunita | [redacted]

---

**From:** Sunita Khorana
**Sent:** Thursday, February 9, 2023 2:05 PM
**To:** Sean Gordon <SGordon@prim.com>
**Subject:** PLS_Auger Employees Remaining after Wave 4 to Transfer.xlsx

Good afternoon Sean,

Here's the list of the remaining employees (after Wave 4) to transfer from PLS and Auger to PTD.

Before we get the process started, can we identify who is on the PSC No hire list?

Regards,

Sunita
Sunita Khorana
Integration Projects Group
c: [redacted]

***"Primoris, building America's future, today."***

| COMPANY | EMPLOYEE NAME | GIVENNAME | SURNAME | PLH EMP ID | PTD EMP ID | PLH Email | PSC Email | TITLE | PLS/AUGER SUPERVISOR | PLS/AUGER SUPERVISOR | FULL TIME/ PART TIME | HRLY/SAL | PLS/AUGER HIRE DATE | PLS/AUGER DEPARTMENT | LABOR TYPE | LOCATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Current | Current | Current | Current | Current | Current | Current | Current | Current |
| Power Line Services | **Redacted** | | | 012772 | | **Redacted** | | Journeyman Lineman | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 213882 | | | | Lineman Apprentice 6 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 014187 | 118481 | | | Lineman Apprentice 5 | **Redacted** | 001932 | Full Time | Hourly | **Redacted** | Direct-Distribution Cent | Direct | Odessa, TX |
| Power Line Services | **Redacted** | | | 214626 | | | | Lineman Apprentice 6 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 215292 | | | | Lineman Apprentice 5 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Auger Services | **Redacted** | | | 214359 | | | | Groundman | **Redacted** | 003067 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Waxahachie, TX |
| Power Line Services | **Redacted** | | | 214967 | | | | Lineman Apprentice 6 | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 012567 | RIF | **Redacted** | **Redacted** | Accts Payable Specialist | **Redacted** | 002216 | Full Time | Hourly | **Redacted** | Accounting | SG&A | Fort Worth, TX |
| Power Line Services | **Redacted** | | | 211927 | | | | Lineman Apprentice 4 | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Auger Services | **Redacted** | | | 8787 | | | | Equipment Operator | **Redacted** | 003067 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Waxahachie, TX |
| Auger Services | **Redacted** | | | 003067 | | **Redacted** | **Redacted** | Superintendent | **Redacted** | 003056 | Full Time | Salaried | **Redacted** | Field Mgmt-Foundations | Indirect | Gonzales, LA |
| Power Line Services | **Redacted** | | | 215153 | | | | Lineman Apprentice 6 | **Redacted** | 214458 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 210799 | | | | Lineman Apprentice 6 | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 014806 | 119812 | | | Equipment Operator | **Redacted** | 003533 | Full Time | Hourly | **Redacted** | Direct-Transmission | Direct | Dilley, TX |
| Power Line Services | **Redacted** | | | 214791 | | **Redacted** | **Redacted** | Foreman | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Auger Services | **Redacted** | | | 214346 | | **Redacted** | **Redacted** | Foreman | **Redacted** | 003067 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Gonzales, LA |
| Power Line Services | **Redacted** | | | 210674 | | | | Foreman | **Redacted** | 214458 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Auger Services | **Redacted** | | | 008788 | | | | Equipment Operator | **Redacted** | 003067 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Gonzales, LA |
| Auger Services | **Redacted** | | | 003034 | | **Redacted** | **Redacted** | Foreman | **Redacted** | 003067 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Citrus County, FL |
| Power Line Services | **Redacted** | | | 210177 | | **Redacted** | **Redacted** | Safety Manager | **Redacted** | 215374 | Full Time | Salaried | **Redacted** | Safety | Indirect | Rome, GA |
| Power Line Services | **Redacted** | | | 213860 | 120344 | | | General Foreman | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Indirect | Concord, NC |
| Power Line Services | **Redacted** | | | 213866 | 120545 | **Redacted** | **Redacted** | Foreman | **Redacted** | 213861 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 213877 | | | | Lineman Apprentice 3 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 016479 | | **Redacted** | **Redacted** | Field Safety Specialist | **Redacted** | 215373 | Full Time | Salaried | **Redacted** | Safety | Indirect | Rome, GA |
| Power Line Services | **Redacted** | | | 215293 | | | | Lineman | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Auger Services | **Redacted** | | | 214347 | | | | Groundman | **Redacted** | 003067 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Gonzales, LA |
| Power Line Services | **Redacted** | | | 215196 | | | | Lineman | **Redacted** | 214458 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 212986 | | | | Equipment Operator | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 013149 | | **Redacted** | **Redacted** | Safety Training Manager | **Redacted** | 215372 | Full Time | Salaried | **Redacted** | Safety | Indirect | Fort Worth, TX |
| Power Line Services | **Redacted** | | | 214261 | | | | Lineman | **Redacted** | 214458 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 003979 | Already Transferred | **Redacted** | **Redacted** | Operations Manager | **Redacted** | 014236 | Full Time | Salaried | **Redacted** | Field Mgmt-Transmission | Indirect | Fort Worth, TX |
| Power Line Services | **Redacted** | | | 211516 | | **Redacted** | **Redacted** | Subcontracts Admin 1 | **Redacted** | 015192 | Full Time | Hourly | **Redacted** | Purchasing | Indirect | Fort Worth, TX |
| Power Line Services | Chapman, Charlotte T. | Charlotte | Chapman | 215048 | RIF | | | HR Manager | Campbell, Alicia | 214341 | Full Time | Salaried | 10/17/2022 | Human Resources | SG&A | Fort Worth, TX |
| Auger Services | **Redacted** | | | 014575 | | **Redacted** | **Redacted** | Crane Operator | **Redacted** | 003056 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Citrus County, FL |
| Power Line Services | **Redacted** | | | 017507 | | **Redacted** | **Redacted** | Field Safety Specialist | **Redacted** | 215373 | Full Time | Salaried | **Redacted** | Safety | Indirect | Citrus County, FL |
| Power Line Services | **Redacted** | | | 213865 | | | | Lineman Apprentice 6 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 015631 | | | | Lineman Apprentice 6 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 212587 | RIF | **Redacted** | **Redacted** | Project Controls Analyst | **Redacted** | 210923 | Full Time | Salaried | **Redacted** | Field Mgmt-Distribution | Indirect | Fort Worth, TX |
| Power Line Services | **Redacted** | | | 213197 | | **Redacted** | **Redacted** | Material Coordinator | **Redacted** | 211394 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Auger Services | **Redacted** | | | 008915 | | | | Equipment Operator | **Redacted** | 003067 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Gonzales, LA |
| Power Line Services | **Redacted** | | | 215457 | | | | Journeyman Lineman | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct Labor | Concord, NC |
| Power Line Services | **Redacted** | | | 213953 | | | | Lineman Apprentice 5 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Auger Services | **Redacted** | | | 003020 | | | | Equipment Operator | **Redacted** | 003067 | Full Time | Hourly | **Redacted** | Shop-Foundations | Indirect | Gonzales, LA |
| Power Line Services | **Redacted** | | | 211648 | | **Redacted** | **Redacted** | General Foreman | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Indirect | Rome, GA |
| Power Line Services | **Redacted** | | | 210516 | | | | Journeyman Lineman | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 213859 | | **Redacted** | **Redacted** | Foreman | **Redacted** | 213854 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 213861 | | **Redacted** | **Redacted** | General Foreman | **Redacted** | 213854 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Indirect | Concord, NC |
| Power Line Services | **Redacted** | | | 214078 | | **Redacted** | **Redacted** | Project Coordinator | **Redacted** | 214458 | Full Time | Hourly | **Redacted** | Field Mgmt-Distrib East | Indirect | Rome, GA |
| Power Line Services | **Redacted** | | | 211641 | | | | Lineman Apprentice 5 | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 213869 | | | | Lineman Apprentice 6 | **Redacted** | 213854 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 213835 | | **Redacted** | **Redacted** | Assistant Project Manager | **Redacted** | 213837 | Full Time | Salaried | **Redacted** | Project Mgmt-Distrib East | Indirect | Rome, GA |

| COMPANY | EMPLOYEE NAME | GIVENNAME | SURNAME | PLH EMP ID | PTD EMP ID | PLH Email | PSC Email | TITLE | PLS/AUGER SUPERVISOR | PLS/AUGER SUPERVISOR | FULL TIME/ PART TIME | HRLY/SAL | PLS/AUGER HIRE DATE | PLS/AUGER DEPARTMENT | LABOR TYPE | LOCATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Power Line Services | Redacted | | | 008567 | | | | License Holder | Redacted | 003703 | Part Time | Hourly | Redacted | Admin/Management | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 017510 | | | | Lineman Apprentice 6 | Redacted | 213854 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 214648 | | Redacted | Redacted | Foreman | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 213144 | | Redacted | Redacted | Project Controls Manager | Redacted | 210923 | Full Time | Salaried | Redacted | Project Mgmt-Distribution | Indirect | Fort Worth, TX |
| Power Line Services | Redacted | | | 010876 | | Redacted | Redacted | Service Supervisor | Redacted | 011840 | Full Time | Hourly | Redacted | Fleet/Equip | Indirect | Sherman, TX |
| Power Line Services | Redacted | | | 015364 | | Redacted | Redacted | Fleet Logistics Supervisor | Redacted | 010876 | Full Time | Hourly | Redacted | Fleet/Equip | Indirect | Fort Worth, TX |
| Power Line Services | Redacted | | | 211325 | | Redacted | Redacted | Field Safety Specialist | Redacted | 215374 | Full Time | Salaried | Redacted | Safety | Indirect | Concord, NC |
| Power Line Services | Redacted | | | 215349 | | | | Lineman Apprentice 4 | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 213880 | | Redacted | Redacted | Foreman | Redacted | 213854 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 213837 | 179477 | Redacted | Redacted | Operations Director | Redacted | 011840 | Full Time | Salaried | Redacted | Field Mgmt-Distrib East | Indirect | Rome, GA |
| Power Line Services | Redacted | | | 215130 | | Redacted | Redacted | Shop Hand | Redacted | 010876 | Full Time | Hourly | Redacted | Fleet/Equip | Indirect | Fort Worth, TX |
| Power Line Services | Redacted | | | 211494 | | | | Lineman Apprentice 4 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 213240 | | | | Lineman Apprentice 3 | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 213393 | | Redacted | Redacted | Foreman | Redacted | 014241 | Full Time | Hourly | Redacted | Direct-Distribution Cent | Direct | Beaumont, TX |
| Power Line Services | Redacted | | | 212684 | | | | Equipment Operator | Redacted | 213854 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 212820 | | | | Lineman Apprentice 3 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 006538 | RIF | Redacted | Redacted | Accountant, Sr. | Redacted | 003938 | Full Time | Salaried | Redacted | Accounting | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 003617 | Already Transferred | Redacted | Redacted | SVP & General Manager | Redacted | 003750 | Full Time | Salaried | Redacted | Admin/Management | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 213653 | 119120 | Redacted | Redacted | Foreman | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 214632 | | | | Lineman | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Auger Services | Redacted | | | 014491 | | Redacted | Redacted | Equipment Operator | Redacted | 003056 | Full Time | Hourly | Redacted | Direct-Foundations | Direct | Waxahachie, TX |
| Power Line Services | Redacted | | | 009076 | RIF | Redacted | Redacted | Accountant, Sr. | Redacted | 003938 | Full Time | Salaried | Redacted | Accounting | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 211331 | | Redacted | Redacted | General Foreman | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Indirect | Rome, GA |
| Auger Services | Redacted | | | 003739 | | Redacted | Redacted | Foreman | Redacted | 003056 | Full Time | Hourly | Redacted | Direct-Foundations | Direct | Waxahachie, TX |
| Power Line Services | Redacted | | | 213620 | | Redacted | Redacted | Mechanic | Redacted | 010876 | Full Time | Hourly | Redacted | Fleet/Equip | Indirect | Odessa, TX |
| Power Line Services | Redacted | | | 214649 | | Redacted | Redacted | Foreman | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 016476 | | | | Lineman | Redacted | 213854 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Auger Services | Redacted | | | 213530 | | | | Laborer | Redacted | 003056 | Full Time | Hourly | Redacted | Direct-Foundations | Direct | Gonzales, LA |
| Power Line Services | Redacted | | | 215499 | | | | Foreman | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct Labor | Concord, NC |
| Power Line Services | Redacted | | | 213854 | | Redacted | Redacted | General Foreman | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Indirect | Concord, NC |
| Power Line Services | Redacted | | | 210800 | | | | Lineman | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 212801 | 121301 | | | Lineman Apprentice 3 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 215086 | | | | Lineman Apprentice 3 | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 213862 | | | | Lineman Apprentice 3 | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 213836 | | Redacted | Redacted | Project Manager, Sr. | Redacted | 011840 | Full Time | Salaried | Redacted | Project Mgmt-Distrib East | Indirect | Rome, GA |
| Power Line Services | Redacted | | | 215195 | | | | Material Handler | Redacted | 211394 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 015647 | | | | Lineman Apprentice 6 | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 213870 | | | | Lineman Apprentice 4 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Auger Services | Redacted | | | 003016 | | | | Equipment Operator | Redacted | 003067 | Full Time | Hourly | Redacted | Shop-Foundations | Indirect | Gonzales, LA |
| Auger Services | Redacted | | | 003055 | | Redacted | Redacted | Administrative Assistant | Redacted | 003056 | Full Time | Hourly | Redacted | Admin/Management | SG&A | Gonzales, LA |
| ~~Power Line Services~~ | ~~Redacted~~ | | | ~~011840~~ | Resinged | Redacted | Redacted | SVP Operations | Redacted | 003617 | Full Time | Salaried | Redacted | Admin/Management | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 214623 | | Redacted | Redacted | Foreman | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 213800 | | Redacted | Redacted | General Foreman | Redacted | 213837 | Full Time | Hourly | Redacted | Field Mgmt-Distrib East | Indirect | Rome, GA |
| Power Line Services | Redacted | | | 215381 | | | | Mechanic | Redacted | | | | Redacted | | | |
| Power Line Services | Redacted | | | 210712 | 270433 | Redacted | Redacted | Field Safety Specialist | Redacted | 215376 | Full Time | Salaried | Redacted | Safety | Indirect | Fort Worth, TX |
| Power Line Services | Redacted | | | 211394 | | Redacted | Redacted | Material Specialist, Sr. | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 215386 | 118964 | | | Lineman Apprentice 5 | Redacted | | | | Redacted | | | |
| Power Line Services | Redacted | | | 211838 | | | | Lineman Apprentice 6 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 211826 | | Redacted | Redacted | Foreman | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 014305 | 110280 | Redacted | Redacted | Assistant Controller | Redacted | 014559 | Full Time | Salaried | Redacted | Accounting | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 214644 | | | | Equipment Operator | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |

| COMPANY | EMPLOYEE NAME | GIVENNAME | SURNAME | PLH EMP ID | PTD EMP ID | PLH Email | PSC Email | TITLE | PLS/AUGER SUPERVISOR | PLS/AUGER SUPERVISOR | FULL TIME/ PART TIME | HRLY/SAL | PLS/AUGER HIRE DATE | PLS/AUGER DEPARTMENT | LABOR TYPE | LOCATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Power Line Services | Redacted | | | 215460 | | | | Lineman Apprentice 4 | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct Labor | Rome, GA |
| Power Line Services | Redacted | | | 213826 | | Redacted | Redacted | Superintendent | Redacted | 214458 | Full Time | Hourly | Redacted | Field Mgmt-Distrib East | Indirect | Rome, GA |
| Power Line Services | Redacted | | | 214638 | 289714 | | | Lineman Apprentice 5 | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 214248 | | | | Mechanic | Redacted | 213871 | Full Time | Hourly | Redacted | Fleet/Equip-Distr East | Indirect | Concord, NC |
| Power Line Services | Redacted | | | 002216 | | Redacted | Redacted | Accts Payable Supervisor | Redacted | 014305 | Full Time | Salaried | Redacted | Accounting | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 211472 | 303831 | | | Lineman Apprentice 6 | Redacted | | | | Redacted | | | |
| Power Line Services | Redacted | | | 013214 | | Redacted | Redacted | Foreman | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 213470 | | | | Lineman | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 215503 | | | | Journeyman Lineman | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct Labor | Concord, NC |
| Power Line Services | Redacted | | | 215463 | | | | Lineman Apprentice 4 | Redacted | 213826 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct Labor | Jackson, GA |
| Power Line Services | Redacted | | | 215066 | | | | Lineman Apprentice 6 | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 215341 | | | | Lineman Apprentice 5 | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 213900 | | | | Lineman Apprentice 5 | Redacted | 213854 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 215183 | | | | Lineman Apprentice 2 | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 214316 | | Redacted | Redacted | Fleet Administrator | Redacted | 010876 | Full Time | Hourly | Redacted | Fleet/Equip | Indirect | Fort Worth, TX |
| Power Line Services | Redacted | | | 211474 | 119867 | | | Lineman Apprentice 8 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 214832 | | Redacted | Redacted | Assistant Project Manager | Redacted | 213836 | Full Time | Salaried | Redacted | Project Mgmt-Distrib East | Indirect | Concord, NC |
| Power Line Services | Redacted | | | 002477 | | Redacted | Redacted | Tool Room Lead | Redacted | 011840 | Full Time | Hourly | Redacted | Fleet/Equip | Indirect | Fort Worth, TX |
| Power Line Services | Redacted | | | 014673 | 111125 | | | Mechanic | Redacted | 010876 | Full Time | Hourly | Redacted | Fleet/Equip | Indirect | Fort Worth, TX |
| Auger Services | Redacted | | | 014463 | | | | Laborer | Redacted | 003056 | Full Time | Hourly | Redacted | Direct-Foundations | Direct | Waxahachie, TX |
| Auger Services | Redacted | | | 014236 | Already Transferred | Redacted | Redacted | SVP Operations | Redacted | 003617 | Full Time | Salaried | Redacted | Admin/Management | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 214696 | RIF | Redacted | Redacted | Assistant Project Manager | Redacted | 214458 | Full Time | Salaried | Redacted | Project Mgmt-Distrib East | Indirect | Rome, GA |
| Power Line Services | Redacted | | | 008798 | Already Transferred | | | Crane Operator | Redacted | 002394 | Full Time | Hourly | Redacted | Direct-Transmission | Direct | Dilley, TX |
| Auger Services | Redacted | | | 003056 | | Redacted | Redacted | Area Manager | Redacted | 014236 | Full Time | Salaried | Redacted | Admin/Management | SG&A | Gonzales, LA |
| Power Line Services | Redacted | | | 213884 | | | | Lineman Apprentice 6 | Redacted | 213854 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 214458 | | Redacted | Redacted | Operations Manager | Redacted | 213837 | Full Time | Salaried | Redacted | Field Mgmt-Distrib East | Indirect | Rome, GA |
| Power Line Services | Redacted | | | 011913 | | Redacted | Redacted | FP&A Manager | Redacted | 011840 | Full Time | Salaried | Redacted | Accounting | SG&A | Odessa, TX |
| Power Line Services | Redacted | | | 215389 | 303830 | | | Lineman Apprentice 5 | Redacted | | | | Redacted | | | |
| Power Line Services | Redacted | | | 211672 | | | | Lineman Apprentice 7 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 211846 | | | | Equipment Operator | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 212803 | | | | Lineman Apprentice 6 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 213871 | | Redacted | Redacted | Superintendent | Redacted | 213837 | Full Time | Hourly | Redacted | Field Mgmt-Distrib East | Indirect | Concord, NC |
| Power Line Services | Redacted | | | 009880 | | Redacted | Redacted | Field Safety Specialist | Redacted | 215374 | Full Time | Salaried | Redacted | Safety | Indirect | Rome, GA |
| Power Line Services | Redacted | | | 215285 | | | | Lineman Apprentice 2 | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 003680 | | Redacted | Redacted | Heavy Haul Driver | Redacted | 010876 | Full Time | Hourly | Redacted | Fleet/Equip | Indirect | Sherman, TX |
| Power Line Services | Redacted | | | 210595 | 303809 | | | Lineman Apprentice 6 | Redacted | | | | Redacted | | | |
| Auger Services | Redacted | | | 002994 | | | | Equipment Operator | Redacted | 003067 | Full Time | Hourly | Redacted | Direct-Foundations | Direct | Gonzales, LA |
| Power Line Services | Redacted | | | 014559 | | Redacted | Redacted | Controller | Redacted | 011840 | Full Time | Salaried | Redacted | Accounting | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 211629 | | | | Lineman Apprentice 4 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 213855 | | | | Lineman Apprentice 4 | Redacted | 213854 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 215346 | | | | Lineman Apprentice 8 | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 213896 | | | | Lineman Apprentice 6 | Redacted | 211648 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 017450 | | Redacted | Redacted | Construction Manager | Redacted | 014236 | Full Time | Salaried | Redacted | Admin/Management | SG&A | Concord, NC |
| Power Line Services | Redacted | | | 214654 | | | | Lineman Apprentice 7 | Redacted | 213871 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 213890 | | | | Field Safety Specialist | Redacted | 215373 | Full Time | Salaried | Redacted | Safety | Indirect | Rome, GA |
| Power Line Services | Redacted | | | 012178 | RIF | Redacted | Redacted | Administrative Assistant | Redacted | 014559 | Full Time | Hourly | Redacted | Admin/Management | SG&A | Fort Worth, TX |
| Power Line Services | Redacted | | | 011899 | RIF | Redacted | Redacted | Accts Payable Specialist | Redacted | 002216 | Full Time | Hourly | Redacted | Accounting | SG&A | Odessa, TX |
| Power Line Services | Redacted | | | 003938 | | Redacted | Redacted | Controller | Redacted | 014559 | Full Time | Salaried | Redacted | Accounting | SG&A | Odessa, TX |
| Power Line Services | Redacted | | | 213875 | | | | Lineman | Redacted | 213854 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | Redacted | | | 211495 | | Redacted | Redacted | Foreman | Redacted | 214458 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | Redacted | | | 210472 | | | | Lineman Apprentice 7 | Redacted | 213990 | Full Time | Hourly | Redacted | Direct-Distribution East | Direct | Rome, GA |



Confidential

| COMPANY | EMPLOYEE NAME | GIVENNAME | SURNAME | PLH EMP ID | PTD EMP ID | PLH Email | PSC Email | TITLE | PLS/AUGER SUPERVISOR | PLS/AUGER SUPERVISOR | FULL TIME/ PART TIME | HRLY/SAL | PLS/AUGER HIRE DATE | PLS/AUGER DEPARTMENT | LABOR TYPE | LOCATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Power Line Services | **Redacted** | | | 213874 | | | | Lineman Apprentice 4 | **Redacted** | 213854 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 213872 | | | | Lineman Apprentice 7 | **Redacted** | 213854 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 215295 | | | | Lineman Apprentice 5 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Auger Services | **Redacted** | | | 003150 | | | | Laborer | **Redacted** | 003056 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Waxahachie, TX |
| Power Line Services | **Redacted** | | | 213898 | | | | Lineman Apprentice 3 | **Redacted** | 213854 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 215084 | | | | Lineman Apprentice 5 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 215498 | | | | Lineman Apprentice 2 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct Labor | Concord, NC |
| Auger Services | **Redacted** | | | 003079 | | **Redacted** | **Redacted** | Superintendent | **Redacted** | 003056 | Full Time | Salaried | **Redacted** | Field Mgmt-Foundations | Indirect | Gonzales, LA |
| Power Line Services | **Redacted** | | | 009165 | | | | Mechanic | **Redacted** | 010876 | Full Time | Hourly | **Redacted** | Fleet/Equip | Indirect | Sherman, TX |
| Power Line Services | **Redacted** | | | 213520 | | **Redacted** | **Redacted** | Mechanic | **Redacted** | 010876 | Full Time | Hourly | **Redacted** | Fleet/Equip | Indirect | Sherman, TX |
| Power Line Services | **Redacted** | | | 214297 | RIF | **Redacted** | **Redacted** | Accts Payable Specialist | **Redacted** | 002216 | Full Time | Hourly | **Redacted** | Accounting | SG&A | Fort Worth, TX |
| Power Line Services | **Redacted** | | | 211637 | | **Redacted** | **Redacted** | Foreman | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 211649 | | | | Lineman Apprentice 5 | **Redacted** | 213990 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Rome, GA |
| Power Line Services | **Redacted** | | | 213863 | | | | Lineman Apprentice 4 | **Redacted** | 213854 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 215159 | | | | Mechanic | **Redacted** | 214458 | Full Time | Hourly | **Redacted** | Fleet/Equip-Distr East | Indirect | Rome, GA |
| Auger Services | **Redacted** | | | 003128 | | | | Equipment Operator | **Redacted** | 003067 | Full Time | Hourly | **Redacted** | Direct-Foundations | Direct | Gonzales, LA |
| Power Line Services | **Redacted** | | | 213678 | | | | Lineman Apprentice 4 | **Redacted** | 213871 | Full Time | Hourly | **Redacted** | Direct-Distribution East | Direct | Concord, NC |
| Power Line Services | **Redacted** | | | 215384 | 303834 | | | Foreman | | | | | | | | |

PARTIALLY UNREDACTED VERSION OF THE 2/16/23 "RIF" LIST

Showing the Names in Red
on Bates Numbers Primoris 000254-000257
As Identified in Defendant's Response to Plaintiff's Interragotatory No. 5

This Partially Unredacted Version of the 2/16/23 "RIF" List
Was Printed to PDF to Match the Format of Defendant's MSJ
Exhibit #A-16 at Defendant's App. 70 (ECF # 39-2, Page ID 745)

| COMPANY | EMPLOYEE NAME | PLH EMP ID | PTD EMP ID | TITLE |
|---|---|---|---|---|
| | | | | Current |
| Power Line Services | [redacted] | 012772 | | Journeyman Lineman |
| Power Line Services | [redacted] | 213882 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 014187 | 118481 | Lineman Apprentice 5 |
| Power Line Services | [redacted] | 214626 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 215292 | | Lineman Apprentice 5 |
| Auger Services | [redacted] | 214359 | | Groundman |
| Power Line Services | [redacted] | 214967 | | Lineman Apprentice 6 |
| Power Line Services | Bell, Franchesska L. | 012567 | RIF | Accts Payable Specialist |
| Power Line Services | [redacted] | 211927 | | Lineman Apprentice 4 |
| Auger Services | [redacted] | 8787 | | Equipment Operator |
| Auger Services | [redacted] | 003067 | | Superintendent |
| Power Line Services | [redacted] | 215153 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 210799 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 014806 | 119812 | Equipment Operator |
| Power Line Services | [redacted] | 214791 | | Foreman |
| Auger Services | [redacted] | 214346 | | Foreman |
| Power Line Services | [redacted] | 210674 | | Foreman |
| Auger Services | [redacted] | 008788 | | Equipment Operator |
| Auger Services | [redacted] | 003034 | | Foreman |
| Power Line Services | [redacted] | 210177 | | Safety Manager |
| Power Line Services | [redacted] | 213860 | 120344 | General Foreman |
| Power Line Services | [redacted] | 213866 | 120545 | Foreman |
| Power Line Services | [redacted] | 213877 | | Lineman Apprentice 3 |
| Power Line Services | [redacted] | 016479 | | Field Safety Specialist |
| Power Line Services | [redacted] | 215293 | | Lineman |
| Auger Services | [redacted] | 214347 | | Groundman |
| Power Line Services | [redacted] | 215196 | | Lineman |
| Power Line Services | [redacted] | 212986 | | Equipment Operator |
| Power Line Services | [redacted] | 013149 | | Safety Training Manager |
| Power Line Services | [redacted] | 214261 | | Lineman |
| Power Line Services | [redacted] | 003979 | Already Transferred | Operations Manager |
| Power Line Services | [redacted] | 211516 | | Subcontracts Admin 1 |
| Power Line Services | Chapman, Charlotte T. | 215048 | RIF | HR Manager |
| Auger Services | [redacted] | 014575 | | Crane Operator |
| Power Line Services | [redacted] | 017507 | | Field Safety Specialist |
| Power Line Services | [redacted] | 213865 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 015631 | | Lineman Apprentice 6 |
| Power Line Services | Cooper, Aaron D. | 212587 | RIF | Project Controls Analyst |
| Power Line Services | [redacted] | 213197 | | Material Coordinator |

| COMPANY | EMPLOYEE NAME | PLH EMP ID | PTD EMP ID | TITLE |
|---|---|---|---|---|
| Auger Services | [redacted] | 008915 | | Equipment Operator |
| Power Line Services | [redacted] | 215457 | | Journeyman Lineman |
| Power Line Services | [redacted] | 213953 | | Lineman Apprentice 5 |
| Auger Services | [redacted] | 003020 | | Equipment Operator |
| Power Line Services | [redacted] | 211648 | | General Foreman |
| Power Line Services | [redacted] | 210516 | | Journeyman Lineman |
| Power Line Services | [redacted] | 213859 | | Foreman |
| Power Line Services | [redacted] | 213861 | | General Foreman |
| Power Line Services | [redacted] | 214078 | | Project Coordinator |
| Power Line Services | [redacted] | 211641 | | Lineman Apprentice 5 |
| Power Line Services | [redacted] | 213869 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 213835 | | Assistant Project Manager |
| Power Line Services | [redacted] | 008567 | | License Holder |
| Power Line Services | [redacted] | 017510 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 214648 | | Foreman |
| Power Line Services | [redacted] | 213144 | | Project Controls Manager |
| Power Line Services | [redacted] | 010876 | | Service Supervisor |
| Power Line Services | [redacted] | 015364 | | Fleet Logistics Supervisor |
| Power Line Services | [redacted] | 211325 | | Field Safety Specialist |
| Power Line Services | [redacted] | 215349 | | Lineman Apprentice 4 |
| Power Line Services | [redacted] | 213880 | | Foreman |
| Power Line Services | Gillis, Arnold R. | 213837 | 179477 | Operations Director |
| Power Line Services | [redacted] | 215130 | | Shop Hand |
| Power Line Services | [redacted] | 211494 | | Lineman Apprentice 4 |
| Power Line Services | [redacted] | 213240 | | Lineman Apprentice 3 |
| Power Line Services | [redacted] | 213393 | | Foreman |
| Power Line Services | [redacted] | 212684 | | Equipment Operator |
| Power Line Services | [redacted] | 212820 | | Lineman Apprentice 3 |
| Power Line Services | Hazen, Janelle S. | 006538 | RIF | Accountant, Sr. |
| Power Line Services | [redacted] | 003617 | Already Transferred | SVP & General Manager |
| Power Line Services | [redacted] | 213653 | 119120 | Foreman |
| Power Line Services | [redacted] | 214632 | | Lineman |
| Auger Services | [redacted] | 014491 | | Equipment Operator |
| Power Line Services | Henricks, Linda K. | 009076 | RIF | Accountant, Sr. |
| Power Line Services | [redacted] | 211331 | | General Foreman |
| Auger Services | [redacted] | 003739 | | Foreman |
| Power Line Services | [redacted] | 213620 | | Mechanic |
| Power Line Services | [redacted] | 214649 | | Foreman |
| Power Line Services | [redacted] | 016476 | | Lineman |

| COMPANY | EMPLOYEE NAME | PLH EMP ID | PTD EMP ID | TITLE |
|---|---|---|---|---|
| Auger Services | [redacted] | 213530 | | Laborer |
| Power Line Services | [redacted] | 215499 | | Foreman |
| Power Line Services | [redacted] | 213854 | | General Foreman |
| Power Line Services | [redacted] | 210800 | | Lineman |
| Power Line Services | [redacted] | 212801 | 121301 | Lineman Apprentice 3 |
| Power Line Services | [redacted] | 215086 | | Lineman Apprentice 3 |
| Power Line Services | [redacted] | 213862 | | Lineman Apprentice 3 |
| Power Line Services | [redacted] | 213836 | | Project Manager, Sr. |
| Power Line Services | [redacted] | 215195 | | Material Handler |
| Power Line Services | [redacted] | 015647 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 213870 | | Lineman Apprentice 4 |
| Auger Services | [redacted] | 003016 | | Equipment Operator |
| Auger Services | [redacted] | 003055 | | Administrative Assistant |
| ~~Power Line Services~~ | [redacted] | ~~011840~~ | Resinged | SVP Operations |
| Power Line Services | [redacted] | 214623 | | Foreman |
| Power Line Services | [redacted] | 213800 | | General Foreman |
| Power Line Services | [redacted] | 215381 | | Mechanic |
| Power Line Services | [redacted] | 210712 | 270433 | Field Safety Specialist |
| Power Line Services | [redacted] | 211394 | | Material Specialist, Sr. |
| Power Line Services | [redacted] | 215386 | 118964 | Lineman Apprentice 5 |
| Power Line Services | [redacted] | 211838 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 211826 | | Foreman |
| Power Line Services | [redacted] | 014305 | 110280 | Assistant Controller |
| Power Line Services | [redacted] | 214644 | | Equipment Operator |
| Power Line Services | [redacted] | 215460 | | Lineman Apprentice 4 |
| Power Line Services | [redacted] | 213826 | | Superintendent |
| Power Line Services | [redacted] | 214638 | 289714 | Lineman Apprentice 5 |
| Power Line Services | [redacted] | 214248 | | Mechanic |
| Power Line Services | [redacted] | 002216 | | Accts Payable Supervisor |
| Power Line Services | [redacted] | 211472 | 303831 | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 013214 | | Foreman |
| Power Line Services | [redacted] | 213470 | | Lineman |
| Power Line Services | [redacted] | 215503 | | Journeyman Lineman |
| Power Line Services | [redacted] | 215463 | | Lineman Apprentice 4 |
| Power Line Services | [redacted] | 215066 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 215341 | | Lineman Apprentice 5 |
| Power Line Services | [redacted] | 213900 | | Lineman Apprentice 5 |
| Power Line Services | [redacted] | 215183 | | Lineman Apprentice 2 |
| Power Line Services | [redacted] | 214316 | | Fleet Administrator |
| Power Line Services | [redacted] | 211474 | 119867 | Lineman Apprentice 8 |
| Power Line Services | [redacted] | 214832 | | Assistant Project Manager |
| Power Line Services | [redacted] | 002477 | | Tool Room Lead |

| COMPANY | EMPLOYEE NAME | PLH EMP ID | PTD EMP ID | TITLE |
|---|---|---|---|---|
| Power Line Services | [redacted] | 014673 | 111125 | Mechanic |
| Auger Services | [redacted] | 014463 | | Laborer |
| Auger Services | [redacted] | 014236 | Already Transferred | SVP Operations |
| Power Line Services | Ranstadler, John A. | 214696 | RIF | Assistant Project Manager |
| Power Line Services | [redacted] | 008798 | Already Transferred | Crane Operator |
| Auger Services | [redacted] | 003056 | | Area Manager |
| Power Line Services | [redacted] | 213884 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 214458 | | Operations Manager |
| Power Line Services | [redacted] | 011913 | | FP&A Manager |
| Power Line Services | [redacted] | 215389 | 303830 | Lineman Apprentice 5 |
| Power Line Services | [redacted] | 211672 | | Lineman Apprentice 7 |
| Power Line Services | [redacted] | 211846 | | Equipment Operator |
| Power Line Services | [redacted] | 212803 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 213871 | | Superintendent |
| Power Line Services | [redacted] | 009880 | | Field Safety Specialist |
| Power Line Services | [redacted] | 215285 | | Lineman Apprentice 2 |
| Power Line Services | [redacted] | 003680 | | Heavy Haul Driver |
| Power Line Services | [redacted] | 210595 | 303809 | Lineman Apprentice 6 |
| Auger Services | [redacted] | 002994 | | Equipment Operator |
| Power Line Services | [redacted] | 014559 | | Controller |
| Power Line Services | [redacted] | 211629 | | Lineman Apprentice 4 |
| Power Line Services | [redacted] | 213855 | | Lineman Apprentice 4 |
| Power Line Services | [redacted] | 215346 | | Lineman Apprentice 8 |
| Power Line Services | [redacted] | 213896 | | Lineman Apprentice 6 |
| Power Line Services | [redacted] | 017450 | | Construction Manager |
| Power Line Services | [redacted] | 214654 | | Lineman Apprentice 7 |
| Power Line Services | [redacted] | 213890 | | Field Safety Specialist |
| Power Line Services | Smithee, Adrianna G. | 012178 | RIF | Administrative Assistant |
| Power Line Services | Spencer, Alessandra | 011899 | RIF | Accts Payable Specialist |
| Power Line Services | [redacted] | 003938 | | Controller |
| Power Line Services | [redacted] | 213875 | | Lineman |
| Power Line Services | [redacted] | 211495 | | Foreman |
| Power Line Services | [redacted] | 210472 | | Lineman Apprentice 7 |
| Power Line Services | [redacted] | 213874 | | Lineman Apprentice 4 |
| Power Line Services | [redacted] | 213872 | | Lineman Apprentice 7 |
| Power Line Services | [redacted] | 215295 | | Lineman Apprentice 5 |
| Auger Services | [redacted] | 003150 | | Laborer |
| Power Line Services | [redacted] | 213898 | | Lineman Apprentice 3 |
| Power Line Services | [redacted] | 215084 | | Lineman Apprentice 5 |

| COMPANY | EMPLOYEE NAME | PLH EMP ID | PTD EMP ID | TITLE |
|---|---|---|---|---|
| Power Line Services | [redacted] | 215498 | | Lineman Apprentice 2 |
| Auger Services | [redacted] | 003079 | | Superintendent |
| Power Line Services | [redacted] | 009165 | | Mechanic |
| Power Line Services | [redacted] | 213520 | | Mechanic |
| Power Line Services | Whitson, Pamela J. | 214297 | RIF | Accts Payable Specialist |
| Power Line Services | [redacted] | 211637 | | Foreman |
| Power Line Services | [redacted] | 211649 | | Lineman Apprentice 5 |
| Power Line Services | [redacted] | 213863 | | Lineman Apprentice 4 |
| Power Line Services | [redacted] | 215159 | | Mechanic |
| Auger Services | [redacted] | 003128 | | Equipment Operator |
| Power Line Services | [redacted] | 213678 | | Lineman Apprentice 4 |
| Power Line Services | [redacted] | 215384 | 303834 | Foreman |

# PLAINTIFF'S EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHARLOTTE CHAPMAN BYRD,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PRIMORIS SERVICES CORPORATION, PLH GROUP INC., POWER LINE SERVICES, INC., and FUTURE INFRASTRUCTURE, LLC,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 3:24-cv-2767-N** |

**DEFENDANT PRIMORIS SERVICES CORPORATION'S SUPPLEMENTAL OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S FIRST SET OF INTERROGATORIES**

TO: PLAINTIFF CHARLOTTE CHAPMAN BYRD, by and through her counsel of record, Carmen Artaza and Christine Hopkins, Tremain Artaza PLLC, 6060 North Central Expressway, Suite 567, Dallas, Texas 75206.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Primoris Services Corporation ("Defendant") serves Plaintiff, Charlotte Chapman Byrd, ("Plaintiff") with the following supplemental Objections and Answers to Plaintiff's First Set of Interrogatories.

Dated: October 3, 2025

Respectfully submitted,

By: */s/ Nicholé M. Plagens*

Michael J. DePonte
Texas Bar No. 24001392
michael.deponte@jacksonlewis.com
Nicholé M. Plagens
Texas Bar No. 24083665
nichole.plagens@jacksonlewis.com
Jackson Lewis P.C.
500 N Akard St, Suite 2500
Dallas, TX 75201
T (214) 520-2400
F (214) 520-2008

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2025, a true and correct copy of Defendant Primoris Services Corporation's Objections and Responses to Charlotte Chapman Byrd's First Set of Interrogatories was served on all counsel of record, via email, to the contact information listed below:

Carmen Artaza
Texas Bar No. 24055114
carmen@tremainartaza.com
Christine Hopkins
Texas Bar No. 24095786
christine@tremainartaza.com
TREMAIN ARTAZA PLLC
6060 North Central Expwy, Ste 567
Dallas, TX 75206

COUNSEL FOR PLAINTIFF

*/s/ Nicholé M. Plagens*
Nicholé M. Plagens

## INTERROGATORIES

**INTERROGATORY NO. 5**

State the full name and effective date of termination for every employee listed in red as a "RIF" on Primoris 000254-00257.

**ANSWER:**

Defendant states that the following individuals comprise those employees full names as listed on Primoris 000254-00257 and effective dates of termination for every employee listed in red as a "RIF" on Primoris 000254-00257:

- Franchesska Bell, former Accounts Payable Specialist, termination date July 23, 2023;
- Charlotte Chapman, former Human Resources ("HR") Manager, termination date February 21, 2023;
- Aaron Cooper, Project Control Analyst, still active;
- Arnold Gillis, former Operation Director, termination date June 8, 2023;
- Janelle Hazen, former Senior Accountant, termination date February 24, 2023;
- Linda Henricks, Senior Accountant, still active;
- John Randstadler, former Assistant Project Manager, termination date November 1, 2024;
- Adrianna Smithee, Administrative Assistant, still active;
- Alessandra Spencer, Accounts Payable Specialist, still active; and
- Pamela Whitson, former Accounts Payable Specialist, termination date August 25, 2023.

**INTERROGATORY NO. 8**

For each company that existed as a subsidiary Primoris Services Corporation at any time from January 1, 2022 through present, state the name of the company, the dates during which it existed as a subsidiary of Primoris Services Corporation, and (a) if it is no longer a subsidiary, explain in detail why it is no longer a subsidiary including specifically disclosing whether whether it merged with or was acquired by Primoris Services Corporation or one of its other subsidiaries and/or whether a new entity was created to take its place.

**ANSWER:**

Defendant objects to this interrogatory as seeking information that is not relevant to any parties' claims or defenses when it seeks "each company that existed as a subsidiary [sic] Primoris Services Corporation…" Primoris Services Corporation consists of over a hundred subsidiaries, many of which are defunct or employ no employees. Furthermore, Ms. Byrd is bringing claims of discrimination and retaliation in relation to her termination from Power Line Services, Inc. (Texas) ("PLS"), a subsidiary of PSC, as part of a Reduction in Force ("RIF") when PLS (Texas) transferred its assets and relevant human capital to Primoris T&D ("PTD"), a second subsidiary of PSC. PLS (Texas) did not transfer assets or relevant human capital to any other PSC subsidiary. Therefore, information about any other subsidiaries of PSC is irrelevant. Further, Defendant objects to this interrogatory as seeking information that is not relevant to any parties' claims or defenses when it seeks information relating to "(a) if it is no longer a subsidiary, explain in detail why it is no longer a subsidiary including specifically disclosing whether it merged or was acquired by Primoris Services Corporation ("PSC") or one of its other subsidiaries and/or whether a new entity was created to take its place." A detailed explanation of why a specific subsidiary is no longer a subsidiary is not only irrelevant, but defendant also objects to this interrogatory as seeking proprietary or confidential business information.

**INTERROGATORY NO. 10**

Identify the legal name of the entity or entities that comprised "Future Infrastructure, a Primoris Company" as identified at https://www.prim.com/about/business-units/future-infrastructure, in 2022, 2023, and 2024.

**ANSWER:**

Defendant states that the only legal entity to comprise "Future Infrastructure, a Primoris Company" as identified at https://www.prim.com/about/business-units/future-infrastructure, in 2022, 2023, and 2024 is Future Infrastructure, LLC.

Docusign Envelope ID: 9637E014-21AD-4105-A879-809E6BFB5BA0

# DECLARATION

I, Jackie Hendrick, Vice President of Human Resources, Utilities, Primoris Services Corporation, hereby swear and/or affirm that I have reviewed DEFENDANT PRIMORIS SERVICES CORPORATION'S SUPPLEMENTAL OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S FIRST SET OF INTERROGATORIES as a representative of Defendant Primoris Services Corporation and am authorized to make this unsworn declaration on its behalf. The factual information set out in the Answers is based either on my personal knowledge or that of other company employees and records. In particular, where I do not have personal knowledge, I have determined that the factual information set out in the Answers was provided by the appropriate employees and/or from the records of said company, and I believe the answers are true and correct to the best of my knowledge.

I declare under penalty of perjury that all of the factual information set out in DEFENDANT PRIMORIS SERVICES CORPORATION'S SUPPLEMENTAL OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S FIRST SET OF INTERROGATORIES is true and correct.

Signed in Mansfield, Texas on this date: October 3, 2025.

____________________________
Jackie Hendrick

# PLAINTIFF'S EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHARLOTTE CHAPMAN BYRD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:24-cv-2767-N** |
| **PRIMORIS SERVICES CORPORATION, PLH GROUP INC., POWER LINE SERVICES, INC., and FUTURE INFRASTRUCTURE, LLC,** | § § § § | |
| | § | |
| **Defendants.** | § | |

**DEFENDANT PRIMORIS SERVICES CORPORATION'S OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S SECOND SET OF INTERROGATORIES**

TO: PLAINTIFF CHARLOTTE CHAPMAN BYRD, by and through her counsel of record, Carmen Artaza and Christine Hopkins, Tremain Artaza PLLC, 6060 North Central Expressway, Suite 567, Dallas, Texas 75206.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Primoris Services Corporation ("Defendant") serves Plaintiff, Charlotte Chapman Byrd, ("Plaintiff") with the following Objections and Answers to Plaintiff's Second Set of Interrogatories.

Dated: October 16, 2025

Respectfully submitted,

By: */s/ Nicholé M. Plagens*

Michael J. DePonte
Texas Bar No. 24001392
michael.deponte@jacksonlewis.com
Nicholé M. Plagens
Texas Bar No. 24083665
nichole.plagens@jacksonlewis.com
Jackson Lewis P.C.
500 N Akard St, Suite 2500
Dallas, TX 75201
T (214) 520-2400
F (214) 520-2008

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2025, a true and correct copy of Defendant Primoris Services Corporation's Objections and Responses to Charlotte Chapman Byrd's Second Set of Interrogatories was served on all counsel of record, via email, to the contact information listed below:

Carmen Artaza
Texas Bar No. 24055114
carmen@tremainartaza.com
Christine Hopkins
Texas Bar No. 24095786
christine@tremainartaza.com
TREMAIN ARTAZA PLLC
6060 North Central Expwy, Ste 567
Dallas, TX 75206

COUNSEL FOR PLAINTIFF

*/s/ Nicholé M. Plagens*
Nicholé M. Plagens

## INTERROGATORIES

**INTERROGATORY NO. 11**

Identify (a) the first date Charlotte Chapman Byrd appeared on any RIF List, or was otherwise identified in any e-mail, spreadsheet, or document as a RIF candidate, and (b) the Bates Number(s) of the earliest RIF List, e-mail, spreadsheet or document that lists or designates Charlotte Chapman Byrd for RIF.

**ANSWER:**

Defendant states that Charlotte Chapman Byrd first appeared on any RIF list, or was otherwise identified in any e-mail, spreadsheet, or document as a RIF candidate on February 16, 2025, as shown in documents previously produced with Bates Numbers Primoris 001486-14789.

**INTERROGATORY NO. 12**

Identify the date that PLS employees included in Wave 5 of the PLS-Auger transfers became employees of PTD.

**ANSWER:**

Defendant states that the PLS employees included in Wave 5 of the PLS-Auger transfers became employees of PTD on March 20, 2023.

Docusign Envelope ID: 878A2830-4705-4438-8C49-2684DF92214D

# DECLARATION

I, Alicia Campbell, Human Resources Director – Power Delivery, Primoris Power Delivery, hereby swear and/or affirm that I have reviewed DEFENDANT PRIMORIS SERVICES CORPORATION'S OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S SECOND SET OF INTERROGATORIES as an authorized representative of Defendant Primoris Services Corporation, and am authorized to make this unsworn declaration on its behalf. The factual information set out in the Answers is based either on my personal knowledge or that of other company employees and records. In particular, where I do not have personal knowledge, I have determined that the factual information set out in the Answers was provided by the appropriate employees and/or from the records of said company, and I believe the answers are true and correct to the best of my knowledge.

I declare under penalty of perjury that all of the factual information set out in DEFENDANT PRIMORIS SERVICES CORPORATION'S OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S SECOND SET OF INTERROGATORIES is true and correct.

Signed in Parker County, TX on this date: October 15, 2025.
(County, State)

Alicia Campbell
Alicia Campbell

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHARLOTTE CHAPMAN BYRD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:24-cv-2767-N** |
| **PRIMORIS SERVICES CORPORATION, PLH GROUP INC., POWER LINE SERVICES, INC., and FUTURE INFRASTRUCTURE, LLC,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**DEFENDANT PRIMORIS SERVICES CORPORATION'S OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S THIRD SET OF INTERROGATORIES**

TO: PLAINTIFF CHARLOTTE CHAPMAN BYRD, by and through her counsel of record, Carmen Artaza and Christine Hopkins, Tremain Artaza PLLC, 6060 North Central Expressway, Suite 567, Dallas, Texas 75206.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Primoris Services Corporation ("Defendant") serves Plaintiff, Charlotte Chapman Byrd, ("Plaintiff") with the following Objections and Answers to Plaintiff's Third Set of Interrogatories.

Dated: February 23, 2026

Respectfully submitted,

By: */s/ Nicholé M. Plagens*
Michael J. DePonte
Texas Bar No. 24001392
michael.deponte@jacksonlewis.com
Nicholé M. Plagens
Texas Bar No. 24083665
nichole.plagens@jacksonlewis.com
Jackson Lewis P.C.
500 N Akard St, Suite 2500
Dallas, TX 75201
T (214) 520-2400
F (214) 520-2008

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, a true and correct copy of Defendant Primoris Services Corporation's Objections and Responses to Charlotte Chapman Byrd's Third Set of Interrogatories was served on all counsel of record, via email, to the contact information listed below:

Carmen Artaza
Texas Bar No. 24055114
carmen@tremainartaza.com
Christine Hopkins
Texas Bar No. 24095786
christine@tremainartaza.com
TREMAIN ARTAZA PLLC
6060 North Central Expwy, Ste 567
Dallas, TX 75206

COUNSEL FOR PLAINTIFF

*/s/ Nicholé M. Plagens*
Nicholé M. Plagens

## INTERROGATORIES

**INTERROGATORY NO. 13**

State the date Alexis Goluguri was laid-off or otherwise terminated by Defendant.

**ANSWER:**

Defendant states that Alexis Goluguri was terminated on May 18, 2023.

**INTERROGATORY NO. 14**

Identify the date(s) Alexis Goluguri and Ashley Dickson were transferred from PLS to PTD.

**ANSWER:**

Defendant states that Alexis Goluguir and Askly Dickson were transferred from PLS to PTD on February 27, 2023.

**INTERROGATORY NO. 15**

Identify the date that PLS employees included in Wave 6 of the PLS-Auger transfers became employees of PTD.

**ANSWER:**

Defendant states that the PLS employees included in Wave 6 of the PLS-Auger transfers became employees of PTD on April 3, 2023.

**INTERROGATORY NO. 16**

Identify the date that PLS employees included in the Final Wave of the PLS-Auger transfers became employees of PTD.

**ANSWER:**

Defendant states that the PLS employees included in the Final Wave of the PLS-Auger transfers became employees of PTD on August 28, 2023.

**INTERROGATORY NO. 17**

For the outside counsel training and in-house counsel training testified about in Jackie Hendrick's deposition, please provide the following information:

- The date(s) of each outside counsel and in-house counsel training session; and
- The names of the individuals who provided the training.

**ANSWER:**

Defendant objects to this interrogatory as seeking information that is not relevant to any parties' claims or defenses when it seeks information regarding "outside counsel training and in-house counsel training testified about in Jackie Hendrick's deposition," as any such human resources training relating to how to handle employee complaints or investigation into an employee complaint conducted by outside counsel or in-house counsel did not occur until after PSC terminated Ms. Byrd's employment. As such, the date(s) of these alleged training sessions and the names of the individuals who provided the training are not relevant.

# DECLARATION

I, Alicia Campbell, Human Resources Director – Power Delivery, Primoris Power Delivery, hereby swear and/or affirm that I have reviewed DEFENDANT PRIMORIS SERVICES CORPORATION'S OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S THIRD SET OF INTERROGATORIES as an authorized representative of Defendant Primoris Services Corporation, and am authorized to make this unsworn declaration on its behalf. The factual information set out in the Answers is based either on my personal knowledge or that of other company employees and records. In particular, where I do not have personal knowledge, I have determined that the factual information set out in the Answers was provided by the appropriate employees and/or from the records of said company, and I believe the answers are true and correct to the best of my knowledge.

I declare under penalty of perjury that all of the factual information set out in DEFENDANT PRIMORIS SERVICES CORPORATION'S OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S THIRD SET OF INTERROGATORIES is true and correct.

Signed in Aledo, Texas on this date: February 23, 2026.

Alicia Campbell (Feb 23, 2026 15:50:02 CST)

Alicia Campbell

# 02.23.2026 - Verification Page for PSC 3rd Set of Interrogatory Answers - Campbell

Final Audit Report 2026-02-23

| | |
|---|---|
| Created: | 2026-02-23 |
| By: | Shannon Osborne (Shannon.Osborne@jacksonlewis.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAQKjxinjfBQpWqjsQZlVtEuEUou8SMrgx |

## "02.23.2026 - Verification Page for PSC 3rd Set of Interrogatory Answers - Campbell" History

- Document created by Shannon Osborne (Shannon.Osborne@jacksonlewis.com)
  2026-02-23 - 9:46:43 PM GMT

- Document emailed to Alicia Campbell (alicia.campbell@prim.com) for signature
  2026-02-23 - 9:47:23 PM GMT

- Email viewed by Alicia Campbell (alicia.campbell@prim.com)
  2026-02-23 - 9:47:48 PM GMT

- Document e-signed by Alicia Campbell (alicia.campbell@prim.com)
  Signature Date: 2026-02-23 - 9:50:02 PM GMT - Time Source: server

- Agreement completed.
  2026-02-23 - 9:50:02 PM GMT

# PLAINTIFF'S EXHIBIT 8



2024 ANNUAL REPORT

# PRIMORIS ENERGIZED

P's Apx. 147



## 2023 Revenue Mix




## 2024 Revenue Mix




## Backlog

$ millions




## Revenue

$ millions




## Operating Income

$ millions




## Diluted EPS

$ per share



# FELLOW SHAREHOLDERS

Primoris had a historic year in 2024, reaching record highs in revenue, earnings, backlog, and cash flow from operations. Our ability to achieve this success is the result of a multiyear transformation to expand our infrastructure services offering into the solar, power delivery, and communications markets, which today are some of the fastest-growing businesses in our service portfolio.

Strong 2024 results demonstrate that Primoris is a premier solutions provider with a broad geographic footprint and the technical expertise to meet the needs of our customers. Proven by repeat business over several decades with some of our clients, we are a trusted partner to our customers in leading the development, expansion, and modernization of infrastructure in North America now and in the years ahead.

Emerging technologies, increased electrification of industry, and a growing interest in onshoring critical aspects of the supply chain are driving demand for power not seen in decades. We believe these trends are likely to continue over a multiyear period and will require an extensive amount of generation from a wide range of sources. Primoris has the potential to play a key role in helping meet this demand as a safe, efficient, and quality contractor, and our employees are energized to capitalize on the opportunity.

## 2024 Financial Accomplishments

In 2024, we grew total company revenue to $6.4 billion, up 11 percent from 2023. The growth was driven by our



Energy segment, which was up 21 percent, primarily due to more than $600 million of growth from our renewables business. The Utilities segment revenue was mostly flat compared to 2023. More importantly, we saw a significant improvement in gross profit and operating income in the Utilities segment, primarily driven by improved productivity and an increase in storm restoration work in our power delivery business.

Another highlight of 2024 was generating over $500 million of operating cash flow, an increase of more than $300 million from the prior year. We have placed an emphasis on increasing operating cash flow the past few years, and we are seeing the results of our employees' efforts. The improvement in our cash conversion the past two years has allowed us to allocate




**In 2024, we grew total company revenue to $6.4 billion, up 11 percent from 2023. The growth was driven by our Energy segment, which was up 21 percent, primarily due to more than $600 million of growth from our renewables business.**

capital to grow the business and strengthen our balance sheet. This includes paying down $150 million of debt in the fourth quarter of 2024 and another $100 million in the first quarter of 2025.

Net income increased to $54.7 million, or 43 percent from 2023, and our earnings per share ("EPS") rose to $3.31 per fully diluted share. This was driven by a 25 percent increase in operating income and lower interest expense. Our interest expense was down almost $13 million due to lower interest rates, lower average debt balances, and higher interest income during the year. Total backlog was up $970 million, or approximately 9%, to $11.9 billion at year-end 2024. We attained this record high by winning more that $7.7 billion of new awards during the year. This is a credit to our teams' ability to capitalize on the growth trends in our end markets and to earn the trust of our customers to successfully perform on their projects.

## 2024 Operational Performance

When assessing our operational performance for the year, we start with safety, which had another momentous year, achieving a Total Recordable Incident Rate ("TRIR") of 0.50. This is well below the average in our industry of 2.30 and was accomplished while working more than thirty-seven million hours during the year. Our culture of safety and consistent execution is an integral part of maintaining strong customer relationships and attracting talent to join the Primoris team.

In the Utilities segment, we remain committed to improving profitability in power delivery through a combination of increased productivity, renewal of Master Services Agreement ("MSA") contracts at higher rates, and growing our mix of project work. Leadership across the organization worked throughout 2024 to better align our resources toward customers and markets with the

greatest opportunities, while de-emphasizing areas that pose more of a challenge to efficiency and profitability. We also benefited from rate base case decisions that drove increased spend in select markets toward the end of the year, and we had various new MSA contracts renewed at higher rates. This included a new MSA with our largest power delivery customer that went into effect at the beginning of 2025.

The communications business grew by double digits in 2024 due to an expanding revenue base from the construction of data centers and traditional investments in fiber to the home. The growth in the market and our skilled labor force provided an opportunity to be more selective with customers and projects. We are optimistic that this dynamic will continue, allowing us to deliver solid margins and improve our cash conversion in the years ahead as it did in 2024. Gas operations also had a solid year of execution and margin improvement despite the overall market experiencing a slow rate of growth.

The Energy segment delivered a solid year of operational execution and backlog growth. The need for additional power generation capacity to meet energy demand in our core markets was again a source of revenue growth and new project awards. Our industrial construction business secured several natural gas power generation projects during the year, and we see opportunity to book more projects in the coming quarters. Primoris has been a consistent performer in the construction of natural gas power generation projects over the years, and we continue to target opportunities that fit well within our capabilities and expertise to ensure we prioritize profitability and minimize risk.

We also took meaningful steps on our strategic plan in 2024 to divest or wind down certain businesses or service lines that we viewed as subscale, low margin, or non-core to Primoris going forward. While these actions will create a headwind to revenue of approximately $160 million in 2025, we expect to see a benefit in operating margins. It will also allow our management teams to allocate time and resources to other areas of the business with higher growth and profitability.

The renewables business had another year of impressive growth, reaching nearly $2 billion in revenue in 2024. Additionally, we had a strong year of booking new orders to finish the year with approximately $3.1 billion in total backlog. We were also recognized in *Solar Power World* magazine's 2024 rankings as the number two ranked solar EPC contractor nationally and the top utility-scale solar EPC service provider in several states including Texas.

Contributing to our success in 2024 were recently launched products and services that complement our utility-scale solar construction business. These include our electrical balance of system ("eBOS") offering, Premier PV, as well as battery storage and operation and maintenance services. We believe these additional products and services, along with high-voltage capabilities from our power delivery business, offer our renewables customers a full-service solution for their utility-scale solar engineering and construction needs.

## Energized for the Future

Following a successful 2024, Primoris is energized about the opportunities that lie ahead in 2025. We have a robust backlog of projects and the talent to continue

**The need for additional power generation capacity to meet energy demand in our core markets was again a source of revenue growth and new project awards.**





**Our close customer relationships, track record for safety and quality, and talented workforce have us well-positioned for managing various economic outcomes we may face in the coming years.**

taking advantage of the secular trends driving increased opportunities in our end markets. While demand for our services remains high, we recognize that there are risks and uncertainties to our growth plans due to the rapidly changing regulatory environment.

The inflationary impacts of tariffs for critical electrical components, metals, and other materials that may be reliant on imports from other countries could present challenges to a supply chain already experiencing longer than normal lead times. Depending on the scope and duration of policy actions, we could see projects deferred or delayed until there is more clarity around the impacts.

Primoris has faced similar policy actions in the past and we are confident in our ability to adapt and adjust our plans accordingly to avoid serious disruptions. Our close customer relationships, track record for safety and quality, and talented workforce have us well-positioned for managing the various economic outcomes we may face in the coming years.

In closing, I want to thank you for your investment in Primoris Services Corporation. We value your support for our leadership and the strategic direction of the Company as we seek to create long-term shareholder value. As we move forward, Primoris has substantial opportunity to lead in the development, expansion, and modernization of infrastructure in North America. I am confident we have the right strategy to seize these opportunities, grow profitability, and increase cash flow through consistent execution and disciplined capital allocation.



**DAVID KING**

Chairman and Interim
President and
Chief Executive Officer

# DRIVEN BY EXCELLENCE

Our industry accolades represent more than just our capabilities — they reflect our ability to deliver projects that are transformative, reliable, and impactful.

MSCI
ESG RATINGS
A

CCC | B | BB | BBB | A | AA | AAA

## OUR ESG COMMITMENTS

- Occupational Health and Safety
- Ethics and Integrity
- Corporate Culture
- Supporting the Energy Transition
- Employee Attraction, Development, and Retention
- Enterprise Risk Management
- Human Rights
- Data Security and Privacy
- Labor Relations
- Supply Chain Management

THE USE BY PRIMORIS SERVICES CORPORATION OF ANY MSCI ESG RESEARCH LLC OR ITS AFFILIATES ("MSCI") DATA, AND THE USE OF MSCI LOGOS, TRADEMARKS, SERVICE MARKS OR INDEX NAMES HEREIN, DO NOT CONSTITUTE A SPONSORSHIP, ENDORSEMENT, RECOMMENDATION, OR PROMOTION OF PRIMORIS SERVICES CORPORATION BY MSCI. MSCI SERVICES AND DATA ARE THE PROPERTY OF MSCI OR ITS INFORMATION PROVIDERS AND ARE PROVIDED 'AS-IS' AND WITHOUT WARRANTY. MSCI NAMES AND LOGOS ARE TRADEMARKS OR SERVICE MARKS OF MSCI.

2024 ENR TOP 600 SPECIALTY CONTRACTORS
PRIMORIS SERVICES CORPORATION #4

**#4** National Top Specialty Contractor

- **#3** National Utility Contractor
- **#1** Texas & Louisiana Top Specialty Contractor
- **#1** Texas & Louisiana Utility, Power, and Telecommunications Contractor
- **#1** California Top Specialty Contractor
- **#1** California Utility Contractor
- **#3** Southeast Top Specialty Contractor
- **#3** Midwest Top Specialty Contractor

Primoris Services Corporation
2024 TOP SOLAR CONTRACTORS
No. 2 National Solar Contractor

**#2** Overall Top Solar Contractor

- **#2** National EPC Solar Contractor
- **#2** National Utility Solar Contractor
- **#1** Texas Solar Contractor
- **#1** Louisiana Solar Contractor
- **#1** Nevada Solar Contractor
- **#1** Kansas Solar Contractor
- **#1** Michigan Solar Contractor

# FUELED BY PURPOSE

We are focused on delivering value to our communities — ensuring that as we build the energy infrastructure of tomorrow, we're powering lasting change.

**$1.5M**

**Charitable Donations in 2024**










**"We are incredibly grateful to Primoris for their generous support of the American Red Cross. As a new Platinum Plus partner and dedicated Ready 365 Giving Circle member, their support will have a profound impact on our disaster relief efforts. Together, we are making a difference, helping communities recover and thrive. Thank you for standing with us."**

**Linda Braddy,** CEO of the American Red Cross North Texas Region




# STORM-PROOF: RECONNECTING COMMUNITIES

With grit and determination, our crews head to storm-stricken areas — working around the clock to get communities back on their feet. It's not just a job, it's a mission.

**1,400+** EMPLOYEES

**250+** CREWS

**185,000** WORKHOURS



Hundreds of our electrical linemen worked long days in Florida, Georgia, Virginia, Tennessee, North Carolina, and South Carolina in the aftermath of Hurricane Helene.



Our crews repaired lines in eastern Texas after powerful tornadoes and high-wind storms downed trees onto lines and caused widespread damage to the area.



Our teams worked on new 125-foot transmission towers in Texas after devastating tornadoes. Dozens of towers spanning several miles of line needed to be replaced.

# SHARED COMMITMENT.




"We are so appreciative of their **professionalism and commitment."**

"They worked **quickly, safely,** and as a team to get the job done."





"The men and women from your linemen crew worked **tirelessly** for days to get our neighborhood up and running."

"Your linemen showed genuine empathy, commitment, and knowledge. They took care of things while **demonstrating a true concern** for serving the community."

"The hard and **relentless work** was much appreciated. Thank you for making our lives better during this crazy time."

# UNIFIED THANKS.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2024**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number: 001-34145**

# Primoris Services Corporation
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **20-4743916**<br>(I.R.S. Employer Identification No.) |
| **2300 N. Field Street, Suite 1900**<br>**Dallas, Texas**<br>(Address of principal executive offices) | **75201**<br>(Zip Code) |

**(214) 740-5600**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.0001 par value | PRIM | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐<br>Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting common equity held by non-affiliates of the registrant was approximately $2,648.8 million based upon the closing price of such common equity as of June 30, 2024 (the last business day of the Registrant's most recently completed second fiscal quarter). For purposes of this Annual Report on Form 10-K, in addition to those stockholders which fall within the definition of "affiliates" under Rule 405 of the Securities Act of 1933, holders of ten percent or more of the Registrant's common stock are deemed to be affiliates.

On February 18, 2025 there were 53,747,628 shares of common stock, par value $0.0001, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The following documents are incorporated by reference into this Annual Report on Form 10-K: Portions of the registrant's definitive Proxy Statement for its 2025 Annual Meeting of Stockholders are incorporated by reference into Part III of this Annual Report on Form 10-K.

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 25 |
| Item 1C. | Cybersecurity | 25 |
| Item 2. | Properties | 26 |
| Item 3. | Legal Proceedings | 27 |
| Item 4. | Mine Safety Disclosures | 27 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 28 |
| Item 6. | Reserved | 29 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 30 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 49 |
| Item 8. | Financial Statements and Supplementary Data | 49 |
| Item 9. | Changes In and Disagreements With Accountants on Accounting and Financial Disclosure | 49 |
| Item 9A. | Controls and Procedures | 50 |
| Item 9B. | Other Information | 51 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 51 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 52 |
| Item 11. | Executive Compensation | 52 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 52 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 52 |
| Item 14. | Principal Accountant Fees and Services | 52 |
| **Part IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 52 |
| Item 16. | Form 10-K Summary | 55 |
| **Signatures** | | 56 |
| **Index to Consolidated Financial Statements** | | F-1 |

## FORWARD-LOOKING STATEMENTS

*This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are subject to the "safe harbor" created by those sections. Forward-looking statements include information concerning our possible or assumed future results of operations, business strategies, financing plans, competitive position, industry environment, growth opportunities, the effects of regulation and the economy, generally. Forward-looking statements include all statements that are not historical facts and usually can be identified by terms such as "anticipates," "believes," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "projects," "should," "will," "would" or similar expressions.*

*Forward-looking statements include information concerning our possible or assumed future results of operations, business strategies, financing plans, competitive position, industry environment, potential growth opportunities, the effects of regulation and the economy, generally. Forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. Actual results may differ materially as a result of a number of factors, including, among other things, customer timing, project duration, weather, and general economic conditions; changes in our mix of customers, projects, contracts and business; regional or national and/or general economic conditions and demand for our services; price, volatility, and expectations of future prices of oil, natural gas, and natural gas liquids; variations and changes in the margins of projects performed during any particular quarter; increases in the costs to perform services caused by changing conditions; the termination, or expiration of existing agreements or contracts; the budgetary spending patterns of customers; inflation, tariffs and other increases in construction costs that we may be unable to pass through to our customers; cost or schedule overruns on fixed-price contracts; availability of qualified labor for specific projects; changes in bonding requirements and bonding availability for existing and new agreements; the need and availability of letters of credit; increases in interest rates and slowing economic growth or recession; the instability in the banking system; costs we incur to support growth, whether organic or through acquisitions; the timing and volume of work under contract; losses experienced in our operations; the results of the review of prior period accounting on certain projects and the impact of adjustments to accounting estimates; developments in governmental investigations and/or inquiries; intense competition in the industries in which we operate; failure to obtain favorable results in existing or future litigation or regulatory proceedings, dispute resolution proceedings or claims, including claims for additional costs; failure of our partners, suppliers or subcontractors to perform their obligations; cyber-security breaches; failure to maintain safe worksites; risks or uncertainties associated with events outside of our control, including conflicts in the Middle East, war between Russia and Ukraine, and tension between China and Taiwan, severe weather conditions, public health crises and pandemics, political crises or other catastrophic events; client delays or defaults in making payments; the cost and availability of credit and restrictions imposed by credit facilities; failure to implement strategic and operational initiatives; risks or uncertainties associated with acquisitions, dispositions and investments; possible information technology interruptions, cybersecurity threats or inability to protect intellectual property; disruptions related to artificial intelligence; the Company's failure, or the failure of our agents or partners, to comply with laws; the Company's ability to secure appropriate insurance; new or changing political conditions and legal and regulatory requirements, including those relating to environmental, health and safety matters; the loss of one or a few clients that account for a significant portion of the Company's revenues; asset impairments; and risks arising from the inability to successfully integrate acquired businesses. We discuss many of these risks in detail in Part I, Item 1A. "Risk Factors." You should read this Annual Report on Form 10-K completely and with the understanding that our actual future results may be materially different from what we expect.*

*Given these uncertainties, you should not place undue reliance on forward-looking statements. Forward-looking statements represent management's beliefs and assumptions only as of the date of this Annual Report on Form 10-K. We assume no obligation to update forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in any forward-looking statements, even if new information becomes available.*

**PART I**

## ITEM 1. BUSINESS

### Business Overview

Primoris Services Corporation ("Primoris", the "Company", "we", "us", or "our") is one of the leading providers of infrastructure services operating mainly in the United States and Canada. We provide a wide range of construction, maintenance, replacement, fabrication, and engineering services to a diversified base of customers through our two segments: Utilities and Energy. The structure of our reportable segments is generally focused on broad end-user markets for our services.

We have longstanding customer relationships with solar facility developers and utility, refining, petrochemical, communications, midstream, downstream, and engineering companies, as well as power producers and transportation agencies across our core markets. We provide our services to a diversified base of customers, under a range of contracting options. A portion of our services are provided under Master Service Agreements ("MSA"), which are generally multi-year agreements. The remainder of our services are generated from contracts for specific construction or installation projects.

### Reportable Segments

Our current reportable segments are the Utilities segment and the Energy segment.

The Utilities segment operates throughout the United States and specializes in a range of services, including the installation and maintenance of new and existing natural gas and electric utility distribution and transmission systems, and communications systems.

The Energy segment operates throughout the United States and Canada and specializes in a range of services that include engineering, procurement, construction, and maintenance services for entities in the energy, renewable energy and energy storage, renewable fuels, and petroleum and petrochemical industries, as well as state departments of transportation.

**Strategy**

Our strategy has remained consistent from year to year and continues to emphasize the following key elements:

- *Growth Through Controlled Expansion.* We continue to grow our Company by expanding our scope of services, leveraging our existing customer base to expand into new geographic markets, and adding new customers. In addition, we continue to evaluate acquisitions that offer growth opportunities and the ability to leverage our resources as a leading service provider to the utilities and energy industries, specifically focusing on attractive markets, including renewable energy, communications, gas distribution, and power generation. See Note 4 — "Business Combinations" of the Notes to Consolidated Financial Statements included in Item 8. of this Annual Report on Form 10-K for additional detail. Our strategy also focuses on higher growth end markets such as renewable energy, utilities and communications.

- *Emphasis on MSA Revenue Growth, Retention of Existing Customers and Expansion of Project Work in our Core Competencies.* In order to fully leverage our relationships with our existing customer base, we believe it is important to maintain strong customer relationships in order to drive more revenue from them. We are focused on an intentional mix of recurring work from MSAs, which are generally multi-year agreements that provide visible, recurring revenue, and project work in areas of our core competency.

- *Ownership or Long-Term Leasing of Equipment.* Many of our services are equipment intensive. The cost of construction equipment, and in some cases the availability of construction equipment, provides a significant barrier to entry into several of our businesses. We believe that our ownership or long-term leasing of a large and varied construction fleet and our maintenance facilities enhances our access to reliable equipment at a favorable cost.

- *Stable Work Force.* Our business model emphasizes self-performance of a significant portion of our work. In both of our segments, we maintain a stable work force of skilled, experienced craft professionals, many of whom are cross-trained on projects such as pipeline and facility construction, refinery maintenance, gas and electrical distribution, and piping systems.

- *Selective Bidding.* We selectively bid projects that we believe offer an opportunity to meet our profitability objectives and that may offer the opportunity to enter promising new markets. In addition, we review our bidding opportunities to attempt to minimize concentration of work with any one customer, in any one industry, or in stressed labor markets. We believe that by carefully positioning ourselves in market segments that have meaningful barriers of entry, we can continue to be competitive.

- *Maintain a strong balance sheet and a conservative capital structure.* We have maintained a capital structure that provides access to debt financing as needed while relying on strong operating cash flows to provide the primary support for our operations. We believe this structure provides our customers, our lenders, and our bonding companies assurance of our financial capabilities. We maintain a revolving credit facility to provide letter of credit capability and, if needed, to augment our liquidity needs.

**Backlog**

Backlog is discussed in Item 7. "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" of this Annual Report on Form 10-K, which is incorporated herein by reference.

**Customers**

We have longstanding customer relationships with solar facility developers and utility, refining, petrochemical, communications, midstream, downstream, and engineering companies, as well as power producers and transportation agencies across our core markets. We have completed major underground and industrial projects for large natural gas transmission and petrochemical companies in the United States and major electrical and gas projects for large utility companies in the United States. Although we have not been dependent upon any one customer in any year, a small number of customers tend to constitute a substantial portion of our total revenue in any given year.

We enter into a large number of contracts each year, and the projects can vary in length from daily work orders to as long as 36 months, and occasionally longer, for completion on larger projects. We often provide services under long term MSAs, which are generally multi-year agreements for specific types of work. Work performed under these contracts is typically generated through project specific work orders, ranging from repairs and new installations, to maintenance and upgrade services. These MSAs have various terms, depending on the nature of the services provided, and our customers are generally not contractually obligated to purchase an amount of services from us under the MSAs, although we do have MSAs that include minimum spend requirements, or targeted spend amounts. For the years ended December 31, 2024, 2023 and 2022, revenue derived from projects performed under MSAs was 36.8%, 36.7%, and 45.8% of total revenue, respectively.

Our customers have included many of the leading energy and utility companies in the United States, such as; Xcel Energy, Pacific Gas & Electric, Southern California Gas, Oncor Electric, Duke Energy, Sempra Energy, Williams, Hecate Energy, Consumers Energy, Dominion, Valero, Enel Green Power North America, D.E. Shaw Renewable Investments, Entergy, Florida Power and Light, Intersect Power, Avantus, ExxonMobil, and Enterprise Pipeline as well as the Texas Department of Transportation and the Louisiana Department of Transportation and Development.

Our top ten customers vary from year to year due to the nature of our business. A large construction project for a customer may result in significant revenue in one year, with significantly less revenue in subsequent years after project completion. For the years ended December 31, 2024, 2023 and 2022, 41.3%, 41.1% and 46.1%, respectively, of total revenue was generated from our top ten customers in each year. In each of the years, a different group of customers comprised the top ten customers by revenue.

Management in each of our segments and business units is responsible for developing and maintaining successful long-term relationships with customers. Our segment and business unit management teams work with our business development group to foster existing customer relationships and better understand their needs in order to secure additional projects and increase revenue from our current customer base. Segment and business unit managers are also responsible for working with our business development group in pursuing growth opportunities with prospective new customers.

We believe that developing and fostering strategic relationships with customers will result in increased future opportunities. Some of our strategic relationships are in the form of long-term MSAs. However, we realize that future opportunities also require cost effective, high value bids, as pricing is a key element for most construction projects and service agreements.

**Seasonality, Cyclicality and Variability**

Our results of operations are subject to quarterly variations. Some of the variation is the result of weather, particularly rain, ice, snow, and named storms, which can impact our ability to perform construction and infrastructure services. These seasonal impacts can affect revenue and profitability in all of our businesses. Any quarter can be affected either negatively or positively by atypical weather patterns in any part of the country. In addition, demand for new projects in our Utilities segment tends to be lower during the early part of the calendar year due to clients' internal budget cycles. As a result, we usually experience higher revenue and earnings in the second, third and fourth quarters of the year as compared to the first quarter.

Our project values range in size from several hundred dollars to several hundred million dollars. The bulk of our work is comprised of project sizes that average less than $3.0 million. We also perform construction projects which tend not to be seasonal, but can fluctuate from year to year based on customer timing, project duration, weather, and general economic conditions. Our business may be affected by declines, or delays in new projects, or by client project schedules. Because of the cyclical nature of some of our business, the financial results for any period may fluctuate from prior periods, and our financial condition and operating results may vary from quarter to quarter. Results from one quarter may not be indicative of our financial condition, or operating results for any other quarter, or for an entire year.

**Competition**

We face competition on large construction projects from both regional and national contractors, including competition from larger companies that have financial and other resources in excess of those available to us. Competitors

on small construction projects range from a few large construction companies, to a variety of smaller contractors. We compete with many local and regional firms for construction services and with a number of large firms on select projects. Each business unit faces varied competition depending on the type of project, project location, and services offered.

We compete with different companies in different end markets. For example, competitors in our utilities markets include Quanta Services, Inc. Dycom Industries, MYR Group, and MasTec, Inc.; competitors in our industrial markets include PCL, Kiewit, Performance Contractors and Boh Brothers; competitors in the renewables market include Blattner Energy, and Mortenson; and competitors in our highway services markets include Sterling Construction Company and Zachry Construction Company. In each market we may also compete with local, private companies.

We believe that the primary factors influencing competition in our industry are price, reputation for quality, safety, schedule certainty, relevant experience, availability of field supervision and skilled labor, machinery and equipment, financial strength, as well as knowledge of local markets and conditions. We believe that we have the ability to compete favorably in all of these factors.

**Contract Provisions and Subcontracting**

We typically structure contracts as unit-price, time and material, fixed-price or cost reimbursable plus fixed fee. A portion of our revenue is derived from MSAs, which provide a menu of available services that are utilized on an as-needed basis and are typically priced using a unit-price or on a time and material basis. The remainder of our services are generated from contracts for specific construction projects, which are subject to multiple pricing options, including unit-price, time and material, fixed-price, or cost reimbursable plus fixed fee. Under a fixed-price contract, we provide labor, equipment and services required by a project for a competitively bid or negotiated fixed price. Under a unit-price contract, we are committed to providing materials or services required by a project at a fixed price per unit of work. While the unit-price contract shifts the risk of estimating the quantity of units required for a particular project to the customer, any increase in our unit cost over the unit price bid, whether due to inflation, inefficiency, faulty estimates or other factors, is borne by us. Significant materials required under a fixed-price or unit-price contract, such as pipe, solar panels, turbines, boilers and vessels, are typically supplied by the customer.

Substantially all of our gas and electric distribution and communication services are provided pursuant to renewable MSAs on a “unit-price” basis. Fees on unit-price contracts are negotiated and earned based on units completed. Historically, substantially all of the gas and electric distribution and communications customers have renewed their MSAs with us. Facility maintenance services, such as regularly scheduled and emergency repair work, are provided on an ongoing basis at predetermined rates, or on a time and material basis.

Construction contracts are primarily obtained through competitive bidding or through negotiations with customers. We are typically invited to bid on projects undertaken by customers who maintain pre-qualified contractor lists. Contractors are selected for the pre-approved contractor lists by virtue of their prior performance for such customers, as well as their experience, reputation for quality, safety record, financial strength, competitiveness, and bonding capacity.

In evaluating bid opportunities, we consider such factors as the customer, the geographic location of the work, the availability of labor, our competitive advantage or disadvantage relative to other likely bidders, our current and projected workload, the likelihood of additional work, our history with the client, contract terms, and the project’s cost and profitability estimates. We use sophisticated estimating systems and our estimating staff has significant experience in the construction industry. The project estimates form the basis of a project budget against which performance is tracked through a project cost system, thereby enabling management to monitor a project’s cost and schedule performance. Project costs are accumulated and monitored regularly against billings and payments to ensure proper tracking of cash flow on the project.

Most contracts provide for termination of the contract at the convenience of the owner or contractor. The terms associated with termination for convenience typically cover the reimbursement of all of our costs through a specific date, as well as all reasonable costs associated with demobilizing from the jobsite. In addition, contracts may be subject to certain completion schedule requirements which may include liquidated damages in the event schedules are not met.

We act as prime contractor on a majority of the construction projects we undertake. In the construction industry, the prime contractor is normally responsible for the execution of the entire contract scope of work, including subcontract work. Thus, we are potentially subject to increased costs and reputational risks associated with the failure of one or more of our subcontractors to perform their respective scope as defined in the contract. While we subcontract specialized activities such as blasting, hazardous waste removal and selected electrical/instrumentation work, we self-perform most of the work on our projects with our own resources, including field supervision, labor, and equipment.

**Risk Management, Insurance and Bonding**

We maintain a comprehensive schedule of insurance policies covering a broad range of exposures arising from our construction and general business operations. All of our policies have been procured with limits and deductibles or self-insured retention amounts up to certain limits applied on an occurrence or claims made basis. In addition, we maintain certain self-insured retentions in our insurance policies in excess of our general, auto, and employers' liability policies.

We maintain a comprehensive safety and risk management program that has contributed to a favorable loss experience factor. Under our senior leadership, our enterprise risk management department, and through a large network of safety directors and health, safety, and environmental professionals, we effectively assess and manage potential risks and liabilities throughout the pre-construction and performance phases of our projects. While we place a strong emphasis on maintaining a safe workplace, we cannot provide assurances that we will be able to prevent or reduce all injuries or claims within our operations.

In connection with our business, we generally are required to provide various types of surety bonds guaranteeing our performance under certain public and private sector contracts. Our ability to obtain surety bonds depends upon our capitalization, working capital, backlog, past performance, management expertise and other factors, and the surety company's current underwriting standards. To date, we have obtained the level of surety bonds necessary to support our business.

**Regulation and Environmental Requirements**

Our operations are subject to compliance with regulatory requirements of federal, state, and municipal agencies and authorities, and international laws and regulations including with respect to:

- Licensing, permitting and inspection requirements applicable to construction projects;
- Worker safety, including regulations established by the Occupational Safety and Health Administration (OSHA), Mine Safety and Health Administration (MSHA), and other local or state regulatory bodies;
- Wage and hour regulations and regulations associated with our collective bargaining agreements and unionized workforce;
- Transportation of equipment and materials, including licensing and permitting requirements, as well as aviation activities;
- Building and electrical codes;
- Applicable U.S. and non-U.S. anti-corruption regulations;
- Immigration regulations applicable to the U.S. and cross-border employment;
- Labor relations and affirmative action;
- Special bidding, procurement and other requirements on government projects; and
- Protection of the environment, including regulations established by the Environmental Protection Agency, state agencies and other foreign environmental regulators.

We believe that we have all the licenses and permits required to conduct our operations and that we are in substantial compliance with applicable regulatory requirements.

We are subject to numerous federal, state, local and international environmental laws and regulations governing our operations, including the handling, transportation and disposal of non-hazardous and hazardous substances and wastes, as well as emissions and discharges into the environment, including discharges to air, surface water, groundwater and soil. We manage these requirements through our corporate environmental management system and comprehensive

employee training programs to ensure compliance. We have a substantial investment in construction equipment that utilizes diesel fuel, which could be negatively impacted by regulations related to greenhouse gas emissions from such sources.

We also are subject to laws and regulations that impose liability and cleanup responsibility for releases of hazardous substances into the environment. Under some of these laws and regulations, liability can be imposed for cleanup of previously owned or leased properties, or properties to which hazardous substances or wastes were sent by current, or former operations at our facilities, regardless of whether we directly caused the contamination or violated any law at the time of discharge, or disposal. The presence of contamination from such substances or wastes could interfere with ongoing operations, or affect our ability to sell, lease or use our properties as collateral for financing.

We continually evaluate whether we must take additional steps at our locations to ensure compliance with environmental laws. While compliance with applicable regulatory requirements has not materially adversely affected our operations in the past, there can be no assurance these requirements will not change, and compliance will not adversely affect our operations in the future. In addition, tighter regulation for the protection of the environment and other factors may make it more difficult to obtain new permits and renewal of existing permits may be subject to more restrictive conditions than currently exist.

**Climate Change-Related Impacts**

Our management considers climate-related risks and opportunities in connection with its long-term strategic planning and enterprise risk management process. While the overall impact on our operations continues to evolve, various aspects of climate change, as well as market and societal concerns about the future impact of climate change, have resulted and are expected to continue to result in operational opportunities and challenges. These opportunities and challenges arise from the physical risks associated with changes in climate, as well as technological advances, market developments and additional regulatory and compliance costs.

Our operating results can be significantly influenced by the climates in which we operate as well as severe weather events. Changes in climate could result in more accommodating weather patterns for greater periods of time in certain areas, which may enable us to increase our productivity in those areas. Physical risks associated with climate change have also increased hazards associated with certain of our operations, which in turn has increased the potential for liability and increased the costs associated with such operations. Additionally, new legislation or regulation related to climate change could increase our costs. However, due to climate change risks some utility customers are transitioning toward more sustainable sources of power generation, such as renewables, which can provide additional opportunities for our Energy segment. For additional information regarding the risks and opportunities described above, see Risks Related to Operating Our Business in Item 1A. "*Risk Factors*" of this Annual Report on Form 10-K.

**Human Capital Management**

***Employee Profile.*** We believe that our employees are vital to successfully completing our projects. Our ability to maintain sufficient, continuous work for hourly employees helps us to maintain a stable, loyal workforce with an understanding of our policies and culture, which contributes to our strong performance, safety and quality record. Our talent acquisition team uses internal and external resources to recruit highly skilled and talented workers, and we encourage employee referrals for open positions. In addition, we have partnerships with technical schools where we recruit and hire craft employees.

Several of our subsidiaries have operations that are unionized through the negotiation and execution of collective bargaining agreements. As of December 31, 2024, approximately 22.9% of our hourly employees, primarily consisting of field laborers, were covered by collective bargaining agreements. These collective bargaining agreements have varying terms and are subject to renegotiation upon expiration. We have not experienced recent work stoppages and believe our employee and union relations are good.

As of December 31, 2024, we employed 3,074 salaried employees and 12,642 hourly employees. The total number of hourly personnel employed is subject to the volume of infrastructure services and construction work in progress.

***Diversity and Inclusion***. We employ a dynamic mix of people to create the strongest company possible. Our policy prohibits discrimination in employment on the basis of age, culture, gender, national origin, sexual orientation, physical appearance, race or religion. We are an inclusive, diverse company with people of all backgrounds, experiences, cultures, styles and talents.

***Professional and Career Development.*** We strive to develop and sustain a skilled labor advantage by providing thorough on-and off-site training programs, project management training, and leadership development programs. We have company-owned training facilities that support continuous skills training, including several locations where we train electric apprentices to become journeymen. We offer multiple levels of leadership programs designed to meet the needs of our employees and support the development of best-in-class talent. Our five cornerstone programs are Foreman Foundations, Extreme Ownership, Hunt for Leadership Success, Next Level Leadership, and The Leadership Experience. From Foreman Foundations where employees learn the fundamentals of transitioning from a crew member to a crew leader through The Leadership Experience where emerging leaders explore values-based leadership and sharpen their strategic leadership skills, our Learning and Development programs are designed to support Primoris' vision, mission, and values and promote the growth of our greatest assets, our employees.

***Safety, Health and Wellness***. We are committed to the health, safety and wellness of our employees, and we pride ourselves on above average workplace safety. We track and maintain several key safety metrics, which senior management reviews monthly, and we evaluate management on their ability to provide safe working conditions on job sites and to create a strong safety culture. Lost Time Injury Rate ("LTIR") tracks the rate of injuries in the workplace which results in the employee having to take a minimum of one full working day away from work. For the year ended December 31, 2024, our LTIR rate was 0.08 compared to an industry average of 1.0 per the U.S. Bureau of Labor construction industry statistics. Total Recordable Incident Rate ("TRIR") tracks the total number of workplace injuries which rise to the level of the Occupational Safety and Health Administration's definition of recordability, whether leading to time away from work or not. TRIR is reported as the number of workplace safety incidents per 100 full-time workers during a one-year period. For the year ended December 31, 2024, our TRIR rate was 0.50 compared to an industry average of 2.3 per the U.S. Bureau of Labor construction industry statistics.

***Compensation and Benefits.*** As part of our compensation philosophy, we believe that we must offer and maintain market competitive total rewards programs for our employees in order to attract and retain superior talent. Our compensation programs are generally designed to align employee compensation with market practices and our performance. With respect to our executive officers, business unit management, and other senior leadership, compensation programs consist of both fixed and variable components. The fixed portion is generally set at market levels, with variable compensation designed to reward employees based on company and individual performance. In connection with these compensation programs, we grant stock-based compensation to management and key personnel at the business unit levels, which we believe helps to align incentives throughout our organization. We also enter into employment agreements with our executive officers and certain other key personnel. For additional information regarding our executive compensation, please see the information required in Item 11. "Executive Compensation," which will be incorporated by reference from our definitive proxy statement related to our 2025 Annual Meeting of Stockholders.

We also provide additional benefits to our non-union employees, including a Company matched 401(k) Plan, healthcare and insurance benefits, health savings and flexible spending accounts, paid time off, family leave, flexible work schedules, and employee assistance programs.

***Code of Conduct.*** All of our employees are subject to our Code of Conduct, which includes guidance and requirements concerning, among other things, general business ethics, including policies concerning the environment, conflicts of interest, anti-corruption, harassment and discrimination, data security and privacy, related party transactions, insider trading and the Anti-Bribery & Corruption Policy, which includes guidance and requirements concerning, among other things, interactions with government officials; provision of gifts, entertainment and hospitality; and charitable and political contributions.

**Website Access and Other Information**

Our website address is www.prim.com. You may obtain free electronic copies of our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any amendments to these reports

through our website under the “Investors” tab or through the website of the Securities and Exchange Commission (the “SEC”) at www.sec.gov. These reports are available on our website as soon as reasonably practicable after we electronically file them with, or furnish them to, the SEC. In addition, the charters of our Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Strategy and Risk Committee are posted on our website under the “Investors/Governance Documents” tab. Also posted on our website under the “Investors/Governance Documents” tab are our Code of Conduct and charters for our Environmental, Social and Governance Committee, Enterprise Risk Management Committee, and Cyber Security Steering Committee along with our Human Rights and Corporate Environmental policies. We intend to disclose on our website any amendments or waivers to our Code of Conduct.

We will make available to any stockholder, without charge, copies of our Annual Report on Form 10-K as filed with the SEC. For copies of this or any other information, stockholders should submit a request in writing to Primoris Services Corporation, Inc., Attn: Corporate Secretary, 2300 N. Field Street, Suite 1900, Dallas, TX 75201.

This Annual Report on Form 10-K and our website may contain information provided by other sources that we believe are reliable. However, we cannot assure you that the information obtained from other sources is accurate or complete. No information on our website is incorporated by reference herein and should not be considered part of this Annual Report on Form 10-K.

## ITEM 1A. RISK FACTORS

Our business is subject to a variety of risks and uncertainties, many of which are described below. Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial also may have a material adverse effect on our business in the future. This Annual Report on Form 10-K includes projections, assumptions and beliefs that are intended to be “forward looking statements” and should be read in conjunction with the discussion of *“Forward Looking Statements”* at the beginning of this Annual Report on Form 10-K.

The following risk factors could have a material adverse effect on our business, the results of our operations, our financial condition, our cash flow and the price of our shares. These risk factors could prevent us from meeting our goals or expectations.

### Risks Related Primarily to Operating our Business

***Our financial and operating results may vary significantly from quarter-to-quarter and year-to-year.***

Our business is subject to seasonal and annual fluctuations. Some of the quarterly variation is the result of weather, particularly rain, ice, snow, and named storms, which create difficult operating conditions. Similarly, demand for routine repair and maintenance services for gas utilities is lower during their peak customer needs in the winter, and demand for routine repair and maintenance services for electric utilities is lower during their peak customer needs in the summer. Some of the annual variation is the result of construction projects which fluctuate based on customer timing, project duration, weather, and general economic conditions. Annual and quarterly results may also be adversely affected by:

- Changes in our mix of customers, projects, contracts and business;
- Regional or national and/or general economic conditions and demand for our services;
- Variations and changes in the margins of projects performed during any particular quarter;
- Increases in the costs to perform services caused by changing conditions;
- The termination, or expiration of existing agreements or contracts;
- The budgetary spending patterns of customers;
- Increases in construction costs, including due to inflation or supply chain challenges, that we may be unable to pass through to our customers;
- Cost or schedule overruns on fixed-price contracts;
- Availability of qualified labor for specific projects;
- Changes in bonding requirements and bonding availability for existing and new agreements;
- The need for, and availability of, letters of credit;

- Costs we incur to support growth, whether organic or through acquisitions;
- The timing and volume of work under contract; and
- Losses experienced in our operations.

As a result, our operating results in any particular quarter may not be indicative of the operating results expected for any other quarter, or for an entire year.

***Demand for our services may decrease during economic recessions or volatile economic cycles, and a reduction in demand in end markets may adversely affect our business.***

A substantial portion of our revenue and profit is generated from construction projects, the awarding of which we do not directly control. The engineering and construction industry historically has experienced cyclical fluctuations in financial results due to economic recessions, downturns in business cycles of our customers, material shortages, price increases by subcontractors, interest rate fluctuations and other economic factors beyond our control. When the general level of economic activity deteriorates, our customers have at times in the past and may in the future delay, or cancel upgrades, expansions, and/or maintenance and repairs to their systems. Many factors, including the financial condition of and potential disruptions related to artificial intelligence in the industries we serve, could adversely affect our customers and their willingness to fund capital expenditures in the future.

Economic, political, regulatory and market conditions affecting our specific end markets may adversely impact the demand for our services, resulting in the delay, reduction or cancellation of certain projects and these conditions may continue to adversely affect us in the future. For example, much of the work that we perform in the highway markets involves funding by federal, state and local governments. This funding is subject to fluctuation based on the budgets and operating priorities of the various government agencies.

We are also dependent on the amount of work our customers outsource. In a slower economy, our customers may decide to outsource less infrastructure services, reducing demand for our services. In addition, consolidation, competition or capital constraints in the industries we serve can result in reduced spending by our customers.

***Many of our customers operate in industries subject to rapid technological and regulatory changes, with many being regulated by federal and state government agencies, and the addition of new regulations or changes to existing regulations may adversely impact demand for our services and the profitability of those services.***

Many of our energy customers are regulated by the Federal Energy Regulatory Commission ("FERC"), our communications customers are regulated by the Federal Communications Commission ("FCC") and our utility customers are regulated by state public utility commissions. These agencies could change the way in which they interpret current regulations and may impose additional regulations. These changes could have an adverse effect on our customers and the profitability of the services they provide, which could reduce demand for our services or delay our ability to complete projects. Additionally, our failure to comply with applicable regulations could result in substantial fines or revocation of our operating licenses, as well as give rise to termination or cancellation rights under our contracts or disqualify us from future bidding opportunities.

The demand for our pipeline construction services is dependent on the level of operating and capital project spending by midstream companies in the oil and gas industry and industrial companies primarily in the petrochemical industry. This level of spending is subject to large fluctuations depending primarily on the current price, volatility, and expectations of future prices of oil, natural gas, and natural gas liquids. The price is a function of many factors, including levels of supply and demand, government policies and regulations, oil industry refining capacity and the potential development of alternative fuels.

Specific government decisions could affect demand for our construction services. For example, limitations on the use of "fracking" technology, creation of significant regulatory issues for the construction of underground pipelines and permitting and licensing requirements have reduced our underground work.

Conversely, government regulations may increase the demand for our pipeline services. Recent pipeline safety legislation could increase demand for our pipeline facility, maintenance, integrity and repair services.

In addition, many customers operate in industries that are subject to rapid changes in technology, governmental regulation, changing consumer demands and consolidation. Technological advances in the markets we serve, including from climate-related initiatives, could render existing projects or technologies uncompetitive or obsolete, and cause longer-term changes in consumer behavior or alter our customers' existing operating models. Our failure to rapidly adopt and master new technologies as they are developed or adapt to changing customer requirements could reduce demand for our services.

***Our business may be materially adversely impacted by regional, national and/or global requirements related to climate change and the impact of greenhouse gas emissions in the future.***

Greenhouse gases that result from human activities, including burning of fossil fuels, are the focus of increased scientific and political scrutiny and may be subject to changing legal requirements. International agreements, federal laws, state laws and various regulatory schemes to limit or otherwise regulate emissions of greenhouse gases, and additional restrictions are under consideration by different governmental entities. We derive a portion of our revenue and contract profit from engineering and construction services to clients that own and/or operate a wide range of process plants and own and/or operate electric power generating plants that generate electricity from burning natural gas or various types of solid fuels. These plants emit greenhouse gases as part of the process to generate electricity or other products. Compliance with existing greenhouse gas regulation may prove costly or difficult. It is possible that owners and operators of existing or future process plants and electric generating plants could be subject to new or changed environmental regulations that result in significantly limiting, or reducing the amounts of greenhouse gas emissions, increasing the cost of emitting such gases or requiring emissions allowances. The costs of controlling such emissions or obtaining required emissions allowances could be significant. It also is possible that necessary controls or allowances may not be available. Such regulations could negatively impact client investments in capital projects in our markets, which could negatively impact the market for our products and/or services.

The establishment of additional rules limiting greenhouse gas emissions could also impact our ability to perform construction services, or to perform these services with current levels of profitability. New regulations may require us to acquire different equipment or change processes. The new equipment may not be available, or it may not be purchased or rented in a cost-effective manner. Project deferrals, delays or cancellations resulting from the potential regulations could adversely impact our business.

In addition, we could be held liable for significant penalties and damages under certain environmental laws and regulations and also could be subject to a revocation of our licenses or permits. Our contracts with our customers may also impose liabilities on us regarding environmental issues that arise through the performance of our services. From time to time, we may incur costs and obligations for correcting environmental noncompliance matters and for remediation at or relating to certain of our job sites or properties.

While the potential impact of climate-related changes, including legislative and regulatory responses thereto, on our operations is uncertain, management considers climate-related risks and opportunities in connection with its long-term strategic planning and short-term deployment of resources. Climate change may result in, among other things, changes in rainfall patterns, storm patterns and intensities and temperature levels. Our operating results are significantly influenced by weather, and major changes in historical weather patterns could significantly impact our future operating results. For example, if climate change results in significantly more adverse weather conditions in a given period, we could experience reduced productivity, which could negatively impact our operating results.

Concerns about the impact of climate change have resulted, and are expected to continue to result, in technological advancements and market developments that impact our business. For example, utility customers are transitioning toward more sustainable sources of power generation, such as renewables, which can provide additional opportunities for our Energy segment. Additionally, increased electrification of new technologies may lead to continued and additional demand for new and expanded electric power infrastructure and reengineering of existing electric power infrastructure. However, concerns about climate change could also result in potential new regulations, regulatory actions or requirements to fund energy efficiency activities, as well as decreased demand for refined products, which in turn could negatively impact our customers and demand for certain of our pipeline, underground utility and infrastructure services.

Climate change could also affect our customers and the types of projects that they award. Demand for power projects, underground pipelines or highway projects could be affected by significant changes in weather, or climate conditions, or by regulatory changes relating to climate change, which could in turn reduce demand for our services.

***Our results could be adversely affected by natural disasters, public health crises, political crises, or other catastrophic events.***

Natural disasters, such as hurricanes, tornadoes, floods, earthquakes, and other adverse weather and climate conditions; public health crises, such as pandemics and epidemics; political crises, such as terrorist attacks, war, labor unrest, and other political instability; or other catastrophic events could disrupt our operations, or the operations of one or more of our vendors or customers, and could adversely affect our financial results. In particular, these types of events could impact our product supply chain from or to the impacted region and could cause our customers to delay or cancel projects, which could impact our ability to operate. In addition, these types of events could lead to general inefficiencies from having to start and stop work, re-sequencing work or modifying our customary work practices.

***Changes to renewable portfolio standards and decreased demand for renewable energy projects could negatively impact our future results of operations, cash flows and liquidity.***

A significant portion of our future business may be focused on providing construction and/or installation services to owners and operators of solar power and other renewable energy facilities. Currently, the development of solar and other renewable energy facilities benefit from the existence of renewable portfolio standards and other state incentives and requirements. Renewable portfolio standards are state-specific statutory provisions requiring or encouraging that electric utilities generate a certain amount of electricity from renewable energy sources. These standards have initiated significant growth in the renewable energy industry and increased demand for renewable energy infrastructure construction services. Elimination of, or changes to, existing renewable portfolio standards, tax credits or similar environmental policies may negatively affect future demand for our services.

***We may lose business to competitors through the competitive bidding processes.***

We are engaged in highly competitive businesses in which some customer contracts are awarded through bidding processes based on price and the acceptance of certain risks, along with other factors. We compete with other infrastructure services contractors, both regional and national, as well as small local contractors. The strong competition in our markets requires maintaining skilled personnel and investing in technology, which can put pressure on profit margins. We do not obtain contracts from all of our bids and our inability to win bids at acceptable profit margins would adversely affect our business.

***We may be unsuccessful at generating organic growth which may affect our ability to expand our operations or grow our business.***

Our ability to generate organic growth may be affected by, among other factors, our ability to:

- Attract new customers;
- Increase the number of projects performed for existing customers;
- Hire and retain qualified personnel;
- Secure appropriate levels of construction equipment;
- Successfully bid for new projects; and
- Adapt the range of services we offer to address our customers' evolving construction needs.

In addition, our customers may reduce the number or size of projects available to us due to their inability to obtain capital. Our customers may also reduce projects in response to economic conditions.

Many of the factors affecting our ability to generate internal growth may be beyond our control, and we cannot be certain that our strategies will be successful or that we will be able to generate cash flow sufficient to fund our operations and to support internal growth. If we are unsuccessful, we may not be able to achieve internal growth, expand our operations or grow our business.

***The timing of new contracts may result in unpredictable fluctuations in our business.***

A portion of our revenue is derived from project-based work that is awarded through a competitive bid process. The portion of revenue generated from the competitive bid process for 2024, 2023 and 2022 was approximately 28.3 %, 30.1%, and 26.3%, respectively. It is generally very difficult to predict the timing and geographic distribution of the projects that we will be awarded. The selection of, timing of or failure to obtain projects, delays in award of projects, the re-bidding or termination of projects due to budget overruns, cancellations of projects or delays in completion of contracts could result in the under-utilization of our assets and reduce our cash flows. Even if we are awarded contracts, we face additional risks that could affect whether or when work will begin. For example, some of our contracts are subject to financing, permitting and other contingencies that may delay or result in termination of projects. We may have difficulty in matching workforce size and equipment location with contract needs. In some cases, we may be required to bear the cost of a ready workforce and equipment that is larger than necessary, resulting in unpredictability in our cash flow, expenses and profitability. If any expected contract award, or the related work release is delayed or not received, we could incur substantial costs without receipt of any corresponding revenue. Finally, the winding down or completion of work on significant projects will reduce our revenue and earnings if these projects have not been replaced.

***We derive a meaningful portion of our revenue from a few customers, and the loss of one or more of these customers could have significant effects on our revenue, resulting in adverse effects on our financial condition, results of operations and cash flows.***

Our customer base is reasonably concentrated, with our top ten customers accounting for approximately 41.3% of our revenue in 2024, 41.1% of our revenue in 2023 and 46.1% of our revenue in 2022. However, the customers included in our top ten customer list generally vary from year to year. Our revenue is dependent both on performance of larger construction projects and relatively smaller projects under MSAs. For the large construction projects, the completion of the project does not necessarily represent the permanent loss of a customer; however, the future revenue generated from work for that customer may fluctuate significantly.

We also generate ongoing revenue from our MSA customers, which are generally comprised of regulated gas and electric utilities. If we were to lose one of these customers, our revenue could decline. Reduced demand for our services by larger construction customers or a loss of a significant MSA customer could have an adverse effect on our business.

***Our international operations expose us to legal, political and economic risks in different countries as well as currency exchange rate fluctuations that could harm our business and financial results. We could be adversely affected by our failure to comply with laws applicable to our foreign activities, such as the U.S. Foreign Corrupt Practices Act.***

During 2024, 2023 and 2022, revenue attributable to our services outside of the United States, principally in Canada, was 4.6%, 5.8% and 6.7% of our total revenue, respectively. There are risks inherent in doing business internationally, including:

- Imposition of governmental controls and changes in laws, regulations, policies, practices, tariffs and taxes;
- Political and economic instability;
- Changes in United States and other national government import or export licensing requirements, tariffs, trade policies and relations affecting the market for our services, including arising from policy initiatives implemented by the new U.S. presidential administration;
- Potential non-compliance with a wide variety of laws and regulations, including the United States Foreign Corrupt Practices Act ("FCPA") and similar non-United States laws and regulations;
- Currency exchange rate fluctuations, devaluations and other conversion restrictions;
- Restrictions on or fees or taxes associated with repatriating foreign profit back to the United States; and
- Difficulties in staffing and managing international operations.

The FCPA and similar anti-bribery laws in other jurisdictions prohibit U.S.-based companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business. We pursue opportunities in certain parts of the world that experience government corruption, and in certain circumstances, compliance with anti-bribery laws may conflict with local customs and practices. Our internal policies mandate compliance with all applicable anti-bribery laws. We require our partners, subcontractors, agents and others

who work for us or on our behalf to comply with the FCPA and other anti-bribery laws. There is no assurance that our policies or procedures will protect us against liability under the FCPA or other laws for actions taken by our agents, employees and intermediaries. If we are found to be liable for FCPA violations (either due to our own acts or our inadvertence, or due to the acts or inadvertence of others), we could suffer from severe criminal or civil penalties or other sanctions, which could have a material adverse effect on our reputation and business. In addition, detecting, investigating and resolving actual or alleged FCPA violations is expensive and could consume significant time and attention of our senior management.

***Backlog may not be realized or may not result in revenue or profit.***

Backlog is measured and defined differently by companies within our industry. We refer to "backlog" as our anticipated revenue from the uncompleted portions of existing contracts where scope is adequately defined, and therefore we can reasonably estimate total contract value, and the estimated revenue on MSA work. We present two measures of backlog; one that includes fixed backlog and estimated revenue on MSA work for the next four quarters, and total backlog that includes all fixed backlog and estimated revenue on MSA work to the end of the MSA agreement. We do not consider renewals when estimating total backlog.

Backlog is not a comprehensive indicator of future revenue amounts or timing. For instance, contract revenues reflected in our backlog may be realized in different periods from those previously anticipated, which can result from project accelerations or delays due to various reasons, including changes in customer spending priorities, project cancellations, regulatory interruptions, scheduling changes, commercial issues (e.g., permitting), engineering revisions, job site conditions and adverse weather.

In addition, most contracts may be terminated by our customers on short notice. Reductions in backlog due to cancellation by a customer, or for other reasons, could significantly reduce the revenue that we actually receive from contracts in backlog. In the event of a project cancellation, we are typically reimbursed for all of our costs through a specific date, as well as all reasonable costs associated with demobilizing from the jobsite, but we typically have no contractual right to the total revenue reflected in our backlog. Projects may remain in backlog for extended periods of time. While backlog includes estimated MSA revenue, customers are not contractually obligated to purchase a certain amount of services under the MSA.

Given these factors, our backlog at any point in time may not accurately represent the revenue that we expect to realize during any period, and our backlog as of the end of a fiscal year may not be indicative of the revenue we expect to earn in the following fiscal year. Inability to realize revenue from our backlog could have an adverse effect on our business.

While backlog may not be indicative of the revenue we expect to earn the following fiscal year, it is a potential, though not comprehensive, indicator of future revenue more generally; however, recognition of revenue from backlog does not necessarily ensure that the projects will be profitable. Poor project execution could impact profit from contracts included in backlog. For projects for which a loss is expected, future revenue will be recorded with no margin, which may reduce the overall margin percentage for work performed.

***Our actual cost may be greater than expected in performing our contracts causing us to realize significantly lower profit or losses on our projects.***

We currently generate, and expect to continue to generate, a substantial portion of our revenue from fixed price and unit price contracts. The actual cost of labor and materials may vary from the costs we originally estimated, and we may not be successful in recouping additional costs from our customers. These variations may cause gross profit for a project to differ from those we originally estimated. Reduced profitability or losses on projects could occur due to changes in a variety of factors such as:

- Failure to properly estimate costs of engineering, materials, equipment or labor;
- Unanticipated technical problems with the structures, materials or services being supplied by us, which may require that we spend our own money to remedy the problem;
- Project modifications not reimbursed by the client creating unanticipated costs;
- Changes in the costs of equipment, materials, labor or subcontractors;

- Our suppliers or subcontractors failing to perform;
- Changes in local laws and regulations; and
- Delays caused by weather.

As projects grow in size and complexity, multiple factors may contribute to reduced profit or losses, and depending on the size of the particular project, variations from the estimated contract costs could have a material adverse effect on our business.

***Weather can significantly affect our revenue and profitability.***

Our ability to perform work and meet customer schedules can be affected by weather conditions such as snow, ice, rain, and named storms. Weather may affect our ability to work efficiently and can cause project delays and additional costs. Our ability to negotiate change orders for the impact of weather on a project could impact our profitability. In addition, the impact of weather can cause significant variability in our quarterly revenue and profitability.

***We require subcontractors and suppliers to assist us in providing certain services, and we may be unable to retain the necessary subcontractors or obtain supplies to complete certain projects which could adversely affect our business.***

We use subcontractors to perform portions of our contracts and to manage workflow. While we are not dependent on any single subcontractor, general market conditions may limit the availability of subcontractors to perform portions of our contracts causing delays and increasing our costs.

Although significant materials are often supplied by the customer, we use suppliers to provide some materials and equipment used for projects. If a supplier fails to provide supplies and equipment at the estimated price, fails to provide adequate amounts of supplies and equipment, fails to provide supplies or equipment that meet the project requirements, or fails to provide supplies when scheduled, we may be required to source the supplies or equipment at a higher price or may be required to delay performance of the project. The additional cost or project delays can negatively impact project profitability.

Failure of a subcontractor or supplier to comply with laws, rules or regulations could negatively affect our reputation and our business.

***We periodically enter into joint ventures which require satisfactory performance by our joint venture partners of their obligations. The failure of our joint venture partners to perform their joint venture obligations could impose additional financial and performance obligations on us that could result in reduced profit or losses for us with respect to the joint venture.***

We periodically enter into various joint ventures and teaming arrangements where control may be shared with unaffiliated third parties. At times, we also participate in joint ventures where we are not a controlling party. In such instances, we may have limited control over joint venture decisions and actions, including internal controls and financial reporting which may have an impact on our business. If our joint venture partners fail to satisfactorily perform their joint venture obligations, the joint venture may be unable to adequately perform or deliver its contracted services. Under these circumstances, we may be required to make additional investments or provide additional services to ensure the adequate performance and delivery of the contracted services. These additional obligations could result in reduced profit and may impact our reputation in the industry.

***We may experience delays and defaults in client payments and we may pay our suppliers and subcontractors before receiving payment from our customers for the related services, which could result in an adverse effect on our financial condition, results of operations and cash flows.***

We use subcontractors and material suppliers for portions of certain work, and our customers pay us for those related services. If we pay our suppliers and subcontractors for materials purchased and work performed for customers who fail to pay us, or such customers delay paying us for the related work or materials, we could experience a material adverse effect on our financial condition, results of operations and cash flows. In addition, if customers fail to pay us for

work we perform, we could experience a material adverse effect on our financial condition, results of operations and cash flows.

***Our inability to recover on contract modifications against project owners for payment or performance could negatively affect our financial condition, results of operations and cash flows.***

We periodically present contract modifications to our clients for changes in contract specifications or requirements. We consider unapproved change orders to be contract modifications for which customers have not agreed to both scope and price. We consider claims to be contract modifications for which we seek, or will seek, to collect from customers, or others, for customer-caused changes in contract specifications or design, or other customer-related causes of unanticipated additional contract costs on which there is no agreement with customers. Claims can also be caused by non-customer-caused changes, such as rain or other weather delays. In some cases, settlement of contract modifications may not occur until after completion of work under the contract. A failure to promptly document and negotiate a recovery for contract modifications could have a negative impact on our cash flows, and an overall ability to recover contract modifications could have a negative impact on our financial condition, results of operations and cash flows.

***For some projects we may guarantee a timely completion or provide a performance guarantee which could result in additional costs, such as liquidated damages, to cover our obligations.***

In our fixed-price and unit-price contracts we may provide a project completion date, and in some of our projects we may commit that the project will achieve specific performance standards.  Failure to complete the project as scheduled or at the contracted performance standards could result in additional costs or penalties, including liquidated damages, and such amounts could exceed expected project profit.

***A significant portion of our business depends on our ability to provide surety bonds, and we may be unable to compete for or work on certain projects if we are not able to obtain the necessary surety bonds.***

Our contracts frequently require that we provide payment and performance bonds to our customers. Under standard terms in the surety market, sureties issue or continue bonds on a project-by-project basis and can decline to issue bonds at any time or require the posting of additional collateral as a condition to issuing or renewing bonds.

Current or future market conditions, as well as changes in our surety providers' assessments of our operating and financial risk, could cause our surety providers to decline to issue or renew, or to substantially reduce, the availability of bonds for our work and could increase our bonding costs. These actions could be taken on short notice. If our surety providers were to limit or eliminate our access to bonding, our alternatives would include seeking bonding capacity from other sureties, finding more business that does not require bonds and posting other forms of collateral for project performance, such as letters of credit or cash. We may be unable to secure these alternatives in a timely manner, on acceptable terms, or at all. Accordingly, if we were to experience an interruption or reduction in the availability of bonding capacity, we may be unable to compete for, or work on certain projects.

***Our bonding requirements may limit our ability to incur indebtedness, which would limit our ability to refinance our existing credit facilities or to execute our business plan.***

Our ability to obtain surety bonds depends upon various factors including our capitalization, working capital, tangible net worth and amount of our indebtedness. In order to obtain required bonds, we may be limited in our ability to incur additional indebtedness that may be needed to refinance our existing credit facilities upon maturity, to complete acquisitions, and to otherwise execute our business plans.

***We may be unable to win some new contracts if we cannot provide clients with letters of credit.***

For many of our clients, surety bonds provide an adequate form of security, but for some clients, security in the form of a letter of credit may be required. While we have capacity for letters of credit under our credit facility, the amount required by a client may be in excess of our credit limit. Any such amount would be issued at the sole discretion of our lenders. Failure to provide a letter of credit when required by a client may result in our inability to compete for, win, or retain a project.

***During the ordinary course of our business, we may become subject to material lawsuits or indemnity claims.***

We have in the past been, and may in the future be, named as a defendant in lawsuits, claims and other legal proceedings during the ordinary course of our business. These actions may seek, among other things, compensation for alleged personal injury, workers' compensation, employment discrimination, breach of contract, cyber-security and related incidents, property damage, punitive damages, and civil penalties, or other losses or injunctive or declaratory relief. In addition, we generally indemnify our customers for claims related to the services we provide and actions we take under our contracts with them, and, in some instances, we may be allocated risk through our contract terms for actions by our customers, or other third parties. Because our services in certain instances may be integral to the operation and performance of our customers' infrastructure, we may become subject to lawsuits or claims for any failure of the systems on which we work, even if our services are not the cause of such failures, and we could be subject to civil and criminal liabilities to the extent that our services contributed to any property damage, personal injury or system failure. The outcome of any of these lawsuits, claims or legal proceedings could result in significant costs and diversion of management's attention from the business. Payments of significant amounts, even if reserved, could adversely affect our reputation, our cash flows, and our business.

***We are self-insured up to certain limits.***

Although we maintain insurance policies with respect to employer's liability, general liability, auto and workers compensation claims, those policies are subject to deductibles or self-insured retention amounts up to certain limits applied on an occurrence or claims-made basis. In addition, for our employees not part of a collective bargaining agreement, we provide employee health care benefit plans. Our primary health insurance plan is subject to a deductible per individual claimant per year.

Our insurance policies include various coverage requirements, including the requirement to give appropriate notice. If we fail to comply with these requirements, our coverage could be denied.

Losses under our insurance programs are accrued based upon our estimates of the ultimate liability for claims reported and an estimate of claims incurred but not reported, with assistance from third-party actuaries. Insurance liabilities are difficult to assess and estimate due to unknown factors, including the severity of an injury, the extent of damage, the determination of our liability in proportion to other parties and the number of incidents not reported. The accruals are based upon known facts and historical trends.

We renew our insurance policies on an annual basis, and therefore deductibles and levels of insurance coverage may change in future periods. In addition, insurers may cancel our coverage or determine to exclude certain items from coverage, or we may elect not to obtain certain types or incremental levels of insurance based on the potential benefits considered relative to the cost of such insurance, or coverage may not be available at reasonable and competitive rates. In any such event, our overall risk exposure would increase, which could negatively affect our results of operations, financial condition and cash flows.

***The loss or long-term incapacitation of one or more of our executive officers or other key employees could adversely affect our business and we may not be able to operate and grow our business effectively if we lose the services of any of our key persons or are unable to attract qualified and skilled personnel in the future.***

We are dependent upon the efforts of our key personnel, and our ability to retain them and hire other qualified employees. We depend on the continued and ongoing services of our executive officers and other key employees, including the senior management of our subsidiaries. The loss of our executive officers, or other key personnel could affect our ability to run our business effectively. Competition for senior management is intense, and we may not be able to retain our personnel. The loss of any key person requires the remaining key personnel to divert immediate and substantial attention to seeking a replacement, as well as to performing the departed person's responsibilities until a replacement is found. In addition, as some of our key persons approach retirement age, we need to provide for smooth transitions. If we fail to find a suitable replacement for any departing executive or senior officer on a timely basis, such departure could adversely affect our ability to operate and grow our business.

In many instances, these employees have significant experience and expertise in our industry. These key employees often possess and maintain key relationships with our customers and subcontractors that would be difficult to

replace. We do not carry "key-person" life or disability insurance on any of our employees. The loss or long-term incapacitation of any one of our executive officers or other key employees could negatively affect our customer relationships or the ability to execute our business strategy, which could adversely affect our business.

***Our business is labor intensive. If we are unable to attract and retain qualified managers and skilled employees, our operating costs may increase.***

Our business is labor intensive and our ability to maintain our productivity and profitability may be limited by our ability to employ, train and retain skilled personnel necessary to meet our requirements. We may not be able to maintain an adequately skilled labor force necessary to operate efficiently and to support our growth strategy. We have from time-to-time experienced, and may in the future experience, shortages of certain types of qualified personnel. For example, periodically there are shortages of engineers, project managers, field supervisors, and other skilled workers capable of working on and supervising the construction of underground, electric utilities, heavy civil and industrial facilities, as well as providing engineering services. The supply of experienced engineers, project managers, field supervisors, journeyman linemen and other skilled workers may not be sufficient to meet current or expected demand. The beginning of new, large-scale infrastructure projects, or increased competition for workers currently available to us, could affect our business, even if we are not awarded such projects. Labor shortages, or increased labor costs, could impair our ability to maintain our business or grow our revenue. If we are unable to hire employees with the requisite skills, we may also be forced to incur significant training expenses.

***Our unionized workforce may commence work stoppages or impact our ability to complete certain acquisitions, which could adversely affect our operations.***

As of December 31, 2024, approximately 22.9% of our hourly employees, primarily consisting of field laborers, were covered by collective bargaining agreements. Although the majority of these agreements prohibit strikes and work stoppages, we cannot be certain that strikes or work stoppages will not occur in the future. Strikes or work stoppages would adversely impact our relationships with our customers and could have an adverse effect on our business.

Our ability to complete future acquisitions could be adversely affected because of our union status for a variety of reasons. For instance, in certain geographic areas, our union agreements may be incompatible with the union agreements of a business we want to acquire, and some businesses may not want to become affiliated with a union company.

***Withdrawal from multiemployer pension plans associated with our unionized workforce could adversely affect our financial condition and results of operations.***

Our collective bargaining agreements generally require that we participate with other companies in multiemployer pension plans. To the extent those plans are underfunded, the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MEPA"), may subject us to substantial liabilities under those plans if we withdraw from them, or if they are terminated. In addition, the Pension Protection Act of 2006 added new funding rules for multiemployer plans that are classified as endangered, seriously endangered or critical status. For a plan in critical status, additional required contributions and benefit reductions may apply if a plan is determined to be underfunded, which could adversely affect our financial condition or results of operations. For plans in critical status, we may be required to make additional contributions, generally in the form of surcharges on contributions otherwise required. Participation in those plans with high funding levels could adversely affect our results of operations, financial condition or cash flows if we are not able to adequately mitigate these costs.

The amount of the withdrawal liability legislated by ERISA and MEPA varies for every pension plan to which we contribute. For each plan, our potential liability is the total unfunded vested benefits of the plan multiplied by a fraction: the numerator of the fraction is the sum of our contributions to the plan for the past ten years and the denominator is the sum of all contributions made by all employers for the past ten years. For some pension plans to which we contribute, the total unfunded vested benefits for the entire plan could be in the billions of dollars. If we cannot reduce the alleged fractional exposure through exemptions or negotiations, the withdrawal from a plan could have a material adverse impact on our business.

***If we fail to integrate acquisitions successfully, we may experience operational challenges and risks which may have an adverse effect on our business.***

As part of our growth strategy, we intend to acquire companies that expand, complement or diversify our business. Acquisitions may expose us to operational challenges and risks, including, among others:

- The diversion of management's attention from the day-to-day operations of the combined company;
- Managing a significantly larger company than before completion of an acquisition;
- The assimilation of new employees and the integration of business cultures;
- Training and facilitating our internal control processes within the acquired organization;
- Retaining key personnel;
- The integration of information, accounting, finance, sales, billing, payroll and regulatory compliance systems;
- Challenges in keeping existing customers and obtaining new customers;
- Challenges in combining service offerings and sales and marketing activities;
- The assumption of unknown liabilities of the acquired business for which there are inadequate reserves;
- The potential impairment of acquired goodwill and intangible assets; and
- The inability to enforce covenants not to compete.

Failure to effectively manage the integration process could adversely impact our business, financial condition, results of operations, and cash flows.

***We may incur higher costs on equipment necessary for our operations.***

A significant portion of our contracts are performed by utilizing our owned or leased construction equipment rather than short-term rental of equipment. To the extent that we are unable to buy or lease equipment necessary for a project, either due to a lack of available funding, or equipment shortages in the marketplace, we may be forced to rent equipment on a short-term basis, or to find alternative ways to perform the work without the benefit of equipment ideally suited for the job, which could increase the costs of completing the project. We often bid for work knowing that we will have to rent equipment on a short-term basis, and we include the equipment rental rates in our bid. If market rates for rental equipment increase between the time of bid submission and project execution, our margins for the project may be reduced. In addition, our equipment requires regular maintenance, which we generally provide through our own repair facilities. If we are unable to maintain the equipment in our fleet, we may be forced to obtain additional third-party repair services at a higher cost or be unable to bid on contracts.

***Our business may be affected by difficult work sites and environments which may adversely affect our ability to procure materials and labor.***

We perform our work under a variety of conditions, including, but not limited to, difficult and hard to reach terrain, difficult site conditions, and busy urban centers, where delivery of materials and availability of labor may be impacted. Performing work under these conditions can slow our progress, potentially causing us to incur contractual liability to our customers. These difficult conditions may also cause us to incur additional, unanticipated costs that we might not be able to pass on to our customers.

***We may incur liabilities or suffer negative financial or reputational impacts relating to health and safety matters.***

Our operations are subject to extensive laws and regulations relating to the maintenance of safe conditions in the workplace, including OSHA and other state and local laws and regulations. While we have invested, and will continue to invest, substantial resources in our environmental, health and safety programs, our industry involves a high degree of operational risk and there can be no assurance that we will avoid significant liability exposure. Although we have taken what we believe are appropriate precautions, we have suffered fatalities in the past and may suffer additional fatalities in the future. Serious accidents, including fatalities, may subject us to substantial penalties, civil litigation or criminal prosecution. Claims for damages to persons, including claims for bodily injury or loss of life, could result in substantial costs and liabilities, which could materially and adversely affect our financial condition, results of operations or cash flows. In addition, if our safety record were to substantially deteriorate over time or we were to suffer substantial

penalties or criminal prosecution for violating health and safety regulations, our customers could cancel our contracts and not award us future business.

***Disruptions to our operational systems could adversely impact our operations, our ability to report financial results and our business.***

We rely on computer, information and communication technology and related systems to operate our business and to protect confidential, sensitive company, customer and partner information. Our computer and communications systems, and consequently our operations, could be damaged or interrupted by cyber-attacks and physical security risks, such as natural disasters, loss of power, communications failures, acts of war, acts of terrorism, computer viruses, physical or electronic break-ins and actions by hackers and cyber-terrorists. Any of these, or similar, events could cause system disruptions, delays and loss of critical information, delays in processing transactions and delays in the reporting of financial information.

***Security breaches, cyber security attacks or other disruptions to our information technology systems and networks could adversely impact our operations or compromise the confidentiality of private customer data or our own proprietary information.***

Any cyber security attack (including denial of service attacks, ransomware, phishing attacks, payment fraud or others) that affects our facilities, our systems, our partners, our customers or any of our financial data could have a material adverse effect on our business. We rely on information technology systems, some of which are managed by third parties, to process, transmit and store electronic information and to manage or support a variety of our business processes, activities and services. Additionally, we collect and store sensitive data, including intellectual property and proprietary business information, as well as personally identifiable information of our customers and employees, in data centers and on information technology networks (including networks that may be controlled or maintained by third parties). The secure operation of these systems and products, and the processing and maintenance of the information processed by these systems and products, is critical to our business operations and strategy. Further, customers using our systems rely on the security of our infrastructure, including hardware, software and other elements provided by third parties, to ensure the reliability of our products and the protection of their data. We also face the risk of operational disruption, failure, termination or capacity constraints of any of the third parties that facilitate our business activities, including vendors, service providers, suppliers, customers, counterparties or other financial intermediaries. Such third parties who provide us services or with whom we communicate could also be the source of a cyberattack on, or breach of, our operational systems, network, data or infrastructure. Despite our security measures and business continuity plans, our information technology systems and networked and connected products may be vulnerable to damage, disruptions or shutdowns caused by attacks by hackers, computer viruses, or breaches due to errors or malfeasance by employees, contractors or others who have access to these systems and products. Any of these events could result in, among other things, the loss of proprietary data, interruptions or delays in our business operations and damage to our reputation.

We have experienced cyber security threats, such as viruses and attacks targeting our systems, and expect the frequency and sophistication of such incidents will continue to increase. Such prior events have not had a material impact on our financial condition, results of operations or liquidity. However, future threats or existing threats of which we are not yet aware could cause harm to our business and our reputation, disrupt our operations, expose us to potential liability, regulatory actions and loss of business, and impact our results of operations materially. We also currently maintain a cyber insurance policy; however, such insurance coverage may not be adequate to cover all the costs related to cyber security attacks or disruptions resulting from such events.

While we have taken steps to mitigate persistent and continuously evolving cyber security threats by implementing network security and internal control measures, implementing policies and procedures for managing risk to our information systems, periodically testing our information technology systems, and conducting employee training on cyber security, a system or network failure or data security breach could have negative consequences for our company, customers, or partners and adversely affect our business. Furthermore, the continuing and evolving threat of cyber-attacks has resulted in increased regulatory focus on prevention. To the extent we face increased regulatory requirements, we may be required to expend significant additional resources to meet such requirements.

***We may need additional capital in the future for working capital, capital expenditures or acquisitions, and we may not be able to access capital on favorable terms, or at all, which would impair our ability to operate our business or achieve our growth objectives.***

Our ability to generate cash is essential for the funding of our operations and the servicing of our debt. If existing cash balances together with the borrowing capacity under our credit facilities were not sufficient to make future investments, make acquisitions or provide needed working capital, we may require financing from other sources. Our ability to obtain such additional financing in the future will depend on a number of factors including prevailing capital market conditions, conditions in our industry, and our operating results. These factors may affect our ability to arrange additional financing on terms that are acceptable to us. If additional funds were not available on acceptable terms, we may not be able to make future investments, take advantage of acquisitions or pursue other opportunities.

**Risks Related Primarily to the Financial Accounting of our Business**

***Our financial results are based upon estimates and assumptions that may differ from actual results.***

In preparing our consolidated annual and quarterly financial statements in conformity with generally accepted accounting principles, many estimates and assumptions are used in determining the reported revenue, costs and expenses recognized during the periods presented, and disclosures of contingent assets and liabilities known to exist as of the date of the financial statements. These estimates and assumptions must be made because certain information that is used in the preparation of our financial statements cannot be calculated with a high degree of precision from data available, is dependent on future events, or is not capable of being readily calculated based on generally accepted methodologies. Often, these estimates are particularly difficult to determine, and we must exercise significant judgment. Estimates may be used in our assessments of the allowance for credit losses, useful lives of property and equipment, fair value assumptions in analyzing goodwill and long-lived asset impairments, self-insured claims liabilities, accounting for revenue recognized over time, and the provision for income taxes. Actual results could differ materially from the estimates and assumptions that we used.

***Our accounting for revenue recognized over time could result in a reduction or elimination of previously reported revenue and profit.***

For contracts where scope is adequately defined, and therefore we can reasonably estimate total contract value, we recognize revenue over time as work is completed because of the continuous transfer of control to the customer (typically using an input measure such as costs incurred to date relative to total estimated costs at completion to measure progress). Accounting for long-term contracts involves the use of various techniques to estimate total transaction price and costs. For long-term contracts, transaction price, estimated cost at completion and total costs incurred to date are used to calculate revenue earned. Unforeseen events and circumstances can alter the estimate of the costs and potential profit associated with a particular contract. Total estimated costs, and thus contract revenue and income, can be impacted by changes in productivity, scheduling, the unit cost of labor, subcontracts, materials and equipment. Additionally, external factors such as weather, client needs, client delays in providing permits and approvals, labor availability, governmental regulation, and politics may affect the progress of a project's completion, and thus the timing of revenue recognition. Actual results could differ from estimated amounts and could result in a reduction or elimination of previously recognized earnings. In certain circumstances, it is possible that such adjustments could be significant and could have an adverse effect on our business.

***Our reported results of operations could be adversely affected as a result of impairments of goodwill or other identifiable intangible assets.***

When we acquire a business, we record an asset called "goodwill" for the excess amount we pay for the business over the net fair value of the tangible and identifiable intangible assets of the business we acquire. At December 31, 2024, our balance sheet included goodwill of $856.9 million and intangible assets of $207.9 million resulting from previous acquisitions. Fair value is determined using a combination of the discounted cash flow, market multiple and market capitalization valuation approaches. Under current accounting rules, goodwill and other identifiable intangible assets that have indefinite useful lives cannot be amortized, but instead must be tested at least annually for impairment, while identifiable intangible assets that have finite useful lives are amortized over their useful lives. Significant judgment is required in completing these tests, as described in Item 7. "*Management's Discussion and*

*Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates— Goodwill and Indefinite-Lived Intangible Assets*" of this Annual Report on Form 10-K. Any impairment of goodwill, or identifiable intangible assets recorded in connection with the various acquisitions, or for any future acquisitions, would negatively impact our results of operations.

***Compliance with and changes in tax laws could adversely affect our performance.***

We are subject to extensive tax liabilities imposed by multiple jurisdictions, including federal, state, local and international jurisdictions. New tax laws, treaties and regulations and changes in existing tax laws, treaties and regulations are continuously being enacted or proposed and could result in a different tax rate on our earnings, which could have a material impact on our earnings and cash flow from operations. In addition, significant judgment is required in determining our provision for income taxes, as described in Item 7. "*Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Income Taxes*" of this Annual Report on Form 10-K. In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. We are regularly subject to audits by tax authorities, and our tax estimates and tax positions could be materially affected by many factors including the final outcome of tax audits and related litigation, the introduction of new tax accounting standards, legislation, regulations and related interpretations, our mix of earnings, the realizability of deferred tax assets and changes in uncertain tax positions. A significant increase in our tax rate could have a material adverse effect on our profitability and liquidity.

***Our variable rate indebtedness subjects us to interest rate risk.***

Borrowings under our revolving credit facility and term loan bear interest at variable rates and expose us to interest rate risk. From time to time, we may use certain derivative instruments to hedge our exposure to variable interest rates. As of December 31, 2024, $300.0 million of our variable rate debt outstanding was economically hedged. The interest rate swap matured on January 31, 2025. The remaining $376.9 million of variable rate debt was unhedged. If interest rates increase, our debt service obligations on the unhedged portion of our variable rate debt will increase even if the amount borrowed remains the same, and our net income and cash flows, will decrease correspondingly. Based on our variable rate debt outstanding as of December 31, 2024, a 1.0% increase or decrease in interest rates would change annual interest expense by approximately $3.8 million.

**Risks Related to our Common Stock**

***Our common stock is subject to potential dilution to our stockholders.***

As part of our acquisition strategy, we have issued and used shares of common stock as a part of contingent earn-out consideration, which have resulted in dilution to our stockholders. Our Certificate of Incorporation permits us to issue up to 90.0 million shares of common stock of which approximately 53.7 million were outstanding at December 31, 2024. While New York Stock Exchange rules require that we obtain stockholder approval to issue more than 20% additional shares, stockholder approval is not required below that level. In addition, we can issue shares of preferred stock which could cause further dilution to the stockholder, resulting in reduced net income and cash flow available to common stockholders.

In 2022, our stockholders adopted the 2022 Employee Stock Purchase Plan (the "ESPP"), under which eligible full-time employees can purchase shares of our common stock at a discount on a semi-annual basis. The number of shares authorized and available for purchase under the ESPP is 1.0 million. As of December 31, 2024, there were 960,496 shares of common stock remaining available for purchase. Additional purchases made under the ESPP will have the effect of diluting our earnings per share and stockholders' percentage of ownership.

In 2023, our stockholders adopted our 2023 Equity Incentive Plan ("2023 Equity Plan"). The 2023 Equity Plan replaced a previous equity plan. The 2023 Equity Plan authorized the Board of Directors to issue equity awards totaling 6.5 million shares of our common stock. As of December 31, 2024, there were 5.8 million shares of common stock remaining available for issuance under our 2023 Equity Plan. Equity awards made to our directors and employees will have the effect of diluting our earnings per share and stockholders' percentage of ownership.

***Delaware law and our charter documents may impede or discourage a takeover or change in control.***

As a Delaware corporation, anti-takeover provisions may impose an impediment to the ability of others to acquire control of us, even if a change of control would be of benefit to our stockholders. In addition, certain provisions of our Certificate of Incorporation and Bylaws also may impose an impediment or discourage others from a takeover. These provisions include: restrictions on the ability of a stockholder to call a special meeting, or nominate a director for election and our Board of Directors' ability to authorize the issuance of preferred shares.

These types of provisions may limit the ability of stockholders to obtain a premium for their shares.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

## ITEM 1C. CYBERSECURITY

### Cybersecurity Risk Management and Strategy

We rely on computer, information, network, and communication technology and related systems to operate our business and to protect confidential, restricted, and sensitive company, customer, and partner information. We have a multi-layered cybersecurity risk management program designed to identify risks related to the organization's digital and physical assets, review and assess existing security measures, and implement and manage solutions to mitigate cyber risks. These solutions are designed to protect our facilities, our systems, our partners, our customers, and our financial data in case we experience a cyber incident. Protection includes phishing detection, social engineering, executive targeting, brand impersonation, configuration mistakes, sensitive data leakage, leaked credentials, malicious attacks, third-party risks, vulnerabilities, insider threats (both intentional and unintentional), and password attacks. This type of ongoing vulnerability risk management is crucial as the organization and the external threat landscape evolves. This cybersecurity risk management program is incorporated as part of the Primoris Enterprise Risk Management Program.

Our cybersecurity policies and processes are based on the controls within the National Institute of Standards and Technology ("NIST") Framework, and we engage a number of external parties to enhance our cybersecurity oversight. For example, every other year, a third-party consulting firm performs an assessment of our cyber program, measuring our program against the NIST controls with a Capability Maturity Model Integration overlay to determine the program's maturity. The assessment findings are disclosed to the Audit Committee of the Board of Directors and our cross-functional management Security Steering Committee ("SSC"). Any improvements resulting from the assessment are identified, along with action plans. We also use a third party to perform an annual Breach Assessment targeting our external and internal network environment to determine the strengths and any weaknesses within our cybersecurity processes. As part of the Breach Assessment, our Incident Response Plan is instigated and reviewed to ensure it remains current and effective for all situations. We also have multiple third-party managed Security Operations Centers ("SOC") in place; including a SOC for logging and monitoring of security events; a SOC for endpoint managed detection and response, including identity protection; a SOC for executive digital and brand protection; and a SOC for protection of network credentials.

In order to oversee and identify risks from cybersecurity threats associated with the Company's use of vendors and other third-party service providers, we conduct continuous passive scanning of the Primoris network, as well as Primoris vendors' external perimeter, on a regular basis to assess any potential vulnerabilities and weaknesses.

As of the date of this report, we are not aware of any known cybersecurity threats that have materially affected or are reasonably likely to materially affect the Company, including our business strategy, results of operations or financial condition. However, as discussed under Part I, Item 1A. "Risk Factors, specifically the risks titled "*Disruptions to our operational systems could adversely impact our operations, our ability to report financial results and our business"* and *"Security breaches, cyber security attacks or other disruptions to our information technology systems and networks could adversely impact our operations or compromise the confidentiality of private customer data or our own proprietary information,*" the sophistication of cyber threats continues to increase, and the preventative actions we take to reduce the risk of cyber incidents and protect our systems and information may be insufficient. Accordingly, no matter how well designed or implemented our controls are, we will not be able to anticipate all security breaches, and we may

not be able to implement effective preventive measures against such security breaches in a timely manner, which could materially affect us, including our business operations, results of operations or financial condition.

**Cybersecurity Governance and Oversight**

The Audit Committee of our Board of Directors provides direct oversight over cybersecurity risk and governance. We also maintain a cross-functional management Security Steering Committee ("SSC"), with members consisting of executive leadership, internal audit, and enterprise risk. The SSC meets quarterly and has a formal charter outlining its responsibility to provide oversite of our comprehensive cybersecurity program. The Audit Committee of the Board of Directors is briefed quarterly by the Chief Information Officer ("CIO") on the cybersecurity program, and both the Audit Committee and SSC are notified between such updates regarding significant new cybersecurity threats or incidents. The full Board of Directors also receives regular reports from the Audit Committee.

The CIO chairs the SSC and oversees Primoris' cybersecurity risk management program. The CIO is supported by the head of cybersecurity, who is a direct report to the CIO. The training and experience of the head of cybersecurity includes a Harvard MBA along with professional experiences involving Forensics and Investigation, NIST controls assessments and implementation, ISO27001 assessments and implementation, Payment Card Industry Certification, and HITRUST implementation and certification. The head of cybersecurity and the security team are responsible for leading company-wide cybersecurity strategy, policy, standards, and processes and work across the organization to assess and prepare Primoris to address cybersecurity risks. Our head of cybersecurity and the security team are informed about and monitor the prevention, detection, mitigation, and remediation of cybersecurity incidents pursuant to our Incident Response Plan.

Our employees are also an important part of protecting our digital and technical environment. A key area of the cybersecurity program is the education of employees regarding cybersecurity using security awareness training, security bulletins and phishing simulations to reinforce training on a quarterly basis. Security awareness training covers all network users. On an annual basis an Acceptable Use Policy ("AUP") is distributed to employees through our Security Awareness Training System for understanding and acknowledgement. Additionally, all new employees are provided the AUP through the Security Awareness System included with initial security training upon being granted access to our network. Additionally, all new employees are provided the AUP by Human Resources and receive initial security training upon being granted access to our network.

## ITEM 2. PROPERTIES

### Facilities

We lease our executive offices in Dallas, Texas and own and lease other facilities throughout the United States and Canada. Our facilities include offices, production yards, maintenance shops, and training and education facilities that are used in our operations by both of our segments. As of December 31, 2024, we owned 46 of our facilities and leased the remainder. We believe that our facilities are adequate to meet our current and foreseeable requirements.

### Property, Plant and Equipment

The construction industry is capital intensive, and we expect to continue making capital expenditures to meet anticipated needs for our services. In 2024, we spent approximately $126.6 million for capital expenditures, which included $81.9 million on our facilities and $36.6 million for construction equipment.

We believe the ownership or long-term leasing of equipment is generally preferable to renting to ensure the equipment is available as needed. In addition, this approach has historically resulted in lower overall equipment costs. All equipment is subject to scheduled maintenance to help ensure reliability. Maintenance facilities exist at most of our regional offices, as well as on-site on major projects to properly service and repair equipment. Major equipment not currently utilized is rented to third parties or sold whenever possible.

## ITEM 3. LEGAL PROCEEDINGS

**Legal Proceedings**

For information regarding legal proceedings, see Note 12 — "*Commitments and Contingencies*" of the Notes to Consolidated Financial Statements included in Item 8. "*Financial Statements And Supplementary Data*" of this Annual Report on Form 10-K, which is incorporated herein by reference.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

### Market Information

Our common stock is listed on the New York Stock Exchange under the symbol "PRIM". We had outstanding 53,747,628 shares of common stock and 335 stockholders of record as of February 18, 2025. These stockholders of record include depositories that hold shares of stock for brokerage firms, which in turn, hold shares of stock for numerous beneficial owners.

### Dividends

We have paid consecutive quarterly cash dividends since 2008, and currently expect that comparable cash dividends will continue to be paid for the foreseeable future. In October of 2024 we increased the quarterly cash dividend from $0.06 per share to $0.08 per share. The declaration and payment of future dividends is contingent upon our revenue and earnings, capital requirements, and general financial conditions, as well as contractual restrictions and other considerations deemed to be relevant by the Board of Directors.

**Performance Graph**

*The following Performance Graph and related information shall not be deemed to be filed with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933 or Securities Exchange Act of 1934, each as amended, except to the extent that we specifically incorporate it by reference into such filing.*

The following graph compares the cumulative total return to holders of our common stock during the five-year period from December 31, 2019, and in each quarter through December 31, 2024. The return is compared to the cumulative total return during the same period achieved on the Standard & Poor's 500 Stock Index (the "S&P 500") and a peer group index selected by our management that includes five public companies within our industry (the "Peer Group"). The companies in the Peer Group were selected because they comprise a broad group of publicly held corporations, each of which has some operations similar to ours. When taken as a whole, management believes the Peer Group more closely resembles our total business than any individual company in the group. The Peer Group is composed of MasTec, Inc., MYR Group, Inc., Dycom Industries, Inc., Sterling Construction Company, Inc. and Granite Construction, Inc.

The returns are calculated assuming that an investment with a value of $100 was made in our common stock, the S&P 500 and the Peer Group as of December 31, 2019. All dividends were reinvested in additional shares of common stock. The Peer Group investment is weighted based on the market capitalization of each company at the measurement period. The graph lines merely connect the measuring dates and do not reflect fluctuations between those dates. The stock performance shown on the graph is not intended to be indicative of future stock performance.

**COMPARISON OF DECEMBER 31, 2019 THROUGH DECEMBER 31, 2024**
**CUMULATIVE TOTAL RETURN**
Among Primoris Services Corporation ("PRIM"), the S&P 500 and the Peer Group




| | 12/31/19 | 12/31/20 | 12/31/21 | 12/31/22 | 12/31/23 | 12/31/24 |
|---|---|---|---|---|---|---|
| PRIM | $100.00 | $125.72 | $110.16 | $101.97 | $155.60 | $359.64 |
| S&P 500 | $100.00 | $116.60 | $147.96 | $119.19 | $148.07 | $182.59 |
| Peer Group | $100.00 | $122.63 | $168.84 | $155.90 | $184.08 | $286.45 |

**ITEM 6. [RESERVED]**

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion of our financial condition and results of operations in conjunction with the financial statements and the notes to those statements included in Item 8.* "*Financial Statements And Supplementary Data*" *in this Annual Report on Form 10-K. This discussion includes forward-looking statements that are based on current expectations and are subject to uncertainties and unknown or changed circumstances. For a further discussion, please see "Forward-Looking Statements" at the beginning of this Annual Report on Form 10-K. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of many factors, including those risks inherent with our business as discussed in Item 1A. "Risk Factors".*

The following discussion starts with an overview of our business and a discussion of trends, including seasonality, that affect our industry. That is followed by an overview of the critical accounting policies and estimates that we use to prepare our financial statements. Next, we discuss our results of operations and liquidity and capital resources, including our off-balance sheet arrangements and contractual obligations. We conclude with a discussion of our outlook and backlog.

### Introduction

We are one of the leading providers of infrastructure services operating mainly in the United States and Canada. We provide a wide range of construction, maintenance, replacement, fabrication, and engineering services to a diversified base of customers through our two segments: Utilities and Energy. The structure of our reportable segments is generally focused on broad end-user markets for our services.

The Utilities segment operates throughout the United States and specializes in a range of services, including the installation and maintenance of new and existing natural gas and electric utility distribution and transmission systems, and communications systems.

The Energy segment operates throughout the United States and Canada and specializes in a range of services that include engineering, procurement, construction, and maintenance services for entities in the energy, renewable energy and energy storage, renewable fuels, and petroleum and petrochemical industries, as well as state departments of transportation.

We have longstanding customer relationships with solar facility developers and utility, refining, petrochemical, communications, midstream, downstream, and engineering companies, as well as power producers and transportation agencies across our core markets. We have completed major underground and industrial projects for a number of large natural gas transmission and petrochemical companies in the United States and major electrical and gas projects for a number of large utility companies in the United States. We enter into a large number of contracts each year, and the projects can vary in length from daily work orders to as long as 36 months, and occasionally longer, for completion on larger projects. Although we have not been dependent upon any one customer in any year, a small number of customers tend to constitute a substantial portion of our total revenue in any given year.

We generate revenue under a range of contracting types, including fixed-price, unit-price, time and material, and cost reimbursable plus fee contracts, each of which has a different risk profile. For the years ended December 31, 2024, 2023, and 2022, $4.7 billion, $3.9 billion, and $2.7 billion, respectively of our revenue is derived from contracts where scope is adequately defined, and therefore we can reasonably estimate total contract value. For these contracts, revenue is recognized over time as work is completed because of the continuous transfer of control to the customer (typically using an input measure such as costs incurred to date relative to total estimated costs at completion to measure progress). For certain contracts, where scope is not adequately defined and we can't reasonably estimate total contract value, revenue is recognized either on an input basis, based on contract costs incurred as defined within the respective contracts, or an output basis based on units completed. Costs to obtain contracts are generally not significant and are expensed in the period incurred.

The classification of revenue, gross profit, and operating income for segment reporting purposes can at times require judgment on the part of management. Our segments may perform services across industries or perform joint

services for customers in multiple industries. To determine reportable segment gross profit and operating income, certain allocations, including allocations of shared and indirect costs, such as facility costs, equipment costs, selling, general, and administrative expenses ("SG&A") and indirect operating expenses were made.

*Acquisition of PLH*

On August 1, 2022, we acquired PLH Group, Inc. ("PLH") in an all-cash transaction valued at approximately $429.0 million, net of cash acquired. PLH is a utility-focused infrastructure services company with concentrations in key fast-growing regions of the United States. The transaction directly aligns with our strategic focus on higher-growth, higher margin markets and expands our capabilities in the utility markets including power delivery, communications, and gas utilities. The total purchase price was funded through a combination of borrowings under our Third Amended and Restated Credit Agreement, dated as of August 1, 2022, which increased our term loan to an aggregate principal amount of $945.0 million (the "Term Loan") and borrowings under our revolving credit facility, in which the lenders agreed to make loans on a revolving basis from time to time and to issue letters of credit for up to $325.0 million (the "Revolving Credit Facility"). We incorporated the majority of the PLH operations into our Utilities segment with the remaining operations going to our Energy segment.

*Acquisition of B Comm Holdco, LLC*

On June 8, 2022, we acquired B Comm Holdco, LLC ("B Comm") in an all-cash transaction of approximately $36.0 million, net of cash acquired. B Comm was incorporated into our Utilities segment and is a provider of maintenance, repair, upgrade and installation services to the communications markets. The transaction directly aligns with the strategy to grow our Master Services Agreement ("MSA") revenue base and expand our communication services within the utility segment. The total purchase price was funded with borrowings under our Revolving Credit Facility.

**Business Environment**

We believe there are growth opportunities across the industries we serve and we continue to have a positive long-term outlook. Although not without risks and challenges, including those discussed below and in *Forward-Looking Statements* and included in Item 1A. "*Risk Factors*," we believe, with our full-service offerings, broad geographic reach, stable financial position and technical expertise, we are well positioned to capitalize on opportunities and trends in our industries.

We have seen and continue to anticipate potential changes to the regulatory and environmental requirements for many of our clients' infrastructure projects, which may impact the timing and certainty of projects. While permitting and other regulatory challenges create uncertainty as to the timing of some of our opportunities, we continue to see consistent investment activity across a wide range of projects in the end markets we serve. We believe that we have the financial and operational strength to meet the challenge of either short-term delays or significant increases in work. We continue to be optimistic about both short and longer-term opportunities. Our current outlook for our primary end markets is as follows:

- *Construction of alternative energy facilities, chemical processing facilities, renewable natural gas facilities, solar power facilities, battery storage* — We believe state and federal governments, investors and utilities remain committed to a diversified power generation mix that includes more alternative energy sources. As this trend continues, along with the growing demand for power, we are seeing an increase in the construction of new generation facilities powered by renewable energy sources, as well as energy storage systems. The extension of investment incentives and strong support of U.S. manufacturing has attracted a significant amount of capital to finance renewable projects as well as to enhance the supply chain needed to meet increasing demand. Other trends we are seeing are major investments in industrial gases and agricultural chemicals. To the extent this dynamic continues, we anticipate continued engineering, procurement, and construction opportunities, that will benefit our Energy segment.

- *Communications construction opportunities* — We believe the federal government remains committed to improving and expanding broadband communications access. Federal and State programs provide critical

funding to help construct and improve the infrastructure required to provide sufficient broadband access to areas that have historically had lower access to broadband services. We expect these opportunities, as well as ongoing spending by communications and technology companies, to benefit our Utilities segment.

- *Power Delivery* — We are experiencing strong tailwinds in our power delivery business as the industry continues to invest in grid resiliency, modernization, renewable generation integration, and increased electrification of certain industries. Our national position in this market allows for scalable coverage across the industry. Electric distribution expansion and resiliency initiatives with clients in our key markets has been, and will continue to be, a strong opportunity for us as we see utilities customers continue to invest in grid reliability. Additionally, we are experiencing new opportunities as utilities providers invest in renewable and natural gas generation and upgrade their transmission infrastructure.

- *Inspection, maintenance and replacement of electric utility infrastructure* — We expect the demand for electricity in the United States to grow over the long-term and believe enhancements to the country's electric utility infrastructure are needed to efficiently serve the power needs of the future. New natural gas and renewable generation will require substations and transmission lines to connect the new generation sources to customers. In addition, current federal legislation also requires the power industry to meet federal reliability standards for its transmission and distribution systems. These opportunities, as well as ongoing electric utility repair and maintenance opportunities are expected to benefit our Utilities segment.

- *Inspection, maintenance and replacement of gas utility infrastructure* — We expect that ongoing safety enhancements to gas pipeline systems and the gas utility infrastructure will provide continuing opportunities for our Utilities segment. We also expect that ongoing gas utility repair and maintenance opportunities will continue.

- *Construction of natural gas-fired power plants and industrial plants* — We expect continued construction opportunities for both baseload and peak shaving power plants; however, we are aware that environmental concerns over gas fired power plants may impact the timing and location of near-term construction opportunities in certain states. We believe that based on continuing population growth, increased power demand, and the intermittency of renewable power resources, gas powered plants will still be needed, not withstanding some opposition to these traditional generation sources. In addition, the historically low price of natural gas could result in the continued replacement of higher carbon emitting coal-fired power plants and the conversion and expansion at chemical plants and industrial facilities in other parts of the United States. These opportunities would benefit our Energy segment.

- *Construction of petroleum, natural gas, natural gas liquid, and other liquid pipelines* — We expect that the volatility in the price of oil, gas, and condensates could reduce production of higher operating cost shale basins. In addition, the ability of our customers to obtain federal and state permits for projects could impact the demand for our services, especially for larger interstate pipelines. However, high levels of production from the shale formations and increased demand for exporting liquified natural gas ("LNG") could strain the current pipeline capacity limitations between production and processing locations which would provide opportunities for our Energy segment.

- *Inspection, maintenance and replacement of pipeline infrastructure* — We believe that regulatory measures around the frequency or stringency of pipeline integrity testing requirements provides growth opportunity for our Energy segment. Regulatory requirements continue to mandate or require our customers to test, inspect, repair, maintain and replace pipeline infrastructure to ensure that it operates safely, reliably and in an environmentally conscious manner. In addition, permitting challenges associated with construction of new pipelines may make existing pipeline infrastructure more valuable, motivating owners to extend the

useful life of existing pipeline assets through maintenance and integrity initiatives. As a result, we expect a potential increase in demand for our pipeline integrity services.

**Material Trends and Uncertainties**

We generate our revenue from construction and engineering projects, as well as from providing a variety of infrastructure services. We depend in part on spending by companies in the communications, gas and electric utilities, energy, chemical, and pipeline industries, as well as state departments of transportation. Over the past several years, each segment has benefited from demand for more efficient and more environmentally friendly energy and power facilities, more reliable gas and electric utility infrastructure, and upgraded and expanded local highway and bridge needs. However, periodically, each of these industries and government agencies is adversely affected by macroeconomic conditions and other challenging market conditions, such as those that have caused declines in the pipeline industry. Economic and other factors outside of our control may affect the amount and size of contracts we are awarded in any particular period.

We actively monitor the impact of the macroeconomic environment, including the impact of inflation, tariffs, and volatility in the commodities markets, on all aspects of our business. We have experienced increased operating costs and anticipate that elevated levels of cost inflation could persist in 2025. In an effort to mitigate the impacts of inflation on our operations, we attempt to recover increases in the cost of labor, equipment, fuel and materials through price escalation provisions that allow us to adjust billing rates for certain major contracts annually; by considering the estimated effect of such increases when bidding or pricing new work; or by entering into back-to-back contracts with suppliers and subcontractors. However, the annual adjustment provided by certain contracts is typically subject to a cap and there can be an extended period of time between the impact of inflation on our costs and when billing rates are adjusted. In some cases, our actual cost increases have exceeded the contractual caps, and therefore negatively impacted the profitability of our operations until the contracts have been renegotiated to reflect these higher costs.

Fluctuations in the market prices of oil, gas and other fuel sources have affected demand for our services. Volatility in the prices of oil, gas, and liquid natural gas that has occurred in recent years has created uncertainty with respect to demand for our pipeline services, both in the near term and for future projects. While the construction of gathering lines within the oil shale formations may remain at lower levels for a period, we believe that over time, the need for pipeline infrastructure for midstream and gas utility companies will result in a continuing need for our services.

The continuing changes in the regulatory environment have affected the demand for our services, either by increasing our work, delaying projects, or cancelling projects. For example, environmental laws and regulations have provided challenges to pipeline projects, resulting in delays or cancellations that impact the timing of revenue recognition. However, the regulatory environment in certain states has resulted in an increase in the construction of gas-fired power plants. In addition, increased demand for electric power is also expanding opportunities for our Energy segment, such as the need for battery storage and the construction of utility scale solar facilities, and natural gas generation facilities.

We are exposed to certain market risks related to changes in interest rates. To monitor and manage these market risks, we have established risk management policies and procedures. Our Revolving Credit Facility and Term Loan bear interest at a variable rate which exposes us to interest rate risk. From time to time, we may use certain derivative instruments to hedge our exposure to variable interest rates. As of December 31, 2024, $300.0 million of our variable rate debt outstanding was economically hedged. The interest rate swap matured on January 31, 2025. Based on our variable rate debt outstanding as of December 31, 2024, a 1.0% increase or decrease in interest rates would change annual interest expense by approximately $3.8 million.

**Seasonality, Cyclicality and Variability**

Our results of operations are subject to quarterly variations. Some of the variation is the result of weather, particularly rain, ice, snow, and named storms, which can impact our ability to perform infrastructure services. These seasonal impacts can affect revenue and profitability in all of our businesses. Any quarter can be affected either negatively, or positively by atypical weather patterns in any part of the country. In addition, demand for new projects in our Utilities segment tends to be lower during the early part of the calendar year due to clients' internal budget cycles. As

a result, we usually experience higher revenue and earnings in the second, third and fourth quarters of the year as compared to the first quarter.

Our project values range in size from several hundred dollars to several hundred million dollars. The bulk of our work is comprised of project sizes that average less than $3.0 million. We also perform construction projects which tend not to be seasonal, but can fluctuate from year to year based on customer timing, project duration, weather, and general economic conditions. Our business may be affected by declines, or delays in new projects, or by client project schedules. Because of the cyclical nature of some of our business, the financial results for any period may fluctuate from prior periods, and our financial condition and operating results may vary from quarter to quarter. Results from one quarter may not be indicative of our financial condition, or operating results for any other quarter, or for an entire year.

**Critical Accounting Policies and Estimates**

***General***—The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the financial statements, and also affect the amounts of revenue and expenses reported for each period. These estimates and assumptions must be made because certain information that is used in the preparation of our financial statements cannot be calculated with a high degree of precision from data available, is dependent on future events, or is not capable of being readily calculated based on generally accepted methodologies. Often, estimates are particularly difficult to determine, and we must exercise significant judgment. Estimates may be used in our accounting for revenue recognized over time, the allowance for credit losses, useful lives of property and equipment, fair value assumptions in analyzing goodwill and long-lived asset impairments, self-insured claims liabilities and deferred income taxes. Actual results could materially differ from those that result from using the estimates under different assumptions or conditions.

An accounting policy is deemed to be critical if i) it requires an accounting estimate to be based on assumptions about matters that are highly uncertain at the time the estimate is made, ii) different estimates could have reasonably been used, or iii) changes in the accounting estimates that are reasonably likely to occur periodically could materially impact our consolidated financial statements.

The following accounting policies require critical accounting estimates that are based on, among other things, judgments and assumptions made by management that include inherent risks and uncertainties. Management's estimates are based on the relevant information available at the end of each period. We periodically review these accounting policies and critical accounting estimates with the Audit Committee of the Board of Directors.

***Revenue recognition* —** We generate revenue under a range of contracting types, including fixed-price, unit-price, time and material, and cost reimbursable plus fee contracts, each of which has a different risk profile. A portion of our revenue is derived from contracts where scope is adequately defined, and therefore we can reasonably estimate total contract value. For these contracts, revenue is recognized over time as work is completed because of the continuous transfer of control to the customer (typically using an input measure such as costs incurred to date relative to total estimated costs at completion to measure progress). For certain contracts, where scope is not adequately defined and we can't reasonably estimate total contract value, revenue is recognized either on an input basis, based on contract costs incurred as defined within the respective contracts, or an output basis based on units completed. Costs to obtain contracts are generally not significant and are expensed in the period incurred.

We evaluate whether two or more contracts should be combined and accounted for as one single performance obligation and whether a single contract should be accounted for as more than one performance obligation. Accounting Standards Codification ("ASC") 606 defines a performance obligation as a contractual promise to transfer a distinct good or service to a customer. A contract's transaction price is allocated to each distinct performance obligation and recognized as revenue when, or as, the performance obligation is satisfied. Our evaluation requires significant judgment and the decision to combine a group of contracts or separate a contract into multiple performance obligations could change the amount of revenue and profit recorded in a given period. The majority of our contracts have a single performance obligation, as the promise to transfer the individual goods or services is not separately identifiable from other promises in the contract and, therefore, is not distinct. However, occasionally we have contracts with multiple performance obligations. For contracts with multiple performance obligations, we allocate the contract's transaction price to each performance obligation using the observable standalone selling price, if available, or alternatively our best

estimate of the standalone selling price of each distinct performance obligation in the contract. The primary method used to estimate standalone selling price is the expected cost plus a margin approach for each performance obligation.

Accounting for long-term contracts involves the use of various techniques to estimate total transaction price and costs. For long-term contracts, transaction price, estimated cost at completion and total costs incurred to date are used to calculate revenue earned. Unforeseen events and circumstances can alter the estimate of the costs and potential profit associated with a particular contract. Total estimated costs, and thus contract revenue and income, can be impacted by changes in productivity, scheduling, the unit cost of labor, subcontracts, materials and equipment. Additionally, external factors such as weather, client needs, client delays in providing permits and approvals, labor availability, governmental regulation, politics and any prevailing impacts from pandemics or epidemics may affect the progress of a project's completion, and thus the timing of revenue recognition. To the extent that original cost estimates are modified, estimated costs to complete increase, delivery schedules are delayed, or progress under a contract is otherwise impeded, cash flow, revenue recognition and profitability from a particular contract may be adversely affected.

The nature of our contracts gives rise to several types of variable consideration, including contract modifications (change orders and claims), liquidated damages, volume discounts, performance bonuses, incentive fees, and other terms that can either increase or decrease the transaction price. We estimate variable consideration as the most likely amount to which we expect to be entitled. We include estimated amounts in the transaction price to the extent we believe we have an enforceable right, and it is probable that a significant reversal of cumulative revenue recognized will not occur. Our estimates of variable consideration and the determination of whether to include estimated amounts in the transaction price are based largely on an assessment of our anticipated performance and all information (historical, current and forecasted) that is reasonably available to us at this time.

Contract modifications result from changes in contract specifications or requirements. We consider unapproved change orders to be contract modifications for which customers have not agreed to both scope and price. We consider claims to be contract modifications for which we seek, or will seek, to collect from customers, or others, for customer-caused changes in contract specifications or design, or other customer-related causes of unanticipated additional contract costs on which there is no agreement with customers. Claims can also be caused by non-customer-caused changes, such as rain or other weather delays. Costs associated with contract modifications are included in the estimated costs to complete the contracts and are treated as project costs when incurred. In most instances, contract modifications are for goods or services that are not distinct, and, therefore, are accounted for as part of the existing contract. The effect of a contract modification on the transaction price, and our measure of progress for the performance obligation to which it relates, is recognized as an adjustment to revenue on a cumulative catch-up basis. In some cases, settlement of contract modifications may not occur until after completion of work under the contract.

As a significant change in one or more of these estimates could affect the profitability of our contracts, we review and update our contract-related estimates regularly. We recognize adjustments in estimated profit on contracts under the cumulative catch-up method. Under this method, the cumulative impact of the profit adjustment is recognized in the period the adjustment is identified. Revenue and profit in future periods of contract performance are recognized using the adjusted estimate. If at any time the estimate of contract profitability indicates an anticipated loss on a contract, the projected loss is recognized in full, including any previously recognized profit, in the period it is identified and recognized as an "accrued loss provision" which is included in "Contract liabilities" on the Consolidated Balance Sheets. For contract revenue recognized over time, the accrued loss provision is adjusted so that the gross profit for the contract remains zero in future periods.

At December 31, 2024, we had approximately $220.8 million of unapproved contract modifications included in the aggregate transaction prices. These unapproved contract modifications were in the process of being negotiated in the normal course of business. Approximately $206.1 million of the unapproved contract modifications had been recognized as revenue on a cumulative catch-up basis through December 31, 2024.

In all forms of contracts, we estimate the collectability of contract amounts at the same time that we estimate project costs. If we anticipate that there may be issues associated with the collectability of the full amount calculated as the transaction price, we may reduce the amount recognized as revenue to reflect the uncertainty associated with realization of the eventual cash collection. For example, when a cost reimbursable project exceeds the client's expected budget amount, the client frequently requests an adjustment to the final amount. Similarly, some utility clients reserve the right to audit costs for significant periods after performance of the work.

The timing of when we bill our customers is generally dependent upon agreed-upon contractual terms, milestone billings based on the completion of certain phases of the work, or when services are provided. Sometimes, billing occurs subsequent to revenue recognition, resulting in unbilled revenue, which is a contract asset. However, we sometimes receive advances or deposits from our customers before revenue is recognized, resulting in deferred revenue, which is a contract liability.

The caption "Contract assets" in the Consolidated Balance Sheets represents the following:

- unbilled revenue, which arise when revenue has been recorded, but the amount will not be billed until a later date;
- retainage amounts for the portion of the contract price earned by us for work performed, but held for payment by the customer as a form of security until we reach certain construction milestones; and
- contract materials for certain job specific materials not yet installed, which are valued using the specific identification method relating the cost incurred to a specific project.

The caption "Contract liabilities" in the Consolidated Balance Sheets represents the following:

- deferred revenue on billings in excess of contract revenue recognized to date, and
- the accrued loss provision.

***Business combinations***—We use the fair value of the consideration paid and the fair value of the assets acquired and liabilities assumed to account for the purchase price of businesses we acquire. The determination of fair value requires estimates and judgments of future cash flow expectations for the assignment of the fair values to the identifiable tangible and intangible assets.

*Identifiable Tangible Assets.* Significant identifiable tangible assets acquired would include accounts receivable, contract assets, leases and fixed assets (generally consisting of facilities and construction equipment). We determine the fair value of these assets as of the acquisition date. For current assets and current liabilities of an acquisition, we will evaluate whether the book value is equivalent to fair value due to their short term nature. We estimate the fair value of fixed assets using a market approach, based on comparable market values for similar equipment of similar condition and age.

*Identifiable Intangible Assets.* When necessary, we use the assistance of an independent third-party valuation specialist to determine the fair value of the intangible assets acquired. Third-party specialists are used to help us identify and separate intangible assets apart from goodwill such as customer relationships and tradenames. Fair value is determined by analyzing revenue trends, expected growth rates for existing customers, customer attrition rates, royalty rates, discount rates and intended use of future assets.

A liability for contingent consideration based on future earnings is estimated at its fair value at the date of acquisition, with subsequent changes in fair value recorded in earnings as a gain or loss. Fair value is estimated as of the acquisition date based on management's best estimate of potential earnout payments.

Accounting principles generally accepted in the United States provide a "measurement period" of up to one year in which to finalize all fair value estimates associated with the acquisition of a business. Most estimates are preliminary until the end of the measurement period. During the measurement period, adjustments to initial valuations and estimates that reflect newly discovered information that existed at the acquisition date are recorded. After the measurement date, any adjustments would be recorded as a current period gain or loss.

***Goodwill and Indefinite-Lived Intangible Assets***—Goodwill and certain intangible assets acquired in a business combination and determined to have indefinite useful lives are not amortized but are assessed for impairment annually and more frequently if triggering events occur. In performing these assessments, management relies on various factors, including operating results, business plans, economic projections, anticipated future cash flows, comparable

transactions and other market data. There are inherent uncertainties related to these factors and judgment in applying them to the analysis of goodwill for impairment. Since judgment is involved in performing fair value measurements used in goodwill impairment analyses, there is risk that the carrying values of our goodwill may not be properly stated.

We account for goodwill, including evaluation of any goodwill impairment under ASC 350, "*Intangibles — Goodwill and Other*", performed at the reporting unit level for those units with recorded goodwill as of October 1 of each year, unless there are indications requiring a more frequent impairment test.

Under ASC 350, we can assess qualitative factors to determine if a quantitative impairment test of intangible assets is necessary. Our qualitative assessment is used to determine whether it is more likely than not (that is, a likelihood of more than 50 percent) that the fair value of the reporting unit is less than its carrying value, including goodwill. Factors used in our qualitative assessment include, but are not limited to, macroeconomic conditions, industry and market conditions, cost factors, overall financial performance and Company and reporting unit specific events. If deemed necessary, we use the quantitative impairment test outlined in ASC 350, which compares the fair value of a reporting unit with its carrying amount. Fair value for the goodwill impairment test is determined utilizing a discounted cash flow analysis based on our financial plan discounted using our weighted average cost of capital and market indicators of terminal year cash flows. Other valuation methods may be used to corroborate the discounted cash flow method. If the carrying amount of a reporting unit is in excess of its fair value, goodwill is considered impaired and an impairment loss is recognized in an amount equal to that excess, limited to the total amount of goodwill of the reporting unit.

There were no impairments of goodwill for the years ended December 31, 2024, 2023 and 2022.

***Income taxes***—We account for income taxes under the asset and liability method as set forth in ASC 740, "*Income Taxes*", which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, deferred tax assets and liabilities are determined based on the temporary differences between the financial reporting bases and tax bases of assets and liabilities using enacted tax rates in effect for the years in which the differences are expected to reverse. The effect of changes in tax rates on net deferred tax assets or liabilities is recognized as an increase or decrease in net income in the period the tax change is enacted.

Deferred tax assets may be reduced by a valuation allowance if, in the judgment of management, it is more likely than not that all or a portion of a deferred tax asset will not be realized. In making such determination, we consider all available evidence, including recent financial operations, projected future taxable income, scheduled reversals of deferred tax liabilities, tax planning strategies, and the length of tax asset carryforward periods. The realization of deferred tax assets is primarily dependent upon our ability to generate sufficient future taxable earnings in certain jurisdictions. If we subsequently determine that some or all deferred tax assets that were previously offset by a valuation allowance are realizable, the value of the deferred tax assets would be increased by reducing the valuation allowance, thereby increasing income in the period when that determination is made.

A tax position is recognized as a benefit only if it is more likely than not that the tax position would be sustained based on its technical merits in a tax examination, using the presumption that the tax authority has full knowledge of all relevant facts regarding the position. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on ultimate settlement with the tax authority. For tax positions not meeting the more likely than not test, no tax benefit is recorded.

Based on our results for the year ended December 31, 2024, a one-percentage point increase in our effective tax rate would have resulted in an increase in our income tax expense of approximately $2.5 million.

***Litigation and contingencies*—**Litigation and contingencies are included in our consolidated financial statements based on our assessment of the expected outcome of litigation proceedings or the expected resolution of the contingency. We record costs related to contingencies when a loss from such claims is probable and the amount is reasonably estimable. In determining whether it is possible to provide an estimate of loss, or range of possible loss, we review and evaluate litigation and regulatory matters on a quarterly basis in light of potentially relevant factual and legal developments. If we determine an unfavorable outcome is not probable or reasonably estimable, we do not accrue for a potential litigation loss. Management is unable to ascertain the ultimate outcome of other claims and legal proceedings;

however, after review and consultation with counsel and taking into consideration relevant insurance coverage and related deductibles/self-insurance retention, management believes that it has meritorious defenses to the claims and believes that the reasonably possible outcome of such claims will not, individually or in the aggregate, have a material adverse effect on our consolidated results of operations, financial condition or cash flows. See Note 12 — "*Commitments and Contingencies*" of the Notes to Consolidated Financial Statements included in Item 8. "*Financial Statements And Supplementary Data*" of this Annual Report on Form 10-K for further information.

**Recently Issued Accounting Pronouncements**

See Note 2 — "*Summary of Significant Accounting Policies – Recently Issued Accounting Pronouncements"* of the Notes to Consolidated Financial Statements included in Item 8. "*Financial Statements And Supplementary Data*" of this Annual Report on Form 10-K for a discussion of recently issued accounting pronouncements.

**Results of Operations**

**Consolidated Results**

**Revenue**

*2024 and 2023*

Revenue for the year ended December 31, 2024 increased by $0.7 billion, or 11.4%, compared to 2023. The increase was primarily due to growth in our Energy segment.

*2023 and 2022*

Revenue for the year ended December 31, 2023 increased by $1.3 billion, or 29.3%, compared to 2022. The increase was primarily due to growth in both our Energy and Utilities segments, and the acquisitions of PLH and B Comm in 2022.

**Gross Profit**

*2024 and 2023*

For the year ended December 31, 2024, gross profit increased by $115.8 million, or 19.7%, compared to 2023. The increase was primarily due to an increase in revenue. Gross profit as a percentage of revenue increased to 11.0% compared to 10.3% for the same period in 2023, primarily driven by improved margins in our Utilities segment.

*2023 and 2022*

For the year ended December 31, 2023, gross profit increased by $130.6 million, or 28.6%, compared to 2022. The increase was primarily due to an increase in revenue. Gross profit as a percentage of revenue remained consistent at 10.3% compared to the same period in 2022.

**Selling, general and administrative expenses**

SG&A expenses consist primarily of compensation and benefits to executive, management level and administrative employees, marketing and communications, professional fees, rent for facilities and utilities.

*2024 and 2023*

SG&A expenses were $383.4 million for the year ended December 31, 2024, an increase of $54.6 million, or 16.6% compared to 2023, primarily due to increased people costs to support revenue growth as well as higher technology

costs associated with ongoing initiatives. SG&A expense as a percentage of revenue for the year ended December 31, 2024 increased slightly to 6.0% compared to 5.8% for the year ended December 31, 2023.

*2023 and 2022*

SG&A expenses were $328.7 million for the year ended December 31, 2023, an increase of $47.2 million, or 16.7% compared to 2022, primarily due to higher incentive compensation costs associated with improved operational performance and increases in headcount from the acquisitions of PLH and B Comm. SG&A expense as a percentage of revenue for the year ended December 31, 2023 decreased to 5.8% compared to 6.4% for the year ended December 31, 2022, primarily due to increased revenue.

**Transaction and related costs**

*2024 and 2023*

Transaction and related costs for the year ended December 31, 2024 were $2.4 million, a decrease of $3.2 million or 57.0% compared to 2023 primarily related to a decrease in integration costs for the PLH acquisition.

*2023 and 2022*

Transaction and related costs for the year ended December 31, 2023 were $5.7 million, a decrease of $14.4 million or 71.7% compared to 2022. The decrease was due to professional fees paid to advisors for the acquisitions of B Comm and PLH in 2022.

**Gain on Sale and Leaseback Transaction**

On June 22, 2022, we completed a sale and leaseback transaction of land and buildings located in Carson, California for an aggregate sales price, net of closing costs, of $49.9 million. Under the transaction, the land, buildings and improvements were sold and leased back for an initial term of three years. The property qualified for sale and leaseback treatment and is classified as an operating lease. Therefore, we recorded a gain on the transaction of $40.1 million. The gain is included in Gain on sale and leaseback transaction on our Consolidated Statements of Income for the year ended December 31, 2022. There were no such comparable transactions for the years ended December 31, 2024 and 2023.

**Other income and expense**

Non-operating income and expense items for the years ended December 31, 2024, 2023 and 2022 were as follows (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Foreign exchange gain (loss), net | $ 2.7 | $ 1.2 | $ 1.1 |
| Other income, net | 0.1 | 1.6 | 2.1 |
| Interest expense, net | (65.3) | (78.2) | (39.2) |
| Total other expense | $ (62.5) | $ (75.4) | $ (36.0) |

Interest expense, net for the year ended December 31, 2024 was $65.3 million compared to $78.2 million for the year ended December 31, 2023. The decrease of $12.9 million was due primarily to lower average debt balances and lower average interest rates.

Interest expense, net for the year ended December 31, 2023 was $78.2 million compared to $39.2 million for the year ended December 31, 2022. The increase of $39.0 million was due primarily to higher average debt balances from the borrowings related to the PLH acquisition and a higher average interest rate.

The weighted average interest rate on total debt outstanding at December 31, 2024, 2023 and 2022 was 5.6%, 6.8% and 6.2%, respectively.

**Provision for income taxes**

Our provision for income taxes increased $22.5 million to $74.0 million for 2024 compared to 2023. The increase was primarily driven by an increase in pre-tax profits subject to tax. The 2024 effective tax rate was 29.0%.

Our provision for income taxes increased $25.3 million to $51.5 million for 2023 compared to 2022. The increase was primarily driven by the tax benefit recognized in 2022 for capital losses, the 2023 expiration of a temporary law which allowed full deductibility of per diem expenses in 2021 and 2022 and increased pre-tax profits subject to tax. The 2023 effective tax rate was 29.0%.

**Segment Results**

Operating performance by segment for the years ended December 31, 2024, 2023, and 2022 was as follows (in millions):

| | For the year ended December 31, 2024 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Utilities | % of Segment Revenue | Energy | % of Segment Revenue | Corporate and non-allocated costs | | Consolidated | % of Consolidated Revenue |
| Revenue | $ 2,439.0 | — | $ 4,032.0 | — | $ (104.2) | (1) | $ 6,366.8 | — |
| Cost of revenue | 2,181.1 | 89.4% | 3,586.7 | 89.0% | (104.2) | (1) | 5,663.6 | 89.0% |
| Gross profit | 257.9 | 10.6% | 445.3 | 11.0% | — | | 703.2 | 11.0% |
| Selling, general, and administrative expenses | 118.2 | 4.8% | 150.2 | 3.7% | 114.9 | | 383.3 | 6.0% |
| Transaction and related costs | — | | — | | 2.5 | | 2.5 | |
| Operating income | $ 139.7 | 5.7% | $ 295.1 | 7.3% | $ (117.4) | | $ 317.4 | 5.0% |

(1) Represents intersegment revenue and cost of revenue of $104.2 million in the Utilities segment eliminated in our Consolidated Statements of Income.

| | For the year ended December 31, 2023 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Utilities | % of Segment Revenue | Energy | % of Segment Revenue | Corporate and non-allocated costs | | Consolidated | % of Consolidated Revenue |
| Revenue | $ 2,410.1 | — | $ 3,346.2 | — | $ (41.0) | (1) | $ 5,715.3 | — |
| Cost of revenue | 2,203.1 | 91.4% | 2,965.7 | 88.6% | (41.0) | (1) | 5,127.8 | 89.7% |
| Gross profit | 207.0 | 8.6% | 380.5 | 11.4% | — | | 587.5 | 10.3% |
| Selling, general, and administrative expenses | 117.8 | 4.9% | 132.6 | 4.0% | 78.3 | | 328.7 | 5.8% |
| Transaction and related costs | — | | — | | 5.7 | | 5.7 | |
| Operating income | $ 89.2 | 3.7% | $ 247.9 | 7.4% | $ (84.0) | | $ 253.1 | 4.4% |

(1) Represents intersegment revenue and cost of revenue of $29.9 million in the Utilities segment and $11.1 million in the Energy segment eliminated in our Consolidated Statements of Income.

| | For the year ended December 31, 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Utilities | % of Segment Revenue | Energy | % of Segment Revenue | Corporate and non-allocated costs | | Consolidated | % of Consolidated Revenue |
| Revenue | $ 2,033.7 | — | $ 2,397.3 | — | $ (10.4) | (1) | $ 4,420.6 | — |
| Cost of revenue | 1,823.0 | 89.6% | 2,151.1 | 89.7% | (10.4) | (1) | 3,963.7 | 89.7% |
| Gross profit | 210.7 | 10.4% | 246.2 | 10.3% | — | | 456.9 | 10.3% |
| Selling, general, and administrative expenses | 91.7 | 4.5% | 108.6 | 4.5% | 81.3 | | 281.6 | 6.4% |
| Transaction and related costs | — | | — | | 20.1 | | 20.1 | |
| Gain on sale and leaseback transaction | — | | — | | (40.1) | | (40.1) | |
| Operating income | $ 119.0 | 5.9% | $ 137.6 | 5.7% | $ (61.3) | | $ 195.3 | 4.4% |

(1) Represents intersegment revenue and cost of revenue of $9.3 million in the Utilities segment and $1.1 million in the Energy segment eliminated in our Consolidated Statements of Income.

*Utilities Segment*

*2024 and 2023*

Revenue increased by $28.9 million, or 1.2%, during 2024 compared to 2023. The increase is primarily due to increased project work in our power delivery market and increased activity in our gas and communications markets. Partially offsetting the overall increase was the substantial completion of a major substation project in our power delivery market in the second half of 2023.

Operating income increased $50.5 million, or 56.6%, during 2024 compared to 2023. The increase is primarily due to increased gross profit. Gross profit as a percentage of revenue increased to 10.6% in 2024 compared to 8.6% in 2023 primarily due to productivity issues on some legacy projects from our PLH acquisition experienced in 2023 and higher costs associated with a communications project in 2023. In addition, we had strong performance in our power delivery market and the increased benefit of higher margin storm work in 2024.

*2023 and 2022*

Revenue increased by $376.4 million, or 18.5%, during 2023 compared to 2022. The increase is primarily due to the acquisitions of PLH and B Comm in 2022 and increased activity in our power delivery and communications markets.

Operating income decreased $29.8 million, or 25.0%, during 2023 compared to 2022. The decrease is primarily due to a decrease in gross profit, partially offset by growth in revenue. Gross profit as a percentage of revenue decreased to 8.6% in 2023 compared to 10.4% in 2022 primarily due to productivity issues on some legacy PLH projects, higher costs associated with a communication project in 2023, and a shift in revenue mix in 2023.

*Energy Segment*

*2024 and 2023*

Revenue increased by $685.8 million, or 20.5%, during 2024 compared to 2023, primarily due to increased renewable energy and industrial activity, partially offset by decreased activity in our pipeline market.

Operating income increased by $47.2 million, or 19.0% during 2024 compared to 2023, due to strong revenue growth. Gross profit as a percentage of revenue decreased slightly to 11.0% in 2024 compared to 11.4% in 2023, primarily due to higher pipeline margins on a mid-Atlantic project in 2023 that did not repeat in 2024. These amounts were partially offset by growth in higher margin renewable energy work and strong performance by our industrial group in 2024.

*2023 and 2022*

Revenue increased by $948.9 million, or 39.6%, during 2023 compared to 2022, primarily due to increased renewable energy, industrial, and pipeline activity and the PLH acquisition.

Operating income increased by $110.3 million, or 80.2% during 2023 compared to 2022, due to higher revenue and margins. Gross profit as a percentage of revenue increased to 11.4% in 2023 compared to 10.3% in 2022, primarily due to significant growth in higher margin renewable energy work, strong performance on a pipeline project in the mid-Atlantic in 2023, higher costs on a separate pipeline project in the mid-Atlantic from unfavorable weather conditions experienced in 2022 and higher relative carrying costs for equipment and personnel in 2022 caused by lower than anticipated pipeline volumes.

## Liquidity and Capital Resources

### Cash Needs

Liquidity represents our ability to pay our liabilities when they become due, fund business operations, and meet our contractual obligations and execute our business plan. Our primary sources of liquidity are our cash balances at the beginning of each period and our cash flows from operating activities. If needed, we have availability under our lines of credit to augment liquidity needs, and we have a current shelf registration statement filed with the SEC that allows for the issuance of an indeterminate amount of debt and equity securities. Our short-term and long-term cash requirements consist primarily of working capital, investments to support revenue growth and maintain our equipment and facilities, general corporate needs, and to service our debt obligations. At December 31, 2024, there were no outstanding borrowings under the Revolving Credit Facility, commercial letters of credit outstanding were $52.3 million, and available borrowing capacity was $272.7 million. In addition, there were no outstanding borrowings under our Canadian credit facilities as of December 31, 2024, commercial letters of credit outstanding were $1.0 million in Canadian dollars and available borrowing capacity was $13.0 million in Canadian dollars.

In June 2023, we entered into an Accounts Receivable Facility (the "Facility") with PNC Bank, National Association ("PNC") to reduce interest costs and improve cash flows from trade accounts receivable. In July 2024 we renewed the Facility for a two-year term, added Regions Bank to the Facility, and increased the maximum purchase commitment to $150.0 million, at any one time. Under the Facility, certain of our designated subsidiaries may sell their trade accounts receivable as they are originated to a wholly owned bankruptcy remote Special Purpose Entity created specifically for this purpose. The total outstanding balance of trade accounts receivable that have been sold and derecognized is $75.0 million as of December 31, 2024. As of December 31, 2024, we had $75.0 million in available capacity under the Facility.

In order to maintain sufficient liquidity, we evaluate our working capital requirements on a regular basis. We may elect to raise additional capital by issuing common stock, convertible notes, term debt or increasing our credit facility as necessary to fund our operations or to fund the acquisition of new businesses.

Our cash and cash equivalents totaled $455.8 million at December 31, 2024, compared to $217.8 million at December 31, 2023. We anticipate that our cash and investments on hand, existing borrowing capacity under our credit facilities, access to and capacity under a shelf registration statement, and our future cash flows from operations will provide sufficient funds to enable us to meet our operating needs, our planned capital expenditures, and settle our commitments and contingencies for the next twelve months and the foreseeable future.

The construction industry is capital intensive, and we expect to continue to make capital expenditures to meet anticipated needs for our services. In 2024, we spent approximately $126.6 million for capital expenditures, which included $81.9 million on our facilities and $36.6 million for construction equipment. Capital expenditures are expected to total between $90.0 million and $110.0 million for 2025, which includes $60.0 million to $80.0 million for construction equipment.

### Cash Flows

Cash flows during the years ended December 31, 2024, 2023 and 2022 are summarized as follows (in millions):

| | 2024 | 2023 | 2022 |
|---|---|---|---|
| ***Change in cash:*** | | | |
| Net cash provided by operating activities | $ 508.3 | $ 198.6 | $ 83.3 |
| Net cash used in investing activities | (27.2) | (30.0) | (481.9) |
| Net cash (used in) provided by financing activities | (244.4) | (205.3) | 452.0 |
| Effect of exchange rate changes | 1.2 | 1.3 | (0.1) |
| Net change in cash, cash equivalents and restricted cash | $ 237.9 | $ (35.4) | $ 53.3 |

**Operating Activities**

The sources and uses of cash flow associated with operating activities for the years ended December 31, 2024, 2023 and 2022 were as follows (in millions):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| ***Operating Activities:*** | | | |
| Net income | $ 180.9 | $ 126.1 | $ 133.0 |
| Depreciation and amortization | 95.5 | 107.0 | 99.2 |
| Gain on sale and leaseback transaction | — | — | (40.1) |
| Changes in assets and liabilities | 255.9 | (0.1) | (79.0) |
| Gain on sale of property and equipment | (44.8) | (48.1) | (31.9) |
| Other | 20.8 | 13.6 | 2.1 |
| Net cash provided by operating activities | $ 508.3 | $ 198.5 | $ 83.3 |

*2024 and 2023*

Net cash provided by operating activities for 2024 was $508.3 million, an increase of $309.7 million compared to 2023. The change year-over-year was primarily due to improvement in the impact from the changes in assets and liabilities and an increase in net income.

The significant components of the $255.9 million change in assets and liabilities for the year ended December 31, 2024 are summarized as follows:

- Contract liabilities increased $251.2 million, primarily due to higher deferred revenue from favorable billing terms on certain new projects.
- Accrued expenses and accounts payable increased $77.8 million, primarily due to revenue growth and the timing of payments to our vendors.
- Contract assets decreased by $62.7 million from December 31, 2023 primarily due to the timing of billing our customers; and
- Accounts receivable increased $167.6 million from December 31, 2023, primarily due to increased revenue and the timing of collecting from our customers.

*2023 and 2022*

Net cash provided by operating activities for 2023 was $198.6 million, an increase of $115.3 million compared to 2022. The change year-over-year was primarily due to improvement in the impact from the changes in assets and liabilities and the inclusion of $40.1 million of gain on a sale and leaseback transaction in 2022 net income.

The significant components of the $0.1 million change in assets and liabilities for the year ended December 31, 2023 are summarized as follows:

- Contract assets increased by $229.8 million from December 31, 2022 primarily due to significant revenue growth in 2023;
- Accounts receivable increased $16.9 million from December 31, 2022, which is net of the $75.0 million we received from the Accounts Receivable Securitization Facility;
- Accounts payable increased $93.4 million from December 31, 2022 primarily due to increased revenue and the timing of payments to our vendors;
- Contract liabilities increased $84.7 million, primarily due to higher deferred revenue; and

- Other current assets decreased by $45.6 million primarily due to an income tax refund and the timing of prepaid material purchases.

***Investing activities***

Net cash used in investing activities was $27.2 million, $30.0 million, and $481.9 million in the years ended December 31, 2024, 2023 and 2022, respectively.

We received net proceeds of $49.9 million from a sale and leaseback transaction of land and buildings during the year ended December 31, 2022.

We purchased property and equipment for $126.6 million, $103.0 million and $94.7 million in the years ended December 31, 2024, 2023 and 2022 respectively, principally for our construction activities and facilities investment. We believe the ownership or long-term leasing of equipment is generally preferable to renting equipment on a project-by-project basis, as this strategy helps to ensure the equipment is available for our projects when needed. In addition, this approach has historically resulted in lower overall equipment costs.

We periodically sell assets and facilities, typically to update our fleet. We received proceeds from the sale of assets of $99.3 million, $63.7 million and $41.3 million for 2024, 2023 and 2022, respectively.

During 2023, we received $9.3 million from a net working capital true-up related to the PLH acquisition.

During 2022, we used $478.4 million for acquisitions, primarily for the acquisitions of PLH and B Comm.

***Financing activities***

Financing activities used cash of $244.4 million in 2024, which was primarily due to the following:

- Payment of long-term debt of $224.5 million including $150.0 million of additional principal payments on our term loan;
- Dividend payments to our stockholders of $12.9 million; and
- Payments related to tax withholding for stock-based compensation of $7.5 million.

Financing activities used cash of $205.3 million in 2023, which was primarily due to the following:

- Net payments on our revolving credit facilities of $100.0 million;
- Payment of long-term debt of $97.0 million; and
- Dividend payments to our stockholders of $12.8 million.

Financing activities provided cash of $452.0 million in 2022, which was primarily due to the following:

- Proceeds from the entry into an amended and upsized term loan of $432.9 million, net of debt issuance costs paid;
- Net borrowings on our credit facilities of $100.0 million;
- Proceeds from the issuance of debt secured by our equipment of $30.0 million;
- Payment of long-term debt of $86.8 million; and
- Dividend payments to our stockholders of $12.8 million.

***Debt Activities***

Credit Agreement

On August 1, 2022, we entered into the Third Amended and Restated Credit Agreement (the "Credit Agreement") with CIBC Bank USA, as administrative agent (the "Administrative Agent") and co-lead arranger, and the financial parties thereto (collectively, the "Lenders") that increased the existing term loan by $439.5 million to an aggregate principal amount of $945.0 million (as amended, the "Term Loan"). The Credit Agreement is scheduled to mature on August 1, 2027.

In addition to the Term Loan, the Credit Agreement increased the existing $200.0 million Revolving Credit Facility, whereby the Lenders agreed to make loans on a revolving basis from time to time and to issue letters of credit, to $325.0 million. At December 31, 2024, there were no outstanding borrowings under the Revolving Credit Facility, commercial letters of credit outstanding were $52.3 million, and available borrowing capacity was $272.7 million.

Under the Credit Agreement, we must make quarterly principal payments on the Term Loan in an amount equal to approximately $11.8 million, with the balance due on August 1, 2027. The proceeds from the Term Loan and additional borrowings under the Revolving Credit Facility were used to finance the acquisition of PLH.

We capitalized $6.5 million of debt issuance costs during the third quarter of 2022 associated with the Credit Agreement that is being amortized as interest expense over the life of the Credit Agreement. In addition, we recorded a loss on extinguishment of debt during the third quarter of 2022 of $0.8 million related to the Credit Agreement.

The principal amount of all loans under the Credit Agreement will bear interest at either: (i) the Secured Overnight Financing Rate plus an applicable margin as specified in the Credit Agreement (based on our net senior debt to earnings before interest, taxes, depreciation and amortization ("EBITDA") ratio as defined in the Credit Agreement), or (ii) the Base Rate (which is the greater of (a) the Federal Funds Rate plus 0.50% or (b) the prime rate as announced by the Administrative Agent) plus an applicable margin as specified in the Credit Agreement. Quarterly non-use fees, letter of credit fees and administrative agent fees are payable at rates specified in the Credit Agreement.

The principal amount of any loan drawn under the Credit Agreement may be prepaid in whole or in part at any time, with a minimum prepayment of $5.0 million.

Loans made under the Credit Agreement are secured by our assets, including, among others, our cash, inventory, equipment (excluding equipment subject to permitted liens), and accounts receivable. Certain subsidiaries have issued joint and several guaranties in favor of the Lenders for all amounts under the Credit Agreement.

The Credit Agreement contains various restrictive and financial covenants including, among others, a net senior debt/EBITDA ratio and minimum EBITDA to cash interest ratio. In addition, the Credit Agreement includes restrictions on investments, change of control provisions and provisions in the event we dispose of more than 20% of our total assets.

We were in compliance with the covenants for the Credit Agreement at December 31, 2024.

On January 31, 2023, we entered into an interest rate swap agreement to manage our exposure to the fluctuations in variable interest rates. The swap effectively exchanged the interest rate on $300.0 million of the debt outstanding under our Term Loan from variable to a fixed rate of 4.095% per annum, plus an applicable margin which was 1.50% at December 31, 2024. The interest rate swap matured on January 31, 2025.

Canadian Credit Facilities

We have credit facilities totaling $14.0 million in Canadian dollars for the purposes of issuing commercial letters of credit and providing funding for working capital. At December 31, 2024, commercial letters of credit outstanding were $1.0 million in Canadian dollars and there were no outstanding borrowings. Available capacity at December 31, 2024 was $13.0 million in Canadian dollars.

**Contractual Obligations**

As of December 31, 2024, we had $739.5 million of outstanding long-term debt, and there were no short-term borrowings.

A summary of contractual obligations as of December 31, 2024 is as follows (in millions):

| | Total | 1 Year | 2 - 3 Years | 4 - 5 Years | After 5 Years |
|---|---|---|---|---|---|
| Long-term debt | $ 739.5 | $ 74.6 | $ 648.9 | $ 9.4 | $ 6.6 |
| Interest on long-term debt (1) | 102.3 | 40.4 | 60.3 | 1.5 | 0.1 |
| Operating leases | 514.1 | 145.3 | 246.4 | 107.6 | 14.8 |
| | $ 1,355.9 | $ 260.3 | $ 955.6 | $ 118.5 | $ 21.5 |
| Letters of credit | $ 53.0 | $ 53.0 | $ — | $ — | $ — |

(1) The interest amount represents interest payments for our fixed rate debt assuming that principal payments are made as originally scheduled. Our Credit Agreement bears interest at variable market rates, and estimated payments are based on the interest rate in effect as of December 31, 2024, including the impact of our interest rate swap.

The summary does not include potential obligations under multi-employer pension plans in which some of our employees participate. Our multi-employer pension plan contribution rates are generally specified in our collective bargaining agreements, and contributions are made to the plans based on employee payrolls. Our obligations for future periods cannot be determined because we cannot predict the number of employees that we will employ at any given time nor the plans in which they may participate.

We may also be required to make additional contributions to multi-employer pension plans if they become underfunded, and these contributions will be determined based on our union payroll. The Pension Protection Act of 2006 added special funding and operational rules for multi-employer plans that are classified as “endangered,” “seriously endangered” or “critical” status. Plans in these classifications must adopt measures to improve their funded status through a funding improvement or rehabilitation plan, which may require additional contributions from employers. The amounts of additional funds that we may be obligated to contribute cannot be reasonably estimated and is not included in the table above.

**Off Balance Sheet Arrangements**

We enter into certain off-balance sheet arrangements in the ordinary course of business that result in risks not directly reflected on our balance sheet. We have no off-balance sheet financing arrangement with VIEs. The following represents transactions, obligations or relationships that could be considered material off-balance sheet arrangements.

- At December 31, 2024, we had letters of credit outstanding of $53.0 million under the terms of our credit agreements. These letters of credit are primarily used by our insurance carriers to ensure reimbursement for amounts that they are disbursing on our behalf, such as to beneficiaries under our self-funded insurance program. In addition, from time to time, certain customers require us to post a letter of credit to ensure payments to our subcontractors or guarantee performance under our contracts. Letters of credit reduce our borrowing availability under our Credit Agreement and Canadian Credit Facility. If a beneficiary were to successfully draw on any letter of credit, we would be required to reimburse the issuer of the letter of credit, and we may be required to record a charge to earnings for the reimbursement. We do not believe that it is likely that any material claims will be made under a letter of credit.

- In the ordinary course of our business, we may be required by our customers to post surety bid or payment/performance bonds in connection with services that we provide. At December 31, 2024, we had bid and payment/performance bonds issued and outstanding totaling approximately $8.1 billion. The remaining performance obligation on those bonded projects totaled approximately $3.0 billion at December 31, 2024. We do not believe that it is likely that a material claim will be made under our surety arrangements.

- Certain of our subsidiaries are parties to collective bargaining agreements with unions. In most instances, these agreements require that we contribute to multi-employer pension and health and welfare plans. For many plans, the contributions are determined annually and required future contributions cannot be determined since contribution rates depend on the total number of union employees and actuarial calculations based on the demographics of all participants. The Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multi-Employer Pension Amendments Act of 1980, subjects employers to potential liabilities in the event of an employer's complete or partial withdrawal of an underfunded multi-employer pension plan. The Pension Protection Act of 2006 added new funding rules that are classified as "endangered", "seriously endangered", or "critical" status. Withdrawal liabilities or requirements for increased future contributions could negatively impact our results of operations and liquidity.

- We enter into employment agreements with certain employees which provide for compensation and benefits under certain circumstances and which may contain a change of control clause. We may be obligated to make payments under the terms of these agreements.

- From time to time we make other guarantees, such as guaranteeing the obligations of our subsidiaries.

**Backlog**

For infrastructure services contractors, backlog can be an indicator of future revenue streams. Different companies define and calculate backlog in different manners. We define backlog as anticipated revenue from the uncompleted portions of existing contracts where scope is adequately defined, and therefore we can reasonably estimate total contract value ("Fixed Backlog"), and the estimated revenue on MSA work ("MSA Backlog"). We present two measures of backlog; one that includes Fixed Backlog and MSA Backlog for the next twelve months, and total backlog that includes all Fixed Backlog and MSA Backlog to the end of the MSA agreement. We do not consider renewals when estimating MSA Backlog. We do not include certain contracts in the calculation of fixed backlog where scope, and therefore contract value, is not adequately defined. We estimate MSA Backlog based on historical trends, anticipated seasonal impacts and estimates of customer demand based on information from our customers.

Fixed and MSA Backlog by reporting segment for the periods ending December 31, 2024 and 2023 were as follows (in millions):

| | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|
| | Next 12 Months | Total | Next 12 Months | Total |
| **Utilities** | | | | |
| Fixed Backlog | $ 71.1 | $ 71.1 | $ 96.3 | $ 96.3 |
| MSA Backlog | 1,822.6 | 5,449.8 | 1,776.5 | 5,093.6 |
| **Backlog** | $ 1,893.7 | $ 5,520.9 | $ 1,872.8 | $ 5,189.9 |
| | | | | |
| **Energy** | | | | |
| Fixed Backlog | $ 3,160.6 | $ 6,023.7 | $ 2,599.0 | $ 5,102.6 |
| MSA Backlog | 142.7 | 320.7 | 308.2 | 602.4 |
| **Backlog** | $ 3,303.3 | $ 6,344.4 | $ 2,907.2 | $ 5,705.0 |
| | | | | |
| **Total** | | | | |
| Fixed Backlog | $ 3,231.7 | $ 6,094.8 | $ 2,695.3 | $ 5,198.9 |
| MSA Backlog | 1,965.3 | 5,770.5 | 2,084.7 | 5,696.0 |
| **Backlog** | $ 5,197.0 | $ 11,865.3 | $ 4,780.0 | $ 10,894.9 |

Backlog should not be considered a comprehensive indicator of future revenue, as a percentage of our revenue is derived from projects that are not part of a backlog calculation. The backlog estimates include amounts from estimated MSAs, but our customers are not contractually obligated to purchase an amount of services from us under the MSAs. Any of our contracts may be terminated by our customers on relatively short notice. In the event of a project cancellation, we are typically reimbursed for all of our costs through a specific date, as well as all reasonable costs associated with demobilizing from the jobsite, but typically we have no contractual right to the total revenue reflected in

backlog. Projects may remain in backlog for extended periods of time as a result of customer delays, regulatory requirements or project specific issues. Future revenue from projects where scope, and therefore contract value, is not adequately defined may not be included in our estimated backlog amount.

**Effects of Inflation and Changing Prices**

Our operations are affected by increases in prices, whether caused by inflation or other economic factors. We attempt to recover anticipated increases in the cost of labor, equipment, fuel and materials through price escalation provisions that allow us to adjust billing rates for certain major contracts annually; by considering the estimated effect of such increases when bidding or pricing new work; or by entering into back-to-back contracts with suppliers and subcontractors. However, the annual adjustment provided by certain contracts is typically subject to a cap and there can be an extended period of time between the impact of inflation on our costs and when billing rates are adjusted. In some cases, our actual cost increases have exceeded the contractual caps, and therefore negatively impacted our operations. We have been able to renegotiate some of our major contracts to address the increased costs on future work and will continue to address this with our customers going forward.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

In the ordinary course of business, we are exposed to risks related to market conditions. These risks primarily include fluctuations in foreign currency exchange rates, interest rates and commodity prices. We may seek to manage these risks through the use of financial derivative instruments. These instruments have in the past included interest rate swaps and may in the future include foreign currency exchange contracts, interest rate swaps and hedges against commodity price fluctuations.

The carrying amounts for cash and cash equivalents, accounts receivable, short term investments, short-term debt, accounts payable and accrued liabilities shown in the Consolidated Balance Sheets approximate fair value at December 31, 2024, due to the generally short maturities of these items.

Our Revolving Credit Facility and Term Loan bear interest at a variable rate which exposes us to interest rate risk. From time to time, we may use certain derivative instruments to hedge our exposure to variable interest rates. As of December 31, 2024, $300.0 million of our variable rate debt outstanding was economically hedged. The interest rate swap matured on January 31, 2025. Based on our variable rate debt outstanding as of December 31, 2024, a 1.0% increase or decrease in interest rates would change annual interest expense by approximately $3.8 million.

We do not execute transactions or use financial derivative instruments for trading or speculative purposes. We generally enter into transactions with counter-parties that are financial institutions as a means to limit significant exposure with any one party.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Our financial statements, supplementary financial data and financial statement schedules are included in a separate section at the end of this Annual Report on Form 10-K, and are incorporated herein by reference. The financial statements, supplementary data and schedules are listed in the index on page F-1 of this Annual Report on Form 10-K and are incorporated herein by reference.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognizes that any system of controls and procedures, no matter how well designed and operated, can only provide reasonable assurance of achieving the desired control objectives, as ours are designed to do, and our management necessarily is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their stated objectives.

In connection with the preparation of this Annual Report on Form 10-K, as of December 31, 2024, an evaluation was performed under the supervision and with the participation of our management, including our CEO and CFO, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) under the Exchange Act). Based on that evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2024, to ensure that the information required to be disclosed by us in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and to ensure that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosures.

### Management's Annual Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) or 15d-15(f) under the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those policies and procedures that:

(i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

(ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

(iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our CEO and CFO, our management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2024. Management based this assessment on the framework in "Internal Control–Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation, our CEO and CFO concluded that our internal control over financial reporting was effective as of December 31, 2024. Management reviewed the results of its assessment with the Audit Committee of our Board of Directors.

**Independent Registered Public Accounting Firm Report**

Moss Adams LLP, the independent registered public accounting firm that audited our consolidated financial statements included in this Annual Report on Form 10-K, has issued a report on our internal control over financial reporting as of December 31, 2024. The report, which expresses an unqualified opinion on the effectiveness of our internal control over financial reporting as of December 31, 2024, is included in Item 8. "*Financial Statements and Supplemental Data*" under the heading "*Report of Independent Registered Public Accounting Firm*."

**Changes in Internal Control Over Financial Reporting**

Our management, with the participation of our CEO and CFO, has evaluated any changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2024. Based on this evaluation, our CEO and CFO concluded that, at December 31, 2024, there has not been any change in our internal control over financial reporting during the most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## ITEM 9B. OTHER INFORMATION

During the three months ended December 31, 2024, no director or officer (as defined in Rule 16a-1(f) of the Exchange Act) of the Company adopted, modified or terminated a "Rule 10b5-1 trading arrangement" or "non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408 of Regulation S-K.

## ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS.

Not applicable.

## PART III

### ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required under this Item 10. is set forth in our Proxy Statement for the 2025 Annual Meeting of Stockholders to be filed with the SEC within 120 days of December 31, 2024 (the "Proxy Statement") and is incorporated herein by reference.

### ITEM 11. EXECUTIVE COMPENSATION

The information required under this Item 11. is set forth in our Proxy Statement and is incorporated herein by reference, except for the information required by Item 402(v) of Regulation S-K or set forth under the caption, "*Compensation Committee Report*" of our Proxy Statement, which specifically is not incorporated herein by reference.

### ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required under this Item 12. is set forth in our Proxy Statement and is incorporated herein by reference.

### ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required under this Item 13. is set forth in our Proxy Statement and is incorporated herein by reference.

### ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required under this Item 14. is set forth in our Proxy Statement and is incorporated herein by reference.

## PART IV

### ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

**(A)** We have filed the following documents as part of this Report:

1. Consolidated Balance Sheets of Primoris Services Corporation and subsidiaries as of December 31, 2024 and 2023 and the related Consolidated Statements of Income, Comprehensive Income, Stockholders' Equity and Cash Flows for the years ended December 31, 2024, 2023 and 2022.
2. Report of Moss Adams LLP, independent registered public accounting firm, related to the consolidated financial statements in part (A)(1) above.
3. Notes to the consolidated financial statements in part (A)(1) above.
4. List of exhibits required by Item 601 of Regulation S-K. See part (B) below.

**(B)** The following is a complete list of exhibits filed as part of this Report, some of which are incorporated herein by reference from certain other of our reports, registration statements and other filings with the SEC, as referenced below:

| Exhibit No. | Description |
|---|---|
| Exhibit 2.1 | Agreement and Plan of Merger, dated December 14, 2020, among Primoris Services Corporation, Future Infrastructure Holdings, LLC, Primoris Merger Sub, LLC and Tower Arch Capital, L.P. (incorporated by reference to Exhibit 2.1 to our Current Report on Form 8-K, as filed with the SEC on December 15, 2020) |
| Exhibit 2.2 | Amendment No 1. to Agreement and Plans of Merger, dated as of January 11, 2021 (incorporated by reference to Exhibit 2.2 to our Current Report on Form 8-K, as filed with the SEC on January 15, 2021) |
| Exhibit 2.3 | Agreement and Plan of Merger, dated June 24, 2022, among Primoris Services Corporation, PLH Group, Inc., Amp Merger Sub, Inc. and Shareholder Representative Services LLC, as Stockholder Representative. (incorporated by reference to Exhibit 2.1 to Primoris' Current Report on Form 8-K filed on June 27, 2022) |
| Exhibit 3.1 | Fifth Amended and Restated Certificate of Incorporation of Primoris Services Corporation, dated May 4, 2018 (incorporated by reference to Exhibit 3.1 to our Quarterly Report on Form 10-Q, as filed with the SEC on November 11, 2018) |
| Exhibit 3.2 | Amended and Restated Bylaws of Primoris Services Corporation, as amended December 15, 2021 (incorporated by reference to Exhibit 3.1 to our Current Report on Form 8-K, as filed with the SEC on December 21, 2021) |
| Exhibit 4.1 | Specimen Common Stock Certificate (incorporated by reference to Exhibit 4.2 to our Registration Statement on Form S-1 (File No. 333-134694), as filed with the SEC on June 2, 2006) |
| Exhibit 4.2 | Description of Registrant's Securities (incorporated by reference to Exhibit 4.2 to our Annual Report on Form 10-K, as filed with the SEC on March 1, 2022) |
| Exhibit 10.1 | 2008 Long-Term Equity Incentive Plan (incorporated by reference to Annex C to our Registration Statement on Form S-4/A (Amendment No. 4) (File No. 333-150343), as filed with the SEC on July 9, 2008) (#) |
| Exhibit 10.2 | 2013 Equity Incentive Plan (incorporated by reference to Appendix A to our Definitive Proxy Statement on Schedule 14A filed with the SEC on April 9, 2013) (#) |
| Exhibit 10.3 | General Indemnity Agreement, dated January 24, 2012, by and among Primoris Services Corporation, ARB, Inc. ARB Structures, Inc., OnQuest, Inc., OnQuest Heaters, Inc. Born Heaters Canada ULC, Cardinal Contractors, Inc., Cardinal Southeast, Inc., Stellaris, LLC, GML Coatings, LLC, James Construction Group, LLC, Juniper Rock Corporation, Rockford Corporation; Alaska Continental Pipeline, Inc., All Day Electric Company, Inc. Primoris Renewables, LLC, Rockford Pipelines Canada, Inc. and Chubb Group of Insurance Companies (incorporated by reference to Exhibit 10.51 to our Annual Report on Form 10-K, as filed with the SEC on March 5, 2012) |
| Exhibit 10.4 | Contribution Agreement, dated as of September 30, 2013, by and among WesPac Energy LLC, Kealine Holdings LLC, Primoris Services Corporation and WesPac Midstream LLC and Highstar WesPac Main Interco LLC and Highstar WesPac Prism/IV-A Interco LLC (incorporated by reference to Exhibit 10.3 to our Quarterly Report on Form 10-Q, as filed with the SEC on November 5, 2013) |

| Exhibit No. | Description |
|---|---|
| Exhibit 10.5 | Agreement for Services, dated January 1, 2020, by and among Primoris Services Corporation and David King. (incorporated by reference to Exhibit 10.16 to our Annual Report on Form 10-K, as filed with the SEC on February 25, 2020) (#) |
| Exhibit 10.6 | Employment Agreement dated April 1, 2022, by and between Primoris Services Corporation and Tom McCormick (incorporated by reference to Exhibit 10.1 to Primoris' Current Report on Form 8-K filed on April 7, 2022) (#) |
| Exhibit 10.7 | Employment Agreement dated April 1, 2022, by and between Primoris Services Corporation and Ken M. Dodgen (incorporated by reference to Exhibit 10.3 to Primoris' Current Report on Form 8-K filed on April 7, 2022) (#) |
| Exhibit 10.8 | Employment Agreement dated April 1, 2022, by and between Primoris Services Corporation and John M. Perisich (incorporated by reference to Exhibit 10.4 to Primoris' Current Report on Form 8-K filed on April 7, 2022) (#) |
| Exhibit 10.9 | 2022 Primoris Services Corporation Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.1 to Primoris' Current Report on Form 8-K filed on May 9, 2022) (#) |
| Exhibit 10.10 | Third Amended and Restated Credit Agreement by and among Primoris Services Corporation, CIBC Bank USA and the several other financial institutions party thereto. (incorporated by reference to Exhibit 10.1 to Primoris' Current Report on Form 8-K filed on August 1, 2022) |
| Exhibit 10.11 | 2023 Equity Incentive Plan (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, as filed with the SEC on May 9, 2023). (#) |
| Exhibit 10.12 | John F. Moreno, Jr. Separation Agreement (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K, as filed with the SEC on May 26, 2023). (#) |
| Exhibit 10.13 | Amended and Restated Employment Agreement dated January 7, 2025, by and among Primoris Services Corporation and Jeremy Kinch (incorporated by reference to Exhibit 10.1 to Primoris' Current Report on Form 8-K filed on January 8, 2025) (#) |
| Exhibit 19.1 | Insider Trading Policy (*) |
| Exhibit 21.1 | Subsidiaries and equity investments of Primoris Services Corporation (*) |
| Exhibit 23.1 | Consent of Moss Adams LLP, independent registered public accounting firm (*) |
| Exhibit 31.1 | Certification of chief executive officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (*) |
| Exhibit 31.2 | Certification of chief financial officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (*) |
| Exhibit 32.1 | Certification of chief executive officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (**) |
| Exhibit 32.2 | Certification of chief financial officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (**) |

| Exhibit No. | Description |
|---|---|
| Exhibit 97 | Dodd-Frank Compensation Recovery Policy (incorporated by reference to Exhibit 97 to our Annual Report on Form 10-K, as filed with the SEC on February 27, 2024) |
| Exhibit 101 INS | Inline XBRL Instance Document – The instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document (*) |
| Exhibit 101 SCH | Inline XBRL Taxonomy Extension Schema Document (*) |
| Exhibit 101 CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document (*) |
| Exhibit 101 LAB | Inline XBRL Taxonomy Extension Label Linkbase Document (*) |
| Exhibit 101 PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document (*) |
| Exhibit 101 DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document (*) |
| Exhibit 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

---

(#) Management contract or compensatory plan, contract or arrangement.
(*) Filed herewith.
(**) This certification will not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or the Exchange Act, or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent specifically incorporated by reference into such filing.

**ITEM 16. FORM 10-K SUMMARY**

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

**Primoris Services Corporation (Registrant)**

Date: February 24, 2025

BY: /s/ Kenneth M. Dodgen
Kenneth M. Dodgen
Executive Vice President, Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated and on the date indicated.

| | Signature | Title |
|---|---|---|
| By: | /s/ Thomas E. McCormick<br>Thomas E. McCormick | President, Chief Executive Officer and Director<br>(Principal Executive Officer) |
| By: | /s/ Kenneth M. Dodgen<br>Kenneth M. Dodgen | Executive Vice President, Chief Financial Officer<br>(Principal Financial Officer) |
| By: | /s/ Travis L. Stricker<br>Travis L. Stricker | Senior Vice President, Chief Accounting Officer<br>(Principal Accounting Officer) |
| By: | /s/ David L. King<br>David L. King | Chairman of the Board of Directors |
| By: | /s/ Michael E. Ching<br>Michael E. Ching | Director |
| By: | /s/ Stephen C. Cook<br>Stephen C. Cook | Director |
| By: | /s/ Carla S. Mashinski<br>Carla S. Mashinski | Director |
| By: | /s/ Terry D. McCallister<br>Terry D. McCallister | Director |
| By: | /s/ Jose R. Rodriguez<br>Jose R. Rodriguez | Director |
| By: | /s/ John P. Schauerman<br>John P. Schauerman | Director |
| By: | Patricia K. Wagner | Director |

Date: February 24, 2025

**PRIMORIS SERVICES CORPORATION**

**INDEX TO FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (Moss Adams LLP, Dallas, TX, PCAOB ID:659) | F-2 |
| Consolidated Balance Sheets as of December 31, 2024 and 2023 | F-5 |
| Consolidated Statements of Income for the Years Ended December 31, 2024, 2023 and 2022 | F-6 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2024, 2023 and 2022 | F-7 |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2024, 2023 and 2022 | F-8 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2024, 2023 and 2022 | F-9 |
| Notes to Consolidated Financial Statements | F-11 |

# Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of
Primoris Services Corporation

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying *consolidated* balance sheets of Primoris Services Corporation (the "Company") as of *December 31, 2024 and 2023*, the related *consolidated* statements of *income, comprehensive income, stockholders' equity and cash flows* for each of the three years in the period ended *December 31, 2024*, and the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of *December 31, 2024*, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the *consolidated* financial statements referred to above present fairly, in all material respects, the *consolidated* financial position of the Company as of *December 31, 2024 and 2023*, and the *consolidated* results of its operations and its cash flows for each of the three years in the period ended *December 31, 2024*, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of *December 31, 2024*, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by COSO.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Annual Report on Internal Control over Financial Reporting included in Item 9A*. Our responsibility is to express an opinion on the Company's *consolidated* financial statements and an opinion on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the *consolidated* financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the *consolidated* financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures to respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the *consolidated* financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the *consolidated* financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

***Definition and Limitations of Internal Control Over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting

principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

***Critical Audit Matter***

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

**Revenue Recognition – Estimated contract costs and variable consideration estimates:** As described in Note 5 to the consolidated financial statements, for the year ended December 31, 2024, the Company's consolidated revenue was $6,367 million, of which, $4,700 million was derived from contracts where scope was adequately defined, and was recognized over time as work is completed because of the continuous transfer of control to the customer. Under this method, the costs incurred to date as a percentage of total estimated costs at completion are used to calculate revenue. Total estimated costs at completion, and thus revenue and margin, are impacted by many factors, which can cause significant changes in estimates during the life cycle of a project. Changes in these estimates could have a significant impact on the amount of revenue and profit recognized. Additionally, the nature of the Company's contracts give rise to several types of variable consideration. The Company's estimate of variable consideration and determination of whether to include estimated amounts in the transaction price are based largely on their assessment of anticipated performance and all information (historical, current and forecasted) that is reasonably available.

Based on the significant judgment required by management and high degree of subjectivity involved in the determination of both total estimated costs at completion and variable consideration, which in turn led to a high degree of auditor judgment, effort and subjectivity in performing procedures and evaluating audit evidence, we have identified auditing these estimates as a critical audit matter.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included evaluating the design and testing the operating effectiveness of internal controls related to the Company's contract management cycle, including those related to the accumulation of the estimated costs to complete a contract and the estimation of variable consideration. Our audit procedures included the following, among others:

- Tested a selection of contracts where scope was adequately defined, including evaluating the reasonableness of the significant assumptions and judgments underlying the accounting for these selected contracts as follows:
  - Inquired with and inspected questionnaires prepared by project personnel to understand the status of the contract, changes from prior periods, key assumptions underlying the revenue and costs, and the existence of any claims or litigation and corroborating such information.
  - Assessed the reasonableness of estimated costs to complete by analyzing historical contract performance relative to overall contractual commitments and estimated gross margin at year end. We assessed management's assumptions on future contract costs by comparing them with executed change orders, estimate documentation, correspondence with the customer, and job cost details with supporting third-party evidence.

- Tested management's estimation process by performing lookback analyses at the contract level to evaluate estimated costs and variable consideration settled in the current year compared to management's prior year estimates.
- Evaluated the appropriateness of the Company's inclusion or exclusion of variable consideration from the work-in-process schedule in the selection of contracts.

/s/ Moss Adams LLP

*Dallas, Texas*
February 24, 2025

We have served as the Company's auditor since 2006.

**PRIMORIS SERVICES CORPORATION**
**CONSOLIDATED BALANCE SHEETS**
**(In Thousands, Except Share Amounts)**

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 455,825 | $ 217,778 |
| Accounts receivable, net | 834,386 | 685,439 |
| Contract assets | 773,736 | 846,176 |
| Prepaid expenses and other current assets | 95,525 | 135,840 |
| Total current assets | 2,159,472 | 1,885,233 |
| Property and equipment, net | 488,241 | 475,929 |
| Operating lease assets | 461,049 | 360,507 |
| Intangible assets, net | 207,896 | 227,561 |
| Goodwill | 856,869 | 857,650 |
| Other long-term assets | 22,341 | 20,547 |
| Total assets | $ 4,195,868 | $ 3,827,427 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 624,254 | $ 628,962 |
| Contract liabilities | 617,424 | 366,476 |
| Accrued liabilities | 350,077 | 263,492 |
| Dividends payable | 4,298 | 3,202 |
| Current portion of long-term debt | 74,633 | 72,903 |
| Total current liabilities | 1,670,686 | 1,335,035 |
| Long-term debt, net of current portion | 660,193 | 885,369 |
| Noncurrent operating lease liabilities, net of current portion | 333,370 | 263,454 |
| Deferred tax liabilities | 64,035 | 59,565 |
| Other long-term liabilities | 58,051 | 47,912 |
| Total liabilities | 2,786,335 | 2,591,335 |
| Commitments and contingencies (See Note 12) | | |
| Stockholders' equity | | |
| Common stock—$0.0001 par value; 90,000,000 shares authorized: 53,740,729 and 53,366,327 issued and outstanding as of December 31, 2024, and December 31, 2023, respectively | 6 | 6 |
| Additional paid-in capital | 285,811 | 275,846 |
| Retained earnings | 1,127,953 | 961,028 |
| Accumulated other comprehensive income | (4,237) | (788) |
| Total stockholders' equity | 1,409,533 | 1,236,092 |
| Total liabilities and stockholders' equity | $ 4,195,868 | $ 3,827,427 |

See accompanying notes.

**PRIMORIS SERVICES CORPORATION**
**CONSOLIDATED STATEMENTS OF INCOME**
**(In Thousands, Except Per Share Amounts)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Revenue | $ 6,366,838 | $ 5,715,309 | $ 4,420,599 |
| Cost of revenue | 5,663,593 | 5,127,818 | 3,963,714 |
| Gross profit | 703,245 | 587,491 | 456,885 |
| Selling, general and administrative expenses | 383,351 | 328,733 | 281,577 |
| Transaction and related costs | 2,442 | 5,685 | 20,054 |
| Gain on sale and leaseback transaction | — | — | (40,084) |
| Operating income | 317,452 | 253,073 | 195,338 |
| Other income (expense): | | | |
| Foreign exchange gain, net | 2,674 | 1,163 | 1,088 |
| Other income, net | 106 | 1,604 | 2,072 |
| Interest expense, net | (65,315) | (78,171) | (39,212) |
| Income before provision for income taxes | 254,917 | 177,669 | 159,286 |
| Provision for income taxes | (74,029) | (51,524) | (26,265) |
| Net income | 180,888 | 126,145 | 133,021 |
| | | | |
| Dividends per common share | $ 0.26 | $ 0.24 | $ 0.24 |
| | | | |
| **Earnings per share:** | | | |
| Basic | $ 3.37 | $ 2.37 | $ 2.50 |
| Diluted | $ 3.31 | $ 2.33 | $ 2.47 |
| | | | |
| **Weighted average common shares outstanding:** | | | |
| Basic | 53,636 | 53,297 | 53,200 |
| Diluted | 54,576 | 54,223 | 53,759 |

See accompanying notes.

**PRIMORIS SERVICES CORPORATION**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(In Thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Net income | $ 180,888 | $ 126,145 | $ 133,021 |
| Other comprehensive (loss) income, net of tax: | | | |
| Foreign currency translation adjustments | (3,449) | 1,832 | (3,318) |
| Comprehensive income | $ 177,439 | $ 127,977 | $ 129,703 |

See accompanying notes.

**PRIMORIS SERVICES CORPORATION**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(In Thousands, Except Share Amounts)**

| | Common Stock | | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance, December 31, 2021** | 53,194,585 | $ 6 | $ 261,918 | $ 727,433 | $ 698 | $ 990,055 |
| Net income | — | — | — | 133,021 | — | 133,021 |
| Foreign currency translation adjustments, net of tax | — | — | — | — | (3,318) | (3,318) |
| Issuance of shares | 75,805 | — | 1,726 | — | — | 1,726 |
| Conversion of stock based awards, net of shares withheld for taxes | 131,709 | — | (1,324) | — | — | (1,324) |
| Stock-based compensation | — | — | 7,441 | — | — | 7,441 |
| Purchase of stock | (277,200) | — | (5,990) | — | — | (5,990) |
| Dividends declared ($0.24 per share) | — | — | — | (12,773) | — | (12,773) |
| **Balance, December 31, 2022** | 53,124,899 | $ 6 | $ 263,771 | $ 847,681 | $ (2,620) | $ 1,108,838 |
| Net income | — | — | — | 126,145 | — | 126,145 |
| Foreign currency translation adjustments, net of tax | — | — | — | — | 1,832 | 1,832 |
| Issuance of shares | 72,823 | — | 1,978 | — | — | 1,978 |
| Conversion of stock based awards, net of shares withheld for taxes | 168,605 | — | (1,736) | — | — | (1,736) |
| Stock-based compensation | — | — | 11,833 | — | — | 11,833 |
| Dividends declared ($0.24 per share) | — | — | — | (12,798) | — | (12,798) |
| **Balance, December 31, 2023** | 53,366,327 | $ 6 | $ 275,846 | $ 961,028 | $ (788) | $ 1,236,092 |
| Net income | — | — | — | 180,888 | — | 180,888 |
| Foreign currency translation adjustments, net of tax | — | — | — | — | (3,449) | (3,449) |
| Issuance of shares | 51,689 | — | 2,307 | — | — | 2,307 |
| Conversion of stock based awards, net of shares withheld for taxes | 322,713 | — | (7,473) | — | — | (7,473) |
| Stock-based compensation | — | — | 15,131 | — | — | 15,131 |
| Dividends declared ($0.26 per share) | — | — | — | (13,963) | — | (13,963) |
| **Balance, December 31, 2024** | 53,740,729 | $ 6 | $ 285,811 | $ 1,127,953 | $ (4,237) | $ 1,409,533 |

See accompanying notes.

**PRIMORIS SERVICES CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In Thousands)**

| | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income | $ 180,888 | $ 126,145 | $ 133,021 |
| Adjustments to reconcile net income to net cash provided by operating activities (net of effect of acquisitions): | | | |
| Depreciation and amortization | 95,522 | 107,041 | 99,157 |
| Stock-based compensation expense | 15,131 | 11,833 | 7,441 |
| Gain on sale of property and equipment | (44,786) | (48,104) | (31,890) |
| Gain on sale and leaseback transaction | — | — | (40,084) |
| Unrealized loss (gain) on interest rate swap | 1,565 | (397) | (5,581) |
| Other non-cash items | 4,139 | 2,181 | 277 |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (167,629) | (16,885) | (98,724) |
| Contract assets | 62,677 | (229,826) | (118,806) |
| Other current assets | 18,379 | 45,578 | (70,275) |
| Net deferred tax liabilities | 4,998 | 29,429 | 14,695 |
| Other long-term assets | 39 | 459 | 932 |
| Accounts payable | 11,384 | 93,433 | 191,532 |
| Contract liabilities | 251,188 | 84,745 | (7,869) |
| Operating lease assets and liabilities, net | (5,301) | (1,194) | (505) |
| Accrued liabilities | 66,388 | (6,832) | 5,707 |
| Other long-term liabilities | 13,731 | 946 | 4,318 |
| Net cash provided by operating activities | 508,313 | 198,552 | 83,346 |
| Cash flows from investing activities: | | | |
| Purchase of property and equipment | (126,555) | (103,005) | (94,690) |
| Proceeds from sale of assets | 99,323 | 63,695 | 41,302 |
| Proceeds from sale and leaseback transaction, net of related expenses | — | — | 49,887 |
| Cash paid for acquisitions, net of cash and restricted cash acquired | — | 9,300 | (478,438) |
| Net cash used in investing activities | (27,232) | (30,010) | (481,939) |
| Cash flows from financing activities: | | | |
| Borrowings under revolving lines of credit | — | 440,223 | 188,560 |
| Payments on revolving lines of credit | — | (540,223) | (88,560) |
| Proceeds from issuance of long-term debt | — | 10,000 | 469,531 |
| Payments on long-term debt | (224,470) | (96,987) | (86,769) |
| Payments related to tax withholding for stock-based compensation | (7,473) | (1,734) | (1,324) |
| Debt issuance costs | — | — | (6,643) |
| Dividends paid | (12,867) | (12,783) | (12,778) |
| Purchase of common stock | — | — | (5,990) |
| Other | 452 | (3,775) | (3,984) |
| Net cash (used in) provided by financing activities | (244,358) | (205,279) | 452,043 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | 1,164 | 1,288 | (102) |
| Net change in cash, cash equivalents and restricted cash | 237,887 | (35,449) | 53,348 |
| Cash, cash equivalents and restricted cash at beginning of the year | 223,542 | 258,991 | 205,643 |
| Cash, cash equivalents and restricted cash at end of the year | $ 461,429 | $ 223,542 | $ 258,991 |

See accompanying notes

**PRIMORIS SERVICES CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (Continued)**
**(In Thousands)**

## SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Cash paid for interest | $ 61,339 | $ 82,264 | $ 37,177 |
| Cash paid for income taxes, net of refunds received | 65,348 (1) | 5,072 | 3,574 |
| Leased assets obtained in exchange for new operating leases | 228,674 | 260,396 | 98,127 |

(1) We purchased $40.0 million of transferable investment tax credits (“ITC”) in 2024 at a purchase price of $36.9 million. Cash paid for income taxes of $65.3 million in 2024 includes the $36.9M ITC purchase price.

## SUPPLEMENTAL DISCLOSURE OF NONCASH INVESTING AND FINANCING ACTIVITIES

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Dividends declared and not yet paid | $ 4,298 | $ 3,202 | $ 3,187 |

See accompanying notes.

**Note 1—Nature of Business**

***Organization and operations —*** Primoris Services Corporation is one of the leading providers of infrastructure services operating mainly in the United States and Canada. We provide a wide range of services, maintenance, replacement, fabrication and engineering services to a diversified base of customers through our two segments.

We have longstanding customer relationships with solar facility developers and utility, refining, petrochemical, communications, midstream, downstream, and engineering companies, as well as power producers and transportation agencies across our core markets. A portion of our services are provided under Master Service Agreements ("MSA"), which are generally multi-year agreements. The remainder of our services are generated from contracts for specific construction projects.

We are incorporated in the State of Delaware, and our corporate headquarters are located at 2300 N. Field Street, Suite 1900, Dallas, Texas 75201. Unless specifically noted otherwise, as used throughout these consolidated financial statements, "Primoris", "the Company", "we", "our", "us" or "its" refers to the business, operations and financial results of the Company and its wholly-owned subsidiaries.

***Reportable Segments —*** Our current reportable segments are the Utilities segment and the Energy segment. See Note 13 – "*Reportable Segments*" for a brief description of the reportable segments and their operations.

The classification of revenue, gross profit, and operating income for segment reporting purposes can at times require judgment on the part of management. Our segments may perform services across industries or perform joint services for customers in multiple industries. To determine reportable segment gross profit and operating income, certain allocations, including allocations of shared and indirect costs, such as facility costs, equipment costs, selling, general, and administrative expenses ("SG&A") and indirect operating expenses, were made.

***Seasonality —*** Our results of operations are subject to quarterly variations. Some of the variation is the result of weather, particularly rain, ice, snow, and named storms, which can impact our ability to perform infrastructure services. These seasonal impacts can affect revenue and profitability in all of our businesses. Any quarter can be affected either negatively or positively by atypical weather patterns in any part of the country. In addition, demand for new projects in our Utilities segment tends to be lower during the early part of the calendar year due to clients' internal budget cycles. As a result, we usually experience higher revenue and earnings in the second, third and fourth quarters of the year as compared to the first quarter.

***Variability —*** Our project values range in size from several hundred dollars to several hundred million dollars. The bulk of our work is comprised of project sizes that average less than $3.0 million. We also perform large construction projects which tend not to be seasonal but can fluctuate from year to year based on customer timing, project duration, weather, and general economic conditions. Our business may be affected by declines or delays in new projects or by client project schedules. Because of the cyclical nature of some of our business, the financial results for any period may fluctuate from prior periods, and our financial condition and operating results may vary from quarter to quarter. Results from one quarter may not be indicative of financial condition or operating results for any other quarter or for an entire year.

**Note 2—Summary of Significant Accounting Policies**

***Basis of presentation —***The accompanying consolidated financial statements were prepared in accordance with accounting principles generally accepted in the United States ("GAAP") and the financial statement rules and regulations of the Securities and Exchange Commission ("SEC"). References for Financial Accounting Standards Board ("FASB") standards are made to the FASB Accounting Standards Codification ("ASC").

***Principles of consolidation*** **—**The accompanying Consolidated Financial Statements include the accounts of Primoris and our wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

***Reclassification*** **—**Certain previously reported amounts have been reclassified to conform to the current year presentation.

***Restricted cash*** **—** Restricted cash consists primarily of cash balances that are restricted as to withdrawal or usage and contract retention payments made by customers into escrow bank accounts and are included in prepaid expenses and other current assets in our Consolidated Balance Sheets. Escrow cash accounts are released to us by customers as projects are completed in accordance with contract terms. As a result of the PLH acquisition (as defined below), we acquired cash pledged to secure letters of credit, which was recorded as restricted cash at December 31, 2022. As of December 31, 2024, all of the restricted cash from the PLH acquisition had been released. The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the Consolidated Balance Sheets to the totals of such amounts shown in the Consolidated Statements of Cash Flows (in thousands):

| | December 31, | | | |
|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2021 |
| Cash and cash equivalents | $ 455,825 | $ 217,778 | $ 248,692 | $ 200,512 |
| Restricted cash included in prepaid expenses and other current assets | 5,604 | 5,764 | 10,299 | 5,131 |
| Total cash, cash equivalents and restricted cash shown in the Consolidated Statements of Cash Flows | $ 461,429 | $ 223,542 | $ 258,991 | $ 205,643 |

***Use of estimates*** **—**The preparation of our Consolidated Financial Statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting periods. As a construction contractor, we use estimates for costs to complete construction projects and the contract value of certain construction projects. These estimates have a direct effect on gross profit as reported in these consolidated financial statements. Actual results could materially differ from our estimates.

***Operating cycle*** **—** In the accompanying Consolidated Balance Sheets, assets and liabilities relating to long-term construction contracts (e.g. contract assets and contract liabilities) are considered current assets and current liabilities, since they are expected to be realized or liquidated in the normal course of contract completion, although completion may require more than one calendar year.

Consequently, we have significant working capital invested in assets that may have a liquidation period extending beyond one year. We have claims receivable and retention due from various customers and others that are currently in dispute, the realization of which is subject to binding arbitration, final negotiation or litigation, all of which may extend beyond one calendar year.

***Cash and cash equivalents*** **—**We consider all highly liquid investments with an original maturity of three months or less when purchased as cash equivalents.

***Business combinations***—Business combinations are accounted for using the acquisition method of accounting. We use the fair value of the assets acquired and liabilities assumed to account for the purchase price of businesses. The determination of fair value requires estimates and judgments of future cash flow expectations to assign fair values to the identifiable tangible and intangible assets. GAAP provides a "measurement period" of up to one year in which to finalize all fair value estimates associated with the acquisition of a business. Most estimates are preliminary until the end of the measurement period. During the measurement period, any material, newly discovered information that existed at the acquisition date would be reflected as an adjustment to the initial valuations and estimates. After the measurement period, any adjustments would be recorded as a current period income or expense.

***Contingent Earnout Liabilities*****—**As part of certain acquisitions, we agreed to pay cash to certain sellers upon meeting specific operating performance targets for specified periods subsequent to the acquisition date. Each quarter we evaluate the fair value of the estimated contingency and record a non-operating charge for the change in the fair value. Upon meeting the target, we reflect the full liability on the balance sheet and record a charge to *"Other income (expense), net"* for the change in the fair value of the liability from the prior period.

***Goodwill and other intangible assets*****—**We account for goodwill in accordance with ASC 350, "*Intangibles — Goodwill and Other*". Under ASC 350, goodwill is subject to an annual impairment test, which we perform as of the first day of the fourth quarter of each year, with more frequent testing if indicators of potential impairment exist. The impairment review is performed at the reporting unit level for those units with recorded goodwill. Our qualitative assessment is used to determine whether it is more likely than not (that is, a likelihood of more than 50 percent) that the fair value of the reporting unit is less than its carrying value, including goodwill. Factors used in our qualitative assessment include, but are not limited to, macroeconomic conditions, industry and market conditions, cost factors, overall financial performance and Company and reporting unit specific events. If deemed necessary, we use the quantitative impairment test outlined in ASC 350, which compares the fair value of a reporting unit with its carrying amount. Fair value for the goodwill impairment test is determined utilizing a discounted cash flow analysis based on our financial plan discounted using our weighted average cost of capital and market indicators of terminal year cash flows. Other valuation methods may be used to corroborate the discounted cash flow method. If the carrying amount of a reporting unit is in excess of its fair value, goodwill is considered impaired and an impairment loss is recognized in an amount equal to that excess, limited to the total amount of goodwill of the reporting unit.

***Income tax*****—**Current income tax expense is the amount of income taxes expected to be paid for the financial results of the current year. A deferred tax liability or asset is established for the expected future tax consequences resulting from the differences in financial reporting bases and tax bases of assets and liabilities using enacted tax rates in effect for the years in which the differences are expected to reverse. A valuation allowance is provided if it is more likely than not that some or all of the deferred tax assets will not be realized. We provide for uncertain tax positions when such tax positions do not meet the recognition thresholds or measurement standards as set forth in ASC 740, *"Income Taxes"*. The difference between a tax position taken or expected to be taken on our income tax returns and the benefit recognized in our financial statements is referred to as an unrecognized tax benefit. Amounts for uncertain tax positions are adjusted in periods when new information becomes available or when positions are effectively settled. We recognize accrued interest and penalties related to uncertain tax positions, if any, as a component of income tax expense.

As a result of the Tax Cuts and Jobs Act new taxes were created on certain foreign earnings. Namely, U.S. shareholders are now subject to a current tax on global intangible low-taxed income ("GILTI") earned by specified foreign subsidiaries. Available guidance related to GILTI provides for an accounting policy election to either recognize deferred taxes for temporary basis differences expected to reverse as GILTI in future years, or provide for the tax expense related to GILTI in the year the tax is incurred as a period expense. We have elected to recognize the current tax on GILTI as an expense in the period the tax is incurred. The current tax impacts of GILTI are included in our effective tax rate.

***Comprehensive income*****—**We account for comprehensive income in accordance with ASC 220, "*Comprehensive Income*", which specifies the computation, presentation and disclosure requirements for comprehensive income (loss). Comprehensive income (loss) consists of net income (loss) and foreign currency translation adjustments, primarily from fluctuations in foreign currency exchange rates of our foreign subsidiaries with a functional currency other than the U.S. dollar.

***Functional currencies and foreign currency translation*****—** For foreign operations where substantially all monetary transactions are in the local currency, we use the local currency as our functional currency. The effects of translating financial statements of foreign operations into our reporting currency are recognized as a cumulative translation adjustment, net of tax in *"Accumulated other comprehensive income"* in the Consolidated Statements of Stockholders' Equity. For certain foreign operations where substantially all monetary transactions are made in United States dollars, we use the U.S. dollar as our functional currency, with gains or losses on translation recorded in income in the period in which they are incurred. Gains or losses on foreign currency transactions are recorded in income in the period in which they are incurred.

***Partnerships and joint ventures* —** We are periodically a member of a partnership or a joint venture. These partnerships or joint ventures are used primarily for the execution of single contracts or projects. Our ownership can vary from a small noncontrolling ownership to a significant ownership interest. We evaluate each partnership or joint venture to determine whether the entity is considered a variable interest entity ("VIE") as defined in ASC 810, *"Consolidation"*, and if a VIE, whether we are the primary beneficiary of the VIE, which would require us to consolidate the VIE in our financial statements. When consolidation occurs, we account for the interests of the other parties as a noncontrolling interest and disclose the net income attributable to noncontrolling interests.

***Cash concentration*—**We place our cash in demand deposit accounts and short-term U.S. Treasury bonds. At December 31, 2024 and 2023, we had cash balances of $455.8 million and $217.8 million, respectively. Our cash balances are held in high credit quality financial institutions in order to mitigate the risk of holding funds not backed by the federal government or in excess of federally backed limits.

***Collective bargaining agreements*—**Approximately 22.9% of our hourly employees, primarily consisting of field laborers, were covered by collective bargaining agreements in 2024. Upon renegotiation of such agreements, we could be exposed to increases in hourly costs and work stoppages.

***Multiemployer plans* —** Various subsidiaries are signatories to collective bargaining agreements. These agreements require that we participate in and contribute to a number of multiemployer benefit plans for our union employees at rates determined by the agreements. The trustees for each multiemployer plan determine the eligibility and allocations of contributions and benefit amounts, determine the types of benefits and administer the plan. If we were to withdraw from an agreement, we could incur a withdrawal obligation, and the potential withdrawal obligation may be significant. In accordance with GAAP, any withdrawal liability would be recorded when it is probable that a liability exists and can be reasonably estimated.

***Insurance*—**We self-insure worker's compensation and general liability up to certain limits per claim. We maintained a self-insurance reserve totaling $57.9 million and $47.6 million at December 31, 2024 and 2023, respectively, with the current portion recorded to "Accrued liabilities" and the long-term portion recorded to "Other long-term liabilities" on the Consolidated Balance Sheets. Claims administration expenses are charged to current operations as incurred. Our accruals are based on judgment and the probability of losses, with the assistance of third-party actuaries. Actual payments that may be made in the future could materially differ from such reserves.

***Derivative instruments and hedging activities*** — We recognize all derivative instruments as either assets or liabilities on the balance sheet at their respective fair values. Our use of derivatives currently consists of interest rate swap agreements. The interest rate swap agreements were entered into to improve the predictability of cash flows from interest payments related to variable rate debt for the duration of the term loan and is not designated as a hedge for accounting purposes. Therefore, the change in the fair value of the derivative asset or liability is reflected in net income in the Consolidated Statements of Income (mark-to-market accounting). Cash flows from derivatives settled are reported as cash flow from operating activities.

***Accounts receivable***—Accounts receivable and contract receivables are primarily with public and private companies and governmental agencies located in the United States and Canada. Credit terms for payment of products and services are extended to customers in the normal course of business. Contract receivables are generally progress billings on projects, and as a result, are short term in nature. Generally, we require no collateral from our customers, but file statutory liens or stop notices on any construction projects when collection problems are anticipated. While a project is underway, we estimate the collectability of contract amounts at the same time that we estimate project costs. As discussed in Note 5 — *"Revenue"*, realization of the eventual cash collection may be recognized as adjustments to the contract revenue and profitability. We provide an allowance for credit losses to estimate losses from uncollectible accounts. Under this method an allowance is recorded based upon historical experience and management's evaluation of, among other factors, current and reasonably supportable expected future economic conditions and the customer's willingness or ability to pay. Receivables are written off in the period deemed uncollectible. The allowance for credit losses at December 31, 2024 and 2023 was $2.0 million and $1.5 million, respectively.

***Accounts Receivable Securitization Facility* —** In June 2023, we entered into an Accounts Receivable Securitization Facility ("the Facility") with PNC Bank, National Association ("PNC") to improve cash flows from trade accounts receivable. In July 2024, we renewed the Facility for a two-year term, added Regions Bank ("Regions") to the

Facility, and increased the maximum purchase commitment to $150.0 million, at any one time. Fees associated with the Facility for the year ended December 31, 2024 and December 31, 2023 were $5.2 and $1.9 million and are included in interest expense in the Consolidated Statements of Income.

Under the Facility, certain of our designated subsidiaries may sell their trade accounts receivable as they are originated to a wholly owned bankruptcy remote Special Purpose Entity ("SPE") created specifically for this purpose. We control and, therefore, consolidate the SPE in our consolidated financial statements. The SPE transfers ownership and control of qualifying accounts receivable to PNC and Regions up to the maximum purchase commitment. We and our related subsidiaries have no continuing involvement in the transferred accounts receivable, other than collection and administrative responsibilities, and, once sold, the accounts receivable are no longer available to satisfy our creditors or our related subsidiaries. We account for accounts receivable sold to the banking counterparty as a sale of financial assets and derecognize the trade accounts receivable from our Consolidated Balance Sheets.

The total outstanding balance of trade accounts receivable that have been sold and derecognized is $75.0 million as of December 31, 2024 and 2023. The SPE owned $209.4 million and $112.2 million of trade accounts receivable as of December 31, 2024 and 2023, respectively, which are included in Accounts receivable, net on the Consolidated Balance Sheets. For the year ended December 31, 2024 and 2023, we received $10.0 million and $75.0 million, respectively, in cash proceeds from the Facility, and repaid $10.0 million and $0, respectively to the Facility, which are included in cash from operating activities in the Consolidated Statements of Cash Flows. As of December 31, 2024, we had $75.0 million available capacity under the Facility.

***Significant revision in contract estimates —*** We recognize revenue over time for contracts where scope is adequately defined, and therefore we can reasonably estimate total contract value. Under this method, the costs incurred to date as a percentage of total estimated costs are used to calculate revenue. Total estimated costs, and thus contract revenue and margin, are impacted by many factors, which can cause significant changes in estimates during the life cycle of a project. For projects that were in process at the end of the prior year, there can be a difference in revenue and profit that would have been recognized in the prior year had current year estimates of costs to complete been known at the end of the prior year. During the year ended December 31, 2024, certain contracts had revisions in cost estimates from those projected at December 31, 2023. This change in estimate resulted in a decrease in net income of $28.0 million, or $0.52 basic earnings per share and $0.51 diluted earnings per share for the year ended December 31, 2024.

***Customer concentration*** — We operate in multiple industry segments encompassing the construction of commercial, utility, industrial and public works infrastructure assets primarily throughout the United States. Typically, the top ten customers in any one calendar year account for approximately 40.0% to 50.0% of total revenue; however, the group that comprises the top ten customers varies from year to year. For the years ended December 31, 2024, 2023 and 2022, approximately 41.3%, 41.1% and 46.1%, respectively, of total revenue was generated from our top ten customers in each year. In each of the years, a different group of customers comprised the top ten customers by revenue, and no one customer accounted for more than 10% of total revenue.

***Property and equipment—***Property and equipment are recorded at cost and are depreciated using the straight-line method over the estimated useful lives of the related assets, usually ranging from three to thirty years. Maintenance and repairs are charged to expense as incurred. Significant renewals and betterments are capitalized. At the time of retirement or other disposition of property and equipment, the cost and accumulated depreciation are removed from the accounts, and any resulting gain or loss is reflected in operating income.

We assess the recoverability of property and equipment whenever events or changes in business circumstances indicate that the carrying amount of the asset may not be fully recoverable. We perform an analysis to determine if an impairment exists. The amount of property and equipment impairment, if any, is measured based on fair value and is charged to operations in the period in which the impairment is determined by management. For the years ended December 31, 2024, 2023 and 2022, our management has not identified any material impairment of its property and equipment.

***Depreciation —*** Effective January 1, 2022, we changed our estimates of the useful lives of certain equipment to better reflect the estimated periods during which these assets will remain in service. The estimated useful lives of equipment that previously ranged three to seven years were increased to a range of three to ten years. The effect of this

change in estimate reduced depreciation expense by $19.3 million, increased net income by $16.1 million, and increased basic and diluted earnings per share by $0.30 for the year ended December 31, 2022.

***Taxes collected from customers—***Sales and use taxes collected from our customers are recorded on a net basis.

***Share-based payments and stock-based compensation—***In May 2013, the shareholders approved and we adopted the Primoris Services Corporation 2013 Equity Incentive Plan ("2013 Equity Plan"). Detailed discussion of shares issued under the 2013 Equity Plan are included in Note 16 — *"Stock-Based Compensation"* and in Note 19— *"Stockholders' Equity"*. Such share issuances include grants of Restricted Stock Units ("RSU") and Performance Stock Units ("PSU") to executives and certain senior managers and issuances of stock to non-employee members of the Board of Directors.

In May 2023, the shareholders approved and we adopted the Primoris Services Corporation 2023 Equity Incentive Plan ("2023 Equity Plan"). Detailed discussion of shares issued under the Equity Plan are included in Note 16 — *"Stock-Based Compensation"* and in Note 19—*"Stockholders' Equity"*. Such share issuances include grants of RSUs and PSUs to executives and certain senior managers and issuances of stock to non-employee members of the Board of Directors.

***Recently Issued Accounting Pronouncements***

In November 2023, the FASB issued ASU No.2023-07, "Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures" which changes the accounting and reporting of segment disclosure requirements primarily through enhanced disclosure about significant segment expenses in accordance with FASB Accounting Standards Codification 280, Segment Reporting. This ASU is effective for fiscal years beginning after December 15, 2023, and interim periods within fiscal years beginning after December 15, 2024, with early adoption permitted. The amendments should be applied prospectively on or after the effective date. We adopted the new standard on January 1, 2024, on a prospective basis. This ASU resulted in us including additional required disclosures in the financial statement footnotes in our annual report on form 10-K commencing with the year ending December 31, 2024, but did not have an effect on our consolidated financial position, results of operations, or cash flows.

In December 2023, the FASB issued ASU No.2023-09, "Income Taxes (Topic 740): Improvements to Income Tax Disclosures" that requires presentation of specific categories of reconciling items, as well as reconciling items that meet a quantitative threshold, in the reconciliation between the income tax provision and the income tax provision using statutory tax rates. The standard also requires disclosure of income taxes paid disaggregated by jurisdiction with separate disclosure of income taxes paid to individual jurisdictions that meet a quantitative threshold. This ASU is effective for fiscal years beginning after December 15, 2024, with early adoption permitted. The amendments should be applied prospectively; however entities have the option to apply retrospectively for each period presented. We do not expect the adoption of this new standard in 2025 to have an impact on our consolidated financial position, results of operations or cash flows.

In November 2024, the FASB issued ASU No. 2024-03, "Income Statement Reporting Comprehensive Income – Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses." This ASU requires an entity to disclose the amounts of purchases of inventory, employee compensation, depreciation, and intangible asset amortization included in each relevant expense caption. It also requires an entity to include certain amounts that are already required to be disclosed under current GAAP in the same disclosure. Additionally, it requires an entity to disclose a qualitative description of the amounts remaining in relevant expense captions that are not separately disaggregated quantitatively, and to disclose the total amount of selling expenses and, in annual reporting periods, an entity's definition of selling expenses. The amendments in the ASU are effective for annual reporting periods beginning after December 15, 2026, and interim reporting periods beginning after December 15, 2027, with early adoption permitted. An entity may apply the amendments prospectively for reporting periods after the effective date or retrospectively to any or all prior periods presented in the financial statements. This ASU will likely result in us including additional required disclosures in the financial statement footnotes, but is not expected to have an effect on our consolidated financial position, results of operations or cash flows..

Other new pronouncements issued but not effective until after December 31, 2024, are not expected to have a material impact on our consolidated results of operations, financial position or cash flows.

**Note 3—Fair Value Measurements**

ASC 820, "*Fair Value Measurements and Disclosures*" defines fair value, establishes a framework for measuring fair value in GAAP and requires certain disclosures about fair value measurements. ASC 820 addresses fair value GAAP for financial assets and financial liabilities that are remeasured and reported at fair value at each reporting period and for non-financial assets and liabilities that are remeasured and reported at fair value on a non-recurring basis.

In general, fair values determined by Level 1 inputs use quoted prices (unadjusted) in active markets for identical assets or liabilities. Fair values determined by Level 2 inputs use data points that are observable such as quoted prices, interest rates and yield curves. Fair values determined by Level 3 inputs are "unobservable data points" for the asset or liability and include situations where there is little, if any, market activity for the asset or liability.

The following table presents, for each of the fair value hierarchy levels identified under ASC 820, our financial assets and certain liabilities that are required to be measured at fair value at December 31, 2024 and 2023 (in thousands):

| | Fair Value Measurements at Reporting Date | | |
|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| **Assets as of December 31, 2024:** | | | |
| Cash and cash equivalents | $ 455,825 | $ — | $ — |
| Interest rate swap | — | 67 | — |
| **Assets as of December 31, 2023:** | | | |
| Cash and cash equivalents | 217,778 | — | — |
| Interest rate swap | — | 1,633 | — |

Other financial instruments not listed in the table consist of accounts receivable, accounts payable and certain accrued liabilities. These financial instruments generally approximate fair value based on their short-term nature. The carrying value of our long-term debt approximates fair value based on a comparison with current prevailing market rates for loans of similar risks and maturities.

The interest rate swap is measured at fair value using the income approach, which discounts the future net cash settlements expected under the derivative contracts to a present value. These valuations primarily utilize indirectly observable inputs, including contractual terms, interest rates and yield curves observable at commonly quoted intervals. See Note 10 – "*Derivative Instruments*" for additional information.

**Note 4—Business Combinations**

*Acquisition of PLH*

On August 1, 2022, we acquired PLH Group, Inc. ("PLH") in an all-cash transaction valued at approximately $429.0 million, net of cash acquired (the "PLH acquisition"). PLH is a utility-focused specialty construction company with concentrations in growing regions of the United States. The transaction directly aligns with our strategic focus on higher-growth, higher margin markets and expands our capabilities in the power delivery, communications, and gas utilities markets. The total purchase price was funded through a combination of borrowings under our term loan facility and borrowings under our revolving credit facility.

During the second quarter of 2023, we finalized the estimate of fair values of the assets acquired and liabilities assumed of PLH. The table below represents the purchase consideration and the estimated fair values of the assets acquired and liabilities assumed from PLH as of the acquisition date. Significant changes since our initial estimates reported in the third quarter of 2022 primarily relate to $24.1 million of project adjustments increasing the fair value of contract liabilities acquired, a $18.8 million change in deferred taxes, a $13.7 million reduction in the fair value of

acquired intangibles, a $9.3 million decrease in the purchase consideration for a working capital true-up, and a $11.7 million reduction in the fair value of fixed assets acquired. As a result of this and other adjustments to the initial estimated fair values of the assets acquired and liabilities assumed, goodwill increased by approximately $34.8 million since the third quarter of 2022. Adjustments recorded to the estimated fair values of the assets acquired and liabilities assumed are recognized in the period in which the adjustments are determined and calculated as if the accounting had been completed as of the acquisition date.

| **Purchase consideration (in thousands)** | | |
|---|---|---|
| Total purchase consideration | $ | 472,193 |
| Less cash and restricted cash acquired | | (43,152) |
| Net cash paid | $ | 429,041 |

| **Identifiable assets acquired and liabilities assumed (in thousands)** | | |
|---|---|---|
| Cash, cash equivalents and restricted cash | $ | 43,152 |
| Accounts receivable | | 74,739 |
| Contract assets | | 74,700 |
| Prepaid expenses and other current assets | | 10,858 |
| Property, plant and equipment | | 51,824 |
| Operating lease assets | | 16,340 |
| Deferred tax asset | | 21,731 |
| Intangible assets: | | |
| Customer relationships | | 77,300 |
| Tradename | | 11,600 |
| Other long-term assets | | 6,466 |
| Accounts payable and accrued liabilities | | (105,427) |
| Contract liabilities | | (49,629) |
| Long-term debt (including current portion) | | (3,313) |
| Noncurrent operating lease liabilities, net of current | | (12,004) |
| Other long-term liabilities | | (7,445) |
| Total identifiable net assets | | 210,892 |
| Goodwill | | 261,301 |
| Total purchase consideration | $ | 472,193 |

We incorporated the majority of the PLH operations into our Utilities segment with the remaining operations going to our Energy segment. Goodwill associated with the PLH acquisition principally consists of expected benefits from the expansion of our services into the utilities market and the expansion of our geographic presence. Goodwill also includes the value of the assembled workforce. Based on the current tax treatment, goodwill is not expected to be deductible for income tax purposes.

The intangible assets acquired with the PLH acquisition consisted of Customer relationships of $77.3 million and Tradenames of $11.6 million. The Customer relationships and Tradenames are being amortized over a weighted average useful life of 15 years and 1.9 years, respectively. For the period from August 1, 2022, the acquisition date, to December 31, 2022, PLH contributed revenue of $367.9 million and gross profit of $38.2 million. It is impractical to segregate and identify revenue and gross profit for PLH in 2024 and 2023 as we have integrated PLH into our existing operations.

Acquisition costs related to PLH were $15.7 million for the year ended December 31, 2022, and are included in “Transaction and related costs” on the Consolidated Statements of Income. Such costs primarily consisted of professional fees paid to advisors.

*Acquisition of B Comm, LLC*

On June 8, 2022 we acquired B Comm, LLC ("B Comm") in an all-cash transaction of approximately $36.0 million, net of cash acquired. B Comm is a provider of maintenance, repair, upgrade and installation services to the communications markets. The transaction directly aligns with the strategy to grow our MSA revenue base and expand our communication services within the utility markets. During the second quarter of 2023, we finalized the estimate of fair values of the assets acquired and liabilities assumed of B Comm. The fair values of the assets acquired and liabilities assumed as of the acquisition date consisted of $4.8 million of fixed assets, $13.2 million of working capital, $10.2 million of intangible assets and $10.0 million of goodwill. We incorporated the operations of B Comm into our Utilities segment. Goodwill associated with the B Comm acquisition principally consists of the value of the assembled workforce. Based on the current tax treatment, goodwill is expected to be deductible for income tax purposes over a 15-year period.

*Supplemental Unaudited Pro Forma Information for the twelve months ended December 31, 2022*

The following pro forma information for the twelve months ended December 31, 2022, presents our results of operations as if the acquisition of PLH had occurred at the beginning of 2021. The supplemental pro forma information has been adjusted to include:

- the pro forma impact of amortization of intangible assets and depreciation of property, plant and equipment;
- the pro forma impact of nonrecurring transaction and related costs primarily consisting of advisor fees and transaction bonuses payments to select PLH employees directly attributable to the acquisition; and
- the pro forma tax effect of both income before income taxes, and the pro forma adjustments, calculated using an effective tax rate of 16.5% for the twelve months ended December 31, 2022.

The pro forma results are presented for illustrative purposes only and are not necessarily indicative of, or intended to represent, the results that would have been achieved had the PLH acquisition been completed on January 1, 2021. For example, the pro forma results do not reflect any operating efficiencies and associated cost savings that we might have achieved with respect to the acquisition (in thousands, except per share amounts):

| | **Year Ended December 31, 2022 (unaudited)** | |
|---|---|---|
| Revenue | $ | 4,814,237 |
| Income before provision for income taxes | | 149,125 |
| Net income | | 124,537 |
| | | |
| Weighted average common shares outstanding: | | |
| Basic | | 53,200 |
| Diluted | | 53,759 |
| | | |
| Earnings per share: | | |
| Basic | $ | 2.34 |
| Diluted | | 2.32 |

**Note 5—Revenue**

We generate revenue under a range of contracting types, including fixed-price, unit-price, time and material, and cost reimbursable plus fee contracts, each of which has a different risk profile. For the years ended December 31, 2024, 2023, and 2022, $4.7 billion, $3.9 billion, and $2.7 billion, respectively of our revenue is derived from contracts where scope is adequately defined, and therefore we can reasonably estimate total contract value. For these contracts, revenue is recognized over time as work is completed because of the continuous transfer of control to the customer (typically using an input measure such as costs incurred to date relative to total estimated costs at completion to measure

progress). For certain contracts, where scope is not adequately defined and we can't reasonably estimate total contract value, revenue is recognized either on an input basis, based on contract costs incurred as defined within the respective contracts, or an output basis, based on units completed. Costs to obtain contracts are generally not significant and are expensed in the period incurred.

We evaluate whether two or more contracts should be combined and accounted for as one single performance obligation and whether a single contract should be accounted for as more than one performance obligation. ASC 606, *Revenue from Contracts with Customers*, defines a performance obligation as a contractual promise to transfer a distinct good or service to a customer. A contract's transaction price is allocated to each distinct performance obligation and recognized as revenue when, or as, the performance obligation is satisfied. Our evaluation requires significant judgment and the decision to combine a group of contracts or separate a contract into multiple performance obligations could change the amount of revenue and profit recorded in a given period. The majority of our contracts have a single performance obligation, as the promise to transfer the individual goods or services is not separately identifiable from other promises in the contract and, therefore, is not distinct. However, occasionally we have contracts with multiple performance obligations. For contracts with multiple performance obligations, we allocate the contract's transaction price to each performance obligation using the observable standalone selling price, if available, or alternatively our best estimate of the standalone selling price of each distinct performance obligation in the contract. The primary method used to estimate standalone selling price is the expected cost plus a margin approach for each performance obligation.

As of December 31, 2024, we had $6.3 billion of remaining performance obligations. We expect to recognize approximately 54.8% of our remaining performance obligations as revenue during the next 12 months and substantially all of the remaining balance in the 12 to 18 months thereafter.

Accounting for long-term contracts involves the use of various techniques to estimate total transaction price and costs. For long-term contracts, transaction price, estimated cost at completion and total costs incurred to date are used to calculate revenue earned. Unforeseen events and circumstances can alter the estimate of the costs and potential profit associated with a particular contract. Total estimated costs, and thus contract revenue and income, can be impacted by changes in productivity, scheduling, the unit cost of labor, subcontracts, materials and equipment. Additionally, external factors such as weather, client needs, client delays in providing permits and approvals, labor availability, governmental regulation, politics and pandemics may affect the progress of a project's completion, and thus the timing of revenue recognition. To the extent that original cost estimates are modified, estimated costs to complete increase, delivery schedules are delayed, or progress under a contract is otherwise impeded, cash flow, revenue recognition and profitability from a particular contract may be adversely affected.

The nature of our contracts gives rise to several types of variable consideration, including contract modifications (change orders and claims), liquidated damages, volume discounts, performance bonuses, incentive fees, and other terms that can either increase or decrease the transaction price. We estimate variable consideration as the most likely amount to which we expect to be entitled. We include estimated amounts in the transaction price to the extent we believe we have an enforceable right, and it is probable that a significant reversal of cumulative revenue recognized will not occur. Our estimates of variable consideration and the determination of whether to include estimated amounts in the transaction price are based largely on an assessment of our anticipated performance and all information (historical, current and forecasted) that is reasonably available to us at this time.

Contract modifications result from changes in contract specifications or requirements. We consider unapproved change orders to be contract modifications for which customers have not agreed to both scope and price. We consider claims to be contract modifications for which we seek, or will seek, to collect from customers, or others, for customer-caused changes in contract specifications or design, or other customer-related causes of unanticipated additional contract costs on which there is no agreement with customers. Claims can also be caused by non-customer-caused changes, such as rain or other weather delays. Costs associated with contract modifications are included in the estimated costs to complete the contracts and are treated as project costs when incurred. In most instances, contract modifications are for goods or services that are not distinct, and, therefore, are accounted for as part of the existing contract. The effect of a contract modification on the transaction price, and our measure of progress for the performance obligation to which it relates, is recognized as an adjustment to revenue on a cumulative catch-up basis. In some cases, settlement of contract modifications may not occur until after completion of work under the contract.

As a significant change in one or more of these estimates could affect the profitability of our contracts, we review and update our contract-related estimates regularly. We recognize adjustments in estimated profit on contracts under the cumulative catch-up method. Under this method, the cumulative impact of the profit adjustment is recognized in the period the adjustment is identified. Revenue and profit in future periods of contract performance are recognized using the adjusted estimate. For the year ended December 31, 2024, revenue was negatively impacted by $32.8 million as a result of changes in estimates associated with performance obligations satisfied prior to December 31, 2023. For the year ended December 31, 2023, revenue was positively impacted by $1.2 million as a result of changes in estimates associated with performance obligations satisfied prior to December 31, 2022. If at any time the estimate of contract profitability indicates an anticipated loss on a contract, the projected loss is recognized in full, including the reversal of any previously recognized profit, in the period it is identified and recognized as an "accrued loss provision" which is included in "Contract liabilities" on the Consolidated Balance Sheets. For contract revenue recognized over time, the accrued loss provision is adjusted so that the gross profit for the contract remains zero in future periods.

At December 31, 2024, we had approximately $220.8 million of unapproved contract modifications included in the aggregate transaction prices. These contract modifications were in the process of being negotiated in the normal course of business. Approximately $206.1 million of the unapproved contract modifications had been recognized as revenue on a cumulative catch-up basis through December 31, 2024.

In all forms of contracts, we estimate the collectability of contract amounts at the same time that we estimate project costs. If we anticipate that there may be issues associated with the collectability of the full amount calculated as the transaction price, we may reduce the amount recognized as revenue to reflect the uncertainty associated with realization of the eventual cash collection. For example, when a cost reimbursable project exceeds the client's expected budget amount, the client frequently requests an adjustment to the final amount. Similarly, some utility clients reserve the right to audit costs for significant periods after performance of the work.

The timing of when we bill our customers is generally dependent upon agreed-upon contractual terms, milestone billings based on the completion of certain phases of the work, or when services are provided. Sometimes, billing occurs subsequent to revenue recognition, resulting in unbilled revenue, which is a contract asset. Also, we sometimes receive advances or deposits from our customers before revenue is recognized, resulting in deferred revenue, which is a contract liability.

The caption “Contract assets” in the Consolidated Balance Sheets represents the following:

- unbilled revenue, which arises when revenue has been recorded but the amount will not be billed until a later date;
- retainage amounts for the portion of the contract price earned by us for work performed, but held for payment by the customer as a form of security until we reach certain construction milestones; and
- contract materials for certain job specific materials not yet installed, which are valued using the specific identification method relating the cost incurred to a specific project.

Contract assets consist of the following (in thousands):

| | December 31, 2024 | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Unbilled revenue | $ 492,252 | $ 604,166 | $ 420,511 |
| Retention receivable | 232,425 | 202,358 | 174,149 |
| Contract materials (not yet installed) | 49,059 | 39,652 | 21,564 |
| | $ 773,736 | $ 846,176 | $ 616,224 |

Contract assets decreased by $72.4 million compared to December 31, 2023, primarily due to lower unbilled revenue.

The caption “Contract liabilities” in the Consolidated Balance Sheets represents the following:

- deferred revenue on billings in excess of contract revenue recognized to date, and
- the accrued loss provision.

Contract liabilities consist of the following (in thousands):

| | December 31, 2024 | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Deferred revenue | $ 614,328 | $ 363,159 | $ 269,853 |
| Accrued loss provision | 3,096 | 3,317 | 6,094 |
| | $ 617,424 | $ 366,476 | $ 275,947 |

Contract liabilities increased by $250.9 million compared to December 31, 2023, due to increased deferred revenue.

Revenue recognized for the years ended December 31, 2024 and 2023, that was included in the contract liability balance at the beginning of each year was approximately $324.4 million and $232.9 million, respectively.

The following tables present our revenue disaggregated into various categories.

MSA and Non-MSA revenue was as follows (in thousands):

| | For the year ended December 31, 2024 | | |
|---|---|---|---|
| **Segment** | **MSA** | **Non-MSA** | **Total** |
| Utilities | $ 2,004,494 | $ 434,535 | $ 2,439,029 |
| Energy | 339,269 | 3,692,766 | 4,032,035 |
| Intersegment eliminations | (562) | (103,664) | (104,226) |
| Total | $ 2,343,201 | $ 4,023,637 | $ 6,366,838 |

| Segment | For the year ended December 31, 2023 MSA | Non-MSA | Total |
|---|---|---|---|
| Utilities | $ 1,814,728 | $ 595,446 | $ 2,410,174 |
| Energy | 291,098 | 3,055,072 | 3,346,170 |
| Intersegment eliminations | (6,529) | (34,506) | (41,035) |
| Total | $ 2,099,297 | $ 3,616,012 | $ 5,715,309 |

| Segment | For the year ended December 31, 2022 MSA | Non-MSA | Total |
|---|---|---|---|
| Utilities | $ 1,692,590 | $ 341,121 | $ 2,033,711 |
| Energy | 332,384 | 2,064,967 | 2,397,351 |
| Intersegment eliminations | (1,987) | (8,476) | (10,463) |
| Total | $ 2,022,987 | $ 2,397,612 | $ 4,420,599 |

Revenue by contract type was as follows (in thousands):

| Segment | For the year ended December 31, 2024 Fixed-price | Unit-price | Cost reimbursable (1) | Total |
|---|---|---|---|---|
| Utilities | $ 334,170 | $ 1,542,824 | $ 562,035 | $ 2,439,029 |
| Energy | 2,584,459 | 663,776 | 783,800 | 4,032,035 |
| Intersegment eliminations | (102,072) | (1,764) | (390) | (104,226) |
| Total | $ 2,816,557 | $ 2,204,836 | $ 1,345,445 | $ 6,366,838 |

(1) Includes time and material and cost reimbursable plus fee contracts.

| Segment | For the year ended December 31, 2023 Fixed-price | Unit-price | Cost reimbursable (1) | Total |
|---|---|---|---|---|
| Utilities | $ 396,794 | $ 1,497,915 | $ 515,465 | $ 2,410,174 |
| Energy | 2,236,540 | 585,629 | 524,001 | 3,346,170 |
| Intersegment eliminations | (10,547) | (26,853) | (3,635) | (41,035) |
| Total | $ 2,622,787 | $ 2,056,691 | $ 1,035,831 | $ 5,715,309 |

(1) Includes time and material and cost reimbursable plus fee contracts.

| Segment | For the year ended December 31, 2022 Fixed-price | Unit-price | Cost reimbursable (1) | Total |
|---|---|---|---|---|
| Utilities | $ 193,710 | $ 1,335,716 | $ 504,285 | $ 2,033,711 |
| Energy | 1,696,776 | 407,068 | 293,507 | 2,397,351 |
| Intersegment eliminations | (1,693) | (8,338) | (432) | (10,463) |
| Total | $ 1,888,793 | $ 1,734,446 | $ 797,360 | $ 4,420,599 |

(1) Includes time and material and cost reimbursable plus fee contracts.

Each of these contract types has a different risk profile. Typically, we assume more risk with fixed-price contracts. Unforeseen events and circumstances can alter the estimate of the costs and potential profit associated with a particular fixed-price contract. However, these types of contracts offer additional profits when we complete the work for less cost than originally estimated. Unit-price and cost reimbursable contracts generally subject us to lower risk. Accordingly, the associated fees are usually lower than fees earned on fixed-price contracts. Under these contracts, our profit may vary if actual costs vary significantly from the negotiated rates.

**Note 6—Property and Equipment**

The following is a summary of property and equipment (in thousands):

| | December 31, 2024 | December 31, 2023 | Useful Life |
|---|---|---|---|
| Land and buildings | $ 193,884 | $ 168,788 | Buildings 30 Years |
| Leasehold improvements | 19,600 | 22,864 | Various* |
| Office equipment | 31,351 | 26,470 | 3 - 5 Years |
| Construction equipment | 570,907 | 664,838 | 3 - 10 Years |
| Solar equipment | 23,552 | 23,552 | 25 years |
| Construction in progress | 74,644 | 38,669 | |
| | 913,938 | 945,181 | |
| Less: accumulated depreciation and amortization | (425,697) | (469,252) | |
| Property and equipment, net | $ 488,241 | $ 475,929 | |

* Leasehold improvements are depreciated over the shorter of the life of the leasehold improvement or the lease term.

Depreciation expense was $75.9 million, $85.2 million and $78.2 million for the years ended December 31, 2024, 2023 and 2022, respectively.

**Note 7—Goodwill and Intangible Assets**

The change in goodwill by segment for 2024 and 2023 was as follows (in thousands):

| | Utilities | Energy | Total |
|---|---|---|---|
| Balance at December 31, 2022 | 716,284 | 155,524 | 871,808 |
| Goodwill adjustments during the period | (12,822) | (1,336) | (14,158) |
| Balance at December 31, 2023 | 703,462 | 154,188 | 857,650 |
| Goodwill adjustments during the period | — | (781) | (781) |
| Balance at December 31, 2024 | $ 703,462 | $ 153,407 | $ 856,869 |

The $0.8 million adjustment in 2024 relates to the disposal of assets within the Energy reporting unit.

There were no impairments of goodwill for the years ended December 31, 2024, 2023 and 2022.

The table below summarizes the intangible asset categories, which are generally amortized on a straight-line basis (in thousands):

| | December 31, 2024 | | | December 31, 2023 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Intangible assets, net | Gross Carrying Amount | Accumulated Amortization | Intangible assets, net |
| Tradenames | $ 19,220 | $ (18,151) | $ 1,069 | $ 19,220 | $ (15,799) | $ 3,421 |
| Customer relationships | 295,977 | (89,150) | 206,827 | 295,977 | (71,837) | 224,140 |
| Total | $ 315,197 | $ (107,301) | $ 207,896 | $ 315,197 | $ (87,636) | $ 227,561 |

Amortization expense of intangible assets was $19.6 million, $21.8 million and $20.9 million for the years ended December 31, 2024, 2023 and 2022, respectively.

Estimated future amortization expense for intangible assets as of December 31, 2024, is as follows (in thousands):

| For the Years Ending December 31, | Estimated Intangible Amortization Expense |
|---|---|
| 2025 | 17,655 |
| 2026 | 16,135 |
| 2027 | 15,598 |
| 2028 | 14,375 |
| 2029 | 14,375 |
| Thereafter | 129,758 |
| | $ 207,896 |

**Note 8—Accounts Payable and Accrued Liabilities**

At December 31, 2024 and 2023, accounts payable included retention amounts of approximately $44.6 million and $24.7 million, respectively. These amounts owed to subcontractors have been retained pending contract completion and customer acceptance of jobs.

The following is a summary of accrued liabilities (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Payroll and related employee benefits | $ 134,821 | $ 108,618 |
| Current operating lease liability | 122,021 | 96,411 |
| Casualty insurance reserves | 16,878 | 18,015 |
| Corporate income taxes and other taxes | 53,469 | 14,203 |
| Other | 22,888 | 26,245 |
| | $ 350,077 | $ 263,492 |

**Note 9—Credit Arrangements**

Long-term debt and credit facilities consist of the following at December 31, 2024 (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Term loan | $ 676,880 | $ 874,128 |
| Revolving credit facility | — | — |
| Commercial equipment notes | 43,900 | 71,004 |
| Mortgage notes | 18,714 | 19,615 |
| Total debt | 739,494 | 964,747 |
| Unamortized debt issuance costs | (4,668) | (6,475) |
| Total debt, net | $ 734,826 | $ 958,272 |
| Less: current portion | (74,633) | (72,903) |
| Long-term debt, net of current portion | $ 660,193 | $ 885,369 |

The weighted average interest rate on total debt outstanding at December 31, 2024 and 2023 was 5.6% and 6.8%, respectively.

Scheduled maturities of long-term debt are as follows (in thousands):

| | Year Ending December 31, |
|---|---|
| 2025 | $ 74,633 |
| 2026 | 64,411 |
| 2027 | 584,484 |
| 2028 | 8,847 |
| 2029 | 568 |
| Thereafter | 6,551 |
| | $ 739,494 |

***Commercial Notes Payable and Mortgage Notes Payable***

From time to time, we enter into commercial equipment notes payable with various equipment finance companies and banks. At December 31, 2024, interest rates ranged from 1.60% to 6.28% per annum and maturity dates range from February 2025 through October 2030. The notes are secured by certain construction equipment.

From time to time, we enter into secured mortgage notes payable with various banks. At December 31, 2024, interest rates ranged from 4.21% to 4.50% per annum and maturity dates range from January 2025 through November 2028. These notes are secured by certain real estate.

***Credit Agreement***

On August 1, 2022, we entered into the Third Amended and Restated Credit Agreement (the "Credit Agreement") with CIBC Bank USA, as administrative agent Administrative Agent and co-lead arranger, and the financial parties thereto (collectively, the "Lenders") that increased the existing term loan by $439.5 million to an aggregate principal amount of $945.0 million (as amended, the "Term Loan"). The Credit Agreement is scheduled to mature on August 1, 2027.

In addition to the Term Loan, the Credit Agreement increased the existing $200.0 million revolving credit facility ("Revolving Credit Facility"), whereby the Lenders agreed to make loans on a revolving basis from time to time and to issue letters of credit, to $325.0 million. At December 31, 2024, commercial letters of credit outstanding were $52.3 million. There were no outstanding borrowings under the Revolving Credit Facility, and available borrowing capacity was $272.7 million at December 31, 2024.

Under the Credit Agreement, we must make quarterly principal payments on the Term Loan in an amount equal to approximately $11.8 million, with the balance due on August 1, 2027.

We capitalized $6.5 million of debt issuance costs during 2022 associated with the Credit Agreement that is being amortized as interest expense over the life of the Credit Agreement. In addition, we recorded a loss on extinguishment of debt during 2022 of $0.8 million related to the Credit Agreement.

The principal amount of all loans under the Credit Agreement will bear interest at either: (i) the Secured Overnight Financing Rate plus an applicable margin as specified in the Credit Agreement (based on our net senior debt to earnings before interest, taxes, depreciation and amortization ("EBITDA") ratio as defined in the Credit Agreement), or (ii) the Base Rate (which is the greater of (a) the Federal Funds Rate plus 0.50% or (b) the prime rate as announced by the Administrative Agent) plus an applicable margin as specified in the Credit Agreement. Quarterly non-use fees, letter of credit fees and administrative agent fees are payable at rates specified in the Credit Agreement.

The principal amount of any loan drawn under the Credit Agreement may be prepaid in whole or in part at any time, with a minimum prepayment of $5.0 million.

Loans made under the Credit Agreement are secured by our assets, including, among others, our cash, inventory, equipment (excluding equipment subject to permitted liens), and accounts receivable. Certain subsidiaries have issued joint and several guaranties in favor of the Lenders for all amounts under the Credit Agreement.

The Credit Agreement contains various restrictive and financial covenants including, among others, a net senior debt/EBITDA ratio and minimum EBITDA to cash interest ratio. In addition, the Credit Agreement includes restrictions on investments, change of control provisions and provisions in the event we dispose of more than 20% of our total assets.

We were in compliance with the covenants for the Credit Agreement at December 31, 2024.

On September 13, 2018, we entered into an interest rate swap agreement to manage our exposure to the fluctuations in variable interest rates. The swap effectively exchanged the interest rate on 75% of the debt outstanding under our Term Loan from variable LIBOR to a fixed rate of 2.89% per annum, in each case plus an applicable margin. The interest rate swap matured on July 10, 2023. See Note 10 – "*Derivative Instruments*".

On January 31, 2023, we entered into a second interest rate swap agreement to manage our exposure to the fluctuations in variable interest rates. The swap effectively exchanged the interest rate on $300.0 million of the debt outstanding under our Term Loan from variable to a fixed rate of 4.095% per annum, plus an applicable margin which was 1.50% at December 31, 2024. The interest rate swap matured on January 31, 2025. See Note 10 – "*Derivative Instruments*".

***Canadian Credit Facilities***

We have credit facilities totaling $14.0 million in Canadian dollars for the purposes of issuing commercial letters of credit and providing funding for working capital. At December 31, 2024, commercial letters of credit outstanding were $1.0 million in Canadian dollars and there were no outstanding borrowings. Available capacity at December 31, 2024, was $13.0 million in Canadian dollars.

**Note 10 — Derivative Instruments**

We are exposed to certain market risks related to changes in interest rates. To monitor and manage these market risks, we have established risk management policies and procedures. We do not enter into derivative instruments for any purpose other than hedging interest rate risk. None of our derivative instruments are used for trading purposes.

***Interest Rate Risk.*** We are exposed to variable interest rate risk as a result of variable-rate borrowings under our Credit Agreement. To manage fluctuations in cash flows resulting from changes in interest rates on a portion of our variable-rate debt, we entered into an interest rate swap agreement on September 13, 2018, with an initial notional amount of $165.0 million. The notional amount of the swap was adjusted down each quarter by a portion of the required principal payments made on the Term Loan and matured on July 10, 2023. On January 31, 2023, we entered into a second interest rate swap agreement with a notional amount of $300.0 million. Neither swap was designated as a hedge for accounting purposes. The swaps effectively change the variable-rate cash flow exposure on the debt obligations to fixed rates. The fair value of outstanding interest rate swap derivatives can vary significantly from period to period depending on the total notional amount of swap derivatives outstanding and fluctuations in market interest rates compared to the interest rates fixed by the swap. As of December 31, 2024, and 2023, our outstanding interest rate swap agreement contained a notional amount of $300.0 million, maturing on January 31, 2025.

***Credit Risk.*** By using derivative instruments to economically hedge exposures to changes in interest rates, we are exposed to counterparty credit risk. Credit risk is the failure of a counterparty to perform under the terms of a derivative contract. When the fair value of a derivative contract is positive, the counterparty owes us, which creates credit risk for us. When the fair value of a derivative contract is negative, we owe the counterparty and, therefore, we do not possess credit risk. We minimize the credit risk in derivative instruments by entering into transactions with high quality counterparties. We have entered into netting agreements, including International Swap Dealers Association Agreements, which allow for netting of contract receivables and payables in the event of default by either party.

The following table summarizes the fair value of our derivative contracts included in the Consolidated Balance Sheets (in thousands):

| | Balance Sheet Location | December 31, 2024 | December 31, 2023 |
|---|---|---|---|
| Interest rate swap | Other current assets | $ 67 | $ — |
| Interest rate swap | Other long-term assets | — | 1,633 |

The following table summarizes the amounts recognized with respect to our derivative instruments within the Consolidated Statements of Income (in thousands):

| | Location of Gain Recognized on Derivatives | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2024 | 2023 | 2022 |
| Interest rate swap | Interest expense, net | $ 1,768 | $ 5,335 | $ 4,078 |

**Note 11—Leases**

We lease administrative and operational facilities, which are generally longer-term, project specific facilities or yards, and construction equipment under non-cancelable operating leases. We determine if an arrangement is a lease at inception. We have lease agreements with lease and non-lease components, which are generally accounted for separately. Operating leases are included in “Operating lease assets”, “Accrued liabilities”, and “Noncurrent operating lease liabilities, net of current portion” on our Consolidated Balance Sheets. We also made an accounting policy election in which leases with an initial term of 12 months or less are not recorded on the balance sheet and lease payments are recognized in the Consolidated Statements of Income on a straight-line basis over the lease term.

Operating lease assets and operating lease liabilities are recognized at commencement date based on the present value of the future minimum lease payments over the lease term. In determining our lease term, we include options to extend or terminate the lease when it is reasonably certain that we will exercise that option. For our leases that do not provide an implicit rate, we use our incremental borrowing rate based on the information available at commencement date to determine the present value of future payments. Lease expense from minimum lease payments is recognized on a straight-line basis over the lease term.

Our leases have remaining lease terms that expire at various dates through 2034, some of which may include options to extend the leases for up to 5 years. The exercise of lease extensions is at our sole discretion. Periodically, we sublease excess facility space, but any sublease income is generally not significant. Our lease agreements do not contain any material residual value guarantees or material restrictive covenants.

The components of operating lease expense are as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Operating lease expense (1) | $ 148,311 | $ 112,170 | $ 76,761 |

(1) Includes short-term leases, which are immaterial.

Our operating lease liabilities are reported on the Consolidated Balance Sheets as follows (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Accrued liabilities | $ 122,021 | $ 96,411 |
| Noncurrent operating lease liabilities, net of current portion | 333,370 | 263,454 |
| | $ 455,391 | $ 359,865 |

The future minimum lease payments under non-cancelable operating leases are as follows (in thousands):.

| For the Years Ending December 31, | Future Minimum Lease Payments |
|---|---|
| 2025 | $ 145,247 |
| 2026 | 135,061 |
| 2027 | 111,388 |
| 2028 | 71,092 |
| 2029 | 36,499 |
| Thereafter | 14,822 |
| Total lease payments | $ 514,109 |
| Less imputed interest | (58,718) |
| Total | $ 455,391 |

Other information related to operating leases is as follows (in thousands, except lease term and discount rate):

| | Year ended December 31, 2024 | 2023 |
|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities | | |
| Operating cash flows from operating leases | $ 145,791 | $ 109,430 |
| Weighted-average remaining lease term on operating leases (years) | 3.90 | 4.44 |
| Weighted-average discount rate on operating leases | 6.50% | 5.64% |

***Sale and Leaseback Transaction***

On June 22, 2022, we completed a sale and leaseback transaction of land and buildings located in Carson, California for an aggregate sales price, net of closing costs, of $49.9 million. Under the transaction, the land, buildings and improvements were sold and leased back for an initial term of three years. The aggregate initial annual rent payment for the property is approximately $1.2 million and includes annual rent increases of 3.0% over the initial lease term. The property qualified for sale and leaseback treatment and is classified as an operating lease. Therefore, we recorded a gain on the transaction of $40.1 million. The gain is included in Gain on sale and leaseback transaction on our Consolidated Statements of Income for the year ended December 31, 2022.

**Note 12—Commitments and Contingencies**

*Legal proceedings*—We are subject to claims and legal proceedings arising out of our business. We record costs related to contingencies when a loss from such claims is probable and the amount is reasonably estimable. In determining whether it is possible to provide an estimate of loss, or range of possible loss, we review and evaluate our litigation and regulatory matters on a quarterly basis in light of potentially relevant factual and legal developments. If we determine an unfavorable outcome is not probable or reasonably estimable, we do not accrue for a potential litigation loss.

Management is unable to ascertain the ultimate outcome of claims and legal proceedings; however, after review and consultation with counsel and taking into consideration relevant insurance coverage and related deductibles/self-insurance retention, management believes that it has meritorious defenses to the claims and believes that the reasonably possible outcome of such claims will not, individually or in the aggregate, have a materially adverse effect on our consolidated results of operations, financial condition or cash flow.

*Representation and Warranty Insurance Recoveries*—We have obtained representation and warranty insurance to insure us against potential losses resulting from breaches of certain representations and warranties in connection with certain prior acquisitions. When appropriate, we file claims to recover losses attributable to breaches of representations or warranties by a selling party. The size of claim and amount of recovery can vary, but in some cases could have a material effect on our consolidated results of operations, financial condition or cash flow.

*Bonding*—As of December 31, 2024 and 2023, we had bid and payment/performance bonds issued and outstanding totaling approximately $8.1 billion and $5.9 billion, respectively. The remaining performance obligation on those bonded projects totaled approximately $3.0 billion and $2.7 billion, respectively.

**Note 13—Reportable Segments**

Our Chief Operating Decision Maker ("CODM"), who is our President and Chief Executive Officer, regularly reviews operating and financial performance based on our operating segments. We have aggregated our operating segments into two reportable segments in consideration of the aggregation criteria set forth in ASC 280. Our current reportable segments include the Utilities segment and the Energy segment.

Each of our reportable segments is composed of similar business units that specialize in services unique to the segment. Driving the end-user focused segments are differences in the economic characteristics of each segment, the nature of the services provided by each segment, the production processes of each segment, the type or class of customer using the segment's services, the methods used by the segment to provide the services, and the regulatory environment of each segment's customers.

The classification of certain operating expenses and SG&A expenses for segment reporting purposes can at times require judgment on the part of management. Our segments may perform services across industries or perform joint services for customers in multiple industries. To determine reportable segment profitability, certain allocations, including allocations of shared and indirect costs, as well as general and administrative costs are made. Certain of our fixed assets are used on an interchangeable basis across both reportable segments.

Beginning in the fourth quarter of 2024, our CODM began reviewing operating and financial data using Operating income rather than gross profit as the primary metric in evaluating performance. Operating income provides a complete view of our core business operations and captures the costs required to run the business including overhead and administrative expense. For segment reporting purposes, the CODM uses "Operating income" to evaluate segment performance and allocate resources, including budget-to-actual variances on a monthly basis. Additionally, Operating income is a better indicator of future performance and provides a more standardized basis for comparison between companies within our industry.

The following is a brief description of the reportable segments:

The Utilities segment operates throughout the United States and specializes in a range of services, including the installation and maintenance of new and existing natural gas and electric utility distribution and transmission systems, and communications systems.

The Energy segment operates throughout the United States and Canada and specializes in a range of services that include engineering, procurement, construction, and maintenance services for entities in the energy, renewable energy and energy storage, renewable fuels, and petroleum and petrochemical industries, as well as state departments of transportation.

Corporate and non-allocated costs include corporate facility and property costs; corporate salaries, benefits, incentive compensation and non-cash stock-based compensation; and acquisition and integration costs.

***Segment Operating Income***

Operating income is calculated as revenue less cost of revenue and SG&A costs. Cost of revenue includes certain direct and indirect costs such as labor and materials, equipment, depreciation, and subcontractor costs. SG&A includes compensation and benefits for executive, management level and administrative employees, marketing and communications, professional fees, rent for facilities and utilities, amortization, and other general costs required to run our business.

Operating performance by segment for the years ended December 31, 2024, 2023 and 2022 was as follows (in thousands):

| | For the year ended December 31, 2024 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Utilities | % of Segment Revenue | Energy | % of Segment Revenue | Corporate and non-allocated costs | Consolidated | % of Consolidated Revenue |
| Revenue | $ 2,439,029 | — | $ 4,032,035 | — | $ (104,226)(1) | $ 6,366,838 | — |
| Cost of revenue | 2,181,068 | 89.4% | 3,586,751 | 89.0% | (104,226)(1) | 5,663,593 | 89.0% |
| Gross profit | 257,961 | 10.6% | 445,284 | 11.0% | — | 703,245 | 11.0% |
| Selling, general, and administrative expenses | 118,253 | 4.8% | 150,186 | 3.7% | 114,912 | 383,351 | 6.0% |
| Transaction and related costs | — | | — | | 2,442 | 2,442 | |
| Operating income | $ 139,708 | 5.7% | $ 295,098 | 7.3% | $ (117,354) | $ 317,452 | 5.0% |

(1) Represents intersegment revenue and cost of revenue of $104.2 million in the Utilities segment eliminated in our Consolidated Statements of Income.

| | For the year ended December 31, 2023 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Utilities | % of Segment Revenue | Energy | % of Segment Revenue | Corporate and non-allocated costs | Consolidated | % of Consolidated Revenue |
| Revenue | $ 2,410,174 | — | $ 3,346,170 | — | $ (41,035)(1) | $ 5,715,309 | — |
| Cost of revenue | 2,203,182 | 91.4% | 2,965,671 | 88.6% | (41,035)(1) | 5,127,818 | 89.7% |
| Gross profit | 206,992 | 8.6% | 380,499 | 11.4% | — | 587,491 | 10.3% |
| Selling, general, and administrative expenses | 117,799 | 4.9% | 132,576 | 4.0% | 78,358 | 328,733 | 5.8% |
| Transaction and related costs | — | | — | | 5,685 | 5,685 | |
| Operating income | $ 89,193 | 3.7% | $ 247,923 | 7.4% | $ (84,043) | $ 253,073 | 4.4% |

(1) Represents intersegment revenue and cost of revenue of $29.9 million in the Utilities segment and $11.1 million in the Energy segment eliminated in our Consolidated Statements of Income.

| | For the year ended December 31, 2022 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Utilities | % of Segment Revenue | Energy | % of Segment Revenue | Corporate and non-allocated costs | Consolidated | % of Consolidated Revenue |
| Revenue | $ 2,033,711 | — | $ 2,397,351 | | $ (10,463)(1) | $ 4,420,599 | — |
| Cost of revenue | 1,823,039 | 89.6% | 2,151,138 | 89.7% | (10,463)(1) | 3,963,714 | 89.7% |
| Gross profit | 210,672 | 10.4% | 246,213 | 10.3% | — | 456,885 | 10.3% |
| Selling, general, and administrative expenses | 91,726 | 4.5% | 108,563 | 4.5% | 81,288 | 281,577 | 6.4% |
| Transaction and related costs | — | | — | | 20,054 | 20,054 | |
| Gain on sale and leaseback transaction | — | | — | | (40,084) | (40,084) | |
| Operating income | $ 118,946 | 5.8% | $ 137,650 | 5.7% | $ (61,258) | $ 195,338 | 4.4% |

(1) Represents intersegment revenue and cost of revenue of $9.4 million in the Utilities segment and $1.1 million in the Energy segment eliminated in our Consolidated Statements of Income.

Reconciliation of operating income to income before provision for income taxes is as follows (in thousands):

| | Year Ended December 31, 2024 | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Operating Income | $ 317,452 | $ 253,073 | $ 195,338 |
| Foreign exchange gain, net | 2,674 | 1,163 | 1,088 |
| Other income, net | 106 | 1,604 | 2,072 |
| Interest expense, net | (65,315) | (78,171) | (39,212) |
| Income before provision for income taxes | $ 254,917 | $ 177,669 | $ 159,286 |

***Depreciation and Amortization***

Depreciation of various fixed assets and finance leases and amortization of intangible assets are reported by the segment/corporate group that utilizes the underlying assets. Depreciation and amortization are included within Cost of revenue and SG&A in the Consolidated Statements of Income. A substantial majority of depreciation is reported in Cost of revenue and all amortization is included within SG&A. Depreciation and amortization expense by segment for the years ended December 31, 2024, 2023, and 2022 was as follows (in thousands):

| | For the years ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Utilities | $ 60,863 | $ 70,916 | $ 71,520 |
| Energy | 29,073 | 31,377 | 24,657 |
| Corporate and non-allocated costs | 5,586 | 4,748 | 2,980 |
| Total depreciation and amortization | $ 95,522 | $ 107,041 | $ 99,157 |

Separate measures of our business assets and cash flows by reportable segment, including capital expenditures, are not produced or utilized by management and our CODM, as defined by ASC 280, to evaluate segment performance and are therefore not presented by segment.

***Geographic Region — Revenue and Total Assets***

The majority of our revenue is derived from customers in the United States with approximately 4.6%, 5.8% and 6.7% generated from sources outside of the United States, principally Canada, for the years ended December 31, 2024, 2023 and 2022, respectively. At December 31, 2024 and 2023, approximately 4.0% and 3.9%, respectively of total assets were located outside of the United States.

**Note 14 — Multiemployer Plans**

***Union Plans—***Various subsidiaries are signatories to collective bargaining agreements. These agreements require that we participate in and contribute to a number of multiemployer benefit plans for our union employees at rates determined by the agreements. The trustees for each multiemployer plan determine the eligibility and allocations of contributions and benefit amounts, determine the types of benefits and administer the plan.

We contributed $62.9 million, $62.2 million, and $46.2 million, to multiemployer pension plans for the years ended December 31, 2024, 2023 and 2022, respectively. These costs were charged to the related construction contracts in process.

The financial risks of participating in multiemployer plans are different from single-employer plans in the following respects:

- Assets contributed to the multiemployer plan by one employer may be used to provide benefits to employees of other participating employers.
- If a participating employer stops contributing to the plan, the unfunded obligations of the plan may be borne by the remaining participating employers.
- If a participating employer chooses to stop participating in the plan, a withdrawal liability may be created based on the unfunded vested benefits for all employees in the plan.

Under U.S. legislation regarding multiemployer pension plans, an employer is required to pay an amount that represents its proportionate share of a plan's unfunded vested benefits in the event of withdrawal from a plan or upon plan termination.

We participate in a number of multiemployer pension plans, and our potential withdrawal obligation may be significant. Any withdrawal liability would be recorded when it is probable that a liability exists and can be reasonably estimated, in accordance with GAAP. We have no plans to withdraw from any labor agreements.

During the last three years, we made annual contributions to 46 pension plans. Based upon the most recent and available plan financial information, we made contributions to the Construction Laborers Pension Trust for Southern California, the Southern California Pipe Trades Trust Funds, the Minnesota Laborers Pension Fund, and the Pipeline Industry Benefit Fund that represented more than 5% of the plan's total contributions. None of the other significant pension plans we contributed to below listed us in the plan's Form 5500 as providing more than 5% of the plan's total contributions during the years ended December 31, 2024, 2023 and 2022.

Our participation in significant plans for the years ended December 31, 2024, 2023 and 2022 is outlined in the table below. The "EIN/Pension Plan Number" column provides the Employer Identification Number ("EIN") and the three digit plan number. The "Zone Status" is based on the latest information that we received from the plan and is certified by the plan's actuary. Among other factors, plans in the red zone are generally less than 65 percent funded, plans in the yellow zone are less than 80 percent funded, and plans in the green zone are at least 80 percent funded. The "FIP/RP Status Pending/Implemented" column indicates plans for which a financial improvement plan ("FIP") or a rehabilitation plan ("RP") is either pending or has been implemented. The "Surcharge Imposed" column includes plans in a red zone status that require a payment of a surcharge in excess of regular contributions. The next column lists the expiration date of our collective bargaining agreement related to the plan.

| Pension Fund Name | EIN / Pension Plan Number | Pension Protection Act Zone Status | | FIP/RP Status Pending / Implemented | Surcharge Imposed | Collective Bargaining Agreement Expiration Date | Contributions of the Company (In Thousands) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2024 | 2023 | | | | 2024 | 2023 | 2022 |
| National Electric Annuity Plan (1) | 52-6132372/001 | N/A | N/A | N/A | N/A | N/A | $ 12,416 | $ 7,805 | $ 1,752 |
| Central Pension Fund of the International Union of Operating Engineers and Participating Employers | 36-6052390/001 | Green as of January 31, 2024 | Green as of January 31, 2023 | No | No | 6/4/2026 | 7,496 | 6,150 | 5,592 |
| Construction Laborers Pension Trust for Southern California | 43-6159056/001 | Green as of December 31, 2023 | Green as of December 31, 2022 | No | No | 6/30/2026 | 6,355 | 5,162 | 3,595 |
| Southern California Pipe Trades Trust Funds | 51-6108443/001 | Green as of December 31, 2023 | Green as of December 31, 2022 | No | No | 8/31/2026 | 4,821 | 4,290 | 3,268 |
| Laborers Pension Trust Fund for Northern California | 94-6277608/001 | Green as of May 31, 2023 | Green as of May 31, 2023 | No | No | 6/30/2027 | 4,525 | 5,198 | 3,699 |
| Minnesota Laborers Pension Fund | 41-6159599/001 | Green as of December 31, 2023 | Green as of December 31, 2022 | No | No | 6/1/2025 | 3,869 | 3,579 | 3,749 |
| Operating Engineer Trust Funds | 95-6032478/001 | Green as of June 30, 2023 | Yellow as of June 30, 2023 | No | No | 6/30/2025 | 3,652 | 4,856 | 1,973 |
| Pipeline Industry Benefit Fund | 73-6146433/001 | Green as of December 31, 2023 | Green as of December 31, 2022 | No | No | 6/1/2026 | 3,353 | 4,363 | 495 |
| Laborers International Union of North America National Pension Fund | 52-6074345/001 | Green as of December 31, 2023 | Green as of December 31, 2022 | No | No | 6/1/2025 | 3,109 | 2,000 | 2,534 |
| United Association National Pension Fund Formerly Plumbers & Pipefitters National Pension Fund | 52-6152779 | Green as of June 30, 2023 | Green as of June 30, 2022 | No | No | 6/4/2026 | 2,251 | 2,358 | 2,847 |
| | | | | Contributions to significant plans | | | 51,847 | 45,761 | 29,504 |
| | | | | Contributions to other multiemployer plans | | | 11,089 | 16,474 | 16,659 |
| | | | | Total contributions made | | | $ 62,936 | $ 62,235 | $ 46,163 |

(1) This plan is a defined contribution multiemployer pension plan and therefore, PPA zone status, funding status, surcharge, and collective bargaining agreement disclosures are not applicable.

## Note 15—Employee Benefit Plans

***Defined Contribution Plans*—**We sponsor multiple defined contribution plans for eligible employees not covered by collective bargaining agreements. Our plans include various features such as voluntary employee pre-tax and Roth-based contributions and matching contributions made by us. In addition, at the discretion of our Board of Directors, we may make additional profit share contributions to the plans. No such additional contributions were made during 2022 through 2024. Matching contributions to all defined contribution plans for the years ended December 31, 2024, 2023 and 2022 were $18.0 million, $16.4 million, and $16.6 million, respectively. The increase in matching contributions in 2024 is primarily due to increased participation in the plans. We have no other post-retirement benefits.

***Deferred Compensation Plan*—**In 2023, we adopted a non-qualified deferred compensation plan under which eligible directors and key employees may defer their receipt of certain cash compensation. This plan is an unfunded and unsecured compensation arrangement. Individuals participating in the plan may allocate deferred cash amounts among a group of notional accounts that mirror the gains and losses of various investment alternatives. Generally, participants receive distributions of deferred balances based on predetermined payout schedules or other events.

The plan covering key employees provides for employer matching contributions for certain officers and employees whose benefits under the 401(k) plan are limited by federal tax law. Contributions vest immediately provided that vesting accelerates upon a change in control or the participant's death or retirement. Any matching and discretionary employer contributions, whether vested or not, are forfeited upon a participant's termination of employment for cause or upon the participant engaging in competition with Primoris or any of its affiliates.

As of December 31, 2024 and 2023, the deferred compensation liability under our deferred compensation plan was $1.2 and $0.3 million, respectively, which was included in "Other long-term liabilities" in the accompanying Consolidated Balance Sheets. To provide for future obligations related to these deferred compensation plans, we have invested in corporate-owned life insurance ("COLI") policies covering certain participants in the deferred compensation plans, the underlying investments of which are intended to be aligned with the investment alternatives elected by plan participants. The COLI assets are recorded at their cash surrender value, which is considered their fair market value, and as of December 31, 2024 and 2023, the fair market was $1.1 million and $0.3 million, respectively, which was included in "Other long-term assets" in the accompanying Consolidated Balance Sheets.

**Note 16—Stock-Based Compensation**

We maintain two equity compensation plans under which stock-based compensation has been granted, the 2013 Equity Plan and the 2023 Equity Plan. Upon the adoption of the 2023 Equity Plan, awards were no longer granted under the 2013 Equity Plan. The 2023 Equity Plan permits the granting of up to 6.5 million shares to executives, directors and certain senior managers. Grants of awards to employees are approved by the Compensation Committee of the Board of Directors and grants to independent members of the Board of Directors are approved by the Board of Directors. As of December 31, 2024, there were 5.8 million shares of common stock remaining available for grant under the 2023 Equity Plan.

Under guidance of ASC 718, "*Compensation — Stock Compensation*", stock-based compensation cost is measured at the date of grant, based on the calculated fair value of the stock-based award, and is recognized as expense over the employee's requisite service period (generally the vesting period of the award). We settle the vesting of RSUs and PSUs through the issuance of new shares of common stock. Forfeitures of stock-based awards are recognized as they occur.

*Restricted Stock Units*

We grant time-vested stock awards in the form of restricted stock units. The fair value of the RSUs is based on the closing market price of our common stock on the day prior to the date of the grant. Stock compensation expense for the RSUs is amortized using the straight-line method over the service period. Time-vested stock awards granted to eligible employees generally vest 25% in year one, 25% in year two, and 50% in year three.

The table below presents RSU activity for 2024:

| Nonvested RSUs | Units | Weighted Average Grant Date Fair Value per Unit |
|---|---|---|
| Balance at December 31, 2023 | 692,715 | $ 28.14 |
| Granted | 306,674 | 45.16 |
| Vested | (387,881) | 29.57 |
| Forfeited | (58,088) | 33.50 |
| Balance at December 31, 2024 | 553,420 | 36.01 |

During 2023, 355,644 RSUs were granted with a weighted-average grant date fair value per unit of $27.83. The total fair value of RSUs that vested during 2024, 2023 and 2022 was $11.5 million, $6.5 million and $4.5 million, respectively. At December 31, 2024, approximately $13.5 million of unrecognized compensation expense remains for the RSUs, which will be recognized over a weighted average period of 2.24 years.

*Performance Stock Units*

Shares of our common stock may be earned based on our performance compared to defined metrics. The number of shares earned under a performance award can vary from zero to 200% of the target shares awarded, based upon our performance compared to the metrics. The metrics used for the grant are determined by the Compensation Committee of the Board of Directors and may be either based on internal measures such as our financial performance compared to target or on a market-based metric such as our stock performance compared to a peer group. Performance awards vest over three years based upon attainment of at least the minimum stated performance targets and minimum service requirements. For performance awards, we recognize stock-based compensation expense based on the grant date fair value of the award. The fair value of internal metric-based performance awards is determined by the market price of our common stock on the day prior to the date of the grant. Stock compensation expense for the PSUs is amortized using the straight-line method over the service period. We adjust the stock-based compensation expense related to internal metric-based performance awards according to our determination of the shares expected to vest at each reporting date. Stock-based compensation expense related to market metric-based performance awards is expensed at their grant date fair value regardless of performance.

The table below presents PSU activity for 2024:

| Nonvested PSUs | Units | Weighted Average Grant Date Fair Value per Unit |
|---|---|---|
| Balance at December 31, 2023 | 334,938 | $ 27.50 |
| Granted | 162,040 | 39.51 |
| Vested | (106,931) | 27.66 |
| Forfeited | (55,324) | 32.45 |
| Balance at December 31, 2024 | 334,723 | 32.02 |

At December 31, 2024, approximately $6.6 million of unrecognized compensation expense remains for the PSUs, which will be recognized over a weighted average period of 1.80 years.

*Stock-based Compensation Expense*

For the years ended December 31, 2024, 2023 and 2022, we recognized $15.1 million, $11.8 million, and $7.4 million, respectively, in compensation expense for both RSUs and PSUs.

**Note 17—Income Taxes**

Income before provision for income taxes consists of the following (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| United States | $ 236,507 | $ 158,137 | $ 133,564 |
| Foreign | 18,410 | 19,532 | 25,722 |
| Total | $ 254,917 | $ 177,669 | $ 159,286 |

The components of the provision for income taxes are as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Current provision | | | |
| Federal | $ 49,816 | $ 11,337 | $ 5,412 |
| State | 12,258 | 7,124 | 2,117 |
| Foreign | 7,485 | 3,705 | 4,041 |
| | 69,559 | 22,166 | 11,570 |
| Deferred provision (benefit) | | | |
| Federal | 5,673 | 28,634 | 12,645 |
| State | (387) | 1,412 | (428) |
| Foreign | (816) | (688) | 2,478 |
| | 4,470 | 29,358 | 14,695 |
| | | | |
| Total | $ 74,029 | $ 51,524 | $ 26,265 |

A reconciliation of income tax expense compared to the amount of income tax expense that would result by applying the U.S. federal statutory income tax rate to pre-tax income is as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| U.S. federal statutory income tax rate | 21.0 % | 21.0 % | 21.0 % |
| State taxes, net of federal income tax impact | 3.7 | 3.8 | 0.8 |
| Tax credits | (1.5) | (0.7) | (1.9) |
| Income taxed at rates greater than U.S. | 0.7 | 0.2 | 0.6 |
| Nondeductible meals & entertainment | 3.4 | 3.6 | 0.5 |
| Nondeductible compensation | 0.8 | 0.7 | 0.4 |
| Capital loss utilization - release of valuation allowance | 0.0 | 0.0 | (5.8) |
| Other items | 0.9 | 0.4 | 0.9 |
| Effective tax rate | 29.0 % | 29.0 % | 16.5 % |

The provision for income taxes has been determined based upon the tax laws and rates in the countries in which we operate. Our operations in the United States are subject to federal income tax rates of 21% and varying state income tax rates. Our principal international operations are in Canada. Our subsidiaries in Canada are subject to a corporate income tax rate of 23%. We did not have any non-taxable foreign earnings from tax holidays for taxable years 2021 through 2024.

We purchased $40.0 million of transferable ITCs in 2024 at a purchase price of $36.9 million which we expect to fully utilize within our 2024 federal income tax return. We made an accounting policy election to use the flow through income statement method under which we recognized the benefit of the ITC in our 2024 income tax expense.

Deferred taxes are recognized for temporary differences between the financial reporting bases and tax bases of assets and liabilities and are measured using enacted tax rates expected to be in effect when such amounts are realized or settled. However, deferred tax assets are recognized only to the extent that it is more likely than not that they will be

realized based upon consideration of available evidence, including future reversals of existing taxable temporary differences, future projected taxable income, the length of the tax asset carryforward periods, and tax planning strategies.

The tax effect of temporary differences that give rise to deferred income taxes are as follows (in thousands):

| | December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Deferred tax assets: | | |
| Accrued compensation | $ 12,232 | $ 12,044 |
| Accrued workers compensation | 3,889 | 3,103 |
| Net operating losses | 34,954 | 41,819 |
| Disallowed interest | — | 8,227 |
| Lease liabilities | 91,933 | 72,363 |
| Insurance reserves | 8,875 | 6,430 |
| Loss reserves | 1,150 | 1,309 |
| Tax credits | 825 | 748 |
| Capitalized research | 14,994 | 11,522 |
| Other | 87 | 315 |
| Total deferred tax assets | 168,939 | 157,880 |
| Deferred tax liabilities | | |
| Depreciation and amortization | (124,395) | (130,051) |
| Prepaid expenses and other | (4,096) | (3,672) |
| Lease assets | (94,140) | (73,516) |
| Total deferred tax liabilities | (222,631) | (207,239) |
| Valuation allowance | (10,343) | (10,206) |
| Net deferred tax liabilities | $ (64,035) | $ (59,565) |

As of December 31, 2024, we have recorded a deferred tax asset of $35.0 million reflecting the tax benefit of approximately $507.9 million of federal and state income tax net operating loss carryforwards, some of which were acquired in the acquisitions of PLH and other companies. Our tax credits of $0.8 million generally expire between 10 and 20 years after they are generated. Our U.S. federal net operating losses expire beginning in 2031, and our state net operating losses generally expire 20 years after the period in which the losses were incurred.

The valuation allowances for deferred income tax assets at December 31, 2024 and 2023, were $10.3 million and $10.2 million, respectively. The $0.1 million increase in valuation allowances during 2024 was due to changes in the realizability of the state net operating losses. These valuation allowances primarily relate to state net operating loss carryforwards established due to uncertainty in Primoris' outlook as to the amount of future taxable income required in particular tax jurisdictions in order to utilize certain tax losses, considering also the tax regulations which limit the annual utilization of acquired losses. Primoris believes it is more likely than not that it will realize the benefit of its deferred tax assets net of existing valuation allowances.

A reconciliation of the beginning, ending and aggregate changes in the gross balances of unrecognized tax benefits is as follows (in thousands):

| | December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Beginning balance | $ 9,217 | $ 10,196 | $ 1,337 |
| Increases in balances for tax positions taken during the current year | 120 | 120 | 120 |
| (Decreases) increases in balances for tax positions taken during prior years | — | (687) | 9,204 |
| Lapse of statute of limitations | — | (412) | (465) |
| Total | $ 9,337 | $ 9,217 | $ 10,196 |

We recognize accrued interest and penalties related to uncertain tax positions in income tax expense. We recognized interest expense related to uncertain tax positions of $0.7 million, $0.6 million, and $0.2 million for the years ending December 31, 2024, 2023, and 2022, respectively.

We believe it is reasonably possible that decreases of up to $0.3 million of unrecognized tax benefits could occur in the next twelve months due to the expiration of statutes of limitation and settlements with tax authorities.

Our federal income tax returns are generally no longer subject to examination for tax years before 2020. The statutes of limitation of state and foreign jurisdictions generally vary between 3 to 5 years. Accordingly, our state and foreign income tax returns are generally no longer subject to examination for tax years before 2018.

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted by the US Government in response to the COVID-19 pandemic. We deferred approximately $42.0 million of FICA tax payments during part of 2020 as allowed under the CARES Act. The unpaid deferral was $21.7 million at December 31, 2022, and was included in Accrued liabilities on our Consolidated Balance Sheet. We paid all remaining payments to the U.S. Treasury on January 3, 2023.

ASU No. 2013-11, "Income Taxes (Topic 740) Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists", requires certain unrecognized tax benefits to be shown as a reduction to another asset or liability. Accordingly, this resulted in a decrease to the December 31, 2022, income tax receivable of $6.3 million.

**Note 18—Dividends and Earnings Per Share**

We have declared cash dividends during 2022, 2023 and 2024 as follows:

| Declaration Date | Record Date | Date Paid | Amount Per Share |
|---|---|---|---|
| February 24, 2022 | March 31, 2022 | April 15, 2022 | 0.06 |
| May 4, 2022 | June 30, 2022 | July 15, 2022 | 0.06 |
| August 3, 2022 | September 30, 2022 | October 15, 2022 | 0.06 |
| November 3, 2022 | December 31, 2022 | January 13, 2023 | 0.06 |
| February 22, 2023 | March 31, 2023 | April 14, 2023 | 0.06 |
| May 3, 2023 | June 30, 2023 | July 14, 2023 | 0.06 |
| August 2, 2023 | September 29, 2023 | October 13, 2023 | 0.06 |
| November 2, 2023 | December 29, 2023 | January 12, 2024 | 0.06 |
| February 21, 2024 | March 28, 2024 | April 15, 2024 | 0.06 |
| May 1, 2024 | June 28, 2024 | July 15, 2024 | 0.06 |
| July 31, 2024 | September 27, 2024 | October 11, 2024 | 0.06 |
| October 30, 2024 | December 31, 2024 | January 15, 2025 | 0.08 |

The payment of future dividends is contingent upon our revenue and earnings, capital requirements and our general financial condition, as well as contractual restrictions and other considerations deemed relevant by our Board of Directors.

The table below presents the computation of basic and diluted earnings per share for the years ended December 31, 2024, 2023 and 2022 (in thousands, except per share amounts):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Numerator:** | | | |
| Net income | $ 180,888 | $ 126,145 | $ 133,021 |
| | | | |
| **Denominator:** | | | |
| Weighted average shares for computation of basic earnings per share: | 53,636 | 53,297 | 53,200 |
| Dilutive effect of stock-based awards | 940 | 926 | 559 |
| Weighted average shares for computation of diluted earnings per share | 54,576 | 54,223 | 53,759 |
| | | | |
| Earnings per share: | | | |
| Basic | $ 3.37 | $ 2.37 | $ 2.50 |
| Diluted | $ 3.31 | $ 2.33 | $ 2.47 |

**Note 19—Stockholders' Equity**

***Preferred Stock***

We are authorized to issue 1,000,000 shares of $0.0001 par value preferred stock. No shares of Preferred Stock were outstanding at December 31, 2024 and 2023.

***Common Stock***

We are authorized to issue 90,000,000 shares of $0.0001 par value common stock, of which 53,740,729 and 53,366,327 shares were issued and outstanding as of December 31, 2024 and 2023, respectively.

We issued 11,359 shares of common stock in 2024, 21,245 shares of common stock in 2023, and 23,782 shares of common stock in 2022 under our LTR Plan. The shares were purchased by the participants in the LTR Plan with payments made to us of $0.3 million in 2024, $0.3 million in 2023, and $0.6 million in 2022. Our LTR Plan for managers allows participants to use a portion of their annual bonus amount to purchase our common stock at a discount from the market price. The shares purchased in 2024, 2023 and 2022 were for bonus amounts earned in 2023, 2022 and 2021 and the number of shares was calculated at 75% of the average closing price for December of the previous year.

During the years ended December 31, 2024, 2023, and 2022, we issued 24,792, 39,040, and 42,080 shares of common stock, respectively, as part of the quarterly compensation of the non-employee members of the Board of Directors. The shares were fully vested upon issuance and have a one-year trading restriction.

During the years ended December 31, 2024, 2023, and 2022, 322,713, 168,605, and 131,709 RSUs, net of forfeitures for tax withholdings, respectively, were converted to common stock.

***Employee Stock Purchase Plan***

In May 2022, our shareholders approved the 2022 Primoris Services Corporation Employee Stock Purchase Plan for which, eligible full-time employees can purchase shares of our common stock at a discount. The purchase price of the stock is 90% of the lower of the market price at the beginning of the offering period or the end of the offering period. Purchases occur semi-annually, approximately 30 days following the filing of our Annual Report on Form 10-K for the fiscal year ended December 31 of each year, but in no cases can extend beyond March 31 of the period or year, and approximately 30 days following the filing of our Quarterly Report on Form 10-Q for the fiscal quarter ended June 30 of each year. In 2024, 15,538 shares were purchased at an average price of $39.51 per share. In 2023, 12,538 shares were purchased at an average purchase price of $25.85 per share.

***Share Purchase Plan***

In November 2021, our Board of Directors authorized a $25.0 million share purchase program. Under the share purchase program, we can, depending on market conditions, share price and other factors, acquire shares of our common stock on the open market or in privately negotiated transactions. In February 2022, our Board of Directors replenished the limit to $25.0 million. During the years ended December 31, 2024 and 2023 we did not purchase any shares of common stock. During the year ended December 31, 2022, we purchased and cancelled 277,200 shares of common stock, which in the aggregate equaled $6.0 million at an average share price of $21.61. The share purchase plan expired on December 31, 2024.

**Note 20—Selected Quarterly Financial Information (Unaudited)**

Selected unaudited quarterly consolidated financial information is presented in the following tables (in thousands, except per share amounts):

| | Year Ended December 31, 2024 | | | |
|---|---|---|---|---|
| | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
| Revenue | $ 1,412,707 | $ 1,563,715 | $ 1,649,086 | $ 1,741,330 |
| Gross profit | 133,376 | 186,710 | 198,561 | 184,598 |
| Net income | 18,943 | 49,543 | 58,436 | 53,966 |
| | | | | |
| **Earnings per share:** | | | | |
| Basic earnings per share | $ 0.35 | $ 0.92 | $ 1.09 | $ 1.00 |
| Diluted earnings per share | 0.35 | 0.91 | 1.07 | 0.99 |
| | | | | |
| Weighted average shares outstanding | | | | |
| Basic | 53,490 | 53,640 | 53,692 | 53,720 |
| Diluted | 54,414 | 54,653 | 54,675 | 54,662 |

| | Year Ended December 31, 2023 | | | |
|---|---|---|---|---|
| | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
| Revenue | $ 1,256,896 | $ 1,413,377 | $ 1,529,486 | $ 1,515,550 |
| Gross profit | 99,732 | 157,264 | 173,895 | 156,600 |
| Net income | 1,310 | 39,032 | 48,144 | 37,659 |
| | | | | |
| **Earnings per share:** | | | | |
| Basic earnings per share | $ 0.02 | $ 0.73 | $ 0.90 | $ 0.71 |
| Diluted earnings per share | 0.02 | 0.72 | 0.89 | 0.69 |
| | | | | |
| Weighted average shares outstanding | | | | |
| Basic | 53,184 | 53,301 | 53,339 | 53,360 |
| Diluted | 53,944 | 54,324 | 54,351 | 54,385 |

# CORPORATE INFORMATION

### INVESTOR RELATIONS

Stockholders, brokers, securities analysts or portfolio managers seeking information about Primoris Services Corporation, New York Stock Exchange Trading Symbol: PRIM, should contact Blake Holcomb, Vice President of Investor Relations, at (214) 545-6773 or BHolcomb@prim.com

A direct link to the filings of Primoris Services Corporation on the U.S. Securities and Exchange Commission website is available at www.prim.com on the Investor Relations page.

### FORWARD-LOOKING STATEMENTS

Any statements included in this 2024 Annual Report that are not historical facts, including without limitation regarding future market trends and results of operations, are forward-looking statements within the meaning of applicable securities law. Please see "Forward-Looking Statements" in the 2024 Annual Report on Form 10-K for more information.

### CORPORATE HEADQUARTERS

**Primoris Services Corporation**
2300 N. Field Street, Suite 1900, Dallas, Texas 75201
(214) 740-5600

**Transfer Agent**
Continental Stock Transfer & Trust Company
1 State Street, 30th Floor, New York, New York 10004
(800) 509-5586

**Independent Registered Public Accounting Firm**
Moss Adams LLP
Certified Public Accountants
14555 Dallas Parkway, Suite 300, Dallas, Texas 75254

## Board of Directors

**Michael E. Ching** (1)(4)(5)
Former Head of Investment Research, Evalueserve

**Stephen C. Cook** (1)(3)(4)(5)
Lead Independent Director
President and Principal Stockholder, Fieldstone Partners

**David L. King**
Chairman and Interim President and Chief Executive Officer,
Primoris Services Corporation

**Carla S. Mashinski, CPA** (1)(2)(5)
Former Chief Financial and Administrative Officer, Cameron LNG

**Terry D. McCallister** (3)(4)(5)
Former Chief Executive Officer and Chairman,
WGL Holdings, Inc. and Washington Gas

**Jose R. Rodriguez, CPA** (1)(3)(5)
Former Senior Audit Partner, KPMG LLP

**John P. Schauerman** (2)(4)(5)
Former Chief Financial Officer, Primoris Services Corporation

**Patricia K. Wagner** (2)(4)(5)
Former Group President of United States
Utilities, Sempra Energy

## Executive Officers

**David L. King**
Chairman and Interim President and Chief Executive Officer,
Primoris Services Corporation

**Kenneth M. Dodgen**
Executive Vice President
Chief Financial Officer

**John M. Perisich**
Executive Vice President
Chief Legal and Administrative Officer and Secretary

**Jeremy R. Kinch**
Executive Vice President
Chief Operating Officer

(1) Audit Committee
(2) Compensation Committee
(3) Nominating and Governance Committee
(4) Strategy and Risk Committee
(5) Independent Director




**Primoris Services Corporation**
2300 N. Field Street, Suite 1900
Dallas, Texas 75201

prim.com

# PLAINTIFF'S EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLOTTE CHAPMAN BYRD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO. |
| | ) | 3:24-cv-2767-N |
| PRIMORIS SERVICES CORPORATION, PLH GROUP, INC., POWER LINE SERVICES, INC., and FUTURE INFRASTRUCTURE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

****************************************

ORAL DEPOSITION OF
SHUNTE CURTIS
DECEMBER 15, 2025
VOLUME 1

****************************************

ORAL DEPOSITION of SHUNTE CURTIS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 15th day of December 2025, from 11:02 a.m. to 2:36 p.m., before TAMMY DICKSON CROSS, a Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, via Zoom, with the witness located in Forney, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 6

MS. PLAGENS: Nicholé Plagens for Primoris Services Corporation, et al. And our corporate representative, Alicia Campbell, is also present.

THE DEPOSITION OFFICER: Okay. And do the attorneys have any other stipulations they would like to put on the record?

MS. ARTAZA: Yes. We're just agreeing that we don't have to do that entire paragraph recitation each time we take a break.

THE DEPOSITION OFFICER: Oh, okay. Yes, ma'am. Got it. Thank you.

MS. ARTAZA: Thank you.

THE DEPOSITION OFFICER: All right. We'll go ahead and swear in the witness now.

Ms. Curtis, if you would please raise your right hand so that I can see it in the camera.

Okay. And you're either going to swear or affirm. Swearing is to God; affirmation is under your honor.

Do you swear or affirm that the testimony you're about to give today in this case will be the truth, the whole truth, and nothing but the truth, so help you God?

MS. CURTIS: Yes.

THE DEPOSITION OFFICER: Okay. Thank

Page 7

you.

All right. Counsel, you may now proceed.

THE REPORTER: All right. So I'll go ahead and swear her in again, then?

MS. ARTAZA: Sure.

SHUNTE CURTIS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. ARTAZA:

Q All right. Good morning, Ms. Curtis. As I said earlier, I represent Charlotte Chapman Byrd in this matter and so I will be taking your deposition today.

Can you please state your full name for the record?

A Shunte Curtis.

Q Okay. And, Ms. Curtis, have you ever had your deposition taken before?

A No.

Q Okay. So let me -- just so you kind of know about the process, let me go over a few just basic rules.

So do you understand that the test- -- that the oath you just took, the testimony that you're giving here today is the same as if you were testifying before a judge or a jury?

Page 8

A Yes.

Q Okay. And then one thing that's very important is that we do not talk over one another because, ultimately, this deposition will be -- everything we say will be transcribed, and so we want to make sure we get a clear record of what -- of what I say and what you say.

A Okay.

Q And then just another little rule that's -- you know, a lot of times in normal everyday conversation, you may nod your head or express yourself, you know, using hand gestures and whatnot. And, of course, the court reporter -- that will be -- it'll appear on the video, but on the transcript itself, it won't appear. So it's just important that you answer each question audibly.

And if you need to take a break at any time today -- I don't anticipate that we will take all day, but if you need a break for any reason, just let me know. I'll -- I'll just ask that you finish answering whatever question's pending.

A Okay.

MS. PLAGENS: Shunte, could you speak up a little bit? I can't hear you.

THE WITNESS: Yes. Is this better?

Page 9

MS. ARTAZA: That's --

MS. PLAGENS: Yes.

MS. ARTAZA: -- much better. Much better.

Q Okay. I may have left something off, you know, but if I remember it as we go through the deposition, I'll -- I'll let you know.

Okay. So, now, let me ask you -- I don't want to know about any conversations that you've had with Ms. Plagens or anyone at her office, but I do want to know about any documents that you've reviewed today.

A I believe we reviewed some org charts and some e-mails.

Q Sitting here today, do you remember what those -- the dates of those org -- org charts?

A I do not, not off the top of my head.

Q Do you recall how many org charts you reviewed?

A Maybe one or two.

Q Okay. And do you recall how many e-mails you reviewed?

A Maybe three or four.

Q Do you recall the substance of those e-mails?

A Yes.
Q Okay. Can you tell me about that?
A One was regarding the transition from myself to Ms. Byrd. She was going to be taking on Future Gas employees, and so we were making arrangements for hands-on training, so there were some e-mails regarding that.
There was also some e-mails regarding possible miscommunication as far as who should be approving certain documents, either from my team or from her team.
Q Okay. Anything else?
A That's all that I can recall right now.
Q Okay. If you think of anything later or if we review a document and you're like, oh, I looked at that, can you just let me know?
A Yes.
Q Thank you.
Okay. Let's see here. Now, do you use your personal cell phone for work-related matters?
A No.
Q Okay. And do you have a company-issued cell phone?
A Yes.
Q And do you use that to communicate regarding



work-related matters?
A Yes.
Q Okay. What is that cell phone number?
A (214) 288-7870.
Q And have you had that cell phone for the entirety of your employment?
A Yes.
Q Okay. And what is your race?
A African-American.
Q Who is your current employer?
A Future Infrastructure.
Q Okay. And when did you begin working for Future Infrastructure?
A June 1st, 2020.
Q Okay. And when you started working for Future Infrastructure, what was your first position that you held?
A HR generalist and recruiter.
Q Do you recall who hired you for that role?
A Yes.
Q And who was that?
A Tracey Smith.
Q Okay. And at some point, were you promoted from the HR generalist/recruiter position to an HR manager role?



A Yes.
Q Do you recall when you were promoted?
A I know it was in the month of May. I believe May 2021.
Q So you were promoted almost a year after you started?
A Yes.
Q Do you know who made the decision to promote you?
A Yes.
Q And who was that?
A Tracey Smith.
Q Okay. And what is your current job title?
A HR director for the communications.
Q And when did you move into that role?
A February 10th, 2025.
Q And was that a lateral move or a promotion?
A A promotion.
Q And do you know who made the decision to give you that promotion?
A Jackie Hendrick.
Q Okay. All righty here. Let me -- and I'm going to be sharing some exhibits with you as we talk today, so let me -- and if you have any difficulty seeing any of these exhibits, which I don't anticipate



you will, but just let me know.
A Okay.
Q Oh, well, you might, actually. Hold on. Let me fix this. There we go.
MS. ARTAZA: All right. I'm going to mark this as Exhibit 1.
(Exhibit 1 marked.)
Q Is this a true and correct copy -- and I can scroll through it -- of your W-2s issued from Future from 2022 through 2023 and then on 2024?
A Yes.
Q Okay. And let me kind of back up a little bit and talk to you about your HR experience before you began working for Future.
(Exhibit 10 marked.)
Q I'm going to show you what's been marked as Exhibit 10. Sorry these are out of order. And I can scroll through this slowly.
Is this a true and correct -- my first question is going to be, is this a true and correct copy of your LinkedIn page?
A Yes.
Q Okay. Oh, let me open it. Okay.
All righty. So if we scroll down to your experience, it looks like before you worked for

A Marivel is paid through Future. Jorge and Robert are paid through B Comm.
Q And then currently in the 2023, '24, or '25 time frame, when you said that Naomi is over all of Future Communications, does she play any role with respect to Future Gas?
A No.
I'm sorry. Can you repeat that?
Q Sure. During the '23, '24, '25 time frame, does Naomi Gonzalez play any role with respect to Future Gas?
A Okay. I'm trying to think when we did the transition. Partial 2023.
Q Okay. What were --
A I'm sorry. I'm getting my dates mixed up.
Q Okay.
A 2023 -- apologies. There's been so many changes. 2023, 2024. When did we do that? I can't recall right now with the dates with 2023.
Q Okay. So at some point, Naomi Gonzalez supported Future Gas and -- well, let me back up.
At some point, did Naomi Gonzalez support Future Gas and Future Communications?
A Yes.
Q Okay. And then it was transitioned so that



she only supports Future Communications, correct?
A Correct.
Q And you just don't know exactly when that occurred?
A It was whenever the company was restructured to line of business, so it had to have been in 2023. So, I believe, January 2023, they were starting -- or there was talks of starting to do the restructure. And then that's when we were doing the transition to hand off to Ms. Chapman.
Q Okay. Oh, you're talking about Ms. -- Ms. Chapman Byrd?
A Yes. Sorry.
Q Oh, okay.
A Chapman Byrd, yes.
Q Yes. Oh, okay. Okay. So -- yeah. So we -- okay.
So when she was employed is when Naomi Gonzalez was supporting Future Gas, when Ms. Byrd was employed?
A Correct.
Q Okay. Now, in terms of the business units that you currently support, you support Future Communications, B Comm, Talus -- Talus?
A Talus.



Q Okay.
A Correct.
Q And then are there any other business units that you currently support?
A No.
Q Okay. Now I want to transition back down -- I guess over to the 2022, 2023 time frame for -- to the time period when Ms. Byrd was employed.
And you understand if I say "Ms. Byrd" or "Ms. Chapman Byrd" or "Charlotte," do you understand that I'm talking about Charlotte Chapman Byrd?
A Yes.
Q Okay. So I want to transition to that time frame.
Now, when -- and so at that point, you were an HR manager. Now, as an HR manager, what business units did you support?
A During which period? There's been a lot of --
Q So during --
A -- changes.
Q -- 2022, 2023, when Ms. Byrd was employed.
A So all of Future, including Gas and B Comm.
Q What about Renewable? Is that a business unit that would have been underneath you?
A No. Not that I recall, no.



Q Okay. And what about PDS Southwest?
A I -- I don't recall.
Q If that was a -- well, strike that.
If -- well, if that was a business unit that was underneath you in the 2022, 2023 time frame, is that something that you think you would have remembered?
A Probably so, but we were regionally based, and so I don't think I -- I did, but, again, we were regionally based, so -- and it's -- that's been years, so I don't remem- -- remember everything.
Q Okay. All right. Let me stop sharing this document.
(Exhibit 3 marked.)
Q I'm going to share what's -- I've marked as Exhibit 3. And I just want to ask you some questions about this document. I think we'll just go page by page, just to make it easiest, essentially.
Is this a true and correct copy of all of the HR employees that have been employed by Future Infrastructure since 2022, with the exception -- well, strike that, actually -- since 2022?
A Yes.
Q Is this list missing any HR?
A No.
Q Well, I guess it doesn't include -- oh, I'm

name?
A Yes.
Q Okay. So just to make sure I'm clear, Naomi Olvera and Naomi Gonzalez are the same person?
A Yes.
Q Okay. Thank you.
(Exhibit 6 marked.)
Q Okay. And then -- okay. I'm going to share with you what's been marked as Exhibit 6. And this is an -- I'll represent that it looks like this is some type of organizational chart as of 11/28/2022.
A Yes.
Q Okay. And so in 2022, did you have two employees underneath you?
A Yes. This was during the acquisition. We acquired B Comm, and that was the HR rep for B Comm.
Q And are you referring to Kelsey --
A Kelsey --
Q -- Valadez?
A Yes.
Q Do you recall why -- do you recall when B Comm was acquired?
A I'd say the summer of 2022, so -- yeah, June or July.
Q Okay. And so Ms. Valadez was the B Comm HR



rep. What happened -- is she still employed with the company, to the best of your knowledge?
A No, she is not.
Q Do you know when she was let go?
A She resigned and she left this year. She was transferred into operations.
Q Do you recall when she was transferred into operations?
A I'd say maybe March of 2023.
Q Okay. Let's see. Okay. And then let me -- do you have any sort of HR certifications?
A Like a SHRM or PHR?
Q Yes.
A No.
Q Okay. Okay. Okay. So -- and I kind of want to focus on the late 2022, 20 -- early 2023 time frame, just for your point of reference.
So -- so when B Comm was acquired, at that time, you had B Comm and Future, correct?
A Correct.
Q And for Future, you had Future Communications and Future Gas underneath you?
A Correct.
Q Sorry. You're breaking up just a little bit.
A Yes, correct.



Q Okay. That's much better. That's much better.
So in early 2023, do you think it's fair to say that you needed additional help in terms of HR support with respect to Future and B Comm?
MS. PLAGENS: Objection; form.
A Can you repeat the question? Sorry.
Q Yeah. In the 2022, 2023 time frame -- it's my understanding that B Comm was acquired in the summer of 2022 -- did you feel as if you needed additional help in terms of HR support with respect to Future and B Comm?
A Yes. We needed more entry level.
Q And when you say "entry level," what do you mean by that?
A Coordinators, specialists, somebody to conduct onboarding.
Q Okay.
MS. PLAGENS: Carmen, we've been going about an hour. Would this be a good time for a break or are you in the middle of --
MS. ARTAZA: Yeah. I mean, this is fine. I think that I actually am about to transition into a little bit of a different topic, so this is a good time. So we can go off the record.
THE REPORTER: All right. I'm off the



record.
(Recess taken from 12:04 to 12:15 p.m.)
THE REPORTER: Back on the record.
MS. ARTAZA: All right. Thank you.
Q (BY MS. ARTAZA) All right. Just as a point of like clarification, when did you begin reporting directly to Jackie Hendrick?
A Maybe sometime in 2023. I don't recall.
Q Do you recall how you were informed of that change?
A Probably in our HR team meeting, but I'm not a hundred percent sure.
Q And do you take any notes during the HR team meeting?
A Sometimes.
Q And is it your practice to retain those notes?
A Yes.
Q Do you still have notes in your possession from the 2023 time frame from the HR team meetings?
A Probably not because our office flooded --
Q Do you recall when --
A -- so a lot of my stuff --
Q I'm sorry.
A -- was damaged. Sorry. Yeah, a lot of -- a

for -- for Future. Is that accurate?
A No. She was going to take over Future Gas.
Q Okay. So you were going to retain Future Communications; is that correct?
A Correct.
Q And at that time, do you remember how many employees were under Future Gas?
A I'd say roughly 70. Excuse me.
Q You're fine.
Okay. And do you know why those employees were going to be transitioned over to Ms. Byrd?
A No. It was just shared with me that she was just going -- she needed some additional work.
Q Who told you that?
A Alicia.
Q Do you recall when she told you that?
A I do not.
Q Okay. Did Ms. Campbell ever give you any other reason as to why those Future Gas employees were going to be placed underneath Ms. Byrd?
A No. Not that I can recall, no.
Q Okay. And -- and after Ms. Byrd was let go, do you know who was responsible for seeing the Future Gas employees with HR matters?



A It -- I believe it -- it moved under Teresa Berry, because we had -- the organization had restructured to lines of business, and Teresa was over Gas.
Q Did an employee named Tessa also assist Ms. Byrd with the Future Gas employees?
A Yes.
Q After Ms. Byrd was let go, did Tessa continue to help with the Future Gas employees, to the best of your knowledge?
A Yes.
Q Do you know whether or not any other employees assisted with the Future Gas employees after Ms. Byrd's termination besides Tessa?
A No. Tessa was only responsible for onboarding, so not -- not to my knowledge.
(Exhibit 2 marked.)
Q Okay. I'm going to show you what I've marked as Exhibit 2. Okay. This is a series of e-mails that we're going to go through, and I just want to ask you some questions about each of these documents.
Is this a true and -- is this first e-mail, dated January 19, 2023, a true and correct copy of an e-mail that you sent to Ms. Byrd?
A Yes.



Q Okay. And why -- why are you sending her this e-mail?
A Because it was part of the transition, and I was just giving her a list of -- of contacts and who -- who she could contact for any specific matter.
Q Okay. Okay. And then it -- it looks like if we go to the second page of this document, which is Bates labeled 3989, is this a true and correct copy of an e-mail that you sent to Ms. Byrd on January 20th, 2023?
A Yes.
Q And it looks like this is a meeting invite, where you were inviting Ms. Byrd and Ms. Tanner to a meeting, and is -- is that accurate?
A Yes.
Q And is that a meeting to transition Future over to Ms. Byrd?
A Yes, it was part of it. They needed to receive training.
Q What kind of training did they need to receive?
A How to enter new hires into the system.
Q And is it your testimony that -- was that for all of Future or just Future Gas?
A Future Gas.



Q Okay. Okay. And then did Ms. Byrd and Ms. Tanner ultimately come to Mesquite and have that meeting for the transition?
A They did come up there. I don't think they came during the -- the original invite.
Q Okay.
A But they did -- they did come up to -- to Mesquite to train, yes.
Q Okay. Now, if we scroll down to this document that's 3783, is this a true and correct copy of an e-mail sent to you -- sent by you to Charlotte on January 19, 2023?
A Yes.
Q Okay. And it doesn't specify anything about Future Gas employees, correct?
A Correct. They all were under the same PTO plan.
Q Okay. When you say they were all under the same PTO plan, what did you mean by that?
A Future Gas and Future Telecommunications.
Q Okay. And if we keep scrolling, is this a true and correct copy of an e-mail -- it is Bates labeled 1267 -- from yourself to Colby Sparks, dated January 23rd, 2023?
A Yes.

Q Okay. And, again, in this e-mail, you told Mr. Sparks that, apologize for the misunderstanding, but we've determined to start the transition immediately and to have it complete by February 6. Is that accurate?
A Yes.
Q Okay. We'll keep scrolling here.
If we look at this next document, which is 4130, is this a -- and it -- is this a true and correct copy of an e-mail sent to Ms. Byrd on January 24th, 2023, from -- that you sent her?
A Yes.
Q And then if we look at the next document, which is 3787, is this a true and correct copy of an e-mail that you sent to Ms. Byrd on January 24th, 2023, titled RE: CO 143 UKG Access for Tessa?
A Yes. It looks like an e-mail to me from Charlotte.
Q Oh, yeah. I'm sorry. It's an email to you from Charlotte. Is that -- is that accurate?
A Yes.
Q What does 143 stand for?
A Future.
Q Okay. Okay. Is this No. 3789 a true and correct copy of an e-mail that Charlotte sent you on January 25th, 2023, and it's titled BG Check Guidelines



& Criteria?
A Yes.
Q Okay. And then if we continue scrolling, we're at document -- this document is numbered 4125.
Is this a true and correct copy of an e-mail that you sent to Morgan Reconnu on January 25th, 2023?
A Yes.
Q Okay. What is the difference between PDS Gas and Future Gas?
A So it's -- it's still the same business. It's just PDS was Company 187 and Future is Company 143.
Q What --
A Future Infrastructure did communications and gas. They were in both industries.
Q Okay. Why would -- why was Ms. -- if you know, why was Ms. Byrd added to 1 -- Company 187 as opposed to Company 143?
MS. PLAGENS: Objection; form.
A I'm not sure. She would have needed access for -- or, excuse me -- she would have needed to be on that e-mail thread for a reason. I'm not sure. I can't recall right now.
Q Okay.
A Unless because PDS Gas, that was Colby's



group. So maybe because it fell under Colby and she needed to get -- she needed to be on that e-mail thread because she would be approving payroll, personnel actions for Colby's group. That's what I'm -- that's the only thing I can think of as why she would need that.
Q Okay. If we go down to No. 3985, is this a true and correct copy of a canceled meeting invite that you sent to Ms. Byrd?
A Yes.
Q And it looks like this meeting, it was a transition meeting. It was supposed to start at 8:30 a.m. and end at 1:30. Is that accurate?
A Yes.
Q Okay. So you anticipated the transition meeting would take approximately five hours?
A Well --
Q Or four --
A -- it was a long drive --
Q Four hours --
A -- so we wanted to make the most of it, so -- probably, so yeah.
Q Okay. And then -- okay. And then I'm -- this document is 3793. Is this a true and correct copy of an e-mail that you sent to Tessa and Charlotte on



January 26th, 2023?
A Yes.
Q And if we look at No. 3796, is this a true and correct copy of an accepted meeting invite from Ms. Byrd?
A Yes.
Q And if we look at -- the first page of this is 4123. Is this a true and correct copy of an e-mail that you sent to Naomi Gonzalez on January 31st, 2023, that is titled Update Severance Guidelines?
A Yes.
Q And if we look at the next document, which is 3986, is this a true and correct copy of an e-mail sent to you from Tessa Tanner on February 1st, 2023?
A Yes.
Q And if we look at the bottom -- well, strike that.
Okay. And if we look at this document, which is 3799, is this a true and correct copy of an e-mail sent from you to Ms. Byrd on February 1st, 2023?
A Yes.
Q Okay. And then if we look at this document, which is 3797, is this a true and correct copy of a meeting invite that you sent on or about February 1st, 2023?

A Yes.
Q And that meeting is scheduled for two hours, correct?
A Yes.
Q Okay. And so do you know whether or not y'all had this Teams meeting?
A I don't recall.
Q Okay. And then if we look at this next document, which is 4121, is this a true and correct copy of a meeting invite that is sent by you to yourself, Ms. Tanner, Ms. Gonzalez, and Ms. Byrd for a meeting to occur on February 9th, 2023?
A Yes.
Q And that meeting was set to last from 9:00 a.m. to 2:00 p.m., correct?
A Yes.
Q Okay. And the purpose of that meeting was for onboard training and transition discussion, correct?
A Correct.
Q And then if we scroll down, and there is a document, Document 3820. Is this a true and correct copy of an e-mail that you sent to Ms. Byrd on February 9th, 2023, which is -- the subject is Sign-On Bonus Program [sic]?
A Yes.



Q Okay. And -- okay. And then the last page of this document, is that a true and correct copy of a -- some type of message between yourself and Ms. Byrd?
A Yes.
Q Okay. And so after February 9th, 2023, do you know if you had any additional e-mail communications with Ms. Byrd?
A I don't recall.
Q Okay. Let's see.
(Exhibit 9 marked.)
Q Okay. And then I am going to pull up what I've marked as Exhibit 9. Okay. Is this a true and correct copy of an e-mail that you sent to Colby Sparks on January 23rd, 2023?
A Yes.
Q And -- okay. And, I'm sorry, we actually looked at some of these documents in Exhibit 2, I believe, but if we scroll down to 1269, it looks like -- hold on -- it looks like Colby is under the impression that Charlotte is the HR contact as of January 23rd, 2023, correct?
A Yes, that's what it appears.
Q Okay. Okay. And then if we look at the e-mail above that -- oh, I'm sorry -- well, strike that.
Okay. When you testified earlier that



Ms. Campbell told you that Ms. Byrd was going to be taking over the Future Gas employees, when you had that conversation with Ms. Campbell, did she tell you that Ms. Byrd would only be taking over the Future Gas employees for a short duration?
A No. Not that I recall, she didn't, no.
Q Okay. And so after -- well, strike that. Well -- okay.
MS. ARTAZA: If we -- I'm about to shift to a different subject -- well, a little bit of a different subject.
MS. PLAGENS: We've been going a little over an hour, Carmen. Do you want to take a break? Would this be a good time?
MS. ARTAZA: Yeah. So I was going to say, if we want to take a break, right now would be a really good time.
MS. PLAGENS: Okay.
MS. ARTAZA: Okay. So we want to come back at 1:32? Does that work?
MS. PLAGENS: Yeah, 10 minutes is cool.
MS. ARTAZA: Okay. Thank you.
THE REPORTER: I'm off the record.
(Recess taken from 1:22 to 1:38 p.m.)
THE REPORTER: I'm back on the record.



Q (BY MS. ARTAZA) Okay. I want to pull up what I'm going to mark as Exhibit 4.
(Exhibit 4 marked.)
Q Okay. Okay. Is this a true and correct copy of an e-mail with a message attached that you sent to Alicia Campbell on February 20th, 2023?
A Yes.
Q Okay. And I want to ask you a few questions about this document. If we look at the second page, that appears to be the same kind of messaging that we saw in Exhibit 2. Is that from a Teams message?
A Yes.
Q Do you have the rest of the Teams messages -- the rest of your Teams messages with Charlotte?
A No.
Q Why did you share this message with Ms. Campbell -- with Ms. Campbell?
A So prior to us meeting for the transition and the training, Charlotte had canceled our -- I believe it was the original meeting where her and Tessa were supposed to come up to Mesquite for the training. And that meeting was canceled.
She sent me a text message around 6:00 that morning and asked if we could just do the meeting over Teams. And I didn't see the message until

and Tessa were assigned to help you with Future, who was helping you with Future?
A Naomi. It was just Naomi and I.
Q Just Naomi and yourself?
A (Moving head up and down.)
Q Okay. When does Ms. -- well, let me back up.
At some point Ms. Byrd was terminated, correct?
A To my knowledge, yes.
Q Okay. So when did you learn that Ms. Byrd had been let go?
A Probably the day of or the -- the day after. Normally, you know, when there's changes within a department, after it happens, the team is pulled together and informed.
Q So you were not informed before she was let go?
A No.
Q And who told you she had been let go?
A I'm sure it would have been Alicia. She was the leader of the -- the group.
Q Sitting here, do you remember why you were told she had been let go?
A Yes. It was a reduction in work force. So to my understanding, the group that Charlotte was hired to



manage, Primoris decided to dissolve it and, therefore, there was -- there is no work for her.
And so even though Alicia never told me directly when she told me she was going to give Charlotte Future Gas, that was kind of my assumption that something was going on because I also knew we were restructuring the company to -- to lines of business and Gas was going to be moved under Teresa, and Teresa already had two managers at the time, so I was wondering where would Charlotte go.
Q Okay. So -- but what specifically were you actually told with respect to the reason that Ms. Byrd was let go?
A That it was a reduction in work force due to a -- to a lack of work because the group that she was hired to manage was dissolved.
Q Okay. So the -- okay. So let's say Ms. Byrd was fired on February -- February 21st, 2023.
The next day, February 22nd, 2023, assuming that's not a Saturday or Sunday, who took over handling the Future Gas employees?
A I think it went back under me until me and Teresa did our transition, which I think that took place in May of 2023 -- April or May, something in that time.



Q Okay. Did anyone ever ask you about whether or not Ms. Byrd should be fired?
A No.
Q Let's see here. Did you have any conversations with Ms. Bagony, Ms. -- or Ms. Wood or Ms. Hendrick about Charlotte's termination?
A No.
Q Are you aware of the -- well, let me see.
During the time that -- from, let's say, February 2023, March 2023, were you aware at that time that Ms. Byrd had been investigating a complaint about the employee where the N-word was used and that she had -- that the employee had been pressured to change his witness statement?
Were you ever aware any of allegations like that --
A No.
MS. PLAGENS: Objection; form.
Q -- during the February and March time frame?
A No.
Q Did you ever discuss with Ms. Kelly Wood her investigation into an incident where an employee had been called the -- the N-word?
A No.
MS. PLAGENS: Objection; form.



Q Okay. Did Kelly Woods ever say anything, I guess, negative to you about Charlotte during the time that she was employed or shortly after her termination?
A No.
Q Did Paula Bagony ever say anything negative to you about Charlotte either when she was employed or shortly after her termination?
A No.
Q Did -- did Alicia Campbell ever say anything negative to you about Charlotte either while she was employed or shortly before -- shortly after her termination?
A No.
Q During the 2022, 2023 time frame, were you ever asked to look at the HR employees underneath you and to consider them for a reduction in force?
A No. I only had one person, so no.
Q Okay. So you just had Naomi and that was it?
A Correct.
Q Okay. Okay. Let me see here. How -- okay. Let me -- now, Colby Sparks, when you were handling Future, all -- all of Future Communications and Gas, how long did you work for Colby -- with Colby Sparks for?
A I don't recall. I -- I -- I don't recall how

long I worked -- I managed his group. I'm not sure.
Q Okay. And when you say "managed," is -- so Colby's group, what does that consist of exactly?
A Meaning?
Q Is it just Future Gas or is it -- I mean, or are there -- when you say like Colby's group, like --
A Yes.
Q -- what is his group --
A His -- his Gas --
Q -- referring to?
A -- employees.
Q Okay.
A His PDS gas employees --
Q Okay.
A -- including Future, yes.
Q And do you know how many PDS Gas employees he has?
A Currently?
Q No. At the 2022, 2023 time frame.
A Definitely less than 500, I think. And I think I'm pushing -- I'm pushing it. It might be -- might have been like 200. It was not a lot.
Q Okay. And so would Ms. Byrd have also been responsible when she took over the Future employees for also managing the PDS employees?



A I believe so, yes.
Q Okay. Okay. Let's see here. And -- okay. So let's see here.
Did -- have you ever heard Ms. Campbell express discontentment about Lisa Scott?
A I don't --
Q Leslea Scott --
A -- know who Lisa --
Q Sorry.
A Oh. I was like I don't know a Lisa Scott. Sorry.
Q Yeah. Sorry.
A I'm sorry. Can you repeat the question?
Q Did you ever hear Ms. Campbell express discontentment about Leslea Scott?
MS. PLAGENS: Objection; form.
A She expressed frustration.
Q Okay. Tell me about that.
A Leslea was a very difficult person to work with.
Q Why was Leslea a difficult person to work with, in your opinion?
A She would talk over you. She would listen to respond, not listen to actually understand. Yeah, it was -- it was just very difficult to -- to work with --



with her.
Q So would Ms. Campbell express frustrations about Leslea Scott to you?
A When we would be on -- well, and when I'm saying now, not during that time. I'm saying now that we all report to Jackie. And, yes, there was some frustrations that were expressed.
Q Did Ms. Campbell ever express frustrations to you regarding Ms. Byrd?
A No.
Q Okay. And then how would you describe your working relationship with Colby Sparks?
A From what I recall, we didn't have an issue from what I recall.
Q Okay.
A In fact, when he was taking over the Future employees, this was before we eliminated Maribel's role, Maribel did not have a very good reputation with the Future Gas guys, and one of the Gas guys had basically forewarned Colby about it, and Colby went to Alicia and actually asked if I could be over his group instead of her so...
Q Okay. Let's see here. Okay. Let me just start -- I'm kind of going to start jumping all over the place a little bit, so sorry in advance.



Okay. Before Future was acquired by Primoris, do you recall what the head count was for Future?
A Maybe right at a thousand.
Q Okay. And that would be for the Communication -- was it Communication and Gas at that time too?
A Yes.
Q Okay.
A So it might have been more, because we had actually also just acquired Pride Utilities, so it might have been more. I -- I just -- I don't recall.
Q Okay. Okay. And then -- let's see here. Do you know why Kelsey Valadez was transferred -- transferred to operations?
A Yes.
Q Can you tell me about that?
A She was part of the assessment that Jackie did and Kelsey did not have HR experience or background.
Q Okay.
MS. ARTAZA: Okay. Okay. Let me just look at my notes. If it's okay, let's just -- can I just take like five, 10 minutes and look at my notes really quick? Because I think I might just be wrapping up.

MS. PLAGENS: Objection; form.
A No. Not that I can think of at the moment, no.
Q Okay.
MS. ARTAZA: All righty. Well, I will pass the witness then.
MS. PLAGENS: I'll reserve questioning for time of trial.
May we have 30 days to read and sign, please?
MS. ARTAZA: Of course.
THE REPORTER: All right. I'm off the record.
MS. HOPKINS: Before we go off the record, Ms. Mabry needs to read us off the record.
THE REPORTER: Okay.
THE DEPOSITION OFFICER: Thank you, Christine.
Does she need to record again?
MS. PLAGENS: I don't --
MS. HOPKINS: I'm still recording.
MS. PLAGENS: -- think the recording stopped.
THE DEPOSITION OFFICER: Okay.
MS. HOPKINS: I'm still recording.



THE DEPOSITION OFFICER: Okay. Sorry. Thank you.
So thank you to everyone here. This does conclude our remote video deposition proceeding for the day. The time is currently 2:36 p.m.
(Deposition concluded at 2:36 p.m.)



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLOTTE CHAPMAN BYRD, )
)
Plaintiff, )
)
VS. ) CIVIL ACTION NO.
) 3:24-cv-2767-N
PRIMORIS SERVICES )
CORPORATION, PLH GROUP, )
INC., POWER LINE )
SERVICES, INC., and )
FUTURE INFRASTRUCTURE, )
LLC, )
)
Defendant. )

REPORTER'S CERTIFICATION
DEPOSITION OF SHUNTE CURTIS
DECEMBER 15, 2025

I, TAMMY DICKSON CROSS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, SHUNTE CURTIS, was duly sworn by the officer and that the transcript of the oral examination is a true record of the testimony given by the witness;

I further certify that the signature of the deponent:

X was requested by the deponent or a party before the completion of the examination and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and



Corrections page contains any changes and the reasons therefor;

was not requested by the deponent or a party before the completion of the examination.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys to the action in which this proceeding was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 31st day of December, 2025



TAMMY DICKSON CROSS, Texas CSR #6925
Expiration Date: 07/31/26
VERITEXT LEGAL SOLUTIONS
Firm Registration No. 571
300 Throckmorton, Suite 1600
Fort Worth, Texas 76102
Telephone: (800) 336-4000

Ms. Carmen Artaza
carmen@tremainartaza.com

December 31, 2025

RE: Chapman Byrd, v. Primoris Services Corporation Et Al.
12/15/2025, Shunte Curtis (#7795896)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions



Chapman Byrd, Charlotte v. Primoris Services Corporation Et Al.
Shunte Curtis (#7795896)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________

________________________________ _______________
Shunte Curtis Date



Chapman Byrd, Charlotte v. Primoris Services Corporation Et Al.
Shunte Curtis (#7795896)

ACKNOWLEDGEMENT OF DEPONENT

I, Shunte Curtis, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Shunte Curtis Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

# PLAINTIFF'S EXHIBIT 10

CAUSE NO. 3:24-cv-2767

| | | |
|---|---|---|
| CHARLOTTE CHAPMAN BYRD, | ) | IN THE DISTRICT COURT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| PRIMORIS SERVICES CORPORATION, PLH GROUP INC., POWER LINE SERVICES, INC., and FUTURE INFRASTRUCTURE, LLC, | ) | DALLAS COUNTY, TEXAS |
| | ) | |
| Defendants. | ) | 134TH JUDICIAL DISTRICT |

ORAL DEPOSITION OF
PAULA BAGONY
NOVEMBER 19, 2025
(REPORTED REMOTELY)

ORAL DEPOSITION of PAULA BAGONY, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 19th of November, 2025, from 10:02 a.m. to 2:36 p.m., before Audra B. Paty, CSR in and for the State of Texas, reported by machine shorthand, in the City of Dade Florida, County of Miami-Dade, State of Texas, pursuant to Notice and the Texas Rules of Civil Procedure.

Job No. CS7759666

retaliation and retaliation. We ended up having one claim that -- the employee claimed retaliation, and it ended up going to -- he ended up obtaining a lawyer and we just settled that one with a law firm and it was basically unfounded, but there was a lot of investigation and legwork that went into that when he filed -- he didn't bring it to the forefront until he filed a lawsuit.

Q. Okay. Do you remember the name of that individual?

A. Keith.

Q. Keith what?

A. Bordman.

Q. Oh, sorry. You broke up.

A. I don't know why the Internet is bad.

Bordman.

Q. Okay.

A. B-O-R-D-M-A-N.

Q. And do you know whether a lawsuit was filed in that case?

A. They -- we ended up settling.

Q. Do you know whether or not a lawsuit was actually filed?

A. I do not.

Q. Okay. Okay. And you made a decision between



"alleged retaliation" and "retaliation." Tell me about how those two terms differ in your mind.

A. We have employees that, when they are let go for performance or PPE violation or things along that line, they will call and they'll start alleging that there was retaliation that happened on the jobsite. We do investigate it and look into it. And more than not it ends up being just an allegation because they're mad. That's what I mean by "alleged."

Q. Okay.

A. We do investigate it, but there's usually -- it's usually unfounded.

Q. And so when you refer to "alleged retaliation," is that -- are those scenarios where somebody contacts you after they have been terminated?

A. Yes, most of the time.

Q. Okay. Now, in terms of investigations that you've done of retaliation complaints, approximately how many have you -- retaliation complaints have you investigated at Primoris?

A. Just the one with Keith Bordman.

Q. Okay. Do you recall what the factual circumstances were in that complaint?

A. He was alleging that he was retaliated against because he turned in a spreadsheet that showed



a loss of -- an income loss on the project, which turned out to be unfounded. He was trying to say that the project was billing and receiving funds from the customer in advance of performing the work. And he felt like he was retaliated against because his job -- his job ended up being layoff or reduction of work, and he felt like he got laid off because he brought this claim of overbilling forward and it turned out to be unfounded.

Q. Now, when you say "it was unfounded," what leads you to the belief that it was unfounded?

A. There was a lot of documents that were provided to his legal team from our operations team and our finance teams that showed how the billing was done. It compared what he submitted on his spreadsheet saying its overbilling as opposed to what we actually billed the customer for. And they didn't match his discrepancies and what he was reporting as opposed to what we had actually billed for.

Q. Okay. Did Mr. Bordman -- was he stating that he had shared the sheet to, like, his supervisor or to somebody else within the company before he was laid off?

A. His supervisor.

Q. Okay. Who was his supervisor?



A. Russ Human.

Q. And do you recall approximately when Mr. Bordman was laid off?

A. It was the beginning of 2025, I believe, within the first quarter, I believe.

Q. Okay. Would you agree with me that an HR manager should not ask a witness to change their witness statement?

A. I would agree, yes.

Q. Have you ever been asked to have an employee withdraw or change a report of racial discrimination?

A. No.

Q. And have you ever been asked to change an employee's witness statement of any kind?

A. No.

Q. Have you -- during the time that you have been at Primoris, has there ever been an instance where you began an investigation of race discrimination or retaliation and then you were removed from that investigation?

A. Not that I'm aware of.

Q. Would you agree with me that it is wrong for an HR manager or director to pressure an employee to change -- into changing a report of racial slurs being used in the workplace?

A. Repeat that. I'm sorry.
Q. Would you agree with me that it is wrong for an HR director or HR manager to pressure an employee to change his or her statement reporting the use of racial slurs in the workplace?
A. Yes, I agree.
Q. Do you know whether companies or employees can be banned from the industry for using racial slurs?
A. Not that I'm aware of.
Q. Has -- besides the incidents that we just discussed, are you aware of any reports that you have been made aware of where an employee is accused of using a racial slur --
MS. PLAGENS: Objection, form.
Q. (BY MS. ARTAZA) -- during your employment at Primoris?
MS. PLAGENS: Same objection. Objection, form.
If you understand, you can answer, Paula.
A. It's a broad question. I'm sorry. Can you repeat it?
Q. (BY MS. ARTAZA) Sure. Besides what we have already discussed, are there any other occasions where



it's been -- where you have become aware -- during your employment at Primoris as an HR manager or senior HR manager where you have become aware of an employee using racial slurs?
A. Yes.
Q. Okay. Tell me about those occasions.
A. We have -- as an HR team, we have weekly -- sometimes biweekly calls. And on those calls, we talk about things that we're dealing with or working on throughout our week. And there's been instances where I recall team members talking about investigations that they're working on and then they refer to them as having racial connotation to them or some of them having harassment to them, but not specifically in detail what they're dealing with.
Q. Okay. And those calls, have they occurred -- have you been having those calls since 2022?
A. We have had them as long as I have been under Alicia.
Q. Okay. Do you know if anyone takes notes during those calls?
A. Not that I'm aware of.
Q. Would you ever take notes during those calls?
A. Only if I had a ticker item that I needed to follow up on.



Q. Okay. Sitting here today, do you recall any of those meetings? Do you recall any of the specific details of a racial slur or racially -- other racially charged language being discussed?
A. No, we usually don't go into great detail on them. It would just be a brief summary of what has -- not even a summary, a brief comment of what somebody's time is tied up with. If they're working on an investigation and if they're having payroll issues or if they're having login issues, things along those lines.
MS. ARTAZA: Okay. So we have been going for about an hour and 20 minutes, and I'm probably going to shift into a different topic area --
MS. PLAGENS: I was about to ask for one.
MS. ARTAZA: Okay.
MS. PLAGENS: I didn't want to interrupt your train of thought, though.
MS. ARTAZA: No, thank you so much. Okay. So do we want to come back -- it's 11:22. Do we want to --
MS. PLAGENS: Ten minutes?
MS. ARTAZA: Yes. That's perfect.
THE REPORTER: We're off the record at 11:22 a.m.



(Recess 11:22 to 11:35.)
THE REPORTER: We're back on the record at 11:35 a.m.
Q. (BY MS. ARTAZA) Okay. Perfect. All right. We just had a brief break, Ms. Bagony. Let me begin by asking you a few questions, and then we'll transition to a different area. Do you agree with me that employers must protect all employees from racial discrimination?
A. Yes.
Q. Do you agree with me that companies must investigate discrimination without inference?
A. Yes.
MS. PLAGENS: Objection, form.
Q. (BY MS. ARTAZA) You can still answer.
A. Yes.
Q. Do you agree with me that employers cannot retaliate against employees who report discrimination?
A. Yes.
Q. And do you agree with me that HR professionals must be allowed to perform their duties without obstruction?
A. Yes.
Q. Okay. Now, at some time -- point in time, it's my understanding there was an entity called PLS

were not transferred, that they were instead terminated; is that correct?
A. Yes.
Q. Okay. And that some of these employees, the documents state, were let go as part of a reduction in force?
A. Yes.
Q. Was there a reduction in force that was happening at this time, to the best of your knowledge?
A. Yes.
Q. Okay. Tell me about when you first learned about this reduction in force.
A. It was during the transfer processes. I don't know the exact date.
Q. Who told you that there was going to be a reduction in force or how did you obtain that information?
A. It would have flown from Nick Hebert on the operations team to Jackie Hendrick on the HR team to me.
Q. Did anyone tell you why there was going to be a reduction in force when this transfer was occurring -- when these transfers were occurring?
A. No.
Q. How did you know which employees to transfer



or to terminate based on when you were -- when you were moving employees out of, I guess, PLS?
A. The leadership team that was supporting PLS had access to the wave sheets, and they would make the updates and changes on the sheets throughout the process.
Q. Who was the leadership team at PLS at that time?
A. Nick Hebert. I don't remember the other gentleman's name.
Q. Okay. Did you keep any of your own Excel spreadsheets or notes about which employees should be transferred and which employees should be terminated?
A. No.
Q. Okay. Do you recall working with Charlotte Byrd?
A. Yes.
Q. And when did you first begin working with Ms. Byrd?
A. I believe the end of 2022.
Q. Now, when Charlotte was hired, what was your understanding as to the reason she was hired?
A. To assist with PLS as they grew.
Q. Okay. And do you recall where you obtained that information that she was hired to assist with PLS



as they grew?
A. One of our HR calls.
Q. And who previously had PLS under -- I guess, assigned to them as the business unit before Ms. Byrd was hired?
A. I don't know.
Q. Do you know whether or not Ms. Byrd was assigned to any other business units besides PLS?
A. I believe she was assisting with PDS.
Q. What was your understanding? Who was she assisting with PDS?
A. Colby Sparks.
Q. And when you say PDS, at that time, that was Future Gas, correct?
MS. PLAGENS: Objection, form.
A. I'm not aware if they had merged yet.
Q. (BY MS. ARTAZA) Okay. So at that time -- well, strike that.
And when you work with Charlotte Byrd, she was an HR manager, correct?
A. Yes.
Q. And you were also an HR manager at that time?
A. Yes.
Q. So essentially you guys were colleagues?
A. Yes.



Q. Did you and Charlotte have an opportunity to work together?
A. We supported two different entities.
Q. And during the time that you had to interact with Charlotte as an HR manager, did you guys have any problems?
A. No.
Q. I mean, was Ms. Byrd cordial during your calls or meetings with her, if any?
A. I didn't have a lot of interaction.
Q. Okay. Did you guys have those HR calls that we discussed earlier?
A. Yes.
Q. And during those HR calls, did -- was Ms. -- did you guys have a cordial working relationship?
A. Yes.
Q. When is the first time that you learned that Ms. Byrd would be included in a reduction in force?
A. I don't recall the date.
Q. Do you recall who told you that she would be included in a reduction in force or let go?
A. Jackie Hendrick.
Q. Was it on the phone or via e-mail or via --
A. I don't recall.
Q. Okay. Do you recall -- what do you recall

Jackie saying to you exactly?
A. I don't recall the conversation.
Q. Okay. Was anybody else -- was anyone else a witness to the conversation?
A. No.
Q. What was your reaction to learning that Ms. Byrd was going to be let go?
A. With the status of PLS and being dissolved, I wasn't surprised.
Q. Okay. Did you have any conversations with Alicia Campbell about Ms. Byrd being let go before she was actually -- before she was terminated?
A. I don't recall.
Q. Did you have any conversations with Sunita regarding the fact that Ms. Byrd was going to be let go before she was actually let go?
A. No.
Q. Did you communicate with anyone about Ms. Byrd being included as a reduction in force on Teams?
A. I don't recall.
Q. Have you reviewed your -- or, well, strike that. Have you attempted to obtain your Team chats from February 2022 time frame to see what was discussed?



A. No.
Q. Sorry. February 2023.
Did you exchange any text messages with anyone about the fact that Ms. Byrd was going to be let go as a reduction in force?
A. Not that I recall.
Q. So did Jackie, during the conversation when she told you that Ms. Byrd was going on the let go -- did she tell you when Ms. Byrd was going to be let go?
A. Not that I recall.
Q. After Ms. Byrd was let go, who took over her job duties with respect to PLS and PLH?
MS. PLAGENS: Objection, form.
Q. (BY MS. ARTAZA) I can break it down. After Ms. Byrd was let go, who took over her job duties with PLS?
A. PLS was merged into PTD.
Q. So as of February 21st, 2023, PLS was merged into PTD?
A. I believe the final merge was the beginning of March 2023.
Q. So as of March 2023, PLS was merged into PTD?
A. Yes.
Q. And if that's -- well, strike that.
Okay. Why don't we look at a few



documents?
(Exhibit No. 8 marked.)
Q. (BY MS. ARTAZA) Okay. I'm going to share what I have marked as Exhibit 8, and this is Primoris 3288 through 3290. And if we look at the first document here, it looks like this is an e-mail sent to you on February 13th, 2023, from Jackie to you. Is that a true and correct copy of an e-mail that you received?
A. Yes.
Q. Okay. And then -- so on this document Jackie tells you, "per Sean, Alicia confirmed the RIFs on this list. Sean is requesting the do-not-hires to be reviewed," correct?
A. Yes.
Q. Okay. And this -- the attachment is titled, "Copy of wave 4, 4B, 4E, 4T, PLS_Auger_Employees to PTD." And then there's a series of numbers. Do you know whether that series of numbers is supposed to be -- is the date February 27th, 2023?
A. It appears to be.
Q. Okay. Do you know why that series of numbers -- do you know why it's dated that way?
A. No.
(Exhibit No. 8A marked.)



Q. (BY MS. ARTAZA) Okay. And so I'm going to pull up the attachment which I have marked as Exhibit 8A. So if we go to the last page, it says it's native, so we're going to pull that document up, 3290. Okay. Have you ever seen this document before?
A. Yes.
Q. Okay. Is this one of the documents that you reviewed today?
A. Yes, before, yes.
Q. Okay. Do you know why there are certain names highlighted in red?
A. Signifying reduction in force.
Q. Okay. Do you know who highlighted these names in red?
A. No.
Q. Okay. And Ms. Byrd's name is not on this document, correct?
A. Correct.
Q. And I'm happy to go through each category, but sitting here today -- or through each tab, but do you recall ever seeing Ms. Byrd's name on a document like this as listed as a reduction in force?
A. Yes.
Q. Okay. But as of -- so the e-mail that I showed you dated February 13th, and so as of February

13th, 2023, is it your understanding that Ms. Byrd was not identified as a candidate for a reduction in force, correct?

MS. PLAGENS: Objection, form.

A. I don't know if she was or was not identified. She wasn't on the list.

Q. (BY MS. ARTAZA) She was not on the list. So is this document the list of RIFs?

A. This is a working document.

Q. So what does that mean?

A. It changes.

Q. Okay. Is there more than one RIF list?

A. Not that I'm aware of.

Q. Okay. So the e-mail that I showed you was February 13th, 2023, correct?

A. Yes.

Q. And I'll represent that this is the attachment. And so we can just -- I'll make this as large as I can, but under wave 4B, Ms. Chapman's name is not on this -- Chapman Byrd's name is not on the list, correct?

A. Correct.

Q. And if we look at wave 4T, Ms. Byrd's name is not on this list, correct?

A. Correct.



Q. And if we look at wave 4E, Ms. Byrd's name is not on this list, correct?

A. Correct.

Q. And so this is the RIF list as of February 13th, 2023, and Ms. Byrd's name is not on this document, correct?

A. Correct.

(Exhibit No. 9 marked.)

Q. (BY MS. ARTAZA) Okay. And I want to talk to you about what has been marked Exhibit 9. Okay. Now, Exhibit 9 is Primoris 3393 through 3395. Is this document at the top here dated February 14th, 2023, a true and correct copy of an e-mail chain between yourself and Ms. Hendrick?

A. Yes.

Q. Okay. And I want to scroll down to -- okay. Well, let me ask you this: What is Primoris Utilities and Distribution Group?

A. It was a -- one of the ways -- we had our signature line because we were supporting Utilities and Distribution.

Q. Okay. What is your current e-mail signature line?

A. I'm not sure.

Q. Okay. So we'll scroll down to this second



page of this document.

A. Uh-huh.

Q. This is an e-mail from Jackie to you dated February 14th at 11:52 a.m., and Jackie says, "Need your help on this. Please try to turn this back over to me ASAP. If that employee's name we discussed isn't on this list, maybe you put that in your e-mail back to me, the recap why we need to accelerate her transfer in this round." Do you know what employee Jackie is referring to in this e-mail?

A. Yes.

Q. What employee is that?

A. Desiree Leaders.

Q. Okay. I mean, what was the situation with -- okay. And I'm going to scroll back up because I do -- it looks like you do mention her at the top here. Do you know, like, why was -- what was the concern with Desiree Leaders, if any?

A. Sure. She supported operations and she needed access to the PLS system and the Primoris system as part of the transition. They were moving her outside of the normal wave, which required additional work on the back end to get her moved. She had been moved over to Primoris, but did not have access to all of the software. So Nick Hebert, who



requested her to be moved outside of the wave, was asking to get her expedited, and he was unaware that she had already been transferred and we were just trying to get her software access.

Q. Okay. So let me go back down here. If we look at the -- well, strike that.

(Exhibit No. 10 marked.)

Q. (BY MS. ARTAZA) Okay. I'm going to show you what's been marked as -- no, wait. Let me strike that.

Okay. I'm going to show you what's been marked as Exhibit 10. Okay. This document is Primoris 1486 through 1489, and then I have copied a portion, not all, of a native document, the 1489 native document. I've copied a portion of that into this exhibit. And so it does not have a Bates label, but it is 1489 -- it's a portion of 1489, but we will be discussing this document. So is this second e-mail here that I'm about to highlight -- is this a true and correct copy of an e-mail that you sent on February 16th, 2023, to Sunita Khorana?

A. Yes.

Q. Okay. And you mention that there are several highlights on the list. Do you know who made those highlights?

A. No.
Q. Did you make those highlights?
A. Not that I recall.
Q. It mentioned that Danny Leigh's last day is tomorrow, so he will not need transferred. Do you know why Mr. Leigh's employment ended?
A. He resigned.
Q. Do you know why he resigned?
A. I do not.
Q. And do you know why -- so if we look at the e-mail chain, it looks like you sent this document to Sunita at 9:07 a.m., but then Sunita forwards it to Nicholas -- and I'm sorry, how do you pronounce his last name?
A. Hebert.
Q. -- Hebert at 8:58 a.m.?
A. Are you requiring why she sent it to Nick?
Q. Well, do you know why there is a time difference in between the 9:07 and then it looks it's 8:58 when she forwards it?
A. I don't know.
Q. Okay. And you don't know where Sunita is located, correct?
A. No, I don't know.
Q. Where is Nicholas located, if you know?



A. He's no longer with the company, but he was in Louisiana.
(Exhibit No. 10A marked.)
Q. (BY MS. ARTAZA) Okay. So I'm actually just going to pull up what I marked as 10A, which is the actual Excel document. Okay. Let me make this bigger. Okay. Have you ever seen this document before?
A. Yes.
Q. Is this one of the documents you reviewed today?
MS. PLAGENS: Objection, form.
Q. (BY MS. ARTAZA) You can answer.
A. I was looking at it. Yes, I think so.
Q. Okay. What is this document?
A. It's part of the working form that comes out from the acquisition team with data.
Q. Okay. So this document comes from the ac -- excuse me, acquisition team?
A. Yes.
Q. Okay. And this document has Ms. Byrd listed as a reduction in force, correct?
A. Yes.
Q. Okay. And it looks like you sent -- well, did you send this document as an attachment with your



e-mail to Sunita Khorana on February 16th, 2023?
A. I don't recall.
Q. Okay. Sitting here today, do you recall whether or not you had the conversation with Jackie Hendrick before or after February 16th, 2023?
A. I don't recall.
Q. Now, on this document, Exhibit 10A, there are no dates listed as to when the employees are supposed to be terminated, correct?
A. Correct.
Q. And sitting here today, if there was more than four waves as parts of the transfer, do you have any reason to dispute that Ms. Byrd was supposed to be part of the very last transfer from PLS to PTD because she needed to maintain access to the HR side of PLS until the end?
MS. PLAGENS: Objection, form.
A. I wouldn't have that knowledge.
Q. (BY MS. ARTAZA) Okay. So you wouldn't know at what wave Ms. Byrd was supposed to be transferred?
MS. PLAGENS: Objection, form.
Q. (BY MS. ARTAZA) Have you ever reviewed any other document besides this document that has Ms. Byrd listed as a RIF?
A. Other than the working document?



Q. Well, this -- other than this document that I'm showing you, have you ever seen Ms. Byrd's name identified with the RIF next to it on any other document or Excel spreadsheet besides this Exhibit 10A?
A. I don't know.
Q. Okay. If someone's name was highlighted in green on one of these Excel spreadsheets, what did that mean?
A. I'm not sure.
Q. And so sitting here today, what is your understanding as to who made the highlights on Exhibit 10A?
A. The manager's associated with the employee.
Q. Okay. And for Ms. Byrd, who would that have been?
A. Jackie Hendrick.
Q. Okay. What about Alicia Campbell?
A. Not for this particular wave or acquisition.
Q. Why do you say that? Like, why are you so sure that she was involved in highlighting the various employees' names or making determinations as to which employees would be transferred or terminated?
A. At the time of this acquisition or transfer was happening, Alicia was involved in a completely

Page 74

separate investigation with some PLS employees that pulled her out of participating, removed her from participating in this particular transfer from PLS to PTD.

Q. Okay. What investigation was Alicia involved in at the time that prevented her from participating?

A. It was a high-level investigation with some senior leadership that was quite lengthy.

Q. What senior leaderships was involved? Who in senior leadership was involved?

A. Nick Hebert was one of them. I don't remember the other parties involved.

Q. Oh, I forgot to ask you earlier: When you conduct an investigation, is it your practice to create a report at the end of your investigation?

A. Yes.

Q. Okay. And so would there have been an investigation report for this Keith Bordman?

A. Yes.

Q. And would there have been an investigation report for the other two issues that occurred, the one that was last year regarding the subcontractor and the one that occurred in 2022?

A. Yes.

Q. Okay. Let me kind of switch gears back to

Page 75

where we were. What -- okay. So it was a high-level investigation. Do you know how long the investigation took?

A. Several months.

Q. Do you recall when it started?

A. No.

Q. Do you recall when it ended?

A. No.

Q. So it involved -- okay. And so what was being investigated, to the best of your recollection?

A. I wasn't privy to all of that information.

Q. So what's your understanding as to what the investigation consisted of?

A. Fraudulent contracts.

Q. And fraudulent contracts in terms of what was -- when you say "fraudulent contracts," what do you mean by that?

A. It was investigated on the acquisition of PLH and whether or not the numbers that were presented at the time of sale were after it or if they were inflated.

Q. So you're saying whether or not the numbers that PLH had at the time it was acquired by Primoris?

A. Yes.

Q. And that was -- when was PLH acquired again?

Page 76

A. I don't know.

Q. Okay. And who was the individual that was allegedly inflating these numbers?

A. I don't know. That's what the investigation was for.

Q. So what was Nick -- can you say his last name again? I'm sorry. I keep wanting to say --

A. Hebert.

Q. Hebert. Okay. What was his involvement?

A. I don't know. I didn't handle the investigation.

Q. And sitting here today, you don't recall when the investigation was completed?

A. No, I don't.

Q. Is it possible that PLH was acquired sometime in August of 2022?

A. I honestly don't know.

Q. Okay. Oh, I'm sorry. Let me ask you -- let's -- well, actually we don't need to look at an exhibit, I don't believe, for this question, but during the PLS to PTD transfer, on several documents, there are discussions about whether or not an employee is eligible for rehire. Who makes a determination of whether or not an employee is eligible for rehire?

A. It's a joint effort between HR and

Page 77

operations.

Q. And what is -- how is it determined or what goes into the determination of whether or not an employee is eligible for rehire?

A. We look at the reason for separation, whether it was termination with cause, termination without cause, resignation.

Q. Okay. And so on that document that we just reviewed, Exhibit 10A, some people were in blue and some people were in red. It's my understanding that the blue people were eligible for rehire based on your e-mail. Let me just pull that e-mail up just so you can see it. Okay. Let's see here. Okay. Can you see Exhibit 10 again?

A. Yes.

Q. And in here you say the ones in blue will be rehires that are eligible for rehire, correct?

A. Yes.

Q. Oh, sorry. And, again, you did not make that color coding?

A. For the rehires, I may have, yes.

Q. Okay. So --

A. And the orange.

Q. Okay. So you made the orange and the blue. Do we know who made the red?

A. No.
Q. Why isn't Charlotte listed as eligible for rehire on this Exhibit 10A? And I'll just pull down. This is a portion of the native Exhibit 1489.
A. Charlotte wouldn't have been a rehire.
Q. I understand, but why isn't she listed as eligible for rehire?
A. The employees listed in blue are employees that had worked for Primoris previously. They left Primoris and went to work for PLH. So we were vetting them to see if they were eligible to come back to Primoris as part of the acquisition. Charlotte would not have fallen in that category.
Q. When did the employees that were highlighted in blue -- when were they -- when did they go to PLH?
A. They would have been at all different times. They would have resigned from -- they would have either resigned or been separated from Primoris, and they sought work elsewhere under PLH prior to them being acquired by Primoris.
Q. Okay. So if an employee was previously employed at PLH and they were essentially coming back over as part of this transition, then they would be in blue?
MS. PLAGENS: Objection, form.



A. If they previously worked for Primoris, they left Primoris, went to work for PLH before they were acquired, standalone entity PLH, now we purchased PLH and we're vetting to see if these employees are eligible to come back to Primoris based on the reason they initially left Primoris.
Q. (BY MS. ARTAZA) Okay. And, again, this document does not have a RIF date for any of the RIF candidates that are highlighted in red here, correct?
A. Correct.
Q. And I'm happy to show you the full document as well just to make sure we're on the same page. Let me just pull up 10A really quick. Oh, gosh. Okay. This Exhibit 10A does not have any RIF dates listed on it, correct?
A. Correct.
(Exhibit No. 11 marked.)
Q. (BY MS. ARTAZA) Okay. I'm going to share what I have marked as Exhibit 11. Is this a true and correct copy of an e-mail that you sent to Alicia Campbell on February 17th, 2023? And this, again, is Primoris 251 through 2 -- oh, gosh. Okay. Hang on. We have some -- it's going to be Primoris 251 through 257. Is that a true and correct copy of just this e-mail right here that you sent to Alicia on February



17th, 2023?
A. Yes.
Q. Okay. And you forward, "PLS Auger Employees Remaining after wave 4 to Transfer." That is the attachment there, correct?
A. Yes.
Q. Do you know why -- and below it looks like you're forwarding your e-mail that was sent to Sunita on February 17th. Do you know why you were forwarding that e-mail to Alicia on February 17th?
A. The subject listed on here that's not eligible for rehire, that's in the first line below. It says, "There is one employee redacted that is not eligible" --
Q. Yeah.
A. -- for rehire." He's in red.
Q. Yeah.
A. There was a lot of push back from the leadership team on wanting to rehire or bring the employee over to Primoris even though on the HR side we were saying no and explaining the reasons why he wasn't eligible for rehire. And I forwarded this to Alicia for her assistance on reiterating and helping reiterate to operations why this individual should not be brought back over to Primoris.



Q. Why was he let go? Or why was he not eligible for rehire?
A. He left the company and when he left the company, he took company information that was proprietary and shared it with his new employer.
Q. Okay. What was Jake GeBauer's role in the transfers last reduction in force?
A. I don't remember what role Jake was in at this time.
Q. And was it -- is it your understanding that the leaders of each business unit were responsible for determining which employees to RIF, if any?
A. Yes.
Q. Did you ever have any conversations with Alicia or Jackie about RIFs that were going to occur during this time within the HR department?
A. I would assume Jackie and I had talked about it.
Q. Do you recall anything of substance from those conversations?
A. We would have discussed if there was severance packages that were going to be allocated to the employees and what that process looked like.
MS. PLAGENS: Carmen, we have been going a little over an hour, and it's actually 1:39 for

Paula, so well past the lunchtime. Do you think that we're going to go long enough that we should take a short break for her to grab something to eat?

MS. ARTAZA: Yeah, I think so. I think, yeah. I think so. We should probably take a lunch break.

MS. PLAGENS: Okay.

MS. ARTAZA: You know, I don't need a lot of time or anything. I don't know how much time you need, but we should probably, you know -- I don't know that we need an hour, but whatever time you need to eat.

THE REPORTER: Do you want to go off the record?

MS. PLAGENS: At this time, we're not -- oh, yes. Please go off the record.

THE REPORTER: We're off at 12:39.

(Recess 12:39 to 1:13.)

THE REPORTER: We're back on the record at 1:13.

A. Carmen?
Q. (BY MS. ARTAZA) Yes.
A. Before we get started, I wanted to -- I needed to make the correction to our discussion on the org charts earlier.



Q. Uh-huh.
A. So on the one org chart that had Kelly Wood reporting underneath me, that was a proposed change that never actually happened. Kelly has always reported under Alicia Campbell.
Q. Okay. So she never was under your reporting structure, so that was just proposed and it never went into effect?
A. Right.
Q. Okay.
A. And then on one of the other org charts it has Sam -- Samantha Alleman reporting to Alicia in 2023. She didn't join our team until 2024.
Q. Did she work for Primoris?
A. She did. She worked on HRIS team.
Q. Okay. Is there anything else?
A. No.
Q. All right. So I'm going to go back to a few things as well. So let's see here. I'm going to go back to Exhibit Number 11. Okay. I'm going to go back to Exhibit 11, which we discussed previously. So as of February 17th, 2023, when you forwarded this e-mail to Ms. Campbell, you had an understanding that Ms. Byrd was listed in red as a RIF on the RIF list, correct?



A. Yes.
Q. And then you were forwarding this list to Ms. Campbell, correct?
A. I forwarded the e-mail to her which appears to have contained the list.
Q. Okay. So you didn't remove the attachment or anything of that nature?
A. Not that I recall.
Q. Did anyone give you permission to share with Alicia Campbell that Ms. Byrd was on the RIF list as a RIF?
A. Not that I recall.
Q. At the time that you forwarded this e-mail to Ms. Campbell, did you know whether she had any prior knowledge that the working RIF list had been updated to include Ms. Byrd as a RIF?
A. I'm not aware if she did or not.
Q. Did Ms. Campbell have any communications with you after receiving this February 17th, 2023, e-mail and attachment about her noticing that Ms. Byrd was on the list as a RIF?
A. I don't recall.
Q. If -- what was your -- what is the way that you communicated with Ms. Campbell the most during the 2023 time frame? Teams, cell phone, e-mail, none of the above, all the above?



A. Phone calls.
Q. Phone calls. Okay. And when you use your phone calls, would that have been your office phone or your company-issued cellphone?
A. Both.
Q. Have you traveled to Texas in the course of your Primoris career?
A. Yes.
Q. How often do you travel to Texas in conjunction with your work at Primoris?
A. Not very often.
Q. Do you recall when is the last time you came to Texas in connection with your work with Primoris?
A. I was in Denton a couple months ago for an HR leadership meeting -- or team meeting.
Q. Okay. Do you have any residences outside of the state of Florida?
A. No. Since 2019.
Q. Since 2019. So approximately six years?
A. Yes.
Q. During that time, have you ever refused to do something that Alicia Campbell has asked you to do in connection with an investigation into an alleged discrimination, harassment, or retaliation?

Page 94

A. Based on the findings, yes. May not always lead to termination.
Q. Okay. So what are other options that HR professionals can use, based on your experience that we haven't kind of discussed already to address concerns about discrimination, harassment, or retaliation in the workplace?
A. It could be recommended that the employee go through some sort of training based on it could be there may be a need to -- a shift in the crew that the employee is working on. So much of it just depends on what the investigation unravels.
Q. Okay. During your career at Primoris, you have had business units removed from your scope of support, correct?
A. I don't think so.
Q. Well, for example, like you had PTD, like, taken away and then placed back under you, correct?
MS. PLAGENS: Objection, form.
A. No, I --
Q. (BY MS. ARTAZA) Oh, sorry. Did I use the wrong three letters?
A. PDS.
Q. PDS. You had that removed and then put back under you, correct?

Page 95

A. Due to the realignment of the lines of business, yes.
Q. And you've never lost your job as a result of a business unit being removed from your scope of responsibility, correct?
A. No.
Q. Okay. Let's go back to Exhibit 9. Okay. Let's go back to Exhibit 9. Is it correct that these February 14th, 2023, e-mails are identifying PLS employees that are to be added to the RIF list? Let me know if you want me to scroll. If you would like me to scroll up or down, just let me know.
A. I'm not sure if these are intended for the RIF list or if they -- I'm not sure.
Q. Okay. So it says -- it looks like it's an e-mail from you and it says, "The employees listed below under 'added' are eligible for rehire" -- oh, and are "not on the RIF list." The two listed as "term" below are accurate as well. So these people are actually not on the RIF list, correct?
A. I believe so. I would have to look at the RIF list.
Q. Okay. Okay. Okay. And if we scroll down -- okay. Okay. Let's see here. Let me stop sharing that. At some point did you have the understanding

Page 96

that Alexis Golguri was supposed to be part of a RIF?
A. Yes.
Q. Okay. And I don't know if -- how do you pronounce her last name?
A. I'm not sure.
Q. Okay. Let's just call her -- we'll both agree that we're talking about Alexis G-O-L-G-U-R-I.
A. Yeah.
Q. But we'll just call her Alexis G. What is your -- when did you learn that she was supposed to be part of the RIF?
A. I believe it was a day or two before she was let go.
Q. Do you recall when she was let go?
A. I do not.
Q. Do you have any reason to dispute that she was terminated around March 31st, 2023?
A. I have no reason to dispute that.
Q. Do you know who told you that she was going to be let go?
A. I believe it was Kelly Wood.
Q. Are you and Kelly friends outside of work?
A. Yes.
Q. Where does Kelly Wood live?
A. Texas.

Page 97

Q. Okay. Do you guys -- do you guys, like, travel to see each other?
A. No.
Q. Okay. But you, I guess, communicate about nonwork-related matters outside of work?
A. Over the phone, yes.
Q. Okay. And how long have you guys -- how long would you have considered yourself and Kelly Wood to be close friends for?
MS. PLAGENS: Objection, form.
Q. (BY MS. ARTAZA) Well, here let me back up. Do you consider yourself to be close friends with Kelly Wood?
A. We're friends.
Q. Okay. Friends. How long would you have -- like, how long do you consider yourself to have been friends with Kelly Wood for?
A. Past four years, five years.
Q. Okay. Is there something in particular that made you guys closer?
MS. PLAGENS: Objection, form.
Q. (BY MS. ARTAZA) Or become friendlier.
A. We do HR together. We work hand in hand together a lot. We both support the same business unit.

when all the RIFs occurred.
Q. Okay. And then just to be clear, I know earlier you testified that you believe there were four waves, but it's possible that there were more than four waves, correct?
A. I don't 100 percent recall how many there were.
Q. Did you ever support Brice Burns' team?
A. No.
Q. Is he in Florida -- no, strike that. He's not.
Did you ever investigate any race discrimination complaints involving Brice Burns or crews that worked for Brice Burns?
A. No.
Q. Did you ever learn about anyone having concerns about Brice Burns discriminating against African-American employees?
A. No.
Q. Did Ms. Byrd ever share with you any concerns about Mr. Burns saying or doing racially discriminatory things during weekly HR meetings or otherwise?
A. Not that I recall.
Q. Sitting here today, do you recall whether or



not you learned at any weekly HR meeting about three Florida employees being terminated for using racially charged language in group text messages?
A. Three Florida employees?
Q. Yeah. Yes. Sorry.
A. If they were in Florida, it would have been something I would have investigated, I would think. Without the names, I wouldn't be able to answer that.
Q. But sitting here today, there's nothing that -- that doesn't come to mind where an issue with three Florida employees being terminated for using racially charged language in a group text message?
A. Nothing that stands out.
Q. And did you know -- and, again, you don't know the dates of any of the waves 4, 5, or any other wave when it ultimately occurred, correct?
A. Correct.
Q. Okay. And if there were any RIFs in connection with wave 5, you don't know when those would have occurred, correct?
A. Correct.
Q. If we wanted to talk to somebody and find out the exact dates of when a wave 5 occurred, who would we talk to to find out that information?
A. Daria Hargrove or Sunita.



MS. ARTAZA: Okay. All righty. I think -- let me just see here really quick. All right. I will pass the witness.
MS. PLAGENS: May I have just a quick moment and go off the record for just a moment?
MS. ARTAZA: Yes.
THE REPORTER: Off the record at 2:35.
(Recess 2:35 to 2:36.)
THE REPORTER: Okay. We're back on the record at 2:36.
MS. PLAGENS: Defendant reserves their questions for time of trial. May we please have 30 days to read and sign?
MS. ARTAZA: Yes. Agreed.
THE NOTARY: Very well. Thank you. This concludes our remote video deposition proceeding for today. The current time is 2:36 p.m.
(Deposition adjourned at 2:36 p.m.)



CHANGES AND SIGNATURE
WITNESS NAME: PAULA BAGONY NOVEMBER 19, 2025
PAGE LINE CHANGE REASON

Job No. CS7759666

I, PAULA BAGONY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________________
PAULA BAGONY

THE STATE OF ________)
COUNTY OF ___________)

Before me, ________________________, on this day personally appeared PAULA BAGONY, known to me (or proved to me under oath or through ________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ________ day of ________________, 2025.

_________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ____________
My commission expires: __________________________





CAUSE NO. 3:24-cv-2767

CHARLOTTE CHAPMAN BYRD, ) IN THE DISTRICT COURT
)
Plaintiff, )
)
VS. )
)
PRIMORIS SERVICES ) DALLAS COUNTY, TEXAS
CORPORATION, PLH GROUP )
INC., POWER LINE SERVICES, )
INC., and FUTURE )
INFRASTRUCTURE, LLC, )
)
Defendants. ) 134TH JUDICIAL DISTRICT

REPORTER'S CERTIFICATION
DEPOSITION OF PAULA BAGONY
NOVEMBER 19, 2025

I, Audra B. Paty, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, PAULA BAGONY, was duly sworn by the officer and that the transcript of oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on __________________, 2025, to the witness or to the attorney for the witness for examination, signature and return to me by ________________, 2026;

that the amount of time used by each party at the deposition is as follows:

Ms. Artaza - 3:29
Ms. Plagens - 0:00





That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:
Ms. Carmen Artaza
Ms. Christine Hopkins
TREMAIN ARTAZA PLLC
6060 North Central Expressway
Suite 567
Dallas, Texas 75206
469.573.0229
carmen@tremainartaza.com
christine@tremainartaza.com

FOR THE DEFENDANTS:
Ms. Nichole M. Plagens
JACKSON LEWIS
500 North Akard Street
Suite 2500
Dallas, Texas 75201
972.728.3250
nichole.plagens@jacksonlewis.com

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.





Certified to by me this 5th day of December, 2025.



________________________________
Audra B. Paty, CSR
Texas CSR #5987
Expiration: 10/31/2026
VERITEXT LEGAL SOLUTIONS
Firm Registration No. 571
300 Throckmorton, Suite 1600
Fort Worth, Texas 76102
817-336-3042

FURTHER CERTIFICATION BY COURT REPORTING FIRM
UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on __________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Ms. Plagens, Custodial Attorney;

That $____________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on ________________ and filed with the Clerk.

Certified to by me this __________ day of __________________, 202__.

_________________________________
VERITEXT LEGAL SOLUTIONS
Firm Registration No. 571
300 Throckmorton, Suite 1600
Fort Worth, Texas 76102
817-336-3042

Job No. CS7759666



carmen@tremainartaza.com

December 10, 2025

RE: Byrd, Charlotte Chapman v. Primoris Service Corporation, Et

DEPOSITION OF: Paula Bagony 7759666

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

PLAINTIFF'S
EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLOTTE CHAPMAN BYRD, )
)
Plaintiff, )
)
VS. )
) CIVIL ACTION
PRIMORIS SERVICES ) NO. 3:24-cv-2767-N
CORPORATION, PLH GROUP )
INC., POWER LINE SERVICES, ) JURY TRIAL DEMANDED
INC., and FUTURE )
INFRASTRUCTURE, LLC, )
)
Defendant. )

-----------------------------------

ORAL DEPOSITION OF
KELLY WOOD
APRIL 24, 2026
(REPORTED REMOTELY)

-----------------------------------

ORAL DEPOSITION OF KELLY WOOD, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on April 24, 2026, from 9:40 a.m. to 3:24 p.m., via Zoom, before Amber Garcia, Notary Public in and for the State of Texas, reported by machine shorthand, pursuant to the Federal Rules of Civil Procedure.

Page 18

termination of Ms. Hendrick from the company?
A. Can you repeat that question?
Q. Did you provide any human resources support with any termination of Ms. Hendrick's employment?
A. No.
Q. Who replaced Ms. Hendrick as vice president of human resources after she separated from the company?
A. In what -- in what capacity?
Q. Do you have a new vice president of human resources?
A. We have a gentleman by the name of Savern, and I don't know his last name right now off the top of my head, that I believe is a senior HR director is his title. I'm not sure that he's the V- -- he took her role, yes.
Q. Okay.
A. But I don't know what his title -- his exact title.
Q. Have you had any discussions with him about Ms. Chapman Byrd's lawsuit or case outside the presence of counsel?
A. No.
Q. Have you ever met him?
A. Yes.
Q. Okay. All right. Ms. Alicia Campbell's

Page 19

deposition was taken on December 8th, 2025, in this case. Have you read or watched Ms. Campbell's deposition testimony?
A. I have not watched anyone's testimony.
Q. So just to -- to confirm, you have not watched the Zoom video recordings of anyone's deposition testimony in this case, correct?
A. That is correct. I have not watched.
Q. Have you read any deposition transcripts -- written deposition transcripts of anyone's testimony in this case?
A. I have not.
Q. What about Tony Gill's testimony?
A. Are you asking me if I've read his testimony?
Q. Yes.
A. No, ma'am.
Q. Okay. Have you discussed Ms. Chapman Byrd's case with Alicia Campbell outside the presence of Primoris's attorney?
A. I have not.
Q. Okay. Is Ben Campbell someone who is currently employed by Primoris?
A. Yes.
Q. Is Ben Campbell a manager or executive that you currently support as an HR manager?

Page 20

A. To -- may I clarify that?
Q. Yes.
A. I will be supporting him at the end of May. I currently do not support his business unit that he is over at the moment.
Q. What business unit is he with?
A. He is with PTD, the West Division or Southwest. I'm not sure what they call it anymore.
Q. Okay. Have you ever in the past supported the division that Ben Campbell -- well, let me strike that and ask it a different way, Ms. Wood.
In the past, have you ever supported Ben Campbell as a manager or executive in your role as HR manager?
A. Yes.
Q. Okay. And when did you support him as an -- as a manager or executive?
A. Again, sorry, I don't recall the date. When he was rehired. I want to say -- I don't recall the date. It was either '20 or '21. It might have been '21.
Q. Okay. How long did you provide HR management support to Ben Campbell?
A. Until 2024.
Q. What was his job title during that time?
A. Vice president, maybe.

Page 21

Q. Was it vice president of a particular division?
A. Of PTD, probably, West Division or Power Delivery. There's been a little bit change of line of business.
Q. Okay. And is Ben Campbell Alicia Campbell's husband?
A. Yes.
Q. Okay. Is Alicia Campbell's mother-in-law employed by Primoris?
A. Yes.
Q. And what is Alicia Campbell's mother-in-law's name?
A. Teresa Campbell.
Q. Was she employed by Primoris back in 2023?
A. I do not recall the date that she was hired.
Q. Did you support Teresa Campbell in your role as an HR manager or generalist during your time at Primoris?
A. No.
Q. What division did Teresa Campbell work in?
A. The fleet division.
Q. Have you ever provided HR management support to the fleet division?
A. I have.
Q. And was that at the time that Teresa Campbell

was not working for the division?
A. Can you clarify?
Q. Okay. I'll ask it a different way. Did Teresa Campbell work for the fleet division while you were providing human resources support to the fleet division?
A. I cannot answer that, because I don't know what -- I can't remember when she was hired, and what business unit she went into. If she was corporation, I did not support that.
Q. Okay.
A. If it was a different company.
Q. Okay. What job title does Teresa Campbell currently hold?
A. I'm not sure.
Q. Okay. What title did she hold when you were working for the fleet division?
A. Can you clarify that?
Q. Did you know what job title Teresa Campbell held when you were providing human resources support to the fleet division?
A. I do not.
Q. In the March to February 2023 time frame, if we talk about early 2023, was Ben Campbell a manager or executive who could recommend your termination from the company?



A. I'm sorry? Repeat that.
Q. Okay. When you were providing human resources support to Ben Campbell when he was the vice president of PTD West Division or Power Delivery, was he someone who could have recommended your termination from the company?
A. No, not to my knowledge.
Q. Okay. Was Ben Campbell someone who could have given performance feedback about your human resources support that you were providing him back in 2023 when you were providing HR support to his division?
A. Would you clarify that and give additional information?
Q. Sure. Was Ben Campbell, as vice president of a division you were supporting, was he in a position to provide feedback about your performance at that time in 2023?
A. No, not to my knowledge.
Q. And what makes you say that?
A. I did not work directly for him.
Q. Okay. The executives and managers that you support at Primoris, can they complain about you if they don't like the human resources support they're receiving from you?
A. I'm sure -- I'm sure they can.



Q. And back in 2023, you would have understood that if Ben Campbell did not like the human resources support he was getting from you, he could have complained about you, right?
MS. PLAGENS: Objection, form.
You can answer, Kelly, if you understood the question.
A. I didn't. Could you repeat it for me?
Q. (BY MS. HOPKINS) Yeah. Back in 2023, you understood that if Ben Campbell did not like something about the HR support you were providing to his division, he could make a complaint about you, right?
MS. PLAGENS: Object to form.
A. I suppose.
Q. (BY MS. HOPKINS) In human resources, do you consider the executives you support to be your clients or customers?
A. Yes.
Q. Okay. So Ben Campbell, back in 2023, was one of your clients or customers, right?
A. One of them -- of many.
Q. Okay.
A. One of several. Excuse me.
Q. All right. And clients or customers, if they're not happy with the support they're receiving,



they can complain?
MS. PLAGENS: Objection, form.
Q. (BY MS. HOPKINS) Right?
A. Could you clarify that for me, please?
Q. Sure. In your human resources role, you are supporting these clients or customers who are executives or managers of various divisions, and they can complain about you if they don't like the support they're receiving, right?
A. I suppose, yes.
Q. Has Ben Campbell ever, to your knowledge, made a complaint about the human resources support that you provided to his division?
A. Not to my knowledge.
Q. Okay. Is Alicia Campbell's father-in-law employed by Primoris?
A. Not an active employee, no.
Q. Was he employed back in 2023?
A. Yes.
MS. PLAGENS: Objection, form.
Q. (BY MS. HOPKINS) What was -- what is his name?
A. Richard Campbell.
Q. And what was his job title back in 2023?
A. I'm not sure of the exact title. I don't recall it.

Page 26

Q. What division was he working for back in 2023?
A. I -- I don't know exactly. I can't recall.
Q. Did you ever provide human resources support to Richard Campbell during his time as an active employee at Primoris?
A. Yes.
Q. And for how long?
A. I can't recall the exact number of years.
Q. Was it for a number of years?
A. Yes.
Q. For the number of years that you were providing human resources support to Richard Campbell, was he in an executive role with one of the divisions at the company?
A. Yes.
Q. And what division was that?
A. He held -- he was over multiple divisions throughout.
Q. Which divisions was he over while you provided HR support to him?
A. PTD.
Q. Did that include PTD Southwest?
A. Yes.
Q. Any other divisions that you recall Mr. Campbell working for when you provided him HR

Page 27

support?
A. Yes.
Q. Which other divisions?
A. The East Division.
Q. The East Division of PTD or some other --
A. Yes.
Q. Did he work for any other divisions other than PTD when you were providing him human resources support?
A. Briefly.
Q. Okay. And what do you recall about that?
A. I took over the union support, and he was involved with that division.
Q. Okay. As of February or March -- and March of 2023, was Richard Campbell someone who could have made a complaint about you if he didn't like the human resources support you were providing to his division?
A. I don't recall exactly what division Mr. Rick Campbell was over in 2023.
Q. Okay. Do you recall one way or another whether you were providing him human resources support in 2023?
A. Can you tell me what company he was supporting in 2023?
Q. I cannot. But let me ask -- let me see if I can jog your memory a different way. Charlotte Chapman Byrd was with the company from October 2022 to

Page 28

February 2023, approximately. If we think back -- if you can think back to the time that Charlotte Chapman Byrd was on the human resources team, were you supporting Richard Campbell at that time?
A. I don't recall.
Q. Okay.
A. No. I don't recall where he was, so I can't answer that truthfully.
Q. Okay. Is Adam Campbell currently employed by Primoris?
A. No.
Q. Was Adam Campbell employed by Primoris in 2023?
A. Yes.
Q. And what job title did he have at the time?
A. I'm sorry. I can't recall. My memory is not good on -- on some of the years.
Q. Okay. What is Adam Campbell's relationship to Alicia Campbell?
A. Brother-in-law.
Q. Have you ever provided human resources support to Adam Campbell during the time that he worked for the company?
A. Can you clarify?
Q. Did you ever provide human resources support to Adam Campbell while he was working for Primoris?

Page 29

A. Yes.
Q. And for how many years or months did you provide human resources support to Adam Campbell?
A. For the length of time that I was employed and he was employed, he was over some division that I supported.
Q. Which division was that?
A. It was PTD East and West.
Q. Okay. And the period of time that your employment overlapped with Adam Campbell's employment, was it more than five years?
A. I'm sorry. Can you repeat that?
Q. Sure. I'm trying to get an estimate of how many years your employment overlapped with Adam Campbell's employment at the company. Can you tell me if it was more than five years or less than five years?
A. I would say more.
Q. Was it more than 10 years?
A. No, I haven't been there 10 years quite yet.
Q. Oh, yep. That's true. Thank you for calling me out on that. Okay. All right.
THE WITNESS: May we take a -- may we take a break?
MS. HOPKINS: Yes, we may. And during the breaks, just for the record, I am going to stop the

recording, and then we'll stop the recording back up when we come back from a break. How long of a break would you like?

THE WITNESS: Five minutes, maybe. 5 to 10 minutes?

MS. PLAGENS: If we can do 10, Christine.

MS. HOPKINS: Yes. We'll be back at 10:23, everybody.

THE WITNESS: Thank you.

THE REPORTER: Off the record at 10:13 a.m.

(Recess taken from 10:13 a.m. to 10:24 a.m.)

MS. HOPKINS: We are back on the record at 10:24 a.m.

Q. (BY MS. HOPKINS) Ms. Wood, did you speak to Alicia Campbell during the break?

A. Yes.

Q. Did you speak to her outside the presence of Nichole Plagens?

A. No.

Q. Was an attorney on the line when you spoke to Ms. Campbell?

A. Yes.

Q. Okay. Did you exchange any text messages with Alicia Campbell during the deposition so far?



A. No.

Q. Okay.

A. May I -- may I clarify something? Because I was- -- because -- I apologize with my memory. I wanted to clarify the dates that you had asked me about Ben Campbell and Rick Campbell and me supporting them. Ben was rehired in 2023, the fall of 2023. And that I supported him, approximately, from the -- I mean, by the time he got his feet wet or was over and doing things, may have been, like, October until '24. The springtime of '24. April, May, somewhere around in there of '24.

Q. Okay. Did you remember anything about Richard Campbell?

A. Yes. It was 2019, because I looked back at -- Adam came back in 2019, so I would have supported Rick in 2019. I know when Adam came back in 2019, he took Rick's place.

Q. Okay. So what job title did Adam Campbell take over from Richard Campbell?

A. Well, I don't know the exact -- I can't recall. Just vice president. It's usually around a vi- -- a VP role.

Q. Okay. And a vi- --

A. It could have been a senior -- it could have been a senior VP.



Q. Okay. When Adam Campbell came in 2019 and started working as vice president or senior vice president, was it of PTD?

A. Yes.

Q. And did Richard Campbell continue to work for PTD in some other role after Adam Campbell came on board in 2019?

A. Yes. He went to other areas that they needed assistance in.

Q. Do you know any of the job titles Richard Campbell held at PTD after 2019?

A. I think they always looped in the same as, like, a senior VP, somewhere around that.

Q. And do you recall anything about the last day that Richard Campbell served in a role at PTD?

A. I believe while I was on FMLA there was some kind of a change. But I think he moved into a safety or HSE department, but I don't recall exactly when. I wasn't really over any of that, so...

Q. So up until you went on FMLA leave in the fall of 2025, Richard Campbell had still been working for PTD in some capacity up until that point?

A. I think he was more working for corporate.

Q. Okay.

A. Or -- or under the direction of corporate.



Q. Okay.

A. Not over corporate. And to clarify, I looked up Teresa Campbell, and I was right. I might have -- I supported fleet T&D under my business unit, but I don't support fleet corporate. And she was hired under fleet corporate.

Q. Okay. So it is your testimony that you never provided HR support to Teresa Campbell ever?

A. No, she works for fleet corporate. I don't support fleet corporate.

Q. And you never have?

A. I never have.

Q. Okay. All right. Thank you for the clarifications that you gave me after speaking --

A. Sorry. There's so many business units and such, and so it gets a little confusing at times.

Q. Yes. Okay. I want to focus in on early 2023. In 2023, were you assigned to finish out an investigation into a complaint Tony Gill had made about Alvin Craddock and Kelly Porter?

A. Would you clarify that, please?

Q. In 2023, did you help investigate a complaint that Tony Gill had made about an incident with Alvin Craddock and Kelly Porter?

A. Yes.

support, there's not a lot of direct support. HR is there for guidance, but there -- that's also union, so they have different type of support. So that's not me supporting the employee every day, because they're union. So they have stewards and such as that that they deal with with their general supers and operations.

Q. Okay. Any point in time after Charlotte Chapman Byrd left the company, did you ever express any concerns about your workload?

MS. PLAGENS: Objection, form.

A. I'm sorry. You cut out again. I'm not sure I heard the whole question.

Q. (BY MS. HOPKINS) Sure.

THE REPORTER: For me too.

MS. HOPKINS: I think we should take a five-minute break. Is that okay?

THE WITNESS: Yes.

MS. PLAGENS: Sure.

MS. HOPKINS: Okay. We'll be back at around 11:27.

THE REPORTER: Off the record at 11:22 a.m.

(Recess taken from 11:22 a.m. to 11:29 a.m.)

MS. HOPKINS: We are back on the record at 11:29 a.m.



Q. (BY MS. HOPKINS) Ms. Wood, before the break, I -- my audio wasn't coming through very well, and the question I was trying to ask you is, whether at any point in time after Charlotte Chapman Byrd was let go, did you ever express any concerns about your workload to anyone at the company?

MS. PLAGENS: Objection, form.

A. No. I mean, it was -- even prior to this several years ago, we had large head counts. So when you -- it -- it wasn't that bad. When you don't deal with the -- it's not like you deal with the employee every day. You deal with operations, and have a lot of conversations there. So there was a time that we -- actually, I think, had, like, 3,000 between Alicia and I a long time -- I mean, several years ago.

Q. (BY MS. HOPKINS) Okay. After Charlotte Chapman Byrd was let go, is it correct that your workload did increase?

A. I honestly wouldn't say that. My head count might have increased, but I'm not sure about workload or work -- we have... I don't understand. I guess, maybe, clarify that for me.

Q. Okay. Well, I'm understanding from your answer that to you, there's a difference between an increase in your head count, and an increase in your workload. So



actually, I'll just -- I'm going to move on to a different exhibit, and I'll see if I'm going to come back to that question later. But I do want to just look at the last organizational chart with you from March 31st, 2025. This says it is a Utility Segment Power Delivery organization chart from March 31st, 2025, and you are listed here, Ms. Wood, as being an HR manager with an employee count of only 379 employees. Do you see that?

(Exhibit Number 7 was marked.)

A. I -- I don't see -- I mean, I see that, but I can't read -- read anything. That's too small.

Q. (BY MS. HOPKINS) Let me know when it gets to the point where it's zoomed in enough for you.

A. Okay. Yes. Yes.

Q. Okay. As of March 31st, 2025, your employee head count is listed as only 379; is that accurate?

A. I'm assuming it is since it's on there. I would think so. That was the union.

Q. Okay. And was there -- was there a point in time in early 2025 where your head count was under 400 employees?

A. I don't recall exactly. I don't remember how many. If -- if that was the time that I was over the union, I don't remember exactly. There was three



different companies in the union, and I know that we had lost a contract, so that could have been correct.

Q. Okay. At a certain point in time, did you stop supporting PTD Southwest, PDS Southwest and Renewables, and instead, only support the union?

A. Yes, for a brief time.

Q. And when that happened, did your employee head count drop drastically?

A. Going to only support the union, yes.

Q. And were you laid off or terminated as a result of your employee head count dropping down below 400?

A. No.

MS. PLAGENS: Objection, form.

Q. (BY MS. HOPKINS) Were you demoted as a result of your head count dropping down below 400?

A. No.

Q. Were you aware -- okay. If we look on the next page, there is a proposed chart in which you are placed as a senior HR generalist underneath Paula Bagony. Do you see that?

A. I do.

Q. Did that actually happen?

A. No, I don't recall I've ever seen that document before.

Q. Were you ever aware of there being any proposal

for you to move from HR manager to a senior HR generalist under Paula Bagony?
A. I was not.
Q. But you kept your HR manager title, correct, the entire time that -- the entire time after Charlotte Chapman Byrd was let go, correct?
A. I kept the role of HR manager, yes.
Q. During the time you have worked as a human resources manager under -- at the company, had your work assignments changed over time?
A. Can you clarify that, please?
Q. Have the divisions that you've been assigned to support changed over time during your career at Primoris as an HR manager?
A. Yes.
Q. And you were never subject to demotion, layoff, or termination because of the changes in the divisions that you were assigned to support, correct?
A. Correct.
Q. Are you aware of any human resources managers other than Charlotte Chapman Byrd who have served under Alicia Campbell who have lost their job due to shifting division assignments or employee head counts?
MS. PLAGENS: Objection, form.
A. No.



Q. (BY MS. HOPKINS) Okay. Do you have a SHRM certification?
A. No.
Q. Do you have any other human resources certifications?
A. Clarify your question, please?
Q. Do you have any certifications in the field of human resources?
A. No. But can I go back to your question about the manager part? I forgot there was one. I'm sorry. Because we took over -- Chapman become PTD. So when you asked if there was any other HR manager, my apologies, I was, kind of, still on that question. There was. Under Alicia Campbell, her name was Linda Kramer. Took me a minute. Linda Kramer. She was HR manager, and she was dismissed.
Q. When was that?
A. 2019, I believe -- 20- -- maybe the end of 2018. It could have been 2019. I'm sorry. I'm not exactly sure on the dates.
Q. Do you know whether she was terminated or laid off?
A. I -- I -- I can't recall the reason. I don't know the exact reason, but I know that's when we absorbed Chapman -- or it -- Chapman was always a



subsidiary of Willbros, I believe, and then it came in about the time that Primoris took us over. So Alicia and I took over the man- -- the HR manager responsibility of that division --
Q. Okay.
A. -- or of that company.
Q. So in this context when you're referring to Chapman, you're referring to a company that was a subsidiary of Willsbro?
A. I really don't remember how it was structured, but yes, they're called T&S now under PTD. It's transmission and substation.
Q. Okay. In 2018 or 2019, were you informed exact -- of the exact reasons for Linda Kramer's separation from the company?
A. I -- no, I don't recall.
Q. Do you have any knowledge whether she was let go for performance reasons or for other reasons?
A. I'm sorry. I can't recall.
Q. Okay. What race was Linda Kramer?
A. Caucasian, I think.
Q. Okay. And was she someone who had been employed by that subsidiary, Chapman?
A. Yes.
Q. When Power Line Services became part of



Primoris, did Power Line Services have a human resources manager of its own at that point, do you know?
A. Can you clarify that, please?
Q. Sure. Do you know whether or not Power Line Services had its own human resources manager before it became part of Primoris?
A. Yes.
Q. And was the individual who served as human resources manager for Power Line Services let go in the process of Pri- -- Power Line Services becoming part of Primoris?
A. I don't have the knowledge or the details of that.
Q. Did you ever have occasion to welcome someone to the team who had previously served as the human resources manager of Power Line Services before the merger?
A. No, there was not a manager of PLS Services.
Q. Okay. So there -- go ahead.
A. Oh, I'm sorry. Not at the -- not that I know of. I mean, I'm sure there was, but I don't know when they departed PLS. So at the time that we took over, there was only two employees, which was Alexis and Ashley.
Q. Okay. So there wasn't any Power Line Services

human resources manager that came over with Ashley and Alexis, it was just the two of them, right?
A. Correct.
Q. Okay. And back in 2018 or 2019 with Linda Kramer, did she have some subordinate employees who were absorbed into the company at that point in time --
A. I'm sorry. Can you repeat that question?
Q. Sure. Back in 2018 or 2019 when this -- you're remembering the situation with Linda Kramer --
A. Right.
Q. -- did she have some staff underneath her who came on board that you continued to work with?
A. Yes, there was one. I'm trying to think of her name.
Q. That's okay. I don't -- I don't need her name.
A. Okay. Good. Because...
Q. Okay. Are you familiar with the Society for Human Resource Management or SHRM?
A. Yes.
Q. Is SHRM a nationally recognized organization that provides guidance to HR professionals?
A. Can you clarify your question?
Q. From your understanding, is SHRM a nationally recognized organization that provides guidance to HR professionals?



A. Yes.
Q. Do HR professionals commonly rely on SHRM materials and guidance in their work?
MS. PLAGENS: Objection, form.
A. I believe that you go there for -- for guidance, correct, or you can go there for guidance.
Q. (BY MS. HOPKINS) Have you ever consulted SHRM resources when performing your human resources role at Primoris?
A. I have.
Q. Okay. I'm going to show you an article to see if you're familiar with it.
A. Okay.
Q. This is going to be Exhibit 9.
(Exhibit Number 9 was marked.)
Q. (BY MS. HOPKINS) All right. Exhibit 9 is a how-to guide, How to Conduct a Workplace Investigation. It's dated October 21st, 2024, and it's multiple pages. It is from the SHRM.org website under "Topics/Tools, How-To Guides, How to Conduct an Investigation." We'll just briefly scroll through it. And my question is going to be, are you familiar with this article, Ms. Wood?
A. I am.
Q. All right. Have you consulted this article



when performing workplace investigations at Primoris?
A. Could you clarify your question, please?
Q. Sure. Have you referred to or read this article in the context of your job at Primoris?
A. Yes, I'm familiar with the article.
Q. Okay. Okay. In terms of some of the things that this article says, I want to know if you agree or disagree with them. Do you agree that during a workplace investigation, the HR professional should explain to the complaining party and all individuals involved that the investigation -- sorry -- that all information gathered will remain confidential to the extent possible?
A. Yes.
Q. Okay. There's a second bullet point in this article that says, "Provide interim protection." Do you agree that when an employee makes a complaint, one of the first considerations may be whether to take immediate measures for the protection of the accuser or the alleged victim. "Separating the complainant from the accused may be necessary to guard against continued harassment or retaliation"?
A. What is your question?
Q. Do you agree with that recommendation that when an employee makes a complaint, one of the first



considerations may be whether to take immediate measures for their protection?
A. Accord- -- yes. According -- I mean, you have to know what the circumstance is on that, but yes.
Q. Okay. And do you agree as a human resources professional that if the accusation is about harassment, you may want to separate the accuser from the accused person temporarily during the investigation as a protective measure?
A. Yes, according to the nature of the incident --
Q. Okay.
A. -- or accused incident.
Q. Why is it important to consider taking measures to protect a victim from the person who is allegedly harassing them during the investigation?
A. Would you clarify?
Q. Do you believe it's important to protect someone who's being harassed from their harasser during an investigation into that harassment?
A. I believe it's important to take all complaints coming in, whether it's accused of harassment or something else. I mean, we take all complaints seriously.
Q. And as part of taking a complaint seriously, do you think it's a good idea to allow a harasser and the

person they're harassing, allegedly, to keep working together while an investigation is being conducted?

MS. PLAGENS: Objection, form.

A. Everything is on a case-by-case, so you look at it -- at what is being done. So generally speaking as the reference, yes.

Q. (BY MS. HOPKINS) Are there potential dangers to the company if you allow someone who's being accused of harassment to continue to work with the victim during an investigation into the harassment?

MS. PLAGENS: Objection, form.

A. I'm sorry. Would you clarify your question?

Q. (BY MS. HOPKINS) As an HR professional, do you acknowledge that there can be a risk to the company if you continue to allow a har- -- accused harasser to work with their victim during the investigation into that harassment?

MS. PLAGENS: Objection, form.

A. Oh, there would be a risk to the employee and the -- and the company.

Q. (BY MS. HOPKINS) All right. Going on to the third point in this article. Do you believe it is a best practice for an HR professional to create an investigation plan?

A. Yes.



Q. Do you believe it is a best practice for an HR professional to have a basic outline of their investigation, an initial list of witnesses, an initial view of documents and videos as part of that plan?

A. Yes.

Q. Do you agree that developing a witness list is very important for conducting a workplace investigation?

A. Yes.

Q. Okay. If we go to the fourth point in this SHRM article, do you agree that it is an HR best practice to conduct thorough interviews and gather evidence?

A. Yes.

Q. Do you agree that it is an HR best practice to identify and secure all relevant evidence, such as e-mails, documents, and witness statements, and review them before conducting interviews?

A. I'm sorry. Can you clarify?

Q. Sure. Do you agree that it is an HR best practice to secure all relevant evidence, such as e-mails, documents, and witness statements during an investigation?

A. Yes.

Q. Do you agree that a -- an HR professional should remain impartial during an investigation?



A. Yes.

Q. Do you agree that it is part of the HR professional's job to look for inconsistencies in witness statements, and seek opportunities to gather more evidence?

A. Yes.

Q. Okay. Do you agree that it is an HR best practice to maintain notes throughout witness interviews?

A. Yes.

Q. Do you agree that it is an HR best practice that when possible during a witness interview to have a third person in the room to serve as a witness and take thorough notes?

A. Yes, if possible.

Q. Okay. Do you agree that it is an HR best practice for an investigator to consider the credibility of the individuals being questioned during an investigation?

A. Yes.

Q. In your experience doing workplace investigations, is it your experience that witness interviews often provide differing and potentially conflicting versions of events?

A. Yes, they can.



Q. And it is the HR professional's responsibility to determine which of those conflicting versions of events is the most likely true?

A. I'm sorry. Would you clarify your question?

Q. Is it the HR professional's responsibility to sort through conflicting information, and determine which version of events is most likely true?

A. Yes.

Q. Okay. Do you agree that an HR professional who is conducting an investigation should make a determination, and communicate it to all parties?

A. To -- yes -- would you clarify?

Q. Is it an HR best practice for an investigator to communicate the ultimate determination or findings of the investigations to all parties involved?

A. Yes, whoever concludes that investigation.

Q. Okay. So the person who concludes the investigation, it would be a best practice for them to communicate what the findings were to the people involved?

A. It should be, yes, for the ones that -- yes.

Q. Do you agree that it is an HR best practice for the investigator to create a final report of the investigation?

A. Yes.

Q. Do you agree that an employee who has reported discrimination including race discrimination must not be pressured to change their statement after the fact?
A. Wouldn't -- we would -- I wouldn't think any HR professional would -- would ask anyone or pressure anyone to change any type of statement.
Q. Okay. Do you agree that a company should not retaliate against a human resources employee who refuses to ask a witness to alter their statement?
A. I'm sorry. Say that again.
Q. Sure. Do you think a human resources employee should have the right to refuse to put pressure on a witness to alter their statement without the threat of being fired?
A. I'm sorry. So you're asking if a HR professional should not ask someone to re- -- to rephrase their question -- I mean, to rephrase -- rewrite their answer?
Q. Well, let -- let's step -- let's step back.
A. Okay.
Q. You're familiar with what retaliation in the workplace is, right?
A. Yes.
Q. And Primoris has company policies against retaliation, right?



A. Correct. Yes.
Q. And that would mean that a company should not retaliate against an employee who comes forward and reports discrimination, right?
A. Correct.
Q. So in our scenario of an employee who comes forward and reports that the N word was used in the workplace, it would be a violation of company policy to retaliate against that employee for making that report, right?
A. Correct.
Q. Are human resources professionals, in your mind, as a matter of best practice, should they also be protected from retaliation?
A. Yes.
Q. Okay. So if there's a scenario where a human resources employee is asked to get an employee to change their witness statement, and that human resources professional refuses, do you agree that that human resources professional has done the right thing by refusing to ask the employee to change their statement?
MS. PLAGENS: Objection, form.
A. Yes.
Q. (BY MS. HOPKINS) And do you agree that human resources professionals should not be retaliated against



for refusing to ask the employee to change their statement?
A. Yes.
Q. Okay. On a scale of 1 to 10, with 10 being the most serious violation of HR best practices, how serious of a violation would it be for a human resources director to put pressure on a human resources manager to alter their investigative findings or witness statements?
MS. PLAGENS: Objection, form.
A. Well, I think that would be a 10.
Q. (BY MS. HOPKINS) Okay. Ms. Wood, I'm going to mark Exhibit 10, your PSC Learn training records.
(Exhibit Number 10 was marked.)
Q. (BY MS. HOPKINS) I'll zoom in so that you can see this more clearly, but I just wanted to show you, it is a multipage document that's being marked as Exhibit 10 --
A. Okay.
Q. -- with the PSC Learn information on it.
Okay. So we're going to go up to the first page. I'm going to scroll over and zoom in.
A. Okay.
Q. Can you see -- can you see the names of the courses and the enrollment dates and completion dates?



A. It's a little -- I can't see all of it on the left-hand side.
Q. Yeah. When I zoom in, it's going to cut off some of this --
A. Oh, I see -- I can see -- I can see most of it.
Q. What I'm asking is if you can see this highlighted part?
A. I can -- yes.
Q. Okay. Just the course names and the enrollment dates are going to be important for this next question.
A. Okay.
Q. So I want to look at the courses that you took before you conducted the Tony Gill investigation.
A. Okay.
Q. All right. I'm highlighting. Okay. So the courses that are listed here that you took in 2022, you took those PS Learn courses before you conducted the Tony Gill investigation, right?
A. Yes.
Q. And you also took these January 2023 performance management courses before you conducted the Tony Gill investigation, right? Because that was January 20th.
A. Yes.
Q. And you took this IT Acceptable Use Policy 2023

I didn't think I should because of the past. Like I said, Tony had brought things to us before, and we had a good relationship. I never thought that he wouldn't come to me.

Q. What if --

A. And if -- if it was important, that he would have said something to me.

Q. What issues had Tony Gill brought to you in the past?

A. I believe it was -- I think -- I can't remember if this one was a director or a VP. I apologize. I just don't remember that. He had saw, if I remember correctly, a weapon in this gentleman's PSC vehicle, and he brought it to us. And with a statement and everything, in which we conducted that investigation.

Q. Was that -- did that involve Kelly Porter?

A. Oh, no. This was long before P- -- PLS was merged -- or long before PSC bought the PLH companies.

Q. Does Primoris have a workplace violence policy?

A. Yes.

Q. Does Primoris prohibit employees from bringing guns to the workplace?

A. Yes.

Q. Does Primoris prohibit employees from having guns in their vehicles?



A. Yes.

Q. Okay. And on February 15th, 2023, when you were talking with Tony Gill and he said there had been a heated argument, did you ask him who the heated argument was with?

A. I believe I did, and he said that he didn't want to go into anything. That it was over and done with, and that he was good.

Q. Did you see --

A. Or would be good, you know, after a few days. I can't remember -- recall exactly the conversation.

Q. Where was Christie Madison's office at that time?

A. Oh, it was through a door, down the hallway where all of us was.

Q. Did you see Tony Gill in Christie Madison's office that day?

A. No.

Q. Did you ever know whether or not Tony Gill had talked to Christie Madison that day about what happened?

A. No.

Q. Did you know at the time you were talking with Tony Gill whether or not he had already spoken to Charlotte Chapman Byrd?

A. No. If he did, he didn't indicate it to me.



Q. Okay. All right. I am going to start showing you some documents regarding the Gill investigation. Okay. This is -- Ms. Wood, did you receive an e-mail on February 20th, '23, around 1:28 p.m. from Alicia Campbell with a document attached regarding the Tony Gill matter?

A. Yes.

Q. Okay. And at that time, was Alicia Campbell forwarding you an employee statement that Charlotte Chapman Byrd had obtained from Tony Gill?

A. Yes.

Q. Okay. As of February 20th, 2023, at 1:28 p.m., had Alicia Campbell already told you that you should be the one responsible for investigating Tony Gill's matter?

A. Yes.

Q. Okay.

A. She had -- she had told me that on Thursday. That's when she had told -- I believe, the conversation that we had with Tony.

Q. All right. Did you and Ms. Campbell exchange any Teams chats regarding the Tony Gill investigation?

A. Not that I can recall.

Q. Okay. When you received this e-mail with the attachment -- we'll get to it -- with this attachment,



did you read through the entire attachment?

A. I mean, I have, yes.

Q. Back then on February 20th, 2023, when you received it from Alicia Campbell, did you read through this statement?

A. Yes. I'm -- again, I'm sure I did back then. That was three years ago. I apologize. I don't remember exactly, but I'm sure I did.

Q. Okay. We're going to see that on March 3rd, 2023, you sent in a conclusion of your investigation to Ms. Campbell and Ms. Hendrick. Before concluding your investigation, did you thoroughly read this entire document that Alicia Campbell forwarded you?

A. Yes. Again, I'm sure I did. I couldn't tell you what date I did, but yes.

Q. Okay. I'm going to scroll up. Okay. So during the investigation, you learned that the incident had taken place on Wednesday, February 15th, around 10:00 to 10:30 in Building B at the Great Southwest Parkway, correct?

A. Yes.

Q. And during the investigation, you learned that the individuals present for the incident were Kelly Porter, Alvin Craddock, and two younger gentleman that worked for Crew 534, correct?

Page 106

A. Yes.
Q. All right. And if we scroll down to the next -- actually, to the third page, you knew that part of Charlotte Chapman Byrd's interview with Tony Gill documented Tony Gill saying that he was called the N word twice by Alvin Craddock, correct?
A. Yes. That's what it says there, yes.
Q. Okay. And you knew that part of Charlotte Chapman Byrd's notes reflected that Kelly Porter had walked into his office during the incident and appeared to have grabbed something, and walked back out with his hands behind his back, right?
A. Yes. I -- yes, it says that. Yes.
Q. You knew that that was documented in Charlotte Chapman Byrd's notes, right?
A. Yes, I can see that.
Q. Okay. All right. And if we scroll down to Primoris 4481, you knew that part of what Charlotte Chapman Byrd documented in her notes was that Tony Gill had reported having a timestamp for a noose in his office, right?
A. That's what it says there, yes.
Q. And you knew that part of Charlotte Chapman Byrd's notes included a report by Tony Gill that racial jokes about Black people in a group setting, that that

Page 107

is something that had happened to him at Primoris, right?
MS. PLAGENS: Objection, form.
A. Again, yes, that's what it says there.
Q. (BY MS. HOPKINS) Okay. And you also knew that part of Charlotte Chapman Byrd's notes were Tony Gill saying that he did not trust Kelly because of her connection to John and Adam, right?
A. That's what it says there.
Q. So you knew that Tony Gill had told Charlotte Chapman Byrd he did not trust you?
A. I guess, I -- I mean, I did -- I knew it from reading that. I did not know it -- he never told me that. I did not know it prior to that. I only knew it by reading that.
Q. Okay.
A. Charlotte never said anything to me. She never came to me.
Q. At that time, what was your connection to John Pinkerton?
A. My connection? I don't have a connection with Mr. Pinkerton. I work with him.
Q. Okay. Did you provide HR support to John Pinkerton for a number of years?
A. I did.

Page 108

Q. And had you also provided HR support to Adam Campbell for a number of years at that time?
A. I did.
Q. Did you have more of a relationship with Adam Campbell than with John Pinkerton?
A. I had a working relationship with both of them. I wouldn't say one over the other.
Q. Did you have a relationship outside of work with the Campbell family?
A. Would you clarify that, please?
Q. Sure. Did you have a relationship outside of work with Alicia Campbell?
A. I did.
Q. And did you have a relationship outside of work with her husband, Ben Campbell?
A. I did.
Q. Okay. And had you met Adam Campbell, Alicia's brother-in-law, outside of work in social settings?
A. A few times. Not many. Very few.
Q. Okay. All right. And did you know that according to Charlotte Chapman Byrd's notes, Tony Gill felt you were a nice person, but that "everything you tell her in confidence is not in confidence"?
A. I did not know he said that, and I don't see how he can say that, because he told me when we were

Page 109

talking on -- again, forgive me -- that Wednesday, I believe you said it was the 15th, that he didn't want me to say anything, and I didn't. So when Alicia called me, I guess, the next day on the 16th when Ms. Chapman Byrd let her know that there were some kind of racial slurs, she called me, and asked me.
If I would have told her, she -- she would have already known I had a conversation with Tony. So when he told me not to say anything to anyone, that he didn't want it reported, he didn't want me to say anything, I didn't. So when Ms. -- when Ms. Alicia called me on Thursday, that was the first time that she heard it -- she heard it. That was when I told her, "Oh, yeah. By the way, I talked to Tony yesterday." So no, ma'am, I did not disclose that to anyone, because he asked me to keep it in confidence.
Q. Sure. And I'm not asking at this point if you violated his confidentiality in any way.
A. Right.
Q. What I'm asking is, you're in- -- you're conducting this investigation. You get this multipage document of all of these notes Charlotte Chapman Byrd took. Did you read the entirety of this last paragraph, and see that there was a note in here about you being a nice person, "but everything you tell her in confidence

is not in confidence"? Did you see that was written there?
A. I do see that it's written there, yes.
Q. And did you --
A. But I don't know what it's referring to.
Q. Okay. So back then when you saw this, you didn't know what that was referring to?
A. No, because I had not -- I had not done anything out of -- out of not confidence. I mean, I hadn't talked -- I didn't talk to anybody. If somebody asked me not to say anything, I didn't.
Q. So back -- so back then when you saw this written down in Charlotte Chapman Byrd's notes, did you think that Charlotte Chapman Byrd was mistyping or miscommunicating what Tony Gill had -- had said to her about you?
A. I honestly -- I don't -- I don't guess I really thought anything about it, because I -- that didn't happen. I didn't know what they were referring to. If someone told me exactly, maybe, I would have had a thought, but I was running an investigation. I didn't think anything about the confidence or not confidence or who was saying it or in what context.
Q. Okay. When -- we talked about that a human resources professional who is investigating a matter



should be impartial, right?
A. Yes.
Q. And at that time, you knew that Tony Gill had expressed to Charlotte Chapman Byrd that he didn't trust you, and felt like you broke confidences, right?
MS. PLAGENS: Objection, form.
A. Yes. That was written, but I don't know what "broke confidences" was, and what did I break confidence with?
Q. (BY MS. HOPKINS) So you -- why did you think it was appropriate for you to continue to handle an investigation into Tony Gill's complaint when Tony Gill himself reportedly did not trust you, and felt that you broke people's confidences?
MS. PLAGENS: Objection, form.
A. Well, like I said before, I had investigated other matters that he -- that he had brought forward -- excuse me -- may I get a drink of water?
Q. (BY MS. HOPKINS) Yes.
A. That he had brought forward prior. And, again, the complaint that I received about this, he was more -- because I spoke to the witnesses on Wednesday. I conducted the -- started the investigation per Alicia Campbell's direction Thursday evening, and I started the investigation by talking to the witnesses.



And then when I spoke to Tony, it was more about he was being ac- -- he was afraid he was being accused of stealing. It wasn't -- he never brought up the N word, that that was the whole thing about it. It was the -- the tooling that they were trying to find. That's what it was about.
Q. Okay.
A. So as far as confidence, he -- he didn't say anything else to me. I saw him on Monday the 20th, and he -- he was just fine to me. He walked me out to my car, he took some boxes that I had in my hand, he helped me to my car, and he was -- told me that Amy had -- Amy, who was his coworker in the warehouse, had come up to the Everman office to bring mail. And he -- and she expressed to him that they were still talking -- or she had heard some scuttlebutt about them accusing Tony of stealing, and that she wanted him to know, and he mentioned that to me again on Monday afternoon.
So I'm -- again, I don't know what confidence I could've -- that he was talking about or she was referencing in that, because he talked to me on Monday afternoon. So if he didn't have confidence in me, I'm not really sure why he was talking to me. My response to him was to "Go talk to Alicia," because Alicia was in the office that day.



Q. Did you, at any point, tell Alicia Campbell that you didn't feel you were the right person to investigate Tony Gill's matter because he had allegedly reported that he did not trust you, and felt like you broke confidences?
A. I don't recall reaching that subject. Again, being a professional, I -- I was going to get the statements like I did with the other employees that were around Tony at the time of the conversation with Alvin.
Q. You say you spoke to the witnesses, right?
A. Yes.
Q. But you never spoke to Kelly Porter, right?
A. I did not.
Q. And you knew Kelly Porter was a witness?
A. I knew that he was in the conversation, yes.
Q. And you knew he had reportedly come -- gone into his office and come back with something behind his back during this incident, this heated argument between Tony Gill, Alvin Craddock, and Kelly Porter, right?
MS. PLAGENS: Objection, form.
A. Alvin told me that Kelly went into his office. There was a brief period that Kelly was not around when they were having a conversation, that he went in the office to get the invoice to show Tony that the materials were received at Primoris, and that's the

material that they were looking for for the crew. The crew couldn't do their work without all this material that they had ordered.

Q. (BY MS. HOPKINS) You took Alvin Craddock's word at that immediately, and immediately believed him that what Kelly Porter had come back with was an invoice?

MS. PLAGENS: Objection, form.

A. No, ma'am. No, ma'am. I'm sorry. I'm saying at one point, he told me he went to his office to get that -- to get the invoice.

Q. (BY MS. HOPKINS) Did you do anything to check to see whether there were security cameras in the area where this heated discussion happened between Alvin Craddock, Kelly Porter, and Tony Gill?

MS. PLAGENS: Objection, form.

A. I don't believe we have cameras inside buildings. We have cameras on the outside of buildings.

Q. (BY MS. HOPKINS) Did you search or have anyone else search Kelly Porter's office for any type of weapon?

A. I don't recall. I --

Q. And you never --

A. Oh, go ahead.

Q. You were going to say?



A. That I don't recall asking anyone to do that, no.

Q. And you, yourself, you did not go to Kelly Porter's office to talk to him or see if there were any weapons in his office, right?

A. No. Usually, we can conduct an interview over the phone --

Q. Okay.

A. -- or over Teams. You don't have to go all the time in person.

Q. And during the course of all the documents you were gathering, you gathered an interview statement Charlotte Chapman Byrd had taken from Braydon Jones, right?

A. Yes.

Q. And in Braydon Jones' statement, it says that Tony Gill told Braydon that Kelly Porter may have had a gat behind his back, right?

A. And who- -- I'm sorry. For clarification, whose statement was that?

Q. Braydon Jones.

A. That I took?

Q. No, that Charlotte Chapman Byrd took.

A. Oh, okay.

Q. Are you recalling that at all now?



A. I am. I recall reading it.

Q. And Braydon -- the Charlotte Chapman Byrd's write-up of her interview with Braydon Jones, it referred to Kelly Porter having a gat behind his back, right?

A. Okay. I would have to see it. I don't recall the exact -- but if it was written, then yes, ma'am. I would have read it.

Q. Okay. Let me find it. Well, first of all, let's start with the top of this document. We're going to mark this as Exhibit 15. Ms. Wood, is this a true and correct copy of an e-mail you sent to Jackie Hendrick on March 2nd, 2023, with Alicia Campbell copied?

(Exhibit Number 15 was marked.)

A. Yes, ma'am.

Q. (BY MS. HOPKINS) And all of the attachments listed are documents you attached to the e-mail that you sent to Ms. Hendrick and Ms. Campbell, correct?

A. Excuse me. Yes, ma'am.

Q. So all of these attachments are documents that you had gathered during the course of your investigation, right?

A. Yes, ma'am.

Q. And all of the these attachments are documents



you had read during the course of your investigation, right?

A. Yes.

Q. Okay. And one of them is referring to Braydon Jones, right?

A. Uh-huh. Yes.

Q. Okay. And if we go to this document, you had obtained these typed up notes that say Braydon Jones up top. And in the document, it says, "Has Tony spoken to you regarding what happened?" "Yes, he told me yesterday, the day after it happened." "What did he tell you?" "That he got ganged up on by four dudes, and that Kelly went into his office, and came back out. Not sure if he had a gat with him." Do you see that?

A. I do.

Q. Okay. So you had read that Tony Gill was not sure if Kelly Porter had come back with a gat?

MS. PLAGENS: Objection, form.

A. Yes.

Q. (BY MS. HOPKINS) Okay. What did you -- did you know what a "gat" was?

A. I believe it's a weapon.

Q. It's a gun, correct?

A. Uh-huh.

Q. Did you know that at the time that "gat" is

slang for gun?
A. Yes.
Q. Okay. What did you do to investigate whether or not Kelly Porter came back out of his office with a gun during that incident?
A. I didn't complete the full investigation. Jackie Hendricks had asked me to give her my notes so she could complete the investigation.
Q. Okay.
A. That's why that was sent to her on that day.
Q. Were you instructed to stop your investigation on March 2nd, 2023?
A. I don't recall Jack- -- I don't recall what date it was, but Jackie had said that she would take over the investigation and complete it.
Q. Okay. You've been, during your deposition, sitting in front of a sign that talks about Primoris, you know, is built on a foundation of trust. We provide our customers un- -- unmatched value, and our employees a safe work environment. There's some other language there. How does it help and provide Tony Gill a safe work environment if you don't investigate whether or not Kelly Porter had a gun --
MS. PLAGENS: Objection, form.
Q. (BY MS. HOPKINS) -- in his office?



MS. PLAGENS: Objection, form.
Sorry, Christine.
A. Well, again, I believe I -- you'd have to go back and pull up the exhibits for me, but I believe I also investigated Braydon, and he wasn't there. So he didn't know what happened. Amy -- Amy did not know what happened. Braydon did not know what happened, so they were not witnesses to this event.
It was hearsay from Tony telling him, and I believe that was Ms. Chapman's notes. Again, I did the investigation, and Jackie said that she would finish it, and I gave her everything. That's why it was sent to her on March the 2nd, I believe, and March the 3rd.
Q. (BY MS. HOPKINS) Okay. So on March the 2nd at 3:04 p.m., you were sending Ms. Hendrick this e-mail because she had told you she was going to complete this investigation?
A. Yes.
Q. And let's share the screen. The next day on March 3rd, you send another e-mail to Ms. Hendrick at 9:28 a.m., correct, with Alicia Campbell copied?
A. Yes.
Q. And this time, you have a lot less documents attached, right?
A. Right.



MS. PLAGENS: Objection, form.
A. I had sent her on the 2nd, and then she -- the way that Jackie likes to operate is she wants you to do a summary. I made a recommendation, and I did not do that on the first, and so she asked me to do -- to write that up, and then send that to her.
Q. (BY MS. HOPKINS) All right. I'm going to put --
A. Since I already sent documents, they might not have been contained in that -- in that one.
Q. I'm just going to -- bear with me one moment. I'll stop sharing my screen, so you don't get dizzy as I'm trying to resize these exhibits. I'm trying to put them side-by-side for us. Still working on it. Bear with me.
Okay. I'm going to share my screen again. Okay. What I have up on my screen, Ms. Wood, is I have Exhibit 17, which is your March 3rd, 2023, e-mail to Jackie Hendrick and Alicia Campbell. And on the other side of the screen, I have Exhibit 15, which is the e-mail you sent the day before to Jackie on March 2nd, 2023.
(Exhibit Number 17 was marked.)
Q. (BY MS. HOPKINS) When you sent Exhibit 15, which is the March 2nd, 2023, e-mail, you'll agree with



me that you had attached Charlotte Chapman Byrd's original notes from her February 17th, 2023, interview with Tony Gill, correct?
A. Yes.
Q. And you attached Charlotte Chapman Byrd's notes of her interview with Braydon Jones, correct?
A. Yes.
Q. And you attached Charlotte Chapman Byrd's notes with another witness, Amy K. If we scroll down, we can find out who Amy K is. Amy Kohrman, right?
A. Yes.
Q. Okay. So those are three documents that were written by Charlotte Chapman Byrd of interviews she conducted that were attached to your March 2nd, 2023, e-mail. But when you send your March 3rd, 2023, e-mail to Jackie Hendrick, none of those three documents are attached, right?
A. Correct.
Q. So your March 3rd, 2023, e-mail to Jackie Hendrick and Alicia Campbell about the Tony Gill investigation excluded Charlotte Chapman Byrd's notes from her February 17th, 2023, interview with Tony Gill, right?
MS. PLAGENS: Objection, form.
A. Yes.

Q. (BY MS. HOPKINS) And your March 3rd, 2023, e-mail excluded Charlotte Chapman Byrd's notes from her interviews with Amy Kohrman and Braydon Jones, correct?
MS. PLAGENS: Objection, form.
A. Yes.
Q. (BY MS. HOPKINS) Okay. And it's your testimony that Jackie Hendrick asked you to send this new e-mail on March 3rd, 2023, summarizing your findings?
A. Yes. Jackie asked -- Jackie likes to have the e-mails -- or she'd like to have the e-mail with the summary so she could look, and then always a recommendation. And it was just a recommendation that she was going to finish it up.
Q. Okay. So is your March 3rd, 2023, e-mail a final report of investigation on the Tony Gill matter?
A. No. She asked me to give her everything that I had on it up until that point, and she was going to take over and conclude the investigation.
Q. Okay. Okay. On March 3rd, 2023, you say that at some point, you interviewed Tony Gill with Jaritza Hernandez as a witness, right?
A. Yes.
Q. And when you did that, you did not take any notes of that conversation with Tony Gill, right?



A. If I --
MS. PLAGENS: Objection, form.
A. Oh, sorry. If I had notes, I gave Jackie everything that I had.
Q. (BY MS. HOPKINS) Okay. Do any of these attachments reflect that you took notes during your conversation with Tony Gill, and with Jaritza Hernandez was a witness?
A. I'm sorry. Can you clarify that?
Q. I mean, we can -- we can spend the time to scroll through these documents. This first --
A. No, I'm sorry. I didn't understand the question. Could you repeat it?
Q. The e-mails you sent on March 2nd and March 3rd, 2023, did not attach any notes from any interview you had with Tony Gill as -- with Jaritza Hernandez as a witness, right?
A. Correct.
Q. And that's because you didn't take notes --
MS. PLAGENS: Objection, form.
Q. (BY MS. HOPKINS) -- when you interviewed -- when you interviewed Tony Gill with Jaritza Hernandez as a witness, right?
MS. PLAGENS: Objection, form.
A. No, I didn't say that I didn't take notes. I



said that I don't know -- if I had the notes, then they would have been sent to Jackie.
Q. (BY MS. HOPKINS) Okay.
A. I gave her everything that I had. That was my summary of my conversation.
Q. If you need me to scroll through the attachments of these e-mails, I will. You're saying if you took notes, they would be attached to those e-mails, right?
A. I said if I had the notes or my notebook, it would have been given to Jackie.
Q. Okay.
A. I gave her everything that I had on that.
Q. And you gave Jackie everything you had by sending her these two e-mails, right?
A. I sent her the two e-mails, and if I had anything else, I would have given it to her. If I had it in a notebook, I wouldn't have been able to scan the notebook. But I -- I used to take notes, yes.
Q. Okay.
A. And I do have -- or I don't have very many, but yes, I have -- I have notebooks.
Q. Sitting here today, do you have a specific recollection of writing notes in a notebook, a physical notebook, of your interview with Tony Gill where Jaritza



Hernandez was present as a witness?
A. Yes. My habit is taking notes.
Q. Okay. Do you have a specific recollection of giving the notes in that notebook to Jackie Hendrick?
A. I gave Jackie everything that I had.
Q. I don't think that answers --
A. I can't recall back then exactly what happened or where those are at. That was three years ago, and I've moved, like, three times since then.
Q. Okay. I guess, that answers another one of my questions. Have you been asked to look for any notebook in which you took notes about the Tony Gill investigation?
A. I have.
Q. Have you located a notebook?
A. I have not.
Q. Sitting here today, do you have a specific recollection of handing that -- those notes -- those physical hardcopy notes to Jackie Hendrick?
A. I cannot -- I don't remember.
Q. Who told you not to interview Kelly Porter?
MS. PLAGENS: Objection, form.
A. No one told me not to inter- -- inter- -- I mean, interview him. Excuse me. I was asked to conclude what I had on that day at that time and send it

repeat it one more time before I answer?
Q. (BY MS. HOPKINS) Sure. Let's break it down. You knew that before your HR director, Alicia Campbell, met with Tony Gill and Charlotte Chapman Byrd, Tony Gill had reported the N word being used, a noose being in his office, and racial jokes being used at the company, right?
MS. PLAGENS: Objection, form.
A. I knew that there was a heated argument, even in our conversation with him -- with Tony Gill and Alicia Campbell and I on the phone Thursday night, he never said anything about a racial slur. He never said -- I didn't even know anything about a noose until I read whatever document that was on. Never heard that before in my life. And that's all I knew, was there was a heated argument. He was accused of stealing.
The -- the -- it was mainly on the stealing is what I'm trying to -- that's what I got out of it. He said -- Charlotte had reported that there was a racial slur. I investigated. I could not confirm that there was a racial slur.
Then when I interviewed Tony, he had changed his statement when I interviewed him, and he brought me his sta- -- or I had his statement, because I had printed it out. I asked him, "Why the difference?"



And he said, "Because it wasn't said." I said, "Well, then, I need to know. You -- you told Charlotte -- or Charlotte has in her notes that it was said." And he said, "I'm giving you the truth. This is my true statement."
Q. (BY MS. HOPKINS) Did you do anything to investigate whether Tony Gill had been pressured to change his statement by anyone before he changed his statement?
A. I asked him, and he said he did that on his own. That he wanted -- he wanted to submit in his words, because he said that what Charlotte wrote was her words, and he wanted to put it in his words. He wanted to put his statement.
Q. During this investigation, was Kelly Porter still coming to work everyday?
A. I can't answer that, ma'am. I don't -- I don't know. He was at another building, another office.
Q. As the investigator, did you put Kelly Porter on administrative leave during the investigation into Tony Gill's matter?
A. I have -- I do not know that. I didn't conclude the re- -- the investigation. I was asked to give what I had at that -- that time to Jackie, and she would conclude it.



Q. From February 20th, 2023 -- well, let -- strike that.
From February 16th, 2023, when you and Alicia Campbell called Tony on the phone, all the way till March 2nd, 2023, when you handed all this off to Jackie Hendrick, at any point during that time frame, did you place Kelly Porter on administrative leave?
A. I did not.
Q. Between February 16th, 2023, and March 2nd, 2023, did you place Alvin Craddock on leave?
A. I did not.
Q. Okay. So as far as you knew, Alvin Craddock was still coming to work like normal during this investigation, right?
MS. PLAGENS: Objection, form.
A. To the best of my knowledge.
Q. (BY MS. HOPKINS) Okay. So someone who, at least according to one set of interview notes, had used racial epithets in the workplace and called someone is the N word, was still coming to work during the investigation, right?
A. As far as I know, yes, but he was -- there was only one person that said that the N word was used.
Q. And who was that?
A. It was from the notes of -- Charlotte's notes



from Tony's interview.
Q. Okay. So was your conclusion that Charlotte Chapman Byrd was lying about what Tony Gill told her?
A. I have no opinion. I don't know if she was lying or not. That's -- I just know that the notes that I took was true from the -- from the gentlemen that was there looking for their tools. They said it was heated. They said that there was a couple of F bombs, probably, but nothing about an N word.
Q. Well, you knew from the get-go that Alvin Craddock, Kelly Porter, and two gentlemen from Crew 354 were present during this exchange, right?
A. Yes.
Q. And you only ended up getting a statement from two of those four people, Alvin Craddock and Chase Newton, right?
MS. PLAGENS: Objection, form.
A. Now, that's not -- I don't believe that's correct. I gave -- some of them wasn't around or they hadn't heard anything, so they didn't have an opinion. I re- -- I believe I had two -- yes. And Tony.
Q. (BY MS. HOPKINS) The people who were present that you learned were present were A.J. Byers, Chase Newton, Alvin Craddock, and Kelly Porter, right?
A. Yes. Well, and Tony. Yes.

Q. And Alvin Craddock gave you a statement?
A. Correct.
Q. And Chase Newton gave you a statement?
A. Correct.
Q. And A.J. Byers said he was there, but didn't hear anything?
A. Correct. I believe that's right from the notes.
Q. Did you find that credible?
A. Did I find it credible?
Q. Did you find it credible that A.J. Byers was present during a heated exchange in which the F bomb was used, and didn't hear anything?
A. He could have been distracted trying to look for the tools that they were there for. I had no reason to believe that it wasn't.
Q. Okay. So at the time, you found A.J. Byers to be credible when he said he didn't hear anything, even though Chase Newton and Alvin Craddock reported there was this heated exchange where people were yelling "motherfucker" to each other?
A. Well, I'm sure they were frustrated, as they were looking for their tools that they needed to complete a job.
Q. You found it credible that A.J. Byers just had



no information to give you at all about anything that he heard or saw?
MS. PLAGENS: Objection, form.
A. I don't know how close he was in proximity. If it was in their warehouse out there, that's a -- a large room. It could've been there. I mean, I could hear somebody arguing, but not hear what they say.
Q. (BY MS. HOPKINS) And you decided not to talk to Kelly Porter?
MS. PLAGENS: Objection, form.
A. That's not true. That's not true. I didn't decide anything. I was asked to give my notes, my investigation at that time, hand it over, and I did. And it would be concluded by Ms. Jackie.
Q. (BY MS. HOPKINS) You had all -- you had all day February 16th, 17th, 20th, 21st, 23rd, 24th, 25th, to talk to Kelly Porter if you wanted to. You didn't talk to him any of those days, right?
MS. PLAGENS: Objection, form.
A. I believe the 16th, it was -- I didn't have all day, because I -- we had the phone call when I was off of work going home is when we called -- is when we called Tony. I spent the day Friday tracking down and getting the witness that was actually the crew that was there, and talking to Alvin and such, trying to find



the -- the missing tools.
Q. (BY MS. HOPKINS) So between February se- -- 16th, 2023, and March 2nd, 2023, your testimony is you were just too busy to talk to Kelly Porter?
MS. PLAGENS: Objection, form.
A. I don't know how to answer that. It wasn't that I was -- I was busy, yes. But, again, I did what I needed to do, and I gave my investigation over. I handed it over when I was asked to.
Q. (BY MS. HOPKINS) At that time, did you know that Kelly Porter had a reputation at the company for being highly aggressive?
MS. PLAGENS: Objection, form.
A. No.
Q. (BY MS. HOPKINS) Did you know at -- did you know at that time that Kelly Porter had a reputation for being aggressive?
MS. PLAGENS: Objection, form.
A. No.
Q. (BY MS. HOPKINS) Did you know at that time that Kelly Porter had a reputation for being abrasive?
MS. PLAGENS: Objection, form.
A. No.
Q. (BY MS. HOPKINS) So you hadn't heard anything negative about Kelly Porter's behavior in the workplace



prior to February of 2023?
A. No, I had not. Not that I can recall.
Q. Shortly after the Tony Gill investigation wrapped up, did Kelly Porter end up getting fired for having a gun in the workplace?
MS. PLAGENS: Objection, form.
A. He was let go, but I don't recall that being the termination.
Q. (BY MS. HOPKINS) Was it verified at some point shortly after the Tony Gill investigation concluded that Kelly Porter did bring a gun to the workplace?
A. Not that I'm aware of.
Q. Did you continue to be the HR manager with responsibility over the division in which Kelly Porter worked after February of 2023?
A. Yes.
Q. Were you the HR person involved in his termination?
A. Yes.
Q. And you're saying Kelly Porter was not fired for bringing a weapon to the workplace?
A. Not that I can remember. I honestly believe it was a fight with a vendor or something with a vendor. I'm sorry. I -- I don't recall it exactly right now.
Q. Okay.

likely I did. I do that to everybody. The first thing I ask them to make sure that they're in a safe location, and they're not working or we can talk.
Q. Did you give Tony Gill any advance notice of this call you were going to make to him on February 16th, 2023?
A. No.
Q. Did you tell Tony Gill whether or not you were conducting a formal investigation at that point into the incident between him, Alvin Craddock, and Kelly Porter?
A. I was driving. I don't recall -- I don't recall if I said that or Alicia said that. I don't recall how the -- exactly how it went.
Q. Did one of you, either you or Alicia Campbell, tell Tony Gill that at this point, you were conducting a formal investigation into the incident?
A. I remember bits and pieces of that phone conversation. I don't -- I'm sure we did, because I know that Alicia asked him about the racial slurs, because that's when she heard about it from -- from Charlotte.
Q. Okay.
A. And that's when Alicia called me and asked me, "Did you know" -- "Do you know anything about Tony?" And I said, "No, other than I saw him yesterday." And



then so we went into that conversation. And then she said, "Well, evidently, there was -- there was something that happened, so get -- let's get him on the phone, and let's talk." And I said, "Okay. Remember, I'm driving." And she said, "Yes." So I know that she did -- she did do -- she held the conversation as well as I did, you know, during that call.
Q. What, specifically, do you remember saying to Tony on that call, you, yourself? Do you remember anything about what you said?
A. I just told him that Alicia was on the phone, and that I had told her that we spoke yesterday. But, again, I don't think I told him that I didn't say anything. I don't know who he -- who he thought -- or how she found out about the information. I'm not sure how that was. But she just asked him about if anything had happened.
Q. Because you were driving, were you unable to take any notes during that telephone call?
A. Correct.
Q. Do you know one way or the other whether Alicia Campbell took notes?
A. I'm not sure.
Q. Have you ever seen a copy of notes that Alicia Campbell took during that initial telephone call with



Tony Gill on February 16th, 2023?
A. I have not, no.
Q. Is there any record at all about what was said on that telephone call with Tony Gill on February 16th, 2023?
A. I'm not sure. I'm sorry. I can't answer that.
Q. Alicia Campbell didn't take the time to tell Tony Gill that he would not be retaliated against for anything he said, did she?
MS. PLAGENS: Objection, form.
A. I'm sorry. Say that once again.
Q. (BY MS. HOPKINS) On that February 16th, 2023, telephone call, you don't have any special recollection of Alicia Campbell telling Tony Gill that he would not be retaliated against, do you?
A. I know that we talked about the incident and I know that we talked about they had a argument, and about the missing tools, and we always tell everybody to give us the truth and to -- that they're not retaliated against.
Q. You're saying you "always tell that to people." I'm asking, do you have a specific recollection of Alicia Campbell saying that to Tony Gill on that telephone call on February 16th, 2023?
A. Yes. Can you give me a minute to go back in



my...
Q. Uh-huh.
A. Because I know where I was driving... We were talking about -- we were -- and she told him that I didn't say anything to him, because I remember that was a point, that he didn't want me saying anything, and I told him that I didn't say anything to Alicia. And she was asking him the question of what happened and all of that, and -- yes.
She said, "Tony, tell us what's going on or what happened, and remember, you're not going to be retaliated. You're not going to be -- something's not going to come back to you. We just need to know what happened. And if it was any racial slurs or any heated argument, was there any physical -- any physical altercation of that?" And he said -- he said, "No."
Q. Okay.
A. No physical altercation.
Q. Did you and Alicia Campbell ask Tony Gill to prepare a written statement during that phone call on February 16th, 2023?
A. Yes. We said that we need to get his statement.
Q. Did you give him a deadline for when he needed to provide his written statement by?

A. I don't recall a certain date. That was Thursday night. Usually, we give them a couple of days to get something in.

Q. Did Alicia Campbell reveal to Tony Gill that she had information from Charlotte Chapman Byrd about the incident?

A. I can't recall if she said Charlotte's name or not, but she said that she -- she did find something out -- maybe she -- I can't remember if it was then or if it was later, because I know that he thought that I was the one that said something. And I said, "I didn't -- I didn't bring it to Alicia first. That was Charlotte that had brought it to Alicia."

Q. Okay. So you told that to Tony Gill at some point?

A. No, I believe Alicia did.

Q. Okay.

A. Alicia told him that it was Charlotte that brought it, that it wasn't me.

Q. Okay. I'm going to share my screen and share Exhibit 20.

(Exhibit Number 20 was marked.)

Q. (BY MS. HOPKINS) During the time you were investigating this matter between February 16th, 2023, and March 2nd, 2023, at any point, did you get a copy of



this photograph?

A. I don't recall the first time I -- I saw that. I can't remember when, but that doesn't even look like a PSC office, so... I don't know where that would have even been at. We don't -- our cubicles did not look like that.

Q. Okay. Do you know where Tony Gill was physically working from in -- in December of 2020?

A. "2020." Wait a minute. When did -- sorry. Let me go back. Was COVID 2020? Is that when COVID started?

Q. I'm going to go ahead and say "yes."

A. Okay. Because I'm trying to -- so --

Q. I don't -- I don't usually like to give witnesses information, but --

A. I know, but I'm just -- I know, and -- and I thank you. Because we -- we didn't even -- we didn't conduct orientation or anything at the office at that time. We did all of that remote. That's why I was asking.

Essential workers, we had to be in the building. But if you were not essential, then that -- so we wouldn't even have done orientation and such at the building. We did all that remote, and it was at hotels. So in December, I mean, he might have been



there, but, I mean, everybody stayed, you know, to themselves.

Q. Okay. My question was a little bit different, but I think I have your memory jogged at least a little bit. In December of 2020, do you know where Tony Gill was assigned to work?

A. It would -- I believe it was the Everman building if it was in an office. It would have been the Everman office.

Q. Okay.

A. But like I said, I -- those cubicles -- we didn't have that metal thing or whatever that is in the middle. That was not on our cubicles there.

Q. You're talking about this metal grate in the middle of the picture?

A. Correct. That doesn't look like a PSC office.

Q. Okay. Well, going back to your investigation, I know you say you can't remember when you first saw this photograph. Did you see it be- -- at any point in time before Charlotte Chapman Byrd was let go from the company?

A. I don't -- I don't believe so, no.

Q. Did you see this photograph any time before you sent Jackie Hendrick your e-mail on March 2nd, 2023?

A. I don't remember. I don't think so, no.



Q. Did Tony Gill provide you this photograph at any point in time when you were investigating this matter back in 2023?

A. No, ma'am.

Q. Did you ask Charlotte Chapman Byrd for everything that she had gathered from Tony Gill?

A. No.

Q. Did you ask Tony Gill whether there was a time stamped photo of a noose as referenced in Charlotte Chapman Byrd's notes at any point in time during your review of the matter?

A. No, because that was never -- again, that was never brought up to me. I believe I learned of it dur- -- in her notes. So it was never brought to my attention by any -- anyone.

Q. Okay. So in --

A. By Tony or any other employee at that time.

Q. So in your mind, anything that was in Charlotte Chapman Byrd's notes was not worthy of investigation?

MS. PLAGENS: Objection, form.

A. No, ma'am, I did not say that. I just said that I -- I didn't get anything that she had. It was not given to me, and that picture was not given to me.

Q. (BY MS. HOPKINS) Right.

A. To my knowledge.

Page 166

Q. We went over, however, that you received notes typed up by Charlotte Chapman Byrd, in which there's a clear reference to a timestamp of a noose in Tony Gill's office, right?
A. Uh-huh. Yes.
Q. Did you ask Tony Gill what that was referring to or whether he had a time-stamped photograph of a noose in his office?
A. I don't recall asking him that specifically. But when I interviewed him, I kept asking him, because it didn't reference anything like that on his statement that he gave that he said that was his words. There wasn't anything in there about that. So why would I -- I don't know why I would ask him about it if it wasn't in his statement.
Q. Okay. You didn't think it was important to ask him why that was in Charlotte Chapman Byrd's notes, but not in his statement?
MS. PLAGENS: Objection, form.
A. Again, that wasn't in his statement that he gave me. So he said that his statement was his true words, and that's what he wanted to submit. I did tell him that there was differences in his statement versus the statement that Charlotte turned in for him, and he said, "These are my words."

Page 167

Q. (BY MS. HOPKINS) Did you ask him if he was afraid?
A. I don't recall if I did or not, but he didn't seem afraid when we were talking.
Q. Did you ask him if he was afraid of Alvin Craddock?
A. No, I did not, because I -- because Tony's like, "I get along with everybody. I want to get along with everybody." So, I mean, you could have a heated argument one day, and be friends the next day. Just depends on the situation.
And I know that, again, those gentlemen were looking for tools that were missing. The company can't make revenue without them doing the work. They couldn't do the work without -- and I say "tools," because I really don't remember exactly what they ordered or what they were missing, but they can't do the work if they don't have the material.
Q. Okay. You -- did you ask Tony Gill if he was afraid of Kelly Porter?
A. No, I did not, not to my knowledge.
Q. Did you ever come to find out that after this incident, Tony Gill found bullet casings around his truck in the parking lot at Primoris?
A. I --

Page 168

MS. PLAGENS: Objection, form.
Go ahead, Kelly.
A. Okay. Thank you. I -- I'm not -- I'm not sure.
Q. (BY MS. HOPKINS) Back in 2023, did John Pinkerton come to you and tell you as HR manager that Tony Gill had reported finding bullet casings around his truck in the Primoris parking lot?
A. I recall something, but I can't -- I can't give you detail. I'm sorry.
Q. To the best of your recollection, do you think John Pinkerton did provide information about that to you back in 2023?
A. I can't -- I can't remember. I can't truthfully answer that. I'm sorry.
Q. Okay. What about Tony Gill? Did Tony Gill come to you and tell you that he had found bullet casings around his truck in the Primoris parking lot shortly after this Alvin Craddock/Kelly Porter investigation wrapped up?
A. Again, I'm sorry. I can't recall exactly the conversation. I don't remember.
Q. Okay. I'm going to mark as Exhibit 18 a chat between Alicia Campbell and Charlotte Chapman Byrd. We can scroll through this. Ms. Wood, my question for you

Page 169

is going to be, back in February of 2023 when you were investigating the Tony Gill matter, did Alicia Campbell ever provide you a copy of this chat?
(Exhibit Number 18 was marked.)
A. No, ma'am.
Q. (BY MS. HOPKINS) Did Alicia Campbell, back in February of 2023, tell you that Charlotte Chapman Byrd had initially reported the Tony Gill matter to her over chat?
MS. PLAGENS: Objection, form.
A. Well, yeah, that's why she called me on that Thursday to ask me if I knew anything about Tony or had I heard anything about Tony. I --
Q. (BY MS. HOPKINS) But --
A. Oh, go ahead.
Q. No, I don't want to interrupt you. Go ahead.
A. Just that had I heard anything about Tony, that there might have been something. And that's when I told Alicia on the phone going, "Oh, hang on a minute. Yes, I saw Tony yesterday." And then we went into the conversation of I said, "He said something happened, a heated argument, but he did not want to go forward -- or didn't want to say anything officially on the record." I said, "That's why I hadn't said anything to you, because he told me not to say anything."

Q. Okay. There's a lot of different ways Charlotte Chapman Byrd could've communicated information to Alicia, including in person or over the telephone or on chat. My specific question is, did Alicia Campbell tell you that there was a chat in which Charlotte Chapman Byrd had actually reported the Tony Gill incident to her in writing on chat?
A. I think, to the best of my knowledge, she said that she messaged her, I believe.
Q. Okay. And as the investigator, did you ask Alicia Campbell for a copy of the message?
A. No.
Q. And Alicia Campbell didn't provide it to you either?
A. No.
Q. All right. We're going to go to Exhibit 20 -- no, sorry. Exhibit 19. Okay. On February 20th, 2023, we see that there is an e-mail from Alicia to Charlotte Chapman Byrd and Tony Gill at 4:33 p.m., and another e-mail from Alicia Campbell to Charlotte Chapman Byrd and Lonnie Gill at 1:15 p.m. Part of Alicia's message to Tony Gill at 1:15 p.m. on February 20th is, "Tony, please confirm the attached statement is correct or if there are any adjustments that need to be made." You were not copied on that e-mail, right?



A. Correct.
Q. So as the investigator of the matter, you were not copied on the e-mail that Alicia Campbell sent to Tony Gill?
A. Correct.
Q. And you were not copied on the follow-up e-mail Alicia Campbell sent to Tony Gill on Monday, February 20th, 2023, at 4:33 p.m. even though you were the investigator in this matter, right?
A. Right.
Q. So why was Alicia Campbell sending e-mails to one of your witnesses in your investigation?
MS. PLAGENS: Objection, form.
A. I can't answer that. I don't know.
Q. (BY MS. HOPKINS) Is it normal for your HR director to start working on your investigations behind your back without you knowing what she's doing?
MS. PLAGENS: Objection, form.
A. No. I mean, no, it's not. If she -- if she had the phone call -- will you scroll down just a bit on that? She's -- she's just letting him know there that -- let me see -- let me look.
I think because at that point, Tony had asked -- I mean, I can't speak -- I can only speak for Alicia, like, me speculating what she was thinking at



that time. But she was letting him know that I didn't disclose anything to her, like he had asked me to. But now that we know about the situation, she's just doing her part and getting that going right there, and telling him that we need his statement.
Q. (BY MS. HOPKINS) Okay.
A. So it's not -- I wouldn't say "behind my back." I -- that's her -- her part of the involvement in it, and then handing it over to me.
MS. HOPKINS: I'm going to move to strike everything after "no, it's not normal" or to that effect.
Q. (BY MS. HOPKINS) Okay. Did these e-mails make it into your packet of information that you sent to Jackie Hendrick about the Tony Gill investigation?
A. I don't recall. I'm sorry.
Q. Did Alicia Campbell forward you this set of e-mails at any point before March 2nd or 3rd, 2023?
A. I can't recall.
Q. If we go back and look at what you sent Jackie Hendrick, we can look at all the attachments here. When you sent Jackie Hendrick your e-mail on March 3rd, 2023, we can scroll through. There are no -- there's no copy of Alicia Campbell's February 20th, 2023, e-mails to Tony Gill, is there?



A. Not on that one as you dated 3/3. Was there one on the 3/2?
Q. Let's check. I will scroll through the documentation. Having scrolled through that -- those attachments, and even looking at the titles of these attachments, when you sent Jackie Hendrick the packet of investigatory documents on March 2nd, 2023, there was no copy of the e-mails Alicia Campbell sent Tony Gill on February 20th, 2023, right?
A. Correct.
Q. And even if we go to the one that was undated -- this undated e-mail you sent to Jackie Hendrick, if you look through the titles of the attachments, and we scroll through the attachments, again, there is no copy of any February 20th, 2023, e-mails from Alicia Campbell to Tony Gill in this packet of material that you sent to Jackie Hendrick, right?
A. Correct.
Q. Okay. Did you ever tell anyone at the company that Tony Gill had made a complaint to you about Charlotte Chapman Byrd?
A. I'm sorry. Say that again.
Q. Sure. Did you ever tell anyone at the company that Tony Gill complained to you about Charlotte Chapman Byrd's involvement in his matter?

Page 174

A. No.
Q. Did Tony Gill ever complain to you that he felt Charlotte Chapman Byrd should not have been involved in speaking with him or investigating his matter?
A. Not that I recall.
Q. So you don't recall Tony Gill making any complaints to you of any kind about Charlotte Chapman Byrd?
A. Not that I can recall.
Q. Christie Madison is an HR employee who reported to you at the time of Charlotte Chapman Byrd's separation, correct?
A. Yes.
Q. Did you believe that Christie Madison had a negative reaction to Charlotte Chapman Byrd getting fired?
A. I'm sorry. Could you clarify your question?
Q. Sure. From your observations, was Christie Madison upset that Charlotte Chapman Byrd was fired or let go?
A. They had developed a friendship, so I'm sure on some level, she was.
Q. Did you ever tell Christie that you felt Christie was acting poorly or behaving poorly in the workplace because of this upsetness she had about

Page 175

Charlotte Chapman Byrd being let go?
A. I did not, no.
Q. Did you give Christie Madison a verbal warning shortly after Charlotte Chapman Byrd was let go?
A. Could you clarify that?
Q. Did you give Christie Madison a verbal warning about her performance shortly after Charlotte Chapman Byrd was let go?
A. Christie Madison received a corrective action that was a verbal warning, along with another employee, due to some infractions that had happened and it was ongoing, so yes.
Q. Did you learn that Christie Madison felt the corrective action was unjustified and unfair?
A. I believe she may have known that, but, again, it was not given just to her. It was given to another coworker as well.
Q. Did Alicia Campbell investigate the corrective action and Christie's complaint that it was unfair?
A. Yes. In fact, Alicia is the one -- I didn't want to write that up. Alicia is the one that asked me to because of the -- of what it was, and how many times it had happened. It happened over and over.
Q. Because Christie Madison's provided a witness statement in this matter and she has referred to

Page 176

receiving a verbal warning, I would like to get your side of the story about what it actually was, and what it was for. So can you explain what the corrective action was, like, what level it was, and then what, specifically, the infractions were?
MS. PLAGENS: Objection, form.
A. I haven't seen -- I'm sorry. I haven't seen it in a bit, but I believe it was for -- they were missing -- I'd have to look at it again. I apologize. I -- I don't -- my memory.
I believe it was some mistakes that they had made on some direct deposit. We were holding up payroll. That is one thing that we teach, instruct. You learn in the very beginning of being a coordinator there's certain -- there's all aspects of HR that we want to make sure that we get in correctly. But when you're onboarding, a direct deposit is -- it is a must.
We don't give out paper checks, and that is one thing that you can say that I was very adamant on being correct. I don't want to hold up payroll for 20-something thousand people, and then they'll have to call Jackie or Alicia or something about that, and say that, "This department's holding it up," because it will -- payroll will not close.
And this was, I believe, the third week in

Page 177

a row that we had went over this for it to get corrected. And, again, it was not just Ms. Christie that got it. It was also the person that was assisting her or they were onboarding with each other.
Q. (BY MS. HOPKINS) Okay. Did you tell Alicia Campbell that you felt Christie was intentionally making those mistakes because she was upset that Charlotte Chapman Byrd got let go?
A. Oh, no. In -- in fact, we wanted -- we wanted -- no, not at all. I wanted to promote Christie. Christie was doing a great job. We wanted to give her more -- more responsibility to see if she could take it. It would have been the opposite.
Q. To your knowledge -- oh, I'm not sure where the feedback is coming from. I'm sorry.
To your knowledge, did anyone investigate concerns Christie Madison raised in her resignation letter that she felt there was a discriminatory and toxic environment at Primoris in the HR department?
A. Yes.
Q. Who investigated it?
A. I'm not sure of every -- all of it, but I know Teresa Berry investigated, along with Tracy Smith.
Q. Were you interviewed as part of that investigation?

A. Yes.
Q. Who interviewed you?
A. Teresa Berry.
Q. Were you informed of what the conclusions of the investigation were?
A. Yes.
Q. And what were the conclusions?
A. Of the investigation regarding -- with Christie? That there was no merit, no findings.
Q. How many investigations have you conducted at Primoris into complaints of discrimination, specifically?
A. I don't -- I don't recall the number. I'm sorry.
Q. Has it been more than just Tony -- the Tony Gill matter?
A. Yes.
Q. Do you think you've conducted more than 10 workplace investigations into complaints of discrimination in your time at the company?
A. I would say yes, about that many or less. Right around. Again, I don't know the exact number. I'm sorry.
Q. Have you ever made a finding that the company has, in fact, discriminated against an employee?



A. I don't think so, no.
Q. Were you -- were you the one to investigate a complaint from Tony Gill's new manager that the manager overheard someone calling Tony the -- the N word?
A. No.
Q. Did you ever learn about any report made by one of Tony Gill's managers that the manager had heard Tony being called the N word?
A. No.
Q. Okay.
A. I don't know.
Q. All right. I'm going to -- I guess, I am going to test your memory about something from back in 2022/2023, when Charlotte Chapman Byrd was employed there, was there a point in time where you and Paula Bagony started meeting with the PLH leadership while Charlotte Chapman Byrd was still employed with the company?
A. Could you give some more information or detail or clarify?
Q. I don't have any more details. I'm just wanting to know if you -- you and Paula Bagony started meeting with the PLH leadership for some reason during the time that Charlotte Chapman Byrd was still working at the company?



A. I -- I -- I don't know how to answer that question. I don't know what leadership would've been still under PLS or PLH at the time, because everybody was being transferred or migrated over to -- to PSC.
Q. Right.
A. Uh-huh.
Q. Did -- were you ever a participant in a human resources team meeting in which Leslea Scott was discussed?
MS. PLAGENS: Objection, form.
A. Can you give more detail?
Q. (BY MS. HOPKINS) Were you present in a in-person team meeting at Everman in which Alicia and Jackie discussed Leslea Scott?
MS. PLAGENS: Objection, form.
A. I -- I'm not sure. In what manner discuss? I mean, we -- we had an in-person meeting with our -- with the team that we were going over the onboarding. I mean, Leslea was there. I guess I'm not fully understanding the question.
Q. (BY MS. HOPKINS) Did you ever hear Alicia Campbell and Jackie Hendrick discussing Leslea Scott in a negative light?
A. No.
Q. Saying bad things about her?



A. No.
Q. Were you ever assigned to investigate any complaints Leslea Scott had about discrimination or retaliation at Primoris?
A. No.
Q. Okay. If you could just give me five minutes to check to see if I have any final questions. We're almost done.
A. Okay.
MS. HOPKINS: So we'll take a five-minute break to 3:21.
THE REPORTER: Off the record at 3:16 p.m.
(Recess taken from 3:16 p.m. to 3:21 p.m.)
MS. HOPKINS: Okay. We're back on the record at 3:21 p.m.
Q. (BY MS. HOPKINS) Ms. Wood, I only have a few final questions for you. After you sent Jackie Hendrick the March 3rd, 2023, e-mail with your recap and recommendations, were you asked to do anything else in regards to the Tony Gill investigation at any point after that?
A. No, ma'am.
Q. Were you ever asked -- asked to check in with Tony Gill after the investigation was complete to see how he was doing?

Page 182

A. No, ma'am.
Q. Were you ever asked to follow up to see if Tony Gill took any PSC learning classes on diversity, equity, or inclusion?
A. No, ma'am.
Q. Were you ever asked to follow up with Alvin Craddock to see if Alvin Craddock had taken any PSC Learn classes on diversity, equity, and inclusion?
A. No, ma'am.
Q. Were you ever asked to follow up to see if John Pinkerton addressed conflict resolution with Tony Gill and Alvin Craddock?
A. No, ma'am.
Q. Okay. And then just one last exhibit. I want to know if Alicia Campbell ever shared this with you, Ms. Wood. It is a Charlotte conversation snippet from February 20th, 2023. It is between Charlotte Chapman Byrd and Shunte Curtis.
(Exhibit Number 22 was marked.)
A. No.
Q. (BY MS. HOPKINS) Did Alicia Campbell let you know that Charlotte Chapman Byrd had expressed concern to Shunte that the company was not going to do anything about a director calling an employee the N word?
A. No.

Page 183

MS. HOPKINS: Okay. All right. I will pass the witness to you, Nichole.
MS. PLAGENS: We'll reserve questioning for time of trial. May we have 30 days for her to read it and sign? I know that -- that's to my court reporter, not to Ms. Mabry.
MS. HOPKINS: Yes.
We'll just have Ms. Mabry come back on and read us out of the deposition, and then we'll be concluded for the day.
Oh, we can't hear you.
MS. MABRY: Can you hear me now?
MS. HOPKINS: Yes.
MS. PLAGENS: Yeah.
MS. MABRY: Okay. I'm sorry. Okay. So this -- thank you, everyone. This concludes our remote deposition proceeding for today. The current time is 3:24 p.m.
(End of proceedings at 3:24 p.m.)

Page 184

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLOTTE CHAPMAN BYRD, )
)
Plaintiff, )
)
v. )
) CIVIL ACTION
PRIMORIS SERVICES ) NO. 3:24-cv-2767-N
CORPORATION, PLH GROUP )
INC., POWER LINE SERVICES, ) JURY TRIAL DEMANDED
INC., and FUTURE )
INFRASTRUCTURE, LLC, )
)
Defendant. )

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
KELLY WOOD
APRIL 24, 2026
(REPORTED REMOTELY)

I, Amber Garcia, Notary Public in and for the State of Texas, hereby certify to the following:
That the witness, KELLY WOOD, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;
I further certify that pursuant to FRCP Rule 30 (e) (1) that the signature of the deponent:
____x_____ was requested by the deponent or a party before the completion of the deposition and returned

Page 185

within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;
__________ was not requested by the deponent or a party before the completion of the deposition.
I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.
Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.
Subscribed and sworn to on this the 29th day of April, 2026.

Amber Garcia
Amber Garcia, Notary ID No. 13426953-9
My commission expires: 3-24-2027
VERITEXT LEGAL SOLUTIONS
Firm Registration No. 571
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
(817) 336-3042
(800) 336-4000

MS. CHRISTINE HOPKINS
Christine@tremainartaza.com

April 29, 2026

RE: Byrd v. Primoris Services Corporation, Et Al.
4/24/2026, Kelly Wood (#7972699)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions



Byrd, Charlotte Chapman v. Primoris Services Corporation, Et Al.
Kelly Wood (#7972699)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________

________________________________ _______________
Kelly Wood Date



Byrd, Charlotte Chapman v. Primoris Services Corporation, Et Al.
Kelly Wood (#7972699)

ACKNOWLEDGEMENT OF DEPONENT

I, Kelly Wood, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Kelly Wood Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

# PLAINTIFF'S EXHIBIT 12

**Sent:** 2/16/2023 4:44:17 PM
**To:** Angela Schaffer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a39fb13a99d7409f89a8d51cd533e017-Angela Scha]; Kelly Wood [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=87a0706e9aca4e6cb84be9ca793fa6af-migtx_kelly]
**CC:** Alicia Campbell [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=05745a86168f439fbee33fee4d14ef73-Alicia Camp]; Missy Rivet [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=922369614a24430e9615bc42fffec3ca-Melissa Riv]
**Subject:** RE: Wave 4 PLS to PTD Transfers Consolidated List.xlsx
**Attachments:** PLS_Auger Employees Remaining after Wave 4 to Transfer_ class.craft.xlsx

There are several employees on this list that should go under Co 100. I have indicated that in the class/craft field.

Danny Leigh's last day is tomorrow; he has resigned. He is listed as a supervisor on this list
There are a few employees that have already been transferred on this list. I have indicated that in column F
The rehires EE's are on the list as well
[redacted] is not eligible for rehire. I have updated his color to red

Have a wonderful evening.

Paula Bagony
*HR Manager*

**Primoris Utilities & Distribution Group**
Direct: 352.458.4455
Cell: Redacted
Fax: 813.996.2919
www.prim.com

*"No business objective is so important that it will be pursued at the sacrifice of safety."*

---

**From:** Paula Bagony
**Sent:** Thursday, February 16, 2023 11:12 AM
**To:** Angela Schaffer <aschaffer@prim.com>; Kelly Wood <Kelly.Wood@prim.com>
**Cc:** Alicia Campbell <Alicia.Campbell@prim.com>; Missy Rivet <mrivet@prim.com>
**Subject:** RE: Wave 4 PLS to PTD Transfers Consolidated List.xlsx

I am working on the class/craft now. Will have it to you shortly

Paula Bagony
*HR Manager*

**Primoris Utilities & Distribution Group**
Direct: 352.458.4455
Cell: [redacted]
Fax: 813.996.2919
www.prim.com

*"No business objective is so important that it will be pursued at the sacrifice of safety."*

---

**From:** Angela Schaffer <aschaffer@prim.com>
**Sent:** Thursday, February 16, 2023 10:46 AM
**To:** Kelly Wood <Kelly.Wood@prim.com>; Paula Bagony <PBagony@prim.com>
**Cc:** Alicia Campbell <Alicia.Campbell@prim.com>; Missy Rivet <mrivet@prim.com>
**Subject:** RE: Wave 4 PLS to PTD Transfers Consolidated List.xlsx
**Importance:** High

Hi Ladies, just wanted to follow up on the status of getting the crafts/classes and locations for the Wave 4 employees. We need to have this information back today so we can complete the import into UKG and get the employee ID's to the integration team.

Also – regarding Wave 3, do you need assistance updating the pay groups so these employees will pass to Viewpoint? We could do the update as an import, just let me know.

Thank you,

***Angela Schaffer***
PLH Human Resources & HRIS
401 E Corporate Drive, Ste 225, Lewisville, TX 75057
o 469.312.1473 | c [redacted]

www.prim.com

**From:** Angela Schaffer
**Sent:** Tuesday, February 14, 2023 5:59 PM
**To:** Kelly Wood <Kelly.Wood@prim.com>; Paula Bagony <PBagony@prim.com>
**Cc:** Alicia Campbell <Alicia.Campbell@prim.com>; Missy Rivet <mrivet@prim.com>
**Subject:** Wave 4 PLS to PTD Transfers Consolidated List.xlsx

Hi Ladies,

Attached is the consolidated of Wave 4 transfers. I filled in the job code/title and organizational information. Please fill in craft/class in Column J and if the employees will work out of a specific office, please list that in Column K.

Thank you for your help!


*Angela Schaffer*
PLH Human Resources & HRIS
401 E Corporate Drive, Ste 225, Lewisville, TX 75057
o 469.312.1473 | c [redacted]

Primoris
www.prim.com

DOCUMENT PRODUCED IN NATIVE FORMAT



Confidential

AutoSave OFF — Exhibit 50 - Primoris 003402 002603009_0000117829-0001 — Search (Cmd + Ctrl + U)

Home | Insert | Draw | Page Layout | Formulas | Data | Review | View — Comments | Share

Spelling | Thesaurus | Workbook Statistics | Check Accessibility | Translate | Show Changes | New Comment | Delete | Previous Comment | Next Comment | Show Comments | Notes | Unprotect Sheet | Protect Workbook | Always Open Read-Only | Hide Ink

A35 fx Power Line Services

| | A | B | C | D | E | F | G | H | I | J | K | L | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | COMPANY | EMPLOYEE NAME | GIVENNAME | SURNAME | PLH EMP ID | PTD EMP ID | CLASS/CRAFT | PLH Email | PSC Email | TITLE | PLS/AUGER SUPERVISOR | PLS/AUGER SUPERVISO | FULL TIME/ PART TIME | HRLY/SAL | PLS/AUGER HIRE DATE | PLS/AUGER DEP |
| 2 | | | | | | | | | | Current | Current | Current | Current | Current | Current | Curren |
| 3 | Power Line Services | [redacted] | [redacted] | [redacted] | 012772 | | 006/208 | | | Journeyman Lineman | [redacted] | 213990 | Full Time | Hourly | 5/14/19 | Direct-Distribu |
| 4 | Power Line Services | [redacted] | [redacted] | [redacted] | 213882 | | 006/206 | | | Lineman Apprentice 6 | [redacted] | 213871 | Full Time | Hourly | 7/11/22 | Direct-Distribu |
| 5 | Power Line Services | [redacted] | [redacted] | [redacted] | 014187 | 118481 | 006/205 | | | Lineman Apprentice 5 | [redacted] | 001932 | Full Time | Hourly | 5/23/22 | Direct-Distribu |
| 6 | Power Line Services | [redacted] | [redacted] | [redacted] | 214626 | | 006/206 | | | Lineman Apprentice 6 | [redacted] | 213871 | Full Time | Hourly | 9/12/22 | Direct-Distribu |
| 7 | Power Line Services | [redacted] | [redacted] | [redacted] | 215292 | | 006/205 | | | Lineman Apprentice 5 | [redacted] | 213871 | Full Time | Hourly | 11/28/22 | Direct-Distribu |
| 8 | Auger Services | [redacted] | [redacted] | [redacted] | 214359 | | 008/200 | | | Groundman | [redacted] | 003067 | Full Time | Hourly | 8/22/22 | Direct-Founc |
| 9 | Power Line Services | [redacted] | [redacted] | [redacted] | 214967 | | 006/206 | | | Lineman Apprentice 6 | [redacted] | 213990 | Full Time | Hourly | 10/10/22 | Direct-Distribu |
| 10 | Power Line Services | [redacted] | [redacted] | [redacted] | 012567 | | Co 100 ? | [redacted] | [redacted] | Accts Payable Specialist | [redacted] | 002216 | Full Time | Hourly | 4/1/19 | Accounti |
| 11 | Power Line Services | [redacted] | [redacted] | [redacted] | 211927 | | 006/204 | [redacted] | [redacted] | Lineman Apprentice 4 | [redacted] | 213990 | Full Time | Hourly | 11/2/21 | Direct-Distribu |
| 12 | Auger Services | [redacted] | [redacted] | [redacted] | 8787 | | 007/400 | [redacted] | [redacted] | Equipment Operator | [redacted] | 003067 | Full Time | Hourly | 8/22/22 | Direct-Founc |
| 13 | Auger Services | [redacted] | [redacted] | [redacted] | 003067 | | 010/702 | [redacted] | [redacted] | Superintendent | [redacted] | 003056 | Full Time | Salaried | 8/22/22 | Field Mgmt-Fou |
| 14 | Power Line Services | [redacted] | [redacted] | [redacted] | 215153 | | 006/206 | [redacted] | [redacted] | Lineman Apprentice 6 | [redacted] | 214458 | Full Time | Hourly | 11/8/22 | Direct-Distribu |
| 15 | Power Line Services | [redacted] | [redacted] | [redacted] | 210799 | | 006/206 | [redacted] | [redacted] | Lineman Apprentice 6 | [redacted] | 213990 | Full Time | Hourly | 8/3/21 | Direct-Distribu |
| 16 | Power Line Services | [redacted] | [redacted] | [redacted] | 014806 | 119812 | 007/400 | [redacted] | [redacted] | Equipment Operator | [redacted] | 003533 | Full Time | Hourly | 8/17/20 | Direct-Transı |
| 17 | Power Line Services | [redacted] | [redacted] | [redacted] | 214791 | | 006/210 | [redacted] | [redacted] | Foreman | [redacted] | 213871 | Full Time | Hourly | 9/26/22 | Direct-Distribu |
| 18 | Auger Services | [redacted] | [redacted] | [redacted] | 214346 | | 006/210 | [redacted] | [redacted] | Foreman | [redacted] | 003067 | Full Time | Hourly | 8/22/22 | Direct-Founc |
| 19 | Power Line Services | [redacted] | [redacted] | [redacted] | 210674 | | 006/210 | [redacted] | [redacted] | Foreman | [redacted] | 214458 | Full Time | Hourly | 7/20/21 | Direct-Distribu |
| 20 | Auger Services | [redacted] | [redacted] | [redacted] | 008788 | | 007/400 | [redacted] | [redacted] | Equipment Operator | [redacted] | 003067 | Full Time | Hourly | 8/22/22 | Direct-Founc |
| 21 | Auger Services | [redacted] | [redacted] | [redacted] | 003034 | | 006/210 | [redacted] | [redacted] | Foreman | [redacted] | 003067 | Full Time | Hourly | 8/22/22 | Direct-Founc |
| 22 | Power Line Services | [redacted] | [redacted] | [redacted] | 210177 | | Co 100 ? | [redacted] | [redacted] | Safety Manager | [redacted] | 215374 | Full Time | Salaried | 4/8/21 | Safety |
| 23 | Power Line Services | [redacted] | [redacted] | [redacted] | 213860 | 120344 | 006/700 | [redacted] | [redacted] | General Foreman | [redacted] | 213871 | Full Time | Hourly | 7/11/22 | Direct-Distribu |
| 24 | Power Line Services | [redacted] | [redacted] | [redacted] | 213866 | 120545 | 006/210 | [redacted] | [redacted] | Foreman | [redacted] | 213861 | Full Time | Hourly | 7/11/22 | Direct-Distribu |
| 25 | Power Line Services | [redacted] | [redacted] | [redacted] | 213877 | | 006/203 | [redacted] | [redacted] | Lineman Apprentice 3 | [redacted] | 213871 | Full Time | Hourly | 7/11/22 | Direct-Distribu |
| 26 | Power Line Services | [redacted] | [redacted] | [redacted] | 016479 | | Co 100 ? | [redacted] | [redacted] | Field Safety Specialist | [redacted] | 215373 | Full Time | Salaried | 11/9/20 | Safety |
| 27 | Power Line Services | [redacted] | [redacted] | [redacted] | 215293 | | 006/208 | [redacted] | [redacted] | Lineman | [redacted] | 213871 | Full Time | Hourly | 11/28/22 | Direct-Distribu |
| 28 | Auger Services | [redacted] | [redacted] | [redacted] | 214347 | | 008/200 | [redacted] | [redacted] | Groundman | [redacted] | 003067 | Full Time | Hourly | 8/22/22 | Direct-Founc |
| 29 | Power Line Services | [redacted] | [redacted] | [redacted] | 215196 | | 006/208 | [redacted] | [redacted] | Lineman | [redacted] | 214458 | Full Time | Hourly | 11/8/22 | Direct-Distribu |
| 30 | Power Line Services | [redacted] | [redacted] | [redacted] | 212986 | | 007/400 | [redacted] | [redacted] | Equipment Operator | [redacted] | 213990 | Full Time | Hourly | 2/15/22 | Direct-Distribu |
| 31 | Power Line Services | [redacted] | [redacted] | [redacted] | 013149 | | Co 100 ? | [redacted] | [redacted] | Safety Training Manager | [redacted] | 215372 | Full Time | Salaried | 7/15/19 | Safety |
| 32 | Power Line Services | [redacted] | [redacted] | [redacted] | 214261 | | 006/208 | [redacted] | [redacted] | Lineman | [redacted] | 214458 | Full Time | Hourly | 8/15/22 | Direct-Distribu |
| 33 | Power Line Services | [redacted] | [redacted] | [redacted] | 003979 | Already Transferred | 001/801 | [redacted] | [redacted] | Operations Manager | [redacted] | 014236 | Full Time | Salaried | 12/13/21 | Field Mgmt-Tra |
| 34 | Power Line Services | [redacted] | [redacted] | [redacted] | 211516 | | 005/100 | [redacted] | [redacted] | Subcontracts Admin 1 | [redacted] | 015192 | Full Time | Hourly | 9/20/21 | Purchasi |
| 35 | Power Line Services | Chapman, Charlotte T. | Charlotte | Chapman | 215048 | | Co 100 ? | | | HR Manager | Campbell, Alicia | 214341 | Full Time | Salaried | 10/17/22 | Human Resı |
| 36 | Auger Services | [redacted] | [redacted] | [redacted] | 014575 | | 007/400 | [redacted] | [redacted] | Crane Operator | [redacted] | 003056 | Full Time | Hourly | 3/16/20 | Direct-Founc |
| 37 | Power Line Services | [redacted] | [redacted] | [redacted] | 017507 | | Co 100 ? | [redacted] | [redacted] | Field Safety Specialist | [redacted] | 215373 | Full Time | Salaried | 2/1/21 | Safety |
| 38 | Power Line Services | [redacted] | [redacted] | [redacted] | 213865 | | 006/206 | [redacted] | [redacted] | Lineman Apprentice 6 | [redacted] | 213871 | Full Time | Hourly | 7/11/22 | Direct-Distribu |
| 39 | Power Line Services | [redacted] | [redacted] | [redacted] | 015631 | | 006/206 | [redacted] | [redacted] | Lineman Apprentice 6 | [redacted] | 213871 | Full Time | Hourly | 2/1/22 | Direct-Distribu |
| 40 | Power Line Services | [redacted] | [redacted] | [redacted] | 212587 | | Co 100 ? | [redacted] | [redacted] | Project Controls Analyst | [redacted] | 210923 | Full Time | Salaried | 1/3/22 | Field Mgmt-Dis |

PLS_Auger

Ready — Accessibility: Good to go — Average: 44851 Count: 18 Sum: 44851 — 125%

# PLAINTIFF'S EXHIBIT 13

**From**: Sunita Khorana [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BD59FA1644F34E0386B95DFA81E42902-SUNITA KHOR]
**Sent**: 2/22/2023 7:50:42 AM
**To**: Nicholas Hebert [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=89128e5d4eb346c1a4a799ead5f48430-Nicholas He]
**Subject**: Master PLS_Auger_Employees to be Transferred.xlsx
**Attachments**: Master PLS_Auger_Employees to be Transferred.xlsx

To discuss for out meeting.

DOCUMENT PRODUCED IN NATIVE FORMAT

AutoSave OFF — Exhibit 29 - Primoris 001539 CONF

Home | Insert | Draw | Page Layout | Formulas | Data | Review | View

A81 | fx | Power Line Services

| 1 | COMPANY | WAVE/HIRE/ TRANSFER/ TERM | EMPLOYEE NAME | Notes | GIVENNAME | SURNAME | PLH EMP ID | TITLE | CRAFT | UNION | PLS/AUGER PR Group | PLS/AUGER SUPERVISOR | PLS/AUGER SUPERVISOR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 012772 | Journeyman Lineman | | | 1 | [redacted] | 213990 |
| 6 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 213882 | Lineman Apprentice 6 | | | 1 | [redacted] | 213871 |
| 10 | Power Line Services | Wave 5 March 13 | [redacted] | Eric Hook is finding out | [redacted] | [redacted] | 014187 | Lineman Apprentice 5 | | | 1 | [redacted] | 001932 |
| 18 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 215292 | Lineman Apprentice 5 | | | 1 | [redacted] | 213871 |
| 22 | Auger Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 214359 | Groundman | | | 1 | [redacted] | 003067 |
| 26 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 214967 | Lineman Apprentice 6 | | | 1 | [redacted] | 213990 |
| 29 | Power Line Services | RIF per Jackie AFTER Wave 4 List | [redacted] | | [redacted] | [redacted] | 012567 | Accts Payable Specialist | | | 2 | [redacted] | 002216 |
| 31 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 211927 | Lineman Apprentice 4 | | | 1 | [redacted] | 213990 |
| 32 | Auger Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 8787 | Equipment Operator | | | 1 | [redacted] | 003067 |
| 34 | Auger Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 003067 | Superintendent | | | 1 | [redacted] | 003056 |
| 36 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 215153 | Lineman Apprentice 6 | | | 1 | [redacted] | 214458 |
| 37 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 210799 | Lineman Apprentice 6 | | | 1 | [redacted] | 213990 |
| 38 | Auger Services | RIF per Jackie Wave 4 List | [redacted] | Fleet/Equip-Foundations | [redacted] | [redacted] | 210437 | Heavy Haul Driver | | | 1 | [redacted] | 003067 |
| 40 | Power Line Services | Wave 5 March 13 | [redacted] | Active on Chase Ezelles Crew/Paul Baker | [redacted] | [redacted] | 014806 | Equipment Operator | | | 1 | [redacted] | 003533 |
| 41 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 214791 | Foreman | | | 1 | [redacted] | 213871 |
| 43 | Auger Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 214346 | Foreman | | | 1 | [redacted] | 003067 |
| 45 | Auger Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 008788 | Equipment Operator | | | 1 | [redacted] | 003067 |
| 46 | Auger Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 003034 | Foreman | | | 1 | [redacted] | 003067 |
| 47 | Power Line Services | Wave Support | [redacted] | Ask Tommy Russell | [redacted] | [redacted] | 210177 | Safety Manager | | | 1 | [redacted] | 215374 |
| 48 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 213860 | General Foreman | | | 1 | [redacted] | 213871 |
| 49 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 213866 | Foreman | | | 1 | [redacted] | 213861 |
| 51 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 213877 | Lineman Apprentice 3 | | | 1 | [redacted] | 213871 |
| 52 | Power Line Services | Wave Support | [redacted] | Ask Tommy Russell | [redacted] | [redacted] | 016479 | Field Safety Specialist | | | 1 | [redacted] | 215373 |
| 53 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 215293 | Lineman | | | 1 | [redacted] | 213871 |
| 54 | Auger Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 214347 | Groundman | | | 1 | [redacted] | 003067 |
| 57 | Power Line Services | Wave 5 March 13 | [redacted] | 2/21 requested by Supervisor Paul Lulewicz | [redacted] | [redacted] | 215196 | Lineman | | | 1 | [redacted] | 214458 |
| 58 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 212986 | Equipment Operator | | | 1 | [redacted] | 213990 |
| 61 | Power Line Services | Wave 5 | [redacted] | Ask Tommy Russell | [redacted] | [redacted] | 013149 | Safety Training Manager | | | 1 | [redacted] | 215372 |
| 67 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 214261 | Lineman | | | 1 | [redacted] | 214458 |
| 80 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 211516 | Subcontracts Admin 1 | | | 1 | [redacted] | 015192 |
| 81 | Power Line Services | RIF per Jackie AFTER Wave 4 List | Chapman, Charlotte T. | | Charlotte | Chapman | 215048 | HR Manager | | | 2 | Campbell, Alicia | 214341 |
| 85 | Auger Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 014575 | Crane Operator | | | 1 | [redacted] | 003056 |
| 86 | Power Line Services | Wave 5 | [redacted] | Transmission East Daniel Cleaver, Paul Baker | [redacted] | [redacted] | 014304 | Operations Director | | | 2 | [redacted] | 003617 |
| 87 | Power Line Services | Wave Support | [redacted] | Ask Tommy Russell | [redacted] | [redacted] | 017507 | Field Safety Specialist | | | 1 | [redacted] | 215373 |
| 90 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 213865 | Lineman Apprentice 6 | | | 1 | [redacted] | 213871 |
| 91 | Power Line Services | Wave 5 | [redacted] | | [redacted] | [redacted] | 015631 | Lineman Apprentice 6 | | | 1 | [redacted] | 213871 |
| 94 | Power Line Services | RIF per Jackie AFTER Wave 4 List | [redacted] | | [redacted] | [redacted] | 212587 | Project Controls Analyst | | | 1 | [redacted] | 210923 |

Summary | Pivot | PLS_Auger | Org | G Young - Emp.+Eq. | Jobs Pilot and Wave 2 | Transition Process Wave 1-2 | Notes | Process Flow | Ty's Lessons Wave 1 | Danny Meeting Wave 1 | Current - Future Job Info Wave1

Ready | Filter Mode | Accessibility: Investigate | 140%

# PLAINTIFF'S EXHIBIT 14

**Sent**: 2/22/2023 1:13:55 PM
**To**: Sunita Khorana [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=bd59fa1644f34e0386b95dfa81e42902-Sunita Khor]; Srinivas Goluguri [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a37bd968d6f14e80a04fca784f7dd64c-Srinivas Go]
**Subject**: RE: PLS to PTD | Wave 5 Effective April 1, 2023 | HR

*Hi Sunita,*


**ALICIA CAMPBELL, SHRM-CP**
Human Resources Director
Utilities South
9001 Primoris Ct,
Fort Worth, TX 76140
Alicia.Campbell@prim.com
W: (469)484-5830
C: Redacted
F: (682)233-9012
www.prim.com


PSC Primoris

***"Primoris, building America's future, today."***

---

**From:** Sunita Khorana <skhorana@prim.com>
**Sent:** Wednesday, February 22, 2023 12:58 PM
**To:** Srinivas Goluguri <sgoluguri@prim.com>; Alicia Campbell <Alicia.Campbell@prim.com>
**Subject:** PLS to PTD | Wave 5 Effective April 1, 2023 | HR

Sri, Alicia,

Here is the employee below that will be included in Wave 5 with an effective date of April 1, 2023. Please be reminded that she will not have access to any PLS applications after transfer.
For the following employee, can you please provide:

1. PTD Home Department
2. PTD Supervisor
3. **Confirm** if they have a laptop, and if so,
4. Provide the Nearest office location with a network connection where they would get their laptops migrated?

| COMPANY | EMPLOYEE NAME | PLH EMP ID | PSC EMP ID | TITLE | PTD HOME DEPT | PLS/AUGER SUPERVISOR | PTD SUPERVISOR | LOCATION |
|---|---|---|---|---|---|---|---|---|
| Power Line Services | Chapman, Charlotte T. | 215048 | | HR Manager | | Campbell, Alicia | | Fort Worth, TX |

| CLOSEST OFFICE LOCATION WITH NETWORK CONNECTION FOR LAPTOP MIGRATION |
| --- |
| |

Thank you,
Sunita | [redacted]

# PLAINTIFF'S EXHIBIT 15

**From**: Jackie Hendrick [jhendrick@prim.com]
**Sent**: 2/20/2023 11:44:28 AM
**To**: Alicia Campbell [Alicia.Campbell@prim.com]

i tried checking the rif list and you are in it


Confidential

# PLAINTIFF'S EXHIBIT 16

JacksonLewis

**Jackson Lewis P.C.**
500 N. Akard St., Suite 2500
Dallas, Texas 75201
(214) 520-2400 Main
(214) 520-2008 Fax
www.jacksonlewis.com

***Michael J. DePonte***
*Direct: (972) 728-3307*
*Michael.DePonte@jacksonlewis.com*
Board Certified-Texas Board of Legal Specialization
Labor and Employment Law
Civil Trial Law

January 31, 2024

***VIA EEOC RESPONDENT PORTAL***
Terance Hobbs
EEOC Investigator
U.S. Equal Employment Opportunity Commission
Dallas District Office
207 S Houston St, 3rd Floor
Dallas, TX 75202

Re: Charging Party: Charlotte Chapman Byrd
Respondent: Primoris Line Services, Inc.
EEOC No.: 450-2024-01639

Dear Mr. Hobbs:

Respondent Primoris Line Services, Inc. ("PLS", or "Respondent"), incorrectly identified in the Charge as Primoris Services Corporation, provides this Position Statement in response to the above-referenced Charge filed by Charging Party Charlotte Chapman Byrd ("Byrd" or "Charging Party").[1] Charging Party asserts she was subjected to discrimination based on her race. Charging Party further alleges she was subjected to retaliation. For the reasons stated herein, PLS denies the allegations and requests Charging Party's claims be dismissed.

## I. FACTUAL BACKGROUND

### A. About Primoris

PLS is an equal opportunity employer that does not discriminate against its employees on any basis and is committed to ensuring a comfortable and nondiscriminatory working environment. As part of this commitment, PLS developed an Equal Employment Opportunity Policy and Anti-

[1] This position statement is submitted solely for informational purposes to aid the EEOC's investigation. It is based upon a preliminary investigation of the Charge allegations and reflects the understanding of events revealed and their relevance to this matter. Respondent reserves the right to submit additional information at any time which may add to or modify this position statement. In addition, this position statement does not preclude Respondent subsequently from asserting any legal defense or theory in opposition to any allegations in the current charge or subsequent litigation.

Harassment Policy and Complaint Procedure. These policies are covered in every new employee's orientation. Each new Employee is asked to acknowledge that they read and understood the policies.

PLS' policies strictly prohibit discrimination based on an employee's race, color, national origin, religion, age, sex, sexual orientation, pregnancy (including childbirth and related medical conditions), physical or mental disability, veteran status, genetic information (including testing and characteristics) and/or any other status or condition protected by applicable local, state or federal law. If an employee believes they have been subjected to discrimination and/or harassment, they should report the conduct to his or her immediate Supervisor, Manager, Human Resources, Legal, or through the Company's Ethics hotline.

Likewise, PLS policies prohibit retaliation against its employees for using its complaint procedure, reporting harassment, or for filing, testifying, assisting or participating in any manner in any investigation, proceeding or hearing conducted by a governmental enforcement agency.

In sum, PLS prohibits discrimination, harassment, or retaliation on any basis.

**B. Charging Party's Employment History with PLS**

Charging Party initially began working for PLS on or about October 17, 2022, as an HR Manager. Unfortunately, the following month, after Charging Party's employment began, the decision was made to shut down PLS. As a result, Charging Party, along with 113 other employees, were laid off over the following quarter. Charging Party's final day of employment was February 21, 2023, when the Human Resources Department no longer had any employees to support.[2]

**C. Charging Party's Actions while Employed at PLS**

In early November 2022, as the HR Manager for her business unit, Charging Party received notice from an employee in her unit that three employees had exchanged inappropriate messages on a text chat, including images, sexual dialogue, and racial slurs. The employee forwarded these messages to Charging Party as the HR Manager. Charging Party then forwarded the issue to HR Director Alicia Campbell and recommended the employees receive written disciplinary action. Despite Charging Party's recommendation, Campbell made the decision to immediately terminate the employees' employment with PLS for inappropriate behavior.[3] Notably, none of the messages referred to Bryce Burns, VP of Operations, or even suggested he was the "Boss man" as claimed by Charging Party in the Charge.[4]

Next, in February 2023, just before Charging Party was scheduled to be laid off, Campbell contacted Hendrick regarding Lonnie "Tony" Gill, an African American Warehouseman.

[2] PLS is no long an active entity.
[3] Campbell's decision to discharge the subject employees was supported by VP of HR Jackie Hendrick.
[4] Charging Party also alleged Burns excluded her from traveling to Florida. However, Burns had no authority over Charging Party's travel.

Specifically, Gill had complained to his HR business unit partner, Kelly Wood, that Charging Party had become involved in a matter in his business unit for which Charging Party had no responsibility. Gill asserted Charging Party approached him unexpectedly and had attempted to insert racial slurs into a statement she wrote for Gill – including the use of the "N' word - which Gill maintained was not used. In fact, Gill refused to include the racial slur in his statement. Despite Charging Party's inappropriate and unprofessional actions, the Company completed its investigation based on Gill's truthful account as it shut down its operations.

## II. LEGAL ANALYSIS

### A. Charging Party Cannot Demonstrate a Claim of Race Discrimination

Charging Party's discrimination claim must be dismissed because she was discharged for legitimate business reasons, and because there is no evidence of any race-based animus on the part of any employee at PLS towards Charging Party. To establish a *prima facie* claim of discrimination, Charging Party must establish: (1) she is a member of a protected group; (2) she was qualified for the position held; (3) she was the subject of an adverse employment action; and (4) she was treated less favorably because of her membership in a protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. If she succeeds in making this showing, then the burden shifts to the Company to articulate a legitimate non-discriminatory reason for her discharge. Once it does this, the burden then shifts back to Charging Party to prove that the Company's stated reason is not the true reason for its action, but instead was mere pretext for discrimination.

To begin, Charging Party's discrimination claim fails because she fails to identify any individual outside of her protected class who was treated more favorably. In fact, Charging Party fails to identify any individuals who were treated more favorably – or retained – following the closure of PLS. Charging Party alludes to "non-African American counterparts" retaining their position with PLS, but this is simply incorrect – no one retained their position with PLS. Nevertheless, even if Charging Party could establish a *prima facie* claim of discrimination, her claim would still fail because the Company has established a legitimate non-discriminatory reason for her discharge. Specifically, PLS shuttered its operations resulting in the termination of Charging Party's employment. Accordingly, Charging Party's discrimination claim must be dismissed.

### B. Charging Party was not subjected to Retaliation.

Charging Party also alleges she was retaliated against for engaging in a protected activity; that is, allegedly submitting Gill's report of alleged discrimination. To establish a *prima facie* claim of retaliation, Charging Party has the burden to prove: (1) she participated in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. As above, under the *McDonnell Douglas* framework, if an employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. Once the employer does so,

the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation.

As an initial matter, Charging Party cannot meet the first element of her retaliation claim. In fact, Charging Party did not engage in a protected activity regarding Gill's statement. While Charging Party allegedly transcribed Gill's statement, which in Charging Party's version contained a racial slur, Gill did not make such statements. In fact, Gill revised his statement and reiterated the "N" word was not used. In other words, Charging Party fabricated that portion of Gill's statement to create a complaint of racial discrimination where race was not an issue. Because Gill's statement did not constitute an engagement in a protected activity by him – Charging Party cannot, in good faith, rely on the submission of Gill's statement as a protected activity to support the first element of her retaliation claim.[5]

Nevertheless, even if Charging Party had engaged in a protected activity – which she did not – she cannot establish any temporal or causal connection between her activity and her lay-off. PLS made the decision to close in November 2022. Gill's statement in February 2023, whether falsified by Charging Party or not, cannot support Charging Party's retaliation claim because the statement was made <u>after</u> the decision to discharge Charging Party. In sum, Charging Party's alleged protected activity lacks any temporary nexus to her discharge.

Ultimately, even if Charging Party had not falsified an employee statement before the Company made the decision to terminate her employment, there is simply no evidence PLS terminated Charging Party's employment because she engaged in a protected activity. To suggest otherwise requires Charging Party to establish the Company discharged her, along with 113 other employees, just to retaliate against Charging Party – an assertion which is both nonsensical, if not narcissistic. In other words, Charging Party's retaliation claim must fail.

## III. CONCLUSION

For all the reasons set forth above, Charging Party's allegations fail to demonstrate the Company subjected her to discrimination or retaliation. PLS simply did not discriminate against Charging Party on any basis – particularly after it determined the need to cease operations. Likewise, Charging Party's employment was terminated only after the Company decided to terminate its operations – not for any discriminatory or retaliatory reason. As a result, Charging Party's claims must be dismissed.

[5] Moreover, Charging Party fails to describe any action she performed outside of her ministerial job duties in human resources to collect information and pass it on. Except Charging Party's embellishment of Gill's statement, nothing in the Charge indicates Charging Party did anything more than her job duties which is fatal to her retaliation claim.

JacksonLewis



We trust you now have all the information necessary to issue a no cause determination. If, however, you need additional information, please do not hesitate to contact me.

Sincerely,

Michael J. DePonte

MJD/NMP/ef

# PLAINTIFF'S EXHIBIT 17

# WITNESS STATEMENT OF KRISTIE MADISON

1. My name is Kristie Madison. I am over 18 years old. I am competent to make the statements in this declaration, all of which are based on my personal knowledge and true and correct to the best of my recollection and knowledge.

2. I worked as an Onboarding Specialist for Primoris Services Corporation from approximately October 3, 2022 to June 22, 2023.

3. I worked in the same building as Tony Gill. I built a rapport with Tony Gill over time. Tony was a super nice guy. Tony was easy going and typically very calm and collected.

4. One day I was either walking out of the building or coming back in the building and I saw Tony Gill. Tony was upset and asked to speak to me.

5. We went into Tony's office and Tony shut the door behind us. Tony was physically trembling.

6. I asked Tony what was wrong.

7. Tony proceeded to tell me that he had just been confronted by some guys in the office. He mentioned someone by the name Kelly who had something behind his back that could have been a gun. He said they used the "n" word. He also said he felt like he had been in a fight for his life. I could tell from Tony's demeanor that he was terrified.

8. I told Tony that I was so sorry this had happened to him. I told Tony that he needed to talk to Charlotte Chapman Byrd.

9. Charlotte Chapman Byrd was a Human Resources Manager who had joined the company after I was hired. I was thrilled when she joined the company. Charlotte developed trust with those of us who were at a lower level in the Human Resources department. Charlotte took myself and other Human Resources staff members out to lunch or bought us lunch and ate with us. Charlotte got to know us and it was clear that it didn't matter to Charlotte what race you were, that she had respect for all of us. From her interactions with us, both I and the other lower-level staff members viewed Charlotte as the safest person you could go to in the Human Resources department, that Charlotte would see to making you feel safe. This is why I immediately recommended that Tony speak to Charlotte after seeing and hearing how shaken he was by the confrontation that had happened that day.

10. After I told Tony that he needed to speak with Charlotte, I left his office and went to find Charlotte. I told Charlotte that she really needed to speak with Tony Gill. I did not share any details with Charlotte. I just told Charlotte that she needed to speak with Tony Gill as soon as possible.

Docusign Envelope ID: 02ADB23B-0D35-4E91-B8BB-3458D9403100

11. A few days later, I was in my office and the Vice President of Human Resources Jackie Hendrick barged into my office and shut the door. This was highly unusual. Jackie did on occasion visit our building, but I had never had a one-on-one meeting with her.

12. Jackie proceeded to stand there in silence in my office with the door shut behind her. I asked Jackie if everything was okay. Jackie then told me that they had let Charlotte go. Jackie told me that Charlotte was not a good person. Jackie told me that I should not contact Charlotte, and that it was in my best interest not to reach out to Charlotte. Jackie did not tell me the reason they let Charlotte go or provide any other information, however my understanding from Jackie's actions and statements that day was that Charlotte had been involuntarily terminated for a particular reason. Jackie did not make it sound or seem like Charlotte was simply laid off or let go as part of a reduction in force.

13. I am not certain of the timing, but on a later occasion, Jackie Hendrick also reached out to me. During that call, Jackie told me again that Charlotte was not a good person. Jackie said something along the lines of "If I told you the things Charlotte had done, you would not want to be friends with her."

14. About three weeks after Jackie first informed me that Charlotte had been let go, I had a meeting with Human Resources Director Alicia Campbell to discuss a verbal warning that my supervisor Kelly Wood had issued to me following Charlotte's termination. I felt that the verbal warning was unjustified and unfair. Alicia seemed to agree with me and told me that she knew Kelly Wood was of control. Alicia told me that Kelly Wood assumed I was feeling some type of way about Charlotte being fired. Alicia told me that Kelly thought I was being retaliatory, as in being difficult, because of Charlotte's termination. I told Alicia that I had nothing against anyone and that I wasn't really sure why they would think that I was feeling any particular way about Charlotte's termination. Alicia said that she, Alicia, wanted to bring me in to make sure I was clear on what happened. Alicia proceeded to tell me that Charlotte "needed to be let go." Alicia told me that there had been an interaction between Alicia and Charlotte in Alicia's office and that Charlotte had done something wrong and that whatever Charlotte had done or said in Alicia's office was the reason for Charlotte's termination. Alicia proceeded to ask questions to try to see if I was still friends with Charlotte.

15. I ultimately decided to resign from Primoris Services Corporation on June 22, 2023. I resigned because I felt that the environment in the Human Resources department was hostile, toxic, unfair, and discriminatory. A true and correct copy of my resignation letter is attached. I felt that Kelly Woods and Alicia Campbell did not judge me based on the merits of my work. Instead, I felt that because I was not the same race as them, I was last on the totem pole and would never be one of their "chosen ones." I also felt that Alicia Campbell and Kelly Woods wanted "yes" people who would do what they were told to do without question even if what they were asked to do wasn't right.

16. While I never shared this sentiment with Kelly Woods, Alicia Campbell, or Jackie Hendrick, I did feel that the timing and circumstances of Charlotte Chapman Byrd's

termination was very suspect, both because of how quickly Charlotte was let go after I asked Charlotte to meet with Tony Gill and because of everything Jackie and Alicia said to me afterwards about Charlotte and her termination.

I declare under penalty of perjury under 28 U.S.C. 1746 and the laws of the United States of American that the above statements are true and correct.

Date: 10/24/2025

DocuSigned by:
87BC4E08451A4CE...
Kristie Madison

Docusign Envelope ID: 02ADB23B-0D35-4E91-B8BB-3458D9403100

Kristie Madison
8336 High Garden St.
Fort Worth TX, 76123

Kelly Wood
HR Manager
Primoris T&D
9001 Primoris Court
Fort Worth TX, 76140

To Whom it May Concern,

I am writing to inform that I am resigning from my position as HR Coordinator at Primoris effective immediately. I am aware of the condition this puts you in as an HR team, and while it is not my typical way of handling things, I could no longer work under the conditions created by Kelly Wood at Primoris. I have had to seek the professional help of a therapist and my primary care physician due to mental anguish, and the hostile, toxic, unfair, and discriminatory work environment that I have suffered in my tenure with the company under the management of Kelly Wood.

In my initial interview Kelly put the biggest red bow on being an employee with Primioris and under her management. She informed me that there were currently two people working the onboarding process and that ultimately there needed to be three. In a roundabout way she hinted the current "girls" (as she likes to refer to her employees0 were failing to get the job done (This should have been a red flag.) She advised that overtime was endless. She also said she was not a micromanager. She went on to say that she wanted to groom someone to eventually take her place. She said I would more than likely be the person that presented the HR portion for new employees during orientation. She presented all of this along with a host of other failed promises. She painted the picture that working under her would be a pleasant breeze which led me to believe that I had found a great long-term career with Primoris. Boy was I in for the rudest of awakening.

When I originally discussed pay with the recruiter it was the amount that every HR Coordinator (seeing since I have been here) starts with. Kelly tried to low ball me and demean me into accepting less than what was originally offered. I objected and she advised she would have to talk to her manager and have it approved.

Not one week into my start date, I quickly learned how Kelly operated. There were three of us under her in the office one of which she had little to no communication with, with the exception of her communicating what she needed through the employee she favored, and all of the mini meetings she would force throughout the day and the many daily "teaching moments." I witnessed firsthand this employee being bullied by Kelly. It rubbed me wrong to witness this type of scrutiny because I saw the mental anguish it caused the employee, and I knew that if it was happening to anyone it would be just a matter of time before would eventually happen to me. Not too long after my arrival it did.

I learned the onboarding process in as little as 2 months as best as I could being trained without having policies, and procedures in place to reference. I took it as my efforts being deemed successful when shortly after I was given the entire process to own single handedly and be responsible for. (a process that I was originally told 3 people would handle.) Not long after I became the pawn of Kelly's bullying. She began not speaking directly to me and going through her favored employee to relay messages, and

Docusign Envelope ID: 02ADB23B-0D35-4E91-B8BB-3458D9403100

when she did speak with me it was in such a demeaning and disrespectful tone that I had tone that I had to take several moments to calm down from. It got so bad that I had to have a conversation with her on the importance of being respected by my manager and what that looked like for me.

Soon after she enforced a daily tasks requirement for the entire team I thought until I asked her favored team member and she advised me that she was not sending it, yet Kelly scolded myself and the other team member when it was not sent.

Alicia and Paula called me on the phone one day to do what I thought was a formal investigation. I was asked if I felt safe to talk to Paula or Alicia about my mishaps with Kelly and I advised them both that I did not because they are all best friends. Obviously, that didn't stop the conversation. I went over several reasons with them as to why I felt the work environment was toxic and unsafe. With every point Alicia defended Kelly and why her actions were acceptable. I told them both that I could not continue to work here if things didn't change with Kelly. I told them they should have a conversation with all the employees in the office and not just me. She advised me that she would however, I later found out she only chose to speak to the employe that she knew would speak in Kelly's favor. The Favored one. A few moments after my conversation with Paula and Alicia- Kelly called me and advised that she spoke with Alicia and Paula and she was told all that was said. She- in her passage aggressive way was rubbing in the fact that she knew and trying to bully me into saying or feeling opposite of what I had just told Paula and Alicia. How's that for an investigation and a safe work environment. From there things continued to spiral.

I witness several employees that I know firsthand were not favored by Kelly be on the chopping block and actually fired, but before they were fired, they were bullied, demeaned and humiliated and even discriminated against. If not by Kelly directly she used her employees to do the heavy lifting. There is a culture that has been created in the HR department that if Kelly doesn't like you for whatever reason, you won't be around for long, or she will make you despise the day you ever accepted a position there.

I have established a great working relationship with everyone in the Primoris office. It's who I am as an employee and I feel that it is necessary to be this way in order to create a culture in the office that individuals want to be part of. Bearing that in mind not too long after Charlotte (previous HR Manager) was fired the heat was turned up on me. I was called into Kelly's office. She and Shaunte put me on a verbal for a minor thing. I have witnessed Kelly's favored people making way bigger mistakes at no written documented cost to them. At this point I advised them that the onboarding processes was too much for just one person to handle and that I would need help. A day or so after my verbal was issued, Alicia called me in her office, we spoke about the verbal I was given and she basically confirmed to me that Kelly assumed I was feeling some type of a way about Charlotte being fired and that Kelly was retaliating. I advised her that I had nothing against anyone and if they felt I did it should have just been a conversation. She advised me that she was talking Kelly out of onboarding and adding another colleague to assist in the onboarding process. It just so happened that was Kelly's current most hated employee. Little did I know that I would be expected to micromanage her and manage the onboarding process. Kelly came to me on several occasions in the short time that I managed her and she would ask me to get on to her about the smallest of nuances. I felt obliged out of fear of retaliation and potentially being fired. Shortly after my title changed from HR Coordinator (which was on my original offer letter) to a lead and I was given the responsibility to manage an employee who on the org chart was under me. When I inquired and asked Kelly if an increase came with my new title and many new responsibilities Kelly advised me that there would be no raise and that she would have to talk to Alicia. I NEVER HEARD BACK. Eventually the young lady was fired.

When I became lead Alicia sent me an invite to the operations meetings that she wanted me to join. She let Kelly know that she wanted me on the call. So Kelly was aware I was on the call. Kelly gave the grandest of introduction of her favored employee who had been recently promoted asked her if she had anything to say, and then she got off the call. Shortly after she walked in my office and said, I'm sorry I didn't introduce you. You can hop in and introduce yourself. I had to get off the call. My response to her was no worries you can give me a proper introduction on the next call like you gave.... She said of course and it never happened.

There were talks of onboarding going recruiting at some point and I was elated because I felt like myself and my coworkers would finally get the relief we deserved. Although I would be remised if I didn’t mention that I did begin to feel a bit uneasy about the transition, as a result of the narrative Alicia and Kelly began to paint about Leslie and her team and their feelings they were forming about me. I must add that things got extremely hectic and even more unorganized between the period of time onboarding was supposed to move to recruiting and it being decided that it was not moving. The temperature in the office was even more turned up and the pressures were surmounting

I've had conversations with Jacky she advised me that I was a model employee and that she asked recruiting to send her others like me. I advised her of Kelly's ways and I also let her know that I would not be there long if I had to deal with the toxicity that is Kelly. She asked me to give her time and she promised things would get better. Do my dismay they never did.

Not too long after Kelly pushed the narritive that I didn’t need to be the lead of onboarding and that another team member who holds no responsibility in the process needed to manage it. She would go in her office, walk right past mine and ask her specifics about new hires, all of which she would have no idea about. I was yet again forced to daily to sit in my office and listen to conversations Kelly had daily about me demeaning me, scrutinizing the process. Whispering about the things she felt were broken in the process and she never not once involved me. It was her mission to having her employee bully, demean, belittle, and be the tool she used to discriminate against me. She has done this to so many others and she did it her last time with me yesterday.

The HR department of all departments should be the gold standard and set the tone for the way all other departments flow within an organization. At best it should be the place where employees know and feel safe. Unfortunately, at Priomiris this is not the case. There are countless other instances that I can speak on specifically, but I will leave them for a later time. My hope is that change is made mandatory for those who are still employed with Priomis and for those who will be.

Best,
Kristie Madison

# PLAINTIFF'S EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **CHARLOTTE CHAPMAN BYRD,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PRIMORIS SERVICES CORPORATION, PLH GROUP INC., POWER LINE SERVICES, INC., and FUTURE INFRASTRUCTURE, LLC,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 3:24-cv-2767-N** |

**DEFENDANT PRIMORIS SERVICES CORPORATION'S OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S LIMITED FIRST SET OF INTERROGATORIES**

TO: PLAINTIFF CHARLOTTE CHAPMAN BYRD, by and through her counsel of record, Carmen Artaza and Christine Hopkins, Tremain Artaza PLLC, 6060 North Central Expressway, Suite 567, Dallas, Texas 75206.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Primoris Services Corporation ("Defendant") serves Plaintiff, Charlotte Chapman Byrd, ("Plaintiff") with the following Objections and Answers to Plaintiff's Limited First Set of Interrogatories.

Dated: June 24, 2025

Respectfully submitted,

By: */s/ Nicholé M. Plagens*

Michael J. DePonte
Texas Bar No. 24001392
michael.deponte@jacksonlewis.com
Nicholé M. Plagens
Texas Bar No. 24083665
nichole.plagens@jacksonlewis.com
Jackson Lewis P.C.
500 N Akard St, Suite 2500
Dallas, TX 75201
T (214) 520-2400
F (214) 520-2008

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2025, a true and correct copy of Defendant Primoris Services Corporation's Objections and Responses to Charlotte Chapman Byrd's First Set of Interrogatories was served on all counsel of record, via email, to the contact information listed below:

Carmen Artaza
Texas Bar No. 24055114
carmen@tremainartaza.com
Christine Hopkins
Texas Bar No. 24095786
christine@tremainartaza.com
TREMAIN ARTAZA PLLC
6060 North Central Expwy, Ste 567
Dallas, TX 75206

COUNSEL FOR PLAINTIFF

*/s/ Nicholé M. Plagens*
Nicholé M. Plagens

## INTERROGATORIES

**INTERROGATORY NO. 1**

State the name, race, job title (as of February 21, 2023), and 2023 W-2 employer(s) of the individual(s) who made the decision to involuntarily terminate the employment of Charlotte Chapman Byrd on February 21, 2023.

**ANSWER:**

Defendant states that Alicia Campbell, Human Resources Director, Primoris Services Corporation ("PSC") made the decision to terminate Ms. Byrd's employment. Ms. Campbell is Caucasian. Because Ms. Campbell is a current management level employee, she should only be contacted through Defendant's counsel of record, Michael J. DePonte, Jackson Lewis, P.C., 500 N. Akard Street, Suite 2500, Dallas Texas 75201, telephone (214) 520-2400.

**INTERROGATORY NO. 2**

State the name, race, job title (as of February 21, 2023), and 2023 W-2 employer(s) of the individual(s) who made the decision to list Charlotte Chapman Byrd in red as a "RIF" on Primoris 000254-00257.

**ANSWER:**

Defendant states that Alicia Campbell, Human Resources Director, Primoris Services Corporation made the decision to list Ms. Byrd in red as a "RIF" on Primoris 000254-00257. Ms. Campbell is Caucasian. Because Ms. Campbell is a current management level employee, she should only be contacted through Defendant's counsel of record, Michael J. DePonte, Jackson Lewis, P.C., 500 N. Akard Street, Suite 2500, Dallas Texas 75201, telephone (214) 520-2400.

**INTERROGATORY NO. 3**

Set forth each and every reason Defendant decided to involuntarily terminate the employment of Charlotte Chapman Byrd on February 21, 2023.

**ANSWER:**

Defendant states that the decision to include Ms. Byrd in the scheduled layoff and terminate her employment on February 21, 2023, was due to the closure of Power Line Services ("PLS"). In November 2022, approximately a month after Ms. Byrd was hired as an HR Manager to support PLS, PSC made the legitimate business decision to shut down PLS because it was not profitable. In shutting down PLS, some employees were transferred to Primoris T&D ("PTD"), but not redundant positions. PTD was already being supported by Paula Bagony, HR Manager, and Kelly Wood, HR Manager. Ms. Bagony and Ms. Wood both possessed greater historical institutional knowledge than Ms. Byrd because they had been with the company longer and were both already acting in the role of HR Manager supporting PTD. The PLS employees transferred to PTD were dispersed evenly between the two already existing HR Managers, ensuring that their workload remained manageable. An additional HR Manager was not needed and Ms. Byrd had less historical institutional knowledge than Ms. Bagony or Ms. Wood. Because Ms. Byrd was the HR Manager hired to support PLS, its closures and transfer and/or termination of all of its employees to PTD made Ms. Byrd's position obsolete.

The timing of Ms. Byrd's termination on February 21, 2023, took place because it: (1) coincided with the timing of transferring the PLS HR Generalist (who resigned in October 2023 and was not replaced) and HR Coordinator (who was laid off in another wave of the RIF in May 2023) to PTD; (2) prevented the complication of issuing dual W-2 forms to Ms. Byrd; and (3) avoided the additional administrative burden of transferring an employee and her assets who was already slated for inclusion in the RIF.

**INTERROGATORY NO. 4**

Set forth each and every reason Defendant decided to list Charlotte Chapman Byrd in red as a "RIF" on Primoris 000254-00257.

**ANSWER:**

Defendant objects to this request as duplicative of Interrogatory 3 when it seeks "each and every reason Defendant decided to list Charlotte Chapman Byrd…as a "RIF" as the reasons for termination explain why she was listed as a "RIF".

Based on the foregoing objection, Defendant states that Ms. Campbell instructed Paula Bagony, HR Manager supporting Primoris T&D, to highlight those who were set to be included in the RIF in red so that they would stand out to the integration team and make them aware of who would not be transferred. Further, Defendant incorporates its response to Interrogatory No. 3, as if set out fully herein.

**INTERROGATORY NO. 6**

State the total number of employees who were supported by Sr. HR Director Utilities Jackie Hendrick, and the "Utilities Segment - Overall HR/Recruiting Team" that reported up to Ms. Hendrick, on each of the following dates: January 1, 2022, September 29, 2022, January 1, 2023, February 21, 2023, and January 1, 2024.

**ANSWER:**

Defendant objects to this interrogatory as seeking information that is not within Defendant's possession, custody, or control, as the Company did not conduct a headcount snapshot reflecting the total number of employees supported by Ms. Hendrick and her "Utilities Segment – Overall HR/Recruiting Team" on each of the requested dates.

Based on the foregoing objection, Defendant states that Ms. Hendrick and her "Utilities Segment – Overall HR/Recruiting Team" ("her Team") supported the following number of employees on each requested date:

- On January 1, 2022, no employees were supported by Ms. Hendrick because she was not employed with Defendant at that time.
- On September 29, 2022, Ms. Hendrick and her team supported 6,320 employees.

- On January 1, 2023, Ms. Hendrick and her team supported 5,614 employees.
- On February 21, 2023, Ms. Hendrick and her team supported 5,552 employees.
- On January 1, 2024, Ms. Hendrick and her team supported 6,079.

**INTERROGATORY NO. 7**

For each and every Human Resources Director or Human Resources Manager added to Jackie Hendrick's "Utilities Segment - Overall HR/Recruiting Team" after February 21, 2023, identify the individual's name, the job title they were given at hire, the name of the entity that employed the individual, their hire date, their race, and the name, race and separation date of any employee the individual was hired to replace.

**ANSWER:**

Defendant objects to this interrogatory as seeking information that is not relevant to any parties' claim or defense when it asks to identify "each and every Human Resources Director…added to Jackie Hendrick's "Utilities Segment – Overall HR/Recruiting Team" after February 21, 2023." Ms. Byrd was a Human Resources Manager. As a result, information regarding Human Resources Directors is not relevant.

Based on the foregoing objection, Defendant states that Andrea Baila, HR Manager supporting and employed by ARB, Inc. was hired on January 8, 2024. Ms. Baila is Caucasian. Ms. Baila was not hired to replace any other employee.

**INTERROGATORY NO. 9**

Identify the name of the legal entities that provided services for Primoris Service Corporation's "Power Line Services" Business Unit, as identified at, https://www.prim.com/about/business-units/power-line-services, in 2022, 2023, and 2024.

**ANSWER:**

Defendant states that the only legal entity to provide services for Primoris Service Corporation's "Power Line Services" Business Unit, as identified at, https://www.prim.com/about/business-units/power-line-services, in 2022, 2023, and 2024 is

Power Line Services, Inc. from August 2022 until August 28, 2023, after which time the "Power Line Services" Business Unit ceased to exist.

## DECLARATION

I, Jackie Hendrick, Vice President of Human Resources, Utilities, Primoris Services Corporation, hereby swear and/or affirm that I have reviewed DEFENDANT PRIMORIS SERVICES CORPORATION'S OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S LIMITED FIRST SET OF INTERROGATORIES as a representative of Defendant Primoris Services Corporation and am authorized to make this unsworn declaration on its behalf. The factual information set out in the Answers is based either on my personal knowledge or that of other company employees and records. In particular, where I do not have personal knowledge, I have determined that the factual information set out in the Answers was provided by the appropriate employees and/or from the records of said company, and I believe the answers are true and correct to the best of my knowledge.

I declare under penalty of perjury that all of the factual information set out in DEFENDANT PRIMORIS SERVICES CORPORATION'S OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S LIMITED FIRST SET OF INTERROGATORIES is true and correct.

Signed in Mansfield, Texas (Johnson County) on this date: June 04, 2025.

Jackie Hendrick

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **CHARLOTTE CHAPMAN BYRD,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 3:24-cv-2767-N** |
| **PRIMORIS SERVICES CORPORATION, PLH GROUP INC., POWER LINE SERVICES, INC., and FUTURE INFRASTRUCTURE, LLC,** | § § § § | |
| | § | |
| **Defendants.** | § | |

**DEFENDANT PRIMORIS SERVICES CORPORATION'S
FIRST AMENDED OBJECTIONS AND ANSWERS TO
PLAINTIFF CHARLOTTE CHAPMAN BYRD'S
LIMITED FIRST SET OF INTERROGATORIES**

TO: PLAINTIFF CHARLOTTE CHAPMAN BYRD, by and through her counsel of record, Carmen Artaza and Christine Hopkins, Tremain Artaza PLLC, 6060 North Central Expressway, Suite 567, Dallas, Texas 75206.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Primoris Services Corporation ("Defendant") serves Plaintiff, Charlotte Chapman Byrd, ("Plaintiff") with the following First Amended Objections and Answers to Plaintiff's Limited First Set of Interrogatories.

Dated: January 6, 2026

Respectfully submitted,

By: */s/ Nicholé M. Plagens*

Michael J. DePonte
Texas Bar No. 24001392
michael.deponte@jacksonlewis.com
Nicholé M. Plagens
Texas Bar No. 24083665
nichole.plagens@jacksonlewis.com
Jackson Lewis P.C.
500 N Akard St, Suite 2500
Dallas, TX 75201
T (214) 520-2400
F (214) 520-2008

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on January 6, 2026, a true and correct copy of Defendant Primoris Services Corporation's Objections and Responses to Charlotte Chapman Byrd's First Set of Interrogatories was served on all counsel of record, via email, to the contact information listed below:

Carmen Artaza
Texas Bar No. 24055114
carmen@tremainartaza.com
Christine Hopkins
Texas Bar No. 24095786
christine@tremainartaza.com
TREMAIN ARTAZA PLLC
6060 North Central Expwy, Ste 567
Dallas, TX 75206

COUNSEL FOR PLAINTIFF

*/s/ Nicholé M. Plagens*
Nicholé M. Plagens

## INTERROGATORIES

**INTERROGATORY NO. 1**

State the name, race, job title (as of February 21, 2023), and 2023 W-2 employer(s) of the individual(s) who made the decision to involuntarily terminate the employment of Charlotte Chapman Byrd on February 21, 2023.

**ANSWER:**

Defendant states that Alicia Campbell, Human Resources Director, Primoris Services Corporation ("PSC") made the decision to terminate Ms. Byrd's employment. Ms. Campbell is Caucasian. Because Ms. Campbell is a current management level employee, she should only be contacted through Defendant's counsel of record, Michael J. DePonte, Jackson Lewis, P.C., 500 N. Akard Street, Suite 2500, Dallas Texas 75201, telephone (214) 520-2400.

**INTERROGATORY NO. 2**

State the name, race, job title (as of February 21, 2023), and 2023 W-2 employer(s) of the individual(s) who made the decision to list Charlotte Chapman Byrd in red as a "RIF" on Primoris 000254-00257.

**AMENDED ANSWER:**

Defendant states that Alicia Campbell, Human Resources Director, Primoris Services Corporation made the decision to list Ms. Byrd as a "RIF" on Primoris 000254-00257 and that the instruction to list employees who were to be included in the RIF in red came from operations. Ms. Campbell is Caucasian. Because Ms. Campbell is a current management level employee, she should only be contacted through Defendant's counsel of record, Michael J. DePonte, Jackson Lewis, P.C., 500 N. Akard Street, Suite 2500, Dallas Texas 75201, telephone (214) 520-2400.

**INTERROGATORY NO. 3**

Set forth each and every reason Defendant decided to involuntarily terminate the employment of Charlotte Chapman Byrd on February 21, 2023.

**AMENDED ANSWER:**

Defendant states that the decision to include Ms. Byrd in the scheduled layoff and terminate her employment on February 21, 2023, was due to the closure of Power Line Services ("PLS"). In December 2022, approximately two months after Ms. Byrd was hired as an HR Manager to support PLS, PSC made the legitimate business decision to shut down PLS because it was not profitable. In shutting down PLS, some employees were transferred to Primoris T&D ("PTD"), but not redundant positions. PTD was already being supported by Paula Bagony, HR Manager, and Kelly Wood, HR Manager. Ms. Bagony and Ms. Wood both possessed greater historical institutional knowledge than Ms. Byrd because they had been with the company longer and were both already acting in the role of HR Manager supporting PTD. The PLS employees transferred to PTD were dispersed evenly between the two already existing HR Managers, ensuring that their workload remained manageable. An additional HR Manager was not needed and Ms. Byrd had less historical institutional knowledge than Ms. Bagony or Ms. Wood. Because Ms. Byrd was the HR Manager hired to support PLS, its closures and transfer and/or termination of all of its employees to PTD made Ms. Byrd's position obsolete.

The timing of Ms. Byrd's termination on February 21, 2023, took place because it: (1) coincided with the timing of transferring the PLS HR Generalist (who resigned in October 2023 and was not replaced) and HR Coordinator (who was laid off in another wave of the RIF in May 2023) to PTD; (2) prevented the complication of issuing dual W-2 forms to Ms. Byrd; (3) avoided the additional administrative burden of transferring an employee and her assets who was already slated for inclusion in the RIF; and (4) Jackie Hendrick, who was Senior Human Resources

Director at the time, needed to be present for the termination because of: (a) Primoris' practice of having two individuals present during terminations; (b) Ms. Hendrick being the only other member of the Human Resources Department, aside from Ms. Campbell—who was also present during the termination—that was within Ms. Byrd's direct reporting structure making her the only other individual appropriately present during the termination; and (c) Ms. Hendrick was scheduled to travel the remainder of February 2023, and the first week of March 2023.

**INTERROGATORY NO. 4**

Set forth each and every reason Defendant decided to list Charlotte Chapman Byrd in red as a "RIF" on Primoris 000254-00257.

**AMENDED ANSWER:**

Defendant objects to this request as duplicative of Interrogatory 3 when it seeks "each and every reason Defendant decided to list Charlotte Chapman Byrd…as a "RIF" as the reasons for termination explain why she was listed as a "RIF".

Based on the foregoing objection, Defendant states Paula Bagony, HR Manager supporting Primoris T&D, highlighted those who were set to be included in the RIF in red so that they would stand out to the integration team and make them aware of who would not be transferred. Further, Defendant incorporates its response to Interrogatory No. 3, as if set out fully herein.

**INTERROGATORY NO. 6**

State the total number of employees who were supported by Sr. HR Director Utilities Jackie Hendrick, and the "Utilities Segment - Overall HR/Recruiting Team" that reported up to Ms. Hendrick, on each of the following dates: January 1, 2022, September 29, 2022, January 1, 2023, February 21, 2023, and January 1, 2024.

**ANSWER:**

Defendant objects to this interrogatory as seeking information that is not within Defendant's possession, custody, or control, as the Company did not conduct a headcount snapshot

reflecting the total number of employees supported by Ms. Hendrick and her “Utilities Segment – Overall HR/Recruiting Team” on each of the requested dates.

Based on the foregoing objection, Defendant states that Ms. Hendrick and her “Utilities Segment – Overall HR/Recruiting Team” (“her Team”) supported the following number of employees on each requested date:

- On January 1, 2022, no employees were supported by Ms. Hendrick because she was not employed with Defendant at that time.
- On September 29, 2022, Ms. Hendrick and her team supported 6,320 employees.
- On January 1, 2023, Ms. Hendrick and her team supported 5,614 employees.
- On February 21, 2023, Ms. Hendrick and her team supported 5,552 employees.
- On January 1, 2024, Ms. Hendrick and her team supported 6,079.

**INTERROGATORY NO. 7**

For each and every Human Resources Director or Human Resources Manager added to Jackie Hendrick’s “Utilities Segment - Overall HR/Recruiting Team” after February 21, 2023, identify the individual’s name, the job title they were given at hire, the name of the entity that employed the individual, their hire date, their race, and the name, race and separation date of any employee the individual was hired to replace.

**ANSWER:**

Defendant objects to this interrogatory as seeking information that is not relevant to any parties’ claim or defense when it asks to identify “each and every Human Resources Director…added to Jackie Hendrick’s “Utilities Segment – Overall HR/Recruiting Team” after February 21, 2023.” Ms. Byrd was a Human Resources Manager. As a result, information regarding Human Resources Directors is not relevant.

Based on the foregoing objection, Defendant states that Andrea Baila, HR Manager supporting and employed by ARB, Inc. was hired on January 8, 2024. Ms. Baila is Caucasian. Ms. Baila was not hired to replace any other employee.

**INTERROGATORY NO. 9**

Identify the name of the legal entities that provided services for Primoris Service Corporation's "Power Line Services" Business Unit, as identified at, https://www.prim.com/about/business-units/power-line-services, in 2022, 2023, and 2024.

**ANSWER:**

Defendant states that the only legal entity to provide services for Primoris Services Corporation's "Power Line Services" Business Unit, as identified at, https://www.prim.com/about/business-units/power-line-services, in 2022, 2023, and 2024 is Power Line Services, Inc. from August 2022 until August 28, 2023, after which time the "Power Line Services" Business Unit ceased to exist.

**DECLARATION**

I, Alicia Campbell, Human Resources Director – Power Delivery, Primoris Power Delivery, hereby swear and/or affirm that I have reviewed DEFENDANT PRIMORIS SERVICES CORPORATION'S FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S LIMITED FIRST SET OF INTERROGATORIES as a representative of Defendant Primoris Services Corporation and am authorized to make this unsworn declaration on its behalf. The factual information set out in the Answers is based either on my personal knowledge or that of other company employees and records. In particular, where I do not have personal knowledge, I have determined that the factual information set out in the Answers was provided by the appropriate employees and/or from the records of said company, and I believe the answers are true and correct to the best of my knowledge.

I declare under penalty of perjury that all of the factual information set out in DEFENDANT PRIMORIS SERVICES CORPORATION'S FIRST AMENDED OBJECTIONS AND ANSWERS TO PLAINTIFF CHARLOTTE CHAPMAN BYRD'S LIMITED FIRST SET OF INTERROGATORIES is true and correct.

Signed in Aledo,tx on this date: January 06.2005, 2026.

Alicia Campbell (Jan 6, 2026 10:45:11 CST)

Alicia Campbell

# PLAINTIFF'S
# EXHIBIT 19

# Primoris Services Corporation Completes PLH Group Acquisition

Aug 01, 2022

DALLAS--(BUSINESS WIRE)-- Primoris Services Corporation (NASDAQ Global Select: PRIM) ("Primoris" or the "Company"), a leading provider of specialty contracting services in North America, announced today that it has closed its acquisition of PLH Group, Inc. ("PLH Group" or "PLH") in an all-cash transaction valued at $470 million. The transaction directly aligns with Primoris' strategic focus on higher-growth, higher-margin markets and expands its capabilities in the utility markets, including power delivery, communications, and gas utilities.

PLH Group is a utility-focused specialty services company with concentration in growing regions of the U.S. As a result of the acquisition, the majority of PLH operations will be incorporated into Primoris' Utilities Segment, with the remaining operations going into the Energy/Renewables and Pipeline segments.

"The addition of PLH is an important step in enhancing both the size and scale of our operations in the Power Delivery and Gas Utilities markets. This acquisition will help us capture substantial growth tailwinds as the U.S. transitions to greater dependence on both traditional and renewable energy sources," said Tom McCormick, Primoris' President and Chief Executive Officer. "We welcome the PLH team to the Primoris family of companies as we work together to drive our company forward."

## ABOUT PRIMORIS

Primoris Services Corporation is a leading specialty contractor providing critical infrastructure services to the utility, energy/renewables and pipeline services markets throughout the United States and Canada. The Company supports a diversified base of blue-chip customers with engineering, procurement, construction and maintenance services. A focus on multi-year master service agreements and an expanded presence in higher-margin, higher-growth markets such as utility-scale solar facility installations, renewable fuels, power delivery systems and communications infrastructure have also increased the Company's potential for long-term growth. Additional information on Primoris is available at www.primoriscorp.com.

## FORWARD LOOKING STATEMENTS

This press release contains certain forward-looking statements, including the Company's outlook, that reflect, when made, the Company's expectations or beliefs concerning future events that involve risks and uncertainties, including with regard to the Company's future performance. Forward-looking statements include all statements that are not historical facts and can be identified by terms such as "anticipates", "believes", "could", "estimates", "expects", "intends", "may", "plans", "potential", "predicts", "projects", "should", "targets", "will", "would" or similar expressions. Forward-looking statements include information concerning the possible or assumed future results of operations, business strategies, financing plans, competitive position, industry environment, potential growth opportunities, the effects of regulation and the economy, generally. Forward-looking statements involve known and unknown risks, uncertainties, and other factors, which may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. Actual results may differ materially as a result of a number of factors, including, among other things, customer timing, project duration, weather, and general economic conditions; changes in the mix of customers, projects, contracts and business; regional or national and/or general economic conditions and demand for the Company's services; macroeconomic impacts arising from the long duration of the COVID-19 pandemic, including labor shortages and supply chain disruptions; price, volatility, and expectations of future prices of oil, natural gas, and natural gas liquids; variations and changes in the margins of projects performed during any particular quarter; increases in the costs to perform services caused by changing conditions; the termination, or expiration of existing agreements or contracts; the budgetary spending patterns of customers; inflation and other increases in construction costs that the Company may be unable to pass through to customers; cost or schedule overruns on fixed-price contracts; availability of qualified labor for specific projects; changes in bonding requirements and bonding availability for existing and new agreements; the need and availability of letters of credit; costs incurred to support growth, whether organic or through acquisitions; the timing and volume of work under contract; losses experienced in the Company's operations; the results of the review of prior period accounting on certain projects and the impact of adjustments to accounting estimates; developments in governmental investigations and/or inquiries; intense competition in the industries in which the Company operates; failure to obtain favorable results in existing or future litigation or regulatory proceedings, dispute resolution proceedings or claims, including claims for additional costs; failure of partners, suppliers or subcontractors to perform their obligations; cyber-security breaches; failure to maintain safe worksites; risks or uncertainties associated with events outside of the Company's control, including severe weather conditions, public

**P's Apx. 361**

health crises and pandemics (such as COVID-19), war or other armed conflict (including Russia's invasion of Ukraine), political crises or other catastrophic events; client delays or defaults in making payments; the availability of credit and restrictions imposed by credit facilities; failure to implement strategic and operational initiatives; risks or uncertainties associated with acquisitions, dispositions and investments; possible information technology interruptions or inability to protect intellectual property; the Company's failure, or the failure of the Company's agents or partners, to comply with laws; the Company's ability to secure appropriate insurance; new or changing legal requirements, including those relating to environmental, health and safety matters; the loss of one or a few clients that account for a significant portion of the Company's revenues; asset impairments; and risks arising from the inability to successfully integrate acquired businesses. In addition to information included in this press release, additional information about these and other risks can be found in Part I, Item 1A "Risk Factors" of the Company's Annual Report on Form 10-K for the year ended December 31, 2021, and the Company's other filings with the U.S. Securities and Exchange Commission ("SEC"). Such filings are available on the SEC's website at www.sec.gov. Given these risks and uncertainties, you should not place undue reliance on forward-looking statements. Primoris does not undertake any obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

View source version on businesswire.com:
https://www.businesswire.com/news/home/20220801005646/en/

Jeremy Apple

312-690-6003

PrimorisIR@clermontpartners.com

Source: Primoris Services Corporation